# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY WILSON, Regional Director of the Sixth
Region of the NATIONAL LABOR RELATIONS
BOARD, for and on behalf of the NATIONAL
LABOR RELATIONS BOARD,

                Petitioner

                v.

PG PUBLISHING CO., INC. D/B/A PITTSBURGH
POST-GAZETTE,

                Respondent

Civil No. _2:24-cv-01166_

## PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

<u>**TABLE OF CONTENTS**</u>

I.   **INTRODUCTION**..................................................................................................... 1

II.  **ISSUES AND THE "NEW" APPLICABLE *WINTER* STANDARD** ........................ 4

III. **STATEMENT OF FACTS**....................................................................................... 5

   A. PPG's Background and Bargaining History....................................................... 5

   B. PPG Engaged in Overall Surface Bargaining During Negotiations with the Unions for Successor Contracts for the Editorial and Production Unit Employees............................ 6

   C. PPG Unlawfully Declared Impasse with the NewsGuild & Unilaterally Implemented Changes to the Terms and Conditions of Employment of the Editorial Unit ................... 9

   D. The Third Circuit Upheld an Arbitration Award Finding PPG Unlawfully Failed to Pay the Fund Contribution Increases Past 2017 for Editorial Unit Employees ..................... 11

   E. PPG Engaged in Overall Surface Bargaining with the Mailers and Pressmen Unions in Negotiations for Interim Healthcare Agreements, Resulting in The Termination of Insurance Coverage through the Fund for Mailers and Pressmen Unit Employees........ 13

   F. Detrimental Impacts of PPG's Unfair Labor Practices .................................... 17

IV. **THE STATUTORY SCHEME PURSUANT TO WHICH SECTION 10(J) INJUNCTIVE RELIEF IS SOUGHT** ........................................................... 20

   A. Likelihood of Success on the Merits .............................................................. 21

   B. Likelihood of Irreparable Harm Absent Interim Relief.................................... 21

   C. Whether the Balance of Equities Favors Interim Relief................................... 22

   D. Whether Interim Relief is in the Public Interest.............................................. 23

V.  **ARGUMENT**........................................................................................................ 23

   A. Petitioner Has Made a Clear Showing that Success on the Merits Is Likely ................. 23

   B. Petitioner Has Shown that Irreparable Harm is Likely Absent Interim Relief and that the Balance of Equities and the Public Interest Favor Interim Relief................................... 40

VI. **CONCLUSION** ................................................................................................... 50

**TABLE OF AUTHORITIES**

**Federal Court Decisions**

*Aguayo v. S. Coast Refuse Corp.*,
   1999 WL 547861 (C.D. Cal. June 28, 1999) ........................................... 47

*Aguayo v. Tomco Carburetor Co.*,
   853 F.2d 744 (9th Cir. 1988) .................................................................. 49

*Allied Chem. & Alkali Workers Local 1 v. Pittsburgh Plate Glass Co.*,
   404 U.S. 157 (1971)................................................................................. 37

*Asseo v. Centro Medico del Turabo, Inc.*,
   900 F.2d 445 (1st Cir. 1990)............................................................. 41, 47

*Asseo v. Pan Am. Grain Co.*,
   805 F.2d 23 (1st Cir. 1986)............................................................... 42, 44

*Calatrello v. Gen. Die Casters, Inc.*,
   2011 WL 446685 (N.D. Ohio Jan. 11, 2011)......................................... 49

*Chester v. Grane Healthcare Co.*,
   666 F.3d 87 (3d Cir. 2011)........................................... 21, 41, 42, 44

*Drew-King v. Amazon.com Servs., LLC*,
   2022 WL 17083273 (E.D.N.Y. Nov. 18, 2022)...................................... 49

*Duffy Tool & Stamping, LLC v. NLRB*,
   233 F.3d 995 (7th Cir. 2000) ................................................................. 43

*Exxon Chem. Co. v. NLRB*,
   386 F.3d 1160 (D.C. Cir. 2004)............................................................. 24

*Fall River Dyeing & Finishing v. NLRB*,
   482 U.S. 27 (1987)................................................................................. 41

*Fernbach v. Sprain Brook Manor Rehab, LLC*,
   91 F. Supp. 3d 531 (S.D.N.Y. 2015)..................................................... 49

*Fibreboard Paper Prod. Corp. v. NLRB*,
   379 U.S. 203 (1964)............................................................................... 47

*Ford Motor Co. v. NLRB*,
   441 U.S. 488 (1979)............................................................................... 46

*Frankl v. HTH Corp.*,
   650 F.3d 1334 (9th Cir. 2011) ........................................................ passim

*Frankl v. HTH Corp.*,
   693 F.3d 1051 (9th Cir. 2012) .............................................................. 48

*Frye v. Specialty Envelope, Inc.*,
    10 F.3d 1221 (6th Cir. 1993) ........................................................... 42

*Garcia v. Sacramento Coca-Cola Bottling Co.*,
    733 F. Supp. 2d 1201 (E.D. Cal. 2010) .................................. 43, 44, 49

*Gold v. State Plaza, Inc.*,
    435 F. Supp. 2d 110 (D.D.C. 2006) .............................................. 43

*Gottfried v. Frankel*,
    818 F.2d 485 (6th Cir. 1987) ....................................................... 49

*Hadsall v. ADT, LLC*,
    2021 WL 2283884 (W.D. Wis. June 4, 2021) ........................... 42, 44

*Hadsall v. Sunbelt Rentals, Inc.*,
    2020 WL 4569177 (E.D. Wis. Aug. 7, 2020) ................................ 43

*Hoffman v. Inn Credible Caterers, Ltd.*,
    247 F.3d 360 (2d Cir. 2001) ........................................................ 42

*Hooks v. Hood River Distillers, Inc.*,
    2021 WL 2142609 (D. Ore. May 26, 2021) ................................. 45

*Hooks v. Ozburn-Hessey Logistics, LLC*,
    775 F. Supp. 2d 1029 (W.D. Tenn. 2011) .................................... 49

*International Union of Electrical, Radio & Machine Workers v. NLRB*,
    426 F.2d 1243 (D.C. Cir. 1970) ............................................ 42, 43

*J.W. Rex Co.*,
    308 NLRB 473 (1992) ................................................................ 36

*Kaynard v. Palby Lingerie, Inc.*,
    625 F.2d 1047 (2d Cir. 1980) ..................................................... 46

*Kinney v. Cook Cty. Sch. Bus, Inc.*,
    2000 WL 748121 (N.D. Ill. June 1, 2000) ................................... 43

*K-Mart Corp. v. NLRB*,
    626 F.2d 704 (9th Cir. 1980) ...................................................... 24

*Kobell v. Suburban Lines, Inc.*,
    731 F.2d 1076 (3d Cir. 1984) ....................................................... 4

*Kobell v. United Ref. Co.*,
    1998 WL 794860 (W.D. Pa. Nov. 8 1998) .................................. 41

*Levine v. C & W Mining Co.*,
    465 F. Supp. 690 (N.D. Ohio 1979) ........................................... 42

*Maram v. Universidad Interamericana*,

722 F.2d 953 (1st Cir. 1983) ............................................................................ 49

*Mattina v. Kingsbridge Heights Rehab. and Care Ctr.*,
2008 WL 3833949 (S.D.N.Y. Aug. 14, 2008) ................................................. 45

*Metro. Edison Co. v. NLRB*,
460 U.S. 693 (1983) ........................................................................................ 24

*Miller v. Cal. Pac. Med. Ctr.*,
19 F.3d 449 (9th Cir. 1994) ....................................................................... 23, 49

*Moore-Duncan v. Horizon House Dev. Servs.*,
155 F. Supp. 2d 390 (E.D. Pa. 2001) .............................................................. 42

*Morio v. N. Am. Soccer League*,
632 F.2d 217 (2d Cir. 1980) ............................................................................ 48

*Muffley v. APL Logistics Mgmt. Warehouse Servs., Inc.*,
2008 WL 544455 (W.D. Ky. Feb. 27, 2008) ................................................... 43

*Muffley v. APL Logistics Servs. Inc.*,
2008 WL 4561573 (W.D. Ky. Oct. 10, 2008) ............................................. 43, 49

*Muffley v. Spartan Mining Co.*,
570 F.3d 534 (4th Cir. 2009) ........................................................................... 49

*NLRB v. Am. Nat'l. Ins. Co.*,
343 U.S. 395 (1952) ........................................................................................ 41

*NLRB v. C & C Plywood Corp.*,
385 U.S. 421 (1967) ........................................................................................ 40

*NLRB v. Cayuga Crushed Stone, Inc.*,
474 F.2d 1380 (2d Cir. 1973) .......................................................................... 42

*NLRB v. Ins. Agents' Int'l Union*,
361 U.S. 477 (1960) ........................................................................................ 24

*NLRB v. Irving Ready-Mix, Inc.*,
780 F. Supp. 2d 747 (N.D. Ind. 2011) ....................................................... 42, 43

*NLRB v. Katz*,
369 U.S 736 (1962) ......................................................................................... 35

*NLRB v. Reed & Prince Mfg. Co.*,
205 F.2d 131 (1st Cir. 1953) ........................................................................... 30

*NLRB v. Truitt Mfg. Co.*,
351 U.S. 149 (1956) ........................................................................................ 30

*NLRB v. Wright Motors, Inc.*,
603 F.2d 604 (7th Cir. 1979) ........................................................................... 25

*Norelli v. HTH Corp.*,
   699 F. Supp. 2d 1176 (D. Haw. 2010) .................................................. 49

*Overstreet v. One Call Locators Ltd.*,
   46 F. Supp. 3d 918 (D. Ariz. 2014) .................................................... 49

*Overstreet v. Thomas Davis Med. Ctrs., P.C.*,
   9 F. Supp. 2d 1162 (D. Ariz. 1997) .................................................... 46

*Pascarell v. Gitano Grp., Inc.*,
   730 F. Supp. 616 (D.N.J. 1990) ........................................................ 47

*Pascarell v. Vibra Screw Inc.*,
   904 F.2d 874 (3d Cir. 1990) ........................................................ 21, 49

*Paulsen v. Remington Lodging & Hosp., LLC*,
   773 F.3d 462 (2d Cir. 2014) ............................................................ 47

*Paulsen v. Renaissance Equity Holdings, LLC*,
   849 F. Supp. 2d 335 (E.D.N.Y. 2012) ............................................... 45

*Penello v. United Mine Workers of America*,
   88 F. Supp. 935 (D.D.C 1950) .......................................................... 46

*Perez v. Noah's Ark Processors, LLC*,
   2019 WL 2076793 (D. Neb. May 10, 2019) ........................................ 43

*PG Publishing, Inc. v. Newspaper Guild of Pittsburgh*,
   19 F.4th 308 (3rd Cir. 2021) ............................................................ 13

*PG Publishing, Inc. v. Newspaper Guild of Pittsburgh*,
   2020 WL 7065834 (W.D. Pa. Dec. 3, 2020)........................... 12, 13, 48

*Phelps Dodge Corp. v. NLRB*,
   313 U.S. 177 (1941)......................................................................... 46

*Pye v. Young Women's Christian Ass'n of W. Mass.*,
   419 F. Supp. 2d 20 (D. Mass. 2006) ............................................ 42, 43

*Rubin v. Vista Del Sol Health Servs., Inc.*,
   2015 WL 306292 (C.D. Cal. Jan. 22, 2015) ...................................... 49

*Seeler vs. The Trading Port, Inc.*,
   517 F.2d 33 (2d Cir. 1975)................................................. 34, 37, 46, 47

*Silverman v. JRL Food Corp.*,
   196 F.3d 334 (2d Cir. 1999)......................................................... 34, 37

*Small v. Avanti Health Sys., LLC*,
   661 F.3d 1180 (9th Cir. 2011) ................................................... passim

*Squillacote v. U.S. Marine Corp.*,

1984 WL 148024 (E.D. Wis. May 10, 1984)...................................................... 42

*Starbucks Corp. v. McKinney*,
144 S. Ct. 1570 (2024) ......................................................... 4, 21, 22, 23

*United Nurses Associations v. NLRB*,
871 F.3d 767 (9th Cir. 2017) .......................................................... 49

*United Steelworkers of America v. Fort Pitt Steel Casting*,
598 F.2d 1273 (3d Cir. 1979).......................................................... 45

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981)........................................................................ 22

*Wilson v. Liberty Homes, Inc.*,
500 F. Supp. 1120 (W.D. Wis. 1980) .............................................. 47

*Winter v. NRDC*,
555 U.S. 7 (2008)........................................................... 5, 22, 23

## NLRB Decisions

*A-1 King Size Sandwiches, Inc.*,
265 NLRB 850 (1982) .................................................................. 28

*Am. Meat Packing Corp.*,
301 NLRB 835 (1991) ...................................................... 26, 31, 32

*Atlanta Hilton & Tower*,
271 NLRB 1600 (1984) ................................................................ 25

*Blue Jeans Corp.*,
177 NLRB 198 (1969) ...................................................... 31, 32, 40

*CJC Holdings, Inc.*,
320 NLRB 1041 (1996) ................................................................ 35

*Fruehauf Trailer Servs.*,
335 NLRB 393 (2001) .................................................................. 39

*Gen. Elec. Co.*,
150 NLRB 192 (1964) .............................................................. 24, 30

*Grill Concepts Servs.*,
372 NLRB No. 30 (Dec. 16, 2022) ................................................ 31

*H.K. Porter Co.*,
153 NLRB 1370 (1965) ................................................................ 31

*Hanes Corp.*,
260 NLRB 557 (1982) .................................................................. 38

vi

*Hydrotherm, Inc.*,
  302 NLRB 990 (1991) ........................................................................... 27, 29

*J.G. Kern Enter.*,
  371 NLRB No. 91 (Apr. 20, 2022) ........................................................ 39

*JH Rutter-Rex Mfg. Co.*,
  86 NLRB 470 (1949) ............................................................................ 38

*John Ascuaga's Nugget*,
  298 NLRB 524 (1990) .......................................................................... 32

*Kitsap Tenant Support Servs, Inc.*,
  366 NLRB No. 98 (May 31, 2018) ........................................ 24, 25, 27, 28

*KSM Industries*,
  336 NLRB 133 (2001) .......................................................................... 36

*Larry Geweke Ford.*,
  344 NLRB 628 (2005) .......................................................................... 38

*Liquor Indus. Bargaining Grp.*,
  333 NLRB 1219 (2001) ............................................................. 30, 31, 33

*McClatchy Newspapers*,
  321 NLRB 1386 (1996) ........................................................................ 36

*Mid-Continent Concrete*,
  336 NLRB 258, 260 (2001) ............................................................ 32, 37

*Mike-Sell's Potato Chip Co.*,
  360 NLRB 131 (2014) .......................................................................... 35

*Ne. Ind. Broad. Co.*,
  88 NLRB 1381 (1950) .......................................................................... 39

*New Concepts for Living, Inc.*,
  371 NLRB No. 157 (Sept. 30, 2022) .................................................... 25

*Nexstar Broad., Inc.*,
  371 NLRB No. 118 (July 27, 2022) ............................................ 26, 31, 39

*North Star Steel Co.*,
  305 NLRB 45 (1991) ............................................................................ 35

*Oak Rubber Co.*,
  277 NLRB 1322 (1985) ........................................................................ 39

*Orchid Paper Prods. Co.*,
  367 NLRB No. 33 (Nov. 20, 2018) ...................................................... 38

*Overnite Transp.Co.*,

296 NLRB 669 (1989) ...................................................................... 25

*Palestine Bottling Co*,
269 NLRB 639 (1984) .................................................................... 26

*PG Publishing Co.*,
368 NLRB No. 41 (Aug. 22, 2019) ................................................. 13

*Phillips 66*,
369 NLRB No. 13 (Jan. 31, 2020) .................................................. 25

*PRC Recording Co.*,
280 NLRB 615 (1986) ............................................................. 35, 36

*Prentice-Hall, Inc.*,
290 NLRB 646 (1988) .................................................................... 29

*Pub. Serv. Co. of Okla.*,
334 NLRB 487 (2001) ........................................................ 24, 27, 28

*Radisson Plaza Minneapolis*,
307 NLRB 94 (1992) ...................................................................... 28

*Regency Serv. Carts, Inc.*,
345 NLRB 671 (2005) .................................................................... 29

*Richfield Hosp., Inc.*,
369 NLRB No. 111 (June 26, 2020) ............................................... 35

*Rivera-Vega v. ConAgra, Inc.*,
70 F.3d 153 (1st Cir. 1995) .................................................. 34, 37, 45

*S.C. Baptist Ministries*,
310 NLRB 156 (1993) .................................................................... 28

*Sacramento Union*,
291 NLRB 552 (1988) .................................................................... 35

*San Isabel Elec. Servs., Inc.*,
225 NLRB 1073 (1976) ............................................................. 27, 29

*Security Walls, Inc.*,
365 NLRB No. 99 (June 15, 2017) ................................................. 39

*Sheltering Pines Convalescent Hosp.*,
255 NLRB 1195 (1981) .................................................................. 38

*Summa Health Sys., Inc.*,
330 NLRB 1379 (2000) .................................................................. 32

*Sweeney & Co., Inc.*,
176 NLRB 208 (1969) ............................................................. 25, 30

*Taft Broad. Co.*,
163 NLRB 475 (1967) ................................................................................................. 35

*Thryv, Inc.*,
372 NLRB No. 22 (Dec. 13, 2022) ....................................................................... 34, 48

*Unique Thrift Store*,
363 NLRB 1074 (2016) ......................................................................................... 26, 31

*United Contractors Inc.*,
244 NLRB 72 (1979) ................................................................................................. 28

*United Parcel Serv.*,
336 NLRB 1134 (2001) ......................................................................................... 38, 39

*Wayne's Dairy*,
223 NLRB 260 (1976) ................................................................................................ 35

*Wendt Corp.*,
372 NLRB No. 135 (Aug. 26, 2023) ......................................................................... 35

## Statutes

National Labor Relations Act,
29 U.S.C. § 151 *et seq*.......................................................................................... passim

## PETITIONER'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED

## I.    INTRODUCTION

This case involves PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (PPG), an employer in the business of publishing a print and electronic newspaper, and four unions[1] with which PPG has long-standing bargaining relationships. After the expiration of the parties' most recent collective-bargaining agreements in March 2017, PPG embarked on a years-long course of bad-faith surface bargaining with each of the Unions in negotiations for successor agreements by, *inter alia*, insisting on terms that would leave the Unions and the employees they represent with substantially fewer rights and less protection than provided by law without a contract. In July 2020, without first reaching a valid impasse in negotiations with the NewsGuild, PPG unilaterally imposed the terms of its own proposals on the Editorial Unit, despite the explicit "evergreen clause" in the parties' expired contract that kept the terms of the expired agreement in effect as long as negotiations for a successor agreement continued. As a direct consequence of its unlawful conduct, PPG fell into substantial arrears on its contributions for the Production Unit's health and life insurance, causing the provider to terminate coverage. PPG deployed similar

---

[1] The four unions involved in this matter are the Newspaper Guild of Pittsburgh, a/w Communications Workers of America (CWA) Local 38061 (the NewsGuild); Pittsburgh Mailers Union No. M-22, a/w CWA Local 14842 (the Mailers); Pittsburgh Newspaper Printing Pressmen's / Paper Handlers Local Union No. 9N, a/w The Graphic Communications Conference / International Brotherhood of Teamsters Local 24M/9N (the Pressmen); and Pittsburgh Typographical Union No. 7, a/w CWA Local 14827 ("the Advertisers). These four unions will be referred to collectively as "the Unions." Hereinafter, the bargaining unit represented by the NewsGuild will be referred to as the "Editorial Unit," and the bargaining units represented by the Mailers, the Pressmen, and the Advertisers will be collectively referred to as the "Production Unit."

surface bargaining tactics with the Production Unions in negotiations for an interim agreement to maintain these benefits in some form, ultimately resulting in the Production Unit employees' loss of health and life insurance coverage in September 2022, which spurred employees to engage in ongoing unfair labor practice strikes in October 2022.

The Regional Director of the Sixth Region of the National Labor Relations Board[2] (Petitioner) has issued complaints in four cases based on unfair labor practice charges filed by each of the four Unions regarding PPG's above-described conduct.[3] The Complaints allege that

---

[2] The National Labor Relations Board is a bifurcated agency with a prosecutorial branch headed by the General Counsel and an adjudicative branch headed by the five-member Board. *See* 29 U.S.C. §§ 153(a), 153(d), 160(b).

[3] On April 27, 2022, the Petitioner issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing in Cases 06-CA-248017, 263791, and 269346 based on charges filed by the NewsGuild (NewsGuild Complaint). On August 18, 2022, the Petitioner issued an Amendment to the NewsGuild Complaint, correcting Respondent's name. The NewsGuild Complaint and Amendment to Complaint are attached to the Petition as Exhibit H. The Petitioner is not seeking injunctive relief as to the violations alleged in Case 06-CA-269346, set forth in paragraph 7 of the NewsGuild Complaint.

On May 17, 2023, the Petitioner issued an Order Consolidating Cases, Consolidated Complaint and Notice of Hearing in Cases 06-CA-263780 and 302624 based on charges filed by the Mailers (Mailers Complaint). The Mailers Complaint is attached to the Petition as Exhibit I.

On July 28, 2023, the Petitioner issued an Order Further Consolidating Cases, Second Consolidated Complaint and Notice of Hearing in Cases 06-CA-259157, 268248, and 302602 based on charges filed by the Pressmen (Pressmen Complaint). The Pressmen Complaint is attached to the Petition as Exhibit J. The Petitioner is not seeking injunctive relief as to the violations alleged in Case 06-CA-259157, set forth in paragraph 10 of the Pressmen Complaint.

On June 9, 2023, the Petitioner issued an Order Further Consolidating Cases, Second Consolidated Complaint and Notice of Hearing in Cases 06-CA-269416, 302624, and 311141 based on charges filed by the Advertisers (Advertisers Complaint). The Advertisers Complaint is attached to the Petition as Exhibit K. The Petitioner is not seeking injunctive relief as to the violations alleged in Cases 06-CA-302624 and 311141, set forth in paragraphs 13 and 14 of the Advertisers Complaint.

Thus far, Administrative Law Judge decisions have issued regarding the NewsGuild Complaint and the Advertisers Complaint, while the other two cases remain pending. *See PG Publishing Co., Inc.*, No. JD-05-23, 2023 WL 1067316 (Jan. 26, 2023) (NewsGuild) and *PG Publishing Co., Inc.*, No. JD-41-24, 2024 WL 3355062 (July 9, 2024) (Advertisers).

PPG violated section 8(a)(1) and (5) of the National Labor Relations Act[4] (the Act) by, *inter alia*: failing or refusing to bargain in good faith: (1) with the four Unions over successor collective-bargaining agreements, (2) with the Production Unions over interim healthcare agreements, and (3) by making unilateral changes to the terms and conditions of employment of the Editorial Unit employees before reaching a valid impasse in contract negotiations with the NewsGuild. An unfair labor practice hearing has been held in front of an Administrative Law Judge (ALJ) on each of the four Complaints.[5]

This proceeding is before the Court on a Petition for Temporary Injunction filed for and on behalf of the National Labor Relations Board (the Board or NLRB) pursuant to section 10(j) of the Act.[6] Section 10(j) authorizes the Board, "upon issuance of a complaint... charging that

---

[4] 29 U.S.C. § 158(a)(1), (5).

[5] The complete administrative record from the unfair labor practice hearing on the NewsGuild Complaint, including the hearing transcript, exhibits, and decision of the ALJ, is attached to this Memorandum as Exhibit 1.

The complete administrative record from the unfair labor practice hearing on the Mailers Complaint, including the hearing transcrips and exhibits, is attached to this Memorandum as Exhibit 2. At the time of filing, no ALJ decision has issued on the Mailers Complaint.

The complete administrative record from the unfair labor practice hearing on the Pressmen Complaint, including the hearing transcript and exhibits, is attached to this Memorandum as Exhibit 3. At the time of filing, no ALJ decision has issued on the Pressmen Complaint

The complete administrative record from the unfair labor practice hearing on the Advertisers Complaint, including the hearing transcript, exhibits, and decision of the ALJ, is attached to this Memorandum as Exhibit 4.

In this brief, pinpoint citations for Exhibits 1-4 refer to the Bates number with prefix "NLRB."

[6] 29 U.S.C. § 160(j). Section 10(j) provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any district court of the United States . . . within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice

---

any person has engaged in or is engaging in an unfair labor practice," to seek temporary injunctive relief from the United States District Court for the District "wherein the unfair labor practice in question is alleged to have occurred." Section 10(j) therefore authorizes the present Petition.

As described above, PPG's violative conduct and the ensuing strikes are ongoing, causing the collective-bargaining process to stall, support for the Unions to erode, and employees to suffer severe adverse medical and financial effects. Interim injunctive relief is necessary to restore industrial peace, protect the integrity of the collective-bargaining process, prevent irreparable harm to employees, and to ensure that the Board's final orders in the underlying administrative proceedings will not be meaningless. Thus, Petitioner seeks an injunction that will return the employees in this case to the status quo as it existed prior to PPG's unlawful conduct and compel PPG to bargain in good faith with the Unions, in addition to other appropriate relief.

## II.  ISSUES AND THE "NEW" APPLICABLE *WINTER* STANDARD

Historically, to resolve a section 10(j) petition, district courts in the Third Circuit only considered two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act, and whether temporary injunctive relief is "just and proper."[7] However, in its recent decision in *Starbucks Corp. v. McKinney*,[8] the Supreme Court held that when considering the Board's request for a preliminary injunction under section 10(j), district courts must now

---

thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

[7] *See, e.g., Chester v. Grane Healthcare Co.*, 666 F.3d 87, 100; *Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 877; *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1078 (3d Cir. 1984).

[8] S. Ct. 1570, 1579 (2024).

apply the traditional four-factor test articulated in *Winter v. NRDC*.[9] The four *Winter* factors to be considered are: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm in the absence of preliminary relief; (3) the balance of equities; and (4) whether an injunction is in the public interest.[10] Thus, Petitioner here must show that the unfair labor practices alleged are likely to succeed on the merits, that irreparable harm is likely if PPG's unlawful conduct continues, that the balance of equities tips favor of preliminary relief, and that an injunction would be in the public interest.

## III.   STATEMENT OF FACTS

The facts are largely not in dispute. PPG asserts that its bargaining positions and actions were lawful, and it blames the Unions for the parties' failure to reach agreements.

### A.  PPG's Background and Bargaining History

PPG is a corporation with offices and places of business in Clinton and Pittsburgh, Pennsylvania (Respondent's or PPG's facilities).[11] PPG is in the business of publishing a print and electronic newspaper called "The Pittsburgh Post-Gazette."[12] For many years and at all material times, PPG has recognized the NewsGuild, Mailers, Pressmen, and Advertisers as the exclusive collective-bargaining representatives of certain units of PPG's employees.[13] This

---

[9] 555 U.S. 7, 20, 22 (2008). Other courts, including those in the Ninth Circuit, already apply the test espoused in *Winter* to section 10(j) cases.

[10] *Id*.

[11] Ex. 4(c) at 15887.

[12] *Id.*

[13] The NewsGuild represents a unit of employees in PPG's Editorial Department (the Editorial Unit). Ex. 1(b) at 824. The Mailers Union represent two bargaining units in PPG's Mailing Department: one consisting of full-time employees (the Full-Time Mailers Unit) and the other of part-time employees in the Mailing Department (the Part-Time Mailers Unit), each covered under their own contract. Ex. 2(a) at 3564-65, 3806-07. The Pressmen Union represents a unit of employees in PPG's Pressroom and Paperhandling Departments (the Pressmen Unit). Ex. 3(c) at

recognition has been embodied in successive collective-bargaining agreements with each Union, the most recent of which were in effect until March 2017.[14]

For a quarter of a century, beginning in 1992, collective bargaining with PPG was a two-step process. First, wages and health insurance were negotiated collectively with PPG by a Unity Council consisting of representatives from each bargaining unit.[15] Then, subsequently, the units met individually with PPG to negotiate the remaining contract language applicable to each unit.[16]

However, at the expiration of the most recent collective-bargaining agreements, PPG departed from this longstanding practice, instead insisting on negotiating successor contracts with each unit separately.[17] PPG retained new counsel to serve as its primary negotiators for this new fragmented approach to bargaining.

### B. PPG Engaged in Overall Surface Bargaining During Negotiations with the Unions for Successor Contracts for the Editorial and Production Unit Employees

#### 1. Bargaining Backdrop

From March 2017 to March 2020, PPG and the Unions held numerous bargaining sessions.[18] In each set of negotiations, PPG demonstrated that it had no intention of reaching agreement with the Unions by, *inter alia*, insisting upon proposals that would leave the Unions and the employees they represent with substantially fewer rights and less protection than

---

10992-1004. The Advertisers Union represents a unit of employees in PPG's Advertising Department (the Advertising Unit). Ex. 4(c) at 15888, 15921.

[14] Ex. 1(c) at 901-60; Ex. 2(c) at 5519-605; Ex. 3(c) at 11009-158; Ex. 4(c) at 15969-6013.

[15] The Unity Council also included other PPG units not at issue in this matter.

[16] Ex. 1(a) at 80-81; Ex. 2(a) at 3696, 4229-300; Ex. 3(a) at 9419; Ex. 4(a) at 14463-65.

[17] Ex. 1(a) at 81-82, 195; Ex. 2(a) at 3576, 4229-300; Ex. 3(a) at 9419-420; Ex. 4(a) at 14465-67.

[18] Due to the emergence of the COVID-19 pandemic, in March 2020, future bargaining sessions were postponed for health and safety concerns. Ex. 1(c) at 1671-72; Ex. 2(c) at 6006-07; Ex. 3(c) at 11380-83; Ex. 4(c) at 16054-58.

provided by law without a contract, and, for one unit, unilaterally implementing its proposals in the absence of a valid impasse.

PPG's initial contract proposals to the Unions varied slightly across the bargaining units, but each would reserve to PPG unilateral control over nearly all significant terms and conditions of employment of the bargaining unit employees. For example, common to all PPG's initial offers were provisions granting PPG unlimited discretion to: (1) assign, subcontract, and/or outsource unit work to individuals outside the bargaining units; (2) select employees for layoffs and recalls; (3) discipline and discharge employees; (4) reduce employees' hours of work (and, thereby, total compensation); and (5) modify or terminate the employees' health, dental, vision, and life insurance plans and short-term disability benefits.[19] Additionally, PPG sought to "eliminate past practices"[20] with the insertion of expansive zipper clauses.[21]

PPG maintained the sweeping discretion contained in its initial proposals through multiple years of bargaining, and, consequently, the parties made little progress toward agreements.[22]

---

[19] Ex. 1(c) at 1007-65; Ex. 2(c) at 5606-60, 5661-94; Ex. 3(c) at 11165-211; Ex. 4(b) at 15452-512.

[20] Ex. 1(d) at 7662.

[21] Throughout each of its proposals to the NewsGuild, Mailers, and Advertisers, PPG included the following provision:

> This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the [Union], including any letter of interpretation, verbal understanding and/or past practices.

Ex. 1(c) at 1043; Ex. 2(c) at 5638, 5674; Ex. 4(b) at 15492.The expired Pressmen agreement contained a similar provision ("anything not contained in this Contract shall not be construed as being part of this Contract" (Ex. 3(c) at 11142), which PPG proposed maintaining unchanged. Ex. 3(c) at 11201.

[22] *See* Ex. 1(c) at 1140-647; Ex. 2(c) at 5695-958; Ex. 3(c) at 11212-303, 11310-71, 12009-139; Ex. 4(b) at 15568-701.

### 2. PPG's 2020 Final Offers

In 2020, PPG transmitted its self-described "Final Offers" to the Unions on the following dates: Advertisers—February 27; Mailers—April 30; NewsGuild—June 12; and Pressmen—June 16.[23] With its Final Offers, PPG sought to deprive the Unions of work jurisdiction while retaining complete discretion to determine and redetermine, *inter alia*, employee hours, discipline, termination, layoffs, recalls, and healthcare plans and other benefits; and to reduce employees' wages, and prohibit employees from exercising their right to strike. [24]

The Final Offers would grant PPG unilateral control over nearly all significant terms and conditions of employment.[25] For example, PPG's proposals included explicit disclaimers of any guaranteed hours of work per day or per week, such that PPG would have the right to unilaterally change or reduce employees' work hours and schedules.[26] Similarly, for both its proposed healthcare plan and short-term disability policy, PPG insisted that the Unions accept the same terms that PPG applies to its nonrepresented employees, including PPG's right to unilaterally change or terminate the benefits at any time.[27]

---

[23] Ex. 1(c) at 1711-810; Ex. 2(c) at 6010-84; Ex. 3(c) at 11386-440; Ex. 4(b) at 15702-38. Several additional contract bargaining sessions were held after the transmission of PPG's Final Offers; however, PPG did not make any further modifications to its proposals.

[24] A chart showing the relevant proposals contained in PPG's Final Offer for each bargaining unit is attached as Appendix 1.

[25] *See* Appendix 1.

[26] *See id.* at 9-10. At the bargaining table, PPG made it "crystal clear" that this proposal would grant it the ability to schedule an employee for "40 hours this week, 10 hours the next week, zero hours the week after that." Ex. 1(a) at 123.

[27] *See* Appendix 1 at 10-12; Ex. 4(a) at 14491-92. PPG explicitly stated during negotiations that it would not consider any healthcare option other than the plan of its own design, even if an alternative would save costs, because it wanted full control over the plan. Ex. 1(a) at 131, 698, 806-07.

Moreover, the terms of PPG's Final Offers would have enabled it to unilaterally encroach upon the Unions' jurisdictions by assigning bargaining unit work to managers, supervisors, non-unit employees, freelancers, and subcontractors.[28] At the same time, the proposals would grant PPG the right to conduct layoffs at any time, for any reason.[29] Under these terms, PPG would be free to simply outsource the work of unit employees and eliminate their jobs, as PPG had recently done with its Finance Department.[30]

## C. PPG Unlawfully Declared Impasse with the NewsGuild & Unilaterally Implemented Changes to the Terms and Conditions of Employment of the Editorial Unit

After PPG transmitted its Final Offer to the NewsGuild on June 12, 2020, the parties communicated several more times over the next month, with PPG stating that it believed the parties were at impasse and the NewsGuild disputing that characterization and requesting more bargaining.[31]

---

[28] *See* Appendix 1 at 1-3; Ex. 1(c) at 1765-66; Ex. 2(c) at 6021, 6062; Ex. 3(c) at 11423, 11437; Ex. 4(b) at 15707-08.

[29] The expired contract for the Mailers Full-Time Unit specifically provided that mechanization could not result in layoffs. Ex. 2(c) at 5524. The expired Pressmen contract stated that layoffs to reduce the force could only be made if "economically necessary and no reasonable alternative exists." Ex. 3(c) at 11118. The expired contracts for the NewsGuild and Pressmen provided the Unions the right to appeal a layoff to arbitration if they believed that "reasons other than economy" factored into a layoff decision. Ex. 1(c) at 916; Ex. 3(c) at 11118. PPG proposed eliminating all of these protections (*see* Appendix 1 at 3-4) and openly stated that it believed "it should have the right to determine staffing levels based on the needs of the [] operation in the present and future, rather than [...] based on what an arbitrator determines or mandates." Ex. 2(c) at 6221.

[30] In 2020, PPG declared impasse in negotiations with the Advertisers for a successor contract for a unit of employees in its Finance Department (the Finance Unit) and unilaterally implemented its proposals, similar to those here. Within three months of the implementation, PPG had outsourced most of the work of the Finance Department and laid off all but one Finance Unit employee. Ex. 4(a) at 14506.

[31] As discussed in Section III.B above, PPG's June 12, 2020 Final Offer to the NewsGuild would grant it, *inter alia*, unilateral discretion to: (1) subcontract work and assign work outside the bargaining unit; (2) reduce employees' work hours, albeit with a 10-day notice; (3) move

On July 27, 2020, PPG declared impasse and unilaterally implemented substantially the same terms and conditions of employment as contained in its June 12 proposal, including its own healthcare plan, although certain provisions were implemented only in part.[32] The NewsGuild was never afforded an opportunity to bargain over these altered terms, as PPG's July 27, 2020, letter stated that its proposal had already been implemented.[33]

PPG's unilateral changes gravely impacted Editorial Unit employees' healthcare benefits. In the past, represented employees employed by PPG were eligible to subscribe to a health insurance plan through the Western Pennsylvania Teamsters and Employers Welfare fund, later renamed to the Employment Partners Benefits Fund (the Fund).[34] The plan available through the Fund was entirely employer-funded, with no employee premiums, however, PPG's contributions were subsidized by a deduction from employees' wages, referred to as the "healthcare diversion." There was an annual cap for the healthcare diversion, such that once an employee's total diverted wages reached the limit (i.e., $4,000), their paycheck deductions would cease until the following calendar year. Thus, under the Fund, unit employees who elected family coverage,

---

[32] Ex. 1(c) at 1832-55. For example, PPG did not implement the following portion of the wage proposal from its Final Offer: "Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums." Similarly, PPG did not implement the portion of its benefits proposal stating "Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) plan as set forth in Exhibit 1, according to the parameters set out in the Plan Document. [PPG] has the right to make changes to the 401(k) plan from time to time so long as the benefits provided in Exhibit 1 are not reduced." *Compare* Ex. 1(c) at 1838-39, 1855 *with id.* at 1772, 1801.

[33] *Id.* at 1832.

[34] Ex. 1(c) at 932-34; Ex. 2(c) at 5535-37; Ex. 3(c) at 11127-29; Ex. 4(c) at 15984-85; Ex. 3(a) at 9564.

employees onto health, dental, vision, and life insurance plans under PPG's sole control (while requiring employees to pay 30% of the premiums for those plans); and (4) eliminate any predictable processes for layoffs and recalls. Ex. 1(c) at 1763-810.

as a majority did, paid a maximum of $4,000 per year through their wage diversion and a maximum deductible of $2,000, for a potential total annual expense of $6,000. However, after unilateral implementation, under PPG's plan, unit employees who elected family coverage paid $8,476 in annual premiums and an out-of-pocket maximum of $6,800, for a potential total annual expense of $15,276.[35]

Additionally, before PPG's unilateral implementation, a family plan under the Fund had an embedded deductible. Thus, using the $l,500 individual/$3,000 family deductible of PPG's plan as an example, an individual family member needing coverage had to pay no more than $1,500. After unilateral implementation, family coverage under PPG's plan has a non-embedded deductible. Thus, the $3,000 deductible must be paid before expenses are covered for an individual family member.

### D. The Third Circuit Upheld an Arbitration Award Finding PPG Unlawfully Failed to Pay the Fund Contribution Increases Past 2017 for Editorial Unit Employees

As noted above, under the 2014–2017 collective-bargaining agreements, all represented full-time employees received health insurance through the Fund. The expired collective-bargaining agreements stated that the "required [PPG] contributions for the calendar year 2015 will be $1,229 per month" for each employee, and "[PPG] contributions for years 2016 and 2017 will not exceed a 5.0% annual increase above the $1,229 per month."[36]

In 2015, PPG paid the required $1,229 per month for each employee. For 2016, the Fund requested a 5.9 percent increase, but PPG limited its increase to 5 percent (thus increasing its payment to $1,290.45 per month for each employee) in accordance with the agreements; and the

---

[35] Although employees covered under "Single" coverage could see a potential reduction in their healthcare costs when comparing only the former $4,000 diversion cap to the new $2,400 annual premiums, any net decrease would be significantly offset by PPG's wage reduction proposals.

[36] Ex. 1(c) at 933; Ex. 2(c) at 5536; Ex. 3(c) at 11128; Ex. 4(c) at 15984.

Fund reduced employees' benefits by increasing their deductibles to cover the shortfall. For 2017, the Fund requested, and PPG granted, a 5-percent increase, to $1,354.97 per month per employee.

In fall 2017, as the parties continued to negotiate over successor agreements, the Fund requested a 5-percent increase from PPG. The Unions maintained that PPG had to pay the increases necessary to maintain benefits because the 2014–2017 agreements did not include a cap on contributions after 2017, but PPG refused, asserting that its sole obligation under the 2014–2017 agreements was to continue contributions at the 2017 level.[37] Negotiations between the parties stalled, and PPG continued making contributions to the Fund at the 2017 level ($1,354.97 per month) for each employee—refusing to pay any subsequent increase.[38] In 2018 and again in 2019, the Fund reduced the employees' benefits by increasing their deductibles to cover the shortfall in PPG's payments.[39]

The NewsGuild filed a grievance under its still-extant contract, alleging that PPG had unlawfully failed to pay increased health insurance premiums past 2017, and on December 30, 2019, an arbitrator concluded that PPG had violated the NewsGuild collective-bargaining agreement by failing to maintain agreed-upon health insurance benefits.[40] Among other things, the arbitrator concluded that the parties' past practice required PPG to pay annual contribution increases of up to 5-percent.[41]

---

[37] Ex. 2(a) at 3754, 3899-900; Ex. 3(a) at 9554-55; Ex. 4(a) at 15189-90.

[38] *Id.*

[39] *See* Ex. 2(c) at 6242; Ex. 3(e) at 12244; Ex. 4(d) at 16516.

[40] *See PG Publishing, Inc. v. Newspaper Guild of Pittsburgh*, 2020 WL 7065834 (W.D. Pa. Dec. 3, 2020), *enforced*, 19 F.4th 308 (3rd Cir. 2021).

[41] In a prior NLRB case involving litigation between the NewsGuild and PPG, the Board did not address whether the parties had a past practice demonstrating that PPG had always increased its

In February 2020, PPG sought to vacate the arbitrator's award in federal district court via a Section 301 lawsuit, and the NewsGuild counterclaimed for enforcement of the award.[42] In December 2020, the U.S. District Court for the Western District of Pennsylvania enforced the arbitrator's award.[43] In November 2021, the Third Circuit affirmed the district court's dismissal of PPG's objections to the award.[44]

### E. PPG Engaged in Overall Surface Bargaining with the Mailers and Pressmen Unions in Negotiations for Interim Healthcare Agreements, Resulting in The Termination of Insurance Coverage through the Fund for Mailers and Pressmen Unit Employees

Due the Employer's bad faith Final Offers to the Unions and the pendency of subsequent arbitration and litigation concerning the Fund, there was a hiatus in successor contract negotiations with the Mailers and Pressmen; however, PPG and the Mailers and Pressmen did continue to negotiate over healthcare coverage.[45]

On October 26, 2020, the Fund told the Mailers and Pressmen that it would be canceling employees' healthcare for the year 2021 due to PPG being in arrears.[46] Ultimately, in order to

---

contributions to maintain healthcare benefits. *PG Publishing Co.*, 368 NLRB No. 41, slip op. at 3 (Aug. 22, 2019).

[42] *PG Publishing, Inc.*, 2020 WL 7065834.

[43] *Id.* at *1-4 (holding, in relevant part, that enforcement of the award did not conflict with the Board's August 2019 decision because the award was based on both contract interpretation and the parties' past practice).

[44] *PG Publishing, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308 (3rd Cir. 2021).

[45] In *PG Publishing Co., Inc.*, No. JD-41-24, 2024 WL 3355062 (July 9, 2024), ALJ Carter found that while PPG bargained in bad faith in regard to overall contract negotiations with the Advertisers, PPG did not bargain in bad faith over an interim healthcare agreement. Ex. 4(e). Thus, the Petitioner is not seeking interim relief for the Advertisers regarding this claim (i.e., that PPG engaged surface bargaining over interim health insurance coverage). The Petitioner believes this portion of ALJ Carter's decision was in error and will be excepting on this basis to the Board.

[46] Ex. 2(c) at 6242; Ex. 2(a) at 3737, 3749; Ex. 3(e) at 12235. This disenrollment was the result of Respondent unilaterally imposing its own healthcare plan on the NewsGuild, as detailed in Section III.C, *supra*.

prevent total loss of healthcare, the Full-Time Mailers and Pressmen Unit employees agreed to cover the cost of the entire premium increase ($272.03 per month, or $62.78 per week). Because the Fund does not accept payments from individuals, PPG and the Mailers and Pressmen memorialized an arrangement wherein PPG deducted the increased amount directly out of the employees' paychecks and remitted the payments to the Fund (the 2021 Healthcare Agreement).[47]

On October 14, 2021, the Fund notified PPG that the premium rates for 2022 would be increasing by 5-percent ($1,709.01 per employee, per month).[48] In response, PPG proposed a 2022 Healthcare Agreement to the Mailers and Pressmen that would have required their respective unit employees to bear the full cost of the additional premium increase.[49] The Mailers and Pressmen rejected the proposed 2022 Healthcare Agreement;[50] however, PPG refused to deviate from its proposal, so bargaining continued into 2022 as the shortfall owed to the Fund grew.[51]

On June 30, 2022, the Fund issued notices directly to employees that their healthcare coverage would be terminated at the end of August 2022.[52] Shortly thereafter, the Mailers and Pressmen requested to bargain with PPG over the effects of the impending loss of benefits (effects bargaining), directly asking PPG to "advise as soon as possible what [PPG's] plan is to maintain the current health care benefit levels in the event the Fund refuses to provide those

---

[47] Ex. 2(a) at 3900-01; Ex. 2(c) at 6312-14; Ex. 3(a) at 9555-56; Ex. 3(c) at 11517-21.

[48] Ex. 2(b) at 5301-02; Ex. 3(e) at 12476.

[49] Ex. 2(a) at 3908-09; Ex. 2(c) at 6334-39; Ex. 3(a) at 9557-59, 10252; Ex. 3(c) at 11522-24.

[50] Ex. 2(c) at 6359-60; Ex. 3(c) at 11526-29.

[51] Ex. 2(a) at 3908-09; Ex. 3(a) at 9562-64.

[52] Ex. 2(b) 5415-17; Ex. 3(c) at 11592.

benefits."[53] The Mailers and Pressmen made four consecutive demands to meet and discuss options for maintaining health insurance coverage;[54] however, PPG ignored these demands and, in response, spuriously claimed that the Mailers and Pressmen never requested effects bargaining.[55]  In spite of PPG's feigned ignorance, the Mailers and Pressmen repeated their demand for effects bargaining[56]— coming to a total of five unanswered demands in five weeks.

In late August 2022, the Fund issued letters reiterating that employee health coverage would be terminated due to insufficient funds.[57] The Fund magnanimously extended coverage for the month of September 2022 to avoid "undue hardship" on individual participants, as it was apparent that PPG had no alternative healthcare arrangement in place for the Production Unit employees.[58] The Fund's letter also notified PPG that the only way the parties could remain in the Fund would be if (1) the deficit owed to the Fund were paid in full, and (2) PPG further committed to cover the 2023 increased rate.[59]

In September, the Fund notified employees and the parties that coverage would be terminated on September 30, 2022.[60] Following this, the Mailers and Pressmen made two more requests to bargain with PPG about maintaining healthcare coverage.[61]

---

[53] Ex. 2(c) at 6396-99; Ex. 3(c) at 11594-95.

[54] Ex. 2(c) at 6396-405, 6410-14; Ex. 3(c) 11594-99, 11602-05.

[55] Ex. 2(c) at 6415-16; Ex. 3(c) at 11606-07.

[56] Ex. 2(c) at 6417-20; Ex. 3(c) at 11608-11,

[57] Ex. 2(c) at 6426, 6435-37; Ex. 3(c) at 11614, 11618.

[58] *Id.*

[59] *Id.*

[60] Ex. 2(c) at 6438-40; Ex. 3(c) at 11620.

[61] Ex. 2(c) at 6441-43; 6446-48; Ex. 3(c) at 11622, 11628.

It was not until the Mailers and Pressmen made their seventh demand for effects bargaining on September 22, 2022, that PPG finally acknowledged the requests and agreed to meet and discuss alternative healthcare options.[62] Up until that point, despite the quickly approaching cancellation of employee healthcare, every single communication PPG addressed to the Mailers and Pressmen had ignored their demands for effects bargaining and/or explicitly limited PPG's willingness to bargain only to "proposals to resolve the issues with the [Fund]."[63]

Due to PPG's delay in responding, effects bargaining concerning the Fund's scheduled termination of coverage did not commence until September 27, 2022, nearly three months after the initial effects bargaining demand and merely three days before participation in the Fund was scheduled to terminate. When PPG finally did meet with the Mailers and Pressmen, it failed to engage in any meaningful bargaining. At PPG's insistence, the Mailers and Pressmen had prepared a series of proposals designed to retain participation in the Fund; however, PPG rejected each proposal as "an economic concession [PPG was] not willing to make" without making any counteroffers of its own.[64] Meanwhile, PPG did not have a single standing proposal that would maintain health insurance for the Production Unit employees past September 30, 2022, through the Fund or otherwise.[65]

It was not until the last day before participation in the Fund was to be terminated that PPG finally offered its own proposals to maintain employee healthcare: the "Alternative Package

---

[62] Ex. 2(c) at 6449-51; Ex. 3(c) at 11630.

[63] *See, e.g.*, Ex. 2(c) at 6406-08, 6415-16, 6421, 6444; Ex. 3(c) at 11600, 11606-07, 11612, 11624.

[64] Ex. 2(a) at 3668, 4410-11; Ex. 3(a) at 9592-96.

[65] PPG's only standing proposal was its 2022 Healthcare Agreement, which, as written, would not stop the scheduled termination of coverage because it failed to address the shortfall due to the Fund or address how the 2023 increase would be resolved.

Proposal,"[66] as well as an updated version of the 2022 Healthcare Agreement proposal referred to as "Option No. 2."[67]

PPG's Alternative Package Proposal (which was nearly identical to the healthcare proposal that the Mailers and Pressmen had repeatedly rejected during successor contract negotiations, and which PPG ultimately imposed unilaterally on the Editorial Unit), was explicitly offered on a take-it-or-leave-it basis.[68] Most significantly, this plan would give PPG unilateral control over employees' healthcare by reserving to PPG "the right to modify, change, etc. the benefits plan."[69] Option No. 2 was identical to the 2022 Healthcare Agreement except for the insertion of provisions requiring the Full-Time Mailers and Pressmen Unit employees to pay the entire deficit for 2022 in a lump sum and commit to paying the following year's increase in addition.[70]

Neither of PPG's proposals were acceptable to the Mailers or Pressmen, and PPG was unwilling to consider any proposal that would split costs between the Production Unit employees and PPG, even though PPG itself repeatedly referred to the 2022 rate hike as merely a "small increase."[71] The parties did not reach any agreement prior to the Fund's deadline of September 30, 2022; thus, Full-Time Mailers and Pressmen Unit employees' healthcare coverage was terminated by the Fund on October 1, 2022.[72]

## F. Detrimental Impacts of PPG's Unfair Labor Practices

[66] Ex. 2(c) at 6452; Ex. 3(c) at 11632.

[67] Ex. 2(c) at 6516-17; Ex. 3(c) at 11694-95.

[68] Ex. 2(c) at 6452; Ex. 3(c) at 11632.

[69] *Id.*

[70] Ex. 2(c) at 6516-17; Ex. 3(c) at 11694-95. *See also* Ex. 2(a) at 4415*;* Ex. 3(a) at 9613.

[71] Ex. 2(a) at 3968, 4273, 4312, 4314; Ex. 3(a) at 9594-95, 10252.

[72] Ex. 2(a) at 3978; Ex. 3(a) at 9603, 9662-63; Ex. 4(a) at 14746.

### 1. *Production and Editorial Unit Employees Begin Unfair Labor Practice Strikes*

Following the failure of the healthcare negotiations and the termination of their Fund healthcare benefits on October 1, 2022, the Production Unit employees went on an unfair labor practice strike beginning on October 6, 2022.[73] The Editorial Unit employees, meanwhile, had been working under the PPG's unilaterally implemented terms since late July 2020. Following the commencement of the Production Unions' unfair labor practice strike, the NewsGuild went out its own unfair labor practice strike beginning on October 18, 2022.[74] Both strikes are ongoing to this day, and employees have expressed that they are "hopeless about the duration of the strike" because of the lack of progress in negotiations.[75] Meanwhile, there has been violence and property damage on the picket lines (injuries include a broken jaw),[76] criminal charges pressed against striking employees,[77] and two lawsuits filed by PPG against the Unions.[78]

### 2. *Unit Employees Lose Insurance, Incur Medical Expenses, Forego Treatment*

Employees' lack of healthcare coverage during the strike has proven dire.[79] Multiple employees have had to choose between paying for expensive treatments out of pocket or

---

[73] Ex. 2(a) at 3987-88, 4212; Ex. 3(a) at 9615; Ex. 4(a) at 14758; Ex. 5 at 2; Ex. 6 at 2.

[74] Ex. 7 at 3.

[75] Ex. 9. *See also* Ex. 10 at 3 ("Given what I have seen… it does not seem like the strike will end at the bargaining table."); Ex. 11 at 2-3 ("It seems like [PPG]'s only goal is to bust the unions—not to make money. At this point almost want them to shut the paper down so that we can just collect unemployment at move on… It seems like everyone is losing hope."); Ex. 12 at 2 ("[PPG] has not been trying to reach an agreement because they want the Union out of there… At best I am hoping that we are able to get a good severance package, because I don't think they want us coming back at all.")

[76] Ex. 8; Ex. 13; Ex. 14; Ex. 15; Ex. 17.

[77] Ex. 17 at 2.

[78] *PG Publishing Co. v. Pittsburgh Typographical Union #7*, 2023 PA Super 225 (2023); *PG Publishing Co.. v. Pittsburgh Typographical Union #7*, 2024 PA Super 165 (2024).

[79] Editorial Unit employees who remain on strike and have not crossed the picket line have been without employer-provided health insurance.

forgoing necessary medical care.[80] Indeed, some employees have spent thousands of dollars on medical treatment or replacement health insurance.[81] Employees who themselves or whose family members had serious medical issues were hit the hardest by the lack of employer-provided healthcare coverage. One employee has had to reduce the number of his prostate cancer treatments,[82] and another employee with a history of cardiac problems—including multiple open-heart surgeries—has had to indefinitely postpone checkups with his cardiologist.[83]

The Unions have represented to Petitioner that all the employees, in both the Editorial and Production Units, would end their unfair labor practice strikes if temporary injunctive relief restored their health insurance benefits as they would have existed but for PPG's unfair labor practices, or in substantially equivalent form.

### 3. Undermining of Collective-Bargaining and Dissipation of Union Support

Contract bargaining with the Production Unions has been shelved as negotiations have been almost exclusively devoted to healthcare since 2020 due to the urgency of employee insurance coverage. Meanwhile, PPG's 2020 unilateral implementation of terms has severely impeded contract bargaining with the NewsGuild: since July 27, 2020, PPG has only offered one proposal— identical to its Final Offer (except for an updated wage chart) because PPG believes the imposed terms are "working well"—and has refused to consider any NewsGuild proposal or amend its own.[84]

---

[80] Ex. 5 at 3; Ex. 11 at 3; Ex. 18; Ex. 19; Ex. 20.¶

[81] Ex. 21; Ex. 22.

[82] Ex. 23.

[83] Ex. 16.

[84] Ex. 7; Ex. 8; Ex. 24; Ex. 25

Support for the NewsGuild has eroded drastically as the Editorial Unit employees become increasingly pessimistic that any agreement will be reached, and some employees place blame on the NewsGuild for lack of progress in negotiations.[85] There were approximately 99 employees in the Editorial Unit at the outset of the strike, and within eight months, 46 had crossed the picket line and resigned their union membership, and 17 had resigned their employment at PPG.[86]

Of the approximately 21 employees in the Advertising Unit at the outset of the strike, within eight months, 7 had crossed the picket line and 4 had resigned their employment, leaving only 10 Advertising employees on strike.[87] Although no employees from the Pressmen or Mailers have crossed the picket line, attendance on the picket line has steadily dwindled over time.[88] A Mailers Unit employee testified about the lack of morale among strikers: "The strike has been tough, not only financially, just all the way around. The winter was brutal, it isn't like we're having fun out there. It seems like everyone is losing hope."[89]

## IV.    THE STATUTORY SCHEME PURSUANT TO WHICH SECTION 10(J) INJUNCTIVE RELIEF IS SOUGHT

Section 10(j) of the Act,[90] authorizes federal district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. As the Supreme Court has stated, because "the Board's administrative proceedings take years, Congress vested the Board

---

[85] Ex. 26 ("[PPG's] delay tactics seem to be working in the effort to destroy [the Unions]."). *See, e.g.* Ex. 10 at 3-4; Ex. 27.

[86] Ex. 7. *See e.g.*, Ex. 9 at 3-4; Ex. 10 at 3-4.

[87] Ex. 6.

[88] Ex. 5; Ex. 12.

[89] Ex. 11 at 3.

[90] 29 U.S.C. § 160(j).

with authority to seek a preliminary injunction in federal court while the proceedings unfold" since in many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, thereby rendering a final Board order ineffectual.[91] Thus, section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. "The court must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power."[92]

### A. Likelihood of Success on the Merits

Likelihood of success in a section 10(j) proceeding is an evaluation of the probability that the Board will issue an order holding that the unfair labor practices alleged by the Petitioner occurred and that the Third Circuit would grant a petition enforcing that order.[93] Therefore, in a section 10(j) proceeding, the district court should sustain the Petitioner's factual allegations if a showing has been made that the Board "is likely to succeed on the merits."[94] However, the Petitioner need not show a certainty of winning.[95]

### B. Likelihood of Irreparable Harm Absent Interim Relief

---

[91] *Starbucks Corp.*, 144 S. Ct. at 1574. *See Grane Healthcare Co.*, 666 F.3d at 92-93 (citing S. Rep. No. 105, 80th Cong., 1st Sess., at 8, 27 (1947), *reprinted at*, *I Legislative History of the Labor Management Relations Act of 1947* at 414, 433 (Government Printing Office 1985)); *Vibra Screw Inc.*, 904 F.2d at 878.

[92] *Frankl v. HTH Corp.*, 650 F.3d 1334, 1355 (9th Cir. 2011) (quoting *Scott v. Stephen Dunn & Assocs.,* 241 F.3d 652, 661 (9th Cir. 2001)).

[93] *HTH Corp.*, 650 F.3d at 1355. *See also Small v. Avanti Health Sys., LLC,* 661 F.3d 1180, 1187 (9th Cir. 2011).

[94] *Starbucks Corp.*, 144 S. Ct. at 1575 (quoting *Winter*, 555 U.S. at 20).

[95] *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981) ("likelihood of success" does not equate to "success.").

Likely irreparable injury is established in a section 10(j) case by showing "a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief."[96] Petitioner can make the requisite showing of likely irreparable harm either through evidence that such harm is occurring,[97] or from "inferences from the nature of the particular unfair labor practice at issue [which] remain available."[98]

Continuing section 8(a)(5) violations involving the failure to bargain in good faith have "long been understood as likely causing an irreparable injury to union representation."[99] "[E]ven if the Board subsequently orders a bargaining remedy, the union is likely weakened in the interim, and it will be difficult to recreate the original status quo with the same relative position of the bargaining parties. That difficulty will increase as time goes on."[100]

### C. Whether the Balance of Equities Favors Interim Relief

"In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"[101] Courts must consider the matter in light of the underlying purpose of section 10(j), which is "to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge."[102] Therefore, in balancing the equities, district courts must take into

---

[96] *HTH Corp.,* 650 F.3d at 1362. *See also Winter*, 555 U.S. at 22. (A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury, but instead it must be demonstrated that the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.)

[97] *See, e.g., Stephen Dunn & Assocs.,* 241 F.3d at 667-68.

[98] *HTH Corp.,* 650 F.3d at 1362.

[99] *Id.*

[100] *Id.* at 1363. *See also Avanti Health Sys.*, 661 F.3d at 1191.

[101] *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

[102] *Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 459-60 (9th Cir. 1994) (en banc).

account the probability that declining to issue an injunction will permit "an alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority."[103]

### D. Whether Interim Relief is in the Public Interest

The public interest in a section 10(j) case is to prevent remedial failure by "ensur[ing] that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge" so as to protect employee rights under the Act.[104]

## V.    ARGUMENT

### A. Petitioner Has Made a Clear Showing that Success on the Merits Is Likely

Given the extant law and the record evidence from the underlying administrative proceedings, as well as a favorable administrative decision, it is highly likely that the Board will find that PPG violated section 8(a)(5) by: (1) engaging in surface bargaining during negotiations with the Unions for successor collective-bargaining agreements; (2) unlawfully declaring impasse and unilaterally changing the Editorial Unit's terms and conditions of employment; and (3) refusing to bargain in good faith with the Mailers and Pressmen over interim agreements concerning health insurance benefits.

#### 4. *Petitioner Has a Substantial Likelihood of Success on the Allegation that PPG Has Violated Section 8(a)(5) By Engaging in Bad-Faith Bargaining for Successive Contracts*

##### a. Legal framework

---

[103] *Starbucks Corp.*, 144 S. Ct. at 1585 (Jackson, J., concurring in part) (citing *HTH Corp.*, 650 F.3d at 1362). *See also Avanti Health Sys.*, 661 F.3d at 1191; *Cal. Pac. Med. Ctr.*, 19 F.3d at 459-60.

[104] *HTH Corp.*, 650 F.3d at 1365 (quoting *Cal. Pac. Med. Ctr.*, 19 F.3d at 460). *See also Avanti Health Sys.*, 661 F.3d at 1197.

Section 8(a)(5) of the Act makes it a violation of the Act for an employer "to refuse to bargain collectively with the representative of [its] employees."[105] The Supreme Court has held that the statutory duty to "meet . . . and confer in good faith" is not fulfilled by "purely formal meetings between management and labor, while each maintains an attitude of 'take it or leave it'". . . rather, collective bargaining "presupposes a desire to reach an ultimate agreement, to enter into a collective-bargaining contract."[106] Surface bargaining—which is defined as "going through the motions of negotiating" without any real intent to reach an agreement—violates the Act's requirement that parties negotiate in good faith.[107]

In evaluating overall bad-faith, the Board examines the totality of the circumstances, including the presence of unreasonable bargaining demands.[108] Because surface bargaining, by definition, may look like hard bargaining, "in some cases, the content of specific proposals may become relevant in determining whether a party was making a sincere effort to reach an

---

[105] An employer that violates section 8(a)(5) of the Act also commits a "derivative" violation of section 8(a)(1) of the Act, which makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise" of their rights under the Act. 29 U.S.C. § 158(a)(1). *See Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983). Accord: *Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1163-64 (D.C. Cir. 2004).

[106] *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485 (1960). Accord: *Gen. Elec. Co.*, 150 NLRB 192, 194 (1964) ("a party who enters into bargaining negotiations with a 'take-it-or-leave-it' attitude violates its duty to bargain although it goes through the forms of bargaining, does not insist on any illegal or nonmandatory bargaining proposals, and wants to sign an agreement.").

[107] *K-Mart Corp. v. NLRB*, 626 F.2d 704, 706 (9th Cir. 1980); *see also Kitsap Tenant Support Services, Inc.*, 366 NLRB No. 98, slip op. at 8 (May 31, 2018) (quoting *Pub. Serv. Co. of Okla.*, 334 NLRB 487, 487 (2001), *enforced*, 318 F.3d 1173 (10th Cir. 2003)).

[108] *Overnite Transportation Co.*, 296 NLRB 669, 671 (1989), *enforced*, 938 F.2d 815 (7th Cir. 1991; *Atlanta Hilton & Tower*, 271 NLRB 1600, 1603 (1984).

agreement."[109] Indeed, "[s]ometimes, especially if the parties are sophisticated, the only indicia of bad faith may be the proposals advanced and adhered to."[110]

     The Board does not evaluate the propriety of individual proposals, but "whether in combination and by the manner proposed they evidence an intent not to reach agreement."[111] While the Act does not prohibit an employer from bargaining aggressively for favorable terms, "rigid adherence to proposals which are predictably unacceptable to the employee representative, may be considered in proper circumstances as evidencing a predetermination not to reach agreement."[112] Thus, an employer's adherence to a specific set of proposals may indicate bad faith in the context of a particular bargaining relationship, even if the "individual proposals might not be unlawful under other circumstances."[113]

     The Board has also held that a party's "failure to define, explain, or advocate a position during bargaining should be considered as evidence of a party's lack of good faith."[114] Similarly, evidence of bad faith can be found in an employer's "refusal to consider a union's proposal, without explanation."[115]

        b. <u>The facts and law clearly support a likely finding that PPG violated the Act by engaging in overall bad-faith bargaining with the Unions for successor contracts</u>

---

[109] *New Concepts for Living, Inc.*, 371 NLRB No. 157, slip op. at 41-42 (Sept. 30, 2022) (citing *Phillips 66*, 369 NLRB No. 13, slip op. at 4, n.9 (Jan. 31, 2020)).

[110] *Altura Commc'n Sols.*, 369 NLRB No. 85, slip op. at 6 (citing *NLRB v. Wright Motors, Inc.*, 603 F.2d 604, 609-10 (7th Cir. 1979)).

[111] *Kitsap Tenant Support Servs., Inc.*, 366 NLRB No. 98, slip op. at 8.

[112] *Sweeney & Co., Inc*., 176 NLRB 208, 212 (1969), *enforced in relevant part*, 437 F.2d 1127 (5th Cir. 1971).

[113] *Altura Commc'n Sols.*, 369 NLRB No. 85, slip op. at 1, n.2.

[114] *Unique Thrift Store*, 363 NLRB 1074, 1074, n.3 (2016) (quoting *Palestine Bottling Co*, 269 NLRB 639, 645 (1984)) (internal quotation marks omitted).

[115] *Nexstar Broad., Inc.*, 371 NLRB No. 118 (July 27, 2022).

The evidence shows that PPG bargained in bad faith with the Unions for successive contracts through its course of conduct, including by its insistence upon proposals that would leave the Unions and the employees they represent with substantially fewer rights and less protection than provided by law without a contract.

PPG made its bargaining intentions clear when it openly stated its position that "the Company must be able to act when it believes necessary to act, not when the Union or an arbitrator says it's okay to act."[116] In accordance with its goal of unilateral control, PPG sought essentially unlimited[117] discretion to determine and redetermine, *inter alia*, the assignment and outsourcing of bargaining work;[118] wages; employees' hours of work (and thereby, total

---

[116] Ex. 2(c) at 6223.

[117] In the underlying administrative proceedings, PPG argued certain provisions in its proposals would limit the extent of its discretion; however, the "limits" PPG identified are ineffectual in context. For example, PPG contends that its hours proposals would not give it total discretion over employees' work hours due to the inclusion of a "normal" workday and workweek; however, that provision would be rendered unenforceable by the subsequent caveat that PPG "does not guarantee any specified hours of work per day or per week." *See, e.g.,* Ex. 1(c) at 1774-75.

[118] *Cf. Am. Meat Packing Corp.*, 301 NLRB 835, 837 (1991) (employer proposal reserving right to assign unit work outside bargaining unit only when "essential to the running of a profitable business" indicated bad faith, because the provision "sets no real standards or limits that might be enforceable"); *Pub. Serv. Co. of Okla.*, 334 NLRB at 487-89 (employer proposal reserving the right to assign unit work to individuals outside bargaining unit indicated bad faith, regardless of caveat that it 'shall not be used to permanently supplant regular [] employees").

compensation);[119] discipline; [120] layoffs and recalls;[121] health, dental, vision, and life insurance

benefits;[122] and short-term disability benefits.[123] Proposals, such as these, that "would authorize

an employer to make unilateral changes to a broad range of significant terms and conditions of

employment, or that would amount to a 'perpetual reopener clause' as to those terms during the

life of the contract, are [] 'at odds with the basic concept of a collective-bargaining

agreement.'"[124] Absent a contract, PPG is required by section 8(a)(5) of the Act to negotiate with

---

[119] *Cf. Altura Commc'n Sols.*, 369 NLRB No. 85, slip op. at 5 (employer proposal stating "nothing in this Agreement shall be construed as a guarantee of hours of work per shift, per day or per week" indicated bad faith because it amounted to a demand for unfettered control over hours of work, and additionally "by seeking complete discretion over hours, the [employer] also sought complete discretion over total compensation.").

[120] *Cf. Kitsap Tenant Support Servs., Inc.*, 366 NLRB No. 98 (May 31, 2018) (employer proposal providing that the employer "*may*" follow a progressive disciplinary schedule, and the "step to be utilized and the degree of discipline to be imposed is [sic] *solely within the judgment and discretion of [the employer]*" indicated bad faith because it amounted to a demand for unfettered control over discipline) (emphasis in original); *San Isabel Elec. Servs., Inc.*, 225 NLRB 1073, 1080 (1976) (employer's proposed management rights clause providing it with authority to unilaterally promulgate work rules and "offering only to inform the [u]nion in advance of the [] rules it intended to establish" indicated bad faith because it served as "an effort to exclude the [u]nion from any participation in decisions affecting important conditions of employment.").

[121] *Cf. Hydrotherm, Inc.*, 302 NLRB 990, 994 (1991) (employer proposal providing that "due consideration" would be given to seniority in decisions on layoff, recall, overtime, and promotion only if "job classifications, qualifications, abilities, experience, and skills of two or more employees are, in the sole judgment of the [e]mployer, equal" indicated bad faith because it amounted to a demand for unilateral discretion).

[122] *Cf. Altura Commc'n Sols.,* 369 NLRB No. 85, slip op. at 1 (employer proposal reserving the right to change employee benefits "provided that such changes also applied to non-unit employees" indicated bad faith because it amounted to a demand for unfettered control over these terms).

[123] *Id.* (employer's proposal to transfer "significant benefits—including… short-term disability benefits" to an employee handbook indicated bad faith because the employer would have exclusive control over the handbook).

[124] *Altura Commc'n Sols.*, 369 NLRB No. 85, slip op. at 4 (citing *Pub. Serv. Co. of Okla.*, 334 NLRB at 488 and *Radisson Plaza Minneapolis*, 307 NLRB 94, 95 (1992), *enforced*, 987 F.2d 1376 (8th Cir. 1993)); *see also Kitsap Tenant Support Servs., Inc.*, 366 NLRB No. 98, slip op. at 8 (citing *Pub. Serv. Co. of Okla.*, 334 NLRB at 488) (finding inference of bad-faith bargaining

the Unions before making changes to any terms and conditions of employment, but PPG's proposals would have granted it the power to modify these core terms at will without input from the Unions.[125] PPG could not seriously have expected meaningful collective bargaining over such proposals.[126]

PPG's steadfast insistence on the above-described proposals evinces its lack of serious intent to reach agreement because the Unions "could do just as well with no contract at all," as PPG's exercise of the vast discretion it would retain over core employment terms could not be

---

appropriate when the employer's proposals, taken as a whole, would leave the union and the employees it represents with substantially fewer rights and less protection than provided by law without a contract); *United Contractors Inc.*, 244 NLRB 72, 73 (1979) (violation found where employer demands a contract that would exclude the labor organization from any effective means of participation in important decisions affecting the terms and conditions of employment of its members).

[125] *See Pub. Serv. Co. of Okla.*, 334 NLRB at 487-89 (noting that without a contract, the union would have the statutory right to prior notice and bargaining over changes or modifications in terms and conditions of employment, and employees would retain the right to strike in protest of such actions).

[126] *Altura Commc'n Sols.*, 369 NLRB No. 85, slip op. at 6 (employer proposals seeking extraordinary control over, *inter alia*, employee benefits, wages, hours, and layoffs, along with a limited grievance procedure and a broad no-strike clause, evinced a failure to bargain in good faith). *See, e.g.*, *Pub. Serv. Co. of Okla.*, 334 NLRB at 487-89 (employer proposals seeking extraordinary control over, *inter alia*, employee benefits, wages, hours, discipline, and outsourcing of unit work would exclude the union from "participati[ng] in the collective-bargaining process to which it is statutorily entitled, effectively stripping it of any meaningful method of representing its members in decisions affecting important conditions of employment and exposing the employer's bad faith"); *Kitsap Tenant Support Servs., Inc.*, 366 NLRB No. 98, slip op. at 11 (employer proposals seeking extraordinary control over employee benefits, wages, discipline, and layoffs, along with a limited grievance procedure, evinced a failure to bargain in good faith ); *S.C. Baptist Ministries*, 310 NLRB 156, 157 (1993) (employer proposals seeking extraordinary control over employee benefits, wages, discipline, and layoffs, along with a limited grievance procedure, evinced a failure to bargain in good faith); *A-1 King Size Sandwiches, Inc.*, 265 NLRB 850, 859 (1982) (employer proposals seeking extraordinary control over wages, discipline, layoffs, and outsourcing of unit work, along with a limited grievance procedure and a broad no-strike clause, evinced a failure to bargain in good faith) *enforced*, 732 F.2d 872 (11th Cir. 1984).

challenged through the grievance process.[127] Moreover, PPG insisted on a broadly worded no-strike clause that would have required the Unions to abandon not only their right to strike but also their right to engage in many other protected activities, including picketing, bannering, boycotts, sympathy strikes, and "any other interference with or interruption of work." Thus, under the combination of PPG's proposed terms, "employees and the Union[s] would be left with no avenue to challenge any of [PPG]'s decisions with regard to the nearly exhaustive rights reserved to [PPG]."[128] The Unions recognized that signing these contracts would so damage their ability to function as the employees' bargaining representatives that it would be akin to signing their own death warrants.[129]

Insistence on a waiver of statutory rights as part of an employer's overall bargaining position is not on its own unlawful; however, an inference of bad faith is appropriate when the employer "offer[s] little more than the status quo in return for these sweeping waivers."[130] Here, PPG made no meaningful concessions to the Unions over multiple years of contract negotiations. In fact, PPG's proposed terms were significantly more onerous than the terms employees had under the status quo; in addition to losing the rights described above, PPG's employees would see pay cuts and higher healthcare costs under the proposed terms. Thus, there is substantial

---

[127] *See Regency Serv. Carts, Inc.*, 345 NLRB 671, 724 (2005) (arbitration clause "nearly meaningless" when "the arbitrator has no power to substitute his discretion for the Employer's").

[128] *Altura Commc'n Sols.*, 369 NLRB No. 85, slip op. at 5; *see also San Isabel Elec. Servs.*, 225 NLRB at 1080 (employer's proposal providing that the arbitrator shall not "substitute his discretion for that of the Company" and including a no-strike clause "would strip the [u]nion of any effective method of representing its members.")

[129] Ex. 2(a) at 3598-99, 3767, 3770; Ex. 4(a) at 14506.

[130] *Hydrotherm*, 302 NLRB at 994. *See, e.g.*, *Prentice-Hall, Inc.*, 290 NLRB 646 (1988) ("An employer of course may seek waivers that will eliminate or restrict the exercise of these rights during the term of a contract, but the [r]espondent's demands for sweeping waivers—viewed in the light of what it was offering in exchange—simply are not the behavior of an employer who is trying to achieve a collective-bargaining agreement").

likelihood that the Board will find PPG's insistence on these proposals to evince its lack of intent to reach agreement on successor collective-bargaining agreements.[131]

Moreover, PPG demonstrated a commitment to reach agreement only on its own terms, exhibiting a "take it or leave it" attitude throughout contract negotiations.[132] For years, PPG went through the motions of bargaining, but while the Union offered compromise after compromise on various terms, PPG refused to offer any substantive concessions or incentives in return.[133] Rather than counteroffers, the Unions were repeatedly met with statements from PPG like "you have [our] proposal" or "we like our language better."[134] The Board has consistently found such conduct to evidence bad faith, as "failure to do little more than reject proposals is indicative of a failure to comply with the statutory requirement of good-faith bargaining."[135]

---

[131] *See, e.g.*, *Liquor Indus. Bargaining Grp.*, 333 NLRB 1219, 1221 (2001) (employer's final offer that was "extreme in nature, [and] made without any corresponding incentives to secure the [u]nion's assent… evidence[d] that the [employer] was not negotiating in good faith with a view to trying to reach or complete agreement with the [u]nion").

[132] *Gen. Elec. Co.*, 150 NLRB at 195 ("'a predetermined resolve not to budge from an initial position,'" [is] an attitude inconsistent with good-faith bargaining") (quoting *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 154 (1956) (Frankfurter, J.)).

[133] *See NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir. 1953) ("while the Board cannot force an employer to make a 'concession' on any specific issue or to adopt any particular position, the employer is obliged to make some reasonable effort in some direction to compose his differences with the union, if [Section] 8(a)(5) is to be read as imposing any substantial obligation at all."); *Sweeney & Co., Inc.*, 176 NLRB at 211-12 (employer's rigid refusal to make any meaningful concessions on critical economic issues evidenced bad faith). .

[134] *E.g.*, Ex. 1(a) at 118, 149, 701; Ex. 2(a) at 3726-27, 3767-780; Ex. 3(a) at 9456-64; Ex. 4(a) at 14736.

[135] *Fitzgerald Mills Corp.*, 133 NLRB at 880 (employer engaged in surface bargaining where it "at all times maintained an uncompromising attitude, rejecting the [u]nion's requests without explanation or discussion . . . [and a]greement on any provision was solely by reason of the [u]nion's acceptance of the [employer]'s proposal as it stood."). *See also Nexstar Broad., Inc.*, 371 NLRB No. 118, slip op. at 32 (employer's "take-it-or-leave-it attitude went beyond hard bargaining" where "the [u]nion consistently approached [the employer] with counterproposals on the various outstanding articles while [the employer] consistently insisted on their own proposals"); *Grill Concepts Servs.*, 372 NLRB No. 30 (Dec. 16, 2022) (employer's "continued

Although bargaining parties have a "statutory right to refuse to agree to a particular proposal or to make a concession," that right "may not be used as a cloak to conceal a purposeful strategy to make bargaining futile or fail."[136] The record shows that PPG attempted to do just that—its intentions made particularly apparent by its approach to the subject of healthcare benefits, where PPG expressly refused to consider any healthcare proposal made by the Unions, even proposals that would have provided a cost savings to PPG.[137]

Furthermore, "[g]ood faith bargaining does require that parties justify positions taken by reasoned discussions."[138] Accordingly, refusal to offer explanations for one's bargaining position beyond conclusory statements that "this is what the party wants" is a significant manifestation of bad-faith bargaining.[139] Throughout negotiations, whenever the Unions questioned the efficacy or necessity a particular proposal, PPG often declined to provide any substantive explanation, asserting simply that "the company wants it"[140] and, on one occasion, going as far as to claim

---

refusal to engage and make counter proposals makes clear it was guided by bad faith in an effort to frustrate the bargaining process"); *Herman Sausage Co.*, 122 NLRB at 170 (evidence of bad faith where "[d]espite the [u]nion's attempts to reach agreement by revising its proposals, the [employer] throughout the negotiations rejected such proposals outright and made no genuine effort to reconcile differences but instead adopted a take-it-or-leave-it attitude").

[136] *H.K. Porter Co.*, 153 NLRB 1370, 1372 (1965) (citing *NLRB v. Herman Sausage Co.,* 275 F. 2d 229, 232 (5th Cir. 1960)).

[137] Ex. 1(a) at 29, 806-07. *Cf. Am. Meat Packing Corp.*, 301 NLRB at 837 (inference of bad faith where employer "never showed any willingness to consider any framework for reducing costs other than its own").

[138] *Unique Thrift Store*, 363 NLRB at 1074 n.3 (quoting *Blue Jeans Corp.*, 177 NLRB 198, 206 (1969), *enforced sub nom. Amalgamated Clothing Workers of America v. NLRB*, 432 F.2d 1341 (D.C. Cir. 1970)).

[139] *Liquor Indus. Bargaining Grp.*, 333 NLRB at 1221.

[140] For example, when the Mailers asked if Respondent had any issues with the no-strike, no-lockout clause in the expired agreement and whether it had given Respondent any problems, Respondent's representatives stated "no, but we like our language better, and this is what we want." Ex. 2(a) at 3777. Similarly, with the NewsGuild, Respondent refused to agree to a stringer

that it was God's will.[141] Similarly, PPG often labelled Union proposals as "unacceptable" or "an economic concession [PPG] is not willing to make" without any attempt to reach a middle ground.[142]  The only explanations PPG gave for its intransigence on its extreme proposals were vague statements about company's financial position, unspecified changes to its business model, and the uncertainty of the "digital future"[143] —justifications that the Board has consistently found to indicate bad faith in similar circumstances.[144]

Additionally, PPG was unprepared or unwilling to explain how certain of its proposals would function. For example, when the Unions sought to understand the practical implementation of PPG's ambiguous layoff proposals, the Unions were told that PPG would "not

budget cap lower than 20% of the annual unit payroll, and when information requested by the NewsGuild revealed that Respondent's current use of stringers only represented four to five percent of the annual unit payroll, Respondent failed to provide any substantive justification for its demand that the budget cap for stringers be increased, saying only that it "liked [its own] proposal better." Ex. 1(a) at 29, 806-07. *Cf Mid-Continent Concrete*, 336 NLRB 258, 260 (2001) (inference of bad faith where "the language of the provision [on the assignment of bargaining unit work] was much broader than what the Respondent claimed was its intended use").

[141] Ex. 3(a) at 9456. *Cf. John Ascuaga's Nugget*, 298 NLRB 524 (1990), *enforced in relevant part sub nom. Sparks Nugget v. NLRB*, 968 F.2d 991 (9th Cir. 1992) (refusal to explain bargaining proposals, other than to state that the party wants the proposed terms, along with refusing to compromise in an effort to reach agreement, ". . . is [conduct] indicative of bad faith because it is not the conduct of a party seeking sincerely to reach agreement").

[142] *E.g.,* Ex. 1(c) at 1514-39, 1682-708; Ex. 2(c) at 6217-41. Ex. 3(c) 11261-78, 11372-79.

[143] *Id.*

[144] *See, e.g.*, *Summa Health Sys., Inc.*, 330 NLRB 1379, 1379 (2000) (employer's "failure to provide any specific economic justification for the absolute discretionary powers it demanded which lessened protections for bargaining unit work, other than generalized insistence on some vague concept of 'flexibility'" evidenced bad faith ); *Blue Jeans Corp.*, 177 NLRB at 206-07 (inference of bad faith found where sole reason offered by employer for rejecting union proposal was that "you never know what is going to happen tomorrow" because the "ostensible logic [of that position] would seem to preclude any agreement or contractual understanding between human beings or organizations composed of beings other than those who could foresee and predict the future with certainty"); *Am. Meat Packing Corp.*, 301 NLRB at 836-37 (employer's poor financial condition "[did] not explain [its] refusal even to consider any changes in proposals that had the potential for totally eliminating unit work by transferring it to nonunit personnel").

get involved in hypotheticals and conjecture."[145] Similarly, PPG refused to discuss the Unions'

concerns about how a lack of guaranteed hours might impact employees' health insurance

eligibility.[146] PPG's persistent refusal to engage in meaningful discussion over the practical

application of its proposals further evinces its bad faith.[147]

The circumstances here, when totaled, demonstrate a substantial likelihood that PPG

engaged in overall bad-faith bargaining with the Unions for successive contracts.

    c.  <u>Favorable ALJ Decisions Also Support Finding That PPG Violated § 8(a)(5) By
Engaging in Surface Bargaining for Successive Contracts with the Unions</u>

Additionally, on January 26, 2023, and July 9, 2024, respectively, ALJ Geoffrey Carter

issued favorable decisions with respect to the NewsGuild and Advertisers Complaints. In his

decisions, the ALJ found, *inter alia*, that PPG bargained in bad faith without intending to reach

agreement in contract negotiations with the NewsGuild and the Advertisers, as evidenced by its

unwavering insistence on proposals that, viewed as a whole, would leave the NewsGuild and

Advertisers and their respective Units with substantially fewer rights and less protection than

provided by law without a contract.[148] Specifically, the ALJ found that PPG insisted on retaining

unilateral control over, *inter alia*, Editorial and Advertising Unit employees' hours of work, pay,

health, dental, vision, and life insurance benefits; the outsourcing of bargaining-unit work to non-

unit individuals; layoff and recall order, and that, in combination with broadly worded no-strike

and zipper clauses, these proposals would have granted PPG the power to modify these core

---

[145] Ex. 1(a) at 126-28.

[146] Ex. 1(a) at 123-24; Ex. 3(a) at 94658-59.

[147] *See, e.g., Liquor Indus. Bargaining Grp.*, 333 NLRB at 1221 (finding bad faith where, "[d]espite repeated requests from the Union for information and explanation about how the wage proposal would work, the [employer] stubbornly refused to offer any details, saying only that it needed "flexibility" in it[s] operations").

[148] Ex. 1(e); Ex. 4(e).

terms at will without input from the NewsGuild or Advertisers, or any protest from their

respective Unit employees.[149] In both decisions, the ALJ found *Thryv* remedies appropriate as a

result of PPG's unfair labor practices.[150] The ALJ's findings and conclusions are legally and

factually sound, providing a solid basis to anticipate that the Board will likely uphold these

portions of his decisions.[151]

Although the ALJ's NewsGuild and Advertisers decisions are not binding on the pending

litigation concerning PPG's bargaining conduct towards the Mailers and Pressmen, it is highly

probative given the similarity of the proposals at issue in each case.[152] Thus, applying the legal

framework of the ALJ's decisions, PPG's persistent demands for unilateral control over the

terms and conditions of employment of the Mailers and Pressmen Units demonstrate PPG's

similar lack of intent to reach an agreement with these Unions.

### 5. *Petitioner Has a Substantial Likelihood of Success on the Allegation that PPG Has Violated Section 8(a)(5) By Unilaterally Changing the Editorial Unit's Terms and Conditions of Employment Absent Bona Fide Impasse with the NewsGuild*

a. Legal framework

Under the unilateral change doctrine, an employer's duty to bargain under the Act

includes the obligation to refrain from taking unilateral action regarding mandatory subjects of

---

[149] Ex. 1(e) at 3481-85; Ex. 4(e) at 17358-63.

[150] *Id*. (PPG to compensate Editorial and Advertiser bargaining unit employees for direct or foreseeable pecuniary harms incurred as a result of its unfair labor practices) (citing *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 14).

[151] *See, e.g., Francisco Foods, Inc.*, 276 F.3d at 288 ("Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed."). Accord: *Silverman v. JRL Food Corp.*, 196 F.3d 334, 335-37 (2d Cir. 1999); *Rivera-Vega v. ConAgra, Inc.*, 70 F.3d 153, 157 n.3, 161 (1st Cir. 1995); *Seeler vs. The Trading Port, Inc.*, 517 F.2d 33, 37, n.7 (2d Cir. 1975).

[152] *See* Appendix 1 for a side-by-side comparison of the relevant proposals in PPG's Final Offer to each Union.

bargaining (such as wages, hours, healthcare benefits, and other conditions of employment) without first bargaining to bona fide impasse with the employees' collective-bargaining representative concerning the contemplated changes.[153]

A bargaining impasse is "the point in time of negotiations when the parties are warranted in assuming that further bargaining would be futile [because] [b]oth parties [] believe they are at the end of their rope."[154] The question of whether true impasse exists depends on several factors, including: "bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of negotiations."[155] The party asserting impasse bears the burden of proof on the issue.[156]

Notably, "lawful impasse cannot be reached in the presence of a serious unremedied unfair labor practice that affects negotiations."[157] Because "[g]ood-faith bargaining is a prerequisite to reaching bona fide impasse," any alleged impasse resulting from bad-faith bargaining "will not be recognized for statutory purposes and the Board refuses to even pass on its legal existence."[158] The Board has also established a specific prohibition on the

---

[153] *See NLRB v. Katz*, 369 U.S. 736, 743-47 (1962). *See also Wendt Corp.*, 372 NLRB No. 135 (Aug. 26, 2023); *Mike-Sell's Potato Chip Co.*, 360 NLRB 131, 139 (2014), *enforced*, 807 F.3d 318 (D.C. Cir. 2015).

[154] *PRC Recording Co*., 280 NLRB 615, 635 (1986) (citations omitted).

[155] *Taft Broad. Co.*, 163 NLRB 475, 478 (1967), *review denied sub nom. American Federation of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968).

[156] *CJC Holdings, Inc*., 320 NLRB 1041 (1996); *North Star Steel Co*., 305 NLRB 45 (1991); *Sacramento Union*, 291 NLRB 552 (1988).

[157] *Richfield Hosp., Inc.*, 369 NLRB No. 111, slip op. at 5 (June 26, 2020). *See also Wayne's Dairy*, 223 NLRB 260, 265 (1976) (an employer cannot "parlay an impasse resulting from its own misconduct into a license to make unilateral changes").

[158] *PRC Recording Co*., 280 NLRB at 634.

implementation of proposals granting the employer broad discretionary powers to unilaterally change key employment terms.[159]

      b. <u>The facts and law clearly support a likely finding that PPG violated the Act by unilaterally changing the Editorial Unit's terms and conditions of employment</u>

There is no dispute that on about July 27, 2020, PPG declared impasse with the NewsGuild and unilaterally changed the Editorial Unit's terms and conditions of employment.[160] However, the evidence clearly shows that PPG was engaged in a course of surface bargaining, which precluded it from declaring a bona fide impasse with the NewsGuild.[161] As such, PPG's subsequent changes to the Editorial Unit's terms and conditions of employment were unlawful.

Moreover, PPG's declaration of impasse came at a time when both parties had demonstrated movement on key issues, which had not yet been discussed at the bargaining table. In fact, the evidentiary record shows that the terms and conditions of employment that PPG unilaterally implemented were different from (and more favorable than) what it offered in its June 12, 2020 Final Offer.[162]

      c. <u>A favorable ALJ decision also supports finding that PPG violated § 8(a)(5) by unilaterally changing the Editorial Unit's terms and conditions of employment</u>

The ALJ found that the parties could not be at a good-faith impasse due to PPG's serious unremedied unfair labor practices, that impacted negotiations.[163] The ALJ also pointed out the

---

[159] *See McClatchy Newspapers*, 321 NLRB 1386 (1996), *enforced*, 131 F.3d 1026 (D.C. Cir. 1997) (implementation of proposal permitting employer to unilaterally set merit pay was unlawful); *KSM Indus.*, 336 NLRB 133, 134-35 (2001) (implementation of proposal allowing employer to unilaterally change healthcare benefits was unlawful).

[160] Ex. 1(c) at 1832-1824.

[161] *Cf. J.W. Rex Co.,* 308 NLRB 473, n.6 (1992) (employer's surface bargaining precluded a good-faith impasse), *enforced mem.*, 998 F.2d 1003 (3d Cir. 1993).

[162] *Compare* Ex. 1(c) at 1763-810 with *id.* at 1835-1855.

[163] Ex. 1(f) at 3487-89.

"inherently contradictory" nature of PPG's actions when it declared the parties were at impasse, but simultaneously announced that it was implementing terms and conditions of employment that differed from what PPG set forth in its Final Offer, and by implementing new terms, PPG demonstrated that it had room to move and therefore the parties were not at impasse.[164]

Accordingly, the ALJ found PPG's declaration of impasse and unilateral changes unlawful, given PPG had not yet reached an overall good-faith impasse with the NewsGuild in successor contract negotiations.[165] Since the ALJ's findings and conclusions on this matter are legally and factually sound, there is a strong likelihood that the Board will uphold this portion of his decision.[166]

**6. _Petitioner Has a Substantial Likelihood of Success on the Allegation that PPG Has Violated § 8(a)(5) By Failing to Bargain in Good Faith with the Mailers and the Pressmen over Interim Health Insurance Agreements for Their Unit Employees_**

a. Legal framework

It is well established that employee health insurance is a mandatory subject of collective bargaining.[167] Therefore, changes to such terms must be bargained with employee representatives upon the union's request.[168] A bargaining obligation is present even when the

---

[164] _Id._

[165] _Id._

[166] An ALJ's favorable decision strongly supports the Board's "reasonable cause" argument in a section 10(j) proceeding. _See, e.g., Francisco Foods, Inc._, 276 F.3d at 288. _Accord JRL Food Corp._, 196 F.3d at 335-37; _ConAgra_, 70 F.3d at 157 n.3, 161; _Trading Port, Inc._, 517 F.2d at 37, n.7.

[167] _See Allied Chem. & Alkali Workers Local 1 v. Pittsburgh Plate Glass Co._, 404 U.S. 157, 159 (1971). Accord: _Mid-Continent Concrete_, 336 NLRB at 259.

[168] _See, e.g._, _Orchid Paper Prods. Co._, 367 NLRB No. 33, slip op. at *1 n.6 (Nov. 20, 2018) (employer failed to bargain over change to health insurance carrier); _Larry Geweke Ford._, 344 NLRB 628, 628 (2005) (employer failed to bargain over change in healthcare plan and employer contributions thereto).

change is outside of an employer's control, in which case, the effects of the change are the subject of negotiation—so called "effects bargaining."[169]

"Agreement is stifled at its source if opportunity is not accorded for discussion or so delayed as to invite or prolong unrest or suspicion."[170] Thus, the obligation to bargain in good faith "encompasses the affirmative duty to make expeditious and prompt arrangements, within reason, for meeting and conferring."[171]

    b. <u>The facts and law clearly support a likely finding that PPG violated the Act by failing to bargain in good faith with the Mailers and Pressmen for health benefits</u>

The evidence clearly shows PPG failed to bargain in good faith with the Mailers and Pressmen over medical insurance (whether for an interim Fund coverage agreement or an alternative PPG plan option) by, *inter alia*: ignoring the Mailers and Pressmen's numerous bargaining requests for nearly three months; refusing to meet until three days before employees' Fund benefits were scheduled to terminate; and failing to make any proposals addressing the Mailers and Pressmen Unit employees' imminent loss of health insurance until the very last day before the scheduled Fund cancellation. The Board has found delays of similar lengths of time to be unreasonable in other cases.[172]

---

[169] *See United Parcel Serv.*, 336 NLRB 1134 (2001) (employer obligated to bargain over effects of facility owner's decision to relocate parking lot); *Hanes Corp.,* 260 NLRB 557, 561-63 (1982) (employer required to bargain over specific methods of complying with newly promulgated OSHA regulation); *Sheltering Pines Convalescent Hosp.,* 255 NLRB 1195 (1981) (employer required to bargain over distribution of funds, payment of which was mandated by statute).

[170] *JH Rutter-Rex Mfg. Co*., 86 NLRB 470, 506 (1949).

[171] *Id.*

[172] *See, e.g.*, *J.G. Kern Enter.*, 371 NLRB No. 91 (Apr. 20, 2022) ("unreasonably delaying bargaining during a period of almost 3 months" violative); *Ne. Ind. Broad. Co.*, 88 NLRB 1381, 1382 (1950) (five-week delay in commencing negotiations with union was unreasonable).

Here, an obligation to engage in effects bargaining arose when the Mailers and Pressmen first requested to meet and discuss options for continued healthcare coverage after the Fund notified employees of the impending termination their health insurance.[173] Rather than bargain in good faith as required by the Act, PPG engaged in dilatory tactics, and when it finally did meet with the Mailers and Pressmen, failed to engage in any meaningful bargaining.[174] When PPG finally did propose an alternative healthcare option, it displayed the same "take it or leave it" approach as it did during successor contract bargaining.[175] In addition, PPG also stymied the possibility of continued coverage through the Fund by refusing to consider any proposal that would split costs between the Mailers and Pressmen Unit employees and PPG, even though PPG it admitted its burden would be small.[176]

---

[173] *See Security Walls, Inc.*, 365 NLRB No. 99, slip op. at 4 (June 15, 2017) ("The Board has never required a union to employ some combination of magic words to express a request to bargain. Rather, a request for bargaining 'need take no special form, so long as there is a clear communication of meaning'") (citing *Armour & Co.*, 280 NLRB 824, 828 (1986) and *Scobell Chem. Co. v. NLRB*, 267 F.2d 922, 925 (2d Cir. 1959)). *Cf. Oak Rubber Co.,* 277 NLRB 1322, 1323 (1985) (union's question to employer to "try and work out any problems which might prompt the Company to relocate" was demand for bargaining over employer's relocation decision), *enforcement denied on other grounds*, 816 F.2d 681 (6th Cir. 1987).

[174] *Cf. Fruehauf Trailer Servs.*, 335 NLRB 393, 393 (2001) (evidence of bad faith where "it took two letters from the [u]nion and the passage of almost 3 months before the [employer] met with the [u]nion for an initial bargaining session, [and] [m]ore important, even when the parties finally met… the [employer] neither presented a contract proposal nor offered any substantive response to the [u]nion's initial proposal."); *United Parcel Serv.*, 336 NLRB at 1135 (employer that, "while willing to listen to the Union's suggestions, immediately rejected them and offered no proposals of its own" failed to satisfy effects bargaining obligation.).

[175] *See Nexstar Broad., Inc.*, 371 NLRB No. 118 slip op. at 32 (employer's bad-faith "take-it-or-leave-it attitude went beyond hard bargaining" where union consistently approached employer with counterproposals on the various outstanding articles while employer consistently insisted on its own proposals).

[176] *Cf. Blue Jeans Corp.*, 177 NLRB at 206 (evidence of bad faith where employer expressed that a particular issue was "minor matter as far as it was concerned [but] did not agree to place such a provision in the contract," because "[i]t is difficult to see how parties can make any progress toward establishing a mutual understanding and arriving at agreement in the face of such an approach.").

PPG's course of conduct clearly reflects its intent to frustrate the possibility of reaching an agreement with the Production Unions regarding interim healthcare coverage. Accordingly, Petitioner has demonstrated a substantial likelihood that PPG failed to engage in effects bargaining over medical insurance for the Mailers and Pressmen Unit employees.

**B.  Petitioner Has Shown that Irreparable Harm is Likely Absent Interim Relief and that the Balance of Equities and the Public Interest Favor Interim Relief**

"[I]n the labor field, as in few others, time is crucially important in obtaining relief."[177] PPG's unlawful refusal to bargain in good faith with the Unions that represent its employees threatens irreparable harm to the national labor policy encouraging good-faith collective bargaining embodied in section 1 of the Act, the employees' right to organize under section 7 of the Act, and the efficacy of the Board's ultimate remedial order.

Congress has declared that "encouraging the practice and procedure of collective bargaining" is "the policy of the United States[.]"[178] Section 7 of the Act grants employees the right to decide whether they wish "to bargain collectively through representatives of their own choosing. . . ."[179]

In this case, PPG has engaged in extensive unlawful conduct in the context of protracted collective-bargaining negotiations, causing, among other harms, many employees to lose their health insurance coverage. As explained below, without timely interim relief, PPG's refusal to bargain in good faith, and the resulting loss of health insurance benefits will undermine employee support for the Unions and deprive employees of the benefits of collective bargaining. Over time, without an immediate injunction requiring interim good-faith bargaining, and

---

[177] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

[178] 29 U.S.C. § 151.

[179] 29 U.S.C. § 157.

especially provision of interim healthcare benefits, these harms will be irreparable, and the

Board's final remedial bargaining order will be ineffective. PPG will succeed in permanently

depriving its employees of Union representation through its illegal conduct, contrary to the Act's

intent.

PPG's refusal to bargain in good faith is likely to irreparably erode employees' support

for their chosen representative over time because the Unions are unable to protect the employees

or affect their working conditions while the case is pending before the Board.[180] The employees

predictably will come to shun the Unions because their working conditions will have been

virtually unaffected by collective bargaining for several years, and they will have little, if any,

reason to support the Unions.[181] This lost support for the Unions will not be restored by a final

---

[180] *See Grane Healthcare Co.*, 666 F.3d at 102 (employer's refusal to bargain in good faith "disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions") (quoting *Fall River Dyeing & Finishing v. NLRB*, 482 U.S. 27, 49-50 (1987)); *Kobell v. United Ref. Co.*, 1998 WL 794860, at *9 (W.D. Pa. Nov. 8 1998) ("[b]y requiring the parties to negotiate collectively and in good faith, and restoring the status quo ante of the affected [] employees' terms and conditions of employment …, we justly and properly safeguard the [u]nion's position as the exclusive collective bargaining representative of its employees and protect the [u]nion's employee support and the collective bargaining process as a whole"). *Cf. NLRB v. Am. Nat'l. Ins. Co.*, 343 U.S. 395, 402 (1952) ("Enforcement of the obligation to bargain collectively is crucial to the statutory scheme.").

[181] *See Grane Healthcare Co.*, 666 F.3d at 102-03 (refusal to bargain "inflicts a particularly potent wound"); *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454-55 (1st Cir. 1990); *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26-27 (1st Cir. 1986) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.") (quoting *International Union of Electrical, Radio & Machine Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970)); *Moore-Duncan v. Horizon House Dev. Servs.*, 155 F. Supp. 2d 390, 396-97 (E.D. Pa. 2001). *See also Avanti Health Sys.*, 661 F.3d at 1192 ( ("delay in bargaining weakens support for the union"); *HTH Corp.*, 650 F.3d at 1362 ("the result of an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether"); *Francisco Foods, Inc.*, 276 F.3d at 297-98; *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 369 (2d Cir. 2001); *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226-27 (6th Cir. 1993); *NLRB v. Cayuga Crushed Stone, Inc.*, 474 F.2d 1380, 1384 (2d Cir. 1973) ("[T]he refusal to bargain itself . . . erodes the status of . . . [u]nions and

Board order in due course. By the time the Board issues final orders for these cases, it will be too late; employees will have given up on the Unions.[182]

This predictable loss of support is indeed occurring in this case. PPG's conduct has already caused employee support for the Unions to begin to dissipate: employee attendance on the picket line is declining as many employees have either crossed the picket line or resigned their employment. The Unions' loss of support, in turn, will make the Board's final bargaining order ineffectual, leading to remedial failure.[183] The Unions need the support of the employees

discourages union membership."); *NLRB v. Irving Ready-Mix, Inc.*, 780 F. Supp. 747, 771 (N.D. Ind. 2011) ("The longer that [the employer] is able to avoid bargaining with the [u]nion, the less likely the [u]nion will be able to organize and represent [the employer's] employees effectively if and when the Board orders [it] to commence bargaining."), *aff'd sub nom. Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566 (7th Cir. 2011); *Pye v. Young Women's Christian Ass'n of W. Mass.*, 419 F. Supp. 2d 20, 22-23 (D. Mass. 2006); *Hadsall v. ADT, LLC*, 2021 WL 2283884, at *8 (W.D. Wis. June 4, 2021).

[182] *See Avanti Health Sys.*, 661 F.3d at 1192 ("delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support"); *Francisco Foods, Inc.*, 276 F.3d at 299; *Electrical, Radio & Machine Workers*, 426 F.2d at 1249 ("When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees."); *Squillacote v. U.S. Marine Corp.*, 1984 WL 148024, at *4 (E.D. Wis. May 10, 1984); *Levine v. C & W Mining Co.*, 465 F. Supp. 690, 694 (N.D. Ohio 1979), *aff'd in relevant part* 610 F.2d 432, 436-37 (6th Cir. 1979).

[183] *See Grane Healthcare Co.*, 666 F.3d at 102-03 (interim bargaining order necessary because "[a]n ultimate Board order that [the employer] recognize the [u]nion may be ineffective if the [u]nion has lost significant support"); *Avanti Health Sys.*, 661 F.3d at 1193 ("[w]ith only limited support … the [u]nion will be unable to bargain effectively regardless of the ultimate relief granted by the Board"); *Francisco Foods, Inc.*, 276 F.3d at 299 (the longer a union "is kept . . . from working on behalf of . . . employees, the less likely it is to be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining"); *Irving Ready-Mix*, 780 F. Supp. 2d at 771-72 ("The longer that [the employer] is able to avoid bargaining with the [u]nion, the less likely the [u]nion will be able to organize and represent [the employer]'s employees effectively if and when the Board orders [the employer] to commence bargaining"); *Garcia v. Sacramento Coca-Cola Bottling Co*., 733 F. Supp. 2d 1201, 1216 (E.D. Cal. 2010); *Young Women's Christian Ass'n of W. Mass.*, 419 F. Supp. 2d at 22-23; *Muffley v. APL Logistics Mgmt. Warehouse Servs., Inc.*, 2008 WL 544455 (W.D. Ky. Feb. 27, 2008), *opinion clarified,* 2008 WL 4561573 (W.D. Ky. Oct. 10, 2008); *Gold v. State Plaza, Inc.*, 435 F. Supp. 2d 110, 122, 126 (D.D.C. 2006); *Kinney v. Cook Cty. Sch. Bus, Inc.*, 2000 WL 748121, at *8-11 (N.D. Ill. June 1, 2000).

they represent to bargain effectively. Without support, the Unions have no leverage and "will be hard-pressed to secure improvements in wages and benefits at the bargaining table."[184] With weakened Unions, a final Board bargaining remedy will be unable to "recreate the original status quo with the same relative position of the bargaining parties."[185] In those circumstances, no meaningful, productive good-faith bargaining will occur under the Board's final order.[186] For these reasons, numerous courts have recognized that an employer's unlawful refusal to bargain in good faith inherently and predictably causes irreparable harm.[187] PPG will defeat the Unions, elude its bargaining obligation, and frustrate the intent of Congress by virtue of its unlawful

---

[184] *Horizon House Dev. Servs.*, 155 F. Supp. 2d at 396-97. *See Hadsall v. Sunbelt Rentals, Inc.*, 2020 WL 4569177, at *5 (E.D. Wis. Aug. 7, 2020) ("it is widely accepted that the longer the employer avoids bargaining with the union, the more likely it is that participation in the union will be chilled and that the union will not be able to be effective in its representation"), *appeal dismissed and remanded*, 993 F.3d 992 (7th Cir. 2021). *See also Duffy Tool & Stamping, LLC v. NLRB*, 233 F.3d 995, 998 (7th Cir. 2000) ("By undermining support for the union, the employer positions himself to stiffen his demands … knowing that if the process breaks down the union may be unable to muster enough votes to call a strike").

[185] *HTH Corp.*, 650 F.3d at 1363.

[186] *See Avanti Health Sys., LLC*, 661 F.3d at 1196 ("if support for the [the union] decreases without an injunction, the [union] 'will be unable to bargain effectively regardless of the ultimate relief granted by the [NLRB].'"); *Perez v. Noah's Ark Processors, LLC*, 2019 WL 2076793, at *5 (D. Neb. May 10, 2019) ("the Board's ultimate remedial action is likely to have little effect if it only results in compelling [the employer] to engage in collective bargaining with a Union that's already lost its base of support"). *See also Electrical, Radio & Machine Workers*, 426 F.2d at 1249 (employer "may continue to enjoy lower labor expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively").

[187] *See Avanti Health Sys., LLC*, 661 F.3d at 1191("Given the central importance of collective bargaining to the cause of industrial peace, when the Director establishes a likelihood of success on a failure to bargain in good faith claim, that failure to bargain will likely cause a myriad of irreparable harms"); *Francisco Foods, Inc.*, 276 F.3d at 297-98 ("[i]n appropriate circumstances, the same evidence that establishes the Director's likelihood of proving a violation of the NLRA may provide evidentiary support for a finding of irreparable harm"); *Sunbelt Rentals*, 2021 WL 2283884, at *8 ("it is generally reasonable to infer that a union's ability to effectively represent employees is diminished the longer the employer is able to avoid bargaining with the union"; no independent just and proper evidence required). *See also Pan Am. Grain Co.*, 805 F.2d at 26-27; *Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d at 1216.

actions. Ordering PPG to bargain in good faith with the Unions now offers the best chance of preserving the Unions' support before it is irrevocably diminished, thereby protecting employees' statutory right to choose representation and preserving the Board's remedial effectiveness.[188]

The striking employees' loss of health insurance and other benefits has compounded the loss of support for the Unions caused by PPG's refusal to bargain in good faith. Indeed, the benefits of collective bargaining often include many negotiated improvements in terms and conditions of employment, such as health insurance benefits, higher wages, and other fringe benefit packages.[189] Although the Board will attempt to remedy the loss of these benefits with its final Order, after years have passed it is often difficult to do so. Other lost benefits due to PPG's unlawful, bad-faith bargaining include such items as job security, safety conditions, the protection of a grievance-arbitration procedure, and freedom from unilateral changes in working conditions. These nonmonetary benefits lost to employees are an important part of collective-bargaining rights under the Act, even if they are difficult to quantify.[190]

Indeed, the harm caused by employees' loss of health insurance benefits has been particularly catastrophic here. PPG's bad faith bargaining led to the Production Unit employees losing their health insurance in October 2022, and it resulted in the Editorial Unit employees being subjected to an unlawfully imposed health plan with less favorable terms.[191] To maintain

---

[188] *Stephen Dunn & Assocs.*, 241 F.3d at 669 ("[s]uccessful bargaining could restore the employees' interest in the Union").

[189] *See Grane Healthcare Co.*, 666 F.3d at 103.

[190] *See Avanti Health Sys., LLC*, 661 F.3d at 1191-92 ("unions provide a range of non-economic benefits to employees that are not realized when an employer refuses to bargain with the union").

[191] *See United Steelworkers of America v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1280 (3d Cir. 1979) ("surely the possibility that a worker would be denied adequate medical care as a result of

their benefits under that plan, the Editorial Unit employees may have to pay 2.5 times more per year than what was required under the Fund (i.e., a potential of $15,276 per year rather than $6,000). PPG's plan also unlawfully imposed a non-embedded deductible on the Editorial Unit employees that requires them to pay more out-of-pocket when an individual family member needs healthcare. Of course, Editorial Unit employees who remain on strike to protest PPG's unlawful conduct have likewise been without employer-provided health insurance since October 2022. Employees have been forced to extremes to cope with this adversity, with many having to choose between paying for expensive treatments out of pocket or foregoing necessary medical care.

In contrast to these serious irreparable harms to the employees' rights, the Unions' status, and the Board's remedial authority, any harm to PPG from a temporary injunction is minimal.[192] An interim bargaining order under section 10(j) is not permanent.[193] The order would not compel agreement to any specific term or condition of employment advanced by the Union in

---

having no insurance would constitute 'substantial and irreparable injury'") (internal citation omitted); *Hooks v. Hood River Distillers, Inc.*, 2021 WL 2142609, at *15 (D. Ore. May 26, 2021) ("when workers suffer significant financial and medical harms, which cannot be remedied with a later monetary award, it adversely affects a union's ability to protect the collective bargaining rights of the workers"); *Mattina v. Kingsbridge Heights Rehab. and Care Ctr.*, 2008 WL 3833949, at *25 (S.D.N.Y. Aug. 14, 2008) (threat of irreparable harm from termination of health coverage "is tragically obvious"), *aff'd*, 329 Fed. Appx. 319 (2d Cir. 2009); *Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 359-60 (E.D.N.Y. 2012) (fact that unlawful lockout threatened employees with homelessness and caused loss of health insurance supported just and proper finding); *ConAgra*, 70 F.3d at 164 (potential for irreparable harm found where, among other things, lockout caused employees to be in arrears on their loans, consequently damaging their credit).

[192] *See Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 182 (1941) ("Protection of the workers' right to self-organization does not curtail the appropriate sphere of managerial freedom; it furthers the wholesome conduct of business enterprise.").

[193] *See Trading Port, Inc.*, 517 F.2d at 40 ("there is nothing permanent about any bargaining order . . . particularly an interim order which will last only until the final Board decision").

negotiations. Rather, it only requires bargaining with the Union in good faith to an agreement or a bona fide impasse.[194] Any agreement reached between the parties under a section 10(j) decree can contain a condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a final bargaining order remedy.[195] Also, the costs in terms of time and money spent on collective bargaining is a burden that falls on both parties and does not defeat a request for an interim bargaining order.[196]

An interim bargaining order will also further the public interest in fostering collective bargaining to safeguard industrial peace.[197] In fact, the Unions have represented that the strikes will end in both the Editorial and Production Units if injunctive relief restores health insurance benefits as they would have existed but for PPG's unfair labor practices, or in substantially

---

[194] *See Avanti Health Sys.*, 661 F.3d at 1196 (in the "balance of the equities, when '[t]he company is not compelled to do anything except bargain in good faith,' the risk from a bargaining order is 'minimal.'"); *Stephen Dunn & Assocs.*, 241 F.3d at 667, 669; *Overstreet v. Thomas Davis Med. Ctrs., P.C.*, 9 F. Supp. 2d 1162, 1167 (D. Ariz. 1997); *Penello v. United Mine Workers of America*, 88 F. Supp. 935, 943 (D.D.C 1950).

[195] *See, e.g.*, *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1054 (2d Cir. 1980).

[196] *See Avanti Health Sys., LLC*, 661 F.3d at 1196; *Stephen Dunn & Assocs.*, 241 F.3d at 669.

[197] *See Ford Motor Co. v. NLRB*, 441 U.S. 488, 499 (1979) ("National labor policy contemplates . . . collective bargaining. . . . this is preferable to allowing recurring disputes to fester outside the negotiation process until strikes or other forms of economic warfare occur."); *Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203, 211 (1964) ("The Act was framed with an awareness that refusals to confer and negotiate had been one of the most prolific causes of industrial strife."); *Centro Medico del Turabo*, 900 F.2d at 455 ("If the goal of the labor laws and regulations is to strengthen the bargaining process, then ordering bargaining . . . cannot be contrary to the public interest."); *Paulsen v. Remington Lodging & Hosp., LLC*, 773 F.3d 462, 469 (2d Cir. 2014) ("principal purpose of a [§] 10(j) injunction is to guard against harm to the collective bargaining rights of employees.").

equivalent form. Additionally, it will serve the public interest in "ensur[ing] that an unfair labor practice will not succeed" because of the long administrative process.[198]

Interim application of the Editorial Unit's extant collective-bargaining agreement to restore health benefits is also necessary to prevent irreparable harm to the NewsGuild's status as bargaining representative and the irremediable loss to unit employees of the benefits of collective bargaining.[199] When an employer refuses to abide by a collective-bargaining agreement, it deprives employees of those contractual protections, such as a grievance against an unjust termination, whose loss an eventual Board order cannot retroactively remedy.[200] An interim order restoring the terms of that contract requires PPG to make healthcare contributions at levels necessary to maintain health benefits, in accordance with an arbitration award that establishes the proper status quo.[201]

An interim remedy prospectively providing reimbursement for any future medical expenses, including the cost of purchasing substitute health insurance, incurred by Production Unit employees because of PPG's unlawful conduct is also just and proper to preserve the

---

[198] *Avanti Health Sys.*, 661 F.3d at 1197 (quoting *HTH Corp.*, 650 F.3d at 1365-66). *See also Trading Port, Inc.*, 517 F.2d at 39 (the public interest is in "prevent[ing] frustration of the purposes of the Act").

[199] The district court under § 10(j) may order an employer to abide by the terms of an agreed-upon labor agreement. *See, e.g., Aguayo v. S. Coast Refuse Corp.*, 1999 WL 547861, at *18 (C.D. Cal. June 28, 1999).

[200] *See Pascarell v. Gitano Grp., Inc.*, 730 F. Supp. 616, 625 (D.N.J. 1990); *Wilson v. Liberty Homes, Inc.*, 500 F. Supp. 1120, 1131 (W.D. Wis. 1980), *aff'd in relevant part*, 1981 WL 17037, at *13-14 (7th Cir. Oct. 7, 1981), *vacated as moot and opinion withdrawn from publication as moot*, 1982 WL 31231 (7th Cir. Feb. 1, 1982).

[201] *See PG Publishing, Inc.*, 2020 WL 7065834, at *1-4 (enforcing arbitration award).

employees' support of the Unions.[202] Such foreseeable pecuniary harms suffered by employees as a result of PPG's unfair labor practices are properly included when the Board orders make-whole remedies.[203] It is well-established that a district court's "fashioning of those remedies typically framed by the Board in an unfair labor practice proceeding is 'just and proper,' even though a final decision by the Board is pending."[204]

The other requested relief is also just and proper. A broad cease-and-desist order is appropriate to prevent further violations because PPG has engaged in "egregious or widespread misconduct ... demonstrat[ing] a general disregard for the employees' fundamental statutory rights."[205] Reading of the district court's order by a responsible employer agent or a Board agent is an "effective but *moderate* way to let in a warming wind of information and, more important, reassurance."[206] Relatedly, posting the order during the pendency of the administrative proceedings, along with electronic dissemination of the order, will further inform the unit

---

[202] Production Unit employees are incurring these out-of-pocket expenses as a direct consequence of PPG's failure to bargain in good faith during contract negotiations and subsequent unilateral changes.

[203] *Thryv, Inc.*, 372 NLRB No. 22, slip op. at 8, 9 (Dec. 13, 2022). Additionally, the district court may consider an interim *Thryv* remedy for the Editorial Unit and as an alternative to the proposed relief for that unit set forth above.

[204] *Morio v. N. Am. Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980).

[205] *Frankl v. HTH Corp.*, 693 F.3d 1051, 1061 (9th Cir. 2012). Accord: *Angle v. Sacks*, 382 F.2d 655, 657-58, 660-61 (10th Cir. 1967).

[206] *United Nurses Associations v. NLRB*, 871 F.3d 767, 788-89 (9th Cir. 2017). Accord: *Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206-07 (D. Haw. 2010) (ordering reading of court order), *aff'd sub nom. Frankl v. HTH Corp.*, 650 F.3d 1334 (9th Cir. 2011); *Fernbach v. Sprain Brook Manor Rehab, LLC*, 91 F. Supp. 3d 531, 550 (S.D.N.Y. 2015); *Rubin v. Vista Del Sol Health Servs., Inc.*, 2015 WL 306292, at *2 (C.D. Cal. Jan. 22, 2015); *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 932 (D. Ariz. 2014); *Calatrello v. Gen. Die Casters, Inc.*, 2011 WL 446685, at *8 (N.D. Ohio Jan. 11, 2011); *Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d at 1218.

employees that they are free to exercise their statutory right to support the Union without fear of retaliation.[207]

The passage of time does not obviate the need for interim injunctive relief. This is an enormously complex case involving many charges filed over an extended time frame and involving four separate administrative hearings. The Board must have time to "investigate and deliberate" before initiating section 10(j) proceedings.[208] Even with some passage of time, delay is significant only if the harm has occurred and the parties cannot be returned to the status quo that would have existed but for an employer's unlawful conduct, such that a final Board order is likely to be as effective as interim injunctive relief.[209] Here, the passage of time has not so undermined employee support for the Unions that an injunction would be no more effective than a final Board order. Importantly, of the four administrative hearings involved in this section 10(j) matter, only two have progressed to a decision by an ALJ. In addition, although employee support for the Unions has started to fray, there are many employees still on the picket line and many employees still supportive of the Unions. Of course, in the absence of injunctive relief, it is

---

[207] *See, e.g.*, *Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1054 (W.D. Tenn. 2011) (ordering posting); *Muffley v. APL Logistics Servs. Inc.*, 2008 WL 4561573, at *2 (W.D. Ky. Oct. 10, 2008) (ordering posting); *Drew-King v. Amazon.com Servs., LLC*, 2022 WL 17083273, at *13 (E.D.N.Y. Nov. 18, 2022) (ordering electronic distribution of § 10(j) order), *appeal docketed*, No. 22-3182 (2d Cir. Dec. 20, 2022).

[208] *See Vibra Screw Inc.*, 904 F.2d at 881 (Board requires time to thoroughly investigate unlawful activity); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 539, 544-45 (4th Cir. 2009) ("[c]omplicated labor disputes like this one require time to investigate and litigate"); *Maram v. Universidad Interamericana*, 722 F.2d 953, 960 (1st Cir. 1983) (the Board "cannot operate overnight").

[209] *See Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988), *overruled on other grounds sub nom., Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449 (9th Cir. 1994) (en banc); *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987).

likely that support will completely dissipate by the time the Board eventually decides these cases, which would result in the final Board orders being meaningless.

Thus, temporary injunctive relief ensures that PPG does not profit from its illegal conduct, protects the employees' section 7 rights, safeguards the parties' collective bargaining process, preserves the remedial power of the Board, and effectuates the will of Congress.

## VI.    CONCLUSION

The foregoing overwhelmingly exceeds the threshold of proof necessary to establish Petitioner's likelihood of success on the merits of the alleged unfair labor practices occurred; that irreparable harm will likely occur without a temporary injunction, and that the balance of equities and public interest favor interim relief. Moreover, the evidence of PPG's efforts to unlawfully undermine and evict the Union presents a clear illustration of the prohibited conduct contemplated by Congress when it enacted section 10(j): a course of conduct that, absent injunctive relief, will enable PPG to accomplish its unlawful purpose. Petitioner urges the Court to preserve the public interest inherent in employee free choice and ensure the integrity of the Board's remedial authority by entering an injunction as requested in the Petition.

Petitioner seeks a temporary injunction directing PPG to cease and desist from engaging in its unlawful conduct; to bargain in good faith with the Unions over successor collective-bargaining agreements and with the Mailers and Pressmen for interim agreements for health benefits, to restore the lawful status quo for the Editorial Unit; to prospectively cover health costs on an interim basis for members of the Production Unit; and to grant the remaining relief sought in the Petition pending the final resolution of the underlying administrative proceedings before the Board.

Dated at Pittsburgh, Pennsylvania this 14th day of August, 2024.

/s/Anne E. Tewksbury

Anne E. Tewksbury (Attorney ID: PA 33314)
Attorney for the Petitioner
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222
Telephone: (412) 690-7115
Fax: (412) 395-5986
Anne.Tewksbury@nlrb.gov

/s/ Zuzana Murarova

Zuzana Murarova (Attorney ID: OH 88431)
Attorney for the Petitioner
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222
Telephone: (412) 690-7122
Fax: (412) 395-5986
Zuzana.Murarova@nlrb.gov

# APPENDIX 1

The following chart reflects significant terms proposed by PPG in its "Final Offer" to each Union[1], as compared to the terms of the parties' expired collective-bargaining agreements.[2] **BOLDED UNDERLINED** headings indicate the Article of PPG's Final Offer where each proposal is located. **Bolded** text indicates proposed language that was not contained the expired contracts. *Italicized* provisions (preceded by "Removed:") and ~~struck through~~ text indicate language that PPG proposed eliminating from the expired contracts. Regular text indicates language from the expired contracts that PPG's proposals would leave unchanged.

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| Job Security: Jurisdiction and Assignment of Work | **AGREEMENT** **The parties recognize the following exceptions to the Guild's jurisdiction: (1) Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work. (2) Non-bargaining unit  employees may perform bargaining unit work on an occasional basis.** Removed: *Exempt employees can do bargaining unit work as performed in the past and/or similar work that may result from the introduction of new print, electronic or other products and as operationally necessary. Performance of such exempt work will not displace bargaining unit employees.* **(3) The Company may subcontract work. (4) The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount** ~~will be 15 percent~~ **to stringers will not exceed 20 percent** of the annual | **ARTICLE 4 – FLEXIBLE WORK ASSIGNMENTS** **The parties recognize the need for flexibility in work assignments. The duties of the employees shall be duties presently performed by employees and new or additional duties assigned to the employees by the Company. However, nothing in this Agreement shall be construed as giving the Union exclusive jurisdiction over or an exclusive right to perform any work. The Company has the sole right to utilize individuals outside of the bargaining unit to perform duties and responsibilities performed by employees within the bargaining unit. Article 4, Flexible Work Assignments, supersedes anything to the contrary in this Agreement.** Removed: *All mailing room work shall be performed only by journeymen, and apprentices.* **ARTICLE 5– OPERATION AND CONTROL OF THE MAILING FACILITIES** Supervisors may perform ~~de minimus~~ bargaining unit work ~~as operationally necessary. Such performance is not~~ | **ARTICLE 5 – FLEXIBLE WORK ASSIGNMENTS** **The parties recognize the need for flexibility in work assignments. The duties of the employees shall be duties presently performed by employees and new or additional duties assigned to the employees by the Company. However, nothing in this Agreement shall be construed as giving the Union exclusive jurisdiction over or an exclusive right to perform any work. The Company has the sole right to utilize individuals outside of the bargaining unit to perform duties and responsibilities performed by employees within the bargaining unit. Article 5, Flexible Work Assignments, supersedes anything to the contrary in this Agreement.** Removed: *All mailing room work shall be performed only by journeymen, apprentices and Part-Time Mailers.* **ARTICLE 7– OPERATION AND CONTROL OF THE MAILING FACILITIES** Supervisors may perform ~~de minimus~~ bargaining unit work ~~as operationally necessary. Such performance is not~~ | **ARTICLE 5 – JURISDICTION** **It is recognized that in the normal day-to-day operation of the pressroom, non-bargaining unit employees such as machinists, electricians, operating engineers, and outside vendors may perform work in the pressroom within their expertise or skill set. Supervisors and managerial employees may perform any work performed by bargaining unit employees.** **ARTICLE 7 – JOURNEYMEN** Removed: *All work performed in the pressroom under the jurisdiction of this contract shall be performed by journeymen pressmen and/or paperhandling pressmen and/or paperhandlers* **ARTICLE 47 – MANAGEMENT RIGHTS** [Exclusive management right …] to cease **or outsource** any department, operation or service **of the Company in whole or in part**… **ARTICLE 38 – APPRENTICES** Removed: *[Apprentices] shall be allowed to work in any position of the press at the discretion of the foreman,* | **ARTICLE 3 – FLEXIBLE WORK ASSIGNMENTS** **The parties recognize the need for flexibility in work assignments. The duties of the employees shall be duties presently performed by employees and new or additional duties assigned to the employees by the Company. However, nothing in this Agreement shall be construed as giving the Union exclusive jurisdiction over or an exclusive right to perform any work. The Company has the right to utilize individuals outside of the bargaining unit to perform duties and responsibilities performed by employees within the bargaining unit. Supervisors and managerial employees may perform any work performed by bargaining unit employees. Article 3, Flexible Work Assignments, supersedes anything to the contrary elsewhere in this Agreement.** Removed: *The work of the Advertising Department shall be assigned only to employees covered by this Agreement.* **ARTICLE 5 – MANAGEMENT RIGHTS** |

[1] Ex. 1(c) at 1711–810; Ex. 2(c) at 6010–84; Ex. 3(c) at 11386–440; Ex. 4(b) at 15702–38.

[2] Ex. 1(c) at 901–60; Ex. 2(c) at 5519–605; Ex. 3(c) at 11009–158; Ex. 4(c) at 15969–6013.

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.<br>Removed: *If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle.*<br>**(5)** […] It is understood that [community journalism] work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors ~~and is not intended to displace bargaining unit work~~. **(6)** The Company may ~~continue to~~ obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.<br><br>**ARTICLE 22 – MANAGEMENT RIGHTS**<br>[Exclusive management right …] to cease, **or restructure** any department, operation or service **of the Company in whole or in part**; […] introduce, **change or discontinue** ~~new or improved~~ research, production, service distribution and maintenance methods, materials, machinery and equipment…<br><br>**ARTICLE 6 – PART-TIME, TEMPORARY EMPLOYEES AND TWO-YEAR ASSOCIATES**<br>Removed: *Part-time and, or temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.* | ~~intended to displace bargaining unit work~~.<br><br>**ARTICLE 32 – MANAGEMENT RIGHTS**<br>[Exclusive management right …] **to establish new jobs and abolish or change existing jobs;** […] to cease, **restructure or outsource** any department, operation or service **of the Company in whole or in part**; […] introduce, **change or discontinue** ~~new or improved~~ research, production, service, distribution and maintenance methods, materials, machinery and equipment… | ~~intended to displace bargaining unit work~~.<br><br>**ARTICLE 2 – MANAGEMENT RIGHTS**<br>[Exclusive management right …] **to establish new jobs and abolish or change existing jobs;** […] to cease, **restructure or outsource** any department, operation or service **of the Company in whole or in part**; […] introduce, **change or discontinue** ~~new or improved~~ research, production, service, distribution and maintenance methods, materials, machinery and equipment… | *provided they do not displace a journeyman* | [Exclusive management right …] to cease, **restructure or outsource** any department, operation or service **of the Company in whole or in part**; […] introduce, **change or discontinue** ~~new or improved~~ research, production, service distribution and maintenance methods, materials, machinery and equipment…<br><br>**ARTICLE 17 – REDUCTION IN FORCE**<br>Removed: *The hiring of part time employees shall not be at the expense of laying off full time regular employees or full time employees previously laid off.* |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | **ARTICLE 8 – SECURITY**<br>Removed: *Stringers and free lancers in no case will replace or displace bargaining unit employees.*<br><br>**ARTICLE 19 – MISCELLANEOUS**<br>Free-lance **independent contractor** photographers may be retained for photo and video assignments ~~to supplement existing coverage. Furthermore, it is understood that the use of free-lancers is not intended to replace bargaining unit jobs or work.~~ | | | | |
| Job Security: Layoffs and Recalls | **ARTICLE 8 – SECURITY**<br>The Company's right to determine the size of the force is recognized and the **Company's decision** ~~right~~ to reduce the force ~~for economy~~ (either permanently or temporarily) shall not be subject to review by the Board of Arbitration~~, provided, however, that in the event the Guild believes that reasons other than economy have entered into the designation of the person or persons to be laid off, it may appeal the particular case or cases to arbitration~~. **The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.**<br><br>In the event such layoffs are necessary, the following procedures shall be observed: […] **In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group […] In the event of recall, the recall shall be according to seniority, provided** | **ARTICLE 11 – DISCHARGING & REHIRING – DECREASE FORCE**<br>**The Company has the right to lay off employees. In all cases of selection of employees for layoffs or reductions in force, the Company shall give due consideration to seniority, performance, attendance, the individual qualifications of the employee to perform the work in question, and the efficient operation of the Company. In increasing the work force, employees laid off because of a reduction in force shall be recalled according to seniority, provided that efficiency, skill, and ability to do the job are, in the judgment of the Company, equal.**<br>Removed: *to decrease the force, such decrease [is] to be accomplished by discharging first the person or persons last employed. Part-timers will be laid off prior to any full-time journeymen being laid off. Should there be an increase in the force, the persons displaced through such cause shall be reinstated in reverse order in which* | **ARTICLE 9 – MANAGER IN CHARGE – DISHCHARGING & REHIRING – DECREASE FORCE**<br>**The Company has the right to lay off employees. In all cases of selection of employees for layoffs or reductions in force, the Company shall give due consideration to seniority, performance, attendance, the individual qualifications of the employee to perform the work in question, and the efficient operation of the Company. [no language on recall order]**<br>Removed: *It is understood and agreed that layoffs and recalls from layoff will be accomplished by seniority*<br><br>**ARTICLE 2 – MANAGEMENT RIGHTS**<br>[Exclusive management right …] to promote, demote, transfer, lay off and recall to work ~~in accordance with the provisions of this Agreement~~ […]; **to determine the fact [or] lack of work** […]<br><br>Removed: ***ARTICLE 8 – STAFFING*** | **ARTICLE 39 – SENIORITY**<br>**In all cases of selection of employees for layoffs or reductions in force, the Company shall give due consideration to seniority, performance, the individual qualifications of the employee to perform the work in question, and ability. [no language on recall order]**<br>Removed: *Those employees with the least amount of seniority shall be first laid off, and when the force again increases the employees are to return to work in the reverse order in which they were laid off.*<br><br>**ARTICLE 14 – HOURS – LUNCH – SLIDE HOURS**<br>**In the event the Company reduces print days in whole or in part and the number of employees in the pressroom is reduced, the Company agrees to maintain five (5) straight-time shifts per week for as many of the remaining full-time pressmen as is practicable to meet its operational** | **ARTICLE 17 – REDUCTION IN FORCE**<br>**In all cases of selection of employees for layoffs or reductions in force in Group I, the Company shall give due consideration to seniority, performance, the individual qualifications of the employee to perform the work in question, and the efficient operation of the Company.**<br>Removed: *Part-time employees in the affected classification within a department shall be laid off prior to laying off a full-time employee. If, after all part-time employees in the affected classification within a department are laid off, the Company determines that it must convert certain full-time jobs to part-time jobs; it will first offer the full-time employee the option of working on a part-time basis.*<br>Removed: *When an employee is designated for a lay-off to reduce the force the employee may elect to move to a job in a lower classification within his/her group or his/her former classification provided such employee* |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | **that skill and qualifications are, in the opinion of the Company, equal.** […] <br><br> Removed: *(1) Voluntary incentives as designed by the Company may first be offered for a reduction in force after consultation with the Guild.(2) Eliminate thirty (30%) percent of the stringer budget and all intern programs, temporary and probationary employees. (3) if additional cost reductions are necessary […] layoffs shall be in inverse seniority order in the affected work group.* | *they were discharged before other help may be employed* <br><br> **ARTICLE 32 – MANAGEMENT RIGHTS** <br> [Exclusive management right …] to promote, demote, transfer, lay off and recall to work ~~in accordance with the provisions of this Agreement~~ […]; **to determine the fact [or] lack of work** […] <br> Removed: *It is agreed that the following journeymen mail room situation holders (a situation is five shifts of work per week) shall not lose their situations because of mechanization of the mailing rooms of the Pittsburgh Post-Gazette and this shall remain in effect without limitation for those journeymen. This includes the introduction of any process, machinery or equipment affecting mailing room work* ***[ARTICLE 4 – JOURNEYMEN AND APPRENTICES]*** <br><br> **ARTICLE 7 – STAFFING** <br> **The Company shall be the sole judge of the number of employees needed to perform any work assignment in the mailroom.** <br> Removed: *All staffing on the downtown production operations shall be in accordance with the study prepared by Ryan and Associates and memorialized in a settlement dated July 31, 2005 […] In addition, all staffing on the inserting operations downtown and the North Side shall be in accordance with the study prepared by Ryan and Associates as attached hereto as Exhibit B.* | *All staffing on the downtown production operations shall be in accordance with the study prepared by Ryan and Associates and memorialized in a settlement dated July 31, 2005 […] In addition, all staffing on the inserting operations downtown and the North Side shall be in accordance with the study prepared by Ryan and Associates as attached hereto as Exhibit B.* <br> *It is understood that if the Company plans a change in physical layout or introduction of new equipment which will affect existing manning practices, the Company will meet with the Union not later than thirty (30) days prior to making the change, for the purpose of resolving any anticipated manning changes or establishing new manning practices. If the parties cannot agree after ten (10) days, the Company and the Union will refer the matter immediately to expedited arbitration procedures under the American Arbitration Association ("AAA")* | **requirements in the judgment of the Company.** <br><br> **ARTICLE 10 – DECREASE PRESSES – NOTICE** <br> Removed: *effective the first payroll week following the signing of the collective bargaining agreement, all employees listed by name at the time of the signing of this Agreement shall be guaranteed a five (5) shift mark-up each payroll week for the balance of the Agreement, ending March 31.* <br> Removed: *Layoffs to reduce the force may be made if the same are economically necessary and no reasonable alternative exists. In the event the Union contends that reasons other than economy have entered into the decision to conduct the layoff, it may appeal the layoff to arbitration pursuant to the provisions of this Agreement.* | *has more seniority than the employee to be displaced.* <br><br> **ARTICLE 15 – REGULAR PART-TIME, TEMPORARY AND INTERN EMPLOYEES** <br> Nor shall there be a lay-off in a classification of work **as a direct result of the use of temporary employees or interns** ~~while temporary employees or interns are employed.~~ |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | | *Removed: It is understood that the Company plans a change in physical layout or introduction of new equipment which will affect existing manning practices, the Company will meet with the Union not later than thirty (30) days prior to making the change, for the purpose of resolving any anticipated manning changes or establishing new manning practices. If the parties cannot agree after ten (10) days, the Company and the Union will refer the matter immediately to expedited arbitration procedures under the American Arbitration Association ("AAA")* | | | |
| Job Security: Transfers and Vacancies | **ARTICLE 8 – SECURITY** An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes ~~shall~~ **may** be afforded the opportunity to transfer to other available positions **in the Company's discretion.** **ARTICLE 13 – ADVANCEMENT, PROMOTION, AND TRANSFER** **Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.** | **ARTICLE 5 – OPERATION AND CONTROL OF THE MAILING FACILITIES** The manager in charge and/or his representative**s** shall be the judge of an employee's competency and shall select, supervise and govern all employees of the mailing facilities ~~in conformity with this Agreement~~. He shall have the right to transfer an employee ~~temporarily~~ to any position. ~~However, when the conveyors are in operation, transfers may not be made which reduce the basic manning on the direct production jobs (conveyors, wire-tyers and tables) except in case of emergency or down for a period greater than 20 minutes.~~ *Removed: It shall not prejudice an employee's standing if he is temporarily transferred to a position the duties of which he is not fully familiar.* **ARTICLE 6 – JOURNEYMEN DEFINED** | **ARTICLE 7 – OPERATION AND CONTROL OF THE MAILING FACILITIES** The manager in charge and/or his representative**s** shall be the judge of an employee's competency and shall select, supervise and govern all employees of the mailing facilities ~~in conformity with this Agreement~~. He shall have the right to transfer an employee ~~temporarily~~ to any position. *Removed: It shall not prejudice an employee's standing if he is temporarily transferred to a position the duties of which he is not fully familiar.* | N/A [no significant changes proposed] | **ARTICLE 14 – HIRING** **Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.** **ARTICLE 15 – TRANSFERS – PROMOTIONS** Transfers shall be made on the basis of the operational requirements of the Company. ~~Where a transfer of a sales person would result in the loss of accounts or territory previously serviced by the affected employee, the employee shall have the right to bargain individually with the Company for an accommodation in connection with his or her compensation or employment with the Company; provided, however, that the Company and the employee may not agree on terms less favorable than those provided for in this Agreement. Such individual bargain shall not be subject to the grievance and arbitration~~ |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | | Removed: *In hiring journeyman employees, the mailroom manager shall not exclude as candidates for employment any individuals who have established competence as journeyman, but must recognize priority as follows: First- Regular situation holders, Second- Other journeyman who have worked in the mailing room, Third- Part Timers.*<br><br>Removed: *An employee may claim in priority a new or vacant situation whenever possible, including the scheduled starting times and slide days, provided he is given an opportunity to become proficient in the work normally done on that situation.* **[ARTICLE 29 – PRIORITY – NEW SHIFTS]** | | | ~~provisions of this Agreement unless the terms agreed upon are in violation of an express provision of this Agreement. The transfer of accounts or territories from sales persons will not be made for punitive or disciplinary purposes.~~<br>Removed: *Those employees who bid and are not selected by the Company to fill the vacancy, shall upon their request be given in writing the reasons for not being selected, and shall upon their request be advised of what may be required to become qualified.*<br><br>**ARTICLE 17 – REDUCTION IN FORCE**<br>The hiring of part time employees in lieu of replacing full time employees who depart ~~by normal attrition~~ is permitted at the Company's discretion ~~so long as the maximum number of part time employees in the Advertising division does not exceed thirty percent (30%) of the full time employees complement in hire during the term of this Agreement unless approved by mutual consent of the Company and the Union.~~ |
| Job Security: Discipline and Discharge | **ARTICLE 8 – SECURITY**<br>**The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.** | **ARTICLE 11 – DISCHARGING & REHIRING – DECREASE FORCE**<br>**The Company may discipline and discharge employees in its discretion. The Company may use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action** | **ARTICLE 9 – MANAGER IN CHARGE – DISHCHARGING & REHIRING – DECREASE FORCE**<br>**The Company may discipline and discharge employees in its discretion. The Company may use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the** | **ARTICLE 43 – CORRECTIVE ACTION**<br>**The Union agrees the Company may discipline employees for just cause. The Company may use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and** | **ARTICLE 37 – CORRECTIVE ACTION**<br>**The Union agrees the Company will discipline employees for just cause. The Company may use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case,** |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | | based on the facts and circumstances of each case, including the employee's employment record as a whole. **Progressive discipline is not required.** Removed: *Upon demand, the manager in charge shall give the reason for discharge in writing.*<br><br>**ARTICLE 9 – GRIEVANCE AND ARBITRATION**<br>The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement **or to substitute his discretion or judgment for the Company's discretion or judgment with respect to any matter this Agreement consigns or reserves to the Company's discretion or judgment.** | appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole. **Progressive discipline is not required.** Removed: *Upon demand, the manager in charge shall give the reason for discharge in writing.*<br><br>**ARTICLE 8 – GRIEVANCE AND ARBITRATION**<br>The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement **or to substitute his discretion or judgment for the Company's discretion or judgment with respect to any matter this Agreement consigns or reserves to the Company's discretion or judgment.** | circumstances of each case, including the employee's employment record as a whole. Removed: *Written forms shall be prepared by the Company on all infractions. One copy of any such prepared form on each infraction shall be given to the employee involved, one copy shall be given to the Union, and the other copy shall be placed in a separate jacket of each such employee and shall remain there for a period of eighteen (18) months from the date of each infraction. The jacket of each employee shall be cleared and expunged of all such forms that are eighteen (18) months old. Those expunged forms shall be destroyed and not referred to thereafter.* Removed: *[progressive discipline process; delineated offenses]* | including the employee's employment record as a whole.<br><br>**ARTICLE 7 – INFORMATION**<br>Removed: *Employees who are warned in writing of Company Rule(s) violations shall have such warnings removed from their personnel files as follows:(a) Written warnings which do not include a loss of pay or suspension shall be removed eighteen (18) months after the date of such warning provided that no other warnings have been issued within the last 18 month period.(b) Written warnings involving a loss of pay or suspension shall be removed thirty (30) months after the date of such warning provided no other such warnings have been issued within that 30-month period.* |
| Job Security: Rules | **ARTICLE 19 – MISCELLANEOUS**<br>**Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.** Removed: *Code of ethics is reprinted in the back of the contract.* | **ARTICLE 28 – DRUG AND ALCOHOL TESTING PROGRAM**<br>A drug and alcohol policy, including random testing, has been established ~~between the Company and the Union.~~ A copy of this policy is available in the Human Resources department. **The Company reserves the right to change in any way its Drug and Alcohol Policy at any time.** | **ARTICLE 15 – DRUG AND ALCOHOL TESTING PROGRAM**<br>A drug and alcohol policy, including random testing, has been established ~~between the Company and the Union.~~ A copy of this policy is available in the Human Resources department. **The Company reserves the right to change in any way its Drug and Alcohol Policy at any time.** | **ARTICLE 48 – DRUG AND ALCOHOL TESTING PROGRAM**<br>A drug and alcohol policy, including random testing, has been established ~~between the Company and the Union.~~ A copy of this policy is available in the Human Resources department. | N/A [no significant changes proposed] |
| Compensation: Wages | **ARTICLE 3 – WAGES**<br>**[Explicit reductions of net wage rates for all Unit employees]**<br><br>**Experience credit for earlier employment by the Company or elsewhere may be given [to] new** | **ARTICLE 18 – WAGES**<br>[For] Journeymen on the list attached hereto…Their wage scale shall be ~~as follows~~ **not less than the following minimum rates: [Explicit wage reductions]** | **ARTICLE 12 – WAGES**<br>Effective with ratification…the **minimum** wage rates shall be as follows:<br><br>**Employees will be paid weekly, bi-weekly or bi-monthly, at the discretion of the Company. The** | **ARTICLE 20 – WAGES**<br>**[Explicit wage reductions for all Unit employees]**<br>Removed: *All commercial work will be paid at 100% of the rates listed above, contingent upon agreement on reduced manning based on the work needed.* | **ARTICLE 8 – WAGES**<br>**[Outside] Salespersons employed by the Company will be paid on a commission and/or base plus commission plan basis as set forth in Appendix A. A wage reduction of five percent (5%) shall be applied to** |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | employees in the Company's discretion.<br><br>**ARTICLE 19 – MISCELLANEOUS**<br>**Employees will be paid weekly, or bi-weekly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.** | **[For all other employees]** ~~wage scale shall be as follows~~ **shall be… paid not less than the following minimum wage rates: [Explicit wage reductions]**<br><br>**Employees will be paid weekly, bi-weekly or bi-monthly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.** | **Company may require employees to participate in a direct deposit program for employee paychecks.** | **ARTICLE 49 – MISCELLANEOUS**<br>**Employees will be paid weekly or bi-weekly at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.** | **the earnings of outside salespersons beginning the first payroll period following the effective date of this Agreement, a wage reduction of three percent (3%) shall be applied to the earnings of outside salespersons beginning the first payroll period following the first anniversary date of this Agreement. The Company shall also have the right to establish, change and discontinue additional employee bonus, reward, commission and incentive programs for salespersons.**<br><br>**Notwithstanding anything to the contrary in this Agreement, the Company retains the right, in its discretion, to transfer and assign advertising accounts and to transfer and assign sales employees to and from advertising territories and categories as the Company determines from time to time.**<br><br>**[Explicit wage reductions for all other Unit employees] The Company shall have the right, in its discretion, to compensate an employee above the minimum rates set forth in this Agreement.**<br><br>**ARTICLE 9 – GUIDELINES ON ADVERTISING COMMISION PLAN**<br>Commissions will be paid on revenue, less adjustments ~~per current practice, billed~~ **as determined** by the Company. <u>Removed</u>: *A process review committee will be formed and meet on a regular basis to identify and resolve issues that impact the sales staff. These issues may include, but are not limited to[…]* |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | | | | | *involuntary account, territory and category transfer[...] The committee will be comprised of both Union and Company representatives[...]. The committee will attempt to resolve all disputes concerning this section and if no resolution can be reached, the matter will be referred to the grievance and arbitration procedures as set forth in the current labor agreement.*<br><br>**ARTICLE 36 – PAYROLL SERVICES**<br>**Employees will be paid weekly or bi-weekly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.** |
| Compensation: Hours and Shifts | **ARTICLE 4 – HOURS**<br>**The Company does not guarantee any specified hours of work per day or per week.** | **ARTICLE 14 – HOURS – LUNCH – RELIEF**<br>**The Company does not guarantee any specified number of hours per day or per week. The Company reserves the right to enlarge or shorten the workweek depending on business need.**<br>Removed: *All journeymen situation holders working at the Post-Gazette whose names appear on the Appendix I will be guaranteed a regular full time 5 shift situation for the term of this agreement, subject to provisions of Article 13, if the available number of shifts falls below five (5) times the number of journeymen.*<br><br>**ARTICLE 32 – MANAGEMENT RIGHTS**<br>[Exclusive management right …] **to establish and change work** | **ARTICLE 11 – LUNCH**<br>**The Company does not guarantee any specified number of hours per day or per week. The Company reserves the right to enlarge or shorten the workweek depending on business need.**<br><br>**ARTICLE 2 – MANAGEMENT RIGHTS**<br>[Exclusive management right …] **to establish and change work schedules, assignments and break periods…** | **ARTICLE 14 – HOURS – LUNCH – SLIDE HOURS**<br>**Nothing in this Agreement shall be construed as a guarantee of any specified number of hours per day or per week. The Company reserves the right to enlarge or shorten the workweek depending on business need.**<br><br>**ARTICLE 11 – STAFFING**<br>**Notwithstanding anything to the contrary in this Agreement, the Company retains the exclusive right in every instance to determine the number of employees and the work assignments of all employees to operate the press in the pressroom of the Company. No staffing determination in one case shall constitute a precedent binding upon the Company in any other case.** | **ARTICLE 10 – HOURS OF WORK**<br>**The Company does not guarantee any specified number of hours of work per day or per week.** |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | | schedules, assignments and break periods… | | **ARTICLE 10 – DECREASE PRESSES – NOTICE** <br> Removed: *effective the first payroll week following the signing of the collective bargaining agreement, all employees listed by name at the time of the signing of this Agreement shall be guaranteed a five (5) shift mark-up each payroll week for the balance of the Agreement, ending March 31.* | |
| Benefits: Health, Dental, Vision, and Life Insurance | **ARTICLE 20 – INSURANCE, HEALTH AND WELFARE, PENSIONS** <br> **Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding. The Company agrees to provide a health, dental, vision and life insurance plan during the term of this Agreement.** <br><br> Removed *The Company shall pay the full cost of a travel accident policy for all employees, which includes the following provisions: principal sum, $100,000; weekly indemnity, the lesser of $100 or 65 percent of weekly* | **ARTICLE 21 – WELFARE BENEFITS** <br> **Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding.** | N/A [Part-Time Mailers Unit employees did not receive these benefits under the expired contract] | **ARTICLE 31 – HEALTH AND WELFARE BENEFITS** <br> **Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding. The Company agrees to provide a health, dental, vision and life insurance plan during the term of this Agreement.** | **ARTICLE 29 – HOSPITAL AND MEDICAL COVERAGE** <br> **Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding.** |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | *earnings; waiting period, 60 days; maximum number of weeks, 52.* | | | | |
| Benefits: Short-Term Disability Policy and FMLA Leave | **ARTICLE 7 – SICK LEAVE** **Bargaining unit employees will be covered by the Company's short-term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company.** Removed: *Employees can accumulate [..] eight [sick pay] days per year during their employment to a maximum of 90 days per year. Only unused days during the year will be carried over to the maximum of 90 days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of five (5) days or longer. This benefit will begin on the 6th work day of disability. The five days will constitute a waiting period. All employees on the payroll on 1/ 1/07 will be provided an initial bank of 7 days short-term disability pay per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days. If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at 60 percent of the employee's negotiated rate of pay for those employees with two years or more of service. Those employees with less than two years service will be eligible for 13 weeks of additional sick leave [...] An employee who exhausts his disability bank shall earn additional sick leave benefits according to the* | **ARTICLE 29 – SICK AND ACCIDENT** **Bargaining unit employees will be covered by the Company's short-term disability (STD) policy. The Company reserves the right to modify or change the Company's STD policy in any way.** Removed: *The Company shall provide sickness and accident benefits of 60% of the employee's base salary (before healthcare diversions) for up to twenty-six (26) weeks for personal accident or illness.* | N/A [Part-Time Mailers Unit employees did not receive these benefits under the expired contract] | **ARTICLE 30 – INSURANCE: SICK & ACCIDENT** **Bargaining unit employees will be covered by the Company's short term disability policy (STD) on the same basis as non-represented employees of the Company. The Company reserves the right to modify or change the Company's STD policy.** Removed: *A weekly disability plan, based on a payout of 60% of the base wage, has been established between the Company and the Union.* | **ARTICLE 23 – SICK LEAVE** **Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy.** Removed: *Employees can accumulate [..] eight [sick pay] days per year during their employment to a maximum of 90 days per year. Only unused days during the year will be carried over to the maximum of 90 days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of five (5) days or longer. This benefit will begin on the 6th work day of disability. The five days will constitute a waiting period. All employees on the payroll on 1/ 1/07 will be provided an initial bank of 7 days short-term disability pay per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days. If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at 60 percent of the employee's negotiated rate of pay pursuant to the Pittsburgh Post-Gazette's weekly Disability Plan in Article 38. An employee who exhausts his disability bank can regenerate additional sick leave benefits according to the following schedule: 3 years of uninterrupted employment – 55%; 5 years of uninterrupted employment – 85%; 7 years of uninterrupted* |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | *following schedule: For one year of uninterrupted employment – 20 percent of maximum short-term disability schedule; two years of uninterrupted employment – 40 percent of maximum short-term disability schedule; three years of uninterrupted employment – 60 percent of maximum short-term disability schedule; four years of uninterrupted employment – 80 percent of maximum short-term disability schedule; five years of uninterrupted employment - 100 percent of maximum short-term disability schedule. The maximum regeneration under this program will be 70 days. Unused individual sick days will continue to be accumulated into the bank until the 90-day maximum is reached.* | | | | *employment – 100%. The maximum regeneration under this program will be 70 days or to your maximum number of days earned by years of service. Unused individual sick days will continue to be accumulated into the bank until the 90-day maximum is reached.*<br><br>**ARTICLE 26 – LEAVES OF ABSENCE**<br>**The Union agrees to comply with the Company's Family and Medical Leave Act policies as amended from time to time.**<br><u>Removed</u>: *The parties agree to comply with the Family and Medical Leave Act of 1993 [...]. The employee shall have the right to elect whether they want to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.* |
| Benefits: Vacation and Holidays | **ARTICLE 6 – PART-TIME, TEMPORARY EMPLOYEEES AND TWO-YEAR ASSOCIATES**<br>**Part-time employees shall not receive holiday pay or personal days.** | N/A [no significant changes proposed] | N/A [Part-Time Mailers Unit employees did not receive these benefits under the expired contract] | **ARTICLE 26 – MANAGER TO ARRANGE VACATION SCHEDULE**<br>The Production Management ~~and the Union~~ will schedule the vacations according to operational needs with the principle of dividing the vacation weeks equally across the year. | **ARTICLE 21 – VACATIONS**<br>**The Company may award, in its discretion, additional vacation in order to recruit qualified applicants.**<br><br>**ARTICLE 22 – HOLIDAYS**<br>**Part-time employees are not eligible for holidays or personal days.** |
| Benefits: Retirement Plan | **ARTICLE 20 – INSURANCE, HEALTH AND WELFARE, PENSIONS**<br>**Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth in Exhibit 1, according to the parameters set out in the <u>Plan</u>** | **ARTICLE 22 – MERGED PENSION PLAN**<br>**Benefit accruals for all participants in the pension plan remain frozen. Each employee's service will continue to be credited according to the terms of the merged pension plan for purposes of vesting and** | N/A [Part-Time Mailers Unit employees did not receive these benefits under the expired contract] | **ARTICLE 32 – PRENSION – PRESSMEN'S TRUST FUND**<br>**On November 16, 2014, the pension plan was frozen.**<br><u>Removed</u>: *On the effective date of this Contract, the pension plan will be frozen. The Company shall deposit into the Printing Pressmen's Union No. 9* | N/A [no significant changes proposed] |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | **Document. The Company has the right to make changes to the 401(k) Plan from time to time so long as the benefits provided in Exhibit 1 are not reduced.**<br>Removed: *As a result of the establishment of the Guild Employees 401(K) Plan as set forth in Exhibit 1, effective July 1, 2015, the weekly pension contribution will be $65.70; and effective July 1, 2016, such contribution will be $55.70. Additionally, each Employee will divert 2% of their base salary to the pension plan. The 2% diversion will be valued at $211,000 a year during the life of this contract. The Guild diverted the night differential for the term of the contract. The night differential diversion will be valued at $45,000 a year during the life of this contract. The Guild diverted the Vacation Bonus for the term of the contract. The Vacation Bonus diversion will be valued at $69,000 a year during the life of this contract. The Guild diverted the Service Bonus for the term of the contract. The Service Bonus diversion will be valued at $16,000 a year during the life of this contract. The Guild diverted the Accrued Vacation language for the term of the contract. The Accrued Vacation language diversion will be valued at $60,000 a year during the life of this contract. The Guild diverted the half pay leave for the term of the contract. The half pay leave diversion will be valued at $60,000 a year during the life of this contract.* | **benefit eligibility. Details of the merged pension plan status and its benefits are outlined in a separate document signed by the Company and the Union.**<br>Removed: *Effective January 1, 2008, the employer will contribute on a yearly basis for each situation holder an amount equal to 7 bonus days for situation holders with less than 2 weeks vacation, 8 bonus days for situation holders with 2 weeks vacation, 9 bonus days for situation holders with 3 weeks vacation. 10 bonus days for situation holders with 4 weeks vacation, and 5 bonus days for situation holders with 5 weeks vacation.* | | *Trust Fund the minimum funding required to maintain the Fund. In exchange, the Company shall remit the following weekly amounts on the following effective dates into the Inter-Local pension fund for each journeyman pressman and paper handler on the payroll as of December 31, 2014:*<br>*January 1, 2015 - $80*<br>*January 1, 2016 - $90*<br>*January 1, 2017 - $100*<br><br>**ARTICLE 34 – TEAMSTER MEMBERS RETIREMENT PLAN**<br>**The Company agrees to remit $100.00 per week to the Teamster Members Retirement Plan (the "Plan") on behalf of each active journeyman pressmen […] The Plan is not a collectively bargained plan. Its benefits are not set out in the collective bargaining agreement. No employer contributes to or is involved in the administration of the Plan.** | |
| Strike Waiver | **ARTICLE 19 – MISCELLANEOUS** | **ARTICLE 10 – NO STRIKES OR LOCKOUTS** | **ARTICLE 17 – NO STRIKES OR LOCKOUTS** | **ARTICLE 42 – NO STRIKES OR LOCKOUTS** | **ARTICLE 20 – NO STRIKES OR LOCKOUTS** |

| Proposal Subject | Editorial Unit | Mailers Full-Time Unit | Mailers Part-Time Unit | Pressmen Unit | Advertising Unit |
|---|---|---|---|---|---|
| | An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest ~~provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product~~ […] No strike, **sympathy strike**, slowdown, work stoppage, **picketing, boycotts, bannering** or any other interference with or interruption of work shall be permitted during the term of this Agreement. | **The Union, its representatives and the employees covered by this Agreement agree, individually and collectively, that none of them will call, authorize, encourage (by action or inaction) or engage in any slowdown, strikes of any kind, sympathy strike, bannering, boycotts against the Company, boycotts against advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations or the production or sale of its products or services during the term of this Agreement. In the event of any strike or any other proscribed activity not authorized, ratified or condoned by the Union, the Union agrees it will make every good faith effort to end such activity. […] The Company shall have direct recourse to the National Labor Relations Board or the courts for a violation of this Article.** | **The Union, its representatives and the employees covered by this Agreement agree, individually and collectively, that none of them will call, authorize, encourage (by action or inaction) or engage in any slowdown, strikes of any kind, sympathy strike, bannering, boycotts against the Company, boycotts against advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations or the production or sale of its products or services during the term of this Agreement. In the event of any strike or any other proscribed activity not authorized, ratified or condoned by the Union, the Union agrees it will make every good faith effort to end such activity. […] The Company shall have direct recourse to the National Labor Relations Board or the courts for a violation of this Article.** | No strike, **sympathy strike**, slowdown, work stoppage, **picketing, boycotts, bannering,** or any other interference with or interruption of work shall be permitted during the term of this Agreement. | No strike, **sympathy strike**, slowdown, work stoppage, **picketing, boycotts, bannering** or any other interference with or interruption of work shall be permitted during the term of this Agreement. |
| Zipper Clause | **ARTICLE 19 – MISCELLANEOUS** This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices. | **ARTICLE 33 – FULLY BARGAINED "ZIPPER CLAUSE"** This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Mailers, including any letter of interpretation, verbal understanding and/or past practices. | **ARTICLE 14– FULLY BARGAINED "ZIPPER CLAUSE"** This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Mailers, including any letter of interpretation, verbal understanding and/or past practices. | **ARTICLE 46 – CONTRACT PARAMOUNT** It is mutually agreed that the Contract contains all working conditions and understandings necessary for the good relations between the Company and the Union for the efficient operation of the pressroom, that nothing foreign thereto shall be allowed to intervene and that anything not contained in this Contract shall not be construed as being part of this Contract. [unchanged from expired contract] | **ARTICLE 38 – MISCELLANEOUS** This Agreement covers only those matters specifically contained herein and supersedes prior agreements between the Company and the Union, including any letters of interpretation, verbal understandings and/or past practices. |

14