# EXHIBIT 1(c)

Exhibit 1(c)

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS
BOARD REGION 6**

**PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE,**

**Respondent**

**and**

**Cases 06-CA-248017
06-CA-263791 and
06-CA-269346**

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061,**

**Charging Party**

INDEX AND DESCRIPTION OF FORMAL DOCUMENTS

GC Exhibit 1

- (a) Charge in Case 06-CA-248017, filed 09/11/2019
- (b) Affidavit of Service of 1(a), dated 09/11/2019
- (c) Charge in Case 06-CA-263791, filed 07/29/2020
- (d) Affidavit of Service of 1(c), dated 07/30/2020
- (e) Charge in Case 06-CA-269346, filed 11/20/2020
- (f) Affidavit of Service of 1(e), dated 11/24/2020
- (g) First Amended Charge in Case 06-CA-269346, filed 02/22/2021
- (h) Affidavit of Service of 1(g), dated 02/23/2021
- (i) First Amended Charge in Case 06-CA263791, filed 03/05/2021
- (j) Affidavit of Service of 1(i), dated 03/09/2021
- (k) First Amended Charge in Case 06-CA-248017, filed 04/05/2021
- (l) Affidavit of Service of 1(k), dated 04/07/2021
- (m) Second Amended Charge in Case 06-CA-269346, filed 06/22/2021
- (n) Affidavit of Service of 1(m), dated 06/22/2021
- (o) Third Amended Charge in Case 06-CA-269346, filed 06/28/2021
- (p) Affidavit of Service of 1(o), dated 06/28/2021
- (q) Fourth Amended Charge in Case 06-CA-269346, filed 10/20/2021
- (r) Affidavit of Service of 1(q), dated 10/20/2021
- (s) Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, dated 04/27/2022
- (t) Affidavit of Service of 1(s), dated 04/27/2022
- (u) Respondent's Answer to Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, filed 05/10/2022
- (v) Order Rescheduling Hearing, dated 07/25/2022

**Case No.** 06-CA-248017

**Official Exhibit No.** GC1

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:**

**Reporter:** BW

**No. of Pages:** 73

(w) Affidavit of Service of 1(v), dated 07/25/2022
(x) Amendment to Complaint, dated 08/18/2022
(y) Affidavit of Service of 1(x), .dated 08/18/2022
(z) Respondent's First Amended Answer to General Counsel's Amendment to Complaint, Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, dated 08/29/2022
(aa) Index and Description of Formal Documents

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 6**

| | | |
|---|---|---|
| **PG PUBLISHING CO., INC., D/B/A PITTSBURGH POST-GAZETTE** | ) | |
| **Respondent** | ) | |
| **and** | ) | **Cases 06-CA-248017** |
| | ) | **06-CA-263791** |
| **NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061,** | ) | **06-CA-269346** |
| **Charging Party** | ) | |

**RESPONDENT'S FIRST AMENDED ANSWER TO GENERAL COUNSEL'S AMENDMENT TO COMPLAINT, ORDER CONSOLIDATING CASES, CONSOLIDATED COMPLAINT AND NOTICE OF HEARING**

**COMES NOW** PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (hereinafter referred to as Respondent), pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, Series 8, as amended, and files Respondent's First Amended Answer To General Counsel's Amendment To Complaint, Order Consolidating Cases, Consolidated Complaint And Notice Of Hearing in these matters as follows:

The second unnumbered paragraph states conclusions of law to which no answer is required but, to the extent a response is deemed necessary, Respondent denies that it has engaged in, or is engaging in, any violations of the National Labor Relations Act as alleged in the second unnumbered paragraph or otherwise in the Consolidated Complaint.

1. (a) Respondent admits that the Charge in Case 06-CA-248017 was filed by Newspaper Guild of Pittsburgh/CWA Local 38061 (hereinafter "the Union") on September 11,

2019 and a copy was served on Respondent by U.S. mail on September 11, 2019. All allegations in Paragraph 1(a) of the Consolidated Complaint not specifically admitted herein are denied.

(b) Respondent admits that the First Amended Charge in Case 06-CA-248017 was filed by the Union on April 5, 2021, and a copy was served on Respondent by U.S. mail on April 7, 2021. All allegations in Paragraph 1(b) of the Consolidated Complaint not specifically admitted herein are denied.

(c) Respondent admits that the Charge in Case 06-CA-263791 was filed by the Union on July 29, 2020, and a copy was served on Respondent by U.S. mail on July 30, 2020. All allegations in Paragraph 1(c) of the Consolidated Complaint not specifically admitted herein are denied.

(d) Respondent admits that the First Amended Charge in Case 06-CA-263791 was filed by the Union on March 5, 2021, and a copy was served on Respondent by U.S. mail on March 9, 2021. All allegations in Paragraph 1(d) of the Consolidated Complaint not specifically admitted herein are denied.

(e) Respondent admits that the Charge in Case 06-CA-269346 was filed by the Union on November 20, 2020, and a copy was served on Respondent by U.S. mail on November 24, 2020. All allegations in Paragraph 1(e) of the Consolidated Complaint not specifically admitted herein are denied.

(f) Respondent admits that the First Amended Charge in Case 06-CA-269346 was filed by the Union on February 22, 2021, and a copy was served on Respondent by U.S. mail on February 23, 2021. All allegations in Paragraph 1(f) of the Consolidated Complaint not specifically admitted herein are denied.

(g) Respondent admits that the Second Amended Charge in Case 06-CA-269346 was filed by the Union on June 22, 2021, and a copy was served on Respondent by U.S.

mail on June 22, 2021. All allegations in Paragraph 1(g) of the Consolidated Complaint not specifically admitted herein are denied.

(h) Respondent admits that the Third Amended Charge in Case 06-CA-269346 was filed by the Union on June 28, 2021, and a copy was served on Respondent by U.S. mail on June 28, 2021. All allegations in Paragraph 1(h) of the Consolidated Complaint not specifically admitted herein are denied.

(i) Respondent admits that the Fourth Amended Charge in Case 06-CA-269346 was filed by the Union on October 20, 2021, and a copy was served on Respondent by U.S. mail on October 20, 2021. All allegations in Paragraph 1(i) of the Consolidated Complaint not specifically admitted herein are denied.

2. (a) Respondent denies the allegations set forth in Paragraph 2(a) of the Consolidated Complaint, but admits that, at all material times, Respondent has been a Pennsylvania corporation, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, with an office and place of business in Pittsburgh, Pennsylvania ("Respondent's facility"), and has been engaged in the business of publishing The Pittsburgh Post-Gazette, a print and electronic newspaper.

(b) Respondent admits the allegations set forth in Paragraph 2(b) of the Consolidated Complaint.

(c) Respondent admits the allegations set forth in Paragraph 2(c) of the Consolidated Complaint.

3. Respondent admits the allegations set forth in Paragraph 3 of the Consolidated Complaint.

4. Respondent admits the allegations set forth in Paragraph 4 of the Consolidated Complaint.

5. Respondent admits that the following individuals held the positions set forth opposite their respective names:

| | | |
|---|---|---|
| John Robinson Block | - | Publisher |
| Rob Weber | - | Production Director |
| Arturo Fernandez | - | Chief Photography Editor |
| Linda Guest | - | former Senior Human Resources Manager |
| Jerry Micco | - | Senior Assistant Managing Editor/News & Investigations |

Respondent further admits that John Robinson Block, Rob Weber, Linda Guest and Steven Stockdale were agents and supervisors of Respondent and Arturo Fernandez and Jerry Micco were supervisors of Respondent. All allegations in Paragraph 5 of the Consolidated Complaint not specifically admitted herein are denied.

6. Respondent denies the allegations set forth in Paragraph 6 of the Consolidated Complaint.

7. Respondent denies the allegations set forth in Paragraph 7 of the Consolidated Complaint.

8. Respondent denies the allegations set forth in Paragraph 8 of the Consolidated Complaint but admits that Respondent has recognized the Union as the exclusive collective bargaining representative of the Unit and that this recognition is embodied in the collective bargaining agreement, which was effective October 15, 2014, to March 31, 2017, between Respondent and the Union.

9. Respondent denies the allegations set forth in Paragraph 9 of the Consolidated Complaint but admits the most recent collective bargaining agreement was effective October 15, 2014 until March 31, 2017, between Respondent and the Union.

10. Respondent denies the allegations set forth in Paragraph 10 of the Consolidated Complaint.

11. (a) Respondent denies the allegations set forth in Paragraph 11(a) of the Consolidated Complaint but admits Respondent and the Union met for the purpose of negotiating a successor collective bargaining agreement to the most recent collective bargaining agreement, which was effective from October 15, 2014 until March 31, 2017.

(b) Respondent denies the allegations set forth in Paragraph 11(b) of the Consolidated Complaint.

(i) Respondent denies the allegations set forth in Paragraph 11(b)(i) of the Consolidated Complaint.

(ii) Respondent denies the allegations set forth in Paragraph 11(b)(ii) of the Consolidated Complaint.

(iii) Respondent denies the allegations set forth in Paragraph 11(b)(iii) of the Consolidated Complaint.

(c) Respondent denies the allegations set forth in Paragraph 11(c) of the Consolidated Complaint, and specifically states that it was the Union, not Respondent, who failed and refused to bargain in good faith with the Respondent.

12. (a) Respondent denies the allegations set forth in Paragraph 12(a) of the Consolidated Complaint but admits that, after a lawful impasse, Respondent notified the Union by letter dated July 27, 2020, that Respondent was implementing portions of its Final Offer, and states that the quotes which appear below in Paragraphs 12(a)(i) through (xix) are excerpts from Respondent's July 27, 2020 letter.

(i) Respondent denies the allegations set forth in the Consolidated Complaint but admits it implemented the following: "**Agreement**: Paragraph C; Paragraph D, Sections 1 through 7 of its Final Offer."

(ii) Respondent denies the allegations set forth in 12(a)(ii) of the Consolidated Complaint but admits it implemented the following: "**Article III**, **Classifications**, **Wages** and **Schedule of Minimums**. The Company is implementing Article III except for Section 4."

(iii) Respondent denies the allegations set forth in 12(a)(iii) of the Consolidated Complaint but admits it implemented the following: "**Article IV, Hours**. The Company is implementing Article IV but only the first sentence in Section 11."

(iv) Respondent denies the allegations set forth in 12(a)(iv) of the Consolidated Complaint but admits it implemented the following: "**Article V, Overtime**."

(v) Respondent denies the allegations set forth in 12(a)(v) of the Consolidated Complaint but admits it implemented the following: "**Article VI, Part-time, Temporary Employees and Two-Year Associates**."

(vi) Respondent denies the allegations set forth in 12(a)(vi) of the Consolidated Complaint but admits it implemented the following: "**Article VII, Sick Leave**. The Company is implementing Article VII except for the second sentence of Article VII, Section 3."

(vii) Respondent denies the allegations set forth in 12(a)(vii) of the Consolidated Complaint but admits it implemented the following: "**Article VIII, Security**. The Company is implementing Article VIII except for the phrase, "in the Company's discretion" in Article VIII, Section 15."

(viii) Respondent denies the allegations set forth in 12(a)(viii) of the Consolidated Complaint but admits it implemented the following: "**Article IX, Expenses**."

(ix) Respondent denies the allegations set forth in 12(a)(ix) of the Consolidated Complaint but admits it implemented the following: "**Article X, Internships, Two Year Associates**."

(x) Respondent denies the allegations set forth in 12(a)(x) of the Consolidated Complaint but admits it implemented the following: "**Article XI, Vacations**."

(xi) Respondent denies the allegations set forth in 12(a)(xi) of the Consolidated Complaint but admits it implemented the following: "**Article XII, Holidays**."

(xii) Respondent denies the allegations set forth in 12(a)(xii) of the Consolidated Complaint but admits it implemented the following: "**Article XIII, Advancement, Promotion and Transfer**."

(xiii) Respondent denies the allegations set forth in 12(a)(xiii) of the Consolidated Complaint but admits it implemented the following: "**Article XIV, Severance Pay**."

(xiv) Respondent denies the allegations set forth in 12(a)(xiv) of the Consolidated Complaint but admits it implemented the following: "**Article XV, Leaves of Absence**."

(xv) Respondent denies the allegations set forth in 12(a)(xv) of the Consolidated Complaint but admits it implemented the following: "**Article XVIII, Preferential Re-Employment**."

(xvi) Respondent denies the allegations set forth in 12(a)(xvi) of the Consolidated Complaint but admits it implemented the following: "**Article XIX, Miscellaneous**, Section 24 only."

(xvii) Respondent denies the allegations set forth in 12(a)(xvii) of the Consolidated Complaint but admits it implemented the following: "**Article XX, Insurance, Health and Welfare, Pensions**. The Company is implementing Article XX as set forth in the

Addendum, except for Section 2 and 3. Bargaining unit employees will be covered by the Company's health, dental, vision and life insurance plans beginning September 1, 2020."

(xviii) Respondent denies the allegations set forth in 12(a)(xviii) of the Consolidated Complaint but admits it implemented the following: "**Article XX, Insurance, Health and Welfare, Pensions**. The Company is implementing Article XX as set forth in the Addendum, except for Section 2 and 3. Bargaining unit employees will be covered by the Company's health, dental, vision and life insurance plans beginning September 1, 2020."

(xix) Respondent denies the allegations set forth in 12(a)(xix) of the Consolidated Complaint but admits it implemented the following: "**Article XX, Insurance, Health and Welfare, Pensions**. The Company is implementing Article XX as set forth in the Addendum, except for Section 2 and 3. Bargaining unit employees will be covered by the Company's health, dental, vision and life insurance plans beginning September 1, 2020."

(b) Respondent admits the allegations set forth in Paragraph 12(b) of the Consolidated Complaint and further agrees the subjects set forth in Paragraph 12(a) are all mandatory subjects of bargaining. All allegations in Paragraph 12(b) of the Consolidated Complaint not specifically admitted herein are denied.

13. Respondent denies the allegations set forth in Paragraph 13 of the Consolidated Complaint.

14. (a) Respondent denies the allegations set forth in Paragraph 14(a) of the Consolidated Complaint.

(i) Respondent denies the allegations set forth in Paragraph 14(a)(i) of the Consolidated Complaint.

(ii) Respondent denies the allegations set forth in Paragraph 14(a)(ii) of the Consolidated Complaint.

(iii) Respondent denies the allegations set forth in Paragraph 14(a)(iii) of the Consolidated Complaint.

(iv) Respondent denies the allegations set forth in Paragraph 14(a)(iv) of the Consolidated Complaint.

(v) Respondent denies the allegations set forth in Paragraph 14(a)(v) of the Consolidated Complaint.

(vi) Respondent denies the allegations set forth in Paragraph 14(a)(vi) of the Consolidated Complaint.

(vii) Respondent denies the allegations set forth in Paragraph 14(a)(vii) of the Consolidated Complaint.

(viii) Respondent denies the allegations set forth in Paragraph 14(a)(viii) of the Consolidated Complaint.

(b) Respondent denies the allegations set forth in Paragraph 14(b) of the Consolidated Complaint but admits the subjects set forth in Paragraph 14(a) (i-viii) are all mandatory subjects of bargaining.

15. Respondent denies the allegations set forth in Paragraph 15 of the Consolidated Complaint.

16. (a) Respondent denies the allegations set forth in Paragraph 16(a) of the Consolidated Complaint.

(b) Respondent denies the allegations set forth in Paragraph 16(b) of the Consolidated Complaint but admits the performance of bargaining unit work by non-unit employees is a mandatory subject of bargaining.

(c) Respondent denies the allegations set forth in Paragraph 16(c) of the Consolidated Complaint.

18. Respondent denies the allegations set forth in Paragraph 18 of the Consolidated Complaint.

19. Respondent denies the allegations set forth in Paragraph 19 of the Consolidated Complaint.

20. Respondent denies the allegations set forth in Paragraph 20 of the Consolidated Complaint.

Any allegations in the Consolidated Complaint which are not specifically admitted or denied above are hereby specifically denied.

## REMEDY

Respondent objects to the Remedies General Counsel seeks on pages 8 and 9 of the Consolidated Complaint, and states that those Remedies are not supported by or available under the facts and/or the law as they apply to this Consolidated Complaint. To the extent the Remedies Paragraph requires a response, Respondent denies each and every requested Remedy, and specifically denies it has violated the National Labor Relations Act ("Act") in any manner.

## DEFENSES

1. Respondent incorporates its answers, objections and responses to the preceding paragraphs numbered 1 through 20 of the Consolidated Complaint as if fully set forth herein.

2. Respondent asserts the following defenses without waiving General Counsel's obligation to meet its burden of proof and without assuming any burden of proof not otherwise imposed by law. Respondent further specifically reserves the right to raise other defenses of which it may become aware either before or at the time of hearing, or as otherwise provided in the Rules and Regulations of the National Labor Relations Board ("Board").

3. Respondent denies that it has engaged in, or is engaging in, any unfair labor practices, both generally and/or as specifically alleged in the Consolidated Complaint and demands strict proof thereof.

4. With respect to the factual allegations raised in the Consolidated Complaint, Respondent acted properly and lawfully under the Act. Respondent denies that any relief or remedy is warranted, including all relief or remedies sought by the Counsel for the General Counsel in the Consolidated Complaint.

5. Respondent alleges and asserts those affirmative defenses provided by law as may be determined applicable to factual specifics of this litigation and pleads the same as affirmative defenses to the Consolidated Complaint.

6. Respondent will rely upon all proper defenses, affirmative or otherwise, lawfully available that may be disclosed by evidence, whether before or at the hearing, and pleads the same as affirmative defenses to the Consolidated Complaint.

7. Respondent bargained in good faith to impasse in collective bargaining and lawfully implemented portions of its Final Offer.

8. Respondent's actions are protected by Section 8(c) of the Act and the First Amendment of the Constitution of the United States.

9. The allegations in the Consolidated Complaint are barred by Section 10(b) of the Act.

10. Respondent denies that it has engaged, or is engaging in, any unfair labor practices as alleged in the Consolidated Complaint and further avers that the conduct and actions of the Union, and/or its representatives, and/or others acting, or purporting to act on its behalf, constituted bad faith bargaining.

11. Respondent lawfully implemented portions of its Final Offer even in the absence of impasse because the Union avoided, delayed, and/or refused to bargain and was given notice of the specific proposals Respondent intended to implement.

12. The Consolidated Complaint does not describe some, or all, of the claims asserted against Respondent with sufficient particularity to enable Respondent to determine all of the defenses and/or claims available to Respondent in response to that action. Therefore, Respondent reserves the right to assert all defenses and/or claims which may be applicable to the claims alleged until such time as the precise nature of the various claims is ascertained.

**WHEREFORE,** having fully answered, Respondent requests that the Consolidated Complaint be dismissed in its entirety and that Respondent be awarded such other relief as the Board deems just and proper.

Dated this 29th day of
August, 2022

Respectfully submitted,

Michael D. Oesterle
King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201
615-726-5496

Counsel for PG Publishing Co., Inc.
d/b/a Pittsburgh Post-Gazette

## CERTIFICATE AND STATEMENT OF SERVICE

The undersigned, as attorney for Respondent, hereby certifies that a true and exact copy of Respondent's First Amended Answer To General Counsel's Amendment To Complaint, Order Consolidating Cases, Consolidated Complaint And Notice Of Hearing was e-filed with the National Labor Relations Board this 29th day of August, 2022. The original and four copies were also sent via certified mail, return receipt requested, and emailed to:

Julie.stern@nlrb.gov
Julie R. Stern, Attorney
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222-4111

and a true and exact copy of Respondent's First Amended Answer To General Counsel's Amendment To Complaint, Order Consolidating Cases, Consolidated Complaint And Notice Of Hearing has been served on the parties listed below via email and certified mail, return receipt requested, this 29th day of August, 2022:

jjp@jpilaw.com
Joseph J. Pass Sr.
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222

cretia483@gmail.com
Lacretia Wimbley, President
Newspaper Guild of Pittsburgh/CWA Local 38061
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

Michael D. Oesterle

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 6**

**PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE**

**and**

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**

**Cases 06-CA-248017**
**06-CA-263791 and**
**06-CA-269346**

**AFFIDAVIT OF SERVICE OF AMENDMENT TO COMPLAINT**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on August 18, 2022, I served the above-entitled document by **electronic mail** upon the following persons, addressed to them at the following addresses:

lguest@post-gazette.com
Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

sstockdale@buckeyebroadband.com
Steven Stockdale, Director HR
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

moesterle@kingballow.com
Michael D. Oesterle, Attorney
King & Ballow
315 Union St., Ste. 1100
Nashville, TN 37201-1437

rlowe@kingballow.com
Richard C. Lowe, Esq.
King & Ballow
315 Union St., Ste. 1100
Nashville, TN 37201-1437

crice@post-gazette.com
Carolyn Rice, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

jjp@jpilaw.com
Joseph J. Pass Sr.
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222

cretia483@gmail.com
Lacretia Wimbley, President
Newspaper Guild of Pittsburgh/CWA
Local 38061
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

| August 18, 2022 | Hannah Ghrist, Designated Agent of NLRB |
|---|---|
| Date | Name |
| | *\/s/ Hannah Ghrist* |
| | Signature |

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION SIX**

**PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE,**

**Respondent**

**and**

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061,**

**Charging Party**

**Cases 06-CA-248017**
**06-CA-263791 and**
**06-CA-269346**

## AMENDMENT TO COMPLAINT

Pursuant to Section 102.17 of the Rules and Regulations of the National Labor Relations Board, the Consolidated Complaint and Notice of Hearing issued on April 27, 2022 is amended as follows:

All references to "Respondent" in the Consolidated Complaint are hereby amended from Pittsburgh Post-Gazette/BCI to PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette.

**RESPONDENT IS FURTHER NOTIFIED** that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, Respondent must file an answer to the above amendment to consolidated complaint. The answer must be **received by this office on or before September 1, 2022** or **postmarked on or before August 31, 2022.** Respondent should file an original and four copies of the answer with this office and serve a copy of the answer on each of the other parties

Dated: August 18, 2022

**/s/ Nancy Wilson**

NANCY WILSON
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 06
1000 Liberty Ave Rm 904
Pittsburgh, PA 15222-4111

Attachments

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 6**

**PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE**

**and**

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**

**Cases 06-CA-248017**
**06-CA-263791 and**
**06-CA-269346**

## AFFIDAVIT OF SERVICE OF ORDER RESCHEDULING HEARING

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on **July 25, 2022,** I served the above-entitled document by **electronic mail** upon the following persons, addressed to them at the following addresses:

Linda Guest , Sr. HR Manager
PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette
2301 Sweeney Drive
Clinton, PA 15026

Steven Stockdale , Director HR
PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette
2201 Sweeney Drive
Clinton, PA 15026

Michael D. Oesterle , Esq.
King & Ballow
315 Union St., Suite 1100
Nashville, TN 37201-1437

Richard C. Lowe, Esq.
King & Ballow
315 Union St., Suite 1100
Nashville, TN 37201-1437

Joseph J. Pass, Sr., Esq.
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222

Carolyn Rice, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

Lacretia Wimbley , President
Newspaper Guild of Pittsburgh/CWA Local 38061
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

July 25, 2022
Date

Julie R. Stern, Designated Agent of NLRB
Name

*/s/Julie R. Stern*
Signature

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION SIX**

**PG PUBLISHING CO., INC. D/B/A PITTSBURGH POST-GAZETTE,**

Respondent

**and**

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061,**

**Charging Party**

**Cases 06-CA-248017**
**06-CA-263791 and**
**06-CA-269346**

**ORDER RESCHEDULING HEARING**

**IT IS HEREBY ORDERED** that the hearing in the above-entitled matter is rescheduled from September 12, 2022 at 10:00 AM to 10:00 AM on **September 19, 2022** at Hearing Room, William S. Moorhead Federal Building, 1000 Liberty Avenue, Room 904, Pittsburgh, PA 15222. The hearing will continue on consecutive days until concluded.

Dated: July 25, 2022

/s/ *Nancy Wilson*

NANCY WILSON
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION SIX
1000 Liberty Ave., Rm 904
Pittsburgh, PA 15222-4111

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 6**

| | | |
|---|---|---|
| **PITTSBURGH POST-GAZETTE/BCI,** | ) | |
| | ) | |
| **Respondent** | ) | |
| | ) | |
| **and** | ) | **Cases 06-CA-248017** |
| | ) | **06-CA-263791** |
| **NEWSPAPER GUILD OF** | ) | **06-CA-269346** |
| **PITTSBURGH/CWA LOCAL 38061,** | ) | |
| | ) | |
| **Charging Party** | ) | |

---

**RESPONDENT'S ANSWER TO ORDER CONSOLIDATING CASES, CONSOLIDATED COMPLAINT AND NOTICE OF HEARING**

---

**COMES NOW** Pittsburgh Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette (hereinafter referred to as Respondent),[1] pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, Series 8, as amended, and files an Answer to the Complaint and Notice of Hearing in these matters as follows:

The second unnumbered paragraph states conclusions of law to which no answer is required but, to the extent a response is deemed necessary, Respondent denies that it has engaged in, or is engaging in, any violations of the National Labor Relations Act as alleged in the second unnumbered paragraph or otherwise in the Consolidated Complaint.

[1] Block Communications, Inc.("BCI") is not a proper party to this action and is not the "employer" in relation to the members of Newspaper Guild of Pittsburgh/CWA Local 38061 under the National Labor Relations Act. The inclusion of BCI in the caption of this case and as a Respondent is in error and should be stricken. In the event that BCI remains in the caption and as a Respondent, this *Answer to Order Consolidating Cases, Consolidated Complaint and Notice Hearing* is adopted and filed by BCI as its own Answer in this case. Also, in that event, Respondent and BCI will move to have BCI removed and dismissed from this case because it is not a proper party.

1. (a) Respondent admits that the Charge in Case 06-CA-248017 was filed by Newspaper Guild of Pittsburgh/CWA Local 38061 (hereinafter "the Union") on September 11, 2019 and a copy was served on Respondent by U.S. mail on September 11, 2019. All allegations in Paragraph 1(a) of the Consolidated Complaint not specifically admitted herein are denied.

(b) Respondent admits that the First Amended Charge in Case 06-CA-248017 was filed by the Union on April 5, 2021, and a copy was served on Respondent by U.S. mail on April 7, 2021. All allegations in Paragraph 1(b) of the Consolidated Complaint not specifically admitted herein are denied.

(c) Respondent admits that the Charge in Case 06-CA-263791 was filed by the Union on July 29, 2020, and a copy was served on Respondent by U.S. mail on July 30, 2020. All allegations in Paragraph 1(c) of the Consolidated Complaint not specifically admitted herein are denied.

(d) Respondent admits that the First Amended Charge in Case 06-CA-263791 was filed by the Union on March 5, 2021, and a copy was served on Respondent by U.S. mail on March 9, 2021. All allegations in Paragraph 1(d) of the Consolidated Complaint not specifically admitted herein are denied.

(e) Respondent admits that the Charge in Case 06-CA-269346 was filed by the Union on November 20, 2020, and a copy was served on Respondent by U.S. mail on November 24, 2020. All allegations in Paragraph 1(e) of the Consolidated Complaint not specifically admitted herein are denied.

(f) Respondent admits that the First Amended Charge in Case 06-CA-269346 was filed by the Union on February 22, 2021, and a copy was served on Respondent by U.S. mail

on February 23, 2021. All allegations in Paragraph 1(f) of the Consolidated Complaint not specifically admitted herein are denied.

(g) Respondent admits that the Second Amended Charge in Case 06-CA-269346 was filed by the Union on June 22, 2021, and a copy was served on Respondent by U.S. mail on June 22, 2021. All allegations in Paragraph 1(g) of the Consolidated Complaint not specifically admitted herein are denied.

(h) Respondent admits that the Third Amended Charge in Case 06-CA-269346 was filed by the Union on June 28, 2021, and a copy was served on Respondent by U.S. mail on June 28, 2021. All allegations in Paragraph 1(h) of the Consolidated Complaint not specifically admitted herein are denied.

(i) Respondent admits that the Fourth Amended Charge in Case 06-CA-269346 was filed by the Union on October 20, 2021, and a copy was served on Respondent by U.S. mail on October 20, 2021. All allegations in Paragraph 1(i) of the Consolidated Complaint not specifically admitted herein are denied.

2. (a) Respondent denies the allegations set forth in Paragraph 2(a) of the Consolidated Complaint, but admits that, at all material times, Respondent has been a Pennsylvania corporation, PG Publishing Co., Inc. d/b/a Pittsburgh Post-Gazette, with an office and place of business in Pittsburgh, Pennsylvania ("Respondent's facility"), and has been engaged in the business of publishing The Pittsburgh Post-Gazette, a print and electronic newspaper. Respondent and Block Communications, Inc. ("BCI") specifically deny that BCI is a proper party in or to this action, BCI is not the employer in relation to the members of the Union, and BCI is not a joint employer in relation to the members of the Union. The inclusion of BCI in the caption of this case and as a Respondent is in error and should be stricken. In the event that BCI remains

in the caption and as a Respondent, this Answer, including all responses, admissions, denials and defenses, is adopted and filed by BCI as its Answer in this case.

(b) Respondent admits the allegations set forth in Paragraph 2(b) of the Consolidated Complaint.

(c) Respondent admits the allegations set forth in Paragraph 2(c) of the Consolidated Complaint.

3. Respondent admits the allegations set forth in Paragraph 3 of the Consolidated Complaint.

4. Respondent admits the allegations set forth in Paragraph 4 of the Consolidated Complaint.

5. Respondent admits that the following individuals held the positions set forth opposite their respective names:

| | | |
|---|---|---|
| John Robinson Block | - | Publisher |
| Rob Weber | - | Production Director |
| Arturo Fernandez | - | Chief Photography Editor |
| Linda Guest | - | former Senior Human Resources Manager |
| Jerry Micco | - | Senior Assistant Managing Editor/News & Investigations |

Respondent further admits that John Robinson Block and Rob Weber were agents and supervisors of Respondent and Arturo Fernandez and Jerry Micco were supervisors of Respondent. All allegations in Paragraph 5 of the Consolidated Complaint not specifically admitted herein are denied.

6. Respondent denies the allegations set forth in Paragraph 6 of the Consolidated Complaint.

7. Respondent denies the allegations set forth in Paragraph 7 of the Consolidated Complaint.

8. Respondent denies the allegations set forth in Paragraph 8 of the Consolidated Complaint but admits that Respondent has recognized the Union as the exclusive collective bargaining representative of the Unit and that this recognition is embodied in the collective bargaining agreement, which was effective October 15, 2014, to March 31, 2017, between Respondent and the Union.

9. Respondent denies the allegations set forth in Paragraph 9 of the Consolidated Complaint but admits the most recent collective bargaining agreement was effective October 15, 2014 until March 31, 2017, between Respondent and the Union.

10. Respondent denies the allegations set forth in Paragraph 10 of the Consolidated Complaint.

11. (a) Respondent denies the allegations set forth in Paragraph 11(a) of the Consolidated Complaint but admits Respondent and the Union met for the purpose of negotiating a successor collective bargaining agreement to the most recent collective bargaining agreement, which was effective from October 15, 2014 until March 31, 2017.

(b) Respondent denies the allegations set forth in Paragraph 11(b) of the Consolidated Complaint.

(i) Respondent denies the allegations set forth in Paragraph 11(b)(i) of the Consolidated Complaint.

(ii) Respondent denies the allegations set forth in Paragraph 11(b)(ii) of the Consolidated Complaint.

(iii) Respondent denies the allegations set forth in Paragraph 11(b)(iii) of the Consolidated Complaint.

(c) Respondent denies the allegations set forth in Paragraph 11(c) of the Consolidated Complaint, and specifically states that it was the Union, not Respondent, who failed and refused to bargain in good faith with the Respondent.

12. (a) Respondent denies the allegations set forth in Paragraph 12(a) of the Consolidated Complaint but admits that, after a lawful impasse, Respondent notified the Union by letter dated July 27, 2020, that Respondent was implementing portions of its Final Offer, and states that the quotes which appear below in Paragraphs 12(a)(i) through (xix) are excerpts from Respondent's July 27, 2020 letter.

(i) Respondent denies the allegations set forth in the Consolidated Complaint but admits it implemented the following: "**Agreement**: Paragraph C; Paragraph D, Sections 1 through 7 of its Final Offer."

(ii) Respondent denies the allegations set forth in 12(a)(ii) of the Consolidated Complaint but admits it implemented the following: "**Article III**, **Classifications**, **Wages** and **Schedule of Minimums**. The Company is implementing Article III except for Section 4."

(iii) Respondent denies the allegations set forth in 12(a)(iii) of the Consolidated Complaint but admits it implemented the following: "**Article IV, Hours**. The Company is implementing Article IV but only the first sentence in Section 11."

(iv) Respondent denies the allegations set forth in 12(a)(iv) of the Consolidated Complaint but admits it implemented the following: "**Article V, Overtime**."

(v) Respondent denies the allegations set forth in 12(a)(v) of the Consolidated Complaint but admits it implemented the following: "**Article VI, Part-time, Temporary Employees and Two-Year Associates**."

(vi) Respondent denies the allegations set forth in 12(a)(vi) of the Consolidated Complaint but admits it implemented the following: "**Article VII, Sick Leave**. The Company is implementing Article VII except for the second sentence of Article VII, Section 3."

(vii) Respondent denies the allegations set forth in 12(a)(vii) of the Consolidated Complaint but admits it implemented the following: "**Article VIII, Security**. The Company is implementing Article VIII except for the phrase, "in the Company's discretion" in Article VIII, Section 15."

(viii) Respondent denies the allegations set forth in 12(a)(viii) of the Consolidated Complaint but admits it implemented the following: "**Article IX, Expenses**."

(ix) Respondent denies the allegations set forth in 12(a)(ix) of the Consolidated Complaint but admits it implemented the following: "**Article X, Internships, Two Year Associates**."

(x) Respondent denies the allegations set forth in 12(a)(x) of the Consolidated Complaint but admits it implemented the following: "**Article XI, Vacations**."

(xi) Respondent denies the allegations set forth in 12(a)(xi) of the Consolidated Complaint but admits it implemented the following: "**Article XII, Holidays**."

(xii) Respondent denies the allegations set forth in 12(a)(xii) of the Consolidated Complaint but admits it implemented the following: "**Article XIII, Advancement, Promotion and Transfer**."

(xiii) Respondent denies the allegations set forth in 12(a)(xiii) of the Consolidated Complaint but admits it implemented the following: "**Article XIV, Severance Pay**."

(xiv) Respondent denies the allegations set forth in 12(a)(xiv) of the Consolidated Complaint but admits it implemented the following: "**Article XV, Leaves of Absence**."

(xv) Respondent denies the allegations set forth in 12(a)(xv) of the Consolidated Complaint but admits it implemented the following: "**Article XVIII, Preferential Re-Employment**."

(xvi) Respondent denies the allegations set forth in 12(a)(xvi) of the Consolidated Complaint but admits it implemented the following: "**Article XIX, Miscellaneous**, Section 24 only."

(xvii) Respondent denies the allegations set forth in 12(a)(xvii) of the Consolidated Complaint but admits it implemented the following: "**Article XX, Insurance, Health and Welfare, Pensions**. The Company is implementing Article XX as set forth in the Addendum, except for Section 2 and 3. Bargaining unit employees will be covered by the Company's health, dental, vision and life insurance plans beginning September 1, 2020."

(xviii) Respondent denies the allegations set forth in 12(a)(xviii) of the Consolidated Complaint but admits it implemented the following: "**Article XX, Insurance, Health and Welfare, Pensions**. The Company is implementing Article XX as set forth in the Addendum, except for Section 2 and 3. Bargaining unit employees will be covered by the Company's health, dental, vision and life insurance plans beginning September 1, 2020."

(xix) Respondent denies the allegations set forth in 12(a)(xix) of the Consolidated Complaint but admits it implemented the following: "**Article XX, Insurance,**

**Health and Welfare, Pensions**. The Company is implementing Article XX as set forth in the Addendum, except for Section 2 and 3. Bargaining unit employees will be covered by the Company's health, dental, vision and life insurance plans beginning September 1, 2020."

(b) Respondent admits the allegations set forth in Paragraph 12(b) of the Consolidated Complaint and further agrees the subjects set forth in Paragraph 12(a) are all mandatory subjects of bargaining. All allegations in Paragraph 12(b) of the Consolidated Complaint not specifically admitted herein are denied.

13. Respondent denies the allegations set forth in Paragraph 13 of the Consolidated Complaint.

14. (a) Respondent denies the allegations set forth in Paragraph 14(a) of the Consolidated Complaint.

(i) Respondent denies the allegations set forth in Paragraph 14(a)(i) of the Consolidated Complaint.

(ii) Respondent denies the allegations set forth in Paragraph 14(a)(ii) of the Consolidated Complaint.

(iii) Respondent denies the allegations set forth in Paragraph 14(a)(iii) of the Consolidated Complaint.

(iv) Respondent denies the allegations set forth in Paragraph 14(a)(iv) of the Consolidated Complaint.

(v) Respondent denies the allegations set forth in Paragraph 14(a)(v) of the Consolidated Complaint.

(vi) Respondent denies the allegations set forth in Paragraph 14(a)(vi) of the Consolidated Complaint.

(vii) Respondent denies the allegations set forth in Paragraph 14(a)(vii) of the Consolidated Complaint.

(viii) Respondent denies the allegations set forth in Paragraph 14(a)(viii) of the Consolidated Complaint.

(b) Respondent denies the allegations set forth in Paragraph 14(b) of the Consolidated Complaint but admits the subjects set forth in Paragraph 14(a) (i-viii) are all mandatory subjects of bargaining.

15. Respondent denies the allegations set forth in Paragraph 15 of the Consolidated Complaint.

16. (a) Respondent denies the allegations set forth in Paragraph 16(a) of the Consolidated Complaint.

(b) Respondent denies the allegations set forth in Paragraph 16(b) of the Consolidated Complaint but admits the performance of bargaining unit work by non-unit employees is a mandatory subject of bargaining.

(c) Respondent denies the allegations set forth in Paragraph 16(c) of the Consolidated Complaint.

18. Respondent denies the allegations set forth in Paragraph 18 of the Consolidated Complaint.

19. Respondent denies the allegations set forth in Paragraph 19 of the Consolidated Complaint.

20. Respondent denies the allegations set forth in Paragraph 20 of the Consolidated Complaint.

Any allegations in the Consolidated Complaint which are not specifically admitted or denied above are hereby specifically denied.

**REMEDY**

Respondent objects to the Remedies General Counsel seeks on pages 8 and 9 of the Consolidated Complaint, and states that those Remedies are not supported by or available under the facts and/or the law as they apply to this Consolidated Complaint. To the extent the Remedies Paragraph requires a response, Respondent denies each and every requested Remedy, and specifically denies it has violated the National Labor Relations Act ("Act") in any manner.

**DEFENSES**

1. Respondent incorporates its answers, objections and responses to the preceding paragraphs numbered 1 through 20 of the Consolidated Complaint as if fully set forth herein.

2. Respondent asserts the following defenses without waiving General Counsel's obligation to meet its burden of proof and without assuming any burden of proof not otherwise imposed by law. Respondent further specifically reserves the right to raise other defenses of which it may become aware either before or at the time of hearing, or as otherwise provided in the Rules and Regulations of the National Labor Relations Board ("Board").

3. Block Communications, Inc.("BCI") is not a proper party to this action and is not the "employer" in relation to the members of Newspaper Guild of Pittsburgh/CWA Local 38061 under the National Labor Relations Act. The inclusion of BCI in the caption of this case and as a Respondent is in error and should be stricken. In the event that BCI remains in the caption and as a Respondent, this *Answer to Order Consolidating Cases, Consolidated Complaint and Notice Hearing* is adopted and filed by BCI as its own Answer in this case. Also, in that event,

Respondent and BCI will move to have BCI removed and dismissed from this case because it is not a proper party.

4. Respondent denies that it has engaged in, or is engaging in, any unfair labor practices, both generally and/or as specifically alleged in the Consolidated Complaint and demands strict proof thereof.

5. With respect to the factual allegations raised in the Consolidated Complaint, Respondent acted properly and lawfully under the Act. Respondent denies that any relief or remedy is warranted, including all relief or remedies sought by the Counsel for the General Counsel in the Consolidated Complaint.

6. Respondent alleges and asserts those affirmative defenses provided by law as may be determined applicable to factual specifics of this litigation and pleads the same as affirmative defenses to the Consolidated Complaint.

7. Respondent will rely upon all proper defenses, affirmative or otherwise, lawfully available that may be disclosed by evidence, whether before or at the hearing, and pleads the same as affirmative defenses to the Consolidated Complaint.

8. Respondent bargained in good faith to impasse in collective bargaining and lawfully implemented portions of its Final Offer.

9. Respondent's actions are protected by Section 8(c) of the Act and the First Amendment of the Constitution of the United States.

10. The allegations in the Consolidated Complaint are barred by Section 10(b) of the Act.

11. Respondent denies that it has engaged, or is engaging in, any unfair labor practices as alleged in the Consolidated Complaint and further avers that the conduct and actions of the

Union, and/or its representatives, and/or others acting, or purporting to act on its behalf, constituted bad faith bargaining.

12. Respondent lawfully implemented portions of its Final Offer even in the absence of impasse because the Union avoided, delayed, and/or refused to bargain and was given notice of the specific proposals Respondent intended to implement.

13. The Consolidated Complaint does not describe some, or all, of the claims asserted against Respondent with sufficient particularity to enable Respondent to determine all of the defenses and/or claims available to Respondent in response to that action. Therefore, Respondent reserves the right to assert all defenses and/or claims which may be applicable to the claims alleged until such time as the precise nature of the various claims is ascertained.

**WHEREFORE,** having fully answered, Respondent requests that the Consolidated Complaint be dismissed in its entirety and that Respondent be awarded such other relief as the Board deems just and proper.

Dated this 10th day of May 2022.

Respectfully submitted,

Michael D. Oesterle
King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201
615-726-5496

Counsel for PG Publishing Co., Inc.
d/b/a Pittsburgh Post-Gazette

**CERTIFICATE AND STATEMENT OF SERVICE**

The undersigned, as attorney for Respondent, hereby certifies that a true and exact copy of the Answer to the Order Consolidating Cases, Consolidated Complaint and Notice of Hearing has been served on the parties listed below via **email** and **certified mail, return receipt requested**, this 10th day of May, 2022:

jjp@jpilaw.com
Joseph J. Pass Sr.
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222

cretia483@gmail.com
Lacretia Wimbley, President
Newspaper Guild of Pittsburgh/CWA Local 38061
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

Michael D. Oesterle

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 6**

**PITTSBURGH POST-GAZETTE/BCI,**

**Respondent**

**and**

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061,**

**Charging Party**

**Cases 06-CA-248017**
**06-CA-263791**
**06-CA-269346**

**AFFIDAVIT OF SERVICE OF: Order Consolidating Cases, Consolidated Complaint and Notice of Hearing (with forms NLRB-4338 and NLRB-4668 attached)**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on April 27, 2022, I served the above-entitled document(s) by **electronic mail,** as noted below, upon the following persons, addressed to them at the following addresses:

lguest@post-gazette.com
Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

sstockdale@buckeyebroadband.com
Steven Stockdale, Director HR
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

moesterle@kingballow.com
Michael D. Oesterle, Attorney
King & Ballow
315 Union St., Ste. 1100
Nashville, TN 37201-1437

rlowe@kingballow.com
Richard C. Lowe, Esq.
King & Ballow
315 Union St., Ste. 1100
Nashville, TN 37201-1437

crice@post-gazette.com
Carolyn Rice, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

jjp@jpilaw.com
Joseph J. Pass Sr.
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222

cretia483@gmail.com
Lacretia Wimbley, President
Newspaper Guild of Pittsburgh/CWA
Local 38061
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

| April 27, 2022 | Hannah Ghrist, Designated Agent of NLRB |
| --- | --- |
| Date | Name |
| | /s/ Hannah Ghrist |
| | Signature |

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 6**

**PITTSBURGH POST-GAZETTE/BCI,**

**Respondent**

**and**

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061,**

**Charging Party**

**Cases 06-CA-248017**
**06-CA-263791**
**06-CA-269346**

**ORDER CONSOLIDATING CASES, CONSOLIDATED COMPLAINT, AND NOTICE OF HEARING**

Pursuant to Section 102.33 of the Rules and Regulations of the National Labor Relations Board ("the Board"), and to avoid unnecessary costs or delay, IT IS ORDERED THAT Cases 06-CA-248017, 06-CA-263791, and 06-CA-269346, which are based on charges filed by Newspaper Guild of Pittsburgh/CWA Local 38061 ("the Union") against Pittsburgh Post-Gazette/BCI ("Respondent"), are consolidated.

This Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, which is based on these charges, is issued pursuant to Section 10(b) of the National Labor Relations Act ("the Act"), 29 U.S. C. § 151 et seq., and Section 102.15 of the Board's Rules and Regulations, and alleges Respondent has violated the Act as described below:

1. (a) The charge in Case 06-CA-248017 was filed by the Union on September 11, 2019, and a copy was served on Respondent by U.S. mail on September 11, 2019.

(b) The first amended charge in Case 06-CA-248017 was filed by the Union on April 5, 2021, and a copy was served on Respondent by U.S. mail on April 7, 2021.

(c) The charge in Case 06-CA-263791 was filed by the Union on July 29, 2020, and a copy was served on Respondent by U.S. mail on July 30, 2020.

(d) The first amended charge in Case 06-CA-263791 was filed by the Union on March 5, 2021, and a copy was served on Respondent by U.S. mail on March 9, 2021.

(e) The charge in Case 06-CA-269346 was filed by the Union on November 20, 2020, and a copy was served on Respondent by U.S. mail on November 24, 2020.

(f) The first amended charge in Case 06-CA-269346 was filed by the Union on February 22, 2021, and a copy was served on Respondent by U.S. mail on February 23, 2021.

(g) The second amended charge in Case 06-CA-269346 was filed by the Union on June 22, 2021, and a copy was served on Respondent by U.S. mail on June 22, 2021.

(h) The third amended charge in Case 06-CA-269346 was filed by the Union on June 28, 2021, and a copy was served on Respondent by U.S. mail on June 28, 2021.

(i) The fourth amended charge in Case 06-CA-269346 was filed by the Union on October 20, 2021, and a copy was served on Respondent by U.S. mail on October 20, 2021.

2. (a) At all material times, Respondent has been a corporation with an office and place of business in Pittsburgh, Pennsylvania ("Respondent's facility"), and has been engaged in the business of publishing The Pittsburgh Post-Gazette, a daily print and electronic newspaper.

(b) Annually, in conducting its operations described above in paragraph 2(a), Respondent derived gross revenues in excess of $200,000 and held membership in and subscribed to various interstate news services, including Associated Press, published various nationally syndicated features, and advertised various nationally sold products.

(c) During the period of time described above in paragraph 2(b), Respondent purchased and received at its Pittsburgh, Pennsylvania facility products, goods, and materials valued in excess of $5,000 directly from points outside the Commonwealth of Pennsylvania.

3. At all material times, Respondent has been an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

4. At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the Act.

5. At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondent within the meaning of Section 2(11) of the Act and agents of Respondent within the meaning of Section 2(13) of the Act:

| | | |
|---|---|---|
| John Robinson Block | - | Publisher |
| Rob Weber | - | Director of Operations |
| Arturo Fernandez | - | Chief Photography Editor |
| Linda Guest | - | Senior Human Resources Manager |
| Steven Stockdale | - | Director of Human Resources |
| Jerry Micco | - | Newsroom Manager |

6. At all material times, the following individuals held the positions set forth opposite their respective names and have been agents of Respondent within the meaning of Section 2(13) of the Act:

| | | |
|---|---|---|
| Steve Cain | - | Security Contractor |
| Charles Sansky | - | Security Contractor |

7. Respondent, by the individuals named below, about the dates and in the locations opposite their names, engaged in surveillance of employees who were engaged in Union activities,

or created an impression among its employees that their Union activities were under surveillance by Respondent by taking pictures and/or video recordings:

| Agent | Date | Location |
| --- | --- | --- |
| (a) Rob Weber | September 25, 2020 | Respondent's facility |
| (b) Arturo Fernandez | September 25, 2020 | Respondent's facility |
| (c) Steve Cain | October 3, 2020<br>October 24, 2020<br>October 31, 2020 | The public sidewalk opposite the private residence of Respondent Publisher Block located in Pittsburgh, Pennsylvania ("the Block residence") |
| (d) Charles Sansky | October 3, 2020<br>October 24, 2020<br>October 31, 2020 | The public sidewalk opposite the Block residence |

8. The following employees of Respondent ("the Unit") constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

> All Editorial Department employees employed by Respondent at its facility currently located in Pittsburgh, Pennsylvania, excluding employees covered by other collective-bargaining agreements, all publishers and associate publishers, Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, Confidential Secretaries, professional employees, office clerical employees, guards, and supervisors as defined in the Act.

9. For many years and at all material times, Respondent has recognized the Union as the exclusive collective-bargaining representative of the Unit. This recognition has been

embodied in successive collective-bargaining agreements, the most recent of which was effective from October 15, 2015 until March 31, 2017.

10. At all material times, based on Section 9(a) of the Act, the Union has been the exclusive collective-bargaining representative of the Unit.

11. (a) At various times from about March 2017 through September 2020, Respondent and the Union met for the purposes of negotiating a successor collective-bargaining agreement to the agreement described above in paragraph 9.

(b) Since about March 11, 2019, Respondent bargained with no intention of reaching agreement by:

(i) insisting upon proposals that are predictably unacceptable to the Union, including unilateral control over wage rates, hours and number of hours worked, subcontracting of bargaining unit work, provisions of health insurance, layoffs, and a broadly worded no-strike clause;

(ii) failing to provide explanations to the Union regarding the Employer's proposals; and

(iii) prematurely declaring impasse.

(c) By its overall conduct, including the conduct described above in paragraph 11(b), Respondent has failed and refused to bargain in good faith with the Union as the exclusive collective-bargaining representative of the Unit.

12. (a) About July 27, 2020, Respondent implemented changes to the following terms and conditions of Unit employees' employment:

(i) the performance of Unit work by non-Unit employees;

(ii) wages;

(iii) hours of work;

(iv) overtime;

(v) conditions governing part-time and temporary employees;

(vi) sick leave;

(vii) layoffs;

(viii) expenses;

(ix) conditions governing internships and two-year associates;

(x) vacation;

(xi) holidays;

(xii) promotion and transfer;

(xiii) severance pay;

(xiv) leaves of absence;

(xv) preferential re-employment;

(xvi) payroll services;

(xvii) health, dental, and vision insurance;

(xviii) life insurance; and

(xix) pension.

(b) The subjects set forth above in paragraph 12(a) relate to wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purposes of collective bargaining.

13. Respondent engaged in the conduct described above in paragraph 12(a) without first bargaining with the Union to an overall good-faith impasse for a successor collective-bargaining agreement.

14. (a) In the alternative, if it is determined that the parties bargained to an overall good-faith impasse prior to the implementation of terms described in paragraph 12(a), Respondent implemented the following terms which were not reasonably comprehended by its pre-impasse proposals:

(i) health, dental, and vision insurance;

(ii) life insurance;

(iii) pension;

(iv) wages;

(v) transfers due to new technology;

(vi) hours of work;

(vii) payroll provisions; and

(viii) the performance of Unit work by non-Unit employees.

(b) The subjects set forth above in paragraph 14(a) relate to wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purposes of collective bargaining.

15. Respondent engaged in the conduct described above in paragraph 14(a) without affording the Union an opportunity to bargain with Respondent with respect to this conduct.

16. (a) On about July 27, 2020, Respondent implemented a discretionary proposal concerning the performance of bargaining unit work by non-Unit employees.

(b) The subject set forth above in paragraph 16(a) relates to wages, hours, and other terms and conditions of employment of the Unit and is a mandatory subject for the purposes of collective bargaining.

(c) By the conduct described above in paragraph 16(a) Respondent retained unilateral discretion over the performance of Unit work by non-Unit employees, thereby undermining the status of the Union as the employees' exclusive collective-bargaining representative.

18. By the conduct described above in paragraph 7 Respondent has been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

19. By the conduct described above in paragraphs 11(b-c), 12(a-b), 13, 14(a-b), 15 and 16(a-c), Respondent has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act.

20. The unfair labor practices of Respondent described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

**REMEDY**

As part of the remedy for the unfair labor practices alleged above in paragraphs 7, 11(b-c), 12(a-b), 13, 14(a-b), 15 and 16(a-c), the General Counsel seeks an Order requiring Respondent to: (1) bargain on request within 15 days of a Board Order; (2) make whole all employees for any losses, including consequential damages, that resulted from Respondent's unilateral implementation of terms; (3) make whole the Union for all costs and expenses incurred during negotiations; (4) make whole employee negotiators for any earnings and or leave lost while attending bargaining sessions; (5) hold a meeting or meetings, scheduled to

ensure the widest possible attendance, where Respondent's representative will read the notice to employees on worktime in presence of a Board agent. Respondent will provide each Unit employee that attends this meeting with a copy of the notice to be read.

The General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

**ANSWER REQUIREMENT**

Respondent is notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, it must file an answer to the complaint. The answer must be **received by this office on or before May 11, 2022, or postmarked on or before May 10, 2022.** Respondent also must serve a copy of the answer on each of the other parties. The answer must be filed electronically through the Agency's website. To file electronically, go to www.nlrb.gov, click on **E-File Documents**, enter the NLRB Case Number, and follow the detailed instructions. Responsibility for the receipt and usability of the answer rests exclusively upon the sender. Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason. The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented. See Section 102.21. If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office. However, if the electronic

version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing. Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations. The answer may not be filed by facsimile transmission. If no answer is filed, or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the complaint are true.

## NOTICE OF HEARING

PLEASE TAKE NOTICE THAT on **September 12, 2022, 10:00a.m. at William S. Moorhead Federal Building, 1000 Liberty Ave., Rm 904, Pittsburgh, PA 15222-4111,** and on consecutive days thereafter until concluded, a hearing will be conducted before an administrative law judge of the National Labor Relations Board. At the hearing, Respondent and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this complaint. The procedures to be followed at the hearing are described in the attached Form NLRB-4668. The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated: April 27, 2022

/s/ Nancy Wilson
NANCY WILSON
REGIONAL DIRECTOR
NATIONAL LABOR RELATIONS BOARD
REGION 06
1000 Liberty Ave Rm 904
Pittsburgh, PA 15222-4111

Attachments

FORM NLRB 4338
(6-90)

UNITED STATES GOVERNMENT
NATIONAL LABOR RELATIONS BOARD
**NOTICE**

Case 06-CA-248017 et al.

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing. However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements ***will not be granted*** unless good and sufficient grounds are shown ***and*** the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds must be set forth in ***detail***;

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5) Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

lguest@post-gazette.com
Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

sstockdale@buckeyebroadband.com
Steven Stockdale, Director HR
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

moesterle@kingballow.com
Michael D. Oesterle, Attorney
King & Ballow
315 Union St., Ste. 1100
Nashville, TN 37201-1437

rlowe@kingballow.com
Richard C. Lowe, Esq.
King & Ballow
315 Union St., Ste. 1100
Nashville, TN 37201-1437

crice@post-gazette.com
Carolyn Rice, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

jjp@jpilaw.com
Joseph J. Pass Sr.
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Blvd.
Pittsburgh, PA 15222

cretia483@gmail.com
Lacretia Wimbley, President
Newspaper Guild of Pittsburgh/CWA
Local 38061
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative**. If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**. The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I. BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II. DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence**: At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits: Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered**

(OVER)

**in evidence.** If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**: An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation. Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval. Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion. If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:** You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing. Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**: Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ. The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III. AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations. Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:** If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred. You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request. You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:** In due course, the ALJ will prepare and file with the Board a decision in this matter. Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision. The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**: The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections. A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **PITTSBURGH POST-GAZETTE/BCI**<br><br>Charged Party<br><br>and<br><br>**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**<br><br>Charging Party | **Case 06-CA-269346** |

**AFFIDAVIT OF SERVICE OF FOURTH AMENDED CHARGE AGAINST EMPLOYER**

I, Hannah Ghrist, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on October 20, 2021**,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Michael D. Oesterle, Attorney
King & Ballow
315 Union St Ste 1100
Nashville, TN 37201-1437

Carolyn Rice, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

| October 20, 2021 | Hannah Ghrist, Designated Agent of NLRB |
|---|---|
| Date | Name |
| | /s/ Hannah Ghrist |
| | Signature |

Form NLRB - 501 (2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

# FOURTH AMENDED CHARGE AGAINST EMPLOYER

**INSTRUCTIONS:**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 06-CA-269346 | 10/20/2021 |

File an original of this charge with NLRB Regional Director in which the alleged unfair labor practice occurred or is occurring.

**1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT**

a. Name of Employer
Pittsburgh Post-Gazette/BCI

b. Tel. No.
(412)263-1329

c. Cell No.

d. Address (street, city, state ZIP code)
2301 Sweeney Drive, Clinton, PA 15026

e. Employer Representative
Carolyn Rice
Sr. HR Manager

f. Fax No.

g. e-Mail
crice@post-gazette.com

h. Dispute Location (City and State)
Clinton, PA

i. Type of Establishment (factory, nursing home, hotel)
Newspaper Publisher

j. Principal Product or Service
Production and distribution of news, newspaper and related products

k. Number of workers at dispute location
500

l. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (*set forth a clear and concise statement of the facts constituting the alleged unfair labor practices*)

In or around September and October 2020, the Employer interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by photographing and/or videotaping unit members, or creating the impression of it photographing and/or videotaping unit members, during demonstrations at the Employer's facility and at the home of Employer Owner John Block.

3. Full name of party filing charge (if labor organization, give full name, including local name and number)
Newspaper Guild of Pittsburgh/CWA Local 38061

4a. Address (street and number, city, state, and ZIP code)
322 North Shore Drive, Suite 250, Pittsburgh, PA 15212

4b. Tel. No
(412)880-4001

4c. Cell No.

4d. Fax No.

4e. e-Mail
cretia483@gmail.com

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (*to be filled in when charge is filed by a labor organization*)

Communications Workers of America, AFL-CIO, CLC

6. DECLARATION
**I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.**

Tel. No.
412-281-3850

Office, if any, Cell No.

(signature of representative or person making charge) [signature]

Joseph J. Pass, Esquire
Print Name and Title

Fax No.
412-281-1985

Address: 219 Ft. Pitt Blvd.
Pittsburgh, PA 15222

Date: 10/20/21

e-Mail
jjp@jpilaw.com

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **PITTSBURGH POST-GAZETTE/BCI**<br><br>Charged Party<br><br>and<br><br>**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**<br><br>Charging Party | **Case 06-CA-269346** |

**AFFIDAVIT OF SERVICE OF THIRD AMENDED CHARGE AGAINST EMPLOYER**

I, Hannah Ghrist, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on June 28, 2021**,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

Michael D. Oesterle, Esquire
King & Ballow
315 Union St., Ste. 1100
Nashville, TN 37201-1437

| | |
|---|---|
| June 28, 2021 | Hannah Ghrist, Designated Agent of NLRB |
| Date | Name |
| | /s/ Hannah Ghrist |
| | Signature |

Form NLRB - 501 (2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

**THIRD AMENDED CHARGE AGAINST EMPLOYER**

**INSTRUCTIONS:**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 06-CA-269346 | 6/28/21 |

File an original of this charge with NLRB Regional Director in which the alleged unfair labor practice occurred or is occurring.

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | | |
|---|---|---|
| a. Name of Employer<br>Pittsburgh Post-Gazette/BCI | | b. Tel. No.<br>(412)263-1329<br>c. Cell No. |
| d. Address (street, city, state ZIP code)<br>2301 Sweeney Drive, Clinton, PA 15026 | e. Employer Representative<br>Linda Guest<br>Sr. HR Manager | f. Fax No.<br>g. e-Mail<br>lguest@post-gazette.com<br>h. Dispute Location (City and State)<br>Clinton, PA |
| i. Type of Establishment (factory, nursing home, hotel)<br>Newspaper Publisher | j. Principal Product or Service<br>Production and distribution of news, newspaper and related products | k. Number of workers at dispute location<br>500 |

l. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (*set forth a clear and concise statement of the facts constituting the alleged unfair labor practices*)

In or around September and October 2020, the Employer interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by conducting surveillance of unit members' protected activities by photographing and/or videotaping unit members during demonstrations at the Employer's facility and at the home of Employer Owner John Block.

In or around June 2020, the the Employer interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by sending a letter to bargaining unit members which threatened them with unspecified reprisals in retaliation for engaging in protected concerted activities.

3. Full name of party filing charge (*if labor organization, give full name, including local name and number*)
Newspaper Guild of Pittsburgh/CWA Local 38061

| | |
|---|---|
| 4a. Address (street and number, city, state, and ZIP code)<br>322 North Shore Drive, Suite 250, Pittsburgh, PA 15212 | 4b. Tel. No.<br>(412)576-4665<br>4c. Cell No.<br>4d. Fax No.<br>4e. e-Mail<br>mfuoco138@gmail.com |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (*to be filled in when charge is filed by a labor organization*)

Communications Workers of America, AFL-CIO, CLC

6. DECLARATION
**I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.**

| | | |
|---|---|---|
| [signature]<br>(signature of representative or person making charge) | Joseph J. Pass, Esquire<br>Print Name and Title | Tel. No. 412-281-3850<br>Office, if any, Cell No. |
| Address: 219 Ft. Pitt Blvd. Pittsburgh, PA 15222 | Date: 6/28/21 | Fax No. 412-281-1985<br>e-Mail jjp@jpilaw.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**PITTSBURGH POST-GAZETTE/BCI**

Charged Party

and

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**

Charging Party

**Case 06-CA-269346**

**AFFIDAVIT OF SERVICE OF SECOND AMENDED CHARGE AGAINST EMPLOYER**

I, Hannah Ghrist, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on June 22, 2021**,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

Michael D. Oesterle, Esquire
King & Ballow
315 Union St., Ste. 1100
Nashville, TN 37201-1437

| June 22, 2021 | Hannah Ghrist, Designated Agent of NLRB |
|---|---|
| Date | Name |
| | /s/ Hannah Ghrist |
| | Signature |

Form NLRB - 501 (2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

# SECOND AMENDED CHARGE AGAINST EMPLOYER

INSTRUCTIONS:

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 06-CA-269346 | 6/22/2021 |

File an original of this charge with NLRB Regional Director in which the alleged unfair labor practice occurred or is occurring.

**1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT**

a. Name of Employer: Pittsburgh Post-Gazette/BCI

b. Tel. No.: (412)263-1329

c. Cell No.:

d. Address (street, city, state ZIP code): 2301 Sweeney Drive, Clinton, PA 15026

e. Employer Representative: Linda Guest, Sr. HR Manager

f. Fax No.:

g. e-Mail: lguest@post-gazette.com

h. Dispute Location (City and State): Clinton, PA

i. Type of Establishment (factory, nursing home, hotel): Newspaper Publisher

j. Principal Product or Service: Production and distribution of news, newspaper and related products

k. Number of workers at dispute location: 500

l. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (*set forth a clear and concise statement of the facts constituting the alleged unfair labor practices*)

In or around September and October 2020, the Employer interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by conducting surveillance of unit members' protected activities by photographing and/or videotaping unit members during demonstrations at the Employer's facility and at the home of Employer Owner John Block.

3. Full name of party filing charge (*if labor organization, give full name, including local name and number*): Newspaper Guild of Pittsburgh/CWA Local 38061

4a. Address (street and number, city, state, and ZIP code): 322 North Shore Drive, Suite 250, Pittsburgh, PA 15212

4b. Tel. No.: (412)576-4665

4c. Cell No.:

4d. Fax No.:

4e. e-Mail: mfuoco138@gmail.com

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (*to be filled in when charge is filed by a labor organization*): Communications Workers of America, AFL-CIO, CLC

6. DECLARATION

**I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.**

Tel. No.: 412-281-3850

Office, if any, Cell No.:

[signature]
(signature of representative or person making charge)

Joseph J. Pass, Esquire
Print Name and Title

Fax No.: 412-281-1985

Address: 219 Ft. Pitt Blvd. Pittsburgh, PA 15222

Date: 22 June 2021

e-Mail: jjp@jpilaw.com

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **PITTSBURGH POST-GAZETTE/BCI**<br><br>Charged Party<br><br>and<br><br>**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**<br><br>Charging Party | **Case 06-CA-248017** |

**AFFIDAVIT OF SERVICE OF FIRST AMENDED CHARGE AGAINST EMPLOYER**

I, Holly Galusky, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on April 7, 2021**,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2301 Sweeney Drive
Clinton, PA 15026

| April 7, 2021 | Holly Galusky, Designated Agent of NLRB |
|---|---|
| Date | Name |
| | /s/ Holly Galusky |
| | Signature |

Form NLRB - 501 (2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

# FIRST AMENDED CHARGE AGAINST EMPLOYER

**INSTRUCTIONS:**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 06-CA-248017 | 04/05/2021 |

File an original of this charge with NLRB Regional Director in which the alleged unfair labor practice occurred or is occurring.

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer: Pittsburgh Post-Gazette/BCI

b. Tel. No.: (412)263-1329

c. Cell No.:

d. Address (street, city, state ZIP code): 2301 Sweeney Drive, Clinton, PA 15026-____

e. Employer Representative: Linda Guest, Sr. HR Manager

f. Fax No.:

g. e-Mail: lguest@post-gazette.com

h. Dispute Location (City and State): Clinton, PA

i. Type of Establishment (factory, nursing home, hotel): Newspaper

j. Principal Product or Service: newspaper publishing and circulation

k. Number of workers at dispute location: 250

l. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) **and (5)** of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (*set forth a clear and concise statement of the facts constituting the alleged unfair labor practices*)

Since about March 11, 2019, the Employer has failed and refused to bargain in good faith with the Union as the collective bargaining representative of its employees by, among other conduct, insisting on proposals that are predictably unacceptable to the Union such as those allowing the Employer complete discretion to change and/or remove negotiated benefits, terms and conditions of employment from bargaining unit employees.

3. Full name of party filing charge (*if labor organization, give full name, including local name and number*): Newspaper Guild of Pittsburgh/CWA Local 38061

4a. Address (street and number, city, state, and ZIP code): 322 North Shore Drive, Suite 250, Pittsburgh, PA 15212

4b. Tel. No.:

4c. Cell No.:

4d. Fax No.:

4e. e-Mail:

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (*to be filled in when charge is filed by a labor organization*)

6. DECLARATION

**I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.**

Tel. No.: (412)281-3850

By: Joseph J. Pass
(signature of representative or person making charge)

Joseph J. Pass, Attorney
Print Name and Title

Office, if any, Cell No.:

Fax No.:

Address: 219 Fort Pitt Blvd., Pittsburgh, PA 15222

Date: 4/5/21

e-Mail: jjp@jpilaw.com

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **PITTSBURGH POST-GAZETTE/BCI**<br>Charged Party<br>and<br>**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**<br>Charging Party | **Case 06-CA-263791** |

**AFFIDAVIT OF SERVICE OF FIRST AMENDED CHARGE AGAINST EMPLOYER**

I, Hannah Ghrist, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on March 9, 2021**,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Steven Stockdale, Director HR
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

Michael D. Oesterle, Esquire
King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201-1437

Richard C. Lowe, Esq.
King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201

| March 9, 2021 | Hannah Ghrist, Designated Agent of NLRB |
|---|---|
| Date | Name |
| | /s/ Hannah Ghrist |
| | Signature |

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA NATIONAL LABOR RELATIONS BOARD

**FIRST AMENDED CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 06-CA-263791 | Date Filed 3-5-2021 |

**INSTRUCTIONS:**
**File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.**

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer: Pittsburgh Post-Gazette/BCI

b. Tel. No. 412-263-1329

c. Cell No.

f. Fax No.

d. Address *(Street, city, state, and ZIP code)*
2201 Sweeney Drive
Clinton, PA 15026

e. Employer Representative: Steven Stockdale, Director HR

g. e-Mail: sStockdale@buckeyebroadband.com

h. Number of workers employed: 500

i. Type of Establishment *(factory, mine, wholesaler, etc.)*: Newspaper Publisher

j. Identify principal product or service: Production of distribution of news, newspapers and related products

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* 8(a)5 of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Since January 29, 2020, the employer has failed and refused to engage in good faith bargaining for a successor contract, and relatedly, on or about July 27, 2020, unlawfully declared impasse and unilaterally implemented portions of its "Final Offer" changing the bargaining unit's terms and conditions of employment in violation of Section 8(a)(5) of the Act. Following its declaration of impasse and unilateral implementation of terms in July 2020 and within the 10(b) period, the employer has failed and refused to bargain in good faith, including in regard to the September 8, 2020 bargaining session between the parties.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
Newspaper Guild of Pittsburgh/CWA Local 38061

4a. Address *(Street and number, city, state, and ZIP code)*
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

4b. Tel. No.

4c. Cell No.

4d. Fax No.

4e. e-Mail

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)* Newspaper Guild of Pittsburgh/CWA Local 38061

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By Joseph J. Pass
*(signature of representative or person making charge)*

Joseph J. Pass
*(Print/type name and title or office, if any)*

Tel. No. 412-281-3850

Office, if any, Cell No.

Fax No. 412-281-1985

e-Mail jjp@jpilaw.com

Address 219 Fort Pitt Blvd., Pittsburgh, PA 15222

03/05/2021
*(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**PITTSBURGH POST-GAZETTE/BCI**

Charged Party

and

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**

Charging Party

**Case 06-CA-269346**

**AFFIDAVIT OF SERVICE OF FIRST AMENDED CHARGE AGAINST EMPLOYER**

I, Hannah Ghrist, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on February 23, 2021**,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2301 Sweeney Drive
Clinton, PA 15026

Michael D. Oesterle, Esquire
King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201-1437

| February 23, 2021 | Hannah Ghrist, Designated Agent of NLRB |
|---|---|
| Date | Name |
| | /s/ Hannah Ghrist |
| | Signature |

Form NLRB - 501 (2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD

# FIRST AMENDED CHARGE AGAINST EMPLOYER

**INSTRUCTIONS:**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 06-CA-269346 | 2/22/2021 |

File an original of this charge with NLRB Regional Director in which the alleged unfair labor practice occurred or is occurring.

**1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT**

| | | |
|---|---|---|
| a. Name of Employer<br>Pittsburgh Post-Gazette/BCI | | b. Tel. No.<br>(412)263-1329<br>c. Cell No. |
| d. Address (street, city, state ZIP code)<br>2301 Sweeney Drive, Clinton, PA 15026 | e. Employer Representative<br>Linda Guest<br>Sr. HR Manager | f. Fax No.<br>g. e-Mail<br>lguest@post-gazette.com<br>h. Dispute Location (City and State)<br>Clinton, PA |
| i. Type of Establishment (factory, nursing home, hotel)<br>Newspaper Publisher | j. Principal Product or Service<br>Production and distribution of news, newspaper and related products | k. Number of workers at dispute location<br>500 |

l. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge (*set forth a clear and concise statement of the facts constituting the alleged unfair labor practices*)

Since about September 18, 2020, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by conducting surveillance of union activities when employees and supporters peacefully demonstrated in the streets outside the Employer's facility, for purposes other than protection of its property or other legitimate reasons.

3. Full name of party filing charge (*if labor organization, give full name, including local name and number*)
Newspaper Guild of Pittsburgh/CWA Local 38061

| | |
|---|---|
| 4a. Address (street and number, city, state, and ZIP code)<br>322 North Shore Drive, Suite 250, Pittsburgh, PA 15212 | 4b. Tel. No.<br>(412)576-4665<br>4c. Cell No.<br>4d. Fax No.<br>4e. e-Mail<br>mfuoco138@gmail.com |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (*to be filled in when charge is filed by a labor organization*)

Communications Workers of America, AFL-CIO, CLC

| | |
|---|---|
| 6. DECLARATION<br>**I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.** | Tel. No.<br>412-281-3850 |
| By: [signature] (signature of representative or person making charge) — Joseph J. Pass, Esquire (Print Name and Title) | Office, if any, Cell No. |
| Address: 219 Ft. Pitt Blvd. Pittsburgh, PA 15222 — Date: 20 Feb 2021 | Fax No.<br>412-281-1985<br>e-Mail<br>jjp@jpilaw.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**PITTSBURGH POST-GAZETTE/BCI**

Charged Party

and

**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**

Charging Party

**Case 06-CA-269346**

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, Holly Galusky, the undersigned employee of the National Labor Relations Board, state under oath that on November 24, 2020**,** I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2301 Sweeney Drive
Clinton, PA 15026

November 24, 2020
Date

Holly Galusky, Designated Agent of NLRB
Name

/s/ Holly Galusky
Signature

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 06-CA-269346 | Date Filed 11-20-2020 |

**INSTRUCTIONS:**
**File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.**

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer: Pittsburgh Post-Gazette/BCI

b. Tel. No.: 412-263-1329

c. Cell No.:

f. Fax. No.:

d. Address *(Street, city, state, and ZIP code)*: 2301 Sweeney Drive, Clinton, PA 15026

e. Employer Representative: Linda Guest, Sr. HR Manager

g. e-mail: lguest@post-gazette.com

h. Number of workers employed: 500

i. Type of Establishment *(factory, mine, wholesaler, etc.)*: Newspaper Publisher

j. Identify principal product or service: Production and distribution of news, newspapesr and related products.

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections) 8 a(1) of the National Labor Relations Act, and thest unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

For the past 6 months and in particular on or about October 25, 2020 the employer has conducted surveillance of union activities whenever employees and supporters peacefully demonstrated in the streets outside the employer's facility. The surveillance was not for the purpose of protecting its property nor for any other ligitimate reason as the union had received approval from the city for the demonstration and police were stationed to protect their peaceful union activity.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*: Newspaper Guild of Pittsburgh/CWA Local 38061

4a. Address *(Street and number, city, state, and ZIP code)*: 322 North Shore Drive, Suite 250, Pittsburgh, PA 15212

4b. Tel. No.: 412-576-4665

4c. Cell No.:

4d. Fax No.:

4e. e-mail: mfuocco138@gmail.com

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*: Teamsters Local 211Newspaper Guild of Pittsburgh/CWA Local 38061

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

[signature] *(signature of representative or person making charge)*

Joseph J. Pass, Esquire *(Print/type name and title or office, if any)*

Address: 219 Fort Pitt Boulevard, Pittsburgh, PA 15222

Date: 11/20/20

Tel. No.: 412-281-3850

Office, if any, Cell No.:

Fax No.: 412-281-1985

e-mail: jjp@jpilaw.com

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **PITTSBURGH POST-GAZETTE/BCI**<br><br>Charged Party<br><br>and<br><br>**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**<br><br>Charging Party | **Case 06-CA-263791** |

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on July 30, 2020**,** I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Steven Stockdale, Director HR
Pittsburgh Post-Gazette/BCI
2201 Sweeney Drive
Clinton, PA 15026

| July 30, 2020 | Hannah Ghrist, Designated Agent of NLRB |
|---|---|
| Date | Name |
| | /s/ Hannah Ghrist |
| | Signature |

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| **DO NOT WRITE IN THIS SPACE** | |
|---|---|
| Case 06-CA-263791 | Date Filed 07/29/2020 |

**INSTRUCTIONS:**
**File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.**

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer: Pittsburgh Post-Gazette/BCI

b. Tel. No. 412-263-1329

c. Cell No.

f. Fax No.

d. Address *(Street, city, state, and ZIP code)*
2201 Sweeney Drive
Clinton, PA 15026

e. Employer Representative
Steven Stockdale, Director HR

g. e-Mail
sStockdale@buckeyebroadband.com

h. Number of workers employed
500

i. Type of Establishment *(factory, mine, wholesaler, etc.)*
Newspaper Publisher

j. Identify principal product or service
Production of distribution of news, newspapers and related products

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* 8(a)5 of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the past six months and previously, the employer has failed and refused to engage in good faith bargaining for a successor contract, and relatedly, on or about July 27, 2020, unlawfully declared impasse and unilaterally implemented portions of its "Final Offer" changing the bargaining unit's terms and conditions of employment in violation of Section 8(a)(5) of the Act.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
Newspaper Guild of Pittsburgh/CWA Local 38061

4a. Address *(Street and number, city, state, and ZIP code)*
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

4b. Tel. No. 412-576-4665

4c. Cell No.

4d. Fax No.

4e. e-Mail
mfuoco138@gmail.com

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)* Newspaper Guild of Pittsburgh/CWA Local 38061

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By Joseph J. Pass
*(signature of representative or person making charge)*

Joseph J. Pass
*(Print/type name and title or office, if any)*

Tel. No. 412-281-3850

Office, if any, Cell No.

Fax No. 412-281-1985

e-Mail jjp@jpilaw.com

Address 219 Fort Pitt Blvd., Pittsburgh, PA 15222

07/29/2020
*(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

GC Exhibit 1(c)

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **PITTSBURGH POST-GAZETTE/BCI**<br><br>Charged Party<br><br>and<br><br>**NEWSPAPER GUILD OF PITTSBURGH/CWA LOCAL 38061**<br><br>Charging Party | **Case 06-CA-248017** |

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on September 11, 2019**,** I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Linda Guest, Sr. HR Manager
Pittsburgh Post-Gazette/BCI
2301 Sweeney Drive
Clinton, PA 15026

| September 11, 2019 | Nancy A Moratis, Designated Agent of NLRB |
|---|---|
| Date | Name |
| | /s/ Nancy A Moratis |
| | Signature |

INTERNET FORM NLRB-501 (2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

FORM EXEMPT UNDER 44 U.S.C 3512

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>06-CA-248017 | Date Filed<br>9-11-19 |

**INSTRUCTIONS:**
**File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.**

1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

a. Name of Employer: Pittsburgh Post-Gazette/BCI

b. Tel. No. (412) 263-1329

c. Cell No.

f. Fax No.

d. Address *(Street, city, state, and ZIP code)*: 2301 Sweeney Drive PA Clinton 15026-____

e. Employer Representative: Linda Guest, Sr. HR Manager

g. e-Mail: lguest@post-gazette.com

h. Number of workers employed: 250

i. Type of Establishment *(factory, mine, wholesaler, etc.)*: Printing & Publishing

j. Identify principal product or service: Newspaper and related products

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* 5 of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

--See additional page--

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
Mike Fuoco Title:
Newspaper Guild of Pittsburgh/CWA Local 38061

4a. Address *(Street and number, city, state, and ZIP code)*: 322 North Shore Drive Suite 250 PA Pittsburgh 15212-____

4b. Tel. No. (412) 576-4665

4c. Cell No.

4d. Fax No.

4e. e-Mail: mfuoco138@gmail.com

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

By Joseph J. Pass
*(signature of representative or person making charge)*

Title: Joseph J Pass, Attorney
*(Print/type name and title or office, if any)*

Tel. No. (412) 281-3850

Office, if any, Cell No.

Fax No. (412) 281-1985

e-Mail: jjp@jpilaw.com

Address 219 Fort Pitt Blvd. Pittsburgh PA 15222-____

09/10/2019 16:55:22
*(date)*

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

RECEIVED
NLRB
REGION 6

2019 SEP 11 AM 9:46

PITTSBURGH, PA

## Basis of the Charge

**8(a)(5)**

Within the previous six months, the Employer failed and refused to bargain in good faith with the union as the collective bargaining representative of its employees.

RECEIVED
NLRB
REGION 6
2019 SEP 11 AM 9:46
PITTSBURGH, PA

# GC EXHIBIT 2

NLRB-0000899

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 2

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 62

# 2014 – 2017

# AGREEMENT BETWEEN

# PITTSBURGH POST-GAZETTE

# AND

# THE NEWSPAPER GUILD OF PITTSBURGH

**Effective: October 15, 2014**

**Expires: March 31, 2017**

## TABLE OF CONTENTS

| | Page |
|---|---|
| Adjustment of Disputes | 25 |
| Advancement, Promotion and Transfer | 21 |
| Checkoff | 3 |
| Classifications, Wages and Schedules of Minimums | 4 |
| Expenses | 17 |
| Guild Shop | 3 |
| Health Care Grid | Exhibit A |
| Holidays | 21 |
| Hours | 9 |
| Insurance, Health and Welfare, Pensions | 30 |
| Internships, Two-Year Associates | 18 |
| Leaves of Absence | 24 |
| Management Rights | 37 |
| Memorandum of Understanding - Photo Reprints | 48 |
| Memorandum of Understanding - Stringer Try Outs | 49 |
| Memorandum of Understanding - Bonus Payments to Part-Timers | 45 |
| Memorandum of Understanding - Exempt Employees | 46 |
| Memorandum of Understanding - Holidays | 47 |
| Memorandum of Understanding - KDKA Gathering Agreement | 42 |
| Memorandum of Understanding - Part-Time Employees | 44 |
| Memorandum of Understanding - PG Speakers Bureau Policy | 43 |
| Memorandum of Understanding - Employees Working Above Class | 50 |
| Memorandum of Understanding - Freelance Work by Buyout Takers | 52 |
| Memorandum of Understanding - PG Plus 2-Year Associates | 51 |
| Military Service | 26 |
| Miscellaneous | 27 |
| Overtime | 10 |
| Part-time, Temporary Employees and Two-Year Associates | 11 |
| Preferential Re-Employment | 26 |
| Privilege Against Disclosure | 37 |
| Security | 13 |
| Severance Pay | 23 |
| Sick Leave | 12 |
| Statement of Policy | 40 |
| Term and Renewal | 38 |
| Vacations | 19 |
| Guild Employees 401 (k) Plan | 58 |

AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this **October 15, 2014,** by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 12, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, **Senior Assistant Managing Editor,** Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

In no event will the number of employees excluded from the Agreement be more than 30 percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have 42 employees excluded, provided that they qualify as management personnel.

Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Exempt employees can do bargaining unit work as performed in the past and/or similar work that may result from the introduction of new print, electronic or other products and as operationally necessary. Performance of such exempt work will not displace bargaining unit employees.

D. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news according to the following guidelines:

1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.

2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.

3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective January 1, 2007, the maximum will be 15 percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.

4. Community Journalism initiatives

Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

The company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors and is not intended to displace bargaining unit work.

ARTICLE I
Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, date of birth and Social Security number.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

ARTICLE II
Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature____________________________________________

Date______________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

RTICLE III
Classifications, Wages and Schedules of Minimums

Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 10% of earnings to a maximum of $5,000 per calendar year. **Effective April 1, 2016, such diversion shall be reduced to 8% and a maximum of $4,250 per calendar year. Effective January 1, 2017, the maximum diversion shall be $4,000 per calendar year**:

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| Content Providers | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 10% Wage Diversion | 88.30 | 90.55 | 103.68 | 108.29 | 111.23 | 114.89 |
| | Wage after diversion | 794.68 | 814.97 | 933.16 | 974.61 | 1001.07 | 1034.02 |

Provides original content for print and electronic publications and products.

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Content Editors/Producers | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 10% Wage Diversion | 89.47 | 96.73 | 107.51 | 112.21 | 116.32 |
| | Wage after diversion | 805.27 | 870.53 | 967.55 | 1009.89 | 1046.90 |

Edits and produces original content for print and electronic publications, products, and slot.

| | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| Assignment Editors | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 10% Wage | 110.25 | 112.21 | 117.96 |

| | | | | |
|---|---|---|---|---|
| | Diversion | | | |
| | Wage after diversion | 992.25 | 1009.89 | 1061.65 |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| Librarian | wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | 10% Wage Diversion | 87.42 | 88.79 | 90.36 |
| | Wage after diversion | 786.74 | 799.09 | 813.20 |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| News Assistant | wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | 10% Wage Diversion | 73.21 | 75.17 | 77.13 |
| | Wage after diversion | 658.85 | 676.49 | 694.13 |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Editorial Clerks | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| Administrative | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 10% Wage Diversion | 65.66 | 67.42 | 68.89 | 69.78 |
| | Wage after diversion | 590.94 | 606.82 | 620.05 | 627.98 |

Provides newsroom support as necessary

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Copy Messengers | | | | | |
| | wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |

| | | | | | |
|---|---|---|---|---|---|
| | 10% Wage Diversion | 54.98 | 55.47 | 55.96 | 56.45 |
| | Wage after diversion | 494.80 | 499.21 | 503.62 | 508.03 |

Provides newsroom support as necessary

| | | 1st Year | 2nd Year |
|---|---|---|---|
| Two-Year Associates | Wage | 570.00 | **625.00** |
| | 2% pension | 11.40 | **12.50** |
| | Net wages | 558.60 | **612.50** |
| | 10% Wage Diversion | 55.86 | **61.25** |
| | Wage after diversion | 502.74 | **551.25** |

Performs various newsroom assignments as necessary

| | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| 3-Month Interns | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 10% Wage Diversion | 50.18 | 51.65 | 53.12 |
| | Wage after diversion | 451.58 | 464.81 | 478.04 |

Performs various newsroom assignments as necessary

1. Employees shall receive a salary increase provided in the schedule of wage minimums or increases according to the following schedule of general increases, whichever is greater, but not both:
2. The above wage minimums and the general increase need not apply to salaries of those who are on retirement or who are on extended sick leave. The pay increases shall go into effect upon the employee's return to work.
3. For the life of this Agreement there is to be no reduction in compensation of anyone covered by this Agreement except when the provisions of Article VIII, Paragraph 3, are implemented.
4. In the application of the foregoing schedules of minimums, experience shall include all regular employment in comparable work. In the event the Guild questions the job classification or experience status of any employee within forty-five (45) days from start of employment, adjustment, if any, will be made retroactive to the start of employment. If such question is raised after forty-five (45) days from start of employment, adjustment, if any, will be effective on the date that the Guild brought the question to the attention of the Company.
5. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his

former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

6. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only; individual merit shall be acknowledged by increases above the minimums.

7. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

8. (a) Effective January 1, 1982, an employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ........................................................................ minimum salary differential
Copy messenger to reporter/editor ........................................................ minimum salary differential
News assistant, clerk to reporter/editor................................................minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

**Effective upon ratification of this Contract, when no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.**

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) Effective January 1, 2003, the Harrisburg and Washington correspondent will receive a salary differential of $20 a week. (Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)

9. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

10. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating or until the top minimum is reached.

11. Effective January 1, 2003, a one-time service bonus of $250 for all employees with 10 or more years of service. Thereafter, the bonus will be paid when an employee completes his/her 10th year of service. Effective January 1, 2004, a one-time service bonus of $500 for all employees with 20 or more years of service. Thereafter, the bonus will be paid when an employee completes his/her 20th year of service. As of Jan. 1, 2007, all service bonuses will be diverted to the Guild Pension Plan for the life of the current contract.

## ARTICLE IV
### Hours

1. No employee eligible for Guild membership shall work more than eight (8) hours per day within a nine (9) consecutive hour period, nor more than five days per week with the following exceptions:

(a) With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

(b) Additionally, full-time employees with at least two years of service shall, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

i. The nature of the work is such that it can be compressed into 4 days.
ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
vii. A lunch or dinner break may be required as part of the work day.
viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

(c) Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

2. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

3. Wherever possible, days off shall be consecutive days.

4. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

5. A differential of $3 per shift will be paid to an employee who begins his shift on or after 2 p.m. As of Jan. 1, 2007, all night differentials will be diverted to the Guild Pension Plan for the life of the current contract.

This shall apply only so long as the employee is assigned to such shifts.

6. Time spent by employees traveling to and from assignments shall be considered as part of the working day. Exceptions: Trips outside the Tri-State area, sports beats and self-initiated assignments.

7. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

8. By arrangement with the Company, employees who elect to reduce their work week to fewer than 40 hours shall be considered flex-time employees. They shall designate a period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

ARTICLE V
Overtime

1. Overtime shall be defined as work beyond 40 hours in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. **Overtime work must be approved in advance by the Company.**

2. Overtime beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. **By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.**

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half, but not less than a day's pay in addition to his regular weekly salary.

5. Overtime shall be reported in writing to the Company or its representative within ten days after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

**ARTICLE VI**
**Part-time, Temporary Employees and Two-Year Associates**

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave and other leaves of absences.

3. It shall be a policy of the Company to pay part-time employees who average individually less than 20 hours per week not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees

may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

5. Part-time and, or temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company can request that an employee furnish a doctor's certificate or other reasonable proof when absent for three (3) consecutive days or more.

2. An employee shall receive a normal week's salary for a period of his or her incapacitation. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability

(a) Employees can accumulate the above eight days per year during their employment to a maximum of 90 days per year. Only unused days during the year will be carried over to the maximum of 90 days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of five (5) days or longer. This benefit will begin on the 6th work day of disability. The five days will constitute a waiting period.

All employees on the payroll on 1/1/07 will be provided an initial bank of 7 days short term disability pay per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days.

(b) If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at 60 percent of the employee's negotiated rate of pay for those employees with two years or more of service. Those employees with less than two years service will be eligible for 13 weeks of additional sick leave. Details of this extended short-term disability plan are available from the Human Resources Director.

(c) An employee who exhausts his disability bank shall earn additional sick leave benefits according to the following schedule: For one year of uninterrupted employment – **20** percent of

maximum short-term disability schedule; two years of uninterrupted employment – **40** percent of maximum short-term disability schedule; three years of uninterrupted employment – **60** percent of maximum short-term disability schedule; **four years of uninterrupted employment – 80 percent of maximum short-term disability schedule; five years of uninterrupted employment – 100 percent of maximum short-term disability schedule.**

The maximum regeneration under this program will be 70 days. Unused individual sick days will continue to be accumulated into the bank until the 90-day maximum is reached.

Sick pay and/or the short-term disability bank are not considered earned and will not be paid out upon termination of employment, including retirement.

4. This program will become effective as of the date of ratification. Benefit payments under the prior Guild sick leave plan will continue for those employees on sick leave as of the date of ratification.

5. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

6. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

7. Sick leave payments shall terminate upon termination of employment or death of the employee.

8. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

9. An employee cannot accrue sick leave or use sick leave benefits for any purpose other than illness or injury.

10. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

11. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

12. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.

## ARTICLE VIII
## Security

1. There shall be no discharge as a result of putting this Agreement into effect.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force, which latter shall be construed as synonymous with discharges for economy.

3. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes. The Company's right to determine the size of the force is recognized and the right to reduce the force for economy (either permanently or temporarily) shall not be subject to review by the Board of Arbitration, provided, however, that in the event the Guild believes that reasons other than economy have entered into the designation of the person or persons to be laid off, it may appeal the particular case or cases to arbitration. Stringers and free lancers in no case will replace or displace bargaining unit employees.

4. A. Layoffs to reduce the force, as distinguished from dismissals for just and sufficient cause, shall not be made until the Company notifies the Guild thirty (30) days in advance that such layoffs are necessary and that no reasonable alternative exists.

B. The Company shall notify the Guild of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), number of employees per work group, numerical order of layoffs within each work group, numerical order of overall layoffs, and the facts upon which the Company relies to establish the necessity pursuant to Section 4A above.

C. In the event such layoffs are necessary, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may first be offered for a reduction in force after consultation with the Guild.

(2) Eliminate thirty (30%) percent of the stringer budget and all intern programs, temporary and probationary employees.

(3) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in inverse seniority order in the affected work group. The employee to be laid off shall be the junior two year associate in the affected work group. If there is no two year associate in the affected work group, the first employee to be laid off shall be the junior two-year associate in the bargaining unit. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. Thereafter, layoffs shall be in inverse seniority order in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. The work group for purposes of layoff will be divided as follows:

I. Content providers in Local News and Business
II. Content providers in Features and Editorial
III. Content providers in Sports
IV. Content providers and Editors in Photography/Multimedia/Art
V. Content Editors and Assigning Editors
VI. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group VI above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

(5) In the event of recall, the recall shall be in reverse order of layoff. Such recall rights will last 12 months from the date of the employee's layoff.

(6) The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

D. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

E. An employee laid off as a result of the provisions of this clause will continue to receive their health/life insurance benefits for a period of three (3) months under the same conditions that applied when he/she was on the payroll. Also, for an additional three (3) months, the Company shall pay fifty (50%) percent of whatever premium or health and life insurance benefits being paid for full time employees, for those laid off employees.

F. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twenty-four (24 months

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(c)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within two years of their date of disability shall

have their benefits and seniority terminated. Said two years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's two year time period shall commence anew;

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within three years of their date of disability shall have their benefits and seniority terminated. Said three years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's three year time period shall commence anew;

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

5. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

6. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two

weeks' pay in lieu of notice may be given by mutual agreement between the Company and the Guild.

(b) In the event of discharge for gross misconduct, or in the case of misconduct after notice has been given said employee may be laid off immediately.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

7. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

8. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

9. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

10. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes shall be afforded the opportunity to transfer to other available positions.

11. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

12. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

## ARTICLE IX
Expenses

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The company will review the **Pittsburgh** AAA gas rate on January 1, **April 1,** July 1, and **October 1**. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

## ARTICLE X
## INTERNSHIPS, TWO-YEAR ASSOCIATES

1. Unpaid academic internships will be limited to fourteen (14) a year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. **Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.**

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they are excluded from the following classifications: news assistant, clerk, and messenger.

E. There will be no assignment restrictions

F. No vacation bonuses will be paid by the Company to two-year associates.

ARTICLE XI
Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service; four (4) weeks for eight (8) continuous years of service and five (5) weeks for 23 continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers. The service requirement for five weeks of vacation will decrease as follows: 21 years in 2002; 20 years in 2003; 18 years in 2004.

Employees hired on or after Jan. 1, 2007, will receive a maximum of four (4) weeks vacation.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

Effective January 1, 1994:

All former Press employees will receive credit, for vacation purposes only, for their service with the Pittsburgh Press Company.

All employees hired between Jan. 1, 1987 and Jan. 1, 1993, will receive, for vacation purposes only, an extra year of service. The extra year of service is eliminated after the employee receives four weeks of vacation.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees eligible for 5 weeks of vacation must take at least one week prior to March 31. Also, all employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

9. With the exception of self-provoked discharge or failure to give two weeks' notice, accrued vacation pay will be paid on termination of employment or in the event of death to the designated beneficiary according to the following schedule:

Less than 3 complete years of service .................................................. 0
3 to 6 complete years of service ..........................................1 week's pay
7 to 11 complete years of service ........................................2 weeks' pay
12 to 15 complete years of service ......................................3 weeks' pay
16 or more years of service .................................................4 weeks' pay

Effective May 1, 2007, the accrued vacation pay will be diverted to the Guild Pension Plan for the current contract.

10. Employees shall receive a $25 bonus for each year of service. For every year after 15 years, the employee will receive an additional $25 bonus for each year or service. For example, an employee with 25 years of service will receive $875 (25 x $25 = $625 + $250 (10 x $25) = $875). Effective Jan. 1, 2007, these service bonuses will be diverted to the Guild Pension Plan for the current contract.

**ARTICLE XII**
Holidays

1. The following holidays, or days observed as such, shall be granted to all employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. An employee **shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.**

2. An employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and an employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, an employee will receive 6-1/4 days' pay for the holiday week if he/she is scheduled to work the holiday and 4 other days during the holiday week.

3. In the week in which one or more of those holidays fall, all time worked beyond the remaining work days or work hours shall be paid for at the overtime rate.

4. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

5. Personal days are based on the number of hours the part-time employee is regularly scheduled to work. For example, an employee who normally works three days a week will receive 60 percent of the personal holidays.

ARTICLE XIII
Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill

such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be 75 days, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher, or be given the option of accepting his severance pay.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above, excepting that he shall not have the option of accepting his severance pay.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. The exempt employee in this role will not count toward the 30% limitation as established elsewhere in the contract.

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the company and the Guild.

## ARTICLE XIV
## Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment:

One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of 52 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
## Leaves of Absence

1. By arrangement with the Company, employees may be granted leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time.

2. If an employee is elected or appointed to any office of The NewsGuild/Communications Workers of America, or AFL-CIO, CLC or any office of a local of The NewsGuild, such employee shall, upon request, be given a leave of absence without pay, and shall be reinstated in the same position upon the expiration of such leave. The foregoing shall also apply to delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewGuild. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3.(a) Any employee who has had five continuous years in the employ of the Company without a leave of absence shall be given at the employee's request a leave of absence not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

(b) An employee with at least 10 years of service shall be given, at his/her request, a leave of absence not to exceed three months, at half pay. Such leaves may be limited to two at any given time. An employee may exercise this right every five years. As of Jan. 1, 2007, such leaves will be suspended for the duration of the current contract and wage savings from such leaves will be diverted into the Guild Pension Plan.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
   (b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
   (c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The employee shall have the right to elect whether they want to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

ARTICLE XVI
Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance shall be defined as a dispute over an alleged violation of this agreement.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the **VP Human Resources**/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The **VP Human Resources**/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first

meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The parties shall determine who shall eliminate the first name by the flip of a coin.

6. Once a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The expense of the arbitration shall be shared equally by both parties. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding.

## ARTICLE XVII
## Military Service

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. When the Company makes discharges or layoffs other than for cause, such discharged or laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(6)) unless same is exhausted with respect to the general type of work for which an additional employee is desired.

2. Employees who have signed temporary replacement cards for employment because of enlistment or conscription of regular employees also shall be placed on the rehiring list when

discharged for reasons other than cause, upon the return of the regular employee from war service, or when any temporary employee enters the armed services.

3. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

4. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
## Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance photographers may be retained for photo and video assignments to supplement existing coverage. Furthermore, it is understood that the use of free-lancers is not intended to replace bargaining unit jobs or work.

5. Exempt employees and freelancers can be used in SEEN and similar publications. The use of exempt and freelancers is not intended to displace bargaining unit jobs or work.

6. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

7. No employee shall be required to take over the duties of any employee in another department of the Pittsburgh Post-Gazette in the event of a labor dispute in such department, or by assuming new duties to assist in the operation of a department where employees are on strike. No strike, slowdown, work

stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lock out its employees during the term of this agreement.

8. The Company agrees not to have or enter into any agreement with any other Company binding such other Company not to offer or give employment to employees of the Company.

9. The Guild shall be notified within 24 hours of all resignations tendered. Resignations shall be subject to grievance procedure upon notice from the Guild within four days after receipt of notice from the Company.

10. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

11. Employees will be free to engage in any **paid or volunteer** activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, **and must receive advance approval for such activities**.

(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, **or other entities that may be a conflict of interest as determined by the Company**.

(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.

(D) The Company shall notify the Guild of its decision in these matters.

**(E) No Company equipment will be used for outside activities.**

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

12. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

13. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

14. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

15. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, date of birth, and Social Security number.
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

16. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

17. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

18. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

19. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

20. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

21. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director.

22. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

ARTICLE XX

Insurance, Health and Welfare, Pensions

1. The Company shall make available non-contributory Group Life Insurance with an agreed-upon plan and under the terms and conditions of a Master Policy which contains the following provisions:

A. 90-day waiting period.

B. Insurance of one times annual salary with a maximum of $50,000.

C. Employees age 70 and above will have insurance of 65 percent of annual salary but not less than the minimum described in Paragraph B above.

D. **Effective January 1, 2015, the above provisions will expire and life insurance for active employees will be provided through the Western Pennsylvania Teamsters and Employers Welfare fund.**

E. Employees at retirement will have $4,000 of paid-up life insurance. **However, retiree life insurance shall not be provided to employees who retire on or after January 1, 2015.**

2. The Company shall pay the full cost of a travel accident policy for all employees, which includes the following provisions: principal sum, $100,000; weekly indemnity, the lesser of $100 or 65 percent of weekly earnings; waiting period, 60 days; maximum number of weeks, 52.

3. Effective with the ratification of this contract, the Company will provide a health insurance and prescription drug plan to eligible employees, their spouses and eligible dependents **as follows:**

**A. Active Employees**

**All provisions regarding the health insurance and prescription drug plan as set forth in the August 1, 2010 Contract shall remain in effect through December 31, 2014. See Exhibit A grid.**

**(1) Effective January 1, 2015, all eligible bargaining unit employees will participate in the Western Pennsylvania Teamsters and Employers Welfare Fund (the "Fund"). Participation in the plan is limited to employees averaging annually more than 30 hours per week. See Exhibit B.**

**(2) The required PG contributions for the calendar year 2015 will be $1,229 per month for participating full-time bargaining unit employees (regardless of family size) and regardless of the option chosen.**

**(3) The PG contributions for years 2016 and 2017 will not exceed a 5.0% annual increase above the $1,229 per month set forth above for calendar year 2015. Any such increases must be based upon the plan design effective January 1, 2015. The PG will receive from the Fund at least 60 days notice of any such annual contribution increase prior to January 1. Increases in excess of 5% will be the responsibility of the covered bargaining unit members via direct billings from the Fund. If direct billing is not available, the PG will only assume responsibility for any withholding of any additional amounts after receiving the expressed written consent of each member and will not assume any other responsibility for collection of any other amounts, or be liable for any other payment to the Fund, other than as stated above.**

**(4) The WPA Fund will establish all applicable rules and operations, including treatment of out-of-network benefits and administration of all claims issues.**

**(5) Required employee contributions, if any, will be deemed as employee contributions for health care and are not related in any way to any prior or future wage deferrals.**

**(6) Effective with bargaining unit participation in the Fund, any and all other PG sponsored benefit plans will terminate, including medical/Rx, life/AD&D, vision, and**

**dental, except for the life insurance program described in Exhibit B (Retiree Health and Welfare Programs) and paragraph 7 below.**

**(7) For any active employee who opts out of participation in the Fund, they shall receive $100 per month. However, the Employer shall be obligated to pay the premium of the employee's life insurance coverage at the same benefit level that existed under the prior contract.**

**(8) For all new hires, there is a thirty (30) day waiting period for all insurance coverage under this agreement.**

**(9) Dental/Optical insurance will be provided for active employees and their dependents through the Fund**

**(10) Spouses of employees who die prior to retirement will be covered with their dependent children by the active employee health plan. The spouse will be required to pay 30% of the composite premium as a condition for obtaining coverage. This coverage will end at the earlier of: after five (5) years of participation, attainment of Medicare Eligibility; or remarriage. Coverage for eligible dependent children ends at their 19th birthday, or earlier if the spouse's coverage ends**

**(11) For surviving spouses, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the surviving spouse of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the surviving spouse's health care insurance.**

**(12) Surviving spouses (under age 65 or not Medicare eligible) of employees who die after retirement will be covered by the active employee health plan. The spouse will be required to pay the same percentage of the composite premium as the retiree. This coverage will end at the earlier of: after five (5) years of participation, attainment of Medicare Eligibility, or remarriage Coverage for surviving spouses 65 and older will cease 60 days after the employee's death.**

**(13) For surviving spouses, retiree health care contributions should, if possible, be made through deductions from the employee's pension. If not, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the retiree of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the health care insurance.**

**A.B. Retiree healthcare**

**:**

**1. The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.**

**2. Future Retiree Medical and Life Benefits - Any and all retiree medical benefits will be terminated as of the effective date of the agreement for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:**

**(a) Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.**

**(b) For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.**

**3. Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.**

**4. Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees ("Retiree Unit" – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:**

**(a) a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 ("Single")/$25,000 ("Other than Single"); or**

**(b) a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.**

**5. Medicare Eligible Retirees – All current Medicare Retirees ("Retiree Unit" as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:**

     **(a) a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.**

**(i) Any current-Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").**

**(ii) Any current-Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):**

**MODIFIED "A" STIPEND PROGRAM**

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $153.90 for retiree and spouse |

**or;**

**(b) A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:**

**MODIFIED "B" STIPEND PROGRAM**

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $119.70 for retiree and spouse |

**6. Other Conditions Related To These Programs**

**(a) A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree**

**(b) A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree**

**(c) "Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement**

(a)**(d) The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.**

**(e) In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits from the Company.**

**(f) If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.**

**(g) Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.**

**(h) If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.**

**(i) Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to make the one-time payment. The Company reserves the right to implement such one-time payments in subgroups or tiers as the Company deems appropriate.**

**(j) The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.**

**(k) Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.**

**7.** a. Benefit accruals for all participants in the pension plan **remain** frozen. Each Employee's service will continue to be credited according to the terms of the pension plan for purposes of vesting and benefit eligibility.

b. **Until June 30, 2015,** the Employer will make weekly pension contributions of $75.70/**active member**. **As a result of the establishment of the Guild Employees 401(K) Plan as set forth in Exhibit 1, effective July 1, 2015, the weekly pension contribution will be $65.70; and effective July 1, 2016, such contribution will be $55.70.** Additionally, each Employee will divert 2% of their base salary to the pension plan. The 2% diversion will be valued at $211,000 a year during the life of this contract. The Guild diverted the night differential for the term of the contract. The night differential diversion will be valued at $45,000 a year during the life of this contract. The Guild diverted the Vacation Bonus for the term of the contract. The Vacation Bonus diversion will be valued at $69,000 a year during the life of this contract. The Guild diverted the Service Bonus for the term of the contract. The Service Bonus diversion will be valued at $16,000 a year during the life of this contract. The Guild diverted the Accrued Vacation language for the term of the contract. The Accrued Vacation language diversion will be valued at $60,000 a year during the life of this contract. The Guild diverted the half pay leave for the term of the contract. The half pay leave diversion will be valued at $60,000 a year during the life of this contract.

c. The Board of Trustees is authorized and directed to adopt the following long-term funding policy immediately. The Fund co-consultants will produce with the annual actuarial valuations a seven-year actuarial projections with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:

- Projections will take into account only negotiated contributions.
- Use of the assumptions in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants.
- No unanticipated actuarial gains or losses during the projection time period.

If the annual projection indicates any future funding deficiencies during the seven-year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.

In the event that the Post-Gazette is required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the Post-Gazette will receive a dollar for dollar credit towards the next subsequent plan year's contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies they shall take into account that these contribution credits will be taken as a reduction in the negotiated contributions in the next plan year.

d. **Effective as soon as administratively practical following ratification of this Contract, all defined benefit (DB) pension plans sponsored by the Post-Gazette (excluding Teamsters #211) will be merged.**

e. Any deadlocked Trustee motion relating to a reduction in benefits required under the Long Term Funding Policy in numbered paragraph 3 above as well as any dispute between the parties regarding the provisions of this agreement shall be arbitrated on an expedited basis, with the arbitration to take place not later than sixty (60) days following the Trustees' meeting at which the deadlock occurs or the date that one party advises the other of a dispute regarding the interpretation or application of this agreement.

Details of the pension plan status and its benefits are outlined in a separate document signed by the Company and the Guild.

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

**ARTICLE XXII**
**Management Rights**

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine reasonable standards of production; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease any department, operation or service; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce new or improved research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

**ARTICLE XXIII**
Term and Renewal

1. This Agreement shall commence on the **October 15, 2014** and expire on the thirty-first day of March **2017.**

2. Not less than 60 days prior to the expiration of this Agreement either party desiring to open negotiations for a new Agreement shall submit its proposals for such new Agreement in writing to the other party. The respondent party, if it desires to file a counter proposal of the conditions it will seek to establish, shall do so at the earliest practicable date, but in any event not longer than thirty (30) days from receipt of notice by the moving party. In the absence of such statement within the prescribed time limit, the existing Agreement becomes automatically the proposal of the respondent party. The terms and conditions of this Agreement shall remain in effect as long as negotiations continue, but in the event a new Agreement is arrived at within four (4) months of the submission of the new proposal, all the terms and conditions of the new Agreement shall be retroactive to the date of the expiration of this Agreement.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: [signature] Date: 1/22/15
**Michael A** Fuoco

By: ______________________________ Date: 1-22-15
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ______________________________ Date: 1/22/15
Stephen B. Spolar, Vice President of Human Resources

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games -- Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block, Publisher and Editor-in-Chief

## Memorandum of Understanding

This Memorandum of Understanding, made this 30th day of January, 1998, shall be incorporated into the Labor Agreement, effective January 1, 1998, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh. The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid $50 for off-shift appearances.
6. This MOU recognizes the jurisdiction agreement-which is pending-between AFTRA and KDKA

FOR THE POST-GAZETTE:

Raymond N. Burnett

DATE: Feb. 5, 1998

FOR THE GUILD:

Harry Tkach

DATE: Feb. 5, 1998

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY
(March 2, 1995)

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at $25. Appearances scheduled during the staff member's non-working hours will be compensated at $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to Barbara Bogucki, assistant to the editor, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

Staffers who have already made their own arrangements to speak before groups in the community before March 3, 1995 would be free to meet those commitments. However, they must notify the company about these arrangements right away

Staffers interested in participating in the Speakers' Bureau should contact Barbara and let her know that they would like to participate as soon as possible.

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the current labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Union agree that part-time employees (employees working no more than 30 hours per week) can work a five-hour shift at straight time over and above their normal work week. It is understood that the part-time employee is guaranteed five hours of pay when called in on his/her off day.

This Memorandum of Understanding does not change the overtime provisions of the contract or the past practice of employees (part time and full time) functioning as stringers outside of their normally assigned duties.

One of the purposes of this Memorandum of Understanding is to resolve the grievance over a part-time employee functioning as a stringer on his off day.

FOR THE POST-GAZETTE

Raymond N. Burnett

DATE: 3/12/03

FOR THE GUILD

Mike Bucsko

DATE: 3/12/03

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Guild agree as follows:

- For the purpose of paying the negotiated Vacation and Service bonuses, part-time employees will be treated the same as full-time employees.
- Paragraph C of the Preamble will be amended as follows, "To cover possible special cases the Publisher shall have the right to designate exemption from Article I – Guild Shop – certain employees at the time of their employment, but not more than one such employee will be on the payroll at any given time."
- The Guild will relinquish all jurisdiction over the work formerly performed by one clerk and one news assistant assigned to the department often referred to as PG Store/Information Products.
- The Guild will withdraw the grievance of January 30, 2003 over the Company's decision to pay proportionate bonuses to part-time employees.
- Part-time employees who have already received proportionate bonuses will be made whole.

FOR THE POST-GAZETTE

Raymond N. Burnett

DATE: 3/12/03

FOR THE GUILD

Mike Bucsko

DATE: 3/12/03

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:

- One of the provisions of the agreement pertaining to the 10 exempt employees who became members of the Newspaper Guild of Pittsburgh in 2002 was that they would remain in the pension plan for non-bargaining unit employees.
- Implicit in that agreement was the recognition that the 10 former exempt employees would not be eligible for the Guild pension.

| FOR THE POST-GAZETTE | FOR THE GUILD |
|---|---|
| _______________________ | _______________________ |
| Raymond N. Burnett | Mike Bucsko |
| DATE: 7/29/03 | DATE: 8/13/03 |

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:

- The six paid holidays—New Year's Day, Memorial Day, the Fourth of July, Labor Day, Thanksgiving Day and Christmas—shall be treated the same as personal days for employees who individually average fewer than 20 hours per week and do not work the holiday. (See Article XII, Paragraph 5.)
- Employees who individually average more than 19-3/8 hours per week will receive another day off with pay if they do not work the holiday, which has been the past practice.
- Any part-time employee who works on one of the six recognized holidays will be paid at the premium holiday rate, which has been the past practice.

| FOR THE POST-GAZETTE | FOR THE GUILD |
|---|---|
| ______________________ | ______________________ |
| Raymond N. Burnett | Mike Bucsko |
| DATE: 8/14/03 | DATE: 8/18/03 |

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding effective January 28, 2004, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Guild agree as follows:

- The Company will assume jurisdiction over photo reprints. For clarification, this involves all work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.
- The Company will gain another exempted employee as described in Paragraph C of the Preamble (this will increase the number of such exemptions allowed to two), with the following provision: the Company will have until December 31, 2006, to name a current employee to this exempt status. If the Company does not exercise this option prior to the expiration of this Agreement, the right to name an exempted employee under Paragraph C will be limited to a new hire.

| FOR THE COMPANY: | FOR THE GUILD: |
| --- | --- |
| Raymond N. Burnett | Mike Bucsko |
| DATE: 1/28/04 | DATE: 1/30/04 |

# MEMORANDUM OF AGREEMENT

THIS AGREEMENT made this 23rd day of November, 2007, by and between PITTSBURGH POST-GAZETTE and NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061, CWA.

1. On July 26, 2007, the Guild filed a grievance over the use of freelance writers to perform restaurant reviews.
2. The Pittsburgh Post-Gazette has denied the grievance, and by letter dated August 30, 2007, the Guild requested that the grievance proceed to arbitration.
3. The parties have reached an agreement as full and final settlement of the grievance, which settlement shall be considered a Memorandum of Understanding regarding the future use of stringer "tryouts". That agreement is as follows:

> The Company may use stringers to "try out" for vacant Guild positions (which no Guild member has been awarded) under terms and conditions mutually agreed to between the parties. In the event the Employer intends to use a stringer to fill the vacant position as set forth above, the Company shall notify the Guild and the parties shall then mutually agree upon the various terms and conditions under which the "tryout" may be utilized.

| PITTSBURGH POST-GAZETTE | NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061 |
| --- | --- |
| BY: Stephen B. Spolar | BY: R. J. Hufnagel |

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

This MOU will be effective retroactively to September 1, 2008.

| For the Company | For the Union |
|---|---|
| Stephen B. Spolar | RJ Hufnagel |
| Date: 5/29/2009 | Date: 6/9/2009 |

**MEMORADUM OF UNDERSTANDING**

This Memorandum of Understanding between the Newspaper Guild of Pittsburgh (hereafter known as the Guild) and the Pittsburgh Post-Gazette (hereafter known as the Company) covers only those Guild members who accept the early-retirement buyout offer the company extended in October 2008. This agreement shall serve as an amendment to that agreement and to the preamble of the Collective Bargaining Agreement between the parties.

Content providers who accept the aforementioned buyout offer shall be free to perform work that currently falls under Guild jurisdiction, under the following limits: Writers may complete a maximum of one freelance submission per week for the print edition, or one piece of web-based content per week for post-gazette.com. In addition, participants may continue to contribute in all aspects of online-only content for post-gazette.com as currently performed.

Aside from the exceptions and limits listed above, any and all rules governing the use of stringers included in the collective bargaining agreement shall continue to apply.

| ______________________ | ______________________ |
|---|---|
| Stephen B. Spolar | Mike Fuoco |
| ______________________ | ______________________ |
| Date | Date |

# EXHIBIT A

## MEDICAL/PRESCRIPTION DRUG - UNION GROUPS (ACTIVES, UNDER 65 RETIREES, COBRA) THROUGH DECEMBER 31, 2014

| Benefit | Network | Out-of-Network | Network | Out-of-Network |
|---|---|---|---|---|
| | Current | | New Plan - 1/1/2011 (A) | |
| **Deductible** *(per benefit period)* | | | | |
| **Individual** | $750 | $1,500 | $250 | $1,500 |
| **Family** | $1,500 | $3,000 | $500 | $3,000 |
| **Out-of-Pocket Maximums** (*excludes deductible and copayments)* | | | | |
| **Individual** | N/A | $3,000 | N/A | $3,000 |
| **Family** | N/A | $6,000 | N/A | $6,000 |
| **Coinsurance** | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| **PCP/Specialist Office Visit Copay** | $25 copay | 80% after deductible | $25 copay | 80% after deductible |
| **Preventive Care** | | | | |
| **Routine physical exams** | $25 copay | Not Covered | $25 copay | Not Covered |
| **Immunizations** | 100% | 80% | 100% | 80% |
| **Routine gynecological exams, including PAP Test** | $25 copay | 80% | $25 copay | 80% |
| **Mammograms, annual routine and medically necessary** | 100% | 80% | 100% | 80% |
| **Emergency Room** | $100 copay | $100 copay | $100 copay | $100 copay |
| **Spinal Manipulations** | $25 copay | 80% | $25 copay | 80% |
| **Hospital Services** | | | | |
| **Inpatient** | $50 copay/admission | 80% | $50 copay/admission | 80% |
| **Outpatient** | 100% | 80% | 100% | 80% |
| **Mental Health/Substance Abuse** | | | | |
| **Inpatient** | 100% | 80% | 100% | 80% |
| **Outpatient** | $25 copay | 80% | $25 copay | 80% |
| **Prescription Drug** | $0 Deductible | | $0 Deductible | |
| **Retail – 31 day supply** *(Mandatory Generic)* | $20 generic/$30 formulary brand/$50 non-formulary brand | | $20 generic/$30 formulary brand/$50 non-formulary brand | |
| **Mail Order – 90 day supply** *(Mandatory Generic)* | $40 generic/$60 formulary brand/$100 non-formulary brand | | $40 generic/$60 formulary brand/$100 non-formulary brand | |

A - As a result of national health care reform, certain benefit mandates will be implemented as of January 1, 2011, including but not limited to:

- Extension of health plan coverage for adult children to age 26
- Elimination of annual dollar limits on "essential" health benefit

These changes will be reflected in updated benefit grids prior to January 1, 2011 as additional guidance become available

**Vision Benefits (active employees)** - Davis Vision Plan will be upgraded to the top tier optical program

**EXHIBIT B**

HIGHMARK. | PPO Blue

# *SUMMARY OF PPOBLUE*

**On the chart below, you'll see what your plan pays for specific services. You may be responsible for a facility fee, clinic charge or similar fee or charge (in addition to any professional fees) if your office visit or service is provided at a location that qualifies as a hospital department or a satellite building of a hospital.**

## *Western PA Teamsters' and Employers' Welfare Fund 9PG*

| | Current PG Plan | | New Plan through WPA Teamsters | |
|---|---|---|---|---|
| Benefit | Network | Out-of-Network (7) | Network | Out-of-Network (7) |
| **General Provisions** | | | | |
| Benefit Period(1) | Calendar Year | | | |
| Deductible (per benefit period)<br>Individual<br>Family | $250<br>$500 | $500<br>$1,000 | $750<br>$1,500 | $1,500<br>$3,000 |
| Plan Pays – payment based on the plan allowance | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Out-of-Pocket Maximums (Once met, plan pays 100% for the rest of the benefit period. The deductible is excluded from the Out-of-Pocket)<br>Individual<br>Family | None<br>None | $3,000<br>$6,000 | None<br>None | $3,000<br>$6,000 |
| Total Maximum Out of Pocket (6) (Includes deductible, coinsurance, copays and other qualified medical expenses, Network only)(6) Once met, plan pays 100% of covered services for the rest of the benefit period.<br>Individual<br>Family | $6,350<br>$12,700 | Not Applicable | $6,350<br>$12,700 | Not Applicable |
| **Office/Clinic/Urgent Care Visits** | | | | |
| Retail Clinic Visits | 100% after $25 copayment | 80% after deductible | 100% after $25 copayment | 80% after deductible |
| Primary Care Provider Office Visits | 100% after $25 copayment | 80% after deductible | 100% after $25 copayment | 80% after deductible |
| Specialist Office Visits | 100% after $25 copayment | 80% after deductible | 100% after $35 copayment | 80% after deductible |
| Virtual Visit Originating Site Fee | 100% | 80% after deductible | 100% | 80% after deductible |
| Urgent Care Center Visits | 100% after $25 copayment | 80% after deductible | 100% after $35 copayment | 80% after deductible |

| | Current PG Plan | | New Plan through WPA Teamsters | |
|---|---|---|---|---|
| Benefit | Network | Out-of-Network (7) | Network | Out-of-Network (7) |
| **Preventive Care(2)** | | | | |
| Routine Adult<br>Physical exams | 100% (deductible does not apply) | Not Covered | 100% (deductible does not apply) | Not Covered |
| Adult immunizations | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| Colorectal cancer screening | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| Routine gynecological exams, including a Pap Test | 100% (deductible does not apply) | 80% (deductible does not apply) | 100% (deductible does not apply) | 80% (deductible does not apply) |
| Mammograms, annual routine and medically necessary | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| Diagnostic services and procedures | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| Routine Pediatric<br>Physical exams | 100% (deductible does not apply) | Not Covered | 100% (deductible does not apply) | Not Covered |
| Pediatric immunizations | 100% (deductible does not apply) | 80% (deductible does not apply) | 100% (deductible does not apply) | 80% (deductible does not apply) |
| Diagnostic services and procedures | 100% (deductible does not apply) | 80% after deductible | 100% (deductible does not apply) | 80% after deductible |
| **Hospital and Medical/Surgical Expenses (including maternity)** | | | | |
| Hospital Inpatient<br>Hospital Outpatient<br>Maternity (non-preventive facility & professional services)<br>Medical/Surgical (except office visits) | 100% after deductible (and $50 inpatient copayment) | 80% after deductible | 100% after deductible | 80% after deductible |
| **Emergency Services** | | | | |
| Emergency Room Services | 100% after $100 copayment (waived if admitted) | | 100% after $100 copayment (waived if admitted) | |
| Ambulance | 100% after deductible | | 100% after deductible | 80% after deductible |
| **Therapy and Rehabilitation Services** | | | | |
| Physical Medicine | 100% after $25 copayment | 80% after deductible | 100% after $35 copayment | 80% after deductible |

| | Current PG Plan | | New Plan through WPA Teamsters | |
|---|---|---|---|---|
| Benefit | Network | Out-of-Network (7) | Network | Out-of-Network (7) |
| | Limit: 20 visits/ benefit period | | Not applicable | |
| Respiratory Therapy | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Speech & Occupational Therapy | 100% after $25 copayment | 80% after deductible | 100% after $35 copayment | 80% after deductible |
| | Limit: 20 visits/ benefit period | | Not Applicable | |
| Spinal Manipulations | 100% after $25 copayment | 80% after deductible | 100% after $35 copayment | 80% after deductible |
| | Limit: 20 visits/ benefit period | | Limit: 25 visits/ benefit period | |
| Other Therapy Services (Cardiac Rehab, Infusion Therapy, Chemotherapy, Radiation Therapy and Dialysis) | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| **Mental Health/Substance Abuse** | | | | |
| Inpatient<br>Inpatient Detoxification/Rehabilitation | 100% after deductible(and $50 inpatient copayment) | 80% after deductible | 100% after deductible | 80% after deductible |
| Outpatient | 100% after $25 copayment | 80% after deductible | 100% after $25 copayment | 80% after deductible |
| **Other Services** | | | | |
| Allergy Extracts and Injections | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Assisted Fertilization Procedures | Not Covered | | Not Covered | |
| Dental Services Related to Accidental Injury | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Diagnostic Services<br>*Advanced Imaging* (MRI, CAT, PET scan, etc.) | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| *Basic Diagnostic Services* (standard imaging, diagnostic medical, lab/pathology, allergy testing) | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Durable Medical Equipment, Orthotics and Prosthetics | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Home Health Care | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible Limit: 50 days/ benefit period |
| Hospice | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Infertility Counseling, Testing and Treatment(3) | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Private Duty Nursing | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible Limit: $5000/benefit period |
| Skilled Nursing Facility Care | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible Limit: 50 days/ benefit period |

| | Current PG Plan | | New Plan through WPA Teamsters | |
|---|---|---|---|---|
| Benefit | Network | Out-of-Network (7) | Network | Out-of-Network (7) |
| Transplant Services | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| Hearing Aid Exam | 100% after $25 copayment | Not Covered | 100% after $35 copayment | Not Covered |
| Hearing Aids | 100% (deductible does not apply) Limit: $500 per Hearing Aid, I aid per year every 3 years | Not Covered | 100% (deductible does not apply) Limit: $500 per Hearing Aid, I aid per ear every 3 years | Not Covered |
| Precertification Requirements(4) | Yes | | | |
| Prescription Drugs | | | | |
| Prescription Drug Program(5)<br>Mandatory Generic<br>*Defined by the Premier Pharmacy Network - Not Physician Network. Prescriptions filled at a non-network pharmacy are not covered.*<br>*Your plan uses the Comprehensive Formulary.* | Retail Drugs (31-day Supply)<br>$20 generic copayment<br>$30 formulary brand copayment<br>$ 50 non-formulary brand copayment<br>*Maintenance Drugs through Mail Order (90-day Supply)*<br>$40 generic copayment<br>$60 formulary brand copayment<br>$ 100 non-formulary brand copayment | | Retail Drugs (31-/60-/90-day Supply)<br>generic copayment $5/$10/$15<br>formulary brand 25% coinsurance<br>*maximum $40/$80/$120*<br>non-formulary brand 50% coinsurance<br>*maximum $80/$160/$240*<br>*Maintenance Drugs through Mail Order (90-day Supply)*<br>$10 generic copayment<br>formulary brand 25% coinsurance<br>*maximum $80*<br>non-formulary brand 50% coinsurance<br>*maximum $160* | |

(1) Your group's benefit period is based on a Calendar Year which runs from January 1 to December 31.
(2) Services are limited to those listed on the Highmark Preventive Schedule. Gender, age and frequency limits may apply.
(3) Treatment includes coverage for the correction of a physical or medical problem associated with infertility. Infertility drug therapy may or may not be covered depending on your group's prescription drug program.
(4) Highmark Medical Management & Policy (MM&P) must be contacted prior to a planned inpatient admission or within 48 hours of an emergency or maternity-related inpatient admission. Be sure to verify that your provider is contacting MM&P for precertification. If not, you are responsible for contacting MM&P. If this does not occur and it is later determined that all or part of the inpatient stay was not medically necessary or appropriate, you will be responsible for payment of any costs not covered.
(5) The formulary is an extensive list of Food and Drug Administration (FDA) approved prescription drugs selected for their quality, safety and effectiveness. It includes products in every major therapeutic category. The formulary was developed by the Highmark Pharmacy and Therapeutics Committee made up of clinical pharmacists and physicians. Your program includes coverage for both formulary and non-formulary drugs at the specific copayment or coinsurance amounts listed above.You are responsible for the payment differential when a generic drug is authorized by your provider and you purchase a brand name drug. Your payment is the price difference between the brand name drug and generic drug in addition to the brand name drug copayment or coinsurance amounts, which may apply.
(6) Effective with plan years beginning on or after January 1,2014 the Network Total Maximum Out-of-Pocket as mandated by the federal government must include deductible, coinsurance, copays, and any qualified medical expenses.
(7) For out of network services, you may be responsible for paying any difference between the provider's actual charge and the PPO Blue allowable charge. Out of pocket limits do not apply to these types of member payments.

**Exhibit 1**
**GUILD EMPLOYEES 401(K) PLAN**

Effective July 1, 2015, PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:

(a) Through June 30, 2016, PG will make a matching contribution ("PG Matching Contributions") to the PG Publishing Company 401(k) Plan (the "Plan") equal to 50% of the first $20 per week deferred by any Eligible Full Time Employee; effective July 1, 2016, the PG Matching Contribution will be increased by applying the 50% match to the first $40 per week deferred by any Eligible Full Time Employee

(b) Through June 30, 2016, the maximum amount of PG Matching Contribution will be $10 /week or the pro-rated equivalent for less than Eligible Full Time Employees; effective July 1, 2016, such maximum amount of PG Matching Contribution will be increased to $20/week or the pro-rated equivalent for less than Eligible Full Time Employees

(c) The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(d) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(e) The PG Matching Contribution will be subject to a vesting schedule as follows:

(i) Less than 3 years of service – 0% Vested

(ii) At least 3 years of service – 100% Vested

(iii) Vesting Service is counted from original hire date

(f) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(g) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

(h) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.

(i) All new employees will be automatically placed into the 401K plan with the ability to opt out.

# GC EXHIBIT 3

NLRB-0000961

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 3

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 44

Pittsburgh Post-Gazette®

January 10, 2017

**Via Certified Mail**

Mike Fuoco, President
Newspaper Guild of Pittsburgh Local No. 38061
322 North Shore Drive, Suite 250
Pittsburgh, PA 15212

Dear Mr. Fuoco:

This letter is to notify Newspaper Guild of Pittsburgh Local No. 38061 that Pittsburgh Post-Gazette (Company) desires to open negotiations with Newspaper Guild of Pittsburgh Local No. 38061 for a new collective bargaining agreement. The collective bargaining agreement (Agreement) with the Union expires March 31, 2017. Under the terms of the Agreement, the terms and conditions of the Agreement shall remain in effect as long as negotiations continue.

The Company reserves the right in negotiations to substitute, add to, or delete contract proposals as negotiations proceed. A Company proposal, or any withdrawal or modification of a proposal, does not constitute a waiver by the Company of the interpretation it places upon the current language of the Agreement.

As proposals are considered by the parties, agreements on the Articles and/or Sections of a new collective bargaining agreement will probably occur on a clause-by-clause basis. It is the Company's position these agreements will not become contractually effective until the day and date that a total agreement on all parts of the collective bargaining agreement is reached, ratified, and signed by all parties to the collective bargaining agreement.

A copy of the Company's proposal is attached.

The Company will be represented in negotiations by Richard C. Lowe of the law firm of King & Ballow. Please contact Richard at 615-726-5420 or rlowe@kingballow.com with suggested dates to begin negotiations. We look forward to reaching a new Agreement with your union as expeditiously as possible.

Sincerely,

Lisa Hurm

Lisa Hurm
VP and General Manager

NLRB-0000964

FMCS FORM F-7

# FEDERAL MEDIATION & CONCILIATION SERVICE
## NOTICE TO MEDIATION AGENCIES

Form Approved
OMB NO. 3076-0004
Expires 12-31-2018

Date Submitted: Confirmation Number:

**Notice Filing Instructions**
**Please submit this notice once to FMCS:**

| Electronically | | Fax | | U.S. Mail |
|---|---|---|---|---|
| www.fmcs.gov | -OR- | (202) 606-4253 | -OR- | NOTICE PROCESSING UNIT<br>FEDERAL MEDIATION & CONCILIATION SERVICE<br>2100 K STREET, NW<br>WASHINGTON, DC 20427 |

*You may also be required to notify your state or territorial mediation agency. Visit www.fmcs.gov for a link to state and territorial mediation agencies.*

**You are hereby notified that written notice of proposed termination or modification of the existing collective bargaining contract was served upon the other party to this contract and that no agreement has been reached.**

1. NOTICE TYPE *(Select one)* [X] **Renegotiation** [ ] **Reopener** [ ] **Initial Contract**
   a. Contract expiration date. *(For existing contracts only.)* *(MM-DD-YYYY)* 03-31-2017
   b. Contract reopen date. *(Only if existing contract provides for reopening or for voluntary re-openers.)* *(MM-DD-YYYY)*
2. INDUSTRY *(See instructions page for industry options)* Information

**Check this box if this employer is a hospital, nursing home or other health care institution.** [ ]

3. THIS NOTICE IS FILED ON BEHALF OF THE: *(Select one)* [ ] **Union** [X] **Employer**

4. EMPLOYER NAME: Pittsburgh Post-Gazette
5. ADDRESS LINE 1: 2201 Sweeney Drive ADDRESS LINE 2:
   CITY: Clinton STATE: PA ZIP CODE: 15026
6. EMPLOYER REP.: Linda A. Guest REP. TITLE: Sr HR Manager
7. PHONE: (412) 263-1329 FAX: (412) 263-2577 EMAIL: lguest@post-gazette.com

8. UNION NAME: Newspaper Guild of Pittsburgh Local #38061 LOCAL #: 38061
9. ADDRESS LINE 1: 322 North Shore Drive, Suite 250 ADDRESS LINE 2:
   CITY: Pittsburgh STATE: PA ZIP CODE: 15212
10. UNION REP.: Mike Fuoco REP. TITLE: President
11. PHONE: (412) 770-3147 FAX: (412) 880-4002 EMAIL:

12. LOCATION OF AFFECTED ESTABLISHMENT CITY: Clinton STATE: PA ZIP CODE: 15026
13. LOCATION OF NEGOTIATIONS *(If different from Line 12)* CITY: STATE: ZIP CODE:

14. NUMBER OF BARGAINING UNIT MEMBERS: 140
*(At all employer locations covered by this contract.)*
15. TOTAL EMPLOYEES AT AFFECTED LOCATION(S): 575
*(All employees, including bargaining unit members, where this contract applies.)*

16. NAME AND TITLE OF OFFICIAL FILING THIS NOTICE: Linda A. Guest, Sr HR Manager
17. SIGNATURE AND DATE: Linda A Guest 1/10/17

**PAPERWORK REDUCTION ACT NOTICE:** The estimated burden associated with this collection of information is 10 minutes per respondent. Comments concerning the accuracy of this burden estimate and suggestions for reducing this burden should be sent to the Office of General Counsel, Federal Mediation and Conciliation Service, 2100 K Street, NW, Washington, DC 20427 or the Paperwork Reduction Project 3076-0003, Office of Management and Budget, Washington, DC 20503.

NLRB-0000966



pennsylvania
DEPARTMENT OF LABOR & INDUSTRY

BUREAU OF MEDIATION

# Dispute Notice

Date: 1/10/17

In accord with the provisions of Section 8(d)(3) of the Taft-Hartley Act of 1947, you are hereby notified that a dispute exists between:

Pittsburgh Post-Gazette
Name of Company

2201 Sweeney Drive, Clinton, PA 15026
Address of Company

Linda A. Guest, 2201 Sweeney Drive, Clinton, PA -- 412-263-1329
Name, Address and Telephone Number of Company Representative to Contact

lguest@post-gazette.com
E-Mail

**AND**

Newspaper Guild of Pittsburgh, Local No. 38061
Name of Union and Local Number

322 North Shore Drive, Suite 250, Pittsburgh, PA 15212
Address of Union

Mike Fuoco, 322 North Shore Drive, Suite 250, Pittsburgh, PA 15212 – 412-770-3147
Name, Address and Telephone Number of Union Representative to Contact

E-Mail

03/31/2017
Date of Termination of Contract

140
Number of Employees in Bargaining Unit

Newspaper
Product or Service

Linda A Guest
Signature

(This notice must be filed at least 30 days prior to expiration date of contract. Submit one copy to the Bureau of Mediation. A second copy may be used to notify Federal Mediation and Conciliation Service as required by law.)

Check on whose behalf this notice is filed: ☐ Union ☑ Employer

Department of Labor & Industry | Bureau of Mediation | 651 Boas Street, Room 413 | Harrisburg, PA 17121-0750
717.787.2803 | Fax 717.705.6329 | www.dli.state.pa.us

*Auxiliary aids and services are available upon request to individuals with disabilities.*
*Equal Opportunity Employer/Program*

LIMS-102 REV 9-09

NLRB-0000967

NLRB-0000968

# INITIAL COMPANY PROPOSAL

## AGREEMENT BETWEEN

## PITTSBURGH POST-GAZETTE

## AND

## THE NEWSPAPER GUILD OF PITTSBURGH

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Guild Shop | 2 |
| II. | Checkoff | 3 |
| III. | Classifications, Wages and Schedules of Minimums | 5 |
| IV. | Hours | 8 |
| V. | Overtime | 10 |
| VI. | Part-time, Temporary Employees and Two-Year Associates | 11 |
| VII. | Sick Leave | 11 |
| VIII. | Security | 12 |
| IX. | Expenses | 14 |
| X. | Internships, Two-Year Associates | 15 |
| XI. | Vacations | 16 |
| XII. | Holidays | 17 |
| XIII. | Advancement, Promotion and Transfer | 18 |
| XIV. | Severance Pay | 19 |
| XV. | Leaves of Absence | 20 |
| XVI. | Adjustment of Disputes | 21 |
| XVII. | Military Service | 22 |
| XVIII. | Preferential Re-Employment | 22 |
| XIX. | Miscellaneous | 23 |
| XX. | Insurance, Health and Welfare, Benefits | 26 |
| XXI. | Privilege Against Disclosure | 29 |

## TABLE OF CONTENTS (Continued)

Page

XXII. Management Rights ....................30

XXIII. Term and Renewal ....................31

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ____________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

C. The work of employees shall be work normally performed by employees within the bargaining unit and new or additional work assigned to the employees by the Company. However, nothing in this Agreement shall be construed as giving the Guild exclusive jurisdiction over or an exclusive right to perform any work.

Notwithstanding anything to the contrary in this Agreement, the Company has the exclusive right to assign bargaining unit work to individuals employed by the Company who are not covered by this Agreement or to individuals employed by any other Company or to contract out work.

Supervisors and managerial employees may perform work performed by bargaining unit employees without restriction.

D. The Company has the right to utilize the services of freelancers, stringers and independent contractors, without restriction.

Community Journalism initiatives

Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

The company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

## ARTICLE I
## Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing as defined by law no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

## ARTICLE II
## Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature________________________________________

Date____________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 10% of earnings to a maximum of $_____ per calendar year. [To be discussed].

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| Content Providers | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 10% Wage Diversion [TBD] | | | | | | |
| | Wage after diversion | | | | | | |

Provides original content for print and electronic publications and products.

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Content Editors/Producers | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 10% Wage Diversion [TBD] | | | | | |
| | Wage after diversion | | | | | |

Edits and produces original content for print and electronic publications, products, and slot.

| Assignment Editors | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 10% Wage Diversion [TBD] | | | |
| | Wage after diversion | | | |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| Librarian | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| | Wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | 10% Wage Diversion [TBD] | | | |
| | Wage after diversion | | | |

Provides newsroom, library and photo support as necessary.

| News Assistant | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| | Wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | 10% Wage Diversion [TBD] | | | |
| | Wage after diversion | | | |

Provides newsroom, library and photo support as necessary.

| Editorial Clerks Administrative | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| | Wage | 670.00 | 688.00 | 703.00 | 712.00 |
| | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 10% Wage Diversion [TBD] | | | | |
| | Wage after diversion | | | | |

Provides newsroom support as necessary

| Copy Messengers | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| | wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | 10% Wage Diversion [TBD] | | | | |
| | Wage after diversion | | | | |

Provides newsroom support as necessary

| Two-Year Associates | | 1st Year | 2nd Year |
|---|---|---|---|
| | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 10% Wage Diversion [TBD] | | |
| | Wage after diversion | | |

Performs various newsroom assignments as necessary

| 3-Month Interns | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 10% Wage Diversion [TBD] | | | |
| | Wage after diversion | | | |

Performs various newsroom assignments as necessary

1. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

2. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

3. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established in this Agreement are minimums only. The Company shall have the sole and exclusive right to compensate an employee above the minimum rates set forth in this Agreement.

4. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ....................................................minimum salary differential
Copy messenger to reporter/editor .......................................minimum salary differential
News assistant, clerk to reporter/editor..........................minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

When no newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

5. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

6. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, until the top minimum is reached, or until the merit increase is removed by the Company, in its discretion.

## ARTICLE IV
## Hours

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify

the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

3. With the approval of the Company, in its discretion, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

i. The nature of the work is such that it can be compressed into 4 days.
ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
vii. A lunch or dinner break may be required as part of the work day.
viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

4. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

5. Subject to newsroom operation requirements, days off shall be consecutive days but consecutive days off are not guaranteed.

6. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

7. Time spent by employees traveling to and from assignments shall be considered as part of the working day once the work day has begun.

8. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

9. With the approval of the Company, in its discretion, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. The Company shall designate the period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee shall return to full-time status. If the Company permits an employee to extend his/her flex time beyond 12 months,

any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available.

10. The Company does not guarantee any specified hours of work per day or per week. The Company reserves the right to enlarge or shorten the workday or workweek depending on business need.

## ARTICLE V
## Overtime

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than 30 minutes at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

6. Columnists, Editorial Writers, Investigative Reporters and Beat Reporters who cover major sports are exempt from overtime provisions.

7. The Company reserves the sole and exclusive right to determine whether to publish and distribute a printed product in whole or in part on any day or days in a workweek.

## ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, other leaves of absences, and to meet newsroom operation requirements. Part-time employees shall not receive holiday pay or personal days.

2. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

3. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to twelve months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the twelve-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability

Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy in any way.

4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

6. All sick leave will be cancelled upon termination of employment, retirement or death of the employee.

7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

8. An employee cannot use sick leave or use sick leave benefits for any purpose other than illness or injury.

9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

10. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.

## ARTICLE VIII
## Security

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future. The Company may discipline and discharge employees in its discretion. The Company may use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole. Progressive discipline is not required.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration.

4. A. The Company shall notify the Guild ten (10) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification, and number of employees being laid off.

B. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, performance, attendance, the individual qualifications of the employee to perform the work assigned, special abilities or qualifications for the particular function, and the efficient operation of the Company.

5. In the event of recall, the recall shall be according to seniority, provided that efficiency, skill and ability to do the job are, in the opinion of the Company, equal. Such recall rights will last six months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within six months or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 6 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company reserves the right to establish and offer, from time to time, termination incentives within a department and/or classification and/or classification within a department for employees who desire to voluntarily terminate their employment.

9. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;
ii.) absence from work due to a layoff for more than six (6) months
iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;
iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated.
v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated.
vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

10. For any employee hired, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department in the Company's sole and exclusive discretion. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

11. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by the Company.

(b) In the event of discharge for misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

12. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

13. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

14. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company's discretion.

15. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

## ARTICLE IX
## Expenses

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of _____ cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. DMV driving records must be submitted to the Company, upon request.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

## ARTICLE X
## Internships, Two-Year Associates

1. Unpaid academic internships will be limited to fourteen (14) a year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they are excluded from the following classifications: news assistant, clerk, and messenger.

E. There will be no assignment restrictions

## ARTICLE XI
## Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service and four (4) weeks for eight (8) continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted

between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees who do not submit vacation requests prior to March 1 may be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

## ARTICLE XII
## Holidays

1. The following holidays, or days observed as such, shall be granted to full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. The Company shall designate the day the holiday is observed. A full-time employee shall receive two (2) personal holidays after working 12 complete months. To claim a personal holiday, an employee must give at least one (1) week notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and a full-time employee required to work on his day off

during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary.

3. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

## ARTICLE XIII
## Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, consideration shall be given to bargaining unit employees to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be up to 75 days, as determined by the Company in its discretion.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. Management shall have the right to change an employee's job duties to meet the operational needs of the Company.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent. An employee shall not be penalized for refusing to accept a transfer.

9. Management shall have the right to transfer employees from one newsroom department to another to meet the needs of the office. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by the Company.

10. Notwithstanding anything to the contrary in this Agreement, employees in one department may be assigned to do work ordinarily done by employees in another department as part of their regular duties without any adjustments to compensation.

## ARTICLE XIV
### Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
## Leaves of Absence

1. The Company, in its sole and exclusive discretion, may grant employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewGuild may request leaves of absence to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to two at any one time, except by mutual consent.

3. Any employee who has had five continuous years in the employ of the Company without a leave of absence may be given a leave of absence by the Company, in its sole and exclusive discretion, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Four Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 4 months shall be granted.
(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The Guild agrees to comply with the Company's Family and Medical Leave Act policies as amended from time to time.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within ten (10) days of the events giving rise to the grievance in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within twenty (20) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. Each party may request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. The parties shall select an arbitrator as expeditiously as possible from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The expense of the arbitration shall be shared equally by both parties. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement or to substitute his discretion or judgment for the Company's discretion or judgment with respect to any matter this Agreement consigns or reserves to the Company's discretion or judgment. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding. All fees and expenses of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case. The arbitrator may hear and determine only one grievance at a time, unless the parties expressly agree otherwise in writing.

## ARTICLE XVII
## Military Service

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the specific position for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
### Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment.

4. Free-lance independent contractor photographers may be retained for photo and video assignments.

5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

6. The Guild, its representatives and the employees covered by this Agreement agree, individually and collectively, that none of them will call, authorize, encourage (by action or inaction) or engage in any slowdown, strikes of any kind, sympathy strike, bannering, boycotts against the Company, boycotts against advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations or the production or sale of its products or services during the term of this Agreement.

In the event of any strike or any other proscribed activity not authorized, ratified or condoned by the Guild, the Guild agrees it will make every good faith effort to end such activity.

The Company agrees that it will not lockout any employees during the term of this Agreement.

The Company shall have direct recourse to the National Labor Relations Board or the courts for a violation of this Article.

7. The Guild shall be notified within 24 hours of all resignations tendered.

8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth.
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director. The Company has the right to change in any way its Drug and Alcohol Policy from time to time.

19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director. The Company reserves the right to change in any way its transitional duty program from time to time.

20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company in its sole discretion from time to time.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. The parties recognize the methods for collection and distribution of news are changing due to the introduction of new technologies, techniques and multi-media platforms. Bargaining unit employees in the Editorial Department may be assigned as part of their regular duties, new or additional duties resulting from new technologies, techniques and multi-media platforms. Employees performing these new or additional duties will be provided adequate training and equipment by the Company.

## ARTICLE XX
### Insurance, Health and Welfare, Pensions

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding.

2. The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.

3. Future Retiree Medical and Life Benefits - Any and all retiree medical benefits were terminated as of October 14, 2014 for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:

(a) Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.

(b) For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.

4. Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.

5. Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees ("Retiree Unit" – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 ("Single")/$25,000 ("Other than Single"); or

(b) a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.

6. Medicare Eligible Retirees – All current Medicare Retirees ("Retiree Unit" as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.

(i) Any current-Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").

(ii) Any current-Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):

MODIFIED "A" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $153.90 for retiree and spouse |

or;

(b) A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:

MODIFIED "B" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $119.70 for retiree and spouse |

7. Other Conditions Related To These Programs

(a) A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree

(b) A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree

(c) "Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement

(d) The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.

(e) In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits from the Company.

(f) If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.

(g) Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.

(h) If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.

(i) Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to make the one-time payment. The Company reserves the right to implement such one-time payments in subgroups or tiers as the Company deems appropriate.

(j) The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.

(k) Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.

8. Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth according to the parameters set out in the Plan Document. The Company has the right to change or amend the 401(k) Plan from time to time.

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

## ARTICLE XXII
## Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work; to establish new jobs and abolish or change existing jobs; to determine and redetermine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine work and quality standards; to cease, restructure or outsource any department, operation or service of the Company in whole or in part; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce, change or discontinue research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine and redetermine the number, location and operation of departments, divisions and all other units of the Company; to install security cameras for the safety of employees and property; to establish or continue policies, practices and procedures for the conduct of the business and, from time to time, to change or abolish such policies, practices or procedures; to determine the number of hours per pay or week that operations shall be carried on; to establish and change work schedules, assignments and break periods; to determine the fact of lack of work; to make, change, discontinue and enforce safety rules and rules governing the conduct of employees; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the

provisions of this Agreement. The Management Rights article shall survive and continue in effect after the expiration date of this Agreement.

## ARTICLE XXIII
## Term and Renewal

1. This Agreement shall commence on ________________ and expire on ________________.

2. This Agreement shall be effective upon its execution and shall remain in full force and effect through ______________. Written notice of a desire to terminate this Agreement must be delivered by the one party to the other not more than one hundred fifty (150) days nor less than sixty (60) days prior to ______________.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ________________________________ Date: ____________________
Michael A Fuoco

By: ________________________________ Date: ____________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ______________________________ Date: ____________________
Stephen B. Spolar, Vice President of Human Resources

## Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

### Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

### Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

## Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

## Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

## Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block
Publisher and Editor-in-Chief

# GC EXHIBIT 4

NLRB-0001005

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 4

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 62

# INITIAL COMPANY PROPOSAL

# AGREEMENT BETWEEN

# PITTSBURGH POST-GAZETTE

# AND

# THE NEWSPAPER GUILD OF PITTSBURGH

**TABLE OF CONTENTS**

**Page**

I. Guild Shop ....3

II. Checkoff....4

III. Classifications, Wages and Schedules of Minimums ....6

IV. Hours....10

V. Overtime ....12

VI. Part-time, Temporary Employees and Two-Year Associates....13

VII. Sick Leave....14

VIII. Security ....15

IX. Expenses ....19

X. Internships, Two-Year Associates ....20

XI. Vacations....21

XII. Holidays ....23

XIII. Advancement, Promotion and Transfer ....24

XIV. Severance Pay ....26

XV. Leaves of Absence ....26

XVI. Adjustment of Disputes....28

XVII. Military Service ....29

XVIII. Preferential Re-Employment ....29

XIX. Miscellaneous ....30

XX. Insurance, Health and Welfare, Benefits ....34

XXI. Privilege Against Disclosure....40

**TABLE OF CONTENTS (Continued)**

**Page**

XXII. Management Rights ....................................................41

XXIII. Term and Renewal ....................................................42

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ~~October 15, 2014,~~ _______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph ~~12~~ 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

~~In no event will the number of employees excluded from the Agreement be more than 30 percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have 42 employees excluded, provided that they qualify as management personnel.~~

~~Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the Agreement).~~

~~C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or~~

~~displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.~~

~~Exempt employees can do bargaining unit work as performed in the past and/or similar work that may result from the introduction of new print, electronic or other products and as operationally necessary. Performance of such exempt work will not displace bargaining unit employees.~~

C. The work of employees shall be work normally performed by employees within the bargaining unit and new or additional work assigned to the employees by the Company. However, nothing in this Agreement shall be construed as giving the Guild exclusive jurisdiction over or an exclusive right to perform any work.

Notwithstanding anything to the contrary in this Agreement, the Company has the exclusive right to assign bargaining unit work to individuals employed by the Company who are not covered by this Agreement or to individuals employed by any other Company or to contract out work.

Supervisors and managerial employees may perform work performed by bargaining unit employees without restriction.

D. ~~The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news according to the following guidelines:~~ The Company has the right to utilize the services of freelancers, stringers and independent contractors, without restriction.

~~1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.~~

~~2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.~~

~~3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective January 1, 2007, the maximum will be 15 percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.~~

~~4.~~ Community Journalism initiatives

Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

The company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors~~ and is not intended to displace bargaining unit work~~.

**ARTICLE I**
**Guild Shop**

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing as defined by law no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth~~ and Social Security number~~.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

**ARTICLE II**
**Checkoff**

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature____________________________________________________

Date_____________________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 10% of earnings to a maximum of ~~$5,000~~ $_____ per calendar year. [To be discussed]. ~~Effective April 1, 2016, such diversion shall be reduced to 8% and a maximum of $4,250 per calendar year. Effective January 1, 2017, the maximum diversion shall be $4,000 per calendar year:~~

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| Content Providers | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 10% Wage Diversion [TBD] | ~~88.30~~ | ~~90.55~~ | ~~103.68~~ | ~~108.29~~ | ~~111.23~~ | ~~114.89~~ |
| | Wage after diversion | ~~794.68~~ | ~~814.97~~ | ~~933.16~~ | ~~974.61~~ | ~~1001.07~~ | ~~1034.02~~ |

Provides original content for print and electronic publications and products.

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Content Editors/Producers | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 10% Wage Diversion [TBD] | ~~89.47~~ | ~~96.73~~ | ~~107.51~~ | ~~112.21~~ | ~~116.32~~ |
| | Wage after diversion | ~~805.27~~ | ~~870.53~~ | ~~967.55~~ | ~~1009.89~~ | ~~1046.90~~ |

Edits and produces original content for print and electronic publications, products, and slot.

| | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| Assignment Editors | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 10% Wage Diversion [TBD] | ~~110.25~~ | ~~112.21~~ | ~~117.96~~ |
| | Wage after diversion | ~~992.25~~ | ~~1009.89~~ | ~~1061.65~~ |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| Librarian | Wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | 10% Wage Diversion [TBD] | ~~87.42~~ | ~~88.79~~ | ~~90.36~~ |
| | Wage after diversion | ~~786.74~~ | ~~799.09~~ | ~~813.20~~ |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| News Assistant | Wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | 10% Wage Diversion [TBD] | ~~73.21~~ | ~~75.17~~ | ~~77.13~~ |
| | Wage after diversion | ~~658.85~~ | ~~676.49~~ | ~~694.13~~ |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Editorial Clerks | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| Administrative | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 10% Wage Diversion [TBD] | ~~65.66~~ | ~~67.42~~ | ~~68.89~~ | ~~69.78~~ |
| | Wage after diversion | ~~590.94~~ | ~~606.82~~ | ~~620.05~~ | ~~627.98~~ |

Provides newsroom support as necessary

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Copy Messengers | | | | | |
| | Wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | 10% Wage Diversion [TBD] | ~~54.98~~ | ~~55.47~~ | ~~55.96~~ | ~~56.45~~ |
| | Wage after diversion | ~~494.80~~ | ~~499.21~~ | ~~503.62~~ | ~~508.03~~ |

Provides newsroom support as necessary

| | | 1st Year | 2nd Year |
|---|---|---|---|
| Two-Year Associates | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 10% Wage Diversion [TBD] | ~~55.86~~ | ~~61.25~~ |
| | Wage after diversion | ~~502.74~~ | ~~551.25~~ |

Performs various newsroom assignments as necessary

| | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| 3-Month Interns | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 10% Wage Diversion [TBD] | ~~50.18~~ | ~~51.65~~ | ~~53.12~~ |
| | Wage after diversion | ~~451.58~~ | ~~464.81~~ | ~~478.04~~ |

Performs various newsroom assignments as necessary

~~1. Employees shall receive a salary increase provided in the schedule of wage minimums or increases according to the following schedule of general increases, whichever is greater, but not both:~~

~~2. The above wage minimums and the general increase need not apply to salaries of those who are on retirement or who are on extended sick leave. The pay increases shall go into effect upon the employee's return to work.~~

~~3. For the life of this Agreement there is to be no reduction in compensation of anyone covered by this Agreement except when the provisions of Article VIII, Paragraph 3, are implemented.~~

~~4~~1. ~~In the application of the foregoing schedules of minimums, experience shall include all regular employment in comparable work. In the event the Guild questions the job classification or experience status of any employee within forty-five (45) days from start of employment, adjustment, if any, will be made retroactive to the start of employment. If such question is raised after forty-five (45) days from start of employment, adjustment, if any, will be effective on the date that the Guild brought the question to the attention of the Company.~~ Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

~~5~~2. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

~~6~~3. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established ~~herein~~ in this Agreement are minimums only~~; individual merit shall be acknowledged by increases above the minimums~~. The Company shall have the sole and exclusive right to compensate an employee above the minimum rates set forth in this Agreement.

~~7. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.~~

~~8~~4. (a) ~~Effective January 1, 1982, a~~An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk .....................................................minimum salary differential
Copy messenger to reporter/editor ........................................minimum salary differential
News assistant, clerk to reporter/editor………………………minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

~~Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.~~

~~Effective upon ratification of this Contract, w~~When no ~~exempt~~ newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

~~(d) Effective January 1, 2003, the Harrisburg and Washington correspondent will receive a salary differential of $20 a week. (Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)~~

~~9~~5. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

~~10~~6. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, ~~or~~ until the top minimum is reached, or until the merit increase is removed by the Company, in its discretion.

~~11. Effective January 1, 2003, a one-time service bonus of $250 for all employees with 10 or more years of service. Thereafter, the bonus will be paid when an employee completes his/her 10th year of service. Effective January 1, 2004, a one-time service bonus of $500 for all employees with 20 or more years of service. Thereafter, the bonus will be paid when an employee completes his/her 20th year of service. As of Jan. 1, 2007, all service bonuses will be diverted to the Guild Pension Plan for the life of the current contract.~~

## ARTICLE IV
## Hours

1. ~~No employee eligible for Guild membership shall work more than~~ A full-time employee's normal workday will be eight (8) hours ~~per day~~ within a nine (9) consecutive hour period. An employee's normal workweek shall be ~~, nor more than~~ five days per week ~~with the following exceptions~~:

~~(a)~~2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

~~(b)~~3. ~~Additionally,~~ With the approval of the Company, in its discretion, full-time employees with at least two years of service ~~shall~~ may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

    i. The nature of the work is such that it can be compressed into 4 days.
ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
vii. A lunch or dinner break may be required as part of the work day.
viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

~~(c) Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild~~.

~~2~~4. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

~~3~~5. ~~Wherever possible,~~ Subject to newsroom operation requirements, days off shall be consecutive days but consecutive days off are not guaranteed.

~~4~~6. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

~~5. A differential of $3 per shift will be paid to an employee who begins his shift on or after 2 p.m. As of Jan. 1, 2007, all night differentials will be diverted to the Guild Pension Plan for the life of the current contract.~~

~~This shall apply only so long as the employee is assigned to such shifts.~~

~~6~~7. Time spent by employees traveling to and from assignments shall be considered as part of the working day once the work day has begun.

~~7~~8. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

~~8~~9. ~~By arrangement with the Company,~~ With the approval of the Company, in its discretion, employees ~~who~~ may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. ~~They~~ The Company shall designate ~~a~~ the period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee ~~may~~ shall return to full-time status. If the ~~employee elects~~ Company permits an employee to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. ~~For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.~~

~~B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.~~

10. The Company does not guarantee any specified hours of work per day or per week. The Company reserves the right to enlarge or shorten the workday or workweek depending on business need.

**ARTICLE V**
**Overtime**

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, ~~which will not be unreasonably withheld,~~ an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement ~~not to be unreasonably withheld~~, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than ~~one hour~~ 30 minutes at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than ~~a day's pay in addition to his regular weekly salary~~ four hours,.

5. Overtime shall be reported in writing to the Company or its representative ~~within ten days~~ promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

6. Columnists, Editorial Writers, Investigative Reporters and Beat Reporters who cover major sports are exempt from overtime provisions.

7. The Company reserves the sole and exclusive right to determine whether to publish and distribute a printed product in whole or in part on any day or days in a workweek.

**ARTICLE VI**
**Part-time, Temporary Employees and Two-Year Associates**

~~1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.~~

~~2~~1. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, ~~and~~ other leaves of absences, and to meet newsroom operation requirements. Part-time employees shall not receive holiday pay or personal days.

~~3~~2. It shall be a policy of the Company to pay part-time employees ~~who average individually less than 20 hours per week~~ not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. ~~Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day.~~ All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

~~4~~3. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to ~~eight~~ twelve months¸ a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the ~~eight~~ twelve-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

~~5. Part-time and, or temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.~~

**ARTICLE VII**
**Sick Leave**

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company ~~can~~ may request that an employee furnish a doctor's certificate or other reasonable proof when absent ~~for three (3) consecutive days or more~~.

2. ~~An employee shall receive a normal week's salary for a period of his or her incapacitation.~~ There shall be no holiday premium pay during the sick leave period.

3. Short-term disability

Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy in any way.

~~(a) Employees can accumulate the above eight days per year during their employment to a maximum of 90 days per year. Only unused days during the year will be carried over to the maximum of 90 days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of five (5) days or longer. This benefit will begin on the 6th work day of disability. The five days will constitute a waiting period.~~

~~All employees on the payroll on 1/1/07 will be provided an initial bank of 7 days short term disability pay per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days.~~

~~(b) If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at 60 percent of the employee's negotiated rate of pay for those employees with two years or more of service. Those employees with less than two years service will be eligible for 13 weeks of additional sick leave. Details of this extended short-term disability plan are available from the Human Resources Director.~~

~~(c) An employee who exhausts his disability bank shall earn additional sick leave benefits according to the following schedule: For one year of uninterrupted employment 20 percent of maximum short-term disability schedule; two years of uninterrupted employment 40 percent of maximum short-term disability schedule; three years of uninterrupted employment 60 percent of maximum short-term disability schedule; four years of uninterrupted employment 80 percent of maximum short-term disability schedule; five years of uninterrupted employment 100 percent of maximum short-term disability schedule.~~

~~The maximum regeneration under this program will be 70 days. Unused individual sick days will continue to be accumulated into the bank until the 90-day maximum is reached.~~

~~Sick pay and/or the short-term disability bank are not considered earned and will not be paid out upon termination of employment, including retirement.~~

~~4. This program will become effective as of the date of ratification. Benefit payments under the prior Guild sick leave plan will continue for those employees on sick leave as of the date of ratification.~~

~~5~~4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

~~6~~5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

~~7~~6. ~~Sick leave payments shall terminate~~ All sick leave will be cancelled upon termination of employment, retirement or death of the employee.

~~8~~7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

~~9~~8. An employee cannot ~~accrue~~ use sick leave or use sick leave benefits for any purpose other than illness or injury.

~~10. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.~~

~~11~~9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

~~12~~10. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.

**ARTICLE VIII**
**Security**

1. ~~There shall be no discharge as a result of putting this Agreement into effect.~~ The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future. The Company may discipline and discharge employees in its discretion. The Company may use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole. Progressive discipline is not required.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force~~, which latter shall be construed as synonymous with discharges for economy. 3.~~ Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the ~~right~~ Company's decision to reduce the force ~~for economy~~ (either permanently or temporarily) shall not be subject to review by the Board of Arbitration~~, provided, however, that in the event the Guild believes that reasons other than economy have entered into the designation of the person or persons to be laid off, it may appeal the particular case or cases to arbitration. Stringers and free lancers in no case will replace or displace bargaining unit employees~~.

4. ~~A. Layoffs to reduce the force, as distinguished from dismissals for just and sufficient cause, shall not be made until the Company notifies the Guild thirty (30) days in advance that such layoffs are necessary and that no reasonable alternative exists.~~

~~B~~A. The Company shall notify the Guild ten (10) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification ~~and work groups defined below (the "work group")~~, and number of employees being laid off ~~per work group, numerical order of layoffs within each work group, numerical order of overall layoffs, and the facts upon which the Company relies to establish the necessity pursuant to Section 4A above~~.

~~C~~B. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, performance, attendance, the individual qualifications of the employee to perform the work assigned, special abilities or qualifications for the particular function, and the efficient operation of the Company. ~~In the event such layoffs are necessary, the following procedures shall be observed:~~

~~(1) Voluntary incentives as designed by the Company may first be offered for a reduction in force after consultation with the Guild.~~

~~(2) Eliminate thirty (30%) percent of the stringer budget and all intern programs, temporary and probationary employees.~~

~~(3) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in inverse seniority order in the affected work group. The employee to be laid off shall be the junior two year associate in the affected work group. If there is no two year associate in the affected work group, the first employee to be laid off shall be the junior two-year associate in the bargaining unit. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. Thereafter, layoffs shall be in inverse seniority order in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. The work group for purposes of layoff will be divided as follows:~~

~~I. Content providers in Local News and Business~~
~~II. Content providers in Features and Editorial~~
~~III. Content providers in Sports~~

~~IV. Content providers and Editors in Photography/Multimedia/Art~~
~~V. Content Editors and Assigning Editors~~
~~VI. Clerical/Librarians/News Assistants~~

~~(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).~~

~~b. Employees in Work Group VI above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.~~

~~c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.~~

5. In the event of recall, the recall shall be according to seniority, provided that efficiency, skill and ability to do the job are, in the opinion of the Company, equal ~~in reverse order of layoff~~. Such recall rights will last ~~12~~ six months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

~~D~~7. In the event a laid off employee is not recalled within ~~a year~~ six months or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within ~~12~~ 6 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

~~E~~8. ~~An employee laid off as a result of the provisions of this clause will continue to receive their health/life insurance benefits for a period of three (3) months under the same conditions that applied when he/she was on the payroll. Also, for an additional three (3) months, the Company shall pay fifty (50%) percent of whatever premium or health and life insurance benefits being paid for full time employees, for those laid off employees.~~ The Company reserves the right to establish and offer, from time to time, termination incentives within a department and/or classification and/or classification within a department for employees who desire to voluntarily terminate their employment.

~~F~~9. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than ~~twenty-four (24)~~ six (6) months

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII ~~4(c)(6)~~ 4(b)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within ~~two years~~ one year from the start of their absence ~~of their date of disability shall~~ may have their benefits and seniority terminated. ~~Said two years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's two year time period shall commence anew;~~

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within ~~three years~~ one year from the start of their absence ~~of their date of disability shall~~ may have their benefits and seniority terminated. ~~Said three years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's three year time period shall commence anew;~~

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

~~5~~10. For any employee hired ~~without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes~~, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

~~For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.~~

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department in the Company's sole and exclusive discretion. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

~~6~~11. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by ~~mutual agreement between~~ the Company ~~and the Guild~~.

(b) In the event of discharge for ~~gross~~ misconduct, or in the case of misconduct after notice has been given said employee may be ~~laid off~~ discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

~~7. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.~~

~~8~~12. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

~~9~~13. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

~~10~~14. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes ~~shall~~ may be afforded the opportunity to transfer to other available positions in the Company's discretion.

~~11~~15**.** Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

~~12. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.~~

**ARTICLE IX**
**Expenses**

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of ~~46~~ ______ cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. ~~A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.~~

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees ~~who are authorized to use employee owned automobiles for the benefit of the Company~~ will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. DMV driving records must be submitted to the Company, upon request.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**ARTICLE X**
**Internships, Two-Year Associates**

1. Unpaid academic internships will be limited to fourteen (14) a year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they are excluded from the following classifications: news assistant, clerk, and messenger.

E. There will be no assignment restrictions

~~F. No vacation bonuses will be paid by the Company to two-year associates.~~

**ARTICLE XI**
**Vacations**

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service~~;~~ and four (4) weeks for eight (8) continuous years of service ~~and five (5) weeks for 23 continuous years of service~~ with the Pittsburgh Post-Gazette or other Block newspapers. ~~The service requirement for five weeks of vacation will decrease as follows: 21 years in 2002; 20 years in 2003; 18 years in 2004.~~

~~Employees hired on or after Jan. 1, 2007, will receive a maximum of four (4) weeks vacation.~~

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31

will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. ~~An employee requesting vacation must give at least three (3) days' notice.~~

~~Effective January 1, 1994:~~

~~All former Press employees will receive credit, for vacation purposes only, for their service with the Pittsburgh Press Company.~~

~~All employees hired between Jan. 1, 1987 and Jan. 1, 1993, will receive, for vacation purposes only, an extra year of service. The extra year of service is eliminated after the employee receives four weeks of vacation.~~

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. ~~Employees eligible for 5 weeks of vacation must take at least one week prior to March 31. Also, all e~~Employees who do not submit vacation requests prior to ~~September 1 will~~ March 1 may be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

~~9. With the exception of self-provoked discharge or failure to give two weeks' notice, accrued vacation pay will be paid on termination of employment or in the event of death to the designated beneficiary according to the following schedule:~~

~~Less than 3 complete years of service .................................................. 0~~
~~3 to 6 complete years of service ......................................... 1 week's pay~~
~~7 to 11 complete years of service ....................................... 2 weeks' pay~~
~~12 to 15 complete years of service ..................................... 3 weeks' pay~~
~~16 or more years of service ................................................ 4 weeks' pay~~

~~Effective May 1, 2007, the accrued vacation pay will be diverted to the Guild Pension Plan for the current contract.~~

~~10. Employees shall receive a $25 bonus for each year of service. For every year after 15 years, the employee will receive an additional $25 bonus for each year or service. For example, an employee with 25 years of service will receive $875 (25 x $25 = $625 + $250 (10 x $25) = $875). Effective Jan. 1, 2007, these service bonuses will be diverted to the Guild Pension Plan for the current contract.~~

**ARTICLE XII**
**Holidays**

1. The following holidays, or days observed as such, shall be granted to ~~all~~ full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. The Company shall designate the day the holiday is observed. ~~An~~ A full-time employee shall receive ~~four (4)~~ two (2) personal holidays after working 12 complete months. ~~Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday.~~ To claim a personal holiday, an employee must give at least ~~three (3) days~~ one (1) week notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. ~~An~~ A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and ~~an~~ a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. ~~Effective January 1, 1981, an employee will receive 6-1/4 days' pay for the holiday week if he/she is scheduled to work the holiday and 4 other days during the holiday week.~~

~~3. In the week in which one or more of those holidays fall, all time worked beyond the remaining work days or work hours shall be paid for at the overtime rate.~~

~~4~~3. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

~~5. Personal days are based on the number of hours the part-time employee is regularly scheduled to work. For example, an employee who normally works three days a week will receive 60 percent of the personal holidays.~~

## ARTICLE XIII
## Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, ~~first~~ consideration shall be given to ~~the employees in Guild jurisdiction~~ bargaining unit employees to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be up to 75 days, ~~which time may be lessened or extended by mutual agreement between the Company and the Guild~~ as determined by the Company in its discretion.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. Management shall have the right to change an employee's job duties to meet the operational needs of the Company. ~~For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such~~

~~training in addition to his salary including any step-ups for which he otherwise would have been eligible.~~

~~An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.~~

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher~~, or be given the option of accepting his severance pay~~.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above~~, excepting that he shall not have the option of accepting his severance pay~~.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent~~ and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company~~. An employee shall not be penalized for refusing to accept a transfer. ~~In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. The exempt employee in this role will not count toward the 30% limitation as established elsewhere in the contract.~~

9. Management shall have the right to transfer employees from one newsroom department to another ~~for up to one year~~ to meet the needs of the office. ~~At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action.~~ For purposes of definition, the following is each a department: Local News, Sports, Universal Desk **(**Copy/Pagination/Web Desk**)**, Features,

Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by ~~mutual agreement between~~ the Company ~~and the Guild~~.

10. Notwithstanding anything to the contrary in this Agreement, employees in one department may be assigned to do work ordinarily done by employees in another department as part of their regular duties without any adjustments to compensation.

**ARTICLE XIV**
**Severance Pay**

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of ~~52~~ 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

**ARTICLE XV**
**Leaves of Absence**

1. ~~By arrangement with t~~The Company, in its sole and exclusive discretion, ~~employees~~ may ~~be~~ grant~~ed~~ employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. ~~If an employee is elected or appointed to any office of The NewsGuild/Communications Workers of America, or AFL-CIO, CLC or any office of a local of The NewsGuild, such employee shall, upon request, be given a leave of absence without pay, and shall be reinstated in the same position upon the expiration of such leave. The foregoing shall also apply to d~~Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewGuild may request leaves of absence to

attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to ~~five~~ two at any one time, except by mutual consent.

3.~~(a)~~ Any employee who has had five continuous years in the employ of the Company without a leave of absence ~~shall~~ may be given ~~at the employee's request~~ a leave of absence by the Company, in its sole and exclusive discretion, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. ~~Such leaves may be limited to one from each department at any one time.~~

~~(b) An employee with at least 10 years of service shall be given, at his/her request, a leave of absence not to exceed three months, at half pay. Such leaves may be limited to two at any given time. An employee may exercise this right every five years. As of Jan. 1, 2007, such leaves will be suspended for the duration of the current contract and wage savings from such leaves will be diverted into the Guild Pension Plan.~~

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

~~Five~~ Four Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than ~~8~~ 4 months shall be granted.
(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The ~~parties agree~~ Guild agrees to comply with the Company's Family and Medical Leave Act ~~of 1993~~ policies as amended from time to time. ~~An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding~~

~~the commencement of such leave, will be entitled to leave under that Act. The employee shall have the right to elect whether they want to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.~~

10. The Guild shall be notified of all leaves and the conditions under which granted.

**ARTICLE XVI**
**Adjustment of Disputes**

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance ~~shall be~~ is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within ten (10) days of the events giving rise to the grievance in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ~~ten (10)~~ twenty (20) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. ~~The parties~~ Each party may ~~mutually agree to~~ request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. ~~In any event, t~~The parties shall select an arbitrator ~~no later than thirty (30) days~~ as expeditiously as possible from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The ~~parties shall determine who shall eliminate the first name by the flip of a coin~~ party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. ~~The expense of the arbitration shall be shared equally by both parties.~~ The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement or to substitute his discretion or judgment for the Company's discretion or judgment with respect to any matter this Agreement consigns or reserves to the Company's discretion or judgment. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding. All fees and expenses of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case. The arbitrator may hear and determine only one grievance at a time, unless the parties expressly agree otherwise in writing.

## ARTICLE XVII
## Military Service

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. ~~When the Company makes discharges or layoffs other than for cause, such discharged or~~ In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the ~~general type of work~~ specific position for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

~~2. Employees who have signed temporary replacement cards for employment because of enlistment or conscription of regular employees also shall be placed on the rehiring list when discharged for reasons other than cause, upon the return of the regular employee from war service, or when any temporary employee enters the armed services.~~

~~3~~2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

~~4~~3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher

classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

**ARTICLE XIX**
**Miscellaneous**

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. ~~Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.~~

4. Free-lance independent contractor photographers may be retained for photo and video assignments ~~to supplement existing coverage. Furthermore, it is understood that the use of free-lancers is not intended to replace bargaining unit jobs or work~~ .

~~5. Exempt employees and freelancers can be used in SEEN and similar publications. The use of exempt and freelancers is not intended to displace bargaining unit jobs or work.~~

~~6~~5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

~~7~~6. ~~No employee shall be required to take over the duties of any employee in another department of the Pittsburgh Post-Gazette in the event of a labor dispute in such department, or by assuming new duties to assist in the operation of a department where employees are on strike. No strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lock out its employees during the term of this agreement.~~ The Guild, its representatives and the employees covered by this Agreement agree, individually and collectively, that none of them will call, authorize, encourage (by action or inaction) or engage in any slowdown, strikes of any kind, sympathy strike, bannering, boycotts against the Company, boycotts against advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations or the production or sale of its products or services during the term of this Agreement.

In the event of any strike or any other proscribed activity not authorized, ratified or condoned by the Guild, the Guild agrees it will make every good faith effort to end such activity.

The Company agrees that it will not lockout any employees during the term of this Agreement.

The Company shall have direct recourse to the National Labor Relations Board or the courts for a violation of this Article.

~~8. The Company agrees not to have or enter into any agreement with any other Company binding such other Company not to offer or give employment to employees of the Company.~~

~~9~~7. The Guild shall be notified within 24 hours of all resignations tendered. ~~Resignations shall be subject to grievance procedure upon notice from the Guild within four days after receipt of notice from the Company.~~

~~10~~8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

~~11~~9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

~~12~~10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

~~13~~11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

~~14~~12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

~~15~~13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth~~, and Social Security number.~~
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

~~16~~14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

~~17~~15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to

the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

~~18~~16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

~~19~~17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

~~20~~18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director. The Company has the right to change in any way its Drug and Alcohol Policy from time to time.

~~21~~19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director. The Company reserves the right to change in any way its transitional duty program from time to time.

~~22~~20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company in its sole discretion from time to time.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. The parties recognize the methods for collection and distribution of news are changing due to the introduction of new technologies, techniques and multi-media platforms. Bargaining unit employees in the Editorial Department may be assigned as part of their regular duties, new or additional duties resulting from new technologies, techniques and multi-media platforms. Employees performing these new or additional duties will be provided adequate training and equipment by the Company.

**ARTICLE XX**
**Insurance, Health and Welfare, Pensions**

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding. ~~The Company shall make available non-contributory Group Life Insurance with an agreed-upon plan and under the terms and conditions of a Master Policy which contains the following provisions:~~

~~A. 90-day waiting period.~~

~~B. Insurance of one times annual salary with a maximum of $50,000.~~

~~C. Employees age 70 and above will have insurance of 65 percent of annual salary but not less than the minimum described in Paragraph B above.~~

~~D. Effective January 1, 2015, the above provisions will expire and life insurance for active employees will be provided through the Western Pennsylvania Teamsters and Employers Welfare fund.~~

~~E. Employees at retirement will have $4,000 of paid-up life insurance. However, retiree life insurance shall not be provided to employees who retire on or after January 1, 2015.~~

~~2. The Company shall pay the full cost of a travel accident policy for all employees, which includes the following provisions: principal sum, $100,000; weekly indemnity, the lesser of $100 or 65 percent of weekly earnings; waiting period, 60 days; maximum number of weeks, 52.~~

~~3. Effective with the ratification of this contract, the Company will provide a health insurance and prescription drug plan to eligible employees, their spouses and eligible dependents as follows:~~

~~A. Active Employees~~

All provisions regarding the health insurance and prescription drug plan as set forth in the August 1, 2010 Contract shall remain in effect through December 31, 2014. See Exhibit A grid.

**(1)** Effective January 1, 2015, all eligible bargaining unit employees will participate in the Western Pennsylvania Teamsters and Employers Welfare Fund (the "Fund"). Participation in the plan is limited to employees averaging annually more than 30 hours per week. See Exhibit B.

**(2)** The required PG contributions for the calendar year 2015 will be $1,229 per month for participating full-time bargaining unit employees (regardless of family size) and regardless of the option chosen.

**(3)** The PG contributions for years 2016 and 2017 will not exceed a 5.0% annual increase above the $1,229 per month set forth above for calendar year 2015. Any such increases must be based upon the plan design effective January 1, 2015. The PG will receive from the Fund at least 60 days notice of any such annual contribution increase prior to January 1. Increases in excess of 5% will be the responsibility of the covered bargaining unit members via direct billings from the Fund. If direct billing is not available, the PG will only assume responsibility for any withholding of any additional amounts after receiving the expressed written consent of each member and will not assume any other responsibility for collection of any other amounts, or be liable for any other payment to the Fund, other than as stated above.

(4) The WPA Fund will establish all applicable rules and operations, including treatment of out-of-network benefits and administration of all claims issues.

(5) Required employee contributions, if any, will be deemed as employee contributions for health care and are not related in any way to any prior or future wage deferrals.

(6) Effective with bargaining unit participation in the Fund, any and all other PG sponsored benefit plans will terminate, including medical/Rx, life/AD&D, vision, and dental, except for the life insurance program described in Exhibit B (Retiree Health and Welfare Programs) and paragraph 7 below.

(7) For any active employee who opts out of participation in the Fund, they shall receive $100 per month. However, the Employer shall be obligated to pay the premium of the employee's life insurance coverage at the same benefit level that existed under the prior contract.

(8) For all new hires, there is a thirty (30) day waiting period for all insurance coverage under this agreement.

(9) Dental/Optical insurance will be provided for active employees and their dependents through the Fund

(10) Spouses of employees who die prior to retirement will be covered with their dependent children by the active employee health plan. The spouse will be required to pay 30% of the composite premium as a condition for obtaining coverage. This coverage will end at the earlier of: after five (5) years of participation, attainment of Medicare Eligibility; or remarriage.

~~Coverage for eligible dependent children ends at their 19th birthday, or earlier if the spouse's coverage ends~~

~~(11) For surviving spouses, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the surviving spouse of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the surviving spouse's health care insurance.~~

~~(12) Surviving spouses (under age 65 or not Medicare eligible) of employees who die after retirement will be covered by the active employee health plan. The spouse will be required to pay the same percentage of the composite premium as the retiree. This coverage will end at the earlier of: after five (5) years of participation, attainment of Medicare Eligibility, or remarriage. Coverage for surviving spouses 65 and older will cease 60 days after the employee's death.~~

~~(13) For surviving spouses, retiree health care contributions should, if possible, be made through deductions from the employee's pension. If not, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the retiree of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the health care insurance.~~

~~B. Retiree healthcare~~

~~1~~2. The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.

~~2~~3. Future Retiree Medical and Life Benefits - Any and all retiree medical benefits ~~will be~~ were terminated as of ~~the effective date of the agreement~~ October 14, 2014 for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:

(a) Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.

(b) For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.

~~3~~4. Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.

~~4~~5. Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees ("Retiree Unit" – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 ("Single")/$25,000 ("Other than Single"); or

(b) a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.

~~5~~6. Medicare Eligible Retirees – All current Medicare Retirees ("Retiree Unit" as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.

(i) Any current-Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").

(ii) Any current-Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):

MODIFIED "A" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $153.90 for retiree and spouse |

or;

(b) A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:

MODIFIED "B" STIPEND PROGRAM

| Description | Proposed Amount |
| --- | --- |
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $119.70 for retiree and spouse |

~~6~~7. Other Conditions Related To These Programs

(a) A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree

(b) A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree

(c) "Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement

(d) The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.

(e) In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits from the Company.

(f) If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.

(g) Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.

(h) If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.

(i) Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to

make the one-time payment. The Company reserves the right to implement such one-time payments in subgroups or tiers as the Company deems appropriate.

(j) The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.

(k) Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.

8. Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth according to the parameters set out in the Plan Document. The Company has the right to change or amend the 401(k) Plan from time to time.

~~7. a. Benefit accruals for all participants in the pension plan remain frozen. Each Employee's service will continue to be credited according to the terms of the pension plan for purposes of vesting and benefit eligibility.~~

~~b. Until June 30, 2015, the Employer will make weekly pension contributions of $75.70/active member. As a result of the establishment of the Guild Employees 401(K) Plan as set forth in Exhibit 1, effective July 1, 2015, the weekly pension contribution will be $65.70; and effective July 1, 2016, such contribution will be $55.70. Additionally, each Employee will divert 2% of their base salary to the pension plan. The 2% diversion will be valued at $211,000 a year during the life of this contract. The Guild diverted the night differential for the term of the contract. The night differential diversion will be valued at $45,000 a year during the life of this contract. The Guild diverted the Vacation Bonus for the term of the contract. The Vacation Bonus diversion will be valued at $69,000 a year during the life of this contract. The Guild diverted the Service Bonus for the term of the contract. The Service Bonus diversion will be valued at $16,000 a year during the life of this contract. The Guild diverted the Accrued Vacation language for the term of the contract. The Accrued Vacation language diversion will be valued at $60,000 a year during the life of this contract. The Guild diverted the half pay leave for the term of the contract. The half pay leave diversion will be valued at $60,000 a year during the life of this contract.~~

~~c. The Board of Trustees is authorized and directed to adopt the following long-term funding policy immediately. The Fund co-consultants will produce with the annual actuarial valuations a seven-year actuarial projections with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:~~

- ~~Projections will take into account only negotiated contributions.~~
- ~~Use of the assumptions in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants.~~

- ~~No unanticipated actuarial gains or losses during the projection time period.~~

~~If the annual projection indicates any future funding deficiencies during the seven-year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.~~

~~In the event that the Post-Gazette is required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the Post-Gazette will receive a dollar for dollar credit towards the next subsequent plan year's contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies they shall take into account that these contribution credits will be taken as a reduction in the negotiated contributions in the next plan year.~~

~~d. Effective as soon as administratively practical following ratification of this Contract, all defined benefit (DB) pension plans sponsored by the Post-Gazette (excluding Teamsters #211) will be merged.~~

~~e. Any deadlocked Trustee motion relating to a reduction in benefits required under the Long Term Funding Policy in numbered paragraph 3 above as well as any dispute between the parties regarding the provisions of this agreement shall be arbitrated on an expedited basis, with the arbitration to take place not later than sixty (60) days following the Trustees' meeting at which the deadlock occurs or the date that one party advises the other of a dispute regarding the interpretation or application of this agreement.~~

~~Details of the pension plan status and its benefits are outlined in a separate document signed by the Company and the Guild.~~

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the

Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

## ARTICLE XXII
## Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work~~ in accordance with the provisions of this Agreement~~; to establish new jobs and abolish or change existing jobs; to determine and redetermine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine ~~reasonable standards of production~~ work and quality standards; ~~to issue, amend and revise reasonable rules and policies in accordance with applicable law; ~~to cease, restructure or outsource any department, operation or service of the Company in whole or in part; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce, change or discontinue ~~new or improved ~~research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine and redetermine the number, location and operation of departments, divisions and all other units of the Company; to install security cameras for the safety of employees and property; to establish or continue policies, practices and procedures for the conduct of the business and, from time to time, to change or abolish such policies, practices or procedures; to determine the number of hours per pay or week that operations shall be carried on; to establish and change work schedules, assignments and break periods; to determine the fact of lack of work; to make, change, discontinue and enforce safety rules and rules governing the conduct of employees; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement. The Management Rights article shall survive and continue in effect after the expiration date of this Agreement.

**ARTICLE XXIII**
**Term and Renewal**

1. This Agreement shall commence on ~~the October 15, 2014~~ ____________________ and expire on ~~the thirty-first day of March 2017~~ ____________________.

2. ~~Not less than 60 days prior to the expiration of this Agreement either party desiring to open negotiations for a new Agreement shall submit its proposals for such new Agreement in writing to the other party. The respondent party, if it desires to file a counter proposal of the conditions it will seek to establish, shall do so at the earliest practicable date, but in any event not longer than thirty (30) days from receipt of notice by the moving party. In the absence of such statement within the prescribed time limit, the existing Agreement becomes automatically the proposal of the respondent party. The terms and conditions of this Agreement shall remain in effect as long as negotiations continue, but in the event a new Agreement is arrived at within four (4) months of the submission of the new proposal, all the terms and conditions of the new Agreement shall be retroactive to the date of the expiration of this Agreement.~~ This Agreement shall be effective upon its execution and shall remain in full force and effect through ________________. Written notice of a desire to terminate this Agreement must be delivered by the one party to the other not more than one hundred fifty (150) days nor less than sixty (60) days prior to ________________.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ________________________________________ Date: ________________________
Michael A Fuoco

By: ________________________________________ Date: ________________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ____________________________________ Date: ________________________
Stephen B. Spolar, Vice President of Human Resources

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books**,** recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block
Publisher and Editor-in-Chief

**~~Memorandum of Understanding~~**

~~This Memorandum of Understanding, made this 30th day of January, 1998, shall be incorporated into the Labor Agreement, effective January 1, 1998, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh. The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:~~

1. ~~Participation will be voluntary.~~
2. ~~Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.~~
3. ~~There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.~~
4. ~~Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.~~
5. ~~Employees will be paid $50 for off-shift appearances.~~
6. ~~This MOU recognizes the jurisdiction agreement which is pending between AFTRA and KDKA~~

~~FOR THE POST-GAZETTE:~~ ~~FOR THE GUILD:~~

~~Raymond N. Burnett~~ ~~Harry Tkach~~

~~DATE: Feb. 5, 1998~~ ~~DATE: Feb. 5, 1998~~

~~MEMORANDUM OF UNDERSTANDING~~
~~PG SPEAKERS' BUREAU POLICY~~
~~(March 2, 1995)~~

~~Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.~~

~~Appearances scheduled during the staff member's regular working hours will be compensated at $25. Appearances scheduled during the staff member's non-working hours will be compensated at $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.~~

~~Staffers contacted for a speaking engagement must first refer the inquiring party to Barbara Bogucki, assistant to the editor, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.~~

~~The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.~~

~~Staffers who have already made their own arrangements to speak before groups in the community before March 3, 1995 would be free to meet those commitments. However, they must notify the company about these arrangements right away~~

~~Staffers interested in participating in the Speakers' Bureau should contact Barbara and let her know that they would like to participate as soon as possible.~~

~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the current labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Union agree that part-time employees (employees working no more than 30 hours per week) can work a five-hour shift at straight time over and above their normal work week. It is understood that the part-time employee is guaranteed five hours of pay when called in on his/her off day.~~

~~This Memorandum of Understanding does not change the overtime provisions of the contract or the past practice of employees (part time and full time) functioning as stringers outside of their normally assigned duties.~~

~~One of the purposes of this Memorandum of Understanding is to resolve the grievance over a part-time employee functioning as a stringer on his off day.~~

~~FOR THE POST-GAZETTE~~ ~~FOR THE GUILD~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 3/12/03~~ ~~DATE: 3/12/03~~

# ~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Guild agree as follows:~~

- ~~For the purpose of paying the negotiated Vacation and Service bonuses, part-time employees will be treated the same as full-time employees.~~
- ~~Paragraph C of the Preamble will be amended as follows, "To cover possible special cases the Publisher shall have the right to designate exemption from Article I – Guild Shop – certain employees at the time of their employment, but not more than one such employee will be on the payroll at any given time."~~
- ~~The Guild will relinquish all jurisdiction over the work formerly performed by one clerk and one news assistant assigned to the department often referred to as PG Store/Information Products.~~
- ~~The Guild will withdraw the grievance of January 30, 2003 over the Company's decision to pay proportionate bonuses to part-time employees.~~
- ~~Part-time employees who have already received proportionate bonuses will be made whole.~~

~~FOR THE POST-GAZETTE~~ ~~FOR THE GUILD~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 3/12/03~~ ~~DATE: 3/12/03~~

~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:~~

- ~~One of the provisions of the agreement pertaining to the 10 exempt employees who became members of the Newspaper Guild of Pittsburgh in 2002 was that they would remain in the pension plan for non-bargaining unit employees.~~
- ~~Implicit in that agreement was the recognition that the 10 former exempt employees would not be eligible for the Guild pension.~~

~~FOR THE POST-GAZETTE~~ ~~FOR THE GUILD~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 7/29/03~~ ~~DATE: 8/13/03~~

~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:~~

- ~~The six paid holidays – New Year's Day, Memorial Day, the Fourth of July, Labor Day, Thanksgiving Day and Christmas – shall be treated the same as personal days for employees who individually average fewer than 20 hours per week and do not work the holiday. (See Article XII, Paragraph 5.)~~
- ~~Employees who individually average more than 19-3/8 hours per week will receive another day off with pay if they do not work the holiday, which has been the past practice.~~
- ~~Any part-time employee who works on one of the six recognized holidays will be paid at the premium holiday rate, which has been the past practice.~~

~~FOR THE POST-GAZETTE~~ ~~FOR THE GUILD~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 8/14/03~~ ~~DATE: 8/18/03~~

~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding effective January 28, 2004, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Guild agree as follows:~~

- ~~The Company will assume jurisdiction over photo reprints. For clarification, this involves all work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.~~
- ~~The Company will gain another exempted employee as described in Paragraph C of the Preamble (this will increase the number of such exemptions allowed to two), with the following provision: the Company will have until December 31, 2006, to name a current employee to this exempt status. If the Company does not exercise this option prior to the expiration of this Agreement, the right to name an exempted employee under Paragraph C will be limited to a new hire.~~

~~FOR THE COMPANY:~~ ~~FOR THE GUILD:~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 1/28/04~~ ~~DATE: 1/30/04~~

**~~MEMORANDUM OF AGREEMENT~~**

~~THIS AGREEMENT made this 23rd day of November, 2007, by and between PITTSBURGH POST-GAZETTE and NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061, CWA.~~

~~1. On July 26, 2007, the Guild filed a grievance over the use of freelance writers to perform restaurant reviews.~~

~~2. The Pittsburgh Post-Gazette has denied the grievance, and by letter dated August 30, 2007, the Guild requested that the grievance proceed to arbitration.~~

~~3. The parties have reached an agreement as full and final settlement of the grievance, which settlement shall be considered a Memorandum of Understanding regarding the future use of stringer "tryouts". That agreement is as follows:~~

~~The Company may use stringers to "try out" for vacant Guild positions (which no Guild member has been awarded) under terms and conditions mutually agreed to between the parties. In the event the Employer intends to use a stringer to fill the vacant position as set forth above, the Company shall notify the Guild and the parties shall then mutually agree upon the various terms and conditions under which the "tryout" may be utilized.~~

| ~~PITTSBURGH POST-GAZETTE~~ | ~~NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061~~ |
|---|---|
| ~~BY: Stephen B. Spolar~~ | ~~BY: R. J. Hufnagel~~ |

# ~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.~~

~~The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.~~

~~The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.~~

~~In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.~~

~~Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.~~

~~For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.~~

~~This MOU will be effective retroactively to September 1, 2008.~~

~~For the Company~~ ~~For the Union~~

~~Stephen B. Spolar~~ ~~RJ Hufnagel~~

~~Date: 5/29/2009~~ ~~Date: 6/9/2009~~

~~**MEMORADUM OF UNDERSTANDING**~~

~~This Memorandum of Understanding between the Newspaper Guild of Pittsburgh (hereafter known as the Guild) and the Pittsburgh Post-Gazette (hereafter known as the Company) covers only those Guild members who accept the early-retirement buyout offer the company extended in October 2008. This agreement shall serve as an amendment to that agreement and to the preamble of the Collective Bargaining Agreement between the parties.~~

~~Content providers who accept the aforementioned buyout offer shall be free to perform work that currently falls under Guild jurisdiction, under the following limits: Writers may complete a maximum of one freelance submission per week for the print edition, or one piece of web-based content per week for post-gazette.com. In addition, participants may continue to contribute in all aspects of online-only content for post-gazette.com as currently performed.~~

~~Aside from the exceptions and limits listed above, any and all rules governing the use of stringers included in the collective bargaining agreement shall continue to apply.~~

~~Stephen B. Spolar~~ ~~Mike Fuoco~~

~~Date~~ ~~Date~~

# EXHIBIT A

## MEDICAL/PRESCRIPTION DRUG - UNION GROUPS (ACTIVES, UNDER 65 RETIREES, COBRA) THROUGH DECEMBER 31, 2014

| Benefit | Network | Out-of-Network | Network | Out-of-Network |
|---|---|---|---|---|
| | Current | | New Plan - 1/1/2011 (A) | |
| **Deductible** *(per benefit period)* | | | | |
| **Individual** | $750 | $1,500 | $250 | $1,500 |
| **Family** | $1,500 | $3,000 | $500 | $3,000 |
| **Out-of-Pocket Maximums** (*excludes deductible and copayments)* | | | | |
| **Individual** | N/A | $3,000 | N/A | $3,000 |
| **Family** | N/A | $6,000 | N/A | $6,000 |
| **Coinsurance** | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| **PCP/Specialist Office Visit Copay** | $25 copay | 80% after deductible | $25 copay | 80% after deductible |
| **Preventive Care** | | | | |
| **Routine physical exams** | $25 copay | Not Covered | $25 copay | Not Covered |
| **Immunizations** | 100% | 80% | 100% | 80% |
| **Routine gynecological exams, including PAP Test** | $25 copay | 80% | $25 copay | 80% |
| **Mammograms, annual routine and medically necessary** | 100% | 80% | 100% | 80% |
| **Emergency Room** | $100 copay | $100 copay | $100 copay | $100 copay |
| **Spinal Manipulations** | $25 copay | 80% | $25 copay | 80% |
| **Hospital Services** | | | | |
| **Inpatient** | $50 copay/admission | 80% | $50 copay/admission | 80% |
| **Outpatient** | 100% | 80% | 100% | 80% |
| **Mental Health/Substance Abuse** | | | | |
| **Inpatient** | 100% | 80% | 100% | 80% |
| **Outpatient** | $25 copay | 80% | $25 copay | 80% |
| **Prescription Drug** | $0 Deductible | | $0 Deductible | |
| **Retail – 31 day supply** *(Mandatory Generic)* | $20 generic/$30 formulary brand/$50 non-formulary brand | | $20 generic/$30 formulary brand/$50 non-formulary brand | |
| **Mail Order – 90 day supply** *(Mandatory Generic)* | $40 generic/$60 formulary brand/$100 non-formulary brand | | $40 generic/$60 formulary brand/$100 non-formulary brand | |

A - As a result of national health care reform, certain benefit mandates will be implemented as of January 1, 2011, including but not limited to:

- Extension of health plan coverage for adult children to age 26
- Elimination of annual dollar limits on "essential" health benefit

These changes will be reflected in updated benefit grids prior to January 1, 2011 as additional guidance become available

**Vision Benefits (active employees)** - Davis Vision Plan will be upgraded to the top tier optical program

~~Exhibit 1~~

~~GUILD EMPLOYEES 401(K) PLAN~~

~~Effective July 1, 2015, PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:~~

~~(a) Through June 30, 2016, PG will make a matching contribution ("PG Matching Contributions") to the PG Publishing Company 401(k) Plan (the "Plan") equal to 50% of the first $20 per week deferred by any Eligible Full Time Employee; effective July 1, 2016, the PG Matching Contribution will be increased by applying the 50% match to the first $40 per week deferred by any Eligible Full Time Employee~~

~~(b) Through June 30, 2016, the maximum amount of PG Matching Contribution will be $10 /week or the pro-rated equivalent for less than Eligible Full Time Employees; effective July 1, 2016, such maximum amount of PG Matching Contribution will be increased to $20/week or the pro-rated equivalent for less than Eligible Full Time Employees~~

~~(c) The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;~~

~~(d) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;~~

~~(e) The PG Matching Contribution will be subject to a vesting schedule as follows:~~

~~(i) Less than 3 years of service – 0% Vested~~

~~(ii) At least 3 years of service – 100% Vested~~

~~(iii) Vesting Service is counted from original hire date~~

~~(f) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;~~

~~(g) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;~~

~~(h) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.~~

(i) ~~All new employees will be automatically placed into the 401K plan with the ability to opt out.~~

# GC EXHIBIT 5

NLRB-0001067

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 5

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 71

AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ~~October 15, 2014~~**_______________,** by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph “A” above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph ~~1~~**2**, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

In no event will the number of employees excluded from the Agreement be more than ~~30~~ **5** percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have ~~42~~ **7** employees excluded, provided that they qualify as management personnel.

Also, no person under Guild jurisdiction will be **involuntarily** ~~arbitrarily~~ named as a manager or excluded from the agreement. ~~arbitrarily named as a manager (excluded from the Agreement).~~

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Exempt employees **cannot** do bargaining unit work as performed in the past **nor do** ~~and/or~~ similar work that may result from the introduction of new print, electronic or other products. ~~and as operationally necessary. Performance of such exempt work will not displace bargaining unit employees.~~

D. The Guild recognizes that stringers will **not** ~~continue to~~ be utilized by the Post-Gazette. ~~to fulfill its obligation to report the news.~~

**E. No one other than Post-Gazette newsroom managers can assign work to or direct Guild members.** ~~according to the following guidelines:~~

~~1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.~~

~~2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.~~

~~3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective January 1, 2007, the maximum will be 15 percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.~~

~~4.~~ **F.** Community Journalism initiatives

Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to,

independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

The company may ~~continue to~~ obtain content from commercial vendors **for:** ~~,including, but not limited to,~~ traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette ~~and~~ through **the** bargaining unit and shall not ~~exempt editors and is not intended to~~ displace bargaining unit work.

ARTICLE I
Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, date of birth ~~and Social Security number~~.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

ARTICLE II
Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the

employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in

relation to my Guild membership dues including assessment.
Employee's Signature______________________________________________________
Date_______________________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

**ARTICLE III**

Classifications, Wages and Schedules of Minimums

- **Eliminate all wage diversions and pension diversions.**
- **Move Content Providers up to the Content Editors scale.**
- **All wages currently being paid will increase seven percent per year. Term of contract to be determined.**
- **Maintain all classifications, definitions and steps.**
- **Additional step increases at the 10-, 15-, 20- and 25-year levels to be negotiated.**

~~Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 10% of earnings to a maximum of $5,000 per calendar year. Effective April 1, 2016, such diversion shall be reduced to 8% and a maximum of $4,250 per calendar year. Effective January 1, 2017, the maximum diversion shall be $4,000 per calendar year:~~

| | ~~Effective Date~~ | ~~1st 6 Mo.~~ | ~~2nd 6 Mo.~~ | ~~2nd Year~~ | ~~3rd Year~~ | ~~4th Year~~ | ~~5th Year~~ |
|---|---|---|---|---|---|---|---|
| ~~Content Providers~~ | ~~wage~~ | ~~901.00~~ | ~~924.00~~ | ~~1058.00~~ | ~~1105.00~~ | ~~1135.00~~ | ~~1172.36~~ |
| | ~~2% pension~~ | ~~18.02~~ | ~~18.48~~ | ~~21.16~~ | ~~22.10~~ | ~~22.70~~ | ~~23.45~~ |
| | ~~Net wages~~ | ~~882.98~~ | ~~905.52~~ | ~~1036.84~~ | ~~1082.90~~ | ~~1112.30~~ | ~~1148.91~~ |
| | ~~10% Wage Diversion~~ | ~~88.30~~ | ~~90.55~~ | ~~103.68~~ | ~~108.29~~ | ~~111.23~~ | ~~114.89~~ |
| | ~~Wage after diversion~~ | ~~794.68~~ | ~~814.97~~ | ~~933.16~~ | ~~974.61~~ | ~~1001.07~~ | ~~1034.02~~ |

~~Provides original content for print and electronic publications and products.~~

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Content Editors/Producers | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 10% Wage Diversion | 89.47 | 96.73 | 107.51 | 112.21 | 116.32 |
| | Wage after diversion | 805.27 | 870.53 | 967.55 | 1009.89 | 1046.90 |

Edits and produces original content for print and electronic publications, products, and slot.

| | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| Assignment Editors | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 10% Wage Diversion | 110.25 | 112.21 | 117.96 |
| | Wage after diversion | 992.25 | 1009.89 | 1061.65 |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| ~~Librarian~~ | ~~wage~~ | ~~892.00~~ | ~~906.00~~ | ~~922.00~~ |
| | ~~2% pension~~ | ~~17.84~~ | ~~18.12~~ | ~~18.44~~ |
| | ~~Net wages~~ | ~~874.16~~ | ~~887.88~~ | ~~903.56~~ |
| | ~~10% Wage Diversion~~ | ~~87.42~~ | ~~88.79~~ | ~~90.36~~ |
| | ~~Wage after diversion~~ | ~~786.74~~ | ~~799.09~~ | ~~813.20~~ |

~~Provides newsroom, library and photo support as necessary.~~

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| ~~News Assistant~~ | ~~wage~~ | ~~747.00~~ | ~~767.00~~ | ~~787.00~~ |
| | ~~2% pension~~ | ~~14.94~~ | ~~15.34~~ | ~~15.74~~ |
| | ~~Net wages~~ | ~~732.06~~ | ~~751.66~~ | ~~771.26~~ |
| | ~~10% Wage Diversion~~ | ~~73.21~~ | ~~75.17~~ | ~~77.13~~ |
| | ~~Wage after diversion~~ | ~~658.85~~ | ~~676.49~~ | ~~694.13~~ |

~~Provides newsroom, library and photo support as necessary.~~

| | Effective | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|---|

| | Date | Year | Year | Year | Year |
|---|---|---|---|---|---|
| Editorial Clerks | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| Administrative | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 10% Wage Diversion | 65.66 | 67.42 | 68.89 | 69.78 |
| | Wage after diversion | 590.94 | 606.82 | 620.05 | 627.98 |

Provides newsroom support as necessary

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Copy Messengers | wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | 10% Wage Diversion | 54.98 | 55.47 | 55.96 | 56.45 |
| | Wage after diversion | 494.80 | 499.21 | 503.62 | 508.03 |

Provides newsroom support as necessary

| | | 1st Year | 2nd Year |
|---|---|---|---|
| Two-Year Associates | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 10% Wage Diversion | 55.86 | 61.25 |
| | Wage after diversion | 502.74 | 551.25 |

Performs various newsroom assignments as necessary

| | ~~Effective Date~~ | ~~1st Internship~~ | ~~2nd Internship~~ | ~~3rd Internship~~ |
|---|---|---|---|---|
| ~~3-Month Interns~~ | ~~wage~~ | ~~512.00~~ | ~~527.00~~ | ~~542.00~~ |
| | ~~2% pension~~ | ~~10.24~~ | ~~10.54~~ | ~~10.84~~ |
| | ~~Adjusted wages~~ | ~~501.76~~ | ~~516.46~~ | ~~531.16~~ |
| | ~~10% Wage Diversion~~ | ~~50.18~~ | ~~51.65~~ | ~~53.12~~ |
| | ~~Wage after diversion~~ | ~~451.58~~ | ~~464.81~~ | ~~478.04~~ |

~~Performs various newsroom assignments as necessary~~

~~1. Employees shall receive a salary increase provided in the schedule of wage minimums or increases according to the following schedule of general increases, whichever is greater, but not both:~~

1. The above wage minimums and the general increase ~~need not~~ **shall** apply to salaries of those who are on ~~retirement or who are on~~ extended sick leave. ~~The pay increases shall go into effect upon the employee's return to work.~~

2. For the life of this Agreement there is to be no reduction in compensation of anyone covered by this Agreement except when the provisions of Article VIII, Paragraph 3, are implemented.

3. In the application of the foregoing schedules of minimums, experience shall include all regular employment in comparable work. In the event the Guild questions the job classification or experience status of any employee within ~~forty-five (45)~~ **ninety (90)** days from start of employment, adjustments **shall be made** retroactive ~~if any, will be made retroactive~~ to the start of employment. If such question is raised after ~~forty-five (45)~~ **ninety (90)** days from start of employment, adjustments, **shall be** ~~if any, will be~~ effective on the date that the Guild brought the question to the attention of the Company.

4. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

5. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only; individual merit shall be acknowledged by increases above the

minimums.

6. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

7. (a) ~~Effective January 1, 1982,~~ **A**n employee temporarily transferred to a higher classification shall receive differential pay **at the higher rate.**~~according to the following schedule:~~

~~Copy messenger to clerk ………………………………. minimum salary differential~~
~~Copy messenger to reporter/editor ……………………minimum salary differential~~
~~News assistant, clerk to reporter/editor ……………… minimum salary differential~~

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

~~Effective upon ratification of this Contract.~~ **W**hen ~~no exempt newsroom manager is on duty and~~ **a** Guild member is assigned to be the ranking supervisor ~~on the premises~~ for at least ~~four~~ 3 ½ hours (one-half) of his shift, he will receive an additional ~~$30~~ **$100** per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) ~~Effective January 1, 2003,~~ **T**he Harrisburg and Washington correspondent**s** will receive a salary differential of ~~$20~~ **$40** a week. ~~(Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)~~

8. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum

bracket comparable with his salary.

9. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating or until the top minimum is reached.

10. ~~Effective January 1, 2003,~~ **Within 30 days of ratification of this agreement the following one-time service bonuses shall be paid:**

- **A** ~~one-time service bonus of $250~~ **$500 for all employees with 10 or more years of service.** ~~Thereafter, the bonus will be paid when an employee completes his/her 10th year of service.~~ ~~Effective January 1, 2004,~~ ~~**A** one-time service bonus of~~
- **An additional $1000 for all employees with 20 or more years of service.**
- **An additional $1500 for employees with 30 or more years of service.**
- **Thereafter, the bonuses will be paid when an employee completes his/her 10th/20th/30th years of service.** ~~As of Jan. 1, 2007, all service bonuses will be diverted to the Guild Pension Plan for the life of the current contract.~~

ARTICLE IV
Hours

1. No ~~employee eligible for Guild membership~~ **bargaining unit employee** shall work more than ~~eight (8)~~ **seven (7)** hours per day within a ~~nine (9)~~ **eight (8)** consecutive hour period, nor more than five days per week with the following exceptions:

(a) With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ~~ten~~ **8.75**-hour days. By mutual agreement, full-time employees also may work a six-day week of not more than ~~40~~ **35-**hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

(b) ~~Additionally,~~ **F**ull-time employees with at least two years of service shall, on a rotating basis, have the option of working a four-day week consisting of four ~~10~~ **8.75-**hour days at his request.~~ under the following conditions:~~

~~i. The nature of the work is such that it can be compressed into 4 days.~~

~~ii. At least one weekend shift may be required as part of the work week except by mutual agreement.~~

**i. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).**
**ii. No employee shall be assigned to work a four-day week without his/her consent.**
**iii. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.**
~~iv. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.~~
**iv. A lunch or dinner break may be required as part of the work day.**
~~v. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.~~

(c) Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

2. A regular schedule of working hours shall be maintained for all employees. No less than ~~three~~ **six** days' notice shall be given in advance of any change in an employee's working schedule~~, where possible~~. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday~~, where possible~~.

3. ~~Wherever possible,~~ **D**ays off shall be consecutive days **unless the employee chooses otherwise.**

**4. No employee shall be required to work more than 5 consecutive days.**

**5.** It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

**6.** A differential of ~~$3~~ **$10** per shift will be paid to an employee who begins his shift on or after 2 p.m., **and/or for working on a weekend. Those working weekend shifts that begin after 2 p.m. shall receive a $20 per shift differential.** ~~As of Jan. 1, 2007, All night differentials will be diverted to the Guild Pension Plan for the life of the current contract.~~

This shall apply only so long as the employee is assigned to such shifts.

**7. An employee whose shift starts between 11 p.m. and 6:30 a.m. shall receive a shift differential of $40.**

**8. No employee shall be required to work any swing shifts.**

**9.** Time spent by employees traveling to and from assignments shall be considered as part of the working day.

**10.** Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

**11.** By arrangement with the Company, employees who elect to reduce their work week to fewer than ~~40~~ **35** hours shall be considered flex-time employees. They shall designate a period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

ARTICLE V
Overtime

1. Overtime shall be defined as work beyond **7 hours per day or** ~~40~~ **35** hours in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime beyond **7 hours per day or 35** ~~40~~ hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. ~~By mutual agreement, which will not be unreasonably withheld, a~~**A**n employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee~~, by mutual agreement not to be unreasonably withheld,~~ may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work **or to work remotely** after his regular working day shall be paid for ~~the time worked, but not~~ **no** less than four hours **or time and one-half for all hours worked, whichever is greater.** ~~An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.~~

4. An employee who ~~called~~ **agrees** to work on his day off shall be compensated at the rate of time and one-half, but not less than a day's pay in addition to his regular weekly salary.

5. Overtime shall be reported in writing to the Company or its representative within ten days after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

## ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than ~~40~~ **35** hours per week cannot exceed ~~35~~ **15** percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of ~~40~~ **35** hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave and other leaves of absences.

3. It shall be a policy of the Company to pay part-time employees who average individually less than ~~20~~ **17.5** hours per week not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than ~~20~~ **17.5** hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. ~~Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration.~~ Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to ~~eight (8)~~ **four (4)** months¸ a period which may be extended by mutual agreement between the Company and the Guild. ~~These employees will be covered only by Articles I, II and VI of this Agreement.~~ Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the ~~eight~~ **four (4)** month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond **four (4)** ~~twelve (12)~~ months shall receive **benefits on a proportionate basis.** ~~one week's vacation~~.

5. Part-time and, or temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide **twelve (12)** ~~eight (8)~~ days sick pay annually which may be taken only when an employee is unable to work due to illness. The company can request that an employee furnish a doctor's certificate or other reasonable proof when absent for **six (6)** ~~three (3)~~ consecutive days or more.

2. An employee shall receive a normal week's salary for a period of his or her incapacitation. There shall be ~~no~~ holiday

premium pay during the sick leave period.

3. Short-term disability

(a) ~~Employees can accumulate the above twelve eight days per year during their employment to a maximum of 240 90 days per year. Only unused days during the year will be carried over to the maximum of 240 90 days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of two (2) five (5) days or longer. This benefit will begin on the 3rd 6th work day of disability. The three five days will constitute a waiting period.~~

**All current employees having at least one year of service will be provided an initial short term disability bank at 120 days short-term disability bank at full pay.** All employees ~~on the payroll on 1/1/07~~ **with less than one year of service will be provided short-term disability bank of 12** ~~7~~ **days at full pay.** ~~per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days.~~ **Upon reaching one year of employment all employees shall receive a short-term disability bank of 120 days at full pay.**

**(b) Employees can accumulate up to 12 unused sick days per year during their employment to a maximum of 240 days in short-term disability pay.**

(c) If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at **85** ~~60~~ percent of the employee's negotiated rate of pay for those employees with **at least one year** ~~two years~~ of service. ~~Those employees with less than two years service will be eligible for 13 weeks of additional sick leave. Details of this extended short-term disability plan are available from the Human Resources Director.~~

(d) An employee who exhausts his disability bank shall earn additional sick leave benefits according to the following schedule: For one year of uninterrupted employment – 20 percent of maximum short-term disability schedule; two years of uninterrupted employment – 40 percent of maximum short-term disability schedule; three years of uninterrupted employment – 60 percent of maximum short-term disability schedule; four years of uninterrupted employment – 80 percent of maximum short-term disability schedule; five years of uninterrupted employment – 100 percent of maximum short-term disability schedule.

The maximum regeneration under this program will be ~~70~~ **120** days. Unused individual sick days will continue to be accumulated into the bank until the **240** ~~90~~-day maximum is reached.

~~Sick pay and/or the short-term disability bank are not considered earned and will not be paid out upon termination of employment, including retirement.~~

**All earned and unused sick pay shall be paid out on termination of employment including retirement.**

4. This program will become effective as of the date of ratification. ~~Benefit payments under the prior Guild sick leave plan will continue for those employees on sick leave as of the date of ratification.~~

5. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

~~6. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.~~

~~7. Sick leave payments shall terminate upon termination of employment or death of the employee.~~

~~8. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.~~

**6.** ~~9.~~ An employee cannot accrue sick leave or use sick leave benefits for any purpose other than illness or injury.

7. ~~10.~~ Employees claiming benefits under this Section shall, upon request, submit ~~to an examination by~~ a doctor's excuse. ~~or doctors designated and paid for by the Company.~~

~~11. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.~~

~~12. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.~~

ARTICLE VIII
Security

1. There shall be no discharge as a result of putting this Agreement into effect.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force, which latter shall be construed as synonymous with discharges for economy.

3. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes. The Company's right to determine the size of the force is recognized and the right to reduce the force for economy (either permanently or temporarily) shall **also** ~~not~~ be subject to review by the Board of Arbitration**.**~~, provided, however, that in the event the Guild~~

~~believes that reasons other than economy have entered into the designation of the person or persons to be laid off, it may appeal the particular case or cases to arbitration. Stringers and freelancers in no case will replace or displace bargaining unit employees.~~

4. A. Layoffs to reduce the force, as distinguished from dismissals for just and sufficient cause, shall not be made until the Company notifies the Guild **sixty (60)** ~~thirty (30)~~ days in advance that such layoffs are necessary and that no reasonable alternative exists.

B. The Company shall notify the Guild of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), number of employees per work group, numerical order of layoffs within each work group, numerical order of overall layoffs, and the facts upon which the Company relies to establish the necessity pursuant to Section 4A above.

C. In the event such layoffs are necessary, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may first be offered for a reduction in force after consultation with the Guild.

(2) Eliminate ~~thirty (30%) percent of the stringer budget and~~ all intern programs, temporary and probationary employees.

(3) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in inverse seniority order in the affected work group. The employee to be laid off shall be the junior two year associate in the affected work group. If there is no two year associate in the affected work group, the first employee to be laid off shall be the junior two-year associate in the bargaining unit. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. Thereafter, layoffs shall be in inverse seniority order in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. The work group for purposes of layoff will be divided as follows:

I. Content providers in Local News and Business
II. Content providers in Features and Editorial

III. Content providers in Sports
IV. Content providers and Editors in Photography/Multimedia/Art
V. Content Editors and Assigning Editors
VI. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group VI above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

(5) In the event of recall, the recall shall be in reverse order of layoff. Such recall rights will last **24** ~~12~~ months from the date of the employee's layoff.

(6) The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

D. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

E. An employee laid off as a result of the provisions of this clause will continue to receive their health/life insurance benefits for a period of **twelve (12)** ~~three (3)~~ months under the same conditions that applied when he/she was on the payroll. Also, for an additional **six (6)** ~~three (3)~~ months, the Company shall pay fifty (50%) percent of whatever

premium or health and life insurance benefits being paid for full time employees, for those laid off employees.

F. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twenty-four (24 months)

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(c)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within two years of their date of disability shall have their benefits and seniority terminated. Said two years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's two year time period shall commence anew;

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within three years of their date of disability **may** ~~shall~~ have their benefits and seniority terminated. Said three years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's three year time period shall commence anew;

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

5. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

6. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by mutual agreement between the Company and the Guild.

(b) In the event of discharge for gross misconduct, or in the case of misconduct after notice has been given said employee may be laid off immediately.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

7. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

8. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

9. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

10. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes shall be afforded the opportunity to transfer to other available positions.

11**.** Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

12. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

ARTICLE IX
Expenses

~~1. If required, all reporters and photographers will use their personal cars in the service of the Company.~~
**1.** ~~2. For the term of this agreement,~~ The Company will reimburse for the business use of a **personal** vehicle by paying a **mileage allowance equal to the IRS regulations.**~~vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.~~

~~3. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used.~~

**2.** ~~4.~~ Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

**3.** ~~5.~~ Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs~~ up to a maximum of $15.00 per day,~~ after the employee pays the initial parking fee.

**4.** ~~6.~~ Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

**5.** ~~7.~~ Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis.

**6.** ~~8.~~ Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**7. The company will provide all Guild members who use a cell phone for work purposes with cell phones, chargers and data plans.**

**8. The company will provide all Guild members with a monthly $100 wellness stipend to be used for gym memberships and other wellness/exercise programs.**

**9. The company will provide all eligible Guild members with a monthly $100 childcare stipend.**

**ARTICLE X**
**INTERNSHIPS, TWO-YEAR ASSOCIATES**

1. Unpaid academic internships will be limited to **ten (10)** ~~fourteen (14)~~ a **calendar** year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to **28** ~~32~~ hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates ~~may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they~~ are excluded from the following classifications: **librarian**, news assistant, clerk, and messenger.

~~E. There will be no assignment restrictions~~

**E.**~~F.~~ ~~No~~ **V**acation bonuses will be paid by the Company to two-year associates.

## ARTICLE XI
## Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; **four (4)** ~~three (3)~~ weeks for three (3) continuous years of service; **five (5)** ~~four (4)~~ weeks for eight (8) continuous years of service and **six (6)** ~~five (5)~~ weeks for **18** ~~23~~ continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers. ~~The service requirement for five weeks of vacation will decrease as follows: 21 years in 2002; 20 years in 2003; 18 years in 2004.~~

~~Employees hired on or after Jan. 1, 2007, will receive a maximum of four (4) weeks vacation.~~

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months

of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation **shall** ~~must~~ give ~~at least~~ three (3) days' notice.

~~Effective January 1, 1994:~~

All former Press employees will receive credit, for vacation purposes only, for their service with the Pittsburgh Press Company.

~~All employees hired between Jan. 1, 1987 and Jan. 1, 1993, will receive, for vacation purposes only, an extra year of service. The extra year of service is eliminated after the employee receives four weeks of vacation.~~

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees eligible for **6** ~~5~~ weeks of vacation must take at least one week prior to March 31. Also, all employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

9. With the exception of self-provoked discharge or failure to give two weeks' notice, accrued vacation pay will be paid on termination of employment or in the event of death to the designated beneficiary according to the following schedule:

| | |
|---|---|
| Less than 3 complete years of service | ~~0~~**1 week's pay** |
| 3 to 6 complete years of service | ~~1~~ **3 week's pay** |
| 7 to 11 complete years of service | ~~2~~ **4 weeks' pay** |
| 12 to 15 complete years of service | ~~3~~ **5 weeks' pay** |
| 16 or more years of service | ~~4~~ **6 weeks' pay** |

~~Effective May 1, 2007, the accrued vacation pay will be diverted to the Guild Pension Plan for the current contract.~~

10. Employees shall receive **annually a** ~~$25~~ **$50** bonus for each year of service. For every year after 15 years, the employee will receive an additional ~~$25~~ **$50** bonus for each year or service. For example, an employee with 25 years of service will receive **$1,750** ~~$875~~ (25 x ~~$25~~ **$50** = ~~$625~~ **$1,250** + ~~$250~~ $500 (10 x ~~$25~~ **$50**) = ~~$875~~ **$1,750**). ~~Effective Jan. 1, 2007, these service bonuses will be diverted to the Guild Pension Plan for the current contract.~~

**11. On an annual basis, Guild members may roll over one (1) week of vacation to the next year.**

## ARTICLE XII
Holidays

1. The following holidays, or days observed as such, shall be granted to all employees as provided in this Article: New

Year's Day, **Martin Luther King Day**, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. An employee shall receive ~~four (4)~~ **(6)** personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a ~~fifth~~ **seventh** personal holiday. To claim a personal holiday, an employee must give at least ~~three (3)~~ **one (1)** day~~s~~ notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. ~~An employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and an employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, A~~**A**n employee ~~will~~ **shall** receive 6-~~1/4~~**1/2** days' pay for the holiday week if he/she is scheduled to work the holiday and 4 other days during the holiday week. **Additionally, employees assigned to work at least half of their shift after 8 p.m. on Christmas Eve and/or News Year's Eve, shall receive holiday pay.**

3. In the week in which one or more of those holidays fall, all time worked beyond the remaining work days or work hours shall be paid for at the overtime rate.

4. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

5. Personal days are based on the number of hours the part-time employee is regularly scheduled to work. For example, an employee who normally works three days a week will receive 60 percent of the personal holidays.

## ARTICLE XIII

Advancement, Promotion and Transfer

1. The Company shall immediately post notice of ~~such~~ **any** vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction. ~~to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned.~~ **On the first day after the application period ends the Guild shall be made aware of anyone seeking the position. If the employer does not select the bargaining unit employee(s) they must notify the**

**employee and the union setting forth their reasons for the rejection. Any rejection must not be for arbitrary or capricious reasons and shall be subject to the grievance procedure.**

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be 75 days, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive ~~$4.00~~ **$10** a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not

be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher, or be given the option of accepting his severance pay.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above, excepting that he shall not have the option of accepting his severance pay.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. The exempt employee in this role ~~will not~~ **shall** count toward the **5%** ~~30%~~ limitation as established elsewhere in the contract.

9. Management shall **not** ~~have the right to~~ transfer employees from one newsroom department to another over their objection. ~~for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action.~~ For purposes of definition, the following is each a department: Local News, Sports, Universal Desk **(**Copy/Pagination/Web Desk**)**, Features, Editorial, Business, Photography**/**Multimedia, Library and Art. These department designations can be modified by mutual agreement between the company and the Guild.

ARTICLE XIV

Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment:

One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of ~~52~~ **70** weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest ~~(except bonuses and pay for special work)~~ received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service ~~completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid~~. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
## Leaves of Absence

1. By arrangement with the Company, employees ~~may~~ **shall** be granted leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time.

2. If an employee is elected or appointed to any office of The NewsGuild/Communications Workers of America, or AFL-CIO, CLC or any office of a local of The NewsGuild, such employee shall, upon request, be given a leave of absence without pay, and shall be reinstated in the same position upon the expiration of such leave. The foregoing shall also apply to delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild. ~~The number of employees on leave under this Section shall be limited to five~~

~~at any one time, except by mutual consent.~~

3.(a) Any employee who has had five continuous years in the employ of the Company without a leave of absence shall be given at the employee's request a leave of absence not to exceed ~~six~~ **nine** months, without pay. ~~Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.~~

(b) An employee with at least 10 years of service shall be given, at his/her request, a leave of absence not to exceed ~~three~~ **six** months, at half pay. Such leaves may be limited to two at any given time. An employee may exercise this right every five years. ~~As of Jan. 1, 2007, such leaves will be suspended for the duration of the current contract and wage savings from such leaves will be diverted into the Guild Pension Plan.~~

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

**Three** ~~Two~~ days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative or close friend.

**Five** ~~Three~~ days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

**Seven** ~~Five~~ Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to ~~five~~ **ten** days at ½ pay is available.

7. ~~(a)~~ Upon request, ~~unpaid~~ maternity, paternity or adoptive parent leave of not more than ~~8~~ **9** months shall be granted **at full pay.**
~~(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.~~

~~(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.~~

~~8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.~~

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The employee shall have the right to elect whether they want to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance shall be defined as a dispute over an alleged violation of this agreement.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The parties shall determine who shall eliminate the first name by the flip of a coin.

6. Once a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be **considered granted.** ~~automatically moved to the next step.~~

7. The parties may mutually agree to extend the time limits set forth above. The expense of the arbitration shall be shared equally by both parties. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding.

## ARTICLE XVII
Military Service

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
Preferential Re-Employment

1. When the Company makes discharges or layoffs other than for cause, such discharged or laid off persons shall be

placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(6)) unless same is exhausted with respect to the general type of work for which an additional employee is desired.

2. Employees who have signed temporary replacement cards for employment because of enlistment or conscription of regular employees also shall be placed on the rehiring list when discharged for reasons other than cause, upon the return of the regular employee from ~~war~~ **military** service, or when any temporary employee enters the armed services.

3. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

4. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline, **images, likenesses** or other identifying information shall not be used over his protest.

3. Employees may be assigned to use multimedia equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

~~4. Free-lance photographers may be retained for photo and video assignments to supplement existing coverage. Furthermore, it is understood that the use of free-lancers is not intended to replace bargaining unit jobs or work.~~

~~5. Exempt employees and freelancers can be used in SEEN and similar publications. The use of exempt and freelancers is not intended to displace bargaining unit jobs or work.~~

**4.** ~~6.~~ Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

**5.** ~~7.~~ No employee shall be required to take over the duties of any employee in another department of the Pittsburgh Post-Gazette in the event of a labor dispute in such department, or by assuming new duties to assist in the operation of a department where employees are on strike. No strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lockout its employees during the term of this agreement.

**6.** ~~8.~~ The Company agrees not to have or enter into any agreement with any other Company binding such other Company not to offer or give employment to employees of the Company.

**7.** ~~9.~~ The Guild shall be notified within 24 hours of all resignations tendered. Resignations shall be subject to grievance procedure upon notice from the Guild within four days after receipt of notice from the Company.

**8.** ~~10.~~ For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

**9.** ~~11.~~ Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

~~(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.~~

**(A)** Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.

**(B)** Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.

~~(C) The Company shall notify the Guild of its decision in these matters.~~

**(C)** No Company equipment will be used for outside activities.

~~There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.~~

(Code of ethics is reprinted in the back of the contract).

**10.** ~~12.~~ In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

**11.** ~~13.~~ An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

**12.** ~~14.~~ An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

**13.** ~~15.~~ The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, date of birth~~, and Social Security number~~.
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and

effective dates.

**14.** ~~16.~~ The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

**15.** ~~17.~~ The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

**16.** ~~18.~~ A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

NLRB-0001107

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

**17.** ~~19.~~ Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

**18.** ~~20.~~ The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

**19.** ~~21.~~ The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director.

**20.** ~~22.~~ The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

**21. Upon request, the Company shall provide standing desks and gel mats to Guild members.**

**22. The Company shall provide the Guild with notification at least 120 days prior to moving from its current location to a different facility. The Company shall meet with Guild leaders to discuss the move.**

**23. The Company will provide eligible Guild members with $100 a month for tuition reimbursement.**

**24. The Company shall provide the following bonuses for recognition in journalism contests, whether or not the contest provides a monetary award:**

- **$25 for regional contests**
- **$50 for state contests**
- **$75 for national contests**

**25. All Guild members shall be given an opportunity to participate in professional development activities (such as seminars, conferences etc.) at the Company's expense.**

## ARTICLE XX

Insurance, Health and Welfare, Pensions

1. The Company shall make available non-contributory Group Life Insurance with an agreed-upon plan and under the terms and conditions of a Master Policy which contains the following provisions:

A. 90-day waiting period.

B. Insurance of one times annual salary with a maximum of $50,000.

C. Employees age 70 and above will have insurance of 65 percent of annual salary but not less than the minimum described in Paragraph B above.

D. ~~Effective January 1, 2015, the above provisions will expire and life insurance for active employees will be provided through the Western Pennsylvania Teamsters and Employers Welfare fund.~~

E. Employees at retirement will have $4,000 of paid-up life insurance. However, retiree life insurance shall not be provided to employees who retire on or after January 1, 2015.

2. The Company shall pay the full cost of a travel accident policy for all employees, which includes the following provisions: principal sum, $100,000; weekly indemnity, the lesser of $100 or 65 percent of weekly earnings; waiting period, 60 days; maximum number of weeks, 52.

3. Effective with the ratification of this contract, the Company will provide a health insurance and prescription drug plan to eligible employees, their spouses and eligible dependents as follows:

A. Active Employees

~~All provisions regarding the health insurance and prescription drug plan as set forth in the August 1, 2010 Contract shall~~

~~remain in effect through December 31, 2014. See Exhibit A grid.~~

(1) ~~Effective January 1, 2015,~~ **A**ll eligible bargaining unit employees will participate in the Western Pennsylvania Teamsters and Employers Welfare Fund (the "Fund"). Participation in the plan is limited to employees averaging annually more than 30 hours per week. See Exhibit B.

(2) The required PG contributions for the calendar year 2015 will be **$1,354.97** ~~$1,229~~ per month for participating full-time bargaining unit employees (regardless of family size) and regardless of the option chosen.

**(3)** The PG contributions ~~for years 2016 2018 and 2017~~ will not exceed a ~~5.0%~~ **25%** annual increase above the **$1,354.97** ~~$1,229~~ per month set forth above for calendar year ~~2015~~ **2017**. Any such increases must be based upon the plan design effective January 1, 2015. The PG will receive from the Fund at least 60 days notice of any such annual contribution increase prior to January 1. Increases in excess of ~~5%~~ **25%** will be the responsibility of the covered bargaining unit members via direct billings from the Fund. If direct billing is not available, the PG will only assume responsibility for any withholding of any additional amounts after receiving the expressed written consent of each member and will not assume any other responsibility for collection of any other amounts, or be liable for any other payment to the Fund, other than as stated above.

(4) The WPA Fund will establish all applicable rules and operations, including treatment of out-of-network benefits and administration of all claims issues.

**(5)** Required employee contributions, if any, will be deemed as employee contributions for health care and are **not** related in any way to any prior or future wage deferrals.

(6) Effective with bargaining unit participation in the Fund, any and all other PG sponsored benefit plans will terminate, including medical/Rx, life/AD&D, vision, and dental, except for the life insurance program described in Exhibit B (Retiree Health and Welfare Programs) and paragraph 7 below.

(7) For any active employee who opts out of participation in the Fund, they shall receive ~~$100~~ **$200** per month. However, the Employer shall be obligated to pay the premium of the employee's life insurance coverage at the same benefit level that existed under the prior contract.

(8) For all new hires, there is a thirty (30) day waiting period for all insurance coverage under this agreement.

(9) Dental/Optical insurance will be provided for active employees and their dependents through the Fund

(10) Spouses of employees who die prior to retirement will be covered with their dependent children by the active employee health plan. The spouse will be required to pay ~~30%~~ **10%** of the composite premium as a condition for obtaining coverage. This coverage will end at the earlier of: after ~~five (5)~~ **ten (10)** years of participation, attainment of Medicare Eligibility; or remarriage. Coverage for eligible dependent children ends at their ~~19th~~ **26th** birthday, or earlier if the spouse's coverage ends

(11) For surviving spouses, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the surviving spouse of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the surviving spouse's health care insurance.

(12) Surviving spouses (under age 65 or not Medicare eligible) of employees who die after retirement will be covered by the active employee health plan. The spouse will be required to pay the same percentage of the composite premium as the retiree. This coverage will end at the earlier of: after ~~five (5) years~~ **ten (10) years** of participation, attainment of Medicare Eligibility, or remarriage Coverage for surviving spouses 65 and older will cease 60 days after the employee's death.

**(13)** For surviving spouses, retiree health care contributions should, if possible, be made through deductions from the employee's pension. If not, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the retiree of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the health care insurance.

B. Retiree healthcare

1. The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.

2. Future Retiree Medical and Life Benefits - Any and all retiree medical benefits will be terminated as of the effective date of the agreement for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:

(a) Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.

(b) For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.

3. Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.

4. Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees (“Retiree Unit” – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company’s unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 (“Single”)/$25,000 (“Other than Single”); or

(b) a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.

5. Medicare Eligible Retirees – All current Medicare Retirees (“Retiree Unit” as defined below), who agree to the

conditions explained below, will be provided a one-time choice to take either:

(a) a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.

(i) Any current-Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").

(ii) Any current-Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):

MODIFIED "A" STIPEND PROGRAM

| Description | Proposed Amount |
| --- | --- |
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $153.90 for retiree and spouse |

or;

(b) A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:

MODIFIED "B" STIPEND PROGRAM

| Description | Proposed Amount |
| --- | --- |
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $119.70 for retiree and spouse |

6. Other Conditions Related To These Programs

(a) A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree

(b) A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree

(c) "Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement

(d) The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.

(e) In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits from the Company.

(f) If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.

(g) Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.

(h) If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.

(i) Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to make the one-time payment. The Company reserves the right to implement such one-time payments in

subgroups or tiers as the Company deems appropriate.

(j) The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.

(k) Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.

**7.** a. Benefit accruals for all participants in the pension plan remain frozen. Each Employee's service will continue to be credited according to the terms of the pension plan for purposes of vesting and benefit eligibility.

~~b. Until June 30, 2015, the Employer will make weekly pension contributions of $75.70/active member. As a result of the establishment of the Guild Employees 401(K) Plan as set forth in Exhibit 1, effective July 1, 2015, the weekly pension contribution will be $65.70; and effective July 1, 2016, such contribution will be $55.70. Additionally, each Employee will divert 2% of their base salary to the pension plan. The 2% diversion will be valued at $211,000 a year during the life of this contract. The Guild diverted the night differential for the term of the contract. The night differential diversion will be valued at $45,000 a year during the life of this contract. The Guild diverted the Vacation Bonus for the term of the contract. The Vacation Bonus diversion will be valued at $69,000 a year during the life of this contract. The Guild diverted the Service Bonus for the term of the contract. The Service Bonus diversion will be valued at $16,000 a year during the life of this contract. The Guild diverted the Accrued Vacation language for the term of the contract. The Accrued Vacation language diversion will be valued at $60,000 a year during the life of this contract. The Guild diverted the half pay leave for the term of the contract. The half pay leave diversion will be valued at $60,000 a year during the life of this contract.~~

b. Effective upon ratification PG Publishing will make contributions to eligible employees as defined in the SPD in accordance with the following:

1. **The employer shall contribute annually a matching contribution made by the employee up to 6% of the employee's gross wages.**

**(a) The PG will make the PG Matching Contribution as soon as practical after the close of each month**

**and after receiving information regarding Employee deferrals;**

**(b) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;**

**(c) The PG Matching Contribution will be subject to a vesting schedule as follows:**

**(i) Less than 3 years of service – 0% Vested**

**(ii) At least 3 years of service – 100% Vested**

**(iii) Vesting Service is counted from original hire date**

**(d) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;**

**(e) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;**

**(f) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.**

**(g) All new employees will be automatically placed into the 401K plan with the ability to opt out.**

c. The Board of Trustees is authorized and directed to adopt the following long-term funding policy immediately. The Fund co-consultants will produce with the annual actuarial valuations a seven-year actuarial projections with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:

- Projections will take into account only negotiated contributions.

- Use of the assumptions in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants.

- No unanticipated actuarial gains or losses during the projection time period.

If the annual projection indicates any future funding deficiencies during the seven-year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.

In the event that the Post-Gazette is required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the Post-Gazette will receive a dollar for dollar credit towards the next subsequent plan year's contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies they shall take into account that these contribution credits will be taken as a reduction in the negotiated contributions in the next plan year.

d. Effective as soon as administratively practical following ratification of this Contract, all defined benefit (DB) pension plans sponsored by the Post-Gazette (excluding Teamsters #211) will be merged.

e. Any deadlocked Trustee motion relating to a reduction in benefits required under the Long Term Funding Policy in numbered paragraph 3 above as well as any dispute between the parties regarding the provisions of this agreement shall be arbitrated on an expedited basis, with the arbitration to take place not later than sixty (60) days following the Trustees' meeting at which the deadlock occurs or the date that one party advises the other of a dispute regarding the interpretation or application of this agreement.

Details of the pension plan status and its benefits are outlined in a separate document signed by the Company and the Guild.

ARTICLE XXI
Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for

publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

## ARTICLE XXII
## Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote,

transfer, layoff and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine reasonable standards of production; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease any department, operation or service; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce new or improved research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall ~~not~~ be considered a waiver of the Company's right to exercise such right, prerogative or function **and** ~~or~~ preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

**ARTICLE XXIII**

Term and Renewal

1. This Agreement shall commence on ~~the October 15, **2014**~~ _________ and expire on ~~the thirty-first day of March **2017**~~ __________.

2. Not less than 60 days prior to the expiration of this Agreement either party desiring to open negotiations for a new Agreement shall **advise the other in writing of its desire to do so.** ~~submit its proposals for such new Agreement in writing to the other party. The respondent party, if it desires to file a counter proposal of the conditions it will seek to establish, shall do so at the earliest practicable date, but in any event not longer than thirty (30) days from receipt of notice by the moving party. In the absence of such statement within the prescribed time limit, the existing Agreement becomes automatically the proposal of the respondent party.~~ The terms and conditions of this Agreement shall remain in effect as long as negotiations continue, but in the event a new Agreement is arrived at within four (4) months of the submission of the new proposal, all the terms and conditions of the new Agreement shall be retroactive to the date of the expiration of this Agreement.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ________________________________ Date: ____________________

Michael A. Fuoco

By: ______________________________ Date: ____________________

Jonathan D. Silver

PG PUBLISHING COMPANY

By: ______________________________ Date: ____________________

Stephen B. Spolar, Vice President of Human Resources

## Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

### Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

### Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

## Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

## Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

## Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block, Publisher and Editor-in-Chief

## Memorandum of Understanding

This Memorandum of Understanding, made this 30th day of January, 1998, shall be incorporated into the Labor Agreement, effective January 1, 1998, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh. The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid ~~$25~~ **$50** for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid ~~$50~~ **$100** for off-shift appearances.
6. ~~This MOU recognizes the jurisdiction agreement which is pending between AFTRA and KDKA~~

| FOR THE POST-GAZETTE: | FOR THE GUILD: |
| --- | --- |
| Raymond N. Burnett | Harry Tkach |
| DATE: Feb. 5, 1998 | DATE: Feb. 5, 1998 |

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY
(March 2, 1995)

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at ~~$25~~ **$50**. Appearances scheduled during the staff member's non-working hours will be compensated at ~~$50~~ **$100**. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to ~~Barbara Bogucki~~ Linda Parker, assistant to the editor, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

~~Staffers who have already made their own arrangements to speak before groups in the community before March 3, 1995 would be free to meet those commitments. However, they must notify the company about these arrangements right away~~

~~Staffers interested in participating in the Speakers' Bureau should contact Barbara and let her know that they would like to participate as soon as possible.~~

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the current labor agreement that expires ~~December 31, 2006~~ **March 31, 2017**. ~~Effective March 12, 2003,~~ Effective upon ratification. The Company and the Union agree that part-time employees (employees working no more than ~~30~~ **26.25** hours per week) can work a five-hour shift at straight time over and above their normal work week. It is understood that the part-time employee is guaranteed five hours of pay when called in on his/her off day.

This Memorandum of Understanding does not change the overtime provisions of the contract or the past practice of employees (part time and full time) functioning as stringers outside of their normally assigned duties.

One of the purposes of this Memorandum of Understanding is to resolve the grievance over a part-time employee functioning as a stringer on his off day.

| FOR THE POST-GAZETTE | FOR THE GUILD |
| --- | --- |
| ________________________ | ________________________ |
| Raymond N. Burnett | Mike Bucsko |
| DATE: 3/12/03 | DATE: 3/12/03 |

## ~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Guild agree as follows:~~

- ~~For the purpose of paying the negotiated Vacation and Service bonuses, part-time employees will be treated the same as full-time employees.~~
- ~~Paragraph C of the Preamble will be amended as follows, "To cover possible special cases the Publisher shall have the right to designate exemption from Article I – Guild Shop – certain employees at the time of their employment, but not more than one such employee will be on the payroll at any given time."~~
- ~~The Guild will relinquish all jurisdiction over the work formerly performed by one clerk and one news assistant assigned to the department often referred to as PG Store/Information Products.~~
- ~~The Guild will withdraw the grievance of January 30, 2003 over the Company's decision to pay proportionate bonuses to part-time employees.~~
- ~~Part-time employees who have already received proportionate bonuses will be made whole.~~

| ~~FOR THE POST-GAZETTE~~ | ~~FOR THE GUILD~~ |
| --- | --- |
| ~~Raymond N. Burnett~~ | ~~Mike Bucsko~~ |
| ~~DATE: 3/12/03~~ | ~~DATE: 3/12/03~~ |

## ~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:~~

- ~~One of the provisions of the agreement pertaining to the 10 exempt employees who became members of the Newspaper Guild of Pittsburgh in 2002 was that they would remain in the pension plan for non-bargaining unit employees.~~
- ~~Implicit in that agreement was the recognition that the 10 former exempt employees would not be eligible for the Guild pension.~~

| ~~FOR THE POST-GAZETTE~~ | ~~FOR THE GUILD~~ |
| --- | --- |
| ~~Raymond N. Burnett~~ | ~~Mike Bucsko~~ |
| ~~DATE: 7/29/03~~ | ~~DATE: 8/13/03~~ |

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective ~~August 1, 2003~~ **upon ratification**, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall be considered a part of this ~~is in addition to the~~ Labor Agreement.~~ that expires on December 31, 2006. The Company and the Union agree as follows:~~

- The ~~six~~ **seven** paid holidays—New Year's Day, **Martin Luther King Day,** Memorial Day, the Fourth of July, Labor Day, Thanksgiving Day and Christmas—shall be treated the same as personal days for employees who individually average fewer than ~~20~~ **17.5** hours per week and do not work the holiday. (See Article XII, Paragraph 5.)
- Employees who individually average more than ~~19-3/8~~ **17.5** hours per week will receive another day off with pay if they do not work the holiday, which has been the past practice.
- Any part-time employee who works on one of the ~~six~~ **seven** recognized holidays will be paid at the premium holiday rate, which has been the past practice.

| FOR THE POST-GAZETTE | FOR THE GUILD |
|---|---|
| Raymond N. Burnett | Mike Bucsko |
| DATE: 8/14/03 | DATE: 8/18/03 |

~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding effective January 28, 2004, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Guild agree as follows:~~

- ~~The Company will assume jurisdiction over photo reprints. For clarification, this involves all work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.~~
- ~~The Company will gain another exempted employee as described in Paragraph C of the Preamble (this will increase the number of such exemptions allowed to two), with the following provision: the Company will have until December 31, 2006, to name a current employee to this exempt status. If the Company does not exercise this option prior to the expiration of this Agreement, the right to name an exempted employee under Paragraph C will be limited to a new hire.~~

| | |
|---|---|
| ~~FOR THE COMPANY:~~ | ~~FOR THE GUILD:~~ |
| ~~Raymond N. Burnett~~ | ~~Mike Bucsko~~ |
| ~~DATE: 1/28/04~~ | ~~DATE: 1/30/04~~ |

**MEMORANDUM OF AGREEMENT**

THIS AGREEMENT made this 23rd day of November, 2007, by and between PITTSBURGH POST-GAZETTE and NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061, CWA.

1. On July 26, 2007, the Guild filed a grievance over the use of freelance writers to perform restaurant reviews.

2. The Pittsburgh Post-Gazette has denied the grievance, and by letter dated August 30, 2007, the Guild requested that the grievance proceed to arbitration.

3. The parties have reached an agreement as full and final settlement of the grievance, which settlement shall be considered a Memorandum of Understanding regarding the future use of stringer "tryouts". That agreement is as follows:

The Company may use stringers to "try out" for vacant Guild positions (which no Guild member has been awarded) under terms and conditions mutually agreed to between the parties. In the event the Employer intends to use a stringer to fill the vacant position as set forth above, the Company shall notify the Guild and the parties shall then mutually agree upon the various terms and conditions under which the "tryout" may be utilized.

PITTSBURGH POST-GAZETTE

NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061

BY: Stephen B. Spolar

BY: R. J. Hufnagel

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

This MOU will be effective retroactively to September 1, 2008.

| For the Company | For the Union |
| --- | --- |
| ______________________ | ______________________ |
| Stephen B. Spolar | RJ Hufnagel |

Date: 6/9/2009

Date: 5/29/2009

**MEMORANDUM OF UNDERSTANDING**

This Memorandum of Understanding between the Newspaper Guild of Pittsburgh (hereafter known as the Guild) and the Pittsburgh Post-Gazette (hereafter known as the Company) covers only those Guild members who accept the early-retirement buyout offer the company extended in October 2008. This agreement shall serve as an amendment to that agreement and to the preamble of the Collective Bargaining Agreement between the parties.

Content providers who accept the aforementioned buyout offer shall be free to perform work that currently falls under Guild jurisdiction, under the following limits: Writers may complete a maximum of one freelance submission per week for the print edition, or one piece of web-based content per week for post-gazette.com. In addition, participants may continue to contribute in all aspects of online-only content for post-gazette.com as currently performed.

Aside from the exceptions and limits listed above, any and all rules governing the use of stringers included in the collective bargaining agreement shall continue to apply.

Stephen B. Spolar

Mike Fuoco

Date

Date

67

NLRB-0001135

# EXHIBIT A

**MEDICAL/PRESCRIPTION DRUG - UNION GROUPS (ACTIVES, UNDER 65 RETIREES, COBRA) THROUGH DECEMBER 31, 2014**

| Benefit | Network | Out-of-Network | Network | Out-of-Network |
|---|---|---|---|---|
| | Current | | New Plan - 1/1/2011 (A) | |
| **Deductible** *(per benefit period)* | | | | |
| **Individual** | $750 | $1,500 | $250 | $1,500 |
| **Family** | $1,500 | $3,000 | $500 | $3,000 |
| **Out-of-Pocket Maximums** (*excludes deductible and copayments)* | | | | |
| **Individual** | N/A | $3,000 | N/A | $3,000 |
| **Family** | N/A | $6,000 | N/A | $6,000 |
| **Coinsurance** | 100% after deductible | 80% after deductible | 100% after deductible | 80% after deductible |
| **PCP/Specialist Office Visit Copay** | $25 copay | 80% after deductible | $25 copay | 80% after deductible |
| **Preventive Care** | | | | |
| **Routine physical exams** | $25 copay | Not Covered | $25 copay | Not Covered |
| **Immunizations** | 100% | 80% | 100% | 80% |
| **Routine gynecological exams, including PAP Test** | $25 copay | 80% | $25 copay | 80% |
| **Mammograms, annual routine and medically necessary** | 100% | 80% | 100% | 80% |
| **Emergency Room** | $100 copay | $100 copay | $100 copay | $100 copay |
| **Spinal Manipulations** | $25 copay | 80% | $25 copay | 80% |
| **Hospital Services** | | | | |
| **Inpatient** | $50 copay/admission | 80% | $50 copay/admission | 80% |
| **Outpatient** | 100% | 80% | 100% | 80% |
| **Mental Health/Substance Abuse** | | | | |
| **Inpatient** | 100% | 80% | 100% | 80% |
| **Outpatient** | $25 copay | 80% | $25 copay | 80% |
| **Prescription Drug** | $0 Deductible | | $0 Deductible | |
| **Retail – 31 day supply** *(Mandatory Generic)* | $20 generic/$30 formulary brand/$50 non-formulary brand | | $20 generic/$30 formulary brand/$50 non-formulary brand | |
| **Mail Order – 90 day supply** *(Mandatory Generic)* | $40 generic/$60 formulary brand/$100 non-formulary brand | | $40 generic/$60 formulary brand/$100 non-formulary brand | |

A - As a result of national health care reform, certain benefit mandates will be implemented as of January 1, 2011, including but not limited to:

- Extension of health plan coverage for adult children to age 26
- Elimination of annual dollar limits on “essential” health benefit

These changes will be reflected in updated benefit grids prior to January 1, 2011 as additional guidance become available

**Vision Benefits (active employees)** - Davis Vision Plan will be upgraded to the top tier optical program

**EXHIBIT B**

# *SUMMARY OF PPOBLUE*

On the chart below, you'll see what your plan pays for specific services. You may be responsible for a facility fee, clinic charge or similar fee or charge (in addition to any professional fees) if your office visit or service is provided at a location that qualifies as a hospital department or a satellite building of a hospital.

## *Western PA Teamsters' and Employers' Welfare Fund 9PG*

# GC EXHIBIT 6

NLRB-0001138

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 6

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 22

**COMPANY COUNTERPROPOSAL NO. 1**
**JUNE 12, 2017**

## AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this _____________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Seen Editor, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D. The parties recognize the following exceptions to the Guild's jurisdiction set forth in Paragraph C:

1. Supervisors and managerial employees may perform bargaining unit work.

2. Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

3. The Company may subcontract work.

4. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed 40 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

5. Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

   The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

   The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

   It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

**COMPANY COUNTERPROPOSAL NO. 2**
**JUNE 12, 2017**

## ARTICLE I
## Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing ~~as defined by law~~ no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.
2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.
3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.
4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.
5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth ~~and Social Security number~~.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.
7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

**COMPANY COUNTERPROPOSAL NO. 3**
**JUNE 12, 2017**

# ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 8% of earnings to a maximum of $4,000 per calendar year.

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| Content Providers | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net Wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 8% Wage Diversion [TBD] | ~~88.30~~ | ~~90.55~~ | ~~103.68~~ | ~~108.29~~ | ~~111.23~~ | ~~114.89~~ |
| | Wage after diversion | ~~794.68~~ | ~~814.97~~ | ~~933.16~~ | ~~974.61~~ | ~~1001.07~~ | ~~1034.02~~ |

Provides original content for print and electronic publications and products.

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Content Editors/Producers | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 8% Wage Diversion [TBD] | ~~89.47~~ | ~~96.73~~ | ~~107.51~~ | ~~112.21~~ | ~~116.32~~ |
| | Wage after diversion | ~~805.27~~ | ~~870.53~~ | ~~967.55~~ | ~~1009.89~~ | ~~1046.90~~ |

Edits and produces original content for print and electronic publications, products, and slot.

| | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| Assignment Editors | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | [illegible] Wage Diversion [TBD] | ~~110.25~~ | ~~112.21~~ | ~~117.96~~ |
| | Wage after diversion | ~~992.25~~ | ~~1009.89~~ | ~~1061.65~~ |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| Librarian | Wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | [illegible] Wage Diversion [TBD] | ~~87.42~~ | ~~88.79~~ | ~~90.36~~ |
| | Wage after diversion | ~~786.74~~ | ~~799.09~~ | ~~813.20~~ |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| News Assistant | Wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | [illegible] Wage Diversion [TBD] | ~~73.21~~ | ~~75.17~~ | ~~77.13~~ |
| | Wage after diversion | ~~658.85~~ | ~~676.49~~ | ~~694.13~~ |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Editorial Clerks | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| Administrative | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | [illegible] Wage Diversion [TBD] | ~~65.66~~ | ~~67.42~~ | ~~68.89~~ | ~~69.78~~ |
| | Wage after diversion | ~~590.94~~ | ~~606.82~~ | ~~620.05~~ | ~~627.98~~ |

Provides newsroom support as necessary

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Copy Messengers | | | | | |
| | Wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | ~~8%~~ Wage Diversion [TBD] | ~~54.98~~ | ~~55.47~~ | ~~55.96~~ | ~~56.45~~ |
| | Wage after diversion | ~~494.80~~ | ~~499.21~~ | ~~503.62~~ | ~~508.03~~ |

Provides newsroom support as necessary

| | | 1st Year | 2nd Year |
|---|---|---|---|
| Two-Year Associates | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | ~~8%~~ Wage Diversion [TBD] | ~~55.86~~ | ~~61.25~~ |
| | Wage after diversion | ~~502.74~~ | ~~551.25~~ |

Performs various newsroom assignments as necessary

| | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| 3-Month Interns | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | ~~8%~~ Wage Diversion [TBD] | ~~50.18~~ | ~~51.65~~ | ~~53.12~~ |
| | Wage after diversion | ~~451.58~~ | ~~464.81~~ | ~~478.04~~ |

Performs various newsroom assignments as necessary

41. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

~~5~~2. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

63. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established in this Agreement are minimums only. The Company shall have the sole and exclusive right to compensate an employee above the minimum rates set forth in this Agreement.

74. Any new classification established by the Company shall be subject to effects bargaining between the Company and the Guild.

85. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ....................................................minimum salary differential
Copy messenger to reporter/editor ......................................minimum salary differential
News assistant, clerk to reporter/editor..........................minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

When no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week. (Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)

96. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

107. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is

either upgraded to a higher experience rating, ~~or~~ until the top minimum is reached, or until the merit increase is removed by the Company, in its discretion.

**COMPANY COUNTERPROPOSAL NO. 4**
**JUNE 12, 2017**

**ARTICLE IV**
**Hours**

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. A full-time employee's normal workweek shall be five days per week.

~~(a)~~2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

~~(b)~~3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

- i. The nature of the work is such that it can be compressed into 4 days.
- ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
- iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
- iv. No employee shall be assigned to work a four-day week without his/her consent.
- v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
- vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
- vii. A lunch or dinner break may be required as part of the work day.
- viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

~~(c)~~4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

~~2~~5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

~~3~~6. Subject to newsroom operation requirements, days off shall be consecutive days.

~~4~~7. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

68. Time spent by employees traveling to and from assignments shall be considered as part of the working day once the work day has begun.

79. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

810. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. The Company and the employee shall mutually agree to the period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week. The Company reserves the right to enlarge or shorten the workday or workweek depending on business need.

**COMPANY COUNTERPROPOSAL NO. 5**
**JUNE 12, 2017**

**ARTICLE V**
**Overtime**

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than 30 minutes at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

6. Columnists, Editorial Writers, and Investigative Reporters are exempt from overtime provisions.

7. The Company reserves the sole and exclusive right to determine whether to publish and distribute a printed product in whole or in part on any day or days in a workweek.

**COMPANY COUNTERPROPOSAL NO. 6**
**JUNE 12, 2017**

**ARTICLE VI**
**Part-time, Temporary Employees and Two-Year Associates**

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 40 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, other leaves of absences, and to meet newsroom operational requirements. Part-time employees shall not receive holiday pay or personal days.

3. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

**COMPANY COUNTERPROPOSAL NO. 7**
**JUNE 12, 2017**

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability

Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy in any way.

~~5~~4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

~~6~~5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

~~7~~6. All sick leave will be cancelled upon termination of employment, retirement or death of the employee.

~~8~~7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

~~9~~8. An employee cannot use sick leave or use sick leave benefits for any purpose other than illness or injury.

9. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

~~11~~10. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

~~12~~11. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.

**COMPANY COUNTERPROPOSAL NO. 8**
**JUNE 12, 2017**

**ARTICLE VIII**
**Security**

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future. The Company may discipline and discharge employees in its discretion. The Company may use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild ten (10) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may, in the Company's discretion, first be offered for a reduction in force after consultation with the Guild.

(2) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:

a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports

e. Content providers (photographers/videographers) in Visuals
f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art
h. Assigning editors in Local News
i. Assigning editors in Business
k. Assigning editors in Features & Editorial
k. Assigning editors in Sports
l. Assigning editors in Visuals
m. Assigning editors in Digital design, Web and Art
n. Assigning editors on universal desk
o. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group (o) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company is willing to provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date. (To be discussed).

9. The Company reserves the right to establish and offer, from time to time, termination incentives within a department and/or classification and/or classification within a department for employees who desire to voluntarily terminate their employment.

10. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;
ii.) absence from work due to a layoff for more than twelve (12) months
iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;
iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated.
v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated.
vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

11. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department in the Company's discretion. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

12. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by the Company.

(b) In the event of discharge for misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

13. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

14. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

15. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

16. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company's discretion.

17. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

18. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

**COMPANY COUNTERPROPOSAL NO. 9**
**JUNE 12, 2017**

**ARTICLE IX**
**Expenses**

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. DMV driving records must be submitted to the Company, upon request.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**COMPANY COUNTERPROPOSAL NO. 10**
**JUNE 12, 2017**

**ARTICLE XVI**
**Adjustment of Disputes**

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within ten (10) days of the events giving rise to the grievance in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within twenty (20) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. Each party may request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. The parties shall select an arbitrator as expeditiously as possible from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be

final and binding. All fees and expenses of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case. The arbitrator may hear and determine only one grievance at a time, unless the parties expressly agree otherwise in writing.

# GC EXHIBIT 7

NLRB-0001160

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 7

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 34

# UNION COUNTER PROPOSAL Number 1
# to COMPANY COUNTER PROPOSAL Number 1

## Sept. 1, 2017

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ~~October 15, 2014~~_______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph ~~12~~, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, ~~Seen Editor~~, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

In no event will the number of employees excluded from the Agreement be more than ~~30~~ 10 percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have ~~42~~ 14 employees excluded, provided that they qualify as management personnel.

Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the agreement.

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Exempt employees cannot do bargaining unit work as performed in the past nor do ~~and/or~~ similar work that may result from the introduction of new print, electronic or other products. ~~and as~~

~~operationally necessary.~~ ~~Performance of such exempt work will not displace bargaining unit employees.~~

D. The ~~Guild recognizes~~ parties agree that stringers will not ~~continue to~~ be utilized by the Post-Gazette. ~~to fulfill its obligation to report the news.~~

E. No one other than Post-Gazette newsroom managers can assign work to or direct Guild members. ~~according to the following guidelines:~~

~~1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.~~

~~2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.~~

~~3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective January 1, 2007, the maximum will be 15 percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.~~

~~4.~~ **F. Commercial vendors** ~~Community Journalism initiatives~~

Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives~~, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.~~

The company may ~~continue to~~ obtain content from commercial vendors for: ~~,including, but not limited to,~~ traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

~~The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.~~

~~The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.~~

It is understood that such work will be under the supervision of the Post-Gazette ~~and~~ through the bargaining unit and shall not ~~exempt editors and is not intended to~~ displace bargaining unit work.

# UNION COUNTER PROPOSAL Number 2
# to COMPANY COUNTER PROPOSAL Number 2

**Sept. 1, 2017**

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

## TA - AGREED BY BOTH - ARTICLE I
## Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.
2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.
3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.
4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.
5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, date of birth ~~and Social Security number~~.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.
7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

## TA - AGREED BY BOTH - ARTICLE II
## Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.
2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.
3. The checkoff assignment shall be made upon the following form:

# UNION COUNTER PROPOSAL Number 3
# to COMPANY COUNTER PROPOSAL Number 3

**Sept. 1, 2017**

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: PG PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.
Employee's Signature________________________________________
Date____________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

# ARTICLE III
## Classifications, Wages and Schedules of Minimums

- **Eliminate all wage diversions and pension diversions.**
- **Move Content Providers up to the Content Editors scale.**
- **Effective upon ratification, wages at all levels and classifications will increase seven (7) percent from the current minimum rates. Rates will increase an additional seven (7) percent in each subsequent year. Term of contract to be determined.**
- **Maintain all classifications, definitions and steps.**
- **Additional step increases at the 10-, 15-, 20- and 25-year levels to be negotiated.**

Employees shall be paid weekly not less than the following wages in these classifications ~~less a wage diversion of 10% of earnings to a maximum of $5,000 per calendar year. Effective April 1, 2016, such diversion shall be reduced to 8% and a maximum of $4,250 per calendar year. Effective January 1, 2017, the maximum diversion shall be $4,000 per calendar year:~~

| | ~~Effective Date~~ | ~~1st 6 Mo.~~ | ~~2nd 6 Mo.~~ | ~~2nd Year~~ | ~~3rd Year~~ | ~~4th Year~~ | ~~5th Year~~ |
|---|---|---|---|---|---|---|---|
| ~~Content Providers~~ | ~~wage~~ | ~~901.00~~ | ~~924.00~~ | ~~1058.00~~ | ~~1105.00~~ | ~~1135.00~~ | ~~1172.36~~ |
| | ~~2% pension~~ | ~~18.02~~ | ~~18.48~~ | ~~21.16~~ | ~~22.10~~ | ~~22.70~~ | ~~23.45~~ |
| | ~~Net wages~~ | ~~882.98~~ | ~~905.52~~ | ~~1036.84~~ | ~~1082.90~~ | ~~1112.30~~ | ~~1148.91~~ |
| | ~~10% Wage Diversion~~ | ~~88.30~~ | ~~90.55~~ | ~~103.68~~ | ~~108.29~~ | ~~111.23~~ | ~~114.89~~ |
| | ~~Wage after diversion~~ | ~~794.68~~ | ~~814.97~~ | ~~933.16~~ | ~~974.61~~ | ~~1001.07~~ | ~~1034.02~~ |

~~Provides original content for print and electronic publications and products.~~

| | ~~Effective Date~~ | ~~1st 6 Mo.~~ | ~~2nd 6 Mo.~~ | ~~2nd Year~~ | ~~3rd Year~~ | ~~4th Year~~ |
|---|---|---|---|---|---|---|
| ~~Content Editors/Produces~~ | ~~Wage~~ | ~~913.00~~ | ~~987.00~~ | ~~1097.00~~ | ~~1145.00~~ | ~~1186.96~~ |
| | ~~2% pension~~ | ~~18.26~~ | ~~19.74~~ | ~~21.94~~ | ~~22.90~~ | ~~23.74~~ |
| | ~~Net wages~~ | ~~894.74~~ | ~~967.26~~ | ~~1075.06~~ | ~~1122.10~~ | ~~1163.22~~ |
| | ~~10% Wage Diversion~~ | ~~89.47~~ | ~~96.73~~ | ~~107.51~~ | ~~112.21~~ | ~~116.32~~ |
| | ~~Wage after diversion~~ | ~~805.27~~ | ~~870.53~~ | ~~967.55~~ | ~~1009.89~~ | ~~1046.90~~ |

NLRB-0001169

~~Edits and produces original content for print and electronic publications, products, and slot.~~

| | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| ~~Assignment Editors~~ | ~~Wage~~ | ~~1125.00~~ | ~~1145.00~~ | ~~1203.68~~ |
| | ~~2% pension~~ | ~~22.50~~ | ~~22.90~~ | ~~24.07~~ |
| | ~~Net wages~~ | ~~1102.50~~ | ~~1122.10~~ | ~~1179.61~~ |
| | ~~10% Wage Diversion~~ | ~~110.25~~ | ~~112.21~~ | ~~117.96~~ |
| | ~~Wage after diversion~~ | ~~992.25~~ | ~~1009.89~~ | ~~1061.65~~ |

~~Assigns work to content providers and content editors/producers and edit and produce content as necessary.~~

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| ~~Librarian~~ | ~~wage~~ | ~~892.00~~ | ~~906.00~~ | ~~922.00~~ |
| | ~~2% pension~~ | ~~17.84~~ | ~~18.12~~ | ~~18.44~~ |
| | ~~Net wages~~ | ~~874.16~~ | ~~887.88~~ | ~~903.56~~ |
| | ~~10% Wage Diversion~~ | ~~87.42~~ | ~~88.79~~ | ~~90.36~~ |
| | ~~Wage after diversion~~ | ~~786.74~~ | ~~799.09~~ | ~~813.20~~ |

~~Provides newsroom, library and photo support as necessary.~~

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| ~~News Assistant~~ | ~~wage~~ | ~~747.00~~ | ~~767.00~~ | ~~787.00~~ |
| | ~~2% pension~~ | ~~14.94~~ | ~~15.34~~ | ~~15.74~~ |
| | ~~Net wages~~ | ~~732.06~~ | ~~751.66~~ | ~~771.26~~ |
| | ~~10% Wage Diversion~~ | ~~73.21~~ | ~~75.17~~ | ~~77.13~~ |
| | ~~Wage after diversion~~ | ~~658.85~~ | ~~676.49~~ | ~~694.13~~ |

~~Provides newsroom, library and photo support as necessary.~~

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Editorial Clerks | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| Administrative | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 10% Wage Diversion | 65.66 | 67.42 | 68.89 | 69.78 |
| | Wage after diversion | 590.94 | 606.82 | 620.05 | 627.98 |

Provides newsroom support as necessary

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Copy Messengers | wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | 10% Wage Diversion | 54.98 | 55.47 | 55.96 | 56.45 |
| | Wage after diversion | 494.80 | 499.21 | 503.62 | 508.03 |

Provides newsroom support as necessary

| | | 1st Year | 2nd Year |
|---|---|---|---|
| Two-Year Associates | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 10% Wage Diversion | 55.86 | 61.25 |
| | Wage after diversion | 502.74 | 551.25 |

Performs various newsroom assignments as necessary

| | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| 3-Month Interns | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 10% Wage Diversion | 50.18 | 51.65 | 53.12 |
| | Wage after diversion | 451.58 | 464.81 | 478.04 |

~~Performs various newsroom assignments as necessary~~

~~1. Employees shall receive a salary increase provided in the schedule of wage minimums or increases according to the following schedule of general increases, whichever is greater, but not both:~~

1. The above wage minimums and the general increase ~~need not~~ **shall** apply to salaries of those who are on ~~retirement or who are on~~ extended sick leave. ~~The pay increases shall go into effect upon the employee's return to work.~~

2. For the life of this Agreement there is to be no reduction in compensation of anyone covered by this Agreement except when the provisions of Article VIII, Paragraph 3, are implemented.

3. In the application of the foregoing schedules of minimums, experience shall include all regular employment in comparable work. In the event the Guild questions the job classification or experience status of any employee within forty-five (45) ~~**ninety (90)**~~ days from start of employment, adjustments **shall be made** retroactive ~~if any, will be made retroactive~~ to the start of employment. If such question is raised after forty-five (45) ~~**ninety (90)**~~ days from start of employment, adjustments, **shall be** ~~if any, will be~~ effective on the date that the Guild brought the question to the attention of the Company.

4. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

5. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only; individual merit shall be acknowledged by increases above the minimums.

6. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

7. (a) ~~Effective January 1, 1982,~~ **A**n employee temporarily transferred to a higher classification shall receive differential pay **at the higher rate.** ~~according to the following schedule:~~

~~Copy messenger to clerk .................................. minimum salary differential~~
~~Copy messenger to reporter/editor ...................... minimum salary differential~~
~~News assistant, clerk to reporter/editor ................. minimum salary differential~~

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

~~Effective upon ratification of this Contract.~~ **W**hen ~~no exempt newsroom manager is on duty and~~ **a** Guild member is assigned to be the ranking supervisor ~~on the premises~~ for at least ~~four~~ 3 ½ hours (one-half) of his shift, he will receive an additional ~~$30~~ $75 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) ~~Effective January 1, 2003,~~ The Harrisburg and Washington correspondents will receive a salary differential of ~~$20~~ [redacted] a week. ~~(Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)~~

8. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

9. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating or until the top minimum is reached.

10. ~~Effective January 1, 2003,~~ **Within 30 days of ratification of this agreement the following one-time service bonuses shall be paid:**

- ~~A one-time service bonus of $250~~ **$500 for all employees with 10 or more years of service.** ~~Thereafter, the bonus will be paid when an employee completes his/her 10th year of service. Effective January 1, 2004, A one-time service bonus of~~
- **An additional $1000 for all employees with 20 or more years of service.**
- **An additional $1500 for employees with 30 or more years of service.**
- **Thereafter, the bonuses will be paid when an employee completes his/her 10th/20th/30th years of service.** ~~As of Jan. 1, 2007, all service bonuses will be diverted to the Guild Pension Plan for the life of the current contract.~~

# UNION COUNTER PROPOSAL Number 4
# to COMPANY COUNTER PROPOSAL Number 4

**Sept. 1, 2017**

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

OLD contract language 1-5

ARTICLE IV
Hours

1. No ~~employee eligible for Guild membership~~ **bargaining unit employee** shall work more than eight (8) ~~seven (7)~~ hours per day within an nine (9) ~~eight (8)~~ consecutive hour period, nor more than five days per week with the following exceptions:

(a) With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten ~~8.75~~-hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 ~~35~~-hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

(b) ~~Additionally,~~ Full-time employees with at least two years of service shall, on a rotating basis, have the option of working a four-day week consisting of four 10 ~~8.75~~-hour days at ~~his~~ **their** request. ~~under the following conditions:~~

The nature of the work is such that it can be compressed into 4 days.

At least one weekend shift may be required as part of the work week except by mutual agreement.

**ii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).**

**iii. No employee shall be assigned to work a four-day week without his/her consent.**

**iv. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.**

~~ii. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.~~

**v. A lunch or dinner break may be required as part of the work day.**

~~iii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.~~

Put back in

(c) Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

2. A regular schedule of working hours shall be maintained for all employees. No less than ~~three~~ ~~six~~ 5 days' notice shall be given in advance of any change in an employee's working schedule~~, where possible~~. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday~~, where possible~~.

3. ~~Wherever possible,~~ Days off shall be consecutive days **unless the employee chooses otherwise.**

**4. No employee shall be required to work more than 5 consecutive days.**

**5.** It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

Holiday

**6.** A differential of ~~$3~~ ~~$10~~ $6 per shift will be paid to an employee who begins his shift on or after 2 p.m., **and/or for working on a weekend. Those working weekend shifts that begin after 2 p.m. shall receive a $20 per shift differential.** ~~As of Jan. 1, 2007, All night differentials will be diverted to the Guild Pension Plan for the life of the current contract.~~

This shall apply only so long as the employee is assigned to such shifts.

NLRB-0001175

7. ~~An~~ employees whose shift ~~starts~~ is between 11 p.m. and 6:30 a.m. shall receive a shift differential of $40.

8. No employee shall be required to work any swing shifts.

9. Time spent by employees traveling to and from assignments shall be considered as part of the working day.

10. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

11. By arrangement with the Company, employees who elect to reduce their work week to fewer than ~~40~~ 35 hours shall be considered flex-time employees. They shall designate a period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

NLRB-0001176

# UNION COUNTER PROPOSAL Number 5
# to COMPANY COUNTER PROPOSAL Number 5

**Sept. 1, 2017**

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

# ARTICLE V
## Overtime

1. Overtime shall be defined as work beyond [illegible] ~~**7 hours per day or**~~ 40 ~~**35**~~ hours in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. ~~Overtime~~ **Work** beyond 8 ~~**7 hours per day or 35**~~ 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. ~~By mutual agreement, which will not be unreasonably withheld, a~~**A**n employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee~~, by mutual agreement not to be unreasonably withheld,~~ may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work **or to work remotely** after his regular working day shall be paid for ~~the time worked, but not~~ **no** less than four hours **or time and one-half for all hours worked, whichever is greater.** ~~An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.~~

4. An employee who ~~called~~ **agrees** to work on his day off shall be compensated at the rate of time and one-half, but not less than a day's pay in addition to his regular weekly salary.

5. Overtime shall be reported in writing to the Company or its representative within ten days after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

NLRB-0001178

# UNION COUNTER PROPOSAL Number 6
# to COMPANY COUNTER PROPOSAL Number 6

**Sept. 1, 2017**

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

# ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 ~~35~~ hours per week cannot exceed ~~35~~ ~~15~~ 20 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of ~~40~~ 35 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave and other leaves of absences.

3. It shall be a policy of the Company to pay part-time employees who average individually less than 20 ~~17.5~~ hours per week not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 ~~17.5~~ hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. ~~Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration.~~ Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight (8) ~~four (4)~~ months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II III, V, VI, and XVI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight ~~four (4)~~ month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond ~~four (4)~~ ~~twelve (12)~~ 8 eight months shall receive **benefits on a proportionate basis.** ~~one week's vacation~~.

5. Part-time **and/or** ~~and, or~~ temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.

# UNION COUNTER PROPOSAL Number 7
# to COMPANY COUNTER PROPOSAL Number 7

## Sept. 1, 2017

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

# ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide ~~twelve (12)~~ ten (10) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company ~~can~~ may request that an employee furnish a doctor's certificate or other reasonable proof when absent for ~~six (6)~~ three (3) consecutive days or more.

2. An employee shall receive a normal week's salary for a period of his or her incapacitation. There shall be ~~no~~ holiday premium pay during the sick leave period.

3. Short-term disability

(a) Employees can accumulate the above **twelve** ~~eight~~ days per year during their employment to a maximum of **240** ~~90~~ days per year. Only unused days during the year will be carried over to the maximum of **240** ~~90~~ days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of **two (2)** ~~five (5)~~ days or longer. This benefit will begin on the **3rd** ~~6th~~ work day of disability. The **three** ~~five~~ days will constitute a waiting period. **All current employees having at least one year of service will be provided an initial short term disability bank of 120 days at full pay.** All employees ~~on the payroll on 1/1/07~~ **with less than one year of service will be provided an initial short-term disability bank of 12** ~~7~~ **days at full pay.** ~~per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days.~~ **Upon reaching one year of employment all employees shall receive a short-term disability bank of 120 days at full pay.**

**(b) Any of the 12 sick days remaining unused at the end of each year shall be added to the employee's short-term disability bank, up to a maximum of 240 days.**

(c) If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at **85** ~~60~~ percent of the employee's negotiated rate of pay for those employees with **at least one year** ~~two years~~ of service. ~~Those employees with less than two years service will be eligible for 13 weeks of additional sick leave. Details of this extended short-term disability plan are available from the Human Resources Director.~~

(d) An employee who exhausts his disability bank shall earn additional sick leave benefits according to the following schedule: For one year of uninterrupted employment – 20 percent of maximum short-term disability schedule; two years of uninterrupted employment – 40 percent of maximum short-term disability schedule; three years of uninterrupted employment – 60 percent of maximum short-term disability schedule; four years of uninterrupted employment – 80 percent of maximum short-term disability schedule; five years of uninterrupted employment – 100 percent of maximum short-term disability schedule.

The maximum regeneration under this program will be ~~70~~ **120** days. Unused individual sick days will continue to be accumulated into the bank until the **240** ~~90~~-day maximum is reached.

~~Sick pay and/or the short-term disability bank are not considered earned and will not be paid out upon termination of employment, including retirement.~~

**All earned and unused sick days placed in the short-term disability bank, to a maximum of 120 days, shall be paid out on the employee's separation from the Company, including retirement. Payment will be made at the employee's rate of pay at the time of separation.**

4. This program will become effective as of the date of ratification. ~~Benefit payments under the prior Guild sick leave plan will continue for those employees on sick leave as of the date of ratification.~~

5. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his

scheduled vacation begins shall have the right to reschedule his vacation.

~~6. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.~~

~~7. Sick leave payments shall terminate upon termination of employment or death of the employee.~~

~~8. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.~~

**6.** ~~9.~~ An employee cannot ~~accrue sick leave or~~ use sick leave benefits for any purpose other than illness or injury.

**7.** ~~10.~~ Employees claiming benefits under this Section shall, upon request, submit ~~to an examination by~~ a doctor's excuse. ~~or doctors designated and paid for by the Company.~~

~~11. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.~~

~~12. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.~~

An individuals STD

NLRB-0001183

# UNION COUNTER PROPOSAL Number 8
# to COMPANY COUNTER PROPOSAL Number 8

**Sept. 1, 2017**

## AGREEMENT BETWEEN
## PITTSBURGH POST-GAZETTE
## AND
## THE NEWSPAPER GUILD OF PITTSBURGH

ARTICLE VIII
Security

The company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence and assist the employee for satisfactory service in the future. The company shall use progressive discipline, which includes, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay and discharge.

1. There shall be no discharge as a result of putting this Agreement into effect.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force, which latter shall be construed as synonymous with discharges for economy.

3. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes. The Company's right to determine the size of the force is recognized and the right to reduce the force for economy (either permanently or temporarily) shall **also** ~~not~~ be subject to review by the Board of Arbitration.~~, provided, however, that in the event the Guild believes that reasons other than economy have entered into the designation of the person or persons to be laid off, it may appeal the particular case or cases to arbitration. Stringers and freelancers in no case will replace or displace bargaining unit employees.~~

4. A. Layoffs to reduce the force, as distinguished from dismissals for just and sufficient cause, shall not be made until the Company notifies the Guild ~~sixty (60)~~ ~~thirty (30)~~ 45 days in advance that such layoffs are necessary and that no reasonable alternative exists.

B. The Company shall notify the Guild of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), number of employees per work group, numerical order of layoffs within each work group, numerical order of overall layoffs, and the facts upon which the Company relies to establish the necessity pursuant to Section 4A above.

C. In the event such layoffs are necessary, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may first be offered for a reduction in force after consultation with the Guild.

**(2) Eliminate ~~thirty (30%) percent of the stringer budget and~~ all intern programs, temporary and probationary employees.**

(3) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in inverse seniority order in the affected work group. The employee to be laid off shall be the junior two year associate in the affected work group. If there is no two year associate in the affected work group, the first employee to be laid off shall be the junior two-year associate in the bargaining unit. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. Thereafter, layoffs shall be in inverse seniority order in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. The work group for purposes of layoff will be divided as follows:

NLRB-0001185

    I. Content providers in Local News and Business
II. Content providers in Features and Editorial
III. Content providers in Sports
IV. Content providers and Editors in Photography/Multimedia/Art
V. Content Editors and Assigning Editors
VI. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group VI above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

(5) In the event of recall, the recall shall be in reverse order of layoff. Such recall rights will last **24** ~~12~~ months from the date of the employee's layoff.

(6) The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

D. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

E. An employee laid off as a result of the provisions of this clause will continue to receive their health/life insurance benefits for a period of ~~twelve (12)~~ ~~three (3)~~ six (6) months under the same conditions that applied when he/she was on the payroll. Also, for an additional **six (6)** ~~three (3)~~ months, the Company shall pay fifty (50%) percent of whatever premium or health and life insurance benefits being paid for full time employees, for those laid off employees.

F. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twenty-four (24 months)

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(c)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position

within their bargaining unit within two years of their date of disability shall have their benefits and seniority terminated. Said two years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's two year time period shall commence anew;

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within three years of their date of disability **may** ~~shall~~ have their benefits and seniority terminated. Said three years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's three year time period shall commence anew;

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

5. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

6. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by mutual agreement between the Company and the Guild.

(b) In the event of discharge for gross misconduct, or in the case of misconduct after notice has been given said employee may be laid off immediately.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

7. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

8. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, **gender identity,** marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

9. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

10. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes shall be afforded the opportunity to transfer to other available positions.

11. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

12. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

# UNION COUNTER PROPOSAL Number 9
# to COMPANY COUNTER PROPOSAL Number 9

**Sept. 1, 2017**

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

ARTICLE IX
Expenses

~~1. If required, all reporters and photographers will use their personal cars in the service of the Company.~~

**1.** ~~2. For the term of this agreement,~~ The Company will reimburse for the business use of a **personal** vehicle by paying a **mileage allowance equal to the amount permitted under IRS regulations.**~~vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.~~

~~3. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used.~~

**2.** ~~4.~~ Necessary working equipment shall be provided for employees and paid for by the Company. ~~If approved by the Company, a~~ **A**n employee may use his personal equipment ~~to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose.~~ In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

**3.** ~~5.~~ Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs ~~up to a maximum of $15.00 per day,~~ after the employee pays the initial parking fee.

**4.** ~~6.~~ Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

**5.** ~~7.~~ Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis.

**6.** ~~8.~~ Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**7. The company shall provide all Guild members who use a cell phone for work purposes with cell phones, chargers and data plans.**

**8. The company shall reimburse all eligible Guild members up to ~~$100~~ $90 per month for gym memberships and other wellness/exercise programs.**

~~9. The company shall reimburse all eligible Guild members up to $100 per month for childcare.~~

ARTICLE X
INTERNSHIPS, TWO-YEAR ASSOCIATES

1. Unpaid academic internships will be limited to **ten (10)** ~~fourteen (14)~~ a **calendar** year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to ~~28~~ 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates ~~may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they~~ are excluded from the following classifications: **librarian**, news assistant, clerk, and messenger.

~~E. There will be no assignment restrictions~~

**E.**~~F.~~ ~~No~~ **V**acation bonuses will be paid by the Company to two-year associates.

# UNION COUNTER PROPOSAL Number 10 to COMPANY COUNTER PROPOSAL Number 10

**Sept. 1, 2017**

# AGREEMENT BETWEEN PITTSBURGH POST-GAZETTE AND THE NEWSPAPER GUILD OF PITTSBURGH

# ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance shall be defined as a dispute over an alleged violation of this agreement.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The parties shall determine who shall eliminate the first name by the flip of a coin.

6. Once a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be ~~considered granted.~~ automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The expense of the arbitration shall be shared equally by both parties. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding.

# GC EXHIBIT 8

NLRB-0001194

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 8

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 11

**COMPANY COUNTERPROPOSAL NO. 11**
**NOVEMBER 1, 2017**

## ARTICLE XII
### Holidays

1. The following holidays, or days observed as such, shall be granted to ~~all~~ full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. The Company shall designate the day the holiday is observed. ~~An~~ A full-time employee shall receive four (4) personal holidays after working 12 complete months. ~~Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday.~~ To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. ~~An~~ A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and ~~an~~ a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. ~~Effective January 1, 1981, an employee will receive 6-1/4 days' pay for the holiday week if he/she is scheduled to work the holiday and 4 other days during the holiday week.~~

~~3. In the week in which one or more of those holidays fall, all time worked beyond the remaining work days or work hours shall be paid for at the overtime rate.~~

~~4~~3. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

~~5. Personal days are based on the number of hours the part-time employee is regularly scheduled to work. For example, an employee who normally works three days a week will receive 60 percent of the personal holidays.~~

**COMPANY COUNTERPROPOSAL NO. 12**
**NOVEMBER 1, 2017**

## ARTICLE XIII
### Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, first consideration shall be given to ~~the employees in Guild jurisdiction~~ bargaining unit employees to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be up to 75 days as determined by the Company. The ~~which~~ time may be ~~lessened or~~ extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

**COMPANY COUNTERPROPOSAL NO. 13**
**NOVEMBER 1, 2017**

## ARTICLE XV
### Leaves of Absence

1. ~~By arrangement with t~~The Company, ~~employees~~ may ~~be~~ grant~~ed~~ employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. ~~If an employee is elected or appointed to any office of The NewsGuild/Communications Workers of America, or AFL-CIO, CLC or any office of a local of The NewsGuild, such employee shall, upon request, be given a leave of absence without pay, and shall be reinstated in the same position upon the expiration of such leave. The foregoing shall also apply to d~~Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewGuild may request leaves of absence to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3.~~(a)~~ Any employee who has had five continuous years in the employ of the Company without a leave of absence ~~shall~~ may be given ~~at the employee's request~~ a leave of absence by the Company, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

~~(b) An employee with at least 10 years of service shall be given, at his/her request, a leave of absence not to exceed three months, at half pay. Such leaves may be limited to two at any given time. An employee may exercise this right every five years. As of Jan. 1, 2007, such leaves will be suspended for the duration of the current contract and wage savings from such leaves will be diverted into the Guild Pension Plan.~~

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

**COMPANY COUNTERPROPOSAL NO. 14**
**NOVEMBER 1, 2017**

## ARTICLE XVIII
### Preferential Re-Employment

1. ~~When the Company makes discharges or layoffs other than for cause, such discharged or~~ In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the general type of work for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

~~2. Employees who have signed temporary replacement cards for employment because of enlistment or conscription of regular employees also shall be placed on the rehiring list when discharged for reasons other than cause, upon the return of the regular employee from war service, or when any temporary employee enters the armed services.~~

~~3~~2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

~~4~~3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

**COMPANY COUNTERPROPOSAL NO. 15**
**NOVEMBER 1, 2017**

## ARTICLE XIX
## Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance independent contractor photographers may be retained for photo and video assignments ~~to supplement existing coverage. Furthermore, it is understood that the use of free-lancers is not intended to replace bargaining unit jobs or work~~ .

~~5. Exempt employees and freelancers can be used in SEEN and similar publications. The use of exempt and freelancers is not intended to displace bargaining unit jobs or work.~~

~~6~~5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

~~7~~6. ~~No employee shall be required to take over the duties of any employee in another department of the Pittsburgh Post-Gazette in the event of a labor dispute in such department, or by assuming new duties to assist in the operation of a department where employees are on strike. No strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lock out its employees during the term of this agreement.~~ The Guild, its representatives and the employees covered by this Agreement agree, individually and collectively, that none of them will call, authorize, encourage (by action or inaction) or engage in any slowdown, strikes of any kind, sympathy strike, bannering, boycotts against the Company, boycotts against advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations or the production or sale of its products or services during the term of this Agreement.

In the event of any strike or any other proscribed activity not authorized, ratified or condoned by the Guild, the Guild agrees it will make every good faith effort to end such activity.

The Company agrees that it will not lockout any employees during the term of this Agreement.

The Company shall have direct recourse to the National Labor Relations Board or the courts for a violation of this Article.

~~7. The Company agrees not to have or enter into any agreement with any other Company binding such other Company not to offer or give employment to employees of the Company.~~

~~9~~7. The Guild shall be notified within 24 hours of all resignations tendered. ~~Resignations shall be subject to grievance procedure upon notice from the Guild within four days after receipt of notice from the Company.~~

~~10~~8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

~~11~~9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

~~12~~10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

~~13~~11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

~~14~~12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

~~15~~13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

~~16~~14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

~~17~~15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

~~18~~16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

~~19~~17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

~~20~~18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director. The Company has the right to change in any way its Drug and Alcohol Policy from time to time after consultation with the Union.

~~21~~19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director. The Company reserves the right to change in any way its transitional duty program from time to time after consultation with the Union.

~~22~~20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. Content providers who receive a buyout under this Agreement may be contracted to perform services as stringers or freelancers

# GC EXHIBIT 9

NLRB-0001205

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 9

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 8

# UNION COUNTER PROPOSAL Number 9 to COMPANY COUNTER PROPOSAL Number 9

## November 1, 2017

# AGREEMENT BETWEEN PITTSBURGH POST-GAZETTE AND THE NEWSPAPER GUILD OF PITTSBURGH

ARTICLE IX
Expenses

~~1. If required, all reporters and photographers will use their personal cars in the service of the Company.~~

**1.** ~~2. For the term of this agreement,~~ The Company will reimburse for the business use of a **personal** vehicle by paying a **mileage allowance equal to the amount permitted under IRS regulations.**~~vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.~~

2. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used.

**3.** ~~4.~~ Necessary working equipment shall be provided for employees and paid for by the Company. ~~If approved by the Company, a~~ **A**n employee may use his personal equipment ~~to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement.~~ It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. ~~The Company shall provide a list of who is using his personal equipment and for what purpose.~~ In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

**4.** ~~5.~~ Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs ~~up to a maximum of $15.00 per day,~~ after the employee pays the initial parking fee.

**5.** ~~6.~~ Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

**6.** ~~7.~~ Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis.

**7.** ~~8.~~ Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**8. The company shall provide all Guild members who use a cell phone for work purposes with cell phones, chargers and data plans.**

**9. The company shall reimburse all eligible Guild members up to ~~$100~~ $90 per month for gym memberships and other wellness/exercise programs.**

~~9. The company shall reimburse all eligible Guild members up to $100 per month for childcare.~~

# UNION COUNTER PROPOSAL Number 10
# to COMPANY COUNTER PROPOSAL Number 10

## November 1, 2017

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

## ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance shall be defined as a dispute over an alleged violation of this agreement.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The parties shall determine who shall eliminate the first name by the flip of a coin.

6. Once a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be ~~considered granted.~~ automatically moved to the next step.

7.  The parties may mutually agree to extend the time limits set forth above.  The expense of the arbitration shall be shared equally by both parties.  The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement.  Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding.

# GC EXHIBIT 10

NLRB-0001213

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 10

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

# Pittsburgh Post-Gazette

November 15, 2017

Joe Pass
Jubelirer, Pass & Intrieri, P.C.
219 Fort Pitt Boulevard, 1st Floor
Pittsburgh, PA 15222-1576

Re: Western Pennsylvania Teamsters and Employers Welfare Fund Insurance

Dear Mr. Pass:

Thank you for your recent letter dated November 6, 2017. As you know, the Company has chosen to bargain individually with each of the Post-Gazette Unions you copied in your letter. The Company does not recognize any unity council as the bargaining representative of the bargaining unit employee you represent or for any of our employees. The Company is not participating in any coordinated bargaining on any subject. I will assume for purposes of this letter that you represent each union copied in your letter separately. If I am mistaken, please let me know.

Attached is a letter the Company recently received from the Western Pennsylvania Teamsters and Employers Welfare Fund ("Welfare Fund"). In that letter, the Welfare Fund is reserving the right to continue to provide health insurance coverage under a reduced benefit structure if the Company does not pay the requested 5% increased contribution rate under the Welfare Fund's Plan 906, beginning January, 2018. Unfortunately, under the expired collective bargaining agreements, any proposed increase by the Welfare Fund must be based upon the plan design effective January 1, 2015, unless the parties mutually agree otherwise.

We respectfully disagree with your assertion that the Company must pay for any increases assessed by the Welfare Fund for 2018 and thereafter. The Company does not believe the expired collective bargaining agreements for the Unions you represent address Welfare Fund contributions for 2018 or thereafter.

We recognize our obligations under law to continue to pay the current contribution rate, which is the status quo. However, because of the positions taken by the Welfare Fund, we again request to meet to address these developments. Time is of the essence because the Welfare Fund will impact our employees' insurance coverage in 2018.

Please contact me to arrange a date and time to meet separately with each Union.

Sincerely,

Linda A. Guest

Linda A. Guest
Senior Human Resources Manager

Cc: Joe Molinero
Steve Stasenko
Chris Lang
Don McConnell
Mike Fuoco
Dan Wasser

# GC EXHIBIT 11

NLRB-0001216

| **Case No.** | **Official Exhibit No.** |
| --- | --- |
| 06-CA-248017 | GC 11 |
| **Dispostion:** | **Identified** X |
| **Rejected**_____ | **Received** X |

**In the Matter of:**
PITTSBURGH POST-GAZETTE

| **Date:** | **Witness:** | **Reporter:** |
| --- | --- | --- |
| 9-19-22 | | BW |

**No. of Pages:** 18

# UNION COUNTER PROPOSAL Number 11 to COMPANY COUNTER PROPOSAL Number 11

## November 28, 2017

# AGREEMENT BETWEEN PITTSBURGH POST-GAZETTE AND THE NEWSPAPER GUILD OF PITTSBURGH

ARTICLE XII
Holidays

1. The following holidays, or days observed as such, shall be granted to all employees as provided in this Article: New Year's Day, ~~Martin Luther King Day~~, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. An employee shall receive ~~four (4)~~ **(5)** personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a ~~fifth~~ **sixth** personal holiday. To claim a personal holiday, an employee must give at least ~~three (3)~~ **one (1)** days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. ~~An employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and an employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, a~~**A**n employee ~~will~~ **shall** receive 6-~~1/4~~**1/2** days' pay for the holiday week if he/she is scheduled to work the holiday and 4 other days during the holiday week. **Additionally, employees assigned to work at least half of their shift after 8 p.m. on Christmas Eve and/or News Year's Eve, shall receive holiday pay.**

3. In the week in which one or more of those holidays fall, all time worked beyond the remaining work days or work hours shall be paid for at the overtime rate.

4. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

5. Personal days are based on the number of hours the part-time employee is regularly scheduled to work. For example, an employee who normally works three days a week will receive 60 percent of the personal holidays.

# UNION COUNTER PROPOSAL Number 12 to COMPANY COUNTER PROPOSAL Number 12

## November 28, 2017

# AGREEMENT BETWEEN PITTSBURGH POST-GAZETTE AND THE NEWSPAPER GUILD OF PITTSBURGH

ARTICLE XIII
Advancement, Promotion and Transfer

1. The Company shall immediately post notice of ~~such~~ **any** vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction.~~ to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned.~~ **On the first day after the application period ends the Guild shall be made aware of anyone seeking the position. If the employer does not select the bargaining unit employee(s) they must notify the employee and the union setting forth their reasons for the rejection. Any rejection must not be for arbitrary or capricious reasons and shall be subject to the grievance procedure. If the job is not filled as a result of the above, the employer shall be free to fill the vacancy from the outside.**

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be **no less than 30 nor more than** 75 days, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher, or be given the option of accepting his severance pay.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above, excepting that he shall not have the option of accepting his severance pay.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. The exempt employee in this role ~~will not~~ **shall** count toward the **5%** ~~30%~~ limitation as established elsewhere in the contract.

9. Management shall not have the right to transfer employees from one newsroom department to another over their objection. for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial,

Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the company and the Guild.

# UNION COUNTER PROPOSAL Number 13 to COMPANY COUNTER PROPOSAL Number 13

## November 28, 2017

# AGREEMENT BETWEEN PITTSBURGH POST-GAZETTE AND THE NEWSPAPER GUILD OF PITTSBURGH

ARTICLE XV
Leaves of Absence

1. By arrangement with the Company, employees may be granted leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time.

2. If an employee is elected or appointed to any office of The NewsGuild/Communications Workers of America, or AFL-CIO, CLC or any office of a local of The NewsGuild, such employee shall, upon request, be given a leave of absence without pay, and shall be reinstated in the same position upon the expiration of such leave. The foregoing shall also apply to delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild. ~~The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.~~

3.(a) Any employee who has had five continuous years in the employ of the Company without a leave of absence shall be given at the employee's request a leave of absence not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

(b) An employee with at least 10 years of service shall be given, at his/her request, a leave of absence not to exceed ~~three~~ **six** months, at half pay. Such leaves may be limited to two at any given time. An employee may exercise this right every five years. ~~As of Jan. 1, 2007, such leaves will be suspended for the duration of the current contract and wage savings from such leaves will be diverted into the Guild Pension Plan.~~

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. ~~(a)~~ Upon request, ~~unpaid~~ maternity, paternity or adoptive parent leave of not more than ~~8~~ **9** months shall be granted **at full pay.**
~~(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.~~
~~(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.~~

~~8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.~~

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The employee shall have the right to elect whether they want to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

# UNION COUNTER PROPOSAL Number 14
# to COMPANY COUNTER PROPOSAL Number 14

## November 28, 2017

# AGREEMENT BETWEEN
# PITTSBURGH POST-GAZETTE
# AND
# THE NEWSPAPER GUILD OF PITTSBURGH

ARTICLE XVIII
Preferential Re-Employment

1. ~~When the Company makes discharges or layoffs other than for cause, such discharged or~~ **In the event of a layoff** laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(6)) unless same is exhausted with respect to the general type of work for which an additional employee is desired.

2. ~~Employees who have signed temporary replacement cards for employment because of enlistment or conscription of regular employees also shall be placed on the rehiring list when discharged for reasons other than cause, upon the return of the regular employee from war~~ **~~military~~** ~~service, or when any temporary employee enters the armed services.~~

3. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

4. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

# UNION COUNTER PROPOSAL Number 15 to COMPANY COUNTER PROPOSAL Number 15

## November 28, 2017

# AGREEMENT BETWEEN PITTSBURGH POST-GAZETTE AND THE NEWSPAPER GUILD OF PITTSBURGH

## ARTICLE XIX
## Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline, **images, likenesses** or other identifying information shall not be used over his protest.

3. Employees may be assigned to use multimedia equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

~~4. Free-lance photographers may be retained for photo and video assignments to supplement existing coverage. Furthermore, it is understood that the use of free-lancers is not intended to replace bargaining unit jobs or work.~~

~~5. Exempt employees and freelancers can be used in SEEN and similar publications. The use of exempt and freelancers is not intended to displace bargaining unit jobs or work.~~

**4.** ~~6.~~ Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

**5.** ~~7.~~ No employee shall be required to take over the duties of any employee in another department of the Pittsburgh Post-Gazette in the event of a labor dispute in such department, or by assuming new duties to assist in the operation of a department where employees are on strike. No strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lockout its employees during the term of this agreement.

**6.** ~~8.~~ The Company agrees not to have or enter into any agreement with any other Company binding such other Company not to offer or give employment to employees of the Company.

**7.** ~~9.~~ The Guild shall be notified within 24 hours of all resignations tendered. Resignations shall be subject to grievance procedure upon notice from the Guild within four days after receipt of notice from the Company.

**8.** ~~10.~~ For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

**9.** ~~11.~~ Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

~~(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.~~

**(A)** Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest. ~~as determined by the Company.~~

**(B)** Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.

~~(C) The Company shall notify the Guild of its decision in these matters.~~

**(C)** No Company equipment will be used for outside activities.

~~There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.~~

(Code of ethics is reprinted in the back of the contract).

**10.** ~~12.~~ In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

**11.** ~~13.~~ An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

**12.** ~~14.~~ An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

**13.** ~~15.~~ The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, date of birth~~, and Social Security number~~.
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting

new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

**14.** ~~16.~~ The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

**15.** ~~17.~~ The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

**16.** ~~18.~~ A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

17. ~~19.~~ Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

18. ~~20.~~ The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

19. ~~21.~~ The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director.

20. ~~22.~~ The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

**21. Upon request, the Company shall provide standing desks and gel mats to Guild members.**

**22. The Company shall provide the Guild with notification at least 120 days prior to moving from its current location to a different facility. The Company shall meet with Guild leaders to discuss the move.**

**23. The Company will provide eligible Guild members with $100 a month for tuition reimbursement.**

**24. The Company shall provide the following bonuses for recognition in journalism contests, whether or not the contest provides a monetary award:**

- **$25 for regional contests**
- **$50 for state contests**
- **$75 for national contests**

**25. All Guild members shall be given an opportunity to participate in professional development activities (such as seminars, conferences etc.) at the Company's expense.**

**26. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.**

# GC EXHIBIT 12

NLRB-0001234

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 12

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 53

January 4, 2018

# COMPANY COUNTERPROPOSAL NO. 16

## AGREEMENT BETWEEN

## PITTSBURGH POST-GAZETTE

## AND

## THE NEWSPAPER GUILD OF PITTSBURGH

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Guild Shop | 3 |
| II. | Checkoff | 4 |
| III. | Classifications, Wages and Schedules of Minimums | 6 |
| IV. | Hours | 10 |
| V. | Overtime | 12 |
| VI. | Part-time, Temporary Employees and Two-Year Associates | 13 |
| VII. | Sick Leave | 14 |
| VIII. | Security | 15 |
| IX. | Expenses | 19 |
| X. | Internships, Two-Year Associates | 20 |
| XI. | Vacations | 21 |
| XII. | Holidays | 23 |
| XIII. | Advancement, Promotion and Transfer | 24 |
| XIV. | Severance Pay | 26 |
| XV. | Leaves of Absence | 27 |
| XVI. | Adjustment of Disputes | 29 |
| XVII. | Military Service | 31 |
| XVIII. | Preferential Re-Employment | 32 |
| XIX. | Miscellaneous | 33 |
| XX. | Insurance, Health and Welfare, Benefits | 37 |
| XXI. | Privilege Against Disclosure | 40 |

**TABLE OF CONTENTS (Continued)**

**Page**

XXII. Management Rights ....................................................41

XXIII. Term and Renewal ....................................................42

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ____________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, ~~Seen Editor~~, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

No person under Guild jurisdiction will be arbitrarily named as a Manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D. The parties recognize the following exceptions to the Guild's jurisdiction set forth in Paragraph C:

1. Supervisors and managerial employees may perform bargaining unit work.

2. Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

3. The Company may subcontract work.

4. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed 40 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

5. Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

   The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

   The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

   It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

## ARTICLE I
## Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

## ARTICLE II
## Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature______________________________________

Date____________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 8% of earnings to a maximum of $4,000 per calendar year.

| Content Providers | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net Wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 8% Wage Diversion [TBD] | ~~88.30~~ | ~~90.55~~ | ~~103.68~~ | ~~108.29~~ | ~~111.23~~ | ~~114.89~~ |
| | Wage after diversion | ~~794.68~~ | ~~814.97~~ | ~~933.16~~ | ~~974.61~~ | ~~1001.07~~ | ~~1034.02~~ |

Provides original content for print and electronic publications and products.

| Content Editors/Producers | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 8% Wage Diversion [TBD] | ~~89.47~~ | ~~96.73~~ | ~~107.51~~ | ~~112.21~~ | ~~116.32~~ |
| | Wage after diversion | ~~805.27~~ | ~~870.53~~ | ~~967.55~~ | ~~1009.89~~ | ~~1046.90~~ |

Edits and produces original content for print and electronic publications, products, and slot.

| Assignment Editors | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 8% Wage Diversion [TBD] | ~~110.25~~ | ~~112.21~~ | ~~117.96~~ |
| | Wage after diversion | ~~992.25~~ | ~~1009.89~~ | ~~1061.65~~ |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| Librarian | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| | Wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | 8% Wage Diversion [TBD] | ~~87.42~~ | ~~88.79~~ | ~~90.36~~ |
| | Wage after diversion | ~~786.74~~ | ~~799.09~~ | ~~813.20~~ |

Provides newsroom, library and photo support as necessary.

| News Assistant | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| | Wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | 8% Wage Diversion [TBD] | ~~73.21~~ | ~~75.17~~ | ~~77.13~~ |
| | Wage after diversion | ~~658.85~~ | ~~676.49~~ | ~~694.13~~ |

Provides newsroom, library and photo support as necessary.

| Editorial Clerks Administrative | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 8% Wage Diversion [TBD] | ~~65.66~~ | ~~67.42~~ | ~~68.89~~ | ~~69.78~~ |
| | Wage after diversion | ~~590.94~~ | ~~606.82~~ | ~~620.05~~ | ~~627.98~~ |

Provides newsroom support as necessary

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Copy Messengers | | | | | |
| | Wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | 8% Wage Diversion [TBD] | ~~54.98~~ | ~~55.47~~ | ~~55.96~~ | ~~56.45~~ |
| | Wage after diversion | ~~494.80~~ | ~~499.21~~ | ~~503.62~~ | ~~508.03~~ |

Provides newsroom support as necessary

| | | 1st Year | 2nd Year |
|---|---|---|---|
| Two-Year Associates | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 8% Wage Diversion [TBD] | ~~55.86~~ | ~~61.25~~ |
| | Wage after diversion | ~~502.74~~ | ~~551.25~~ |

Performs various newsroom assignments as necessary

| | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| 3-Month Interns | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 8% Wage Diversion [TBD] | ~~50.18~~ | ~~51.65~~ | ~~53.12~~ |
| | Wage after diversion | ~~451.58~~ | ~~464.81~~ | ~~478.04~~ |

Performs various newsroom assignments as necessary

41. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

~~5~~2. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

~~6~~3. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums.

~~7~~4. Any new classification established by the Company shall be subject to effects bargaining between the Company and the Guild.

~~8~~5. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ....................................................minimum salary differential
Copy messenger to reporter/editor ......................................minimum salary differential
News assistant, clerk to reporter/editor.........................minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

When no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week. (Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)

~~9~~6. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

~~10~~7. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, ~~or~~ until the top minimum is reached, or until the merit increase is removed by the Company, in its discretion.

# ARTICLE IV
## Hours

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

~~(a)~~2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

~~(b)~~3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

- i. The nature of the work is such that it can be compressed into 4 days.
- ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
- iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
- iv. No employee shall be assigned to work a four-day week without his/her consent.
- v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
- vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
- vii. A lunch or dinner break may be required as part of the work day.
- viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

~~(c)~~4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

~~2~~5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

~~3~~6. Subject to newsroom operation requirements, whenever possible, days off shall be consecutive days.

~~4~~7. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

68. Time spent by employees traveling to and from assignments shall be considered as part of the working day once the work day has begun.

79. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

810. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. They shall designate a period not to exceed twelve (12) months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week. The Company reserves the right to enlarge or shorten the workday or workweek depending on business need.

## ARTICLE V
## Overtime

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than 30 minutes at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

6. Columnists, Editorial Writers, and Investigative Reporters are exempt from overtime provisions.

7. The Company reserves the sole and exclusive right to determine whether to publish and distribute a printed product in whole or in part on any day or days in a workweek.

## ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 15 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, other leaves of absences, and to meet newsroom operational requirements. Part-time employees shall not receive holiday pay or personal days.

3. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability -- Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company.

~~5~~4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

~~6~~5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

~~7~~6. Sick leave payments shall terminate upon termination of employment, retirement or death of the employee.

~~8~~7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

~~9~~8. An employee cannot use sick leave or use sick leave benefits for any purpose other than illness or injury.

~~11~~9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

~~12~~10. Company agrees to notify the Guild when an individual's STD is reduced or discontinued. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

## ARTICLE VIII
### Security

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future. ~~The Company may discipline and discharge employees in its discretion.~~ The Company may use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild ten (10) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may, in the Company's discretion, first be offered for a reduction in force after consultation with the Guild.

(2) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:

a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports
e. Content providers (photographers/videographers) in Visuals
f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art

h. Assigning editors in Local News
i. Assigning editors in Business
k. Assigning editors in Features & Editorial
k. Assigning editors in Sports
l. Assigning editors in Visuals
m. Assigning editors in Digital design, Web and Art
n. Assigning editors on universal desk
o. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group (o) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company is willing to provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date. (To be discussed.

9. The Company reserves the right to establish and offer, from time to time, termination incentives within a department and/or classification and/or classification within a department for employees who desire to voluntarily terminate their employment.

10. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;
ii.) absence from work due to a layoff for more than twelve (12) months
iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;
iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated.
v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within 18 months from the start of their absence may have their benefits and seniority terminated.
vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

11. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

12. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by the Company.

(b) In the event of discharge for misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

13. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

14. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

15. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

16. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company's discretion.

17. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

18. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

# ARTICLE IX
## Expenses

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. ~~The Company shall provide a list of who is using his personal equipment and for what purpose.~~ In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. DMV driving records must be submitted to the Company, upon request.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

## ARTICLE X
### Internships, Two-Year Associates

1. Unpaid academic internships will be limited to fourteen (14) a year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they are excluded from the following classifications: news assistant, clerk, and messenger.

E. There will be no assignment restrictions

## ARTICLE XI
### Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service; and four (4) weeks for eight (8) continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

## ARTICLE XII
## Holidays

1. The following holidays, or days observed as such, shall be granted to full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. The Company shall designate the day the holiday is observed. A full-time employee shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, a full-time employee will receive 6-1/4 days' pay for the holiday week if he/she works the holiday and 4 other days during the holiday week.

43. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

**ARTICLE XIII**
**Advancement, Promotion and Transfer**

1. When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be not less than 30, nor more than 75 days as determined by the Company, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating

and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher~~, or be given the option of accepting his severance pay~~.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above~~, excepting that he shall not have the option of accepting his severance pay~~.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. ~~The exempt employee in this role will not count toward the 30% limitation as established elsewhere in the contract.~~

9. Management shall have the right to transfer employees from one newsroom department to another for up to ~~one year~~ eighteen (18) months to meet the needs of the office. At the end of ~~one year~~ eighteen (18) months, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the Company and the Guild.

10. Notwithstanding anything to the contrary in this Agreement, employees in one newsroom department may be assigned to do work ordinarily done by employees in another newsroom department as part of their regular duties.

## ARTICLE XIV
## Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of ~~52~~ 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
### Leaves of Absence

1. The Company may grant employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild shall, upon request, be given a leave of absence without pay to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3. Any employee who has had five continuous years in the employ of the Company without a leave of absence may be given a leave of absence by the Company, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
   (b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
   (c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The ~~parties agree~~ Guild agrees to comply with the Company's Family and Medical Leave Act ~~of 1993~~ policies as amended from time to time on the same basis as nonrepresented employees of the Company.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. Each party may request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. The parties shall select an arbitrator as expeditiously as possible from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding. All fees and expenses of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case. The arbitrator may hear and determine

only one grievance at a time, unless the parties expressly agree otherwise in writing that the grievances are related.

**ARTICLE XVII**
**Military Service**

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the general type of work for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

32. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

43. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
## Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance independent contractor photographers may be retained for photo and video assignments.

~~6~~5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

~~7~~6. The Guild, its representatives and the employees covered by this Agreement agree, individually and collectively, that none of them will call, authorize, encourage (by action or inaction) or engage in any slowdown, strikes of any kind, sympathy strike, bannering, boycotts against the Company, boycotts against advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations or the production or sale of its products or services during the term of this Agreement.

In the event of any strike or any other proscribed activity not authorized, ratified or condoned by the Guild, the Guild agrees it will make every good faith effort to end such activity.

The Company agrees that it will not lockout any employees during the term of this Agreement.

The Company shall have direct recourse to the National Labor Relations Board or the courts for a violation of this Article.

~~9~~7. The Guild shall be notified within 24 hours of all resignations tendered.

~~10~~8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

~~11~~9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

~~12~~10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

~~13~~11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

~~14~~12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

~~15~~13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.

(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

~~16~~14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

~~17~~15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

~~18~~16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

~~19~~17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

~~20~~18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the

Human Resources Director. The Company has the right to change in any way its Drug and Alcohol Policy from time to time after consultation with the Union.

~~21~~19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director. The Company reserves the right to change in any way its transitional duty program from time to time after consultation with the Union.

~~22~~20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. Content providers who receive a buyout under this Agreement may be contracted to perform services as stringers or freelancers.

25. The Company may use ADP or any other payroll services firm. Employees will be paid weekly, bi-weekly or bi-monthly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.

## ARTICLE XX
### Insurance, Health and Welfare, Pensions

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding.

~~A. Retiree healthcare~~ [To be discussed]

~~1~~2. The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.

~~2~~3. Future Retiree Medical and Life Benefits - Any and all retiree medical benefits ~~will be~~ were terminated as of ~~the effective date of the agreement~~ October 14, 2014 for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:

(a) Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.

(b) For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.

~~3~~4. Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.

~~4~~5. Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees ("Retiree Unit" – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 ("Single")/$25,000 ("Other than Single"); or

(b) a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges;

as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.

~~5~~6. Medicare Eligible Retirees – All current Medicare Retirees ("Retiree Unit" as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.

(i) Any current-Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").

(ii) Any current-Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):

MODIFIED "A" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $153.90 for retiree and spouse |

or;

(b) A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:

MODIFIED "B" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $119.70 for retiree and spouse |

~~6~~7. Other Conditions Related To These Programs

(a) A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree

(b) A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree

(c) "Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement

(d) The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.

(e) In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits from the Company.

(f) If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.

(g) Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.

(h) If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.

(i) Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to make the one-time payment. The Company reserves the right to implement such one-time payments in subgroups or tiers as the Company deems appropriate.

(j) The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.

(k) Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.

8. Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth in Exhibit I, according to the parameters set out in the Plan Document. The Company has the right to make changes to the 401(k) Plan from time to time so long as the benefits provided in Exhibit I are not reduced.

9. Frozen Pension Plan – [To be discussed].

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

# ARTICLE XXII
## Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work ~~in accordance with the provisions of this Agreement~~; to establish new jobs and abolish or change existing jobs; to determine and redetermine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine ~~reasonable standards of production~~ work and quality standards; ~~to issue, amend and revise reasonable rules and policies in accordance with applicable law;~~ to cease, restructure or outsource any department, operation or service of the Company in whole or in part; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce, change or discontinue ~~new or improved~~ research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine and redetermine the number, location and operation of departments, divisions and all other units of the Company; to install security cameras for the safety of employees and property; to establish or continue policies, practices and procedures for the conduct of the business and, from time to time, to change or abolish such policies, practices or procedures; to determine the number of hours per day or week that operations shall be carried on; to establish and change work schedules, assignments and break periods; to determine the fact of lack of work; to make, change, discontinue and enforce safety rules and rules governing the conduct of employees; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement. The Management Rights article shall survive and continue in effect after the expiration date of this Agreement.

## ARTICLE XXIII
## Term and Renewal

1. This Agreement shall commence on ________________ and expire on ________________.

2. This Agreement shall be effective upon its execution and shall remain in full force and effect through ______________. Written notice of a desire to terminate this Agreement must be delivered by the one party to the other not more than one hundred fifty (150) days nor less than sixty (60) days prior to ______________.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ____________________________________ Date: ____________________
Michael A Fuoco

By: ____________________________________ Date: ____________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ________________________________ Date: ____________________
Stephen B. Spolar, Vice President of Human Resources

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block
Publisher and Editor-in-Chief

**Memorandum of Understanding**

The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid $50 for off-shift appearances.

# MEMORANDUM OF UNDERSTANDING
# PG SPEAKERS' BUREAU POLICY

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at not less than $25. Appearances scheduled during the staff member's non-working hours will be compensated at not less than $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to the appropriate Company representative, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

Exhibit 1
GUILD EMPLOYEES 401(K) PLAN

The PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:

(a) The PG will make a matching contribution ("PG Matching Contribution") to the PG Publishing Company 401(K) Plan (the "Plan") equal to 50% of the first $40 per week deferred by any Eligible Full Time Employee.

(b) The maximum amount of PG Matching Contribution will be $20 per week or the pro-rated equivalent for less than Eligible Full Time Employees.

(c) The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(d) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(e) The PG Matching Contribution will be subject to a vesting schedule as follows:

(i) Less than 3 years of service – 0% Vested

(ii) At least 3 years of service – 100% Vested

(iii) Vesting Service is counted from original hire date

(f) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(g) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

(h) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.

(i) All new employees will be automatically placed into the 401K plan with the ability to opt out.

# GC EXHIBIT 13

NLRB-0001287

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 13

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

| **Date:** | **Witness:** | **Reporter:** |
|---|---|---|
| 9-19-22 | SILVER | BW |

**No. of Pages:** 53

# UNION COUNTER PROPOSAL

## February 9, 2018

NLRB-0001289

AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ~~October 15, 2014~~______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph ~~12~~, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, ~~Seen Editor~~, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

In no event will the number of employees excluded from the Agreement be more than ~~30~~ **20** percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have ~~42~~ **28** employees excluded, provided that they qualify as management personnel.

TA **Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the agreement.)**

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Exempt employees **can** do bargaining unit work **in breaking news situations only if a Guild member in the same classification in the work required is not available**. ~~as performed in the past~~

~~and/or similar work that may result from the introduction of new print, electronic or other products. and as operationally necessary.~~ ~~Performance of such exempt work will not displace bargaining unit employees.~~

D. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligations to report the news according to the following guidelines:

1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.

2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.

3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective ~~January 1, 2007~~ **upon ratification**, the maximum will be ~~15~~ **7.5** percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment **to be distributed equally to all Guild members.** ~~into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.~~

~~4.~~ **E. Commercial vendors** ~~Community Journalism initiatives~~

**Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives.**~~, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.~~

The company may ~~continue to~~ obtain content from commercial vendors **for:** ~~,including, but not limited to,~~ traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics, **only to the extent currently used but in no event shall the use of such vendors displace any bargaining unit employees**.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette ~~and~~ through the bargaining unit and shall not ~~exempt editors and is not intended to~~ displace bargaining unit work.

ARTICLE I
Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the

date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, date of birth~~ and Social Security number~~.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

## ARTICLE II
## Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

- **Eliminate all wage diversions and pension diversions.**
- **Move Content Providers up to the Content Editors scale.**
- **Effective upon ratification, wages at all levels and classifications will increase seven (7) percent from the current minimum rates. Rates will increase an additional seven (7) percent in each subsequent year. Term of contract to be determined.**
- **Maintain all classifications, definitions and steps.**
- **Additional step increases at the 10-, 15-, 20- and 25-year levels to be negotiated.**

Employees shall be paid weekly not less than the following wages in these classifications.~~ less~~

~~a wage diversion of 10% of earnings to a maximum of $5,000 per calendar year. Effective April 1, 2016, such diversion shall be reduced to 8% and a maximum of $4,250 per calendar year. Effective January 1, 2017, the maximum diversion shall be $4,000 per calendar year:~~

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| Content Providers | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 10% Wage Diversion | 88.30 | 90.55 | 103.68 | 108.29 | 111.23 | 114.89 |
| | Wage after diversion | 794.68 | 814.97 | 933.16 | 974.61 | 1001.07 | 1034.02 |

~~Provides original content for print and electronic publications and products.~~

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Content Editors/Produces | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 10% Wage Diversion | 89.47 | 96.73 | 107.51 | 112.21 | 116.32 |
| | Wage after diversion | 805.27 | 870.53 | 967.55 | 1009.89 | 1046.90 |

~~Edits and produces original content for print and electronic publications, products, and slot.~~

| | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| Assignment Editors | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 10% Wage Diversion | 110.25 | 112.21 | 117.96 |
| | Wage after diversion | 992.25 | 1009.89 | 1061.65 |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| Librarian | wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | 10% Wage Diversion | 87.42 | 88.79 | 90.36 |
| | Wage after diversion | 786.74 | 799.09 | 813.20 |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| News Assistant | wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | 10% Wage Diversion | 73.21 | 75.17 | 77.13 |
| | Wage after diversion | 658.85 | 676.49 | 694.13 |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Editorial Clerks Administrative | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 10% Wage Diversion | 65.66 | 67.42 | 68.89 | 69.78 |
| | Wage after | 590.94 | 606.82 | 620.05 | 627.98 |

diversion
Provides newsroom support as necessary

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Copy Messengers | wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | 10% Wage Diversion | 54.98 | 55.47 | 55.96 | 56.45 |
| | Wage after diversion | 494.80 | 499.21 | 503.62 | 508.03 |

Provides newsroom support as necessary

| | | 1st Year | 2nd Year |
|---|---|---|---|
| Two-Year Associates | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 10% Wage Diversion | 55.86 | 61.25 |
| | Wage after diversion | 502.74 | 551.25 |

Performs various newsroom assignments as necessary

| | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| 3-Month Interns | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 10% Wage Diversion | 50.18 | 51.65 | 53.12 |
| | Wage after diversion | 451.58 | 464.81 | 478.04 |

Performs various newsroom assignments as necessary

1. Employees shall receive a salary increase provided in the schedule of wage minimums or increases according to the following schedule of general increases, whichever is greater, but not both:

1. The above wage minimums and the general increase need not shall apply to salaries of those who are on retirement or who are on extended sick leave. The pay increases shall go into effect upon the employee's return to work.

2. For the life of this Agreement there is to be no reduction in compensation of anyone covered by this Agreement except when the provisions of Article VIII, Paragraph 3, are implemented.

3. In the application of the foregoing schedules of minimums, experience shall include all regular

employment in comparable work. In the event the Guild questions the job classification or experience status of any employee within forty-five (45) days from start of employment, adjustments **shall be made** retroactive ~~if any, will be made retroactive~~ to the start of employment. If such question is raised after forty-five (45) ~~ninety (90)~~ days from start of employment, adjustments, **shall be** ~~if any, will be~~ effective on the date that the Guild brought the question to the attention of the Company.

4. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

5. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only; individual merit shall be acknowledged by increases above the minimums.

6. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

7. (a) ~~Effective January 1, 1982, A~~An employee temporarily transferred to a higher classification shall receive differential pay **at the higher rate.** ~~according to the following schedule:~~

~~Copy messenger to clerk .................................minimum salary differential~~
~~Copy messenger to reporter/editor .....................minimum salary differential~~
~~News assistant, clerk to reporter/editor ................. minimum salary differential~~

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

Effective upon ratification of this Contract. When ~~no exempt newsroom manager is on duty and~~ a Guild member is assigned to be the ranking supervisor ~~on the premises~~ for at least four ~~3 ½~~ hours ~~(one-half)~~ of his shift, he will receive an additional ~~$30~~ **$75** per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) ~~Effective January 1, 2003, T~~The Harrisburg and Washington correspondents will receive a salary differential of ~~$20~~ **$30** a week. ~~(Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)~~

8. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

9. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating or until the top minimum is reached.

10. ~~Effective January 1, 2003,~~ **Within 30 days of ratification of this agreement the following one-time service bonuses shall be paid:**

- ~~A one-time service bonus of $250~~ **$500 for all employees with 10 or more years of service.** ~~Thereafter, the bonus will be paid when an employee completes his/her 10th year of service. Effective January 1, 2004, A one-time service bonus of~~
- **An additional $1000 for all employees with 20 or more years of service.**
- **An additional $1500 for employees with 30 or more years of service.**
- **Thereafter, the bonuses will be paid when an employee completes his/her 10th/20th/30th years of service.** ~~As of Jan. 1, 2007, all service bonuses will be diverted to the Guild Pension Plan for the life of the current contract.~~

## ARTICLE IV
## Hours

1. No ~~employee eligible for Guild membership~~ **bargaining unit employee** shall work more than eight (8) hours per day within a**n** **nine (9)** consecutive hour period, nor more than five days per week with the following exceptions:

(a) With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

(b) ~~Additionally,~~ **F**ull-time employees with at least two years of service shall, on a rotating basis, have the option of working a four-day week consisting of four **10** hour days at ~~his~~ **their** request. ~~under the following conditions:~~

The nature of the work is such that it can be compressed into 4 days.

i. At least one weekend shift may be required as part of the work week except by mutual agreement.

ii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).

iii. No employee shall be assigned to work a four-day week without his/her consent.

iv. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.

~~ii. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.~~

v. A lunch or dinner break may be required as part of the work day.

iii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

(c) Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

2. **A regular schedule of working hours consisting of 5 consecutive days 40 hours per week shall be maintained for all full-time employees. In the event the employer reduces publication**

**of its digital publications from its current 7 day schedule, the employer may request that the guaranteed work week be amended. The employer shall give the Guild no less than a 10 day notice in such event. Once notice is given, the parties shall meet to determine if there needs to be a change in any work schedules. There shall be no changes in the hours and/or work schedules set forth herein unless and until the parties mutually agree in writing to any such changes.** ~~A regular schedule of working hours shall be maintained for all employees.~~ No less than ~~three~~ 5 days' notice shall be given in advance of any change in an employee's working schedule~~, where possible~~. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday~~, where possible~~.

3. ~~Wherever possible,~~ Days off shall be consecutive days **unless the employee chooses otherwise.**

**4. No employee shall be required to work more than 5 consecutive days.**

5. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

6. A differential of ~~$3~~ $6 per shift will be paid to an employee who begins his shift on or after 2 p.m., **and/or for working on a weekend. Those working weekend shifts that begin after 2 p.m. shall receive a $20 per shift differential.** ~~As of Jan. 1, 2007, All night differentials will be diverted to the Guild Pension Plan for the life of the current contract.~~

This shall apply only so long as the employee is assigned to such shifts.

**7. When the majority of an employee shift is between 11 p.m. and 6:30 a.m. that employee shall receive a shift differential of $40.**

**8. No employee shall be required to work any swing shifts except by mutual agreement between the employee and the company.**

9. Time spent by employees traveling to and from assignments shall be considered as part of the working day.

10. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

11. By arrangement with the Company, employees who elect to reduce their work week to fewer than 40 hours shall be considered flex-time employees. They shall designate a period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the

same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

## ARTICLE V
## Overtime

1. Overtime shall be defined as work beyond **8 hours per day or** 40 hours in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. ~~Overtime~~ **Work** beyond **8 hours per day or** 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. ~~By mutual agreement, which will not be unreasonably withheld, A~~**A**n employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee~~, by mutual agreement not to be unreasonably withheld,~~ may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work **or to work remotely** after his regular working day shall be paid for ~~the time worked, but not~~ **no** less than four hours **or time and one-half for all hours worked, whichever is greater.** ~~An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.~~

4. An employee who ~~called~~ **agrees** to work on his day off shall be compensated at the rate of time and one-half, but not less than a day's pay in addition to his regular weekly salary.

5. Overtime shall be reported in writing to the Company or its representative within ten days after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

## ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed ~~35~~ **20** percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave and other leaves of absences.

3. It shall be a policy of the Company to pay part-time employees who average individually less than **20** ~~17.5~~ hours per week not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than **20** ~~17.5~~ hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. ~~Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration.~~ Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight (8) months, a period which may be extended by mutual agreement between the Company and the Guild. **These employees will be covered only by Articles I, II III, IV, V, VI, VII and XVI of this Agreement.** Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the **eight** month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees ~~whose positions are extended beyond (12) twelve months~~ shall receive **benefits on a proportionate basis.** ~~one week's vacation~~.

5. Part-time **and/or** ~~and, or~~ temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide ~~eight (8) twelve (12)~~ **nine (9)** days sick pay annually which may be taken only when an employee is unable to work due to illness. The company ~~can~~ **may** request that an employee furnish a doctor's certificate or other reasonable proof when absent for **three (3)** consecutive days or more.

2. An employee shall receive a normal week's salary for a period of his or her incapacitation. There shall be ~~no~~ holiday premium pay during the sick leave period.

3. Short-term disability

(a) Employees can accumulate the above **9** days per year during their employment to a maximum of **240** ~~90~~ days per year. Only unused days during the year will be carried over to the maximum of **240** ~~90~~ days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of **two (2)** ~~five (5)~~ days or longer. This benefit will begin on the **3rd** ~~6th~~ work day of disability. The **three** ~~five~~ days will constitute a waiting period.

**All current employees having at least one year of service will be provided an initial short term disability bank of 120 days at full pay.** All employees ~~on the payroll on 1/1/07~~ **with less than one year of service will be provided an initial short-term disability bank of 9** ~~7~~ **days at full pay.** ~~per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days.~~ **Upon reaching one year of employment all employees shall receive a short-term disability bank of 120 days at full pay.**

**(b) Any of the 9 sick days remaining unused at the end of each year shall be added to the employee's short-term disability bank, up to a maximum of 240 days.**

(c) If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at **85** ~~60~~ percent of the employee's negotiated rate of

pay for those employees with **at least one year** ~~two years~~ of service. ~~Those employees with less than two years service will be eligible for 13 weeks of additional sick leave. Details of this extended short-term disability plan are available from the Human Resources Director.~~

(d) An employee who exhausts his disability bank shall earn additional sick leave benefits according to the following schedule: For one year of uninterrupted employment – 20 percent of maximum short-term disability schedule; two years of uninterrupted employment – 40 percent of maximum short-term disability schedule; three years of uninterrupted employment – 60 percent of maximum short-term disability schedule; four years of uninterrupted employment – 80 percent of maximum short-term disability schedule; five years of uninterrupted employment – 100 percent of maximum short-term disability schedule.

The maximum regeneration under this program will be ~~70~~ **120** days. Unused individual sick days will continue to be accumulated into the bank until the **240** ~~90~~-day maximum is reached.

~~Sick pay and/or the short-term disability bank are not considered earned and will not be paid out upon termination of employment, including retirement.~~

**All earned and unused sick days placed in the short-term disability bank, to a maximum of 120 days, shall be paid out on the employee's separation from the Company, including retirement. Payment will be made at the employee's rate of pay at the time of separation.**

4. This program will become effective as of the date of ratification. ~~Benefit payments under the prior Guild sick leave plan will continue for those employees on sick leave as of the date of ratification.~~

5. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

~~6. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.~~

~~7. Sick leave payments shall terminate upon termination of employment or death of the employee.~~

~~8. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.~~

**6.** ~~9.~~ An employee cannot accrue sick leave or use sick leave benefits for any purpose other than illness or injury.

**7.** ~~10.~~ Employees claiming benefits under this Section shall, upon request, submit ~~to an examination by~~ a doctor's excuse. ~~or doctors designated and paid for by the Company.~~

~~11. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.~~

~~12. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.~~

## ARTICLE VIII
## Security

**The company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence and assist the**

**employee for satisfactory service in the future. The company shall use progressive discipline, which includes, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay and discharge.**

1. There shall be no discharge as a result of putting this Agreement into effect.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force, which latter shall be construed as synonymous with discharges for economy.

3. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes. The Company's right to determine the size of the force is recognized and the right to reduce the force for economy (either permanently or temporarily) shall **also** ~~not~~ be subject to review by the Board of Arbitration.~~, provided, however, that in the event the Guild believes that reasons other than economy have entered into the designation of the person or persons to be laid off, it may appeal the particular case or cases to arbitration. Stringers and freelancers in no case will replace or displace bargaining unit employees.~~

4. A. Layoffs to reduce the force, as distinguished from dismissals for just and sufficient cause, shall not be made until the Company notifies the Guild ~~sixty (60)~~ ~~thirty (30)~~ **45** days in advance that such layoffs are necessary and that no reasonable alternative exists.

B. The Company shall notify the Guild of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), number of employees per work group, numerical order of layoffs within each work group, numerical order of overall layoffs, and the facts upon which the Company relies to establish the necessity pursuant to Section 4A above.

C. In the event such layoffs are necessary, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may first be offered for a reduction in force after consultation with the Guild.

**(2) Immediately eliminate** ~~thirty (30%) percent of the~~ **all stringers,** ~~budget and all~~ **intern programs, temporary and probationary employees.**

(3) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in inverse seniority order in the affected work group. The employee to be laid off shall be the junior two year associate in the affected work group. If there is no two year associate in the affected work group, the first employee to be laid off shall be the junior two-year associate in the bargaining unit. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. Thereafter, layoffs shall be in inverse seniority order in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. The work group for purposes of layoff will be divided as follows:

I. Content providers in Local News and Business
II. Content providers in Features and Editorial
III. Content providers in Sports

IV. Content providers and Editors in Photography/Multimedia/Art
V. Content Editors and Assigning Editors
VI. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group VI above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

(5) In the event of recall, the recall shall be in reverse order of layoff. Such recall rights will last **24** ~~12~~ months from the date of the employee's layoff.

(6) The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

D. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

E. An employee laid off as a result of the provisions of this clause will continue to receive their health/life insurance benefits for a period of ~~three (3)~~ **six (6)** months under the same conditions that applied when he/she was on the payroll. Also, for an additional **six (6)** ~~three (3)~~ months, the Company shall pay fifty (50%) percent of whatever premium or health and life insurance benefits being paid for full time employees, for those laid off employees.

F. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twenty-four (24 months)

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(c)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within two years of their date of disability shall have their benefits and seniority terminated. Said two years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's two year time period shall commence anew;

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within three years of their date of disability **may** ~~shall~~ have their benefits and seniority terminated. Said three years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's three year time period shall commence anew;

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

5. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

6. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by mutual agreement between the Company and the Guild.

(b) In the event of discharge for gross misconduct, or in the case of misconduct after notice has been given said employee may be laid off immediately.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

7. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of

which their competency might be questioned.

8. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, **gender identity,** marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

9. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

10. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes shall be afforded the opportunity to transfer to other available positions.

11. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

12. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

## ARTICLE IX
## Expenses

~~1. If required, all reporters and photographers will use their personal cars in the service of the Company.~~

**1.** ~~2. For the term of this agreement,~~ The Company will reimburse for the business use of a **personal** vehicle by paying a **mileage allowance equal to the amount permitted under IRS regulations.**~~vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.~~

~~3. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used.~~

**2.** ~~4.~~ Necessary working equipment shall be provided for employees and paid for by the Company. ~~If approved by the Company, a~~ **A**n employee may use his personal equipment~~to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose.~~ In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

**3.** ~~5.~~ Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs~~up to a maximum of $15.00 per day,~~ after the employee pays the initial parking fee.

**4.** ~~6.~~ Requests for reimbursement of expenses shall be submitted within 30 days of completion of

the assignment. Any extension must be approved by the Managing Editor.

**5.** ~~7.~~ Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis.

**6.** ~~8.~~ Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**7. The company shall provide all Guild members who use a cell phone for work purposes with cell phones, chargers and data plans.**

**8. The company shall reimburse all eligible Guild members up to ~~$100~~ $90 per month for gym memberships and other wellness/exercise programs.**

~~9. The company shall reimburse all eligible Guild members up to $100 per month for childcare.~~

ARTICLE X
INTERNSHIPS, TWO-YEAR ASSOCIATES

1. Unpaid academic internships will be limited to **twelve (12)** ~~fourteen (14)~~ a **calendar** year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

old language

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VII, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates ~~may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they~~ are

excluded from the following classifications: **librarian**, news assistant, clerk, and messenger.

~~E. There will be no assignment restrictions~~

**E.**~~F.~~ ~~No~~ **V**acation bonuses will be paid by the Company to two-year associates.

ARTICLE XI
Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service; two (2) weeks for one (1) complete year of service; **four (4)** ~~three (3)~~ weeks for three (3) continuous years of service; **five (5)** ~~four (4)~~ weeks for eight (8) continuous years of service and **six (6)** ~~five (5)~~ weeks for **18** ~~23~~ continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers. ~~The service requirement for five weeks of vacation will decrease as follows: 21 years in 2002; 20 years in 2003; 18 years in 2004.~~

~~Employees hired on or after Jan. 1, 2007, will receive a maximum of four (4) weeks vacation.~~

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

~~Effective January 1, 1994:~~

All former Press employees will receive credit, for vacation purposes only, for their service with the Pittsburgh Press Company.

~~All employees hired between Jan. 1, 1987 and Jan. 1, 1993, will receive, for vacation purposes only, an extra year of service. The extra year of service is eliminated after the employee receives four weeks of vacation.~~

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September

1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees eligible for **6** ~~5~~ weeks of vacation must take at least one week prior to March 31. Also, all employees who do not submit vacation requests prior to September 1

will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

9. With the exception of self-provoked discharge or failure to give two weeks' notice, accrued vacation pay will be paid on termination of employment or in the event of death to the designated beneficiary according to the following schedule:

| | | |
|---|---|---|
| Less than 3 complete years of service | – | 0**1 week's pay** |
| 3 to 6 complete years of service | – | 1 **3 week's pay** |
| 7 to 11 complete years of service | – | 2 **4 weeks' pay** |
| 12 to 15 complete years of service | – | 3 **5 weeks' pay** |
| 16 or more years of service | – | 4 **6 weeks' pay** |

~~Effective May 1, 2007, the accrued vacation pay will be diverted to the Guild Pension Plan for the current contract.~~

**10.** Employees shall receive **annually a** ~~$25~~ **$40** bonus for each year of service. For every year after 15 years, the employee will receive an additional ~~$25~~ **$40** bonus for each year or service. For example, an employee with 25 years of service will receive **$1,400** ~~$875~~ (25 x ~~$25~~ **$40** = ~~$625~~ **$1,000**+ ~~$250~~ $400 (10 x $25 **$40**) = $875 **$1,400**). ~~Effective Jan. 1, 2007, these service bonuses will be diverted to the Guild Pension Plan for the current contract.~~

~~**11. On an annual basis, Guild members may roll over one (1) week of vacation to the next year.**~~

# ARTICLE XII
## Holidays

1. The following holidays, or days observed as such, shall be granted to all employees as provided in this Article: New Year's Day, ~~Martin Luther King Day~~, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. An employee shall receive ~~four (4)~~ **(5)** personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a ~~fifth~~ **sixth** personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. ~~An employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and an employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, A~~An employee ~~will~~ **shall** receive 6-~~1/4~~**1/2** days' pay for the holiday week if he/she is scheduled to work the holiday and 4 other days during the holiday week. **Additionally, employees assigned to work at least half of their shift after 8 p.m. on Christmas Eve and/or New Year's Eve, shall receive holiday pay.**

3. In the week in which one or more of those holidays fall, all time worked beyond the remaining work days or work hours shall be paid for at the overtime rate.

4. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

5. Personal days are based on the number of hours the part-time employee is regularly scheduled to work. For example, an employee who normally works three days a week will receive 60 percent of the personal holidays.

# ARTICLE XIII
## Advancement, Promotion and Transfer

1. The Company shall immediately post notice of ~~such~~ **any** vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction. ~~to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned.~~ **On the first day after the application period ends the Guild shall be made aware of anyone seeking the position. If the employer does not select the bargaining unit employee(s) they must notify the employee and the union setting forth their reasons for the rejection. Any rejection must not be for arbitrary or capricious reasons and shall be subject to the grievance procedure. If the job is not filled as a result of the above, the employer shall be free to fill the vacancy from the outside.**

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be

paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be **no less than 30 nor more than** 75 days, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher~~, or be given the option of accepting his severance pay~~.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above~~, excepting that he shall not have the option of accepting his severance pay~~.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company

determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. The exempt employee in this role ~~will not~~ **shall** count toward the **20%** ~~30%~~ limitation as established elsewhere in the contract.

9. Management shall have the right to transfer employees from one newsroom department to another over their objection. for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the company and the Guild.

## ARTICLE XIV
## Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment:

One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of ~~52~~ **70** weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest ~~(except bonuses and pay for special work)~~ received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service ~~completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid~~. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
## Leaves of Absence

1. By arrangement with the Company, employees may be granted leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time.

2. If an employee is elected or appointed to any office of The NewsGuild/Communications Workers of America, or AFL-CIO, CLC or any office of a local of The NewsGuild, such employee shall, upon request, be given a leave of absence without pay, and shall be reinstated in the same position upon the expiration of such leave. The foregoing shall also apply to delegates elected to The

NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild. ~~The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.~~

3.(a) Any employee who has had five continuous years in the employ of the Company without a leave of absence shall be given at the employee's request a leave of absence not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

(b) An employee with at least 10 years of service shall be given, at his/her request, a leave of absence not to exceed ~~three~~ **six** months, at half pay. Such leaves may be limited to two at any given time. An employee may exercise this right every five years. ~~As of Jan. 1, 2007, such leaves will be suspended for the duration of the current contract and wage savings from such leaves will be diverted into the Guild Pension Plan.~~

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. ~~(a)~~ Upon request, ~~unpaid~~ maternity, paternity or adoptive parent leave of not more than ~~8~~ **9** months shall be granted. **The first six months shall be at full pay and the remaining three months shall be at half pay.**
~~(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.~~
~~(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.~~

~~8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.~~

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The employee shall have the right to elect whether they want to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance shall be defined as a dispute over an alleged violation of this agreement.

2. **No later than thirty (30) days after the employee or Union has brought the dispute to the attention of management personnel and the parties are unable to amicably resolve the dispute, the Union or the grievant shall submit the grievance in writing to the employee's immediate supervisor.** Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The parties shall determine who shall eliminate the first name by the flip of a coin.

6. Once a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be ~~considered granted~~ automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The expense of the arbitration shall be shared equally by both parties. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to

accept and abide by the award of the arbitrator, which shall be final and binding.

## ARTICLE XVII
## Military Service

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. ~~When the Company makes discharges or layoffs other than for cause, such discharged or~~ **In the event of a layoff** laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(6)) unless same is exhausted with respect to the general type of work for which an additional employee is desired.

2. ~~Employees who have signed temporary replacement cards for employment because of enlistment or conscription of regular employees also shall be placed on the rehiring list when discharged for reasons other than cause, upon the return of the regular employee from war~~ **military** ~~service, or when any temporary employee enters the armed services.~~

3. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

4. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
## Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline, **images, likenesses** or other identifying information shall not be used over his protest.

3. Employees may be assigned to use multimedia equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

~~4. Free-lance photographers may be retained for photo and video assignments to supplement existing coverage. Furthermore, it is understood that the use of free-lancers is not intended to replace bargaining unit jobs or work.~~

~~5. Exempt employees and freelancers can be used in SEEN and similar publications. The use of exempt and freelancers is not intended to displace bargaining unit jobs or work.~~

**4.** ~~6.~~ Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

**5.** ~~7.~~ No employee shall be required to take over the duties of any employee in another department of the Pittsburgh Post-Gazette in the event of a labor dispute in such department, or by assuming new duties to assist in the operation of a department where employees are on strike. No strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lockout its employees during the term of this agreement.

**6.** ~~8. The Company agrees not to have or enter into any agreement with any other Company binding such other Company not to offer or give employment to employees of the Company.~~

**7.** ~~9.~~ The Guild shall be notified within 24 hours of all resignations tendered. Resignations shall be subject to grievance procedure upon notice from the Guild within four days after receipt of notice from the Company.

**8.** ~~10.~~ For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

**9.** ~~11.~~ Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

~~(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.~~

**(A)** Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest. ~~as determined by the Company.~~

**(B)** Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.

~~(C) The Company shall notify the Guild of its decision in these matters.~~

**(C)** No Company equipment will be used for outside activities.

~~There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.~~

(Code of ethics is reprinted in the back of the contract).

10. ~~12.~~ In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

11. ~~13.~~ An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

12. ~~14.~~ An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

13. ~~15.~~ The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, date of birth~~, and Social Security number~~.
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

14. ~~16.~~ The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

15. ~~17.~~ The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

**16.** ~~18.~~ A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

**17.** ~~19.~~ Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

**18.** ~~20.~~ The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

**19.** ~~21.~~ The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the ~~Company's~~ **agreed to** Transitional Duty Program is available from the Human Resources Director.

**20.** ~~22.~~ The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

**21. Upon request, the Company shall provide standing desks and gel mats to Guild members.**

**22. The Company shall provide the Guild with notification at least 120 days prior to moving from its current location to a different facility. The Company shall meet with Guild leaders to discuss the move.**

**23. The Company will provide eligible Guild members with $100 a month for tuition reimbursement.**

**24. The Company shall provide the following bonuses for recognition in journalism contests, whether or not the contest provides a monetary award:**

- **$25 for regional contests**
- **$50 for state contests**
- **$75 for national contests**

**25. All Guild members shall be given an opportunity to participate in professional development activities (such as seminars, conferences etc.) at the Company's expense.**

**26. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.**

ARTICLE XX
Insurance, Health and Welfare, Pensions

1. The Company shall make available non-contributory Group Life Insurance with an agreed-upon plan and under the terms and conditions of a Master Policy which contains the following provisions:

A. 90-day waiting period.

B. Insurance of one times annual salary with a maximum of $50,000.

B. Employees age 70 and above will have insurance of 65 percent of annual salary but not less than the minimum described in Paragraph B above.

C. ~~Effective January 1, 2015, the above provisions will expire and life insurance for active employees will be provided through the Western Pennsylvania Teamsters and Employers Welfare fund.~~

D. Employees at retirement will have $4,000 of paid-up life insurance. ~~However, retiree life insurance shall not be provided to employees who retire on or after January 1, 2015.~~

2. The Company shall pay the full cost of a travel accident policy for all employees, which includes the following provisions: principal sum, $100,000; weekly indemnity, the lesser of $100 or 65 percent of weekly earnings; waiting period, 60 days; maximum number of weeks, 52.

3. Effective with the ratification of this contract, the Company will provide a health insurance and prescription drug plan to eligible employees, their spouses and eligible dependents as follows:

A. Active Employees
~~All provisions regarding the health insurance and prescription drug plan as set forth in the August 1, 2010 Contract shall remain in effect through December 31, 2014. See Exhibit A grid.~~

**(1)** ~~Effective January 1, 2015,~~ All eligible bargaining unit employees will participate in the Western Pennsylvania Teamsters and Employers Welfare Fund (the "Fund"). Participation in the plan is limited to employees averaging annually more than 30 hours per week. See Exhibit B.

**(2)** The required PG contributions for the calendar year ~~2015~~ **2017** will be **$1,354.97** ~~$1,229~~ per month for participating full-time bargaining unit employees (regardless of family size) and regardless of the option chosen.

(3) **The Company shall pay the entire amount of the calendar 2018 base rate for participating bargaining unit employees (regardless of family size) and regardless of the option chosen. In**

NLRB-0001318

**subsequent years, the Company shall pay the entire base rate plus all increases of up to 25% per year. In each subsequent year, the Company and the Guild will equally split the amount of any increase over 25%.** ~~The PG contributions for years 2016 2018 and 2017 will not exceed a 5.0% annual increase above the $1,229 per month set forth above for calendar year 2015. Any such increases must be based upon the plan design effective January 1, 2015. The PG will receive from the Fund at least 60 days notice of any such annual contribution increase prior to January 1. Increases in excess of 5% will be the responsibility of the covered bargaining unit members via direct billings from the Fund. If direct billing is not available, the PG will only assume responsibility for any withholding of any additional amounts after receiving the expressed written consent of each member and will not assume any other responsibility for collection of any other amounts, or be liable for any other payment to the Fund, other than as stated above.~~

**(3)** The WPA Fund will establish all applicable rules and operations, including treatment of out-of-network benefits and administration of all claims issues.

**(4)** Required employee contributions, if any, will be deemed as employee contributions for health care and are **not** related in any way to any prior or future wage deferrals.

**(5)** Effective with bargaining unit participation in the Fund, any and all other PG sponsored benefit plans will terminate, including medical/Rx, life/AD&D, vision, and dental, except for the life insurance program described in Exhibit B (Retiree Health and Welfare Programs) and paragraph 7 below.

**(6)** For any active employee who opts out of participation in the Fund, they shall receive ~~$100~~ **$200** per month. However, the Employer shall be obligated to pay the premium of the employee's life insurance coverage at the same benefit level that existed under the prior contract.

**(7)** For all new hires, there is a thirty (30) day waiting period for all insurance coverage under this agreement.

**(8)** Dental/Optical insurance will be provided for active employees and their dependents through the Fund

**(9)** Spouses of employees who die prior to retirement will be covered with their dependent children by the active employee health plan. The spouse will be required to pay ~~30%~~ **10%** of the composite premium as a condition for obtaining coverage. This coverage will end at the earlier of: after ~~five (5)~~ **ten (10)** years of participation, attainment of Medicare Eligibility; or remarriage. Coverage for eligible dependent children ends at their ~~19th~~ **26th** birthday, or earlier if the spouse's coverage ends

**(10)** For surviving spouses, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the surviving spouse of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the surviving spouse's health care insurance.

**(11)** Surviving spouses (under age 65 or not Medicare eligible) of employees who die after retirement will be covered by the active employee health plan. The spouse will be required to pay the same percentage of the composite premium as the retiree. This coverage will end at the earlier of:

after ~~five (5) years~~ **ten (10) years** of participation, attainment of Medicare Eligibility, or remarriage Coverage for surviving spouses 65 and older will cease 60 days after the employee's death.

**(12)** For surviving spouses, retiree health care contributions should, if possible, be made through deductions from the employee's pension. If not, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the retiree of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the health care insurance.

B. Retiree healthcare **TO BE DISCUSSED**

1. The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.

2. Future Retiree Medical and Life Benefits - Any and all retiree medical benefits will be terminated as of the effective date of the agreement for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:

(a) Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.

(b) For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.

3. Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.

4. Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees ("Retiree Unit" – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 ("Single")/$25,000 ("Other than Single"); or

(b) a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.

5. Medicare Eligible Retirees – All current Medicare Retirees ("Retiree Unit" as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.

(i) Any current-Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").

(ii) Any current-Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):

MODIFIED "A" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $153.90 for retiree and spouse |

or;

(b) A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:

MODIFIED "B" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $119.70 for retiree and spouse |

6. Other Conditions Related To These Programs

(a) A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree

(b) A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree

(c) "Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement

(d) The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.

(e) In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits

from the Company.

(f) If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.

(g) Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.

(h) If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.

(i) Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to make the one-time payment. The Company reserves the right to implement such one-time payments in subgroups or tiers as the Company deems appropriate.

(j) The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.

(k) Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.

**7.** a. Benefit accruals for all participants in the pension plan remain frozen. Each Employee's service will continue to be credited according to the terms of the pension plan for purposes of vesting and benefit eligibility.

~~b. Until June 30, 2015, the Employer will make weekly pension contributions of $75.70/active member. As a result of the establishment of the Guild-Employees 401(K) Plan as set forth in Exhibit 1, effective July 1, 2015, the weekly pension contribution will be $65.70; and effective July 1, 2016, such contribution will be $55.70. Additionally, each Employee will divert 2% of their base salary to the pension plan. The 2% diversion will be valued at $211,000 a year during the life of this contract. The Guild diverted the night differential for the term of the contract. The night differential diversion will be valued at $45,000 a year during the life of this contract. The Guild diverted the Vacation Bonus for the term of the contract. The Vacation Bonus diversion will be valued at $69,000 a year during the life of this contract. The Guild diverted the Service Bonus for the term of the contract. The Service Bonus diversion will be valued at $16,000 a year during the life of this contract. The Guild diverted the Accrued Vacation language for the term of the contract. The Accrued Vacation language diversion will be valued at $60,000 a year during the life of this contract. The Guild diverted the half pay leave for the term of the contract. The half pay leave diversion will be valued at $60,000 a year during the life of this contract.~~

b. The Board of Trustees is authorized and directed to adopt the following long-term funding policy immediately. The Fund co-consultants will produce with the annual actuarial valuations a seven-year actuarial projections with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:

- Projections will take into account only negotiated contributions.
- Use of the assumptions in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants.
- No unanticipated actuarial gains or losses during the projection time period.

If the annual projection indicates any future funding deficiencies during the seven-year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.

In the event that the Post-Gazette is required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the Post-Gazette will receive a dollar for dollar credit towards the next subsequent plan year's contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies they shall take into account that these contribution credits will be taken as a reduction in the negotiated contributions in the next plan year.

c. Effective as soon as administratively practical following ratification of this Contract, all defined benefit (DB) pension plans sponsored by the Post-Gazette (excluding Teamsters #211) will be merged.

d. Any deadlocked Trustee motion relating to a reduction in benefits required under the Long Term Funding Policy in numbered paragraph 3 above as well as any dispute between the parties regarding the provisions of this agreement shall be arbitrated on an expedited basis, with the arbitration to take place not later than sixty (60) days following the Trustees' meeting at which the deadlock occurs or the date that one party advises the other of a dispute regarding the interpretation or application of this agreement.

Details of the pension plan status and its benefits are outlined in a separate document signed by the Company and the Guild.

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the

employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

ARTICLE XXII
Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, layoff and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine reasonable standards of production; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease any department, operation or service; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce new or improved research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall ~~not~~ be considered a waiver of the Company's right to exercise such right, prerogative or function **and** ~~or~~ preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

ARTICLE XXIII
Term and Renewal

1. This Agreement shall commence on ~~the October 15, 2014~~ __________ and expire on ~~the thirty-first day of March 2017~~ ___________.

2. Not less than 60 days prior to the expiration of this Agreement either party desiring to open negotiations for a new Agreement shall **advise the other in writing of its desire to do so.** ~~submit its~~

~~proposals for such new Agreement in writing to the other party. The respondent party, if it desires to file a counter proposal of the conditions it will seek to establish, shall do so at the earliest practicable date, but in any event not longer than thirty (30) days from receipt of notice by the moving party. In the absence of such statement within the prescribed time limit, the existing Agreement becomes automatically the proposal of the respondent party.~~ The terms and conditions of this Agreement shall remain in effect as long as negotiations continue, but in the event a new Agreement is arrived at within four (4) months of the submission of the new proposal, all the terms and conditions of the new Agreement shall be retroactive to the date of the expiration of this Agreement.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ______________________________ Date: ____________________
Michael A. Fuoco

By: ______________________________ Date: ____________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ______________________________ Date: ____________________
Stephen B. Spolar, Vice President of Human Resources

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

## Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

## Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block, Publisher and Editor-in-Chief

Memorandum of Understanding

This Memorandum of Understanding, made this 30th day of January, 1998, shall be incorporated into the Labor Agreement, effective January 1, 1998, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh. The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid ~~$25~~ **$50** for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid ~~$50~~ **$100** for off-shift appearances.
6. ~~This MOU recognizes the jurisdiction agreement which is pending between AFTRA and KDKA~~

FOR THE POST-GAZETTE:

Raymond N. Burnett

DATE: Feb. 5, 1998

FOR THE GUILD:

Harry Tkach

DATE: Feb. 5, 1998

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY
(March 2, 1995)

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at ~~$25~~ **$50**. Appearances scheduled during the staff member's non-working hours will be compensated at ~~$50~~ **$100**. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to **the appropriate Company representative** ~~Barbara Bogucki, assistant to the editor,~~ who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

~~Staffers who have already made their own arrangements to speak before groups in the community before March 3, 1995 would be free to meet those commitments. However, they must notify the company about these arrangements right away~~

~~Staffers interested in participating in the Speakers' Bureau should contact Barbara and let her know that they would like to participate as soon as possible.~~

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the current labor agreement that expires ~~December 31, 2006~~ **March 31, 2017**. ~~Effective March 12, 2003,~~ Effective upon ratification. The Company and the Union agree that part-time employees (employees working no more than 30 hours per week) can work a five-hour shift at straight time over and above their normal work week. It is understood that the part-time employee is guaranteed five hours of pay when called in on his/her off day.

This Memorandum of Understanding does not change the overtime provisions of the contract or the past practice of employees (part time and full time) functioning as stringers outside of their normally assigned duties.

One of the purposes of this Memorandum of Understanding is to resolve the grievance over a part-time employee functioning as a stringer on his off day.

FOR THE POST-GAZETTE

Raymond N. Burnett

DATE: 3/12/03

FOR THE GUILD

Mike Bucsko

DATE: 3/12/03

# ~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Guild agree as follows:~~

- ~~For the purpose of paying the negotiated Vacation and Service bonuses, part-time employees will be treated the same as full-time employees.~~
- ~~Paragraph C of the Preamble will be amended as follows, "To cover possible special cases the Publisher shall have the right to designate exemption from Article I – Guild Shop – certain employees at the time of their employment, but not more than one such employee will be on the payroll at any given time."~~
- ~~The Guild will relinquish all jurisdiction over the work formerly performed by one clerk and one news assistant assigned to the department often referred to as PG Store/Information Products.~~
- ~~The Guild will withdraw the grievance of January 30, 2003 over the Company's decision to pay proportionate bonuses to part-time employees.~~
- ~~Part-time employees who have already received proportionate bonuses will be made whole.~~

~~FOR THE POST-GAZETTE~~ ~~FOR THE GUILD~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 3/12/03~~ ~~DATE: 3/12/03~~

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:

- One of the provisions of the agreement pertaining to the 10 exempt employees who became members of the Newspaper Guild of Pittsburgh in 2002 was that they would remain in the pension plan for non-bargaining unit employees.
- Implicit in that agreement was the recognition that the 10 former exempt employees would not be eligible for the Guild pension.

FOR THE POST-GAZETTE FOR THE GUILD

Raymond N. Burnett Mike Bucsko

DATE: 7/29/03 DATE: 8/13/03

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective ~~August 1, 2003~~ **upon ratification**, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall be considered a part of this ~~is in addition to the~~ Labor Agreement. ~~that expires on December 31, 2006. The Company and the Union agree as follows:~~

- The six paid holidays—New Year's Day, Memorial Day, the Fourth of July, Labor Day, Thanksgiving Day and Christmas—shall be treated the same as personal days for employees who individually average fewer than 20 hours per week and do not work the holiday. (See Article XII, Paragraph 5.)
- Employees who individually average more than 19-3/8 hours per week will receive another day off with pay if they do not work the holiday, which has been the past practice.
- Any part-time employee who works on one of the six recognized holidays will be paid at the premium holiday rate, which has been the past practice.

FOR THE POST-GAZETTE

Raymond N. Burnett

DATE: 8/14/03

FOR THE GUILD

Mike Bucsko

DATE: 8/18/03

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding effective January 28, 2004, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Guild agree as follows:

- The Company will assume jurisdiction over photo reprints. For clarification, this involves all work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.
- The Company will gain another exempted employee as described in Paragraph C of the Preamble (this will increase the number of such exemptions allowed to two), with the following provision: the Company will have until December 31, 2006, to name a current employee to this exempt status. If the Company does not exercise this option prior to the expiration of this Agreement, the right to name an exempted employee under Paragraph C will be limited to a new hire.

FOR THE COMPANY: FOR THE GUILD:

Raymond N. Burnett Mike Bucsko

DATE: 1/28/04 DATE: 1/30/04

MEMORANDUM OF AGREEMENT

THIS AGREEMENT made this 23rd day of November, 2007, by and between PITTSBURGH POST-GAZETTE and NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061, CWA.

1. On July 26, 2007, the Guild filed a grievance over the use of freelance writers to perform restaurant reviews.
2. The Pittsburgh Post-Gazette has denied the grievance, and by letter dated August 30, 2007, the Guild requested that the grievance proceed to arbitration.
3. The parties have reached an agreement as full and final settlement of the grievance, which settlement shall be considered a Memorandum of Understanding regarding the future use of stringer "tryouts". That agreement is as follows:

The Company may use stringers to "try out" for vacant Guild positions (which no Guild member has been awarded) under terms and conditions mutually agreed to between the parties. In the event the Employer intends to use a stringer to fill the vacant position as set forth above, the Company shall notify the Guild and the parties shall then mutually agree upon the various terms and conditions under which the "tryout" may be utilized.

PITTSBURGH POST-GAZETTE — NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061

BY: Stephen B. Spolar — BY: R. J. Hufnagel

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

This MOU will be effective retroactively to September 1, 2008.

For the Company

Stephen B. Spolar

Date: 5/29/2009

For the Union

RJ Hufnagel

Date: 6/9/2009

~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding between the Newspaper Guild of Pittsburgh (hereafter known as the Guild) and the Pittsburgh Post-Gazette (hereafter known as the Company) covers only those Guild members who accept the early retirement buyout offer the company extended in October 2008. This agreement shall serve as an amendment to that agreement and to the preamble of the Collective Bargaining Agreement between the parties.~~

~~Content providers who accept the aforementioned buyout offer shall be free to perform work that currently falls under Guild jurisdiction, under the following limits: Writers may complete a maximum of one freelance submission per week for the print edition, or one piece of web-based content per week for post-gazette.com. In addition, participants may continue to contribute in all aspects of online-only content for post-gazette.com as currently performed.~~

~~Aside from the exceptions and limits listed above, any and all rules governing the use of stringers included in the collective bargaining agreement shall continue to apply.~~

~~For the Company~~ ~~For the Union~~

~~Stephen B. Spolar~~ ~~Michael A. Fuoco~~

~~Date~~ ~~Date~~

Exhibit 1
GUILD EMPLOYEES 401(K) PLAN

**"Effective upon ratification PG Publishing (PG) will make contributions to eligible employees as defined below in accordance with the following schedule:**

**(a) During the life of the collective bargaining agreement the employer shall match all employee contributions up to a maximum of 6% of the employee's gross income paid by the PG to the employee.**

~~Effective July 1, 2015, PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:~~

~~(a) Through June 30, 2016, PG will make a matching contribution ("PG Matching Contributions") to the PG Publishing Company 401(k) Plan (the "Plan") equal to 50% of the first $20 per week deferred by any Eligible Full Time Employee; effective July 1, 2016, the PG Matching Contribution will be increased by applying the 50% match to the first $40 per week deferred by any Eligible Full Time Employee~~

~~(b) Through June 30, 2016, the maximum amount of PG Matching Contribution will be $10 /week or the pro-rated equivalent for less than Eligible Full Time Employees; effective July 1, 2016, such maximum amount of PG Matching Contribution will be increased to $20/week or the pro-rated equivalent for less than Eligible Full Time Employees.~~

(b)The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(c) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(d) The PG Matching Contribution will be subject to a vesting schedule as follows:

(i) Less than 3 years of service – 0% Vested

(ii) At least 3 years of service – 100% Vested

(iii) Vesting Service is counted from original hire date

(e) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(f) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

~~(g) The determination of the permissible types of compensation that may be defer to the Plan is not altered by this proposal.~~

(g) All new employees will be automatically placed into the 401K plan with the ability to opt out.

# GC EXHIBIT 14

NLRB-0001340

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 14

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 17

**Company Counterproposal No. 19**
**February 28, 2018**

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, ~~Seen Editor,~~ Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

No person under Guild jurisdiction will be arbitrarily named as a Manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D. The parties recognize the following exceptions to the Guild's jurisdiction set forth in Paragraph C:

1. Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work.

2. Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

3. The Company may subcontract work.

4. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed ~~40~~ 20 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

5. Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

**Company Counterproposal No. 20**
**February 28, 2018**

**ARTICLE IV**
**Hours**

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

~~(a)~~2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

~~(b)~~3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

i. The nature of the work is such that it can be compressed into 4 days.
ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
vii. A lunch or dinner break may be required as part of the work day.
viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

~~(c)~~4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

~~2~~5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

36. Subject to newsroom operation requirements, whenever possible, days off shall be consecutive days.

47. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

68. Time spent by employees traveling to and from assignments shall be considered as part of the working day once the work day has begun.

79. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

810. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. They shall designate a period not to exceed twelve (12) months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week. In the event the Company reduces its print and/or digital publication schedule from its current seven (7) day schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours.

**<u>Company Counterproposal No. 21</u>**
**February 28, 2018**

**ARTICLE VIII**
**Security**

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future. ~~The Company may discipline and discharge employees in its discretion.~~ The Company ~~may~~ shall use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

<u>**Company Counterproposal No. 22**</u>
**February 28, 2018**

**ARTICLE X**
**Internships, Two-Year Associates**

1. Unpaid academic internships will be limited to fourteen (14) a year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.
b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.
c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates ~~may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they~~ are excluded from the following classifications: librarian, news assistant, clerk, and messenger.

E. There will be no assignment restrictions

**Company Counterproposal No. 23**
**February 28, 2018**

**ARTICLE XIII**
**Advancement, Promotion and Transfer**

1. When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be not less than 30, nor more than 75 days as determined by the Company, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher~~, or be given the option of accepting his severance pay~~.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above~~, excepting that he shall not have the option of accepting his severance pay~~.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. ~~The exempt employee in this role will not count toward the 30% limitation as established elsewhere in the contract.~~

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year ~~eighteen (18) months~~ to meet the needs of the office. At the end of one year ~~eighteen (18) months~~, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the Company and the Guild.

~~10. Notwithstanding anything to the contrary in this Agreement, employees in one newsroom department may be assigned to do work ordinarily done by employees in another newsroom department as part of their regular duties.~~

**Company Counterproposal No. 24**
**February 28, 2018**

# ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. ~~Each party may~~ The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. ~~The~~ In any event, the parties shall select an arbitrator ~~as expeditiously as possible~~ no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding. All fees and expenses of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case. ~~The arbitrator may hear and determine only one grievance at a time, unless the parties expressly agree otherwise in writing that the grievances are related.~~

**Company Counterproposal No. 25**
**February 28, 2018**

**ARTICLE V**
**Overtime**

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than 30 minutes at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

6. Columnists, Editorial Writers, and Investigative Reporters are exempt from overtime provisions.

~~7. The Company reserves the sole and exclusive right to determine whether to publish and distribute a printed product in whole or in part on any day or days in a workweek.~~

**Company Counterproposal No. 26**
**February 28, 2018**

## ARTICLE XIX
## Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance independent contractor photographers may be retained for photo and video assignments.

~~6~~5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

~~7~~6. The Guild, its representatives and the employees covered by this Agreement agree, individually and collectively, that none of them will call, authorize, encourage (by action or inaction) or engage in any slowdown, strikes of any kind, sympathy strike, bannering, boycotts against the Company, boycotts against advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations or the production or sale of its products or services during the term of this Agreement.

In the event of any strike or any other proscribed activity not authorized, ratified or condoned by the Guild, the Guild agrees it will make every good faith effort to end such activity.

The Company agrees that it will not lockout any employees during the term of this Agreement.

The Company shall have direct recourse to the National Labor Relations Board or the courts for a violation of this Article.

~~9~~7. The Guild shall be notified within 24 hours of all resignations tendered.

~~10~~8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

~~11~~9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

~~12~~10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

~~13~~11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

~~14~~12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

~~15~~13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

~~16~~14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

~~17~~15. The news assistant classification is based on the following:

A.  Writing Duties: All writing could be described as non-creative.  Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases.  If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B.  Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C.  Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D.  Non-writing news assistants:

   Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E.  Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential.  Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F.  No news assistant will be reprimanded for an error in news judgment.

~~18~~16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees.  The employees will cooperate in maintaining these conditions.

B.  The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern.  The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

~~19~~17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

~~20~~18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director. The Company has the right to change in any way its Drug and Alcohol Policy from time to time after consultation with the Union.

~~21~~19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director. The Company reserves the right to change in any way its transitional duty program from time to time after consultation with the Union.

~~22~~20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. Content providers who receive a buyout under this Agreement may be contracted to perform services as stringers or freelancers.

25. The Company may use ADP or any other payroll services firm. Employees will be paid weekly~~, or bi-weekly or bi-monthly~~, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.

# GC EXHIBIT 15

NLRB-0001357

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 15

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

# ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance shall be defined as a dispute over an alleged violation of this agreement.

2. **No later than thirty (30) days after the Guild President or Unit Chairman becomes aware of a dispute the Union shall file a grievance in writing with the employer's Human Relations Director.** Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitratorwithin ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The parties shall determine who shall eliminate the first name by the flip of a coin.

6. Once a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be ~~considered granted~~ automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The expense of the arbitration shall be shared equally by both parties. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding.

# GC EXHIBIT 16

NLRB-0001360

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 16

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 6

**Company Counterproposal No. 27**
**April 11, 2018**

## ARTICLE VIII
## Security

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and prepare the employee for satisfactory service in the future. The Company shall use progressive discipline, which normally includes, but is not limited to, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild ten (10) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may, in the Company's discretion, first be offered for a reduction in force after consultation with the Guild.

(2) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. Two year associates in the affected work group shall be laid off first. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:



a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports
e. Content providers (photographers/videographers) in Visuals
f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art
h. Assigning editors
i. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group (i) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company is willing to provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date. (To be discussed.

9. The Company reserves the right to establish and offer, from time to time, termination incentives within a department and/or classification and/or classification within a department for employees who desire to voluntarily terminate their employment.

10. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;
ii.) absence from work due to a layoff for more than twelve (12) months
iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;
iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated.
v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within 18 months from the start of their absence may have their benefits and seniority terminated.
vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

11. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

12. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by [__] the Company.

(b) In the event of discharge for [__] misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

13. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

14. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

15. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

16. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company's discretion.

17. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

18. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

# GC EXHIBIT 17

NLRB-0001366

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 17

**Dispostion:**

**Identified** X

**Rejected**

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

| **Date:** | **Witness:** | **Reporter:** |
| --- | --- | --- |
| 9-19-22 | SILVER | BW |

**No. of Pages:** 53

May 3, 2018

# COMPANY PROPOSAL

## AGREEMENT BETWEEN

## PITTSBURGH POST-GAZETTE

## AND

## THE NEWSPAPER GUILD OF PITTSBURGH

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Guild Shop | 3 |
| II. | Checkoff | 4 |
| III. | Classifications, Wages and Schedules of Minimums | 6 |
| IV. | Hours | 10 |
| V. | Overtime | 12 |
| VI. | Part-time, Temporary Employees and Two-Year Associates | 13 |
| VII. | Sick Leave | 14 |
| VIII. | Security | 15 |
| IX. | Expenses | 19 |
| X. | Internships, Two-Year Associates | 20 |
| XI. | Vacations | 21 |
| XII. | Holidays | 23 |
| XIII. | Advancement, Promotion and Transfer | 24 |
| XIV. | Severance Pay | 26 |
| XV. | Leaves of Absence | 27 |
| XVI. | Adjustment of Disputes | 29 |
| XVII. | Military Service | 31 |
| XVIII. | Preferential Re-Employment | 32 |
| XIX. | Miscellaneous | 33 |
| XX. | Insurance, Health and Welfare, Benefits | 37 |
| XXI. | Privilege Against Disclosure | 40 |

**TABLE OF CONTENTS (Continued)**

**Page**

XXII. Management Rights ....................................................41

XXIII. Term and Renewal ....................................................42

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

No person under Guild jurisdiction will be arbitrarily named as a Manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D. The parties recognize the following exceptions to the Guild's jurisdiction set forth in Paragraph C:

1. Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work.

2. Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

3. The Company may subcontract work.

4. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed 20 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

5. Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

   The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

   The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

   It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

## ARTICLE I
## Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

## ARTICLE II
## Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature______________________________________________

Date________________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 8% of earnings to a maximum of $4,000 per calendar year.

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| Content Providers | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net Wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 8%Wage Diversion [TBD] | ~~88.30~~ | ~~90.55~~ | ~~103.68~~ | ~~108.29~~ | ~~111.23~~ | ~~114.89~~ |
| | Wage after diversion | ~~794.68~~ | ~~814.97~~ | ~~933.16~~ | ~~974.61~~ | ~~1001.07~~ | ~~1034.02~~ |

Provides original content for print and electronic publications and products.

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Content Editors/Producers | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 8% Wage Diversion [TBD] | ~~89.47~~ | ~~96.73~~ | ~~107.51~~ | ~~112.21~~ | ~~116.32~~ |
| | Wage after diversion | ~~805.27~~ | ~~870.53~~ | ~~967.55~~ | ~~1009.89~~ | ~~1046.90~~ |

Edits and produces original content for print and electronic publications, products, and slot.

| | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| Assignment Editors | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 8% Wage Diversion [TBD] | ~~110.25~~ | ~~112.21~~ | ~~117.96~~ |
| | Wage after diversion | ~~992.25~~ | ~~1009.89~~ | ~~1061.65~~ |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| Librarian | Wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | 8% Wage Diversion [TBD] | ~~87.42~~ | ~~88.79~~ | ~~90.36~~ |
| | Wage after diversion | ~~786.74~~ | ~~799.09~~ | ~~813.20~~ |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| News Assistant | Wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | 8% Wage Diversion [TBD] | ~~73.21~~ | ~~75.17~~ | ~~77.13~~ |
| | Wage after diversion | ~~658.85~~ | ~~676.49~~ | ~~694.13~~ |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Editorial Clerks | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| Administrative | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 8% Wage Diversion [TBD] | ~~65.66~~ | ~~67.42~~ | ~~68.89~~ | ~~69.78~~ |
| | Wage after diversion | ~~590.94~~ | ~~606.82~~ | ~~620.05~~ | ~~627.98~~ |

Provides newsroom support as necessary

| Copy Messengers | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| | Wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | 8% Wage Diversion [TBD] | ~~54.98~~ | ~~55.47~~ | ~~55.96~~ | ~~56.45~~ |
| | Wage after diversion | ~~494.80~~ | ~~499.21~~ | ~~503.62~~ | ~~508.03~~ |

Provides newsroom support as necessary

| Two-Year Associates | | 1st Year | 2nd Year |
|---|---|---|---|
| | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 8% Wage Diversion [TBD] | ~~55.86~~ | ~~61.25~~ |
| | Wage after diversion | ~~502.74~~ | ~~551.25~~ |

Performs various newsroom assignments as necessary

| 3-Month Interns | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 8% Wage Diversion [TBD] | ~~50.18~~ | ~~51.65~~ | ~~53.12~~ |
| | Wage after diversion | ~~451.58~~ | ~~464.81~~ | ~~478.04~~ |

Performs various newsroom assignments as necessary

41. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

~~5~~2. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

3. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums.

~~7~~4. Any new classification established by the Company shall be subject to effects bargaining between the Company and the Guild.

~~8~~5. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ....................................................minimum salary differential
Copy messenger to reporter/editor ......................................minimum salary differential
News assistant, clerk to reporter/editor..........................minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

When no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week. (Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)

~~9~~6. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

~~10~~7. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, ~~or~~ until the top minimum is reached, or until the merit increase is removed by the Company, in its discretion.

## ARTICLE IV
### Hours

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

~~(a)~~2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

~~(b)~~3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

i. The nature of the work is such that it can be compressed into 4 days.
ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
vii. A lunch or dinner break may be required as part of the work day.
viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

~~(c)~~4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

~~2~~5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

~~3~~6. Subject to newsroom operation requirements, whenever possible, days off shall be consecutive days.

~~4~~7. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

68. Time spent by employees traveling to and from assignments shall be considered as part of the working day once the work day has begun.

79. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

810. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. They shall designate a period not to exceed twelve (12) months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week. In the event the Company reduces its print and/or digital publication schedule from its current seven (7) day schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours.

## ARTICLE V
## Overtime

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than 30 minutes at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

6. Columnists, Editorial Writers, and Investigative Reporters are exempt from overtime provisions.

## ARTICLE VI
### Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, other leaves of absences, and to meet newsroom operational requirements. Part-time employees shall not receive holiday pay or personal days.

3. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability -- Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company.

~~5~~4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

~~6~~5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

~~7~~6. Sick leave payments shall terminate upon termination of employment, retirement or death of the employee.

~~8~~7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

~~9~~8. An employee cannot use sick leave or use sick leave benefits for any purpose other than illness or injury.

~~11~~9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

~~12~~10. Company agrees to notify the Guild when an individual's STD is reduced or discontinued. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

## ARTICLE VIII
### Security

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and assist the employee for satisfactory service in the future. The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild twenty-one (21) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may, in the Company's discretion, first be offered for a reduction in force after consultation with the Guild.

(2) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. Two year associates in the affected work group shall be laid off first. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:

a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports
e. Content providers (photographers/videographers) in Visuals

f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art
h. Assigning editors
i. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group (i) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company is willing to provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date. (To be discussed.

~~9. The Company reserves the right to establish and offer, from time to time, termination incentives within a department and/or classification and/or classification within a department for employees who desire to voluntarily terminate their employment.~~

9. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twelve (12) months

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated. Said one year will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's one year time period shall commence anew.

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within 18 months from the start of their absence may have their benefits and seniority terminated. Said 18 months will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's 18 month time period shall commence anew.

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

10. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

11. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by [ ] the Company.

(b) In the event of discharge for [ ] misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

12. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

13. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

14. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

15. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company's discretion.

16. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

17. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

## ARTICLE IX
### Expenses

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The Company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. DMV driving records must be submitted to the Company, upon request.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

## ARTICLE X
### Internships, Two-Year Associates

1. Unpaid academic internships will be limited to fourteen (14) a year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.
b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.
c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates are excluded from the following classifications: librarian, news assistant, clerk, and messenger.

E. There will be no assignment restrictions

## ARTICLE XI
### Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service and four (4) weeks for eight (8) continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

## ARTICLE XII
## Holidays

1. The following holidays, or days observed as such, shall be granted to full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. The Company shall designate the day the holiday is observed. A full-time employee shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, a full-time employee will receive 6-1/4 days' pay for the holiday week if he/she works the holiday and 4 other days during the holiday week.

43. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

## ARTICLE XIII
## Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be not less than 30, nor more than 75 days as determined by the Company, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating

and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. ~~The exempt employee in this role will not count toward the 30% limitation as established elsewhere in the contract.~~

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the Company and the Guild.

## ARTICLE XIV
### Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of ~~52~~ 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
## Leaves of Absence

1. The Company may grant employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild shall, upon request, be given a leave of absence without pay to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3. Any employee who has had five continuous years in the employ of the Company without a leave of absence may be given a leave of absence by the Company, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
   (b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
   (c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The ~~parties agree~~ Guild agrees to comply with the Company's Family and Medical Leave Act ~~of 1993~~ policies as amended from time to time on the same basis as nonrepresented employees of the Company.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance, or when the Union reasonably should have known of the events giving rise to the grievance, in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and

binding. All fees and expenses of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case.

**ARTICLE XVII**
**Military Service**

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the general type of work for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

~~3~~2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

~~4~~3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
## Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance independent contractor photographers may be retained for photo and video assignments.

~~6~~5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

~~7~~6. The Guild, its representatives and the employees covered by this Agreement agree, individually and collectively, that none of them will call, authorize, encourage (by action or inaction) or engage in any slowdown, strikes of any kind, sympathy strike, bannering, boycotts against the Company, boycotts against advertisers which are the result of a dispute with the Company, picketing or any other acts which interfere with the Company's operations or the production or sale of its products or services during the term of this Agreement.

In the event of any strike or any other proscribed activity not authorized, ratified or condoned by the Guild, the Guild agrees it will make every good faith effort to end such activity.

The Company agrees that it will not lockout any employees during the term of this Agreement.

The Company shall have direct recourse to the National Labor Relations Board or the courts for a violation of this Article.

~~9~~7. The Guild shall be notified within 24 hours of all resignations tendered.

~~10~~8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

~~11~~9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

~~12~~10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

~~13~~11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

~~14~~12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

~~15~~13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.

(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

~~16~~14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

~~17~~15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

~~18~~16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

~~19~~17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

~~20~~18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the

Human Resources Director. The Company has the right to change in any way its Drug and Alcohol Policy from time to time after consultation with the Union.

~~21~~19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director. The Company reserves the right to change in any way its transitional duty program from time to time after consultation with the Union.

~~22~~20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.
c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. Content providers who receive a buyout under this Agreement may be contracted to perform services as stringers or freelancers.

25. The Company may use ADP or any other payroll services firm. Employees will be paid weekly~~,~~ or bi-weekly~~ or bi-monthly~~, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.

## ARTICLE XX
### Insurance, Health and Welfare, Pensions

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding.

~~A. Retiree healthcare~~ [Discuss need to retain since no retiree medical]

~~1~~2. The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.

~~2~~3. Future Retiree Medical and Life Benefits - Any and all retiree medical benefits ~~will be~~ were terminated as of ~~the effective date of the agreement~~ October 14, 2014 for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:

(a) Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.

(b) For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.

~~3~~4. Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.

~~4~~5. Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees ("Retiree Unit" – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 ("Single")/$25,000 ("Other than Single"); or

(b) a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges;

as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.

56. Medicare Eligible Retirees – All current Medicare Retirees ("Retiree Unit" as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:

(a) a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.

(i) Any current-Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").

(ii) Any current-Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):

MODIFIED "A" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $153.90 for retiree and spouse |

or;

(b) A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:

MODIFIED "B" STIPEND PROGRAM

| Description | Proposed Amount |
|---|---|
| Group #1: participants currently receiving maximum of $171/ retiree and spouse | $119.70 for retiree and spouse |

67. Other Conditions Related To These Programs

(a) A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree

(b) A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree

(c) "Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement

(d) The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.

(e) In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits from the Company.

(f) If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.

(g) Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.

(h) If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.

(i) Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to make the one-time payment. The Company reserves the right to implement such one-time payments in subgroups or tiers as the Company deems appropriate.

(j) The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.

(k) Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.

8. Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth in Exhibit 1, according to the parameters set out in the Plan Document. The Company has the right to make changes to the 401(k) Plan from time to time so long as the benefits provided in Exhibit 1 are not reduced.

9. Frozen Pension Plan – [To be discussed].

## ARTICLE XXI
### Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

**ARTICLE XXII**
**Management Rights**

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work ~~in accordance with the provisions of this Agreement~~; to establish new jobs and abolish or change existing jobs; to determine and redetermine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine ~~reasonable standards of production~~ work and quality standards; ~~to issue, amend and revise reasonable rules and policies in accordance with applicable law;~~ to cease or restructure any department, operation or service of the Company in whole or in part; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce, change or discontinue ~~new or improved~~ research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine and redetermine the number, location and operation of departments, divisions and all other units of the Company; to install security cameras for the safety of employees and property; to establish or continue policies, practices and procedures for the conduct of the business and, from time to time, to change or abolish such policies, practices or procedures; to determine the number of hours per day or week that operations shall be carried on; to establish and change work schedules, assignments and break periods; to determine the fact of lack of work; to make, change, discontinue and enforce safety rules and rules governing the conduct of employees; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement. ~~The Management Rights article shall survive and continue in effect after the expiration date of this Agreement.~~

## ARTICLE XXIII
## Term and Renewal

1. This Agreement shall commence on ________________ and expire on ________________.

2. This Agreement shall be effective upon its execution and shall remain in full force and effect through ______________. Written notice of a desire to terminate this Agreement must be delivered by the one party to the other not more than one hundred fifty (150) days nor less than sixty (60) days prior to ______________.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ____________________________________ Date: _____________________
Michael A Fuoco

By: ____________________________________ Date: _____________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: _________________________________ Date: _____________________
Stephen B. Spolar, Vice President of Human Resources

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block
Publisher and Editor-in-Chief

**Memorandum of Understanding**

The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid $50 for off-shift appearances.

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at not less than $25. Appearances scheduled during the staff member's non-working hours will be compensated at not less than $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to the appropriate Company representative, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

Exhibit 1
GUILD EMPLOYEES 401(K) PLAN

The PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:

(a) The PG will make a matching contribution ("PG Matching Contribution") to the PG Publishing Company 401(K) Plan (the "Plan") equal to 50% of the first $40 per week deferred by any Eligible Full Time Employee

(b) The maximum amount of PG Matching Contribution will be $20 per week or the pro-rated equivalent for less than Eligible Full Time Employees

(c) The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(d) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(e) The PG Matching Contribution will be subject to a vesting schedule as follows:

(i) Less than 3 years of service – 0% Vested

(ii) At least 3 years of service – 100% Vested

(iii) Vesting Service is counted from original hire date

(f) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(g) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

(h) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.

(i) All new employees will be automatically placed into the 401K plan with the ability to opt out.

# GC EXHIBIT _

NLRB-0001419

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 18

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 51

November 14, 2018

# COMPANY PROPOSAL

## AGREEMENT BETWEEN

## PITTSBURGH POST-GAZETTE

## AND

## THE NEWSPAPER GUILD OF PITTSBURGH

# TABLE OF CONTENTS

Page

I. Guild Shop ....... 3

II. Checkoff ....... 4

III. Classifications, Wages and Schedules of Minimums ....... 6

IV. Hours ....... 10

V. Overtime ....... 12

VI. Part-time, Temporary Employees and Two-Year Associates ....... 13

VII. Sick Leave ....... 14

VIII. Security ....... 15

IX. Expenses ....... 19

X. Internships, Two-Year Associates ....... 20

XI. Vacations ....... 21

XII. Holidays ....... 23

XIII. Advancement, Promotion and Transfer ....... 24

XIV. Severance Pay ....... 26

XV. Leaves of Absence ....... 27

XVI. Adjustment of Disputes ....... 29

XVII. Military Service ....... 31

XVIII. Preferential Re-Employment ....... 32

XIX. Miscellaneous ....... 33

XX. Insurance, Health and Welfare, Benefits ....... 37

XXI. Privilege Against Disclosure ....... 38

**TABLE OF CONTENTS (Continued)**

**Page**

XXII. Management Rights ....................................................................................................39

XXIII. Term and Renewal .........................................................................................................40

**AGREEMENT**

Agreement is made and entered into at Pittsburgh, PA this ______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

No person under Guild jurisdiction will be arbitrarily named as a Manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D. The parties recognize the following exceptions to the Guild's jurisdiction set forth in Paragraph C:

1. Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work.

2. Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

3. The Company may subcontract work.

4. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed 20 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

5. Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

   The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

   The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

   It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

**ARTICLE I**
**Guild Shop**

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

## ARTICLE II
## Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature________________________________________

Date____________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall be paid weekly not less than the following wages in these classifications less a wage diversion of 8% of earnings to a maximum of $4,000 per calendar year.

| Content Providers | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net Wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 8% Wage Diversion [TBD] | ~~88.30~~ | ~~90.55~~ | ~~103.68~~ | ~~108.29~~ | ~~111.23~~ | ~~114.89~~ |
| | Wage after diversion | ~~794.68~~ | ~~814.97~~ | ~~933.16~~ | ~~974.61~~ | ~~1001.07~~ | ~~1034.02~~ |

Provides original content for print and electronic publications and products.

| Content Editors/Producers | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 8% Wage Diversion [TBD] | ~~89.47~~ | ~~96.73~~ | ~~107.51~~ | ~~112.21~~ | ~~116.32~~ |
| | Wage after diversion | ~~805.27~~ | ~~870.53~~ | ~~967.55~~ | ~~1009.89~~ | ~~1046.90~~ |

Edits and produces original content for print and electronic publications, products, and slot.

| Assignment Editors | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 8% Wage Diversion [TBD] | ~~110.25~~ | ~~112.21~~ | ~~117.96~~ |
| | Wage after diversion | ~~992.25~~ | ~~1009.89~~ | ~~1061.65~~ |

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| Librarian | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| | Wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | 8% Wage Diversion [TBD] | ~~87.42~~ | ~~88.79~~ | ~~90.36~~ |
| | Wage after diversion | ~~786.74~~ | ~~799.09~~ | ~~813.20~~ |

Provides newsroom, library and photo support as necessary.

| News Assistant | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| | Wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | 8% Wage Diversion [TBD] | ~~73.21~~ | ~~75.17~~ | ~~77.13~~ |
| | Wage after diversion | ~~658.85~~ | ~~676.49~~ | ~~694.13~~ |

Provides newsroom, library and photo support as necessary.

| Editorial Clerks Administrative | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 8% Wage Diversion [TBD] | ~~65.66~~ | ~~67.42~~ | ~~68.89~~ | ~~69.78~~ |
| | Wage after diversion | ~~590.94~~ | ~~606.82~~ | ~~620.05~~ | ~~627.98~~ |

Provides newsroom support as necessary

Copy Messengers

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| | Wage | 561.00 | 566.00 | 571.00 | 576.00 |
| | 2% pension | 11.22 | 11.32 | 11.42 | 11.52 |
| | Net wages | 549.78 | 554.68 | 559.58 | 564.48 |
| | 8% Wage Diversion [TBD] | ~~54.98~~ | ~~55.47~~ | ~~55.96~~ | ~~56.45~~ |
| | Wage after diversion | ~~494.80~~ | ~~499.21~~ | ~~503.62~~ | ~~508.03~~ |

Provides newsroom support as necessary

| Two-Year Associates | | 1st Year | 2nd Year |
|---|---|---|---|
| | Wage | 570.00 | 625.00 |
| | 2% pension | 11.40 | 12.50 |
| | Net wages | 558.60 | 612.50 |
| | 8% Wage Diversion [TBD] | ~~55.86~~ | ~~61.25~~ |
| | Wage after diversion | ~~502.74~~ | ~~551.25~~ |

Performs various newsroom assignments as necessary

| 3-Month Interns | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| | wage | 512.00 | 527.00 | 542.00 |
| | 2% pension | 10.24 | 10.54 | 10.84 |
| | Adjusted wages | 501.76 | 516.46 | 531.16 |
| | 8% Wage Diversion [TBD] | ~~50.18~~ | ~~51.65~~ | ~~53.12~~ |
| | Wage after diversion | ~~451.58~~ | ~~464.81~~ | ~~478.04~~ |

Performs various newsroom assignments as necessary

41. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

~~5~~2. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

3. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums.

~~7~~4. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

~~8~~5. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ........................................................minimum salary differential
Copy messenger to reporter/editor ........................................minimum salary differential
News assistant, clerk to reporter/editor...........................minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

When no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week. (Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)

~~9~~6. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

~~10~~7. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, ~~or~~ until the top minimum is reached, or until the merit increase is removed by the Company, in its discretion.

# ARTICLE IV
## Hours

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

~~(a)~~2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

~~(b)~~3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

- i. The nature of the work is such that it can be compressed into 4 days.
- ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
- iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
- iv. No employee shall be assigned to work a four-day week without his/her consent.
- v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
- vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
- vii. A lunch or dinner break may be required as part of the work day.
- viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

~~(c)~~4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

~~2~~5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

~~3~~6. Subject to newsroom operation requirements, whenever possible, days off shall be consecutive days.

~~4~~7. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

68. Time spent by employees traveling to and from assignments shall be considered as part of the working day once the work day has begun.

79. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

810. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. They shall designate a period not to exceed twelve (12) months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week. In the event the Company reduces its print and/or digital publication schedule from its current seven (7) day schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours.

## ARTICLE V
## Overtime

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than 30 minutes at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

6. Columnists, Editorial Writers, and Investigative Reporters are exempt from overtime provisions.

## ARTICLE VI
### Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, other leaves of absences, and to meet newsroom operational requirements. Part-time employees shall not receive holiday pay or personal days.

3. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability -- Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company.

~~5~~4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

~~6~~5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

~~7~~6. Sick leave payments shall terminate upon termination of employment, retirement or death of the employee.

~~8~~7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

~~9~~8. An employee cannot use sick leave or use sick leave benefits for any purpose other than illness or injury.

~~11~~9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

~~12~~10. Company agrees to notify the Guild when an individual's STD is reduced or discontinued. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

**ARTICLE VIII**
**Security**

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and assist the employee for satisfactory service in the future. The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild twenty-one (21) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may, in the Company's discretion, first be offered for a reduction in force after consultation with the Guild.

(2) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. Two year associates in the affected work group shall be laid off first. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:

a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports
e. Content providers (photographers/videographers) in Visuals

f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art
h. Assigning editors
i. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group (i) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company is willing to provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date. (To be discussed.

~~9. The Company reserves the right to establish and offer, from time to time, termination incentives within a department and/or classification and/or classification within a department for employees who desire to voluntarily terminate their employment.~~

9. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twelve (12) months

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated. Said one year will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's one year time period shall commence anew.

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within 18 months from the start of their absence may have their benefits and seniority terminated. Said 18 months will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's 18 month time period shall commence anew.

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

10. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

11. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by [__] the Company.

(b) In the event of discharge for [__] misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

12. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

13. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

14. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

15. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company's discretion.

16. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

17. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

## ARTICLE IX
### Expenses

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The Company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. Employees are required to authorize release of their DMV records.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

## ARTICLE X
### Internships, Two-Year Associates

1. Unpaid academic internships will be limited to fourteen (14) a year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of Articles VI, Sections 2-4; XIII; XIV; XV; XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates are excluded from the following classifications: librarian, news assistant, clerk, and messenger.

E. There will be no assignment restrictions

## ARTICLE XI
## Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service and four (4) weeks for eight (8) continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

## ARTICLE XII
## Holidays

1. The following holidays, or days observed as such, shall be granted to full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. The Company shall designate the day the holiday is observed. A full-time employee shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, a full-time employee will receive 6-1/4 days' pay for the holiday week if he/she works the holiday and 4 other days during the holiday week.

43. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

## ARTICLE XIII
### Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be not less than 30, nor more than 75 days as determined by the Company, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating

and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. ~~The exempt employee in this role will not count toward the 30% limitation as established elsewhere in the contract.~~

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the Company and the Guild.

## ARTICLE XIV
## Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of ~~52~~ 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
## Leaves of Absence

1. The Company may grant employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild shall, upon request, be given a leave of absence without pay to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3. Any employee who has had five continuous years in the employ of the Company without a leave of absence may be given a leave of absence by the Company, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The Company may require employees to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance, or when the Union reasonably should have known of the events giving rise to the grievance, in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and

binding. The expense of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case.

**ARTICLE XVII**
**Military Service**

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the general type of work for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

~~3~~2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

~~4~~3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
### Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance independent contractor photographers may be retained for photo and video assignments.

~~6~~5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

~~7~~6. No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lock out its employees during the term of this Agreement.

~~9~~7. The Guild shall be notified within 24 hours of all resignations tendered.

~~10~~8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

~~11~~9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

~~12~~10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

~~13~~11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

~~14~~12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

~~15~~13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

~~16~~14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

~~17~~15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

~~18~~16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

~~19~~17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

~~20~~18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

~~21~~19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director.

~~22~~20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.

    c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. Content providers who receive a buyout under this Agreement may be contracted to perform services as stringers or freelancers.

25. The Company may use ADP or any other payroll services firm. Employees will be paid weekly, or bi-weekly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.

## ARTICLE XX
### Insurance, Health and Welfare, Pensions

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding.

2. Retiree healthcare

A. Any and all retiree medical benefits were terminated as of October 14, 2014.

3. 401(k) Plan

A. Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth in Exhibit 1, according to the parameters set out in the Plan Document. The Company has the right to make changes to the 401(k) Plan from time to time so long as the benefits provided in Exhibit 1 are not reduced.

4. Pension Plan.

A. The defined benefit pension plan has been merged and frozen.

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

## ARTICLE XXII
## Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine ~~reasonable standards of production~~ work and quality standards; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease or restructure any department, operation or service of the Company in whole or in part; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce, change or discontinue ~~new or improved~~ research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

**ARTICLE XXIII**
**Term and Renewal**

1. This Agreement shall commence on ________________ and expire on ________________.

2. This Agreement shall be effective upon its execution and shall remain in full force and effect through ______________. Written notice of a desire to terminate this Agreement must be delivered by the one party to the other not more than one hundred fifty (150) days nor less than sixty (60) days prior to ______________.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ________________________________ Date: ____________________
Michael A Fuoco

By: ________________________________ Date: ____________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ________________________________ Date: ____________________
Stephen B. Spolar, Vice President of Human Resources

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block
Publisher and Editor-in-Chief

## Memorandum of Understanding

The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid $50 for off-shift appearances.

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at not less than $25. Appearances scheduled during the staff member's non-working hours will be compensated at not less than $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to the appropriate Company representative, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

Exhibit 1
GUILD EMPLOYEES 401(K) PLAN

The PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:

(a) The PG will make a matching contribution ("PG Matching Contribution") to the PG Publishing Company 401(K) Plan (the "Plan") equal to 50% of the first $40 per week deferred by any Eligible Full Time Employee

(b) The maximum amount of PG Matching Contribution will be $20 per week or the pro-rated equivalent for less than Eligible Full Time Employees

(c) The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(d) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(e) The PG Matching Contribution will be subject to a vesting schedule as follows:

(i) Less than 3 years of service – 0% Vested

(ii) At least 3 years of service – 100% Vested

(iii) Vesting Service is counted from original hire date

(f) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(g) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

(h) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.

(i) All new employees will be automatically placed into the 401K plan with the ability to opt out.

# GC EXHIBIT 19

NLRB-0001470

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 19

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 16

Union Counterproposal
November 14, 2018

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ~~October 15, 2014~~_______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph ~~12~~, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, ~~Seen Editor~~, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

In no event will the number of employees excluded from the Agreement be more than ~~30~~ **10** percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have ~~42~~ **14** employees excluded, provided that they qualify as management personnel.

**Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the agreement.)**

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which

replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Exempt employees **cannot** do bargaining unit work as performed in the past **nor do** ~~and/or~~ similar work that may result from the introduction of new print, electronic or other products. ~~and as operationally necessary. Performance of such exempt work will not displace bargaining unit employees.~~

**The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.**

**D. The Guild recognizes that from time to time the Post-Gazette may need to use stringers. In recognition of such potential need whenever the Post-Gazette contends there is a need for stringers they shall advise the Guild of that need. They shall indicate the number of stringers needed, the work the stringer(s) is to perform, and the length the time the stringer(s) is needed. The parties shall then meet to determine whether stringer(s) can be used. Absent mutual agreements stringers shall not perform any bargaining unit work. Any such agreement that permits stringers shall include the extent they can be used, the amount they shall be paid, the conditions under which they shall perform bargaining unit work and the length of time the stringer shall remain as a stringer. Any such agreement must be signed in writing and approved by the Post-Gazette and the Guilds Executive Board.**

~~The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligations to report the news according to the following guidelines:~~

~~1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.~~

~~2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.~~

~~3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective January 1, 2007, the maximum will be 15 percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.~~

~~4.~~ **E. Commercial vendors** ~~Community Journalism initiatives~~

**Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette**

**audience, the Company agrees to work with the Guild in developing community journalism initiatives.**~~, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.~~

The company may ~~continue to~~ obtain content from commercial vendors **for:** ~~,including, but not limited to,~~ traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette ~~and~~ through the bargaining unit and shall not ~~exempt editors and is not intended to~~ displace bargaining unit work.

Union Counterproposal
November 14, 2018

# ARTICLE IV
## Hours

1. No ~~employee eligible for Guild membership~~ **bargaining unit employee** shall work more than eight (8) hours per day within an **nine (9)** consecutive hour period, nor more than five days per week with the following exceptions:

(a) With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.
(b) ~~Additionally,~~ Full-time employees with at least two years of service shall, on a rotating basis, have the option of working a four-day week consisting of four **10** hour days at ~~his~~ **their** request. ~~under the following conditions:~~
The nature of the work is such that it can be compressed into 4 days.

i. At least one weekend shift may be required as part of the work week except by mutual agreement.
ii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iii. No employee shall be assigned to work a four-day week without his/her consent.
iv. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
~~ii. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.~~
v. A lunch or dinner break may be required as part of the work day.
iii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

(c) Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

2. **Any employee who is regularly scheduled to work forty (40) hours within any seven (7) day pay period shall be considered a full-time employee and shall be guaranteed a forty (40) hour work week during the life of this contract unless discharge for cause or laid off pursuant to the layoff provision of this Agreement. Any day in which an employee's absence is authorized by the provisions of this contract shall be considered a regularly scheduled day. In the event the employer reduces its print and digital publication from its current 7 day schedule, the employer may request that the guaranteed work week be amended. The employer shall give the Guild no less than a 10 day notice in such event. Once notice is given, the parties shall meet to determine if there needs to be a change in any work schedules. There shall be no changes in the hours and/or work**

**schedules set forth herein unless and until the parties mutually agree in writing to any such changes.** ~~A regular schedule of working hours shall be maintained for all employees.~~ No less than ~~three~~ **5** days' notice shall be given in advance of any change in an employee's working schedule~~, where possible~~. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday~~, where possible~~.

3. ~~Wherever possible,~~ **D**ays off shall be consecutive days **unless the employee chooses otherwise.**

**4. No employee shall be required to work more than 5 consecutive days.**

**5.** It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

**6.** A differential of ~~$3~~ **$6** per shift will be paid to an employee who begins his shift on or after 2 p.m., **and/or for working on a weekend. Those working weekend shifts that begin after 2 p.m. shall receive a $20 per shift differential.** ~~As of Jan. 1, 2007, All night differentials will be diverted to the Guild Pension Plan for the life of the current contract.~~

This shall apply only so long as the employee is assigned to such shifts.

**7. When the majority of an employee shift is between 11 p.m. and 6:30 a.m. that employee shall receive a shift differential of $40.**

**8. No employee shall be required to work any swing shifts except by mutual agreement between the employee and the company.**

**9.** Time spent by employees traveling to and from assignments shall be considered as part of the working day.

**10.** Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

**11.** By arrangement with the Company, employees who elect to reduce their work week to fewer than 40 hours shall be considered flex-time employees. They shall designate a period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance

coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status
whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

Union Counterproposal
November 14, 2018

# ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed ~~35~~ **20** percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave and other leaves of absences, **and to meet newsroom operational needs.**

3. It shall be a policy of the Company to pay part-time employees who average individually less than **20** ~~17.5~~ hours per week not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than **20** ~~17.5~~ hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. ~~Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration.~~ Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight (8) months, a period which may be extended by mutual agreement between the Company and the Guild. **These employees will be covered only by Articles I, II III, V, VI, and XVI of this Agreement.** Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the **eight** month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond **(8) eight** months shall receive **all benefits of that contract on a proportionate basis.** ~~one week's vacation~~.

5. Part-time **and/or** ~~and, or~~ temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.

Union Counterproposal
November 14, 2018

# ARTICLE X
# INTERNSHIPS, TWO-YEAR ASSOCIATES

1. Unpaid academic internships will be limited to **fourteen (14)** a **calendar** year. The number may be increased by mutual consent between the Company and the Guild.
   a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.
   b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.
   c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their
period of employment.

D. Associates ~~may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they~~ are excluded from the following classifications: **librarian**, news assistant, clerk, and messenger.

~~E. There will be no assignment restrictions~~

E.~~F.~~ ~~No~~ Vacation bonuses will be paid by the Company to two-year associates.

# ARTICLE XI
## Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service; two (2) weeks for one (1) complete year of service; **four (4)** ~~three (3)~~ weeks for three (3) continuous years of service; **five (5)** ~~four (4)~~ weeks for eight (8) continuous years of service and **six (6)** ~~five (5)~~ weeks for **18** ~~23~~ continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers. ~~The service requirement for five weeks of vacation will decrease as follows: 21 years in 2002; 20 years in 2003; 18 years in 2004.~~

~~Employees hired on or after Jan. 1, 2007, will receive a maximum of four (4) weeks vacation.~~

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three
(3) days' notice.

~~Effective January 1, 1994:~~

All former Press employees will receive credit, for vacation purposes only, for their service with the Pittsburgh Press Company.

~~All employees hired between Jan. 1, 1987 and Jan. 1, 1993, will receive, for vacation purposes only, an extra year of service. The extra year of service is eliminated after the employee receives four weeks of vacation.~~

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January l and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September

1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be

arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees eligible for **6** ~~5~~ weeks of vacation must take at least one week prior to March 31. Also, all employees who do not submit vacation requests prior to September 1 ~~will~~ **may** be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

9. With the exception of self-provoked discharge or failure to give two weeks' notice, accrued vacation pay will be paid on termination of employment or in the event of death to the designated beneficiary according to the following schedule:

| | | |
|---|---|---|
| Less than 3 complete years of service | – | 0**1 week's pay** |
| 3 to 6 complete years of service | – | 1 **3 week's pay** |
| 7 to 11 complete years of service | – | 2 **4 weeks' pay** |
| 12 to 15 complete years of service | – | 3 **5 weeks' pay** |
| 16 or more years of service | – | 4 **6 weeks' pay** |

~~Effective May 1, 2007, the accrued vacation pay will be diverted to the Guild~~

~~Pension Plan for the current contract.~~

**10.** Employees ~~shall~~ receive **annually a** ~~$25~~ **$40** bonus for each year of service. For every year after 15 years, the employee will receive an additional ~~$25~~ **$40** bonus for each year or service. For example, an employee with 25 years of service will receive **$1,400** ~~$875~~ (25 x ~~$25~~ **$40** = ~~$625~~ **$1,000**+ ~~$250~~ $400 (10 x $25 **$40**) = $875 **$1,400**). ~~Effective Jan. 1, 2007, these service bonuses will be diverted to the Guild Pension Plan for the current contract.~~

~~**11. On an annual basis, Guild members may roll over one (1) week of vacation to the next year.**~~

Union Counterproposal
November 14, 2018

# ARTICLE XIII
## Advancement, Promotion and Transfer

1. The Company shall immediately post notice of ~~such~~ **any** vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction. ~~to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned.~~ **On the first day after the application period ends the Guild shall be made aware of anyone seeking the position. If the employer does not select the bargaining unit employee(s) they must notify the employee and the union setting forth their reasons for the rejection. Any rejection must not be for arbitrary or capricious reasons and shall be subject to the grievance procedure. If the job is not filled as a result of the above, the employer shall be free to fill the vacancy from the outside.**

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be **no less than 30 nor more than** 75 days, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If **during or** at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher~~, or be given the option of accepting his severance pay~~.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above~~, excepting that he shall not have the option of accepting his severance pay~~.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. The exempt employee in this role ~~will not~~ **shall** count toward the **5%** ~~30%~~ limitation as established elsewhere in the contract.

20%

9. Management shall have the right to transfer employees from one newsroom department to another over their objection. for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial,

Union Counterproposal
November 14, 2018

Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the company and the Guild.

NLRB-0001485

# GC EXHIBIT 20

NLRB-0001486

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 20

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 15

AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ~~October 15, 2014~~_______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 12, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, **Editorial Director,** Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, ~~Seen-Editor~~, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

In no event will the number of employees excluded from the Agreement be more than ~~30~~ **20** percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have ~~42~~ **28** employees excluded, provided that they qualify as management personnel.

**Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the agreement.)**

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which

replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Exempt employees **cannot** do bargaining unit work as performed in the past **nor do** ~~and/or~~ similar work that may result from the introduction of new print, electronic or other products.~~-and as operationally necessary.~~ ~~Performance of such exempt work will not displace bargaining unit employees.~~

**The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.**

**D. The Guild recognizes that from time to time the Post-Gazette may need to use stringers. In recognition of such potential need whenever the Post-Gazette contends there is a need for stringers they shall advise the Guild of that need. They shall indicate the number of stringers needed, the work the stringer(s) is to perform, and the length the time the stringer(s) is needed. The parties shall then meet to determine whether stringer(s) can be used. Absent mutual agreements stringers shall not perform any bargaining unit work. Any such agreement that permits stringers shall include the extent they can be used, the amount they shall be paid, the conditions under which they shall perform bargaining unit work and the length of time the stringer shall remain as a stringer. Any such agreement must be signed in writing and approved by the Post-Gazette and the Guilds Executive Board.**

~~The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligations to report the news according to the following guidelines:~~

~~1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.~~

~~2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.~~

~~3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective January 1, 2007, the maximum will be 15 percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.~~

~~4.~~ **E. Commercial vendors** ~~Community Journalism initiatives~~

**Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette**

**audience, the Company agrees to work with the Guild in developing community journalism initiatives.**~~, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.~~

The company may ~~continue to~~ obtain content from commercial vendors **for:** ~~, including, but not limited to,~~ traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette ~~and~~ through the bargaining unit and shall not ~~exempt editors and is not intended to~~ displace bargaining unit work.

Union's Security Proposal
December 13, 2018

Consistent with our discussions on November 14, 2018 regarding Security, the parties hereby agree as follows:

1. The Post-Gazette shall provide a twenty-four (24) hour seven (7) day per week security guard at the facility where the bargaining unit employees are employed. (The union suggests that the security staff be upgraded and that the utmost security would be off duty Pittsburgh Police Officers)

2. The Post-Gazette provide employees with the ability to park their automobiles in the parking lot immediately adjacent to the building. The employees are willing to pay the going rate except when there are special events. In such events the price to the employee should not exceed that which they pay when there are no events. If this agreement cannot be reached with the lot operator, the Post-Gazette shall pay to the employee the difference between the regular rate and the event rate. In the alternative, the employees would be agreeable to the Post-Gazette establishing a parking lot elsewhere so long as a shuttle service is provided, similar to that provided by Allegheny General Hospital for its employees. For those employees who do not park in the lots made available by the Post-Gazette, the Post-Gazette shall provide escort service to employees walking to the transit stop during any day in which an event is held for the stadiums located on the Northside, or any day after 6:00 pm and before 7:00 am.

3. The Post-Gazette shall provide security monitors in the newsroom showing the lobby and the rear entrances of the building.

4. The Post-Gazette shall eliminate any and all motion detectors that automatically open the third floor doors. There shall be a switch or button that opens the door when someone actually desires to leave the newsroom. In conjunction with this change a camera shall be installed outside the doors on the third floor so the employee can monitor the hallway before opening the door to make certain it is safe to leave.

5. The Post-Gazette shall install rope ladders to allow escapes from the third floor. These ropes should be set up with at least one located on the Stage AE side of the building.

6. The Post-Gazette shall provide no less than five panic buttons in the newsroom at different locations that when triggered will immediately call 911.

7. The Post-Gazette shall install interior locking deadbolts on all bathroom doors.

Union Counterproposal
December 13, 2018

# ARTICLE IV
## Hours

1. No ~~employee eligible for Guild membership~~ **bargaining unit employee** shall work more than eight (8) hours per day within a**n** **nine (9)** consecutive hour period, nor more than five days per week with the following exceptions:

(a) **When an employee works overtime hours**

~~(a)~~ (b) With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

~~(b)~~ (c) ~~Additionally,~~ **F**ull-time employees with at least two years of service shall, on a rotating basis, have the option of working a four-day week consisting of four **10** hour days at ~~his~~ **their** request. ~~under the following conditions:~~

i. The nature of the work is such that it can be compressed into 4 days.

ii. At least one weekend shift may be required as part of the work week except by mutual agreement.

iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).

iv. No employee shall be assigned to work a four-day week without his/her consent.

v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.

~~i. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.~~

vii. A lunch or dinner break may be required as part of the work day.

viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

~~(c)~~ (d) Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

2. **Any employee who is regularly scheduled to work forty (40) hours within any seven (7) day pay period shall be considered a full-time employee and shall be guaranteed a forty (40) hour work week during the life of this contract unless discharge for cause or laid off pursuant to the layoff provision of this Agreement. Any day in which an employee's absence is authorized by the provisions of this contract shall be considered a regularly scheduled day. In the event the employer reduces its print and digital publication from its current 7 day schedule, the employer may request that the guaranteed work week be amended. The employer shall give the Guild no less than a 10 day notice in such event. Once notice is given, the parties shall meet to determine if there needs to be a change**

**in any work schedules. There shall be no changes in the hours and/or work schedules set forth herein unless and until the parties mutually agree in writing to any such changes.** A regular schedule of working hours shall be maintained for all employees. No less than ~~three~~ **5** days' notice shall be given in advance of any change in an employee's working schedule~~, where possible~~. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday~~, where possible~~.

3. ~~Wherever possible,~~ Days off shall be consecutive days **unless the employee chooses otherwise.**

**4. No employee shall be required to work more than 5 consecutive days, except as provided in Article V Section 1.**

**5.** It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

**6.** A differential of ~~$3~~ $6 per shift will be paid to an employee who begins his shift on or after 2 p.m., **and/or for working on a weekend. Those working weekend shifts that begin after 2 p.m. shall receive a $20 per shift differential.** ~~As of Jan. 1, 2007, All night differentials will be diverted to the Guild Pension Plan for the life of the current contract.~~

This shall apply only so long as the employee is assigned to such shifts.

**7. When the majority of an employee shift is between 11 p.m. and 6:30 a.m. that employee shall receive a shift differential of $40.**

**8. No employee shall be required to work any swing shifts except by mutual agreement between the employee and the company.**

**9.** Time spent by employees traveling to and from assignments shall be considered as part of the working day.

**10.** Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

**11.** By arrangement with the Company, employees who elect to reduce their work week to fewer than 40 hours shall be considered flex-time employees. They shall designate a period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will

continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status
whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

Union Counterproposal
December 13, 2018

# ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed ~~35~~ **20** percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave and other leaves of absences**, and to meet newsroom operational needs.**

3. It shall be a policy of the Company to pay part-time employees who average individually less than **20** ~~17.5~~ hours per week not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than **20** ~~17.5~~ hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. ~~Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration.~~ Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight (8) months, a period which may be extended by mutual agreement between the Company and the Guild. **These employees will be covered only by Articles I, II III, IV, V, VI, and XVI of this Agreement.** Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the **eight** month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond **(8) eight** months shall receive **all benefits of that contract on a proportionate basis.** ~~one week's vacation~~.

5. Part-time **and/or** ~~and, or~~ temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.

Union Counterproposal
December 13, 2018

# ARTICLE X
# INTERNSHIPS, TWO-YEAR ASSOCIATES

1. Unpaid academic internships will be limited to **fourteen (14)** a **calendar** year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI **(paragraphs 2, 3 and 4)**, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates ~~may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they~~ are excluded from the following classifications: **librarian**, news assistant, clerk, and messenger.

E. There will be no assignment restrictions

**E.**~~F.~~ ~~No~~ **V**acation bonuses will be paid by the Company to two-year associates.

Union Counterproposal
December 13, 2018

# ARTICLE XIII
## Advancement, Promotion and Transfer

1. **When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction.** The Company shall immediately post notice of ~~such~~ **any** vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction.~~to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned.~~ **On the first day after the application period ends the Guild shall be made aware of anyone seeking the position. If the employer does not select the bargaining unit employee(s) they must notify the employee and the union setting forth their reasons for the rejection. Any rejection must not be for arbitrary or capricious reasons and shall be subject to the grievance procedure. If the job is not filled as a result of the above, the employer shall be free to fill the vacancy from the outside.**

2. When an employee is ~~advanced to~~ **awarded** a position ~~in a higher classification~~, he shall be paid **no less than** the salary minimum in the ~~advanced~~ classification **but in no event less than their current salary.** ~~next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater.~~ The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee ~~so advanced~~ **awarded the position** shall be **no less than 30 nor more than** 75 days, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If **during or** at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher~~, or be given the option of accepting his severance pay~~.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above~~, excepting that he shall not have the option of accepting his severance pay~~.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. The exempt employee in this role ~~will not~~ **shall** count toward the **20%** ~~30%~~ limitation as established elsewhere in the contract.

9. Management shall have the right to transfer employees from one newsroom department to another over their objection for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local

News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the company and the Guild.

# GC EXHIBIT 21

NLRB-0001501

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 21

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

January 31, 2019

**Company Proposal**

The 2% wage diversion to the pension plan will be deleted. On the effective date of this Agreement, the Company agrees to increase the minimum wage schedules set forth in Article III of the collective bargaining agreement by two percent (2%). The Company's proposal set forth herein is expressly conditioned on the Union's acceptance of the Company's health care proposal in Article XX, Section 1, of its November 14, 2018 proposal.

# GC EXHIBIT 22

NLRB-0001504

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 22

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 5

Union Counterproposal
July 15, 2019

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ~~October 15, 2014~~______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

## EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

### Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 12, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, **Editorial Director,** Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, ~~Seen Editor~~, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

In no event will the number of employees excluded from the Agreement be more than ~~30~~ 20 percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have ~~42~~ 28 employees excluded, provided that they qualify as management personnel.

**Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the agreement.)**

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which

replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

Exempt employees **cannot** do bargaining unit work as performed in the past **nor do** ~~and/or~~ similar work that may result from the introduction of new print, electronic or other products. ~~and as operationally necessary. Performance of such exempt work will not displace bargaining unit employees.~~

**The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.**

**D.** The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligations to report the news according to the following guidelines:

1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.

2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.

3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective January 1, 2007, the maximum will be 15 percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.

~~4.~~ **E. Commercial vendors** ~~Community Journalism initiatives~~

**Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives.** ~~, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.~~

The company may ~~continue to~~ obtain content from commercial vendors **for:** ~~, including, but not limited to,~~ traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

Union Counterproposal
July 15, 2019

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette ~~and~~ through the bargaining unit and shall not ~~exempt editors and is not intended to~~ displace bargaining unit work.

# GC EXHIBIT 23

NLRB-0001509

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 23

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 81

Pittsburgh Post-Gazette®
post-gazette.COM

# Position Statement

# and

# Best Offer

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

Direct Dial: (615) 726-5420
E-mail: rlowe@kingballow.com

August 6, 2019

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

In response to the Union's request at our last meeting, the Company has prepared its Best Offer for a new collective bargaining agreement ("Agreement"). The highlighted provisions reflect the current Company proposal on a particular issue. The balance of the Company's Best Offer reflects tentative agreements and/or language from the expired collective bargaining agreement which is not in dispute.

The Company is proposing a three (3) year contract, effective on the signing date of the new Agreement. The Company is proposing wage increases as follows: On the first pay period following the effective date of the Agreement, the top minimum scale in each classification in Article III shall increase three percent (3%). On the first anniversary date of the Agreement, the top minimum scale in each classification in Article III shall increase two percent (2%). On the second anniversary date of the Agreement, the top minimum scale in each classification in Article III shall increase three percent (3%). The Company is not proposing retroactive pay.

The Company has prepared a position statement setting forth the positions of the Company and the Union on substantially all of the remaining open issues. This position statement does not set forth every discussion held or position maintained by either party to explain, justify or reject a specific proposal. The position statement does summarize the positions of the parties on the open issues. The Company hopes this summary is helpful.

We believe the Company's Best Offer is fair and in the best interest of both parties. We respectfully urge acceptance of this offer.

Sincerely,

Richard C. Lowe

NLRB-0001513

Pittsburgh Post-Gazette®
post-gazette.com

# Position Statement

# TABLE OF CONTENTS

**Article** **Page**

Agreement ..... 1
III. Classifications, Wages and Schedules of Minimums ..... 4
IV. Hours ..... 6
V. Overtime ..... 8
VI. Part-time, Temporary Employees and Two-Year Associates ..... 9
VII. Sick Leave ..... 10
VIII. Security ..... 11
IX. Expenses ..... 14
X. Internships, Two-Year Associates ..... 15
XI. Vacations ..... 16
XII. Holidays ..... 17
XIII. Advancement, Promotion and Transfer ..... 18
XIV. Severance Pay ..... 19
XV. Leaves of Absence ..... 20
XVI. Adjustments of Disputes ..... 21
XIX. Miscellaneous ..... 22
XX. Insurance, Health & Welfare, Pension ..... 24

**Agreement**

1. The Union is proposing the following language:

> In no event will the number of employees excluded from the Agreement be more than 20 percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the Company may have 28 employees excluded, provided that they qualify as management personnel.

The Company has repeatedly told the Union since negotiations began in early 2017 that its proposal to limit the number of supervisors the Company may have was a permissive subject of bargaining the Company was not going to agree to. In negotiations held on July 15, 2019, the Union stated it would remove its permissive proposals at some point and would not go to impasse over them. No agreement has been reached on the Union's permissive proposal.

2. The Company has proposed to retain the Union's jurisdiction subject to certain exceptions as follows:

A. **Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work.**

Managers currently have the right to perform bargaining unit work as performed in the past and/or similar work that may result from the introduction of new print, electronic or other products as operationally necessary. The parties disagree over the current scope of bargaining unit work performed by managers.

The Company believes managers should continue to perform bargaining unit work when, in its judgement, such work contributes to the efficient operation of the newsroom. The Company has proposed the work of managers will not directly cause the layoff of any bargaining unit employees.

The Union is proposing to prohibit managers from performing bargaining unit work. The Union's current proposal is a regressive proposal, i.e., a proposal worse than an earlier 2017 proposal. The Union has also stated it would agree to the Company's proposal if the Company gave everyone a 30% wage increase. No agreement has been reached by the parties.

B. **Non-bargaining unit employees may perform bargaining unit work on an occasional basis.**

The Company is proposing to allow non-bargaining unit employees to perform work on an occasional, non-routine basis. Any employee of the Company should have the right to contribute to the news products of the Company subject to newsroom management's approval. As the Company routinely accepts content from outside contributors, there is no good reason not to accept content on an occasional basis from its own employees.

The Union refuses to allow this exception to its jurisdiction. No agreement has been reached by the parties.

C. **The Company may subcontract work.**

The Company currently receives content from outside contributors and sources. There is, however, no language in the Agreement reflecting this fact. The Company has emphasized to the Union that the ability to acquire content from any source, without restriction, will assist the Company in maintaining its relevance as a local newspaper. Such flexibility will also assist the newspaper in fulfilling its commitment to the community to provide news and information which is relevant to people's lives. As the Company approaches its digital-only future, the ability to obtain content from any source will be important to its success.

The Company's proposal also permits the Company to adjust its operations to take advantage of future business models which enhance operational efficiencies. The newsroom design of the future will probably differ materially from today's current operations. It is critical for the Company's success to retain the flexibility to structure its newsroom operations to operate efficiently in a digital-only environment. Newspapers are struggling today to find a business model which will ensure the survival of local newspapers. The Company believes its proposal is vital to the future success of the Post-Gazette.

The Union is unwilling to provide the Company with the flexibility the Company is proposing. No agreement has been reached by the parties.

D. **The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount paid to stringers will not exceed 20 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.**

The Company is proposing to retain its current use of stringers to provide outside content. The Company's proposal increases the number of stringers the Company can hire from 15% to 20% of the guild payroll. It is difficult to predict future challenges the newspaper will face and their effect on available newsroom resources. It is prudent to ensure the newspaper's ability to obtain content from any source as it strives to achieve the efficient allocation of more limited future resources.

Until the July 15, 2019 meeting, the Union's proposal on stringers was regressive. The Union's proposal denied the Company's right to utilize any stringers without the agreement of the Union. After again pointing out the regressive nature of the Union's proposal, the Union withdrew its proposal on July 15 and reverted back to the expired contract's language on stringers. No agreement has been reached by the parties.

**Article III**

**Classifications, Wages and Schedules of Minimums**

1. The Company is proposing a three (3) year contract, effective on the signing date of the new Agreement. The Company is proposing wage increases as follows: On the first pay period following the effective date of the Agreement, the top minimum scale in each classification in Article III shall increase three percent (3%). On the first anniversary date of the Agreement, the top minimum scale in each classification in Article III shall increase two percent (2%). On the second anniversary date of the Agreement, the top minimum scale in each classification in Article III shall increase three percent (3%). The Company is not proposing retroactive pay.

   The Union is proposing the following:

   - Eliminate all wage diversions and pension diversions.
   - Move Content Providers up to the Content Editors scale.
   - Effective upon ratification, wages at all levels and classifications will increase seven (7) percent from the current minimum rates. Rates will increase an additional seven (7) percent in each subsequent year. Term of contract to be determined.
   - Maintain all classifications, definitions and steps.
   - Additional step increases at the 10-, 15-, 20- and 25-year levels to be negotiated.

   The Union's proposal is an economic concession the Company is not willing to make. No agreement on wages has been reached by the parties.

2. The Company is proposing that experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion. In order to attract the best journalists in the future, the Company must have the flexibility to recruit journalists with as many tools as possible. Entry level salaries is one of those tools. In the competitive environment of attracting talent, the Company's right to determine an applicant's initial rate of pay is important.

3. The expired contract provides that when no exempt manager is on duty, and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift. The Company is proposing to retain this language from the expired contract.

   The Union is proposing to increase the amount of money the assigned ranking supervisor is paid from $30 per shift to $75 per shift. The Company believes the $30 per shift is fair. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

4. The Union is proposing to increase the salary differential for the Harrisburg and Washington correspondent from $20 to $30 per week. The Company has rejected the Union's proposal as an economic concession it is not willing to make. No agreement has been reached by the parties.

5. The parties have agreed to retain the expired contract language permitting employees to receive merit increases from the Company. The remaining issue in dispute is the Company's proposal allowing the Company to remove merit increases.

The Company's position is a merit increase can be removed if, for example, (1) an employee received a merit increase for a special project which is then completed, or (2) if an employee no longer holds a certain position that justified a merit increase, or (3) if performance issues surface after an employee receives a merit increase. No agreement has been reached by the parties.

**Article IV**

**Hours**

1. The Company is proposing to retain the current workday and workweek as follows:

> A full-time employee's normal work day will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

The Union, on the other hand, is proposing a guaranteed workweek as follows:

> Any employee who is regularly scheduled to work forty (40) hours within any seven (7) day pay period shall be considered a full-time employee and shall be guaranteed a forty (40) hour work week during the life of this contract unless discharged for cause or laid off pursuant to the layoff provisions of this Agreement.

The Union is also proposing in the event the Company reduces its print and digital publication schedule, the guaranteed work week could not be reduced unless the Union agreed.

A guaranteed work week is an economic concession the Company is not willing to make. The Company will be a digital-only newspaper. The Company's current plans are to publish a digital news product every day of the week. However, given the institutional and financial stresses on newspapers, it would be less than prudent to guarantee workweeks in today's environment for traditional media. While the Company believes in providing normal workdays and workweeks for its employees, it is not willing to provide a guarantee.

In the event a reduction in work schedules becomes necessary due to the reduction in the Company's print or digital publications schedule, the Company is proposing to sit down with the Union to discuss the effects of any reduced work schedule. No agreement has been reached by the parties.

2. The Company is proposing to retain the current three (3) day notice where possible of changes in an employee's work schedule. The Union is proposing a strict five (5) day notice period. The Company believes a three (3) day notice period is fair especially in light of the operational requirements of a newsroom. No agreement has been reached by the parties.

The Company is also proposing the right to change an employee's starting time with 24 hours' notice. Because news events are unpredictable, the Company believes the flexibility to change starting times with adequate notice is a reasonable exercise of its right to schedule employees for work.

The Union's position is that an employee can veto any change to his or her starting time. The Company is mindful of potential undue hardships created by starting time changes. However, the nature of a journalist's job will necessitate starting time changes from time to time. No agreement has been reached by the parties.

3. The Union is proposing shift differentials of different amounts. The shift differentials proposed by the Union are an economic concession the Company is not willing to make. No agreement has been reached by the parties.

4. The Union is proposing that days off be consecutive, unless the employee chooses otherwise. The Company is proposing to provide consecutive days off whenever possible and subject to newsroom requirements. The Company will continue to schedule consecutive work shifts but cannot guarantee them. Newsroom operational requirements may require workweeks with nonconsecutive work shifts. No agreement has been reached by the parties.

5. The Union is proposing to allow swing shifts only by mutual consent. The Company tries to accommodate an employee's preferences for his or her work schedules. The nature of the Company's newsroom operations require swing shifts from time to time. Swing shifts are currently scheduled in the newsroom. No agreement has been reached by the parties.

**Article V**

**Overtime**

1. Overtime is currently paid after forty (40) hours worked in the work week. The Union is also proposing that overtime be paid for work beyond eight (8) hours in a work day. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

2. The Company is proposing to continue to pay an employee required to return to work after his regular working day for the time worked, but not less than four (4) hours. The Union has proposed to extend a callback to anytime an employee is required to work remotely after his regular working day. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

3. The Union is proposing that an employee can refuse to work on his or her day off if requested by the Company. The Company cannot accept such a restriction on its scheduling practices. Employees are scheduled to work on their days off from time to time because of news events or other operational requirements. The Company believes this is the nature of a journalist's job and cannot agree to the Union's proposal.

   The Company is also proposing to reduce the minimum guarantee of hours for work on a day off from eight hours to four hours. The eight hour guarantee is an economic concession the Company is not willing to make. No Agreement has been reached by the parties.

4. Under federal law, Columnists, Editorial Writers and Investigative Reporters are exempt from the overtime provisions of the Fair Labor Standards Act because they are exempt professionals. The Union has vigorously opposed the Company's proposal to exempt these individuals from overtime. In the interest of reaching a mutually acceptable agreement with the Union, the Company has deleted this proposal from its best offer.

## Article VI

**Part-time, Temporary Employees and Two-Year Associates**

1. The Union is proposing to decrease the number of two-year associates, paid interns and part-time employees the Company may employ from 35 percent of the Union's membership to 20 percent. The Company believes the current limitation of 35 percent should remain unchanged. Because of the enormous challenges facing newspapers, it is essential for the Company to operate with maximum efficiency. This includes determining the role two-year associates, paid interns and part-time employees will play in the Company's future newsroom operations. No agreement has been reached by the parties.

2. The Company is proposing that part-time employees not receive holiday pay or personal days because they are not full-time employees. The Union is insisting part-time employees receive these benefits. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

3. The Union is proposing that temporary employees whose positions extend beyond eight months shall receive full benefits under the contract on a proportionate basis. The Company's proposal is to retain the expired contract language which awards one week's vacation to temporaries whose temporary positions extend past eight months with the mutual agreement of the parties. The Company does not believe temporary employees have any expectation they will receive full benefits. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

4. The Company is proposing to eliminate language in the expired contract which provides that part-time and temporary employees will not eliminate or displace a regular full-time employee. When asked if the Company could decide to cover news assignments with a part-time employee if the regular full-time reporter covering the assignment departed or was reassigned, the Union stated the current contract language would prevent that. The Company believes management should have the right to decide how to cover news assignments with the available news staff. No agreement has been reached by the parties.

## Article VII

## Sick Leave

1. The Company is proposing to continue to provide employees with eight (8) days sick pay annually. The Union is proposing nine (9) days. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

2. The Company is proposing to cover bargaining unit employees with its short term disability policy (STD). The Union is insisting on retaining the short term disability banks in the expired contract with increases to the maximum accumulation. The Union's proposal is an economic concession it is not willing to make. No agreement has been reached by the parties.

3. The Union is proposing that any unused sick days in an employee's short –term disability bank, up to a maximum of 120 days, be paid out on the employee's separation from the Company, including retirement. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

## Article VIII

## Security

1. The Company is proposing the following language to ensure fair treatment of all employees:

> The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and assist the employee for satisfactory service in the future. The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

The Union is proposing the identical language as the Company except for the last sentence. The Union asked the Company how it determines the appropriate discipline in a particular case.

The Company's position is that each disciplinary situation is unique. Once the Company determines an employee has engaged in any type of misconduct, the Company addresses what level of discipline is appropriate based on the facts and circumstances in that particular case. If the offense is of a serious nature such as theft, for example, the Company may decide the serious offense warrants discharge without the necessity of prior warnings or attempts at corrective discipline. If the infraction was of a less serious nature such as tardiness, for example, the Company may opt for some milder penalty aimed at correction.

The nature of the offense, the Employee's work record and the presence or absence of any mitigating factors all play a part in evaluating the appropriate discipline in any circumstance. There is no mechanical formula applied to Employee discipline because each situation is different.

For example, the Employee's prior work record is a factor in determining the appropriateness of a disciplinary penalty. An offense may be ameliorated by the lack of previous discipline and it may be exacerbated by a poor disciplinary record. A disciplinary warning for tardiness in an employee's work record which is three (3) years old will most likely be treated differently than a three (3) year old disciplinary warning for sexual harassment.

The Company also evaluates any mitigating factors that would excuse or extenuate the discipline. For example, length of service can serve as a mitigating factor depending upon the type of offense at issue.

Again, the totality of an employee's work record is reviewed by the Company in deciding on appropriate discipline under the circumstances of a particular case. As both parties have agreed, the major purpose of any disciplinary action is to correct the problem, prevent reoccurrences and assist the Employee for satisfactory service in the future.

No agreement has been reached by the parties.

2. The Company is proposing to lay off employees by work groups similar to the work groups in the expired contract. The Company has proposed some modifications to the work groups to better reflect its current operations. The primary disagreement between the parties is the methodology used for a layoff within a work group. The Company is proposing to consider seniority, qualifications, performance, and skills in the affected work group. The Union's proposal is to lay off in inverse seniority order.

Professional journalists are not clones of each other, or even equally qualified with each other. Each journalist performs his or her job with varying degrees of skill, ability and efficiency. The Union's position that seniority be the sole factor in layoffs is specious. Under the Union's reasoning, all veteran professional baseball players with comparable years of service are the baseball equals of Mike Trout, or for that matter, Babe Ruth.

The Company has explained how the Company would apply its language for layoffs. At the time a reduction in force is necessary, the Company will consider seniority, qualifications, performance and skills of the employees in the affected work group. There is no formula for applying these factors. Decisions will be based on the Company's business needs at the time these factors are considered.

For example, at the time a reduction in force is necessary, the Company will evaluate the performance of employees in the work group in which a layoff is to occur. If a layoff is to occur in the Business content providers work group, the Company will evaluate each employee's work product, productivity, technical knowledge if relevant to the job requirements, and any other performance factors which the Company may deem relevant to meet the Company's current operational requirements.

No agreement has been reached by the parties.

3. The Company is proposing to recall laid off employees according to seniority, provided that the skill and qualifications are, in the opinion of the Company, equal. The Company believes that in the event of a recall, the Company's operational requirements existing at the time will assist the Company in evaluating the skill and qualifications of employees laid off in an affected work group. If the skill and qualifications are substantially equal, the Company believes the more senior employee should be called back first.

The Union is proposing strict seniority should govern recalls in an affected work group. The Company respectfully disagrees with the union's position. No agreement has been reached by the parties.

4. The expired contract provided for inconsistent recall periods. The Company is proposing to retain a 12 month recall period. The Union is proposing a recall period of 24 months. The Company believes a 12 month recall period makes more sense with the uncertainties newspapers face today. No agreement has been reached by the parties.

5. The Company is willing to provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of an employee's termination date for laid off employees. The Union is proposing six months of paid healthcare coverage and an additional six months of reduced paid health coverage for laid off employees. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

6. The Company is proposing the right to terminate the seniority rights of employees for absences due to illness or non-work related injury after 1 year, and absences due to a work related injury after 18 months. The Company is proposing to reduce the time periods in the expired contract because the Company believes the time periods are excessive. Shorter time periods may also encourage employees to return to work earlier from their leaves. The Union is proposing to maintain the expired contract's two (2) year period for illnesses or non-work related injury and three (3) years for work related injuries. No agreement has been reached by the parties.

7. The Company is proposing to retain the existing no-discrimination provision in the expired contract. The Union's proposal is to add "gender identity" to the provision. Because the law surrounding gender identity discrimination is still being developed by the courts, the Company's position is to let the EEOC and courts continue to handle gender identity issues rather than arbitrating these kinds of disputes under the collective bargaining agreement. No agreement has been reached by the parties.

## Article IX

## Expenses

1. The Company is proposing to retain the current mileage allowance. The Union is proposing a mileage allowance equal to the amount permitted under IRS regulations. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

2. The Union is proposing to allow an employee to use his own personal equipment without the Company's approval. Necessary working equipment is currently provided for employees and paid for by the Company. The Company's position is that employees must obtain approval of the Company before an employee may use his personal equipment to cover stories. The risks of hackers, viruses, and other IT security issues mandate the Company's control over equipment used by employees in its newsroom operations.

3. The Union is proposing the Company pay all parking costs after the initial parking fee. The Company is proposing to retain the current reimbursement limit of $15.00 per day after the employee pays the initial parking fee. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

4. The Company is proposing that bargaining unit employees be required to authorize release of their DMV records. This release is necessary for the maintenance of the Company's liability insurance. The Union has rejected the Company's proposal for no good reason. No agreement has been reached by the parties.

5. The Union is proposing the Company provide all Guild members who use a cell phone for work purposes with cell phones, chargers and data plans. The Company currently provides cell phones to employees if the Company decides a cell phone is necessary for the employee to perform his primary duties. Providing all bargaining unit employees with a cell phone is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

6. The Union is proposing the Company reimburse all eligible Union members up to $90 per month for gym memberships and other wellness/exercise programs. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

**Article X**

**Internships, Two-Year Associates**

1. The Union is proposing two-year associates be paid vacation bonuses. The Union's proposal is an economic concession the Company is unwilling to make. No agreement has been reached by the parties.

## Article XI

## Vacations

1. The Company is proposing four weeks as the maximum amount of vacation employees can earn. The Union is proposing the following additional vacation:

   - 4 weeks' vacation after 3 years of service
   - 5 weeks' vacation after 4 years of service
   - 6 weeks' vacation after 18 years of service.

   The Company believes a maximum of four weeks' vacation is fair. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

2. The Union has proposed to reinstate the payment of accrued vacation pay for employees who terminate their employment with the Company with enhanced amounts of vacation pay. The Company is willing to pay employees accrued vacation pay.

3. The Union has proposed to reinstate longevity bonuses eliminated over 12 years ago. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

**Article XII**

**Holidays**

1. The Union is seeking to increase the number of personal days for bargaining unit employees. Additionally, the Union is proposing to increase the premium for holidays. Finally, the Union is proposing holiday pay for employees assigned to the Christmas Eve and New Year's Eve shift.

   The Company believes the current premiums paid for holidays are fair. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

**Article XIII**

**Advancement, Promotion and Transfer**

1. The Company has proposed to allow bargaining unit employees to apply for job openings as follows:

> When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

The Union is proposing that unsuccessful applicants cannot be rejected for arbitrary or capricious reasons and that any rejection is subject to the grievance procedure. The Company believes promotion decisions should not be subject to challenge through arbitration. They have not been in the past and should not be in the future. With the continuing challenges facing the newspaper, it is important the Company maintain control over promotion decisions.

The Company is proposing the right to fill vacancies and new positions from outside the bargaining unit. If the Company believes there is a promising candidate for a position inside or outside the community, it should have the right to consider and hire that person for the position. The Company, of course, believes in promoting from within. Nevertheless, the Company must retain the right to hire from outside the bargaining unit.

**Article XIV**

**Severance Pay**

1. The Union is proposing to increase the maximum amount of severance pay from 52 to 70 weeks' pay. The Company is proposing to reduce the maximum amount of severance pay from 52 to 26 weeks' pay. The Company believes a maximum of 26 weeks' severance pay is fair. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

**Article XV**

**Leaves of Absence**

1. The Company is proposing the right to have an employee's available paid leave run concurrently with leaves of absence under the Family and Medical Leave Act (FMLA). That option is permitted under the FMLA. The Company believes operational efficiencies will be enhanced if the Company applies paid leave to FMLA absences. The Union has rejected the Company's proposal. No agreement has been reached by the parties.

**Article XVI**

**Adjustments of Disputes**

1. Promptness is one of the most important aspects of grievance adjustments. Failure to settle grievances with dispatch is a major cause of labor unrest. The parties' expired collective bargaining agreement did not contain a time limitation for filing a grievance. The Company has proposed the following language:

> A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance, or when the Union reasonably should have known of the events giving rise to the grievance, in order to be timely.

The Company believes fifteen (15) days from the date of the event which generated the grievance, or when the Union reasonably should have known of the event generating the grievance, is a reasonable amount of time for an employee or the Union to raise a grievance it has with the Company. The earlier a grievance is filed and brought to the Company's attention, the easier it is for the Company to fix a mistake or resolve a dispute over the interpretation of contract language. The Company has a responsibility to live up to the terms of its collective bargaining agreement, a responsibility the Company takes very seriously. If the Union believes a Company action is not consistent with the contract, it should raise the issue promptly so the Company can evaluate its actions.

The Union is proposing the following language:

> No later than thirty (30) days after the Guild President or Unit Chairman becomes aware of a dispute the Union shall file a grievance in writing with the employer's Human Relations Director.

The Company believes 30 days is not a reasonable time period for filing a grievance. Additionally, the Union applies a subjective standard for becoming aware of a dispute. The Company believes its use of an objective standard is more fair. No agreement has been reached by the parties.

## Article XIX

## Miscellaneous

1. The Company has proposed the following language:

> An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

The Union wants to withhold their by-line, etc., to register their discontent over the Company's labor policies, editorial policy, or, for that matter, any reason. As professional journalists, the Company does not believe this is a proper purpose for withholding a by-line, etc. As a work for hire under the copyright laws, it is the Company's decision to withhold by-lines or not to withhold by-lines. However, as the Company's proposal makes clear, the Company believes it is reasonable for an employee to withhold his or her byline, etc. when the reason for withholding this information is related to preserving the professional integrity of the employee's work product. The Company will consider additional editorial, ethical or security concerns raised by an employer in requesting this information be withheld. No agreement has been reached by the parties.

2. The Company is proposing to add sympathy strike, picketing, boycotts and bannering to the expired contract's list of activities which are not permitted during the term of the Agreement. The Union refuses to agree to a comprehensive No Strike/No Lockout provision despite the parties' agreement to settle any alleged violations of the Agreement peaceably through a fair grievance and arbitration procedure.

Justice Thomas, in the Supreme Court's decision in *14 Penn Plaza LLC et al. v. Pyett et al.*, 129 S.Ct. 1456 (2009), recognized the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike. Otherwise, there would be no benefit to an employer such as the Company to agree to arbitrate grievance disputes.

A labor contract is of no benefit to the Company if the Union or the employees can inflict economic harm on the Company by engaging in a sympathy strike, boycott, picketing, or bannering during the labor contract's term. Moreover, the law requires specificity in a No-Strike provision to ensure the statutory right to engage in these activities are consciously waived during the term of the Agreement.

The Union wants the best of both worlds; it wants to memorialize wages, hours and working conditions in a binding contract, including just cause termination, and grievance and arbitration procedures, but still be able to exert economic or publicity pressure on the Company anytime it chooses. The Union's position is simply untenable.

3. The Company has proposed the following language:

> Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

Social media has transformed news gathering and reporting in this country. As a news organization, the Company has special privileges and responsibilities. In order to preserve the Company's institutional and editorial integrity, the Company must have credibility with the community we serve. The Company must protect its core functions as a news organization of objectivity and unbiased coverage of the news. In today's political climate and with the explosion of social media, the Company must be constantly mindful of preserving our reputation in the community for institutional and editorial integrity. The Company's proposal will assist the Company in meeting challenges which could threaten its institutional and editorial integrity.

4. The Union is proposing the company provide standing desks and gel mats to Union members. The Union's proposal is an economic concession the Company is not willing to make. The Company does not object to considering individual requests for these items. However, the decision to provide these items is discretionary with the Company. No agreement has been reached by the parties.

5. The Union is proposing the Company provide the Union with 120 days' notice prior to moving to a different facility and meet with the Union to discuss the move. The Company will, of course, provide reasonable notice to the Guild if the Company is relocating. However, locking in a set period such as 120 days may be problematic under the circumstances existing at the time which may, for example, require confidentiality. No agreement has been reached by the parties.

6. The Union is proposing the Company provide Union employees $100/month for tuition reimbursement. The Union's proposal is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

7. The Union has proposed bonuses for recognition in journalism contests. The Union's proposal is an economic concession the Company is not willing to make. However, the Company currently retains the discretion to pay bonuses for such activities. No agreement has been reached by the parties.

8. The Union is proposing the Company pay the expenses for employees to participate in professional development activities (such as seminars, conferences, etc.). The Company currently deals with such activities on a case-by-case basis. The Union's proposal to guarantee the payment of expenses in all cases is an economic concession the Company is not willing to make. No agreement has been reached by the parties.

## Article XX

## Insurance, Health & Welfare, Pension

1. The Company is proposing that bargaining unit employees be covered by the Company's health, dental, vision, and life insurance plans, as those plans are modified by the Company from time to time. The Company is proposing to enroll employees in the Company's Consumer Driven Healthcare Plan (CDHP). Premium costs are shared under that Plan; 70% paid for by the Company and 30% paid for by the employee. The Company is proposing to cease its participation in the Western Pennsylvania Teamsters and Employers Welfare Fund.

   The Company believes its CDHP is representative of today's typical health care plans and is a good plan, especially with the health savings accounts and tiered rates. The Company believes that by maintaining its own healthcare plan for its employees, it will have more control and flexibility to provide quality healthcare coverage at reasonable prices in an ever-changing healthcare environment.

NLRB-0001540

Pittsburgh Post-Gazette®
post-gazette.COM

# Best Offer

August 6, 2019

# COMPANY BEST OFFER

# AGREEMENT BETWEEN

# PITTSBURGH POST-GAZETTE

# AND

# THE NEWSPAPER GUILD OF PITTSBURGH

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | Guild Shop | 3 |
| II. | Checkoff | 4 |
| III. | Classifications, Wages and Schedules of Minimums | 6 |
| IV. | Hours | 10 |
| V. | Overtime | 12 |
| VI. | Part-time, Temporary Employees and Two-Year Associates | 13 |
| VII. | Sick Leave | 14 |
| VIII. | Security | 15 |
| IX. | Expenses | 19 |
| X. | Internships, Two-Year Associates | 20 |
| XI. | Vacations | 21 |
| XII. | Holidays | 23 |
| XIII. | Advancement, Promotion and Transfer | 24 |
| XIV. | Severance Pay | 26 |
| XV. | Leaves of Absence | 27 |
| XVI. | Adjustment of Disputes | 29 |
| XVII. | Military Service | 31 |
| XVIII. | Preferential Re-Employment | 32 |
| XIX. | Miscellaneous | 33 |
| XX. | Insurance, Health and Welfare, Benefits | 37 |
| XXI. | Privilege Against Disclosure | 38 |
| XXII. | Management Rights | 39 |
| XXIII. | Term and Renewal | 40 |

**AGREEMENT**

Agreement is made and entered into at Pittsburgh, PA this ______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Editorial Director, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

No person under Guild jurisdiction will be arbitrarily named as a Manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D. The parties recognize the following exceptions to the Guild's jurisdiction set forth in Paragraph C:

1. Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work.

2. Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

3. The Company may subcontract work.

4. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed 20 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

5. Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

   The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

   The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

   It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

## ARTICLE I
## Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

## ARTICLE II
## Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature______________________________________________

Date________________________________

Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.

## ARTICLE III
### Classifications, Wages and Schedules of Minimums

Employees shall receive the following minimum wage rates for these classifications (5-day workweek):

**Content Providers -- (Provides original content for print and electronic publications and products):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st six months | 812.34 | 812.34 | 812.34 |
| 2nd six months | 833.08 | 833.08 | 833.08 |
| 2nd year | 953.89 | 953.89 | 953.89 |
| 3rd year | 996.27 | 996.27 | 996.27 |
| 4th year | 1,023.32 | 1,023.32 | 1,023.32 |
| 5th year | **1,088.71** | **1,110.48** | **1,143.80** |

**Content Editors/Producers -- (Edits and produces original content for print and electronic publications, products, and slot):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st six months | 823.16 | 823.16 | 823.16 |
| 2nd six months | 889.88 | 889.88 | 889.88 |
| 2nd year | 989.06 | 989.06 | 989.06 |
| 3rd year | 1,032.33 | 1,032.33 | 1,032.33 |
| 4th year | **1,102.27** | **1,124.31** | **1,158.04** |

**Assignment Editors -- (Assigns work to content providers and content editors/producers and edits and produces content as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 3rd year | 1,014.30 | 1,014.30 | 1,014.30 |
| 4th year | 1,032.33 | 1,032.33 | 1,032.33 |
| 5th year | **1,117.80** | **1,140.15** | **1,174.36** |

**Librarian -- (Provides newsroom, library and photo support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 804.23 | 804.23 | 804.23 |
| 2nd year | 816.85 | 816.85 | 816.85 |
| 3rd year | **856.21** | **873.34** | **899.54** |

**News Assistant -- (Provides newsroom, library and photo support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 673.50 | 673.50 | 673.50 |
| 2nd year | 691.53 | 691.53 | 691.53 |
| 3rd year | **730.85** | **745.46** | **767.83** |

**Editorial Clerks Administrative -- (Provides newsroom support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 604.07 | 604.07 | 604.07 |
| 2nd year | 620.30 | 620.30 | 620.30 |
| 3rd year | 633.82 | 633.82 | 633.82 |
| 4th year | **661.20** | **674.42** | **694.65** |

**Copy Messengers -- (Provides newsroom support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 505.80 | 505.80 | 505.80 |
| 2nd year | 510.31 | 510.31 | 510.31 |
| 3rd year | 514.81 | 514.81 | 514.81 |
| 4th year | **534.90** | **545.60** | **561.97** |

**Two-Year Associates -- (Performs various newsroom assignments as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 513.91 | 513.91 | 513.91 |
| 2nd year | **580.41** | **592.01** | **609.77** |

**Three-Month Interns -- (Performs various newsroom assignments as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st internship | 461.62 | 461.62 | 461.62 |
| 2nd internship | 475.14 | 475.14 | 475.14 |
| 3rd internship | **503.33** | **513.39** | **528.80** |

1. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

2. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

3. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums.

4. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

5. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ....................................................minimum salary differential
Copy messenger to reporter/editor .......................................minimum salary differential
News assistant, clerk to reporter/editor..........................minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

When no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week. (Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)

6. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

7. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, until the top minimum is reached, or until the merit increase is removed by the Company, in its discretion.

## ARTICLE IV
## Hours

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

- i. The nature of the work is such that it can be compressed into 4 days.
- ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
- iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
- iv. No employee shall be assigned to work a four-day week without his/her consent.
- v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
- vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
- vii. A lunch or dinner break may be required as part of the work day.
- viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

6. Subject to newsroom operation requirements, whenever possible, days off shall be consecutive days.

7. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

8. Time spent by employees traveling to and from assignments shall be considered as part of the working day.

9. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

10. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. They shall designate a period not to exceed twelve (12) months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week. In the event the Company reduces its print and/or digital publication schedule from its current schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours.

## ARTICLE V
## Overtime

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

## ARTICLE VI
### Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, and other leaves of absences, and to meet newsroom operational needs. Part-time employees shall not receive holiday pay or personal days.

3. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

## ARTICLE VII
## Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent for three (3) consecutive days or more.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability -- Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company.

4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

6. Sick leave payments shall terminate upon termination of employment, retirement or death of the employee.

7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

8. An employee cannot use sick leave or use sick leave benefits for any purpose other than illness or injury.

9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

10. Company agrees to notify the Guild when an individual's STD is reduced or discontinued. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

**ARTICLE VIII**
**Security**

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and assist the employee for satisfactory service in the future. The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild twenty-one (21) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may, in the Company's discretion, first be offered for a reduction in force after consultation with the Guild.

(2) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. Two year associates in the affected work group shall be laid off first. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:

a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports
e. Content providers (photographers/videographers) in Visuals

f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art
h. Assigning editors
i. Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group (i) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company will provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date in the event of a layoff.

9. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;
ii.) absence from work due to a layoff for more than twelve (12) months

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated. Said one year will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's one year time period shall commence anew.

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within 18 months from the start of their absence may have their benefits and seniority terminated. Said 18 months will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's 18 month time period shall commence anew.

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

10. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

11. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by [__] the Company.

(b) In the event of discharge for [__] misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

12. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

13. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

14. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

15. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company's discretion.

16. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

17. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

## ARTICLE IX
### Expenses

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The Company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. Employees are required to authorize release of their DMV records.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

## ARTICLE X
## Internships, Two-Year Associates

1. Unpaid academic internships will be limited to fourteen (14) a calendar year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of Articles VI, Sections 2-4; XIII; XIV; XV; XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates are excluded from the following classifications: librarian, news assistant, clerk, and messenger.

E. There will be no assignment restrictions

## ARTICLE XI
## Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service and four (4) weeks for eight (8) continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January 1 and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

## ARTICLE XII
### Holidays

1. The following holidays, or days observed as such, shall be granted to full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. A full-time employee shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, a full-time employee will receive 6-1/4 days' pay for the holiday week if he/she works the holiday and 4 other days during the holiday week.

3. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

## ARTICLE XIII
## Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be not less than 30, nor more than 75 days as determined by the Company, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating

and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work.

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the Company and the Guild.

## ARTICLE XIV
## Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
### Leaves of Absence

1. The Company may grant employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild shall, upon request, be given a leave of absence without pay to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3. Any employee who has had five continuous years in the employ of the Company without a leave of absence may be given a leave of absence by the Company, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
   (b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
   (c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The Company may require employees to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance, or when the Union reasonably should have known of the events giving rise to the grievance, in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and

binding. The expense of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case.

## ARTICLE XVII
## Military Service

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the general type of work for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
### Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance independent contractor photographers may be retained for photo and video assignments.

5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

6. No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lock out its employees during the term of this Agreement.

7. The Guild shall be notified within 24 hours of all resignations tendered.

8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director.

20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.

     c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. The Company may use ADP or any other payroll services firm. Employees will be paid weekly, or bi-weekly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.

## ARTICLE XX
## Insurance, Health and Welfare, Pensions

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding.

Eligible bargaining unit employees participating in the Company's health, vision and dental insurance programs shall pay the following share of the total premium costs for the health, vision and dental insurance programs as determined by the Company:

| Coverage Choice | Employee Share |
|---|---|
| Employee | 30% |
| Employee +1 | 30% |
| Family | 30% |

| 2019 Premium Rates for Consumer Driven Healthcare Plan (CDHP) | | |
|---|---|---|
| **Tier** | **Monthly Premium** | **Employee Contribution** |
| Single | $648.94 | $195.00 |
| Employee +1 | $1,290.36 | $387.00 |
| Family | $1,959.82 | $588.00 |

2. Retiree healthcare

A. Any and all retiree medical benefits were terminated as of October 14, 2014.

3. 401(k) Plan

A. Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth in Exhibit 1, according to the parameters set out in the Plan Document. The Company has the right to make changes to the 401(k) Plan from time to time so long as the benefits provided in Exhibit 1 are not reduced.

4. Pension Plan.

A. The defined benefit pension plan has been merged and frozen.

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

## ARTICLE XXII
## Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine work and quality standards; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease or restructure any department, operation or service of the Company in whole or in part; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce, change or discontinue research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

**ARTICLE XXIII**
**Term and Renewal**

1. This Agreement shall commence on ________________ and expire on ________________.

2. This Agreement shall be effective upon its execution and shall remain in full force and effect through ______________. Written notice of a desire to terminate this Agreement must be delivered by the one party to the other not more than one hundred fifty (150) days nor less than sixty (60) days prior to ______________.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ____________________________________ Date: ____________________
Michael A Fuoco

By: ____________________________________ Date: ____________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ________________________________ Date: ____________________

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block
Publisher and Editor-in-Chief

**Memorandum of Understanding**

The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid $50 for off-shift appearances.

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at not less than $25. Appearances scheduled during the staff member's non-working hours will be compensated at not less than $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to the appropriate Company representative, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

Exhibit 1
GUILD EMPLOYEES 401(K) PLAN

The PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:

(a) The PG will make a matching contribution ("PG Matching Contribution") to the PG Publishing Company 401(K) Plan (the "Plan") equal to 50% of the first $40 per week deferred by any Eligible Full Time Employee

(b) The maximum amount of PG Matching Contribution will be $20 per week or the pro-rated equivalent for less than Eligible Full Time Employees

(c) The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(d) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(e) The PG Matching Contribution will be subject to a vesting schedule as follows:

(i) Less than 3 years of service – 0% Vested

(ii) At least 3 years of service – 100% Vested

(iii) Vesting Service is counted from original hire date

(f) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(g) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

(h) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.

(i) All new employees will be automatically placed into the 401K plan with the ability to opt out.

# GC EXHIBIT 24

NLRB-0001590

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 24

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 58

# UNION COUNTER PROPOSAL

## September 6, 2019

NLRB-0001592

AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ~~October 15, 2014~~_______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph ~~12~~, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, ~~Seen Editor~~, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

~~In no event will the number of employees excluded from the Agreement be more than 30 **20** percent of the total of full-time equivalent employees represented by the Guild. For example, if there are 140 full-time equivalent Guild employees the company may have 42 **28** employees excluded, provided that they qualify as management personnel.~~

**Also, no person under Guild jurisdiction will be arbitrarily named as a manager (excluded from the agreement.)**

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

**The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprint.**

Exempt employees **can** do bargaining unit work **in breaking news situations only if a Guild member in the same classification in the work required and who is working that is not**

**available.** ~~as performed in the past and/or similar work that may result from the introduction of new print, electronic or other products. and as operationally necessary.~~ ~~Performance of such exempt work will not displace bargaining unit employees.~~

D. The Guild recognizes that stringers, **also known as freelancers** will continue to be utilized by the Post-Gazette to fulfill its obligations to report the news according to the following guidelines:

1. Stringers who answer phones for sports will continue to use Company-owned equipment to input statistics, scores or other noncreative material.

2. If the Company deems it necessary that stringers, with the exception of those covered under Paragraph 1 above, must work in the office, they will be considered part-time employees covered under Articles I, II and VI of this Agreement.

**3. Stringers can be used to cover high school sports and SEEN events as long as at least one such event per shift is covered by a guild member.**

4.3. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. Effective ~~January 1, 2007~~ **upon ratification**, the maximum will be **15** ~~7.5~~ percent of the annual Guild payroll. If the amount of stringer annual expenses should exceed the percentage outlined above, the company will match this excess with a payment **to be distributed equally to all Guild members.** ~~into the Guild Pension Fund or other similar vehicle. This percentage may be changed by mutual agreement to meet operational needs.~~

4. **E. Commercial vendors** ~~Community Journalism initiatives~~

**Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives.**~~, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.~~

The company may ~~continue to~~ obtain content from commercial vendors **for:** ~~,including, but not limited to,~~ traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics, **only to the extent currently used but in no event shall the use of such vendors displace any bargaining unit employees**.

The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette ~~and~~ through the bargaining unit and shall not ~~exempt editors and is not intended to~~ displace bargaining unit work.

ARTICLE I
Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, date of birth ~~and Social Security number~~.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

ARTICLE II
Checkoff

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

The following form to be used shall be that in the current Agreement.

ARTICLE III
Classifications, Wages and Schedules of Minimums

**Eliminate all wage diversions and pension diversions.**
**~~Move Content Providers up to the Content Editors scale.~~**

~~Effective upon ratification, wages at all levels and classifications will increase seven (7) percent from the current minimum rates. Rates will increase an additional seven (7) percent in each subsequent year.~~ **Term of contract ~~to be determined.~~ shall be from April 1, 2017 and shall expire March 31, 2022.**

~~**Maintain all classifications, definitions and steps.**~~

**CONTENT PROVIDERS/EDITORS/PRODUCERS**

Reporters, Photographers, Artists, Critics, Columnists, Editorial Writers

*Provides original content for print and electronic publications and products.*

Copy Editors, Copy Editor/page Designer, Page Designer, Online Editor/producer, Copy Readers, Slot

*Edits and produces original content for print and electronic publications, products and slot.*

| Effective Date | Percent Increase | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Apr. 1, 2017 | 7.5% | $981.48 | $1,061.03 | $1,179.28 | $1,230.88 | $1,275.98 |
| Apr. 1, 2018 | 6.0% | $1,040.36 | $1,124.69 | $1,250.03 | $1,304.73 | $1,352.54 |
| Apr. 1, 2019 | 5.5% | $1,097.58 | $1,186.54 | $1,318.78 | $1,376.49 | $1,426.93 |
| Apr. 1, 2020 | 6.5% | $1,168.93 | $1,263.67 | $1,404.50 | $1,465.96 | $1,519.68 |
| Apr. 1, 2021 | 6.0% | $1,239.06 | $1,339.49 | $1,488.77 | $1,553.92 | $1,610.86 |

**ASSIGNMENT EDITORS**

Features Editor, Book Editor, News Editor, Art Director, Features Design Director, Op-Ed Editor, Associate Editor, Bureau Chief, Local News Editors, Lifestyle Editor, Copy Desk Chief, Weekend Editor, Asst. Sports Editor, Investigations Editor, Television Editor, Film Editor, Travel Editor, Outdoors Editor, Photo Editors, Food Editor, A&E Editor

*Assigns work to content providers and content editors/producers and edit and produce content as necessary.*

| Effective Date | Percent Increase | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| Apr. 1, 2017 | 7.5% | $1,209.38 | $1,230.88 | $1,293.96 |
| Apr. 1, 2018 | 6.0% | $1,281.94 | $1,304.73 | $1,371.59 |
| Apr. 1, 2019 | 5.5% | $1,352.44 | $1,376.49 | $1,447.03 |
| Apr. 1, 2020 | 6.5% | $1,440.35 | $1,465.96 | $1,541.09 |
| Apr. 1, 2021 | 6.0% | $1,526.77 | $1,553.92 | $1,633.55 |

| **LIBRARIAN**<br>*Provides newsroom, library and photo support as necessary.* | | | | |
|---|---|---|---|---|
| Effective Date | Percent Increase | 1st Year | 2nd Year | 3rd Year |
| Apr. 1, 2017 | 7.5% | $958.90 | $973.95 | $991.15 |
| Apr. 1, 2018 | 6.0% | $1,016.43 | $1,032.39 | $1,050.62 |
| Apr. 1, 2019 | 5.5% | $1,072.34 | $1,089.17 | $1,108.40 |
| Apr. 1, 2020 | 6.5% | $1,142.04 | $1,159.96 | $1,180.45 |
| Apr. 1, 2021 | 6.0% | $1,210.56 | $1,229.56 | $1,251.28 |

| **NEWS ASSISTANT**<br>*Provides newsroom, library and photo support as necessary.* | | | | |
|---|---|---|---|---|
| Effective Date | Percent Increase | 1st Year | 2nd Year | 3rd Year |
| Apr. 1, 2017 | 7.5% | $803.03 | $824.53 | $846.03 |
| Apr. 1, 2018 | 6.0% | $851.21 | $874.00 | $896.79 |
| Apr. 1, 2019 | 5.5% | $898.02 | $922.07 | $946.11 |
| Apr. 1, 2020 | 6.5% | $956.39 | $982.00 | $1,007.61 |
| Apr. 1, 2021 | 6.0% | $1,013.78 | $1,040.92 | $1,068.06 |

| **EDITORIAL CLERKS ADMINISTRATIVE**<br>*Provides newsroom support as necessary.* | | | | | |
|---|---|---|---|---|---|
| Effective Date | Percent Increase | 1st Year | 2nd Year | 3rd Year | 4th Year |
| Apr. 1, 2017 | 7.5% | $720.25 | $739.60 | $755.73 | $765.40 |
| Apr. 1, 2018 | 6.0% | $763.47 | $783.98 | $801.07 | $811.32 |
| Apr. 1, 2019 | 5.5% | $805.46 | $827.09 | $845.13 | $855.95 |
| Apr. 1, 2020 | 6.5% | $857.81 | $880.86 | $900.06 | $911.58 |
| Apr. 1, 2021 | 6.0% | $909.28 | $933.71 | $954.06 | $966.28 |

| COPY MESSENGERS<br>*Provides newsroom support as necessary.* | | | | | |
|---|---|---|---|---|---|
| Effective Date | Percent Increase | 1st Year | 2nd Year | 3rd Year | 4th Year |
| Apr. 1, 2017 | 7.5% | $603.08 | $597.70 | $613.83 | $619.20 |
| Apr. 1, 2018 | 6.0% | $639.26 | $633.56 | $650.65 | $656.35 |
| Apr. 1, 2019 | 5.5% | $674.42 | $668.41 | $686.44 | $692.45 |
| Apr. 1, 2020 | 6.5% | $718.26 | $711.85 | $731.06 | $737.46 |
| Apr. 1, 2021 | 6.0% | $761.35 | $754.57 | $774.92 | $781.71 |

| TWO-YEAR ASSOCIATES<br>*Performs various newsroom assignments as necessary.* | | | |
|---|---|---|---|
| Effective Date | Percent Increase | 1st Year | 2nd Year |
| Apr. 1, 2017 | 7.5% | $612.75 | $671.88 |
| Apr. 1, 2018 | 6.0% | $649.52 | $712.19 |
| Apr. 1, 2019 | 5.5% | $685.24 | $751.36 |
| Apr. 1, 2020 | 6.5% | $729.78 | $800.20 |
| Apr. 1, 2021 | 6.0% | $773.57 | $848.21 |

| 3-MONTH INTERN<br>*Performs various newsroom assignments as necessary.* | | | | |
|---|---|---|---|---|
| Effective Date | Percent Increase | 1st Internship | 2nd Internship | 3rd Internship |
| Apr. 1, 2017 | 7.5% | $550.40 | $671.88 | $582.65 |
| Apr. 1, 2018 | 6.0% | $583.42 | $712.19 | $617.61 |
| Apr. 1, 2019 | 5.5% | $615.51 | $751.36 | $651.58 |
| Apr. 1, 2020 | 6.5% | $655.52 | $800.20 | $693.93 |
| Apr. 1, 2021 | 6.0% | $694.85 | $848.21 | $735.57 |

Employees shall be paid weekly not less than **the wages in the above classifications.** ~~following wages in these classifications. less a wage diversion of 10% of earnings to a maximum of $5,000 per calendar year. Effective April 1, 2016, such diversion shall be reduced to 8% and a maximum of $4,250 per calendar year. Effective January 1, 2017, the maximum diversion shall be $4,000 per calendar year:~~

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|---|---|---|
| Content Providers | wage | 901.00 | 924.00 | 1058.00 | 1105.00 | 1135.00 | 1172.36 |
| | 2% pension | 18.02 | 18.48 | 21.16 | 22.10 | 22.70 | 23.45 |
| | Net wages | 882.98 | 905.52 | 1036.84 | 1082.90 | 1112.30 | 1148.91 |
| | 10% Wage Diversion | 88.30 | 90.55 | 103.68 | 108.29 | 111.23 | 114.89 |
| | Wage after diversion | 794.68 | 814.97 | 933.16 | 974.61 | 1001.07 | 1034.02 |

Provides original content for print and electronic publications and products.

| | Effective Date | 1st 6 Mo. | 2nd 6 Mo. | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|---|
| Content Editors/Produces | Wage | 913.00 | 987.00 | 1097.00 | 1145.00 | 1186.96 |
| | 2% pension | 18.26 | 19.74 | 21.94 | 22.90 | 23.74 |
| | Net wages | 894.74 | 967.26 | 1075.06 | 1122.10 | 1163.22 |
| | 10% Wage Diversion | 89.47 | 96.73 | 107.51 | 112.21 | 116.32 |
| | Wage after diversion | 805.27 | 870.53 | 967.55 | 1009.89 | 1046.90 |

Edits and produces original content for print and electronic publications, products, and slot.

| | Effective Date | 3rd Year | 4th Year | 5th Year |
|---|---|---|---|---|
| Assignment Editors | Wage | 1125.00 | 1145.00 | 1203.68 |
| | 2% pension | 22.50 | 22.90 | 24.07 |
| | Net wages | 1102.50 | 1122.10 | 1179.61 |
| | 10% Wage Diversion | 110.25 | 112.21 | 117.96 |

| | Wage after diversion | 992.25 | 1009.89 | 1061.65 |
|---|---|---|---|---|

Assigns work to content providers and content editors/producers and edit and produce content as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| Librarian | wage | 892.00 | 906.00 | 922.00 |
| | 2% pension | 17.84 | 18.12 | 18.44 |
| | Net wages | 874.16 | 887.88 | 903.56 |
| | 10% Wage Diversion | 87.42 | 88.79 | 90.36 |
| | Wage after diversion | 786.74 | 799.09 | 813.20 |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year |
|---|---|---|---|---|
| News Assistant | wage | 747.00 | 767.00 | 787.00 |
| | 2% pension | 14.94 | 15.34 | 15.74 |
| | Net wages | 732.06 | 751.66 | 771.26 |
| | 10% Wage Diversion | 73.21 | 75.17 | 77.13 |
| | Wage after diversion | 658.85 | 676.49 | 694.13 |

Provides newsroom, library and photo support as necessary.

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| Editorial Clerks | wage | 670.00 | 688.00 | 703.00 | 712.00 |
| Administrative | 2% pension | 13.40 | 13.76 | 14.06 | 14.24 |
| | Net Wages | 656.60 | 674.24 | 688.94 | 697.76 |
| | 10% Wage Diversion | 65.66 | 67.42 | 68.89 | 69.78 |
| | Wage after diversion | 590.94 | 606.82 | 620.05 | 627.98 |

~~Provides newsroom support as necessary~~

| | Effective Date | 1st Year | 2nd Year | 3rd Year | 4th Year |
|---|---|---|---|---|---|
| ~~Copy Messengers~~ | ~~wage~~ | ~~561.00~~ | ~~566.00~~ | ~~571.00~~ | ~~576.00~~ |
| | ~~2% pension~~ | ~~11.22~~ | ~~11.32~~ | ~~11.42~~ | ~~11.52~~ |
| | ~~Net wages~~ | ~~549.78~~ | ~~554.68~~ | ~~559.58~~ | ~~564.48~~ |
| | ~~10% Wage Diversion~~ | ~~54.98~~ | ~~55.47~~ | ~~55.96~~ | ~~56.45~~ |
| | ~~Wage after diversion~~ | ~~494.80~~ | ~~499.21~~ | ~~503.62~~ | ~~508.03~~ |

~~Provides newsroom support as necessary~~

| | | 1st Year | 2nd Year |
|---|---|---|---|
| ~~Two Year~~ | ~~Wage~~ | ~~570.00~~ | ~~625.00~~ |
| ~~Associates~~ | ~~2% pension~~ | ~~11.40~~ | ~~12.50~~ |
| | ~~Net wages~~ | ~~558.60~~ | ~~612.50~~ |
| | ~~10% Wage Diversion~~ | ~~55.86~~ | ~~61.25~~ |
| | ~~Wage after diversion~~ | ~~502.74~~ | ~~551.25~~ |

~~Performs various newsroom assignments as necessary~~

| | Effective Date | 1st Internship | 2nd Internship | 3rd Internship |
|---|---|---|---|---|
| ~~3-Month Interns~~ | ~~wage~~ | ~~512.00~~ | ~~527.00~~ | ~~542.00~~ |
| | ~~2% pension~~ | ~~10.24~~ | ~~10.54~~ | ~~10.84~~ |
| | ~~Adjusted wages~~ | ~~501.76~~ | ~~516.46~~ | ~~531.16~~ |
| | ~~10% Wage Diversion~~ | ~~50.18~~ | ~~51.65~~ | ~~53.12~~ |
| | ~~Wage after diversion~~ | ~~451.58~~ | ~~464.81~~ | ~~478.04~~ |

~~Performs various newsroom assignments as necessary~~

1. **Employees shall receive a salary increase provided in the schedule of wage minimums**

**or increases according to the** ~~following~~ **schedule of general increases, whichever is greater, but not both:**

1. The above wage minimums and the general increase **need not** ~~**shall**~~ apply to salaries of those who are on **retirement or who are on** extended sick leave. The pay increases shall go into effect upon the employee's return to work.

2. For the life of this Agreement there is to be no reduction in compensation of anyone covered by this Agreement except when the provisions of Article VIII, Paragraph 3, are implemented.

3. In the application of the foregoing schedules of minimums, experience shall include all regular employment in comparable work. In the event the Guild questions the job classification or experience status of any employee within ~~forty-five (45)~~ **ninety (90)** days from start of employment, adjustments **shall be made** retroactive ~~if any, will be made retroactive~~ to the start of employment. If such question is raised after ~~forty-five (45)~~ **ninety (90)** days from start of employment, adjustments, **shall be** ~~if any, will be~~ effective on the date that the Guild brought the question to the attention of the Company.

4. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

5. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only; individual merit shall be acknowledged by increases above the minimums.

6. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

7. (a) ~~Effective January 1, 1982, A~~An employee temporarily transferred to a higher classification shall receive differential pay **at the higher rate.** ~~according to the following schedule:~~

~~Copy messenger to clerk .................................. minimum salary differential~~
~~Copy messenger to reporter/editor ........................ minimum salary differential~~
~~News assistant, clerk to reporter/editor ................. minimum salary differential~~

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

~~Effective upon ratification of this Contract.~~ When ~~no exempt newsroom manager is on duty and~~ a Guild member is assigned to be the ranking supervisor ~~on the premises~~ for at least four ~~3 ½~~ hours ~~(one-half)~~ of his shift, he will receive an additional ~~$30~~ ~~**$75**~~ **$55** per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) ~~Effective January 1, 2003,~~ The Harrisburg and Washington correspondents will receive a salary differential of **$20** ~~$30~~ a week. ~~(Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)~~

8. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

9. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating or until the top minimum is reached.

10. **Effective April 1, 2017,** ~~January 1, 2003,~~ **within 30 days of ratification of this agreement the following service bonuses shall be paid in each year as set forth hereafter:**
~~A one-time service bonus of $250~~ **$500 for all employees with 10 or more years of service.**
~~Thereafter, the bonus will be paid when an employee completes his/her 10th year of service. Effective January 1, 2004, A one-time service bonus of~~
**$750 for all employees with 15 or more years of service.**
**$1,000 for all employees with 20 or more years of service.**
**$1,250.00 for all employees with 25 or more years of service.**
**Thereafter, the bonuses will be paid when an employee completes his or her 10th-15th-20th-25th year of service.**
~~As of Jan. 1, 2007, all service bonuses will be diverted to the Guild Pension Plan for the life of the current contract.~~

## ARTICLE IV
## Hours

1. No ~~employee eligible for Guild membership~~ **bargaining unit employee** shall work more than eight (8) hours per day within a **nine (9)** consecutive hour period, nor more than five days per week with the following exceptions:

**(a) When an employee works overtime hours**
~~(a)~~ **(b)** With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.
~~(b)~~ **(c)** ~~Additionally,~~ Full-time employees with at least two years of service shall, on a rotating basis, have the option of working a four-day week consisting of four **10** hour days at ~~his~~ **their** request **under the following conditions:**
i. The nature of the work is such that it can be compressed into 4 days.
At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability. **The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.**

vi. A lunch or dinner break may be required as part of the work day.
vii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

~~(c)~~ **(d)** Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

**2. Any employee who is regularly scheduled to work forty (40) hours within any seven (7) day pay period shall be considered a full-time employee and shall be guaranteed a forty (40) hour work week during the life of this contract unless discharge for cause or laid off pursuant to the layoff provision of this Agreement. Any day in which an employee's absence is authorized by the provisions of this contract shall be considered a regularly scheduled day.[1]**

**In the event the employer reduces either its print or digital publication from its current schedule, the employer may request that the guaranteed work week be amended.**

**The employer shall give the Guild no less than a 10 day notice in such event. Once notice is given, the parties shall meet to determine if there needs to be a change in any work schedules. There shall be no changes in the hours and/or work schedules set forth herein unless and until the parties mutually agree in writing to any such changes.** A regular schedule of working hours shall be maintained for all employees. No less than ~~three~~ **5** days' notice shall be given in advance of any change in an employee's working schedule~~, where possible~~. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday~~, where possible~~.

3. **Wherever possible,** days off shall be consecutive days. ~~**unless the employee chooses otherwise.**~~

**4. No employee shall be required to work more than 5 consecutive days**, except as provided in Article V Section 1.

5. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

6. A differential of **$3** ~~$6~~ per shift will be paid to an employee who begins his shift on or after 2 p.m., **and/or for working on a weekend. Those working weekend shifts that begin after 2 p.m. shall receive a ~~$20~~ $10 per shift differential.** ~~As of Jan. 1, 2007, All night differentials will be diverted to the Guild Pension Plan for the life of the current contract.~~

This shall apply only so long as the employee is assigned to such shifts.

**7. When the majority of an employee shift is between 11 p.m. and 6:30 a.m. that employee shall receive a shift differential of $40.**

**8. No employee shall be required to work any swing shifts except by mutual agreement between the employee and the company.**

---

**[1] Although the parties have historically recognized that full time employees are guaranteed a 40 hour work week, during negotiations the employer for the first time in its history contended that is not the case. Therefore, this language and other language is being inserted to make certain there is no mistake that our 40 hour guarantee is as it always has been a part of our collective bargaining agreement.**

**9.** Time spent by employees traveling to and from assignments shall be considered as part of the working day.

**10.** Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

**11.** By arrangement with the Company, employees who elect to reduce their work week to fewer than 40 hours shall be considered flex-time employees. They shall designate a period not to exceed 12 months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

ARTICLE V
Overtime

1. Overtime shall be defined as work beyond **8 hours per day or** 40 hours in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. ~~Overtime~~ **Work** beyond **8 hours per day or** 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. ~~By mutual agreement, which will not be unreasonably withheld,~~ An employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee~~, by mutual agreement not to be unreasonably withheld,~~ may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. **A full-time employee required to return to work or to work remotely after his regular working day shall be paid for the time worked, but no less than four hours or time and one-half for all hours worked, whichever is greater. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.**

4. An employee who **is called** ~~**agrees**~~ to work on his day off shall be compensated at the rate of time and one-half, but not less than a day's pay in addition to his regular weekly salary.

5. Overtime shall be reported in writing to the Company or its representative within ten days after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

ARTICLE VI
Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed ~~35~~ **20** percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave and other leaves of absences.

3. It shall be a policy of the Company to pay part-time employees who average individually less than **20** ~~17.5~~ hours per week not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than **20** ~~17.5~~ hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. **Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration.** Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight (8) months, a period which may be extended by mutual agreement between the Company and the Guild. **These employees will be covered only by Articles I, II III, IV, V, VI, VII and XVI of this Agreement.** Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the **eight** month period of employment, except by mutual agreement between the Company and the Guild. Temporary **employees whose positions are extended beyond (12) twelve months** shall receive **benefits on a proportionate basis.** ~~one week's vacation~~.

5. Part-time **and/or** ~~and, or~~ temporary employees shall not be employed where, in effect, such employment would eliminate or displace a regular full-time employee.

ARTICLE VII
Sick Leave

1. Sick leave shall be calculated on an anniversary year basis. The company will provide ~~eight (8)~~ ~~twelve (12)~~ **nine (9)** days sick pay annually which may be taken only when an employee is unable to work due to illness. The company ~~can~~ **may** request that an employee furnish a doctor's certificate or other reasonable proof when absent for **three (3)** consecutive days or more.

2. An employee shall receive a normal week's salary for a period of his or her incapacitation.

There shall be ~~no~~ holiday premium pay during the sick leave period.

3. Short-term disability

(a) **Any employee with at least one year of service shall have 20 days of disability coverage and can** accumulate the above **unused** ~~9~~ **sick** days per year during their employment to a maximum of ~~240~~ **90** days ~~per year~~. Only unused days during the year will be carried over to the maximum of ~~240~~ **90** days total. These accumulated days will constitute a short-term disability bank which can be used for any illness of **three (3)** ~~two (2)~~ ~~five (5)~~ days or longer. This benefit will begin on the ~~3rd~~ ~~6th~~ **4th** work day of disability. The **three** ~~five~~ days will constitute a waiting period.

**(b).**~~All employees on the payroll on 3/1/17~~ **All current employees shall not have any of their accumulated sick/disability days reduced as a result of this article and shall accumulate additional sick/disability days in accordance with this article.** ~~**With less than one year of service will be provided an initial short-term disability bank of 9 7 days at full pay.** per full year of service to a maximum of 70 days. These days are part of the maximum accumulation of ninety (90) days.~~ ~~**Upon reaching one year of employment all employees shall receive a short-term disability bank of 120 days at full pay.**~~

(c) If an employee exhausts his sick pay and short-term disability bank, the employee will be eligible for 26 weeks of additional sick leave at **70** ~~85~~ ~~60~~ percent of the employee's negotiated rate of pay for those employees with **at least one year** ~~two years~~ of service. ~~Those employees with less than two years service will be eligible for 13 weeks of additional sick leave. Details of this extended short-term disability plan are available from the Human Resources Director.~~

(d) An employee who exhausts his disability bank shall earn additional sick leave benefits according to the following schedule: For one year of uninterrupted employment – 20 percent of maximum short-term disability schedule; two years of uninterrupted employment – 40 percent of maximum short-term disability schedule; three years of uninterrupted employment – 60 percent of maximum short-term disability schedule; four years of uninterrupted employment – 80 percent of maximum short-term disability schedule; five years of uninterrupted employment – 100 percent of maximum short-term disability schedule.

The maximum regeneration under this program will be **90** ~~70~~ ~~120~~ days. Unused individual sick days will continue to be accumulated into the bank until the ~~240~~ **90**-day maximum is reached.

~~Sick pay and/or the short-term disability bank are not considered earned and will not be paid out upon termination of employment, including retirement.~~

**All earned and unused sick days placed in the short-term disability bank, to a maximum of ~~120~~ 90 days, shall be paid out on the employee's separation from the Company, including retirement. Payment will be made at the employee's rate of pay at the time of separation.**

4. This program will become effective as of the date of ratification. ~~Benefit payments under the prior Guild sick leave plan will continue for those employees on sick leave as of the date of ratification.~~

5. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

**6. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.**

**7. Sick leave payments shall terminate upon termination of employment or death of the employee.**

~~8. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.~~

7.~~9.~~ An employee cannot use sick leave benefits for any purpose other than illness or injury.

8.~~10.~~ Employees claiming **short-term disability** benefits under this Section shall, upon request, **submit a doctor's excuse.** ~~**submit to an examination by a doctor's excuse.** or doctors designated and paid for by the Company.~~

**9. 11. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.**

**10.** ~~12. Company agrees to notify the Guild when sick leave pay is reduced or discontinued.~~

ARTICLE VIII
Security

**The company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence and assist the employee for satisfactory service in the future. The company shall use progressive discipline, which includes, coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay and discharge.**

1. There shall be no discharge as a result of putting this Agreement into effect.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force, which latter shall be construed as synonymous with discharges for economy.

3. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes. The Company's right to determine the size of the force is recognized and the right to reduce the force for economy (either permanently or temporarily) shall **also** ~~not~~ be subject to review by the Board of Arbitration, **provided, however, that in the event the Guild believes that reasons other than economy have entered into the designation of the person or persons to be laid off, it may appeal the particular case or cases to arbitration. Stringers and freelancers in no case will replace or displace bargaining unit employees.**

4. A. Layoffs to reduce the force, as distinguished from dismissals for just and sufficient cause, shall not be made until the Company notifies the Guild ~~sixty (60)~~ ~~thirty (30)~~ **45** days in advance that such layoffs are necessary and that no reasonable alternative exists.

B. The Company shall notify the Guild of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), number of employees per work group, numerical order of layoffs within each work group, numerical order of overall layoffs, and the facts upon which the Company relies to establish the necessity pursuant to Section 4A above.

C. In the event such layoffs are necessary, the following procedures shall be observed:

(1) Voluntary incentives as designed by the Company may first be offered for a reduction in force after consultation with the Guild.

**(2) Immediately eliminate** ~~**thirty (30%) percent of the**~~ **all stringers,**~~**budget and all**~~ **intern programs, temporary and probationary employees.**

(3) If additional cost reductions are necessary, the Company, after implementing any voluntary methods of reducing the force in consultation with the Guild, will proceed with layoffs in inverse seniority order in the affected work group. The employee to be laid off shall be the junior two year associate in the affected work group. If there is no two year associate in the affected work group, the first employee to be laid off shall be the junior two-year associate in the bargaining unit. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. Thereafter, layoffs shall be in inverse seniority order in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. The work group for purposes of layoff will be divided as follows:

Content providers in Local News and Business
Content providers in Features and Editorial
Content providers in Sports
Content providers and Editors in Photography/Multimedia/Art
Content Editors and Assigning Editors
Clerical/Librarians/News Assistants

(4) a. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

b. Employees in Work Group VI above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

c. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

(5) In the event of recall, the recall shall be in reverse order of layoff. Such recall rights will last ~~24~~ **12** months from the date of the employee's layoff.

(6) The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

D. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

E. An employee laid off as a result of the provisions of this clause will continue to receive their health/life insurance benefits for a period of ~~three (3)~~ **six (6)** months under the same conditions that applied when he/she was on the payroll. Also, for an additional **six (6)** ~~three~~

~~(3)~~ months, the Company shall pay fifty (50%) percent of whatever premium or health and life insurance benefits being paid for full time employees, for those laid off employees.

F. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twenty-four (24 months)

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(c)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within two years of their date of disability shall have their benefits and seniority terminated. Said two years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's two year time period shall commence anew;

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within three years of their date of disability **may** ~~shall~~ have their benefits and seniority terminated. Said three years will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days in which event the employee's three year time period shall commence anew;

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

5. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

6. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by mutual agreement between the Company and the Guild.

(b) In the event of discharge for gross misconduct, or in the case of misconduct after notice has been given said employee may be laid off immediately.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

7. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

8. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, **gender identity,** marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

9. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

10. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes shall be afforded the opportunity to transfer to other available positions.

11. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

12. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

ARTICLE IX
Expenses

1. **If required, all reporters and photographers will use their personal cars in the service of the Company.**
~~2. For the term of this agreement,~~ The Company will reimburse for the business use of a **personal** vehicle by paying a **mileage allowance equal to the amount permitted under IRS regulations.** ~~vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.~~

2. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company. The Company agrees to furnish the Guild with a list of all employees whose automobiles are used.

**3.** ~~4.~~ Necessary working equipment shall be provided for employees and paid for by the Company. **If-approved by the Company,** an employee may use his personal **equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose.** In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

**4.** ~~5.~~ Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs ~~up to a maximum of $15.00 per day,~~ after the employee pays the initial parking fee.

**5.** ~~6.~~ Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

**6.** ~~7.~~ Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis.

**7.** ~~8.~~ Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**8. At the company's expense it shall provide all Guild members who use a cell phone for ~~work~~ news coverage purposes with cell phones, chargers and data plans.**

~~**8. The company shall reimburse all eligible Guild members up to $100 $90 per month for gym memberships and other wellness/exercise programs.**~~

~~9. The company shall reimburse all eligible Guild members up to $100 per month for childcare.~~

ARTICLE X
INTERNSHIPS, TWO-YEAR ASSOCIATES

1. Unpaid academic internships will be limited to ~~twelve (12)~~ **fourteen (14)** a **calendar** year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual

agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of articles VI, XIII, XIV, XV, XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates ~~may work in any classification with the understanding that only their first four weeks of employment may involve news assistant/clerical work. After the first four weeks they~~ are excluded from the following classifications: **librarian**, news assistant, clerk, and messenger.

**E. There will be no assignment restrictions**

F. **No** vacation bonuses will be paid by the Company to two-year associates.

## ARTICLE XI
## Vacations

Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service**;** two (2) weeks for one (1) complete year of service; ~~**four (4)**~~ **three (3)** weeks for three (3) continuous years of service; ~~**five (5)**~~ **four (4)** weeks for eight (8) continuous years of service and ~~**six (6)**~~ **five (5)** weeks for **18** ~~23~~ continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers. ~~The service requirement for five weeks of vacation will decrease as follows: 21 years in 2002; 20 years in 2003; 18 years in 2004.~~

~~Employees hired on or after Jan. 1, 2007, will receive a maximum of four (4) weeks vacation.~~

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

~~Effective January 1, 1994:~~

~~**All former Press employees will receive credit, for vacation purposes only, for their service with the Pittsburgh Press Company.**~~

~~All employees hired between Jan. 1, 1987 and Jan. 1, 1993, will receive, for vacation purposes only, an extra year of service. The extra year of service is eliminated after the employee receives four weeks of vacation.~~

1. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted

between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1.
No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

Employees eligible for ~~6~~ **5** weeks of vacation must take at least one week prior to March 31. Also, all employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

1. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

2. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

3. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

4. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

1. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

With the exception of self-provoked discharge or failure to give two weeks' notice, accrued vacation pay will be paid on termination of employment or in the event of death to the designated beneficiary according to the following schedule:

| | |
|---|---|
| Less than 3 complete years of service | – 0 ~~1 week's pay~~ |
| 3 to 6 complete years of service | – 1 ~~3 week's pay~~ |
| 7 to 11 complete years of service | – 2 ~~4 weeks' pay~~ |
| 12 to 15 complete years of service | – 3 ~~5 weeks' pay~~ |
| 16 or more years of service | – 4 ~~6 weeks' pay~~ |

~~Effective May 1, 2007, the accrued vacation pay will be diverted to the Guild Pension Plan for the current contract.~~

1. **In addition ~~to~~ those ~~bon~~uses and wages provided in Article III,** employees ~~shall receive **monthly annually** a $25 **$40** bonus for each year of service. For every year after with~~ **with 15-20 years of service shall** ~~the employee will~~ receive an additional ~~$25~~ **$40 per month wage increase.** ~~bonus for each year or service.~~ ~~**For example, an employee with 25 years of service will receive $1,400 $875 (25 x $25 $40 = $625 $1,000+ $250 $400 (10 x $25 $40) = $875 $1,400). Effective Jan. 1, 2007, these service bonuses will be diverted to the Guild Pension Plan for the current contract.**~~ **For employees with 21-25 years of service with get an additional $20 per month wage increase (for example a total of $60 additional wage increase); for every 5 year increment thereafter the additional amount will increase by $20 a month (for example employees with 30 years will receive an additional $80 wage increase).**

~~**11. On an annual basis, Guild members may roll over one (1) week of vacation to the next year.**~~

ARTICLE XII
Holidays

1. The following holidays, or days observed as such, shall be granted to all employees as provided in this Article: New Year's Day, **Martin Luther King Day**, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. An employee shall receive **four (4)** ~~**(5)**~~ personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a **fifth** ~~**sixth**~~ personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. ~~An employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and an employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981,~~ An employee ~~will~~ **shall** receive **6 ½** ~~**-1/41/2**~~ days' pay for the holiday week if he/she is scheduled to work the holiday and 4 other days during the holiday week. **Additionally, employees assigned to work at least half of their shift after 8 p.m. on Christmas Eve and/or New Year's Eve, shall receive holiday pay.**

3. In the week in which one or more of those holidays fall, all time worked beyond the remaining work days or work hours shall be paid for at the overtime rate.

4. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

5. Personal days are based on the number of hours the part-time employee is regularly scheduled to work. For example, an employee who normally works three days a week will receive 60 percent of the personal holidays.

ARTICLE XIII
Advancement, Promotion and Transfer

1. **When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction.** The Company shall immediately post notice of ~~such~~ **any** vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. When new positions, vacancies or openings are to be filled, first consideration shall be given to the employees in Guild jurisdiction.~~to whom advancement to the vacancy would constitute a promotion insofar as salary or any other remuneration is concerned.~~

2. When an employee is ~~advanced to~~ **awarded** a position ~~in a higher classification~~, he shall be paid **no less than** the salary minimum in the ~~advanced~~ classification **but in no event less than their current salary.** ~~next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater.~~ The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee ~~so advanced~~ **awarded the position** shall be **no less than 30 nor more than** 75 days, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If **during or** at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher~~, or be given the option of accepting his severance pay~~.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be

subject to the conditions outlined in paragraph 6, above~~, excepting that he shall not have the option of accepting his severance pay~~.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work. ~~The exempt employee in this role will not **shall** count toward the 20% 30% limitation as established elsewhere in the contract.~~

9. Management shall have the right to transfer employees from one newsroom department to another over their objection for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the company and the Guild.

## ARTICLE XIV
### Severance Pay

Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment:

One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of **52** ~~70~~ weeks' pay.

"Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

The salary paid as dismissal compensation shall be the highest ~~(except bonuses and pay for special work)~~ received by the employee during the last 52 weeks of his employment.

The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service ~~completed during the Military~~

~~Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid~~. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
## Leaves of Absence

1. By arrangement with the Company, employees may be granted leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time.

2. If an employee is elected or appointed to any office of The NewsGuild/Communications Workers of America, or AFL-CIO, CLC or any office of a local of The NewsGuild, such employee shall, upon request, be given a leave of absence without pay, and shall be reinstated in the same position upon the expiration of such leave. The foregoing shall also apply to delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild. **The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.**

3.(a) Any employee who has had five continuous years in the employ of the Company without a leave of absence shall be given at the employee's request a leave of absence not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

(b) An employee with at least 10 years of service shall be given, at his/her request, a leave of absence not to exceed **three** ~~**six**~~ months, at half pay. Such leaves may be limited to two at any given time. An employee may exercise this right every five years. ~~As of Jan. 1, 2007, such leaves will be suspended for the duration of the current contract and wage savings from such leaves will be diverted into the Guild Pension Plan.~~

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

~~(a)~~ Upon request, ~~unpaid~~ maternity, paternity or adoptive parent leave of not more than **8** ~~**9**~~ months shall be granted. **The first four months shall be at full pay and the remaining four months shall be at half pay.**

~~(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.~~

~~(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.~~

~~8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.~~

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The employee shall have the right to elect whether they want to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVI
## Adjustment of Disputes

It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance shall be defined as a dispute over an alleged violation of this agreement.

1. **No later than thirty (30) days after the employee or Union has brought the dispute to the attention of management personnel and the parties are unable to amicably resolve the dispute, the Union or the grievant shall submit the grievance in writing to the employee's immediate supervisor.** Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

2. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

1. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

1. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event,

the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The parties shall determine who shall eliminate the first name by the flip of a coin.

1. Once a grievance is filed and the answering party fails to respond within the prescribed time limits, the grievance shall be ~~considered granted~~ automatically moved to the next step.

1. The parties may mutually agree to extend the time limits set forth above. The expense of the arbitration shall be shared equally by both parties. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and binding.

## ARTICLE XVII
## Military Service

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

## ARTICLE XVIII
## Preferential Re-Employment

1. ~~When the Company makes discharges or layoffs other than for cause, such discharged or~~ **In the event of a layoff** laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(6)) unless same is exhausted with respect to the general type of work for which an additional employee is desired.

2. ~~Employees who have signed temporary replacement cards for employment because of enlistment or conscription of regular employees also shall be placed on the rehiring list when discharged for reasons other than cause, upon the return of the regular employee from war **military** service, or when any temporary employee enters the armed services.~~

3. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

4. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined

by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

## ARTICLE XIX
## Miscellaneous

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline, **images, likenesses** or other identifying information shall not be used over his protest.

3. Employees may be assigned to use multimedia equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

**4. ~~Freelance photographers may be retained for photo and video assignments to supplement existing coverage. Furthermore,~~ It is understood that the use of free-lancers will not replace bargaining unit jobs or work.**

**5.** ~~6.~~ Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

6. ~~7.~~ No employee shall be required to take over the duties of any employee in another department of the Pittsburgh Post-Gazette in the event of a labor dispute in such department, or by assuming new duties to assist in the operation of a department where employees are on strike. No strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lockout its employees during the term of this agreement.

~~8. The Company agrees not to have or enter into any agreement with any other Company binding such other Company not to offer or give employment to employees of the Company.~~

**7.** ~~9.~~ The Guild shall be notified within 24 hours of all resignations tendered. Resignations shall be subject to grievance procedure upon notice from the Guild within four days after receipt of notice from the Company.

**8.** ~~10.~~ For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

**9.** ~~11.~~ Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

~~(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.~~

**(A)** Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest. ~~as determined by the Company.~~

**(B)** Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
~~(C) The Company shall notify the Guild of its decision in these matters.~~
**(C)** No Company equipment will be used for outside activities.

~~There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.~~

(Code of ethics is reprinted in the back of the contract).

**10.** ~~12.~~ In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

**11.** ~~13.~~ An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

**12.** ~~14.~~ An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

**13.** ~~15.~~ The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, date of birth~~, and Social Security number~~.
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

**14.** ~~16.~~ The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

**15.** ~~17.~~ The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

**16.** ~~18.~~ A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

**17.** ~~19.~~ Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

**18.** ~~20.~~ The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

**19.** ~~21.~~ The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the **Company's** ~~agreed to~~ Transitional Duty Program is available from the Human Resources Director.

**20.** ~~22.~~ The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:
That such coverage is permissible within the State of Pennsylvania.
The parties agree on the cost of the program.
That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

**21. Upon request of the employees doctor, the Company shall provide standing desks and gel mats to Guild members.**

**22. The Company shall provide the Guild with notification at least 120 days prior to moving from its current location to a different facility. The Company shall meet with Guild leaders to discuss the move.**

~~**24. The Company shall provide the following bonuses for recognition in journalism contests, whether or not the contest provides a monetary award:**~~
~~**$25 for regional contests**~~
~~**$50 for state contests**~~
~~**$75 for national contests**~~

~~**25. All Guild members shall be given an opportunity to participate in professional development activities (such as seminars, conferences etc.) at the Company's expense.**~~

**23. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.**

ARTICLE XX
Insurance, Health and Welfare, Pensions

1. The Company shall make available non-contributory Group Life Insurance with an agreed-upon plan and under the terms and conditions of a Master Policy which contains the following provisions:

A. 90-day waiting period.

B. Insurance of one times annual salary with a maximum of $50,000.

Employees age 70 and above will have insurance of 65 percent of annual salary but not less than the minimum described in Paragraph B above.

A. ~~Effective January 1, 2015, the above provisions will expire and life insurance for active employees will be provided through the Western Pennsylvania Teamsters and Employers Welfare fund.~~

Employees at retirement will have $4,000 of paid-up life insurance. ~~However, retiree life insurance shall not be provided to employees who retire on or after January 1, 2015.~~

2. The Company shall pay the full cost of a travel accident policy for all employees, which includes the following provisions: principal sum, $100,000; weekly indemnity, the lesser of $100 or 65 percent of weekly earnings; waiting period, 60 days; maximum number of weeks, 52.

3. Effective with the ratification of this contract, the Company will provide a health insurance and prescription drug plan to eligible employees, their spouses and eligible dependents as follows:

Active Employees
~~All provisions regarding the health insurance and prescription drug plan as set forth in the August 1, 2010 Contract shall remain in effect through December 31, 2014. See Exhibit A grid.~~

~~Effective January 1, 2015,~~ All eligible bargaining unit employees will participate in the Western Pennsylvania Teamsters and Employers Welfare Fund (the "Fund"). Participation in the plan is limited to employees averaging annually more than 30 hours per week. Exhibit B **is the health insurance plan that will be implemented.**

~~The required PG contributions for the calendar year 2015~~ ~~**2017**~~ ~~will be~~ ~~**$1,354.97**~~ ~~$1,229 per month for participating full-time bargaining unit employees (regardless of family size) and regardless of the option chosen.~~

(2) **The Company shall pay the entire amount of the calendar 2018 base rate for participating bargaining unit employees (regardless of family size) and regardless of the option chosen. In subsequent years, the Company shall pay the entire base rate plus all increases of up to 25% per year. In each subsequent year, the Company and the Guild will equally split the amount of any increase over 25%.** ~~The PG contributions for years 2016 2018 and 2017 will not exceed a 5.0% annual increase above the $1,229 per month set forth above for calendar year 2015. Any such increases must be based upon the plan design effective January 1, 2015. The PG will receive from the Fund at least 60 days notice of any such annual contribution increase prior to January 1. Increases in excess of 5% will be the responsibility of the covered bargaining unit members via direct billings from the Fund. If direct billing is not available, the PG will only assume responsibility for any withholding of any additional amounts after receiving the expressed written consent of each member and will not assume any other responsibility for collection of any other amounts, or be liable for any other payment to the Fund, other than as stated above.~~

The WPA Fund will establish all applicable rules and operations, including treatment of out-of-network benefits and administration of all claims issues.

Required employee contributions, if any, will be deemed as employee contributions for health care and are **not** related in any way to any prior or future wage deferrals.

Effective with bargaining unit participation in the Fund, any and all other PG sponsored benefit plans will terminate, including medical/Rx, life/AD&D, vision, and dental, except for the life insurance program described in Exhibit B (Retiree Health and Welfare Programs) and paragraph 7 below.

For any active employee who opts out of participation in the Fund, they shall receive ~~$100~~ **$200** per month. However, the Employer shall be obligated to pay the premium of the employee's life insurance coverage at the same benefit level that existed under the prior contract.

For all new hires, there is a thirty (30) day waiting period for all insurance coverage under this agreement.

Dental/Optical insurance will be provided for active employees and their dependents through the Fund

(1) Spouses of employees who die prior to retirement will be covered with their dependent children by the active employee health plan. The spouse will be required to pay ~~30%~~ **10%** of the composite premium as a condition for obtaining coverage. This coverage will end at the earlier of: after ~~five (5)~~ **ten (10)** years of participation, attainment of Medicare Eligibility; or remarriage. Coverage for eligible dependent children ends at their ~~19th~~ **26th** birthday, or earlier if the spouse's coverage ends

(1) For surviving spouses, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the surviving spouse of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse

receives notice, the Company may then, in that event, cancel the surviving spouse's health care insurance.

~~11. Surviving spouses (under age 65 or not Medicare eligible) of employees who die after retirement will be covered by the active employee health plan. The spouse will be required to pay the same percentage of the composite premium as the retiree. This coverage will end at the earlier of: after five (5) years~~ **~~ten (10) years~~** ~~of participation, attainment of Medicare Eligibility, or remarriage Coverage for surviving spouses 65 and older will cease 60 days after the employee's death.~~

**~~12. For surviving spouses, health care contributions should, if possible, be made through deductions from the employee's pension. If not, a method will be set up where the surviving spouse has a certain date in which to remit the required contributions. If the surviving spouse fails to make those contributions, the Post-Gazette must notify the spouse of the delinquency by certified mail/return receipt requested with a copy to the employees union and must be afforded at least 30 days to make such payments. If the payments are not remitted within 30 days after the surviving spouse receives notice, the Company may then, in that event, cancel the health care insurance.~~**

**B. ~~Retiree healthcare TO BE DISCUSSED~~**

**~~The following sets forth Retiree Benefit programs during the term of the 2014-2017 collective bargaining agreement.~~**

**~~Future Retiree Medical and Life Benefits - Any and all retiree medical benefits will be terminated as of the effective date of the agreement for current actives. Any active employees who were eligible for pre-Medicare or post-Medicare medical benefits under the formula that was set forth in the 2007-2010 and the current agreement will receive a one-time payment as follows:~~**

**~~Those who are entitled to the $228.00 stipend shall receive a one-time payment of $12,000.00 for single coverage and $18,000.00 for all other coverages.~~**

**~~For those entitled to the $171.00 stipend, they shall receive a one-time payment of $10,000.00 for single coverage and $14,000.00 for all other coverages.~~**

**~~Any of the above individuals participating in the VSPP as the result of the reduction in force shall not be entitled to any additional health care payments in connection with such participation.~~**

**~~Pre-Medicare Retirees Eligible Retirees – All current Pre-Medicare Retirees ("Retiree Unit" – as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:~~**

**~~a monthly reimbursement of the cost of coverage, for a temporary period of time, up to a maximum annual stipend of $3,000. These retirees can purchase coverage as they deem appropriate, including health insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement. Eligible retirees who select this option must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $15,000 ("Single")/$25,000 ("Other than Single"); or~~**

~~a monthly reimbursement of the cost of coverage, up to a maximum annual stipend of $1500, during the life of the 2014-2017 collective bargaining agreement. These retirees can purchase coverage as they deem appropriate, including health-insurance exchanges; as with Medicare Eligible Retirees, they will have to provide evidence of enrollment and payment to receive the reimbursement.~~

~~Medicare Eligible Retirees – All current Medicare Retirees ("Retiree Unit" as defined below), who agree to the conditions explained below, will be provided a one-time choice to take either:~~

~~a choice to participate, for a temporary period of time, in the modified "A" stipend program, to purchase MAPD/MEDIGAP or equivalent, in the amounts set forth below.~~

~~(i) Any current Medicare retirees currently eligible for the $171 stipend must agree in advance to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend in exchange for a onetime payment of $12,000 ("Single")/$18,000 ("Other than Single").~~

~~(ii) Any current Medicare Retirees currently eligible for the $228 or higher stipend must agree to the Company's unilateral right, at some time in the future in its sole discretion as further described below, to terminate the temporary stipend for a onetime payment of $13,000 (Single)/$19,000 ("Other than Single"):~~

~~**MODIFIED "A" STIPEND PROGRAM**~~

| ~~Description~~ | ~~Proposed Amount~~ |
|---|---|
| ~~Group #1: participants currently receiving maximum of $171/ retiree and spouse~~ | ~~$153.90 for retiree and spouse~~ |

~~or;~~

~~A choice to participate in the modified "B" stipend program, to purchase MAPD/MEDIGAP or equivalent, as follows during the life of the 2014-2017 collective bargaining agreement:~~

~~**MODIFIED "B" STIPEND PROGRAM**~~

| ~~Description~~ | ~~Proposed Amount~~ |
|---|---|
| ~~Group #1: participants currently receiving maximum of $171/ retiree and spouse~~ | ~~$119.70 for retiree and spouse~~ |

~~Other Conditions Related To These Programs~~

~~A "Retiree Unit" is defined as either a Retiree or a Surviving Spouse of a Retiree~~

A "Single" is defined as either a Retiree or a Surviving Spouse of a Retiree

"Other than Single" is defined as a Retiree, Spouse, or others, as deemed eligible as of the date of retirement

The amount of payment is tied to the Retiree's status (Medicare Eligible or Pre-Medicare Eligible), regardless of the status of the spouse.

In order to receive a lump sum payment described above, each current Retiree (Retiree, Spouse, or Surviving Spouse) must agree to sign a release indicating that by accepting this one-time payment, each Current Retiree relinquishes any and all future rights for any and all retiree benefits from the Company.

If a release is not executed in the manner set forth herein on a timely basis, then the Current Retiree will be automatically placed into the stipend program capped at $1,500 (if pre-Medicare eligible) or the modified "B" stipend program described above.

Current retirees who are receiving Company paid life insurance shall be entitled to life insurance pursuant to the retirement provisions of their respective contracts. In addition, those active employees eligible for retiree medical benefits under the formula that was set forth in the 2007-2010 labor agreement who resign from employment under the terms of the current VSPP shall also be eligible for Company paid life insurance.

If a Current Retiree elects a one-time payment option and the Company elects to effect such payment to the retiree, it will be treated as a taxable payment by the Company.

Those who elect to participate in the program that permits the Company to make a one-time payment must sign an irrevocable election that releases the Company form all future retiree medical obligations upon the Company's exercise of the one-time payment. Those who elect this option also understand that the one-time payment is at the Company's discretion at any time. They also understand that there is no guarantee that the Company will exercise its right to make the one-time payment. The Company reserves the right to implement such one-time payments in subgroups or tiers as the Company deems appropriate.

The parties have negotiated this Retiree Benefits agreement in good faith. They have agreed to hold each other harmless in the event any lawsuits are filed or entered against the Unity Council, any of its member unions, and/or the Post-Gazette challenging the terms of this Retiree Benefit Agreement.

Except as provided herein, the Publisher will not be offering medical, life insurance or other welfare programs for current employees upon their retirement.

7. a. Benefit accruals for all participants in the pension plan remain frozen. Each Employee's service will continue to be credited according to the terms of the pension plan for purposes of vesting and benefit eligibility.

b. Until June 30, 2015, the Employer will make weekly pension contributions of $75.70/active member. As a result of the establishment of the Guild Employees 401(K) Plan as set forth in Exhibit 1, effective July 1, 2015, the weekly pension contribution will be $65.70; and effective July 1, 2016, such contribution will be $55.70. Additionally, each Employee will

**divert 2% of their base salary to the pension plan. The 2% diversion will be valued at $211,000 a year during the life of this contract. The Guild diverted the night differential for the term of the contract. The night differential diversion will be valued at $45,000 a year during the life of this contract. The Guild diverted the Vacation Bonus for the term of the contract. The Vacation Bonus diversion will be valued at $69,000 a year during the life of this contract. The Guild diverted the Service Bonus for the term of the contract. The Service Bonus diversion will be valued at $16,000 a year during the life of this contract. The Guild diverted the Accrued Vacation language for the term of the contract. The Accrued Vacation language diversion will be valued at $60,000 a year during the life of this contract. The Guild diverted the half pay leave for the term of the contract. The half pay leave diversion will be valued at $60,000 a year during the life of this contract.**

b. The Board of Trustees is authorized and directed to adopt the following long-term funding policy immediately. The Fund co-consultants will produce with the annual actuarial valuations a seven-year actuarial projections with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:

Projections will take into account only negotiated contributions.

Use of the assumptions in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants.

No unanticipated actuarial gains or losses during the projection time period.

If the annual projection indicates any future funding deficiencies during the seven-year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.

In the event that the Post-Gazette is required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the Post-Gazette will receive a dollar for dollar credit towards the next subsequent plan year's contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies they shall take into account that these contribution credits will be taken as a reduction in the negotiated contributions in the next plan year.

c. Effective as soon as administratively practical following ratification of this Contract, all defined benefit (DB) pension plans sponsored by the Post-Gazette (excluding Teamsters #211) will be merged.

d. Any deadlocked Trustee motion relating to a reduction in benefits required under the Long Term Funding Policy in numbered paragraph 3 above as well as any dispute between the parties regarding the provisions of this agreement shall be arbitrated on an expedited basis, with the arbitration to take place not later than sixty (60) days following the Trustees' meeting at which the deadlock occurs or the date that one party advises the other of a dispute regarding the interpretation or application of this agreement.

Details of the pension plan status and its benefits are outlined in a separate document signed by the Company and the Guild.

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

## ARTICLE XXII
## Management Rights

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, layoff and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine reasonable standards of production; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease any department, operation or service; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce new or improved research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way,

shall ~~not~~ be considered a waiver of the Company's right to exercise such right, prerogative or function **and** ~~or~~ preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

ARTICLE XXIII
Term and Renewal

1. This Agreement shall commence on ~~the October 15, 2014~~ **April 1, 2017** and expire on ~~the thirty-first day of March 2017~~ **on the 31st day of March, 2022.**

2. Not less than 60 days prior to the expiration of this Agreement either party desiring to open negotiations for a new Agreement shall **advise the other in writing of its desire to do so.** ~~submit its proposals for such new Agreement in writing to the other party. The respondent party, if it desires to file a counter proposal of the conditions it will seek to establish, shall do so at the earliest practicable date, but in any event not longer than thirty (30) days from receipt of notice by the moving party. In the absence of such statement within the prescribed time limit, the existing Agreement becomes automatically the proposal of the respondent party.~~ The terms and conditions of this Agreement shall remain in effect as long as negotiations continue, but in the event a new Agreement is arrived at within four (4) months of the submission of the new proposal, all the terms and conditions of the new Agreement shall be retroactive to the date of the expiration of this Agreement.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ______________________________ Date: ____________________
Michael A. Fuoco

By: ______________________________ Date: ____________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ______________________________ Date: ____________________
Stephen B. Spolar, Vice President of Human Resources

## Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

### Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

### Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

### Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books, recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block, Publisher and Editor-in-Chief

**This Memorandum of Understanding, made this 30th day of January, 1998, shall be incorporated into the Labor Agreement, effective January 1, 1998, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh. The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:**

1. **Participation will be voluntary.**
2. **Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.**
3. **There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.**
4. **Employees will be paid $25 $50 for on-shift appearances when they must travel to the KDKA television studio.**
5. **Employees will be paid $50 $100 for off-shift appearances.**
6. ~~**This MOU recognizes the jurisdiction agreement which is pending between AFTRA and KDKA**~~

**FOR THE POST-GAZETTE:**

Raymond N. Burnett

DATE: Feb. 5, 1998

_______________________

DATE: _______________________

**FOR THE GUILD:**

Harry Tkach

DATE: Feb. 5, 1998

_______________________

DATE: _______________________

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY
(March 2, 1995)

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at ~~$25~~ **$50**. Appearances scheduled during the staff member's non-working hours will be compensated at ~~$50~~ **$100**. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to **the appropriate Company representative** ~~Barbara Bogucki, assistant to the editor,~~ who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

~~Staffers who have already made their own arrangements to speak before groups in the community before March 3, 1995 would be free to meet those commitments. However, they must notify the company about these arrangements right away~~

~~Staffers interested in participating in the Speakers' Bureau should contact Barbara and let her know that they would like to participate as soon as possible.~~

~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the current labor agreement that expires December 31, 2006 March 31, 2017. Effective March 12, 2003, Effective upon ratification. The Company and the Union agree that part-time employees (employees working no more than 30 hours per week) can work a five-hour shift at straight time over and above their normal work week. It is understood that the part-time employee is guaranteed five hours of pay when called in on his/her off day.~~

~~This Memorandum of Understanding does not change the overtime provisions of the contract or the past practice of employees (part time and full time) functioning as stringers outside of their normally assigned duties.~~

~~One of the purposes of this Memorandum of Understanding is to resolve the grievance over a part-time employee functioning as a stringer on his off day.~~

~~FOR THE POST-GAZETTE~~ ~~FOR THE GUILD~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 3/12/03~~ ~~DATE: 3/12/03~~

# ~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh is in addition to the labor agreement that expires December 31, 2006. Effective March 12, 2003, the Company and the Guild agree as follows:~~

~~For the purpose of paying the negotiated Vacation and Service bonuses, part-time employees will be treated the same as full-time employees.~~
~~Paragraph C of the Preamble will be amended as follows, "To cover possible special cases the Publisher shall have the right to designate exemption from Article I – Guild Shop – certain employees at the time of their employment, but not more than one such employee will be on the payroll at any given time."~~
~~The Guild will relinquish all jurisdiction over the work formerly performed by one clerk and one news-assistant assigned to the department often referred to as PG Store/Information Products.~~
~~The Guild will withdraw the grievance of January 30, 2003 over the Company's decision to pay proportionate bonuses to part-time employees.~~
~~Part-time employees who have already received proportionate bonuses will be made whole.~~

~~FOR THE POST-GAZETTE~~ ~~FOR THE GUILD~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 3/12/03~~ ~~DATE: 3/12/03~~

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective August 1, 2003, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Union agree as follows:

One of the provisions of the agreement pertaining to the 10 exempt employees who became members of the Newspaper Guild of Pittsburgh in 2002 was that they would remain in the pension plan for non-bargaining unit employees.
Implicit in that agreement was the recognition that the 10 former exempt employees would not be eligible for the Guild pension.

FOR THE POST-GAZETTE FOR THE GUILD

Raymond N. Burnett Mike Bucsko

DATE: 7/29/03 DATE: 8/13/03

MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, effective ~~August 1, 2003~~ **upon ratification**, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall be considered a part of this ~~is in addition to the~~ Labor Agreement. ~~that expires on December 31, 2006. The Company and the Union agree as follows:~~

The ~~six~~ **7** paid holidays—New Year's Day, **Martin Luther King Day,** Memorial Day, the Fourth of July, Labor Day, Thanksgiving Day and Christmas—shall be treated the same as personal days for employees who individually average fewer than 20 hours per week and do not work the holiday. (See Article XII, Paragraph 5.)
Employees who individually average more than 19-3/8 hours per week will receive another day off with pay if they do not work the holiday, which has been the past practice.
Any part-time employee who works on one of the ~~six~~ **seven** recognized holidays will be paid at the premium holiday rate, which has been the past practice.

FOR THE POST-GAZETTE FOR THE GUILD

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 8/14/03~~ ~~DATE: 8/18/03~~

DATE: DATE:

# ~~MEMORANDUM OF UNDERSTANDING~~

~~This Memorandum of Understanding effective January 28, 2004, by and between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, is in addition to the Labor Agreement that expires on December 31, 2006. The Company and the Guild agree as follows:~~

~~The Company will assume jurisdiction over photo reprints. For clarification, this involves all work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.~~
~~The Company will gain another exempted employee as described in Paragraph C of the Preamble (this will increase the number of such exemptions allowed to two), with the following provision: the Company will have until December 31, 2006, to name a current employee to this exempt status. If the Company does not exercise this option prior to the expiration of this Agreement, the right to name an exempted employee under Paragraph C will be limited to a new hire.~~

~~FOR THE COMPANY:~~ ~~FOR THE GUILD:~~

~~Raymond N. Burnett~~ ~~Mike Bucsko~~

~~DATE: 1/28/04~~ ~~DATE: 1/30/04~~

MEMORANDUM OF AGREEMENT

THIS AGREEMENT made this 23rd day of November, 2007, by and between PITTSBURGH POST-GAZETTE and NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061, CWA.

On July 26, 2007, the Guild filed a grievance over the use of freelance writers to perform restaurant reviews.

The Pittsburgh Post-Gazette has denied the grievance, and by letter dated August 30, 2007, the Guild requested that the grievance proceed to arbitration.

The parties have reached an agreement as full and final settlement of the grievance, which settlement shall be considered a Memorandum of Understanding regarding the future use of stringer "tryouts". That agreement is as follows:

The Company may use stringers to "try out" for vacant Guild positions (which no Guild member has been awarded) under terms and conditions mutually agreed to between the parties. In the event the Employer intends to use a stringer to fill the vacant position as set forth above, the Company shall notify the Guild and the parties shall then mutually agree upon the various terms and conditions under which the "tryout" may be utilized.

PITTSBURGH POST-GAZETTE — NEWSPAPER GUILD OF PITTSBURGH, LOCAL 38061

BY: Stephen B. Spolar — BY: R. J. Hufnagel

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

~~This MOU will be effective retroactively to September 1, 2008.~~

For the Company

Stephen B. Spolar

Date: 5/29/2009

For the Union

RJ Hufnagel

Date: 6/9/2009

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding between the Newspaper Guild of Pittsburgh (hereafter known as the Guild) and the Pittsburgh Post-Gazette (hereafter known as the Company) covers only those Guild members who accept the early-retirement buyout offer the company extended in October 2008. This agreement shall serve as an amendment to that agreement and to the preamble of the Collective Bargaining Agreement between the parties.

Content providers who accept the aforementioned buyout offer shall be free to perform work that currently falls under Guild jurisdiction, under the following limits: Writers may complete a maximum of one freelance submission per week for the print edition, or one piece of web-based content per week for post-gazette.com. In addition, participants may continue to contribute in all aspects of online-only content for post-gazette.com as currently performed.

Aside from the exceptions and limits listed above, any and all rules governing the use of stringers included in the collective bargaining agreement shall continue to apply.

For the Company

Stephen B. Spolar

Date

For the Union

Michael A. Fuoco

Date

Exhibit 1
GUILD EMPLOYEES 401(K) PLAN

**"Effective upon ratification PG Publishing (PG) will make contributions to eligible employees as defined below in accordance with the following schedule:**

**(a) During the life of the collective bargaining agreement the employer shall match all employee contributions up to a maximum of 6% of the employee's gross income paid by the PG to the employee.**

~~Effective July 1, 2015, PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:~~

~~Through June 30, 2016, PG will make a matching contribution ("PG Matching Contributions") to the PG Publishing Company 401(k) Plan (the "Plan") equal to 50% of the first $20 per week deferred by any Eligible Full Time Employee; effective July 1, 2016, the PG Matching Contribution will be increased by applying the 50% match to the first $40 per week deferred by any Eligible Full Time Employee~~

~~Through June 30, 2016, the maximum amount of PG Matching Contribution will be $10 /week or the pro-rated equivalent for less than Eligible Full Time Employees; effective July 1, 2016, such maximum amount of PG Matching Contribution will be increased to $20/week or the pro-rated equivalent for less than Eligible Full Time Employees.~~

(b)The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

The PG Matching Contribution will be subject to a vesting schedule as follows:

Less than 3 years of service – 0% Vested

At least 3 years of service – 100% Vested

Vesting Service is counted from original hire date

The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

"Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

~~The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.~~

(g) All new employees will be automatically placed into the 401K plan with the ability to opt out.

# Business

**ROYALTIES0908/Legere**
Royalty owners big and small are feeling the effects of persistently low -- and dropping -- natural gas prices. The commonwealth expects much less revenue from its leases on 260,000 acres of state forests this year and the impact fee is likely to bring in $49 million less this year because of low prices.

      **WEB:** 7 a.m. Monday
      **NEWSSLIDE:** Yes/No, what date
      **PRINT:** Yes, Sunday, 28 Inches, Biz front
      **VISUALS:** File photo attached
      **INFOGRAPHICS:** PG Chart of natural gas spot prices at a SWPA trading hub

    **SELLLATER0908/Grant**
A Wexford entrepreneur is launching a website meant to help people test the waters months before they are ready to sell their homes.

      **WEB:** 9 a.m. Monday
      **NEWSSLIDE:** Yes/No, what date
      **PRINT:** Yes, Sunday, 37 Inches, Biz front
      **VISUALS:** PG photo attached

**MEDMARIJUANA0908/Twedt (THIS WILL BE FILED EARLY FRIDAY MORN. PLEASE LEAVE SPACE FOR THIS AND THE SIDE, IF POSSIBLE. IF IT GETS TOO TIGHT, GO WITH THE OTHER THREE STORIES AND WE'LL FIND WIRE FOR THE INSIDE)**
A guy was pulled over in Beaver County for having dark-tinted windows. He ended up being cited for his medical marijuana.

    **WEB:** 8:30 a.m. Monday
      **NEWSSLIDE:** Yes/No, what date
      **PRINT:** Yes/No, Sunday, 30 Inches, Biz front
      **VISUALS:** File photo of marijuana?
      w/

**MARIJUANASIDE0908/Twedt**
Pitt is working on equipment to help police do a sort of breathalyzer for THC, the active ingredient in pot.

      **WEB:** 8:30 a.m. Monday
      **NEWSSLIDE:** Yes/No, what date
      **PRINT:** Yes/No, Sunday, 12 Inches, Inside Biz
      **VISUALS:** PG Photo taken Aug 28

**TONYBIZ0908/Norman (goes ragged right in print)**
      Tony Norman business column
      **WEB:** 9:30 AM monday
      **NEWSSLIDE:** Yes/No, what date
      **PRINT:** Yes, Sunday, 37 Inches, Biz front
      **VISUALS:** photos attached
      TAKES SWEAT EQUITY TAG

**DATELINE0908**

****Optional stories for print in Libercus****
**Mocktailbars0908 w/ photos**

GENERAL COUNSEL 25
SKIPPED

NLRB-0001648

# GC EXHIBIT 26

NLRB-0001649

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 26

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**E-mail: rlowe@kingballow.com**

January 17, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Contract Negotiations Between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

The parties last met for contract negotiations on September 6, 2019. At the end of the meeting, the Company asked for future meeting dates. The Union refused to schedule any future meeting dates and stated it would get back to the Company. The Union has not offered any meeting dates for contract negotiations since the September 6, 2019 meeting.

Despite the Company's efforts to schedule meetings, the Union was only available to meet for contract negotiations on six occasions in 2019. The Union's continuing, deliberate efforts to avoid negotiations is unacceptable.

The Company is again requesting suggested meeting dates for contract negotiations.

Sincerely,

Richard C. Lowe

RCL/rps

cc: Linda Guest
Jack Yoedt

# GC EXHIBIT 27

NLRB-0001652

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 27

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3



JUBELIRER, PASS & INTRIERI, P.C.
*Attorneys-at-Law*

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon

*also licensed in Ohio

*of counsel*
Neal R. Cramer
Joseph M. Burns**

**licensed in Illinois

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

January 23, 2020

Richard C. Lowe
King & Ballow
315 Union Street
Suite 1100
Nashville, Tennessee 37201
rlowe@kingballow.com

***Re: Contract Negotiations between Pittsburgh Post-Gazette and Newspaper Guild***

Dear Richard:

I have received your self-serving declaration of January 17, 2020. I have no desire to engage you in placing the "blame" on why there has not been any meetings. It is interesting to note however, the past several months we have been in continuous litigation and not once have you mentioned anything about "negotiation" meetings. Be that as it may, the Guild is prepared to meet with you on Monday, February 24, 2020. Although during the past three years of "negotiations" you have not made a single proposal in response to the improvements which the Union has suggested we remain ever hopeful that you will see the need to reward these loyal employees who have severed the Post-Gazette diligently over the past 14 years despite not having received one cent in a general wage increase. Clearly, your proposal that the 8% the employees are currently paying for health insurance being restored to their paycheck over the next three years is not in any sense of the word "a wage increase". In fact, the way you propose refunding their money will not even equal 8%. In any event, that is not a wage increase and these employees are expecting significant wage increases along with other benefit improvements. We hope to see you then and we can begin at 10:30 a.m. in the sector office of our building.

Very truly yours,

Joseph J. Pass

JJP:crc
cc: John Silver
Mike Fuoco

# GC EXHIBIT 28

NLRB-0001655

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 28

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22 **Witness:** SILVER **Reporter:** BW

**No. of Pages:** 3

**From:** Richard Lowe
**To:** Joe Pass (jjp@jpilaw.com)
**Cc:** Linda A. Guest (lguest@post-gazette.com); Jerry Micco; jyoedt@fmcs.gov
**Date:** Monday, January 27, 2020 10:39:00 AM

Joe, we are confirmed for Guild negotiations on February 24 at the Sector office, beginning at 10:30am. Best, Richard

**Richard C. Lowe**
**KING & BALLOW**
**315 Union Street**
**Suite 1100**
**Nashville, TN 37201**

**E-mail: rlowe@kingballow.com**
**Direct Dial: 615-726-5420**

**CONFIDENTIAL**

This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone (615)726-5420 or by return email and delete the message, along with any attachments, from your computer. Thank you.

# GC EXHIBIT 29

NLRB-0001658

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 29

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 4

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Fax: (615) 248-2860**
**E-mail: rlowe@kingballow.com**

March 6, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Contract Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

The parties last met in negotiations on February 24, 2020. At the conclusion of that meeting, the federal mediator offered the following dates for future meetings:

| | |
|---|---|
| March 1, 2020 | March 19, 2020 |
| March 16, 2020 | March 20, 2020 |
| March 17, 2020 | |

The Company accepted all of the mediator's dates for negotiations. You stated you were going on vacation and could not accept the March dates.

The mediator then offered March 23, 24 and 25 as additional meeting dates. The Company accepted all of these dates. The Union accepted none of these dates. You stated you would let the Company know about future meeting dates. At that point, the meeting concluded because you stated you had a meeting to attend.

The Company has not heard from you for almost two weeks. The Company is again requesting meeting dates.

Finally, the parties discussed Article IV, Hours, at our last meeting. During these discussions, the Company discovered it had left off a phrase in Article IV, Section 6, when it had

withdrawn a previous proposal in an earlier negotiation meeting and agreed to go back to the old contract language. The complete old contract language for Article IV, Section 6, is set forth below:

> Article IV, Section 6. Time spent by employees traveling to and from assignments shall be considered as part of the working day. Exceptions: Trips outside the Tri-State area, sports events and self-initiated assignments.

I apologize for the inadvertent omission.

Sincerely,

Richard C. Lowe

RCL/rps

cc: Linda Guest
Jack Yoedt

# GC EXHIBIT 30

NLRB-0001662

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 30

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

**From:** Joseph J Pass
**To:** Richard Lowe
**Cc:** "Linda Ann Guest"; "jyoedt@fmcs.gov"; Micharl A. Fuoco; Jonathan Silver; melissa tkach; Zack (zacktanner7@gmail.com); "kukublaz@aol.com"
**Subject:** [EXTERNAL] RE: Contract Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh
**Date:** Tuesday, March 10, 2020 3:55:08 PM

---

Richard, March 25, 2020 is good for the Guild negotiations.. We can meet at the Sector office at 10:30 AM. Please confirm. Thank you.

Joseph J. Pass, Esquire
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Blvd
Pittsburgh, PA 15222
Direct Dial: 412-802-2651
Office: 412-281-3850
FAX: 412-281-1985
jjp@jpilaw.com

# GC EXHIBIT 31

NLRB-0001665

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 31

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

**From:** Richard Lowe
**To:** Joseph J Pass
**Cc:** Linda A. Guest (lguest@post-gazette.com); jyoedt@fmcs.gov
**Subject:** RE: Contract Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh
**Date:** Wednesday, March 11, 2020 10:08:00 AM

Joe, the Company is available to meet on March 25. We are also available on March 23 and March 24 as offered by the mediator. Best, Richard

**Richard C. Lowe**
**KING & BALLOW**
**315 Union Street**
**Suite 1100**
**Nashville, TN 37201**
**E-mail:** rlowe@kingballow.com
**Direct Dial: 615-726-5420**

**CONFIDENTIAL**
This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone (615)726-5420 or by return email and delete the message, along with any attachments, from your computer. Thank you.

# GC EXHIBIT 32

NLRB-0001668

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 32

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 4



JUBELIRER, PASS & INTRIERI, P.C.
Attorneys at Law

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon

*also admitted in Ohio

*of counsel*
Neal R. Cramer
Joseph M. Burns**
** licensed in Illinois

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

March 22, 2020

***VIA E-MAIL ONLY***

Richard Lowe, Esquire
King & Ballow
315 Union Street
Suite 1100
Nashville, TN 37201

*Re: PG/PG Unions*

Richard:

I received your letter regarding GCIU 24/9M. Your response was not at all surprising. As expected, it is nothing more than a repeat of the PG's standard response given to not only the Pressmen, but the Teamsters, Mailers, Guild, Advertisers, and Finance Unions. This leaves me to our proposed meeting with the Guild scheduled for March 25.

As I am sure you must be aware, the current Coronavirus is a pandemic unlike anything we have ever experienced. The Federal Government, and more significantly the Governor of the State of Pennsylvania has ordered all non-essential services to be shuttered effective 8 a.m. March 23. The aim is to limit contact amongst individuals. Obviously, the need for us to meet pales in comparison to the needs of the people. Needs such as income, security, safety and most significantly affordable good healthcare coverage.

In the past week I have dealt with a number of employers, both large and small, and have been overwhelmed by the compassion and support those employers have demonstrated on behalf of their employees. Literally, all have gone above and beyond what they are contractually obligated to do in providing wages, benefits, fully paid leave and most significantly all-encompassing improved healthcare. All have expressed by word and deed their compassion for their employees.

In contrast, the Post-Gazette has completely ignored their hard working employees and at every turn attempts to deny their employees healthcare, to the extent of refusing to honor a binding arbitration award ordering the PG to provide the healthcare prescribed in their CBA -- a CBA that

the Post-Gazette pledged to honor including any final and binding arbitration award. Such conduct clearly demonstrates that even written agreements that the employer affixes its signature to, means nothing. Whatever happened to a man's word is his bond?

It is reprehensible and disgusting that in these horrific times the PG refuses to act with compassion and understanding to employees who for fourteen years have gone without wage increases and yet provided dedicated service along with having given the PG more than 100 million dollars in concessions. And, now in their time of need, the PG refuses to recognize not only its contractual obligations but its moral obligations to step up and do the right thing -- which is to give all its dedicated employees the healthcare that Arbitrator Nadelbach has found to be the employer's obligation. To refuse to do so in these desperate times is unconscionable. It is time for the PG to do the right thing!

When weighing the benefits of meeting and simply going through the worthless motions that for three plus years have proved the employer has no intention on reaching an amicable resolution to the various CBA's versus saving the lives of those of us involved in these fruitless meetings, makes our decision very easy.

The Guild meeting scheduled for the 25th will not be going forward, nor will there be any future meetings scheduled for any of the bargaining units at the Post-Gazette until the current Coronavirus pandemic is completely arrested.

Finally, despite the obvious acrimony that has transpired over more than three years of wasted time and energy, I urge you and your family to keep safe.


Very truly yours,

*s/Joseph J. Pass*
Joseph J. Pass, Esquire

# GC EXHIBIT 33

NLRB-0001672

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 33

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

**Joseph J Pass**

**From:** Joseph J Pass
**Sent:** Monday, March 23, 2020 8:22 PM
**To:** Richard Lowe

Richard, Just wanted to make sure you got my letter advising that we will not be meeting Wed, Just wanted to make sure you did not make an unnecessary trip in todays environment.

***Joseph J. Pass, Esquire***
***Jubelirer, Pass & Intrieri, P.C.***
***219 Fort Pitt Boulevard***
***Pittsburgh, PA 15222***
***412/281-3850***
***fax 412-281-1985***

# GC EXHIBIT 34

NLRB-0001675

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 34

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

**Joseph J Pass**

| | |
|---|---|
| **From:** | Richard Lowe <rlowe@kingballow.com> |
| **Sent:** | Tuesday, March 24, 2020 9:40 AM |
| **To:** | Joseph J Pass |
| **Subject:** | Re: [EXTERNAL] |

Thanks for the heads up Joe. Stay safe and stay well. Best, Richard

Sent from my iPhone

> On Mar 23, 2020, at 7:21 PM, Joseph J Pass <jjp@jpilaw.com> wrote:
>
> Richard, Just wanted to make sure you got my letter advising that we will not be meeting Wed, Just wanted to make sure you did not make an unnecessary trip in todays environment.
>
> ***Joseph J. Pass, Esquire***
> ***Jubelirer, Pass & Intrieri, P.C.***
> ***219 Fort Pitt Boulevard***
> ***Pittsburgh, PA 15222***
> ***412/281-3850***
> ***fax 412-281-1985***

# GC EXHIBIT 35

NLRB-0001678

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 31

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 31

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**E-mail: rlowe@kingballow.com**

May 22, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

On September 6, 2019, the Union presented a counterproposal to the Company's August 6, 2019 Best Offer. The parties discussed the Union's counterproposal at the September 6 meeting and continued discussion on the Union's counterproposal at our last meeting on February 24, 2020. The Union cancelled the scheduled March 25, 2020 meeting date because of the pandemic. You stated in your March 22 letter as follows:

> The Guild meeting scheduled for the 25th will not be going forward, nor will there be any future meetings scheduled for any of the bargaining units at the Post-Gazette until the current Coronavirus pandemic is completely arrested.

The Company has thoroughly reviewed your September 6, 2019 counterproposal. Because of the paucity of collective bargaining meetings between the parties, the Company has prepared a comprehensive, written response to your counterproposal.

The attached response and the Company's August 6, 2019 Position Statement accompanying the Company's Best Offer provides the Union with the Company's position on substantially all of the remaining open issues. The Company's response and Position Statement does not set forth every discussion held or position maintained by either party to explain, justify or reject a specific proposal. The Company's response and Position Statement does fairly summarize the position of the parties on substantially all of the remaining open issues.

We continue to believe the Company's Best Offer as modified since August 6, 2019, is a fair offer and in the best interest of both parties. We respectfully urge the Union to accept this offer.

Sincerely,

Richard C. Lowe

RCL/rps

**Company's Response to Union's September 6, 2019 Counterproposal to the Company's August 6, 2019 Best Offer**

**Agreement**

1. The Union is proposing the following restriction on managers performing bargaining unit work:

> Exempt employees can do bargaining unit work in breaking news situations only if a Guild member in the same classification in the work required and who is working that is not available.

The Union's September 6 counterproposal is substantially the same as its February 17, 2017 proposal. The Union's proposal follows a series of regressive proposals made by the Union on September 1, 2017, November 14, 2018, December 13, 2018 and January 15, 2019 which prohibited managers from performing bargaining unit work. The Company respectfully rejects the Union's proposal.

Managers currently have the right to perform bargaining unit work as performed in the past and/or similar work that may result from the introduction of new print, electronic or other products, and as operationally necessary. The parties disagree over the current scope of bargaining unit work performed by managers.

The Company believes managers should be able to perform bargaining unit work beyond just breaking news situations when, in its judgement, such work contributes to the efficient operation of the newsroom. The Company has proposed the work of managers will not directly cause the layoff of any bargaining unit employees.

2. Stringers are independent contractors utilized by the Company as content providers. As independent contractors, the means by which they produce content is generally determined by the stringer. Therefore, paragraphs D, 1 and 2 of the Agreement article are not necessary.

The Union continues to make regressive proposals regarding stringers. In its February 17, 2017 proposal, the Union proposed to continue the existing contract language permitting stringers, but reduced the percentage of stringers the Company could use from 15% to 7.5%. However, subsequent proposals (September 1, 2017; November 14, 2018; December 13, 2018) regressed by prohibiting the use of stringers altogether or permitting stringers only if the Union agreed. Approximately 29 months later, the Union dropped its regressive proposal on July 15, 2019.

The Union's September 6, 2019 proposal on stringers became regressive again by adding a proviso that stringers can be used to cover high school sports and SEEN events as long as at least one such event per shift is covered by a Guild member and that if the amount of

stringer annual expenses should exceed 15% of the annual Guild payroll, the Company will match this excess with a payment to be distributed equally to all Guild members.

The Union's regressive proposal is unacceptable. The Company is proposing to retain its current use of stringers to provide outside content. The Company's proposal increases the number of stringers the Company can hire from 15% to 20% of the Guild payroll. It is difficult to predict future challenges the newspaper will face and their effect on available newsroom resources. It is prudent to ensure the newspaper's ability to obtain content from any source as it operates with more limited future resources. For example, it may or may not be necessary to cover high school sports or SEEN events with a bargaining unit employee. The Company will use its editorial judgement in assigning coverage for these events.

The expired contract provided that if the amount of stringer expenses should exceed the 15% of the annual Guild payroll, the Company would match the excess with a payment into the Guild Pension Fund or other similar vehicle. The Company had deleted the penalty provision from its proposal. The Union's proposal not only retains the penalty provision but requires the Company pay employees monetary damages if the Company exceeds the dollar amount allotted to the use of stringers. The Company rejects the penalty provision and asserts the Union's proposal is a permissive subject of bargaining.

3. The Union's September 6 proposal on the Company's use of outside vendors is also regressive. The Union first proposed no restriction on the use of certain outside vendors in its February 8, 2017 proposal. The Union then regressed in its February 17, 2017 proposal by limiting the use of certain vendors "only to the extent currently used with no displacement of bargaining unit employees." On September 1, 2017, the Union reverted back to its February 8 proposal which proposed no restriction on certain outside vendors. This Union proposal was continued in subsequent Union proposals on November 14, 2018; December 13, 2018; and July 15, 2019.

On September 6, 2019, the Union once again made a regressive proposal by limiting the Company's use of outside vendors "only to the extent currently used." The Company pointed out the regressive proposal to the Union on September 6. The Union offered no explanation. The Union's September 6 proposal also added a restriction that the use of certain vendors could not displace any bargaining unit employees. This restriction was not present in its prior proposals on September 1, 2017, November 14, 2018, December 13, 2019 and July 15, 2019.

The Company rejected the Union's regressive proposal. As the Company transitions to a digital newspaper, the right to obtain content from any source is essential. The Company believes the language in the expired contract on outside vendors should be retained.

**Article III**

**Classifications, Wages and Schedules of Minimums**

1. The Company is proposing a three (3) year contract, effective on the signing date of the new Agreement. The Company is proposing wage increases as follows: On the first pay period following the effective date of the Agreement, the top minimum scale in each classification in Article III shall increase three percent (3%). On the first anniversary date of the Agreement, the top minimum scale in each classification in Article III shall increase two percent (2%). On the second anniversary date of the Agreement, the top minimum scale in each classification in Article III shall increase three percent (3%). The Company is not proposing retroactive pay.

The Union proposed the following in its September 6, 2019 proposal:

- Eliminate all wage diversions and pension diversions.
- 5 year contract retroactive to April 1, 2017 and expiring March 31, 2022
- Wage increases retroactive to April 1, 2017

| Effective Date | Percent Increase |
|---|---|
| April 1, 2017 | 7.5% |
| April 1, 2018 | 6.0% |
| April 1, 2019 | 5.5% |
| April 1, 2020 | 6.5% |
| April 1, 2121 | 6.0% |

- The Union made another regressive proposal by withdrawing its proposal since 2017 to maintain all classifications, definitions and steps.

The Union's economic proposal is an economic concession the Company is not willing to make. If the contract became effective on April 1, 2020, for example, employees would receive an astonishing 35.5% increase in wages, in addition to retroactivity.

2. The Company agreed to the following language in Article III, Section 1 of the Union's proposal:

> The above wage minimums need not apply to salaries of those who are on extended sick leave. The pay increases shall go into effect upon the employee's return to work.

3. The Company is proposing that experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion. In order to attract the best journalists in the future, the Company must have the flexibility to recruit journalists with as many tools as possible. Entry level salaries is one of those tools. In the competitive

environment of attracting talent, the Company's right to determine an applicant's initial rate of pay is important. The Union's proposal enabling the Union to challenge the Company's experience credit decisions is rejected.

4. The parties have agreed to retain the expired contract language permitting employees to receive merit increases from the Company. The remaining issue in dispute is the Company's proposal allowing the Company to remove merit increases.

   The Company's position is a merit increase can be removed if, for example, (1) an employee received a merit increase for a special project which is then completed, or (2) if an employee no longer holds a certain position that justified a merit increase, or (3) if performance issues surface after an employee receives a merit increase. The Union has rejected the Company's proposal to remove merit increases.

5. The expired contract provides that when no exempt manager is on duty, and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift. The Company is proposing to retain this language from the expired contract.

   The Union is proposing to increase the amount of money the assigned ranking supervisor is paid from $30 per shift to $55 per shift. The Company believes the $30 per shift payment is fair. The Union's proposal is an economic concession the Company is not willing to make.

6. The Union made another regressive proposal in Article III, Section 10. The Union's proposal is regressive because it makes the bonuses retroactive to April 1, 2017 and increases the amount of the bonus from earlier Union proposals. The Union is proposing to resurrect service bonuses which were discontinued in 2007. The service bonuses were discontinued and diverted to funding the Guild Pension Plan in 2007. The Company is responsible for funding the pension plan which has been merged with several other pension plans. The Union's proposal is an economic concession the Company is not willing to make.

**Article IV**

**Hours**

1. The Company is proposing to maintain the normal workweek of eight hours per day and forty hours per week. The Union, on the other hand, continues to rely on its regressive proposals. In its February 8, 2017 proposal, the Union proposed language which sets forth a normal workweek for employees. The normal workweek was continued in the Union's February 17, 2017 proposal and September 1, 2017 proposal. On November 14, 2018, the Union suddenly regressed and proposed language guaranteeing an employee's workweek and prohibiting changes in work schedules without the approval of the Union. The Union has continued its regressive proposal in its latest proposal. The Union's proposal is unacceptable.

   A guaranteed work week is an economic concession the Company is not willing to make. The Company will be a digital-only newspaper. The Company's current plans are to publish a digital news product every day of the week. However, given the institutional and financial stresses on newspapers, it would be less than prudent to guarantee workweeks in today's environment for traditional media. While the Company believes in providing normal workdays and workweeks for its employees, it is not willing to provide a guarantee.

   In the event a reduction in work schedules becomes necessary due to the reduction in the Company's print or digital publications schedule the Company is proposing to sit down with the Union to discuss the effects of any reduced work schedule.

2. The Union is proposing in Article IV, Section 1(c) that full-time employees with at least two years of service shall have the right to work a four day workweek under certain conditions. The Union's proposal contradicts the requirement that the Company must approve four-day workweek in the Union's Article IV, Section 1(b) proposal. The Company is not opposed to alternative work schedules provided the Company approves such schedules.

3. The Company is proposing to retain the current three day notice where possible of changes in an employee's work schedule. The Union is proposing a strict five day notice period. The Company believes a three day notice period is fair, especially in light of the operational requirements of a newsroom. The Union's proposal is unacceptable.

   The Company is also proposing the right to change an employee's starting time with 24 hours' notice. Because news events are unpredictable, the Company believes the flexibility to change starting times with adequate notice is a reasonable exercise of its right to schedule employees for work. The Union maintains the Company cannot change an employee's starting time without the employee's approval. The Union's proposal is unacceptable.

4. The Union is proposing to reintroduce shift differentials which were eliminated in 2007. The Union's proposal is an economic concession it is not willing to make.

5. The Union is proposing to eliminate swing shifts unless mutually agreed to. The Company currently utilizes swing shifts on occasion to meet operational requirements. The Union's proposal is therefore not acceptable.

## Article V

## Overtime

1. The expired contract provided that overtime is paid after forty (40) hours worked in the workweek. The Union is proposing that overtime be paid for work beyond eight (8) hours in a work day. The Union's proposal is an economic concession the Company is not willing to make.

2. The Union is proposing that employees have the right to decide whether to take compensatory time off in lieu of overtime compensation. The Union's proposal is unacceptable. The Company must retain the right to determine employee work schedules in order to meet operational requirements. The Company will, of course, consider an employer's request for comp time in lieu of overtime compensation.

3. The Company is proposing to continue to pay an employee required to return to work after his regular working day for the time worked, but not less than four (4) hours. The Union has proposed to extend a callback to anytime an employee is required to work remotely after his regular working day. The Union's proposal is an economic concession the Company is not willing to make.

4. The Company is also proposing to reduce the minimum guarantee of hours for work on a day off from eight (8) hours to four (4) hours. The Company respects an employee's off-duty time. On those occasions when it becomes necessary to require work on an employee's day off, the Company will give the employee as much notice as practicable. The Company's proposal provides more flexibility in meeting operational requirements on an employee's day off. The eight (8) hour guarantee is an economic concession the Company is not willing to make.

# Article VI

## Part-time, Temporary Employees and Two-Year Associates

1. The Union is proposing to decrease the number of two-year associates, paid interns and part-time employees the Company may employ from 35 percent of the Union's membership to 20 percent. The Company believes the current limitation of 35 percent should remain unchanged. Because of the enormous challenges facing newspapers, it is essential for the Company to operate with maximum efficiency. This includes determining the role two-year associates, paid interns and part-time employees will play in the Company's future newsroom operations.

2. The Company is proposing that part-time employees not receive holiday pay or personal days because they are not full-time employees. The Union is insisting part-time employees receive these benefits. The Union's proposal is an economic concession the Company is not willing to make.

3. The Union is proposing that temporary employees whose positions extend beyond twelve (12) months shall receive full benefits under the contract on a proportionate basis. The Company's proposal is to retain the expired contract language which awards one week's vacation to temporaries whose temporary positions extend past twelve (12) months. The Company does not believe temporary employees have any expectation they will receive full benefits. The Union's proposal is an economic concession the Company is not willing to make.

4. The Company is proposing to eliminate language in the expired contract which provides that part-time and temporary employees will not eliminate or displace a regular full-time employee. When asked if the Company could decide to cover news assignments with a part-time employee if the regular full-time reporter covering the assignment departed or was reassigned, the Union stated the contract language would prevent that. The Company believes management should have the right to decide how to cover news assignments with the available news staff. The Union's proposal is unacceptable.

## Article VII

## Sick Leave

1. The Company is proposing to continue to provide employees with eight (8) days sick pay annually. The Union is proposing nine (9) days. The Union's proposal is an economic concession the Company is not willing to make.

2. The Company is proposing to cover bargaining unit employees with its short term disability policy (STD). The Union is insisting on retaining the short term disability banks in the expired contract with enhanced benefits. The Union's proposal is an economic concession the Company is not willing to make.

3. The Union is proposing that any unused sick days in an employee's short –term disability bank, up to a maximum of ninety (90) days, be paid out on the employee's separation from the Company, including retirement. The Union's proposal is an economic concession the Company is not willing to make.

4. At the February 24, 2020 meeting, the Company agreed to delete "Retirement" in Section 6 (Company Counterproposal No. 32).

5. At the February 24, 2020 meeting, the Company agreed to delete "sick leave or use" in Section 8 (Company Counterproposal No. 33).

## Article VIII

## Security

1. The Company is proposing the following language to ensure fair treatment of all employees:

> The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and assist the employee for satisfactory service in the future. The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

The Union's September 6, 2019 proposal contains the identical language as the Company except for the last sentence. The Union's position on the last sentence is "superfluous" to the Company's right to discipline for just cause. On the contrary, the Company's proposal sets forth precisely how it determines the appropriate discipline in a particular case.

The Company's position is that each disciplinary situation is unique. Once the Company determines an employee has engaged in any type of misconduct, the Company addresses what level of discipline is appropriate based on the facts and circumstances in that particular case. If the offense is of a serious nature such as theft, for example, the Company may decide the serious offense warrants discharge without the necessity of prior warnings or attempts at corrective discipline. If the infraction was of a less serious nature such as tardiness, for example, the Company may opt for some milder penalty aimed at correction.

The nature of the offense, the Employee's work record and the presence or absence of any mitigating factors all play a part in evaluating the appropriate discipline in any circumstance. There is no mechanical formula applied to Employee discipline because each situation is different.

For example, the Employee's prior work record is a factor in determining the appropriateness of a disciplinary penalty. An offense may be ameliorated by the lack of previous discipline and it may be exacerbated by a poor disciplinary record. A disciplinary warning for tardiness in an employee's work record which is three (3) years old will most likely be treated differently than a three (3) year old disciplinary warning for sexual harassment.

The Company also evaluates any mitigating factors that would excuse or extenuate the discipline. For example, length of service can serve as a mitigating factor depending upon the type of offense at issue.

Again, the totality of an employee's work record is reviewed by the Company in deciding on appropriate discipline under the circumstances of a particular case. As both parties have agreed, the major purpose of any disciplinary action is to correct the problem, prevent reoccurrences and assist the Employee for satisfactory service in the future.

2. Management has the right to determine the number of employees necessary for its operations. The Union has proposed that the Company can lay off if the layoff is due to economy. The Company is proposing to delete the reference to economy because, in determining the number of employees necessary for operations, the Company must be able to reduce the force for any lawful reason. The Union's proposal is therefore not acceptable.

3. In Section 4(C)(2) of the Security article, the Union first proposed in its February 8, 2017 proposal that stringers need not be released before a layoff could take place. In the Union's February 17, 2017 proposal, the Union regressed and all stringers had to be eliminated before a layoff took place. On September 1, 2017, the Union dropped its regressive proposal. But, on September 6, 2019, the regressive proposal came back. The current proposal the Union maintains requires all stringers be released before a layoff takes place. The Union's response to its regressive proposals on stringers at the September 6 meeting was "whatever, okay." Because stringers assist the Company in obtaining content, it makes no sense to eliminate all stringers in the event of a layoff.

4. The Company is proposing to lay off employees by work groups similar to the work groups in the expired contract. The Company has proposed some modifications to the work groups to better reflect its current operations. The primary disagreement between the parties is the methodology used for a layoff within a work group. The Company is proposing to consider seniority, qualifications, performance, and skills in the affected work group. The Union's proposal is to lay off in inverse seniority order.

Professional journalists are not clones of each other, or even equally qualified with each other. Each journalist performs his or her job with varying degrees of skill, ability and efficiency. The Union's position that seniority be the sole factor in layoffs is specious. Under the Union's reasoning, all veteran professional baseball players with comparable years of service are the baseball equals of Mike Trout, or for that matter, Babe Ruth.

The Company has explained how the Company would apply its language for layoffs. At the time a reduction in force is necessary, the Company will consider seniority, qualifications, performance and skills of the employees in the affected work group. There is no formula for applying these factors. Decisions will be based on the Company's business needs at the time these factors are considered.

For example, at the time a reduction in force is necessary, the Company will evaluate the performance of employees in the work group in which a layoff is to occur. If a layoff is to occur in the Business content providers work group, the Company will evaluate each employee's work product, productivity, technical knowledge if relevant to the job

requirements, and any other performance factors which the Company may deem relevant to meet the Company's current operational requirements.

5. The Company is proposing to recall laid off employees according to seniority, provided that the skill and qualifications are, in the opinion of the Company, equal. The Company believes that in the event of a recall, the Company's operational requirements existing at the time will assist the Company in evaluating the skill and qualifications of employees laid off in an affected work group. If the skill and qualifications are substantially equal, the Company believes the more senior employee should be called back first.

   The Union is proposing strict seniority should govern recalls in an affected work group. The Company respectfully disagrees with the union's position.

6. The expired contract provided for inconsistent recall periods. The Company is proposing to retain a 12 month recall period. The Union is proposing a recall period of 24 months. The Company believes a 12 month recall period makes more sense with the uncertainties newspapers face today. The Union's proposal is therefore unacceptable.

7. The Company is willing to provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of an employee's termination date for laid off employees. The Union is proposing six months of paid healthcare coverage and an additional three months of reduced paid health coverage for laid off employees. The Union's proposal is an economic concession the Company is not willing to make.

8. The Company is proposing the right to terminate the seniority rights of employees for absences due to illness or non-work related injury after 1 year, and absences due to a work related injury after 18 months. The Company is proposing to reduce the time periods in the expired contract because the Company believes the time periods are excessive. Shorter time periods may also encourage employees to return to work earlier from their leaves. The Union is proposing to maintain the expired contract's two (2) year period for illnesses or non-work related injury and three (3) years for work related injuries. The Union's proposal is rejected.

9. The Company is proposing to retain the existing no-discrimination provision in the expired contract. The Union's proposal is to add "gender identity" to the provision. Because the law surrounding gender identity discrimination is still being developed by the courts, the Company's position is to let the EEOC and courts continue to handle gender identity issues rather than arbitrating these kinds of disputes under the collective bargaining agreement. The Union's proposal is not acceptable.

## Article IX

## Expenses

1. The Company is proposing to retain the current mileage allowance. The Union is proposing a mileage allowance equal to the amount permitted under IRS regulations. The Union's proposal is an economic concession the Company is not willing to make.

2. The Union reverted back to the expired contract language regarding an employee's use of his own personal equipment. The Company agreed to add back a line previously deleted from the expired contract (Company Counterproposal No. 34).

3. The Union is proposing the Company pay all parking costs after the initial parking fee. The Company is proposing to retain the current reimbursement limit of $15.00 per day after the employee pays the initial parking fee. Upon further consideration of the Company's parking reimbursement policies, the Union's proposal is an economic concession the Company is not willing to make.

4. The Company is proposing that bargaining unit employees be required to authorize release of their DMV records. This release is necessary for the maintenance of the Company's liability insurance. The Union has rejected the Company's proposal for no good reason.

5. The Union is proposing the Company provide all Guild members who use a cell phone for news coverage purposes with cell phones, chargers and data plans. The Company currently provides cell phones to employees if the Company decides a cell phone is necessary for the employee to perform his primary duties. The Company is proposing to retain control over the distribution of all phones among bargaining unit employees. The Union's proposal is rejected.

**Article XI**

**Vacations**

1. The Company is proposing four weeks as the maximum amount of vacation employees can earn. The Union is proposing additional vacation of five (5) weeks after eighteen (18) years of service. The Company believes a maximum of four weeks' vacation is fair. The Union's proposal is an economic concession the Company is not willing to make.

2. The Union has proposed to reinstate the payment of enhanced, accrued vacation pay for employees who terminate their employment with the Company. The enhanced payments were eliminated in 2007. The Company is willing to pay employees accrued vacation pay but is not proposing to reinstate the enhanced payment. The Union's proposal is an economic concession the Company is not willing to make.

3. The Union has proposed to reinstate longevity bonuses eliminated over 13 years ago. The Union's proposal is an economic concession the Company is not willing to make.

**Article XII**

**Holidays**

1. The Union is seeking to increase the number of holidays for bargaining unit employees. Additionally, the Union is proposing to increase the premium for holidays. Finally, the Union is proposing holiday pay for employees assigned to the Christmas Eve and New Year's Eve shift. The Company believes the current number of holidays and premiums paid for holidays are fair. The Union's proposal is an economic concession the Company is not willing to make.

2. The Union continues to propose holiday pay for part-time employees. The Union's proposal is an economic concession the Company is not willing to make.

## Article XIII

## Advancement, Promotion and Transfer

1. The Company has proposed to allow bargaining unit employees to apply for job openings as follows:

> When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

The Company is proposing the right to fill vacancies and new positions from outside the bargaining unit. If the Company believes there is a promising candidate for a position inside or outside the community, it should have the right to consider and hire that person for the position. The Company, of course, believes in promoting from within. Nevertheless, the Company must retain the right to hire from outside the bargaining unit at any time and will consider qualified applicants from within the bargaining unit. The Union objects to adding this language to the contract.

2. In Section 2 of this Article, the Union proposed the expired contract language in four proposals (February 8, 2017; February 17, 2017; November 28, 207; and November 14, 2018). On December 31, 2018, the Union changed the language in Section 2 of its proposal. The new proposal allowed a person who bid in a lower classification to keep his current salary, another regressive proposal. The regressive proposal is continued in the Union's September 6, 2019 proposal. The Union's proposal is not acceptable.

**Article XIV**

**Severance Pay**

1. The Union is proposing to retain the maximum amount of severance pay at 52 weeks' pay. The Company is proposing to reduce the maximum amount of severance pay from 52 to 26 weeks' pay. The Company believes a maximum of 26 weeks' severance pay is fair. The Union's proposal is an economic concession the Company is not willing to make.

## Article XV

## Leaves of Absence

1. The Company has proposed that leaves of absence granted by the Company will not be precedential because of the uniqueness of employee applications for leaves. The Union is opposed to adding this language to its proposal.

2. The Company has proposed that leaves of absences must be approved by the Company. The Union's September 6 proposal allows an employee to unilaterally take a leave of absence based on longevity. The Company believes management must approve such leaves based on operational requirements existing at the time the request for leave is made.

3. The Union is proposing to grant additional paid leave to employees on maternity, paternity or adoption leaves of absence. The Company believes the current compensation for these leaves of absences are fair. The Union's proposal is an economic concession the Company is not willing to make.

4. The Company is proposing the right to have an employee's available paid leave run concurrently with leaves of absence under the Family and Medical Leave Act (FMLA). That option is permitted under the FMLA. The Company believes operational efficiencies will be enhanced if the Company applies paid leave to FMLA absences. The Union has rejected the Company's proposal and continues to insist paid leaves not run concurrently with FMLA leaves. The Union's proposal is not acceptable.

**Article XVI**

**Adjustments of Disputes**

1. Promptness is one of the most important aspects of grievance adjustments. Failure to settle grievances with dispatch is a major cause of labor unrest. The parties' expired collective bargaining agreement did not contain a time limitation for filing a grievance. The Company has proposed the following language:

> A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance, or when the Union reasonably should have known of the events giving rise to the grievance, in order to be timely.

The Company believes fifteen (15) days from the date of the event which generated the grievance, or when the Union reasonably should have known of the event generating the grievance, is a reasonable amount of time for an employee or the Union to raise a grievance it has with the Company. The earlier a grievance is filed and brought to the Company's attention, the easier it is for the Company to fix a mistake or resolve a dispute over the interpretation of contract language. The Company has a responsibility to live up to the terms of its collective bargaining agreement, a responsibility the Company takes very seriously. If the Union believes a Company action is not consistent with the contract, it should raise the issue promptly so the Company can evaluate its actions.

On April 4, 2018, the Union proposed the following language:

> No later than thirty (30) days after the Guild President or Unit Chairman becomes aware of a dispute the Union shall file a grievance in writing with the employer's Human Relations Director.

The Company told the Union it did not believe 30 days was a reasonable time period for filing a grievance. Additionally, the Union applied a subjective standard for becoming aware of a dispute. The Company responded that an objective standard is more fair.

The Union proposed the following language in its September 6, 2019 proposal:

> No later than thirty (30) days after the employee or Union has brought the dispute to the attention of management personnel and the parties are unable to amicably resolve the dispute, the Union or the grievant shall submit the grievance in writing to the employee's immediate supervisor.

The Union's latest proposal is regressive because the proposal eliminates any time limit based on the event giving rise to the grievance or when the employee or Union should reasonably have been aware of the event giving rise to the grievance.

2. The Company is proposing that the party requesting arbitration shall strike first in the event the parties request an arbitration panel. This is only fair because that party is the one who filed the grievance.

## Article XVIII

**<u>Preferential Re-Employment</u>**

1. The Company has proposed that laid off employees must be qualified without additional training for the specific position to be filled in the event of a recall. A laid off content provider in Sports, for example, may not be qualified to fill an opening in the editorial department. Each situation will be different, but the Company needs assurance that if a laid off individual is not qualified for an open, specific position, the Company could, but not be required to, return that person to a specific position he or she is not equipped to perform in.

## Article XIX

## Miscellaneous

1. The Company has proposed the following language:

> An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

The Union wants to withhold their by-line, etc., to register their discontent over the Company's labor policies, editorial policy, or, for that matter, any reason. The Union's proposal is unacceptable. As professional journalists, the Company does not believe this is a proper purpose for withholding a by-line, etc. As a work for hire under the copyright laws, it is the Company's decision to withhold by-lines or not to withhold by-lines. However, as the Company's proposal makes clear, the Company believes it is reasonable for an employee to withhold his or her byline, etc. when the reason for withholding this information is related to preserving the professional integrity of the employee's work product. The Company will consider additional editorial, ethical or security concerns raised by an employer in requesting this information be withheld.

2. The Company is proposing to add sympathy strike, picketing, boycotts and bannering to the expired contract's list of activities which are not permitted during the term of the Agreement. The Union refuses to agree to a comprehensive No Strike/No Lockout provision despite the parties' agreement to settle any alleged violations of the Agreement peaceably through a fair grievance and arbitration procedure.

Justice Thomas, in the Supreme Court's decision in *14 Penn Plaza LLC et al. v. Pyett et al.,* 129 S.Ct. 1456 (2009), recognized the agreement to arbitrate grievance disputes is the quid pro quo for an agreement not to strike. Otherwise, there would be no benefit to an employer such as the Company to agree to arbitrate grievance disputes.

A labor contract is of no benefit to the Company if the Union or the employees can inflict economic harm on the Company by engaging in a sympathy strike, boycott, picketing, or bannering during the labor contract's term. Moreover, the law requires specificity in a No-Strike provision to ensure the statutory right to engage in these activities are consciously waived during the term of the Agreement.

The Union wants the best of both worlds; it wants to memorialize wages, hours and working conditions in a binding contract, including just cause termination, and grievance and arbitration procedures, but still be able to exert economic or publicity pressure on the Company anytime it chooses. The Union's position is simply untenable.

3. The Company has proposed the following language:

> Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

Social media has transformed news gathering and reporting in this country. As a news organization, the Company has special privileges and responsibilities. In order to preserve the Company's institutional and editorial integrity, the Company must have credibility with the community we serve. The Company must protect its core functions as a news organization of objectivity and unbiased coverage of the news. In today's political climate and with the explosion of social media, the Company must be constantly mindful of preserving our reputation in the community for institutional and editorial integrity. The Company's proposal will assist the Company in meeting challenges which could threaten its institutional and editorial integrity.

4. The Union is proposing the company provide standing desks and gel mats to Union members upon request of the employee's doctor. The Union's proposal is an economic concession the Company is not willing to make. The Company does not object to considering individual requests for these items and will provide reasonable accommodations as required by law. However each situation is different. The interactive process will allow the parties to reach a solution to any request of accommodation which may or may not involve standing desks and gel mats. However, the decision to provide these items is discretionary with the Company.

5. The Union is proposing the Company provide the Union with 120 days' notice prior to moving to a different facility and meet with the Union to discuss the move. The Company will, of course, provide reasonable notice to the Guild if the Company is relocating and will satisfy any requirements required by law. However, locking in a set period such as 120 days may be problematic under the circumstances existing at the time which may, for example, require confidentiality. The Union's proposal is unacceptable.

**Article XX**

**Insurance, Health & Welfare, Pension**

1. The Company is proposing that bargaining unit employees be covered by the Company's health, dental, vision, and life insurance plans, as those plans are modified by the Company from time to time. The Company is proposing to enroll employees in the Company's Consumer Driven Healthcare Plan (CDHP). Premium costs are shared under that Plan; 70% paid for by the Company and 30% paid for by the employee. The Company is proposing to cease its participation in the Western Pennsylvania Teamsters and Employers Welfare Fund (Fund).

   The Company believes its CDHP is representative of today's typical health care plans and is a good plan, especially with the health savings accounts and tiered rates. The Company believes that by maintaining its own healthcare plan for its employees, it will have more control and flexibility to provide quality healthcare coverage at reasonable prices in an ever-changing healthcare environment.

   The Union has proposed to remain in the Fund under the Benefit Plan attached to the expired contract. Under the Union's proposal, the Company would be responsible for the entire premium amount regardless of family size and options chosen. Additionally, the Company would be responsible for 25% of any contribution rate increases mandated by the Fund each year of the new collective bargaining agreement. The Union's proposal is an economic concession the Company is not willing to make.

**Article XXII**

**Management Rights**

1. The Union is proposing to modify the last sentence of the Management Rights Article. The Union's proposal would preclude the Company from exercising a management right or exercising that right in a different manner if the Company, in is judgment, decided not to exercise that right in a given situation or exercised that right in a particular manner.

   The Union's proposal essentially guts the Management Rights proposal over the term of the contract. The Union's proposal is not acceptable.

**Article XXIII**

**Term and Renewal**

1. The Union's proposal retains the evergreen clause which is a permissive subject of bargaining and not acceptable to the Company.

**Exhibit 1**

**Guild Employees 401(K) Plan**

1. The Union is proposing that the Company match all employee contributions up to a maximum of six percent (6%) of the employee's gross income. The Union's proposal is an economic concession the Company is not willing to make.

# GC EXHIBIT 36

NLRB-0001709

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 36

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 102

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**E-mail: rlowe@kingballow.com**

June 12, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

On August 6, 2019, the Union was presented with the Company's Best Offer. The Union responded with a counterproposal on September 6, 2019. The parties discussed the Union's counterproposal on September 6, 2019 and again on February 24, 2020. The Union cancelled the scheduled March 25, 2020 meeting date because of the pandemic. You stated:

> The Guild meeting scheduled for the 25th will not be going forward, nor will there be any future meetings scheduled for any of the bargaining units at the Post-Gazette until the current Coronavirus pandemic is completely arrested.

On May 22, 2020, the Company provided the Union with a comprehensive, written response to the Union's September 6, 2019 counterproposal. The Company received no response from the Union.

Attached hereto is the Company's Final Offer to the Union. We have included a "clean" version and a "red-lined" version to show the changes which have been made by the Company from its August 6, 2019 Best Offer. The additions or deletions to the Company's Best Offer are highlighted in blue.

The Company is proposing a three (3) year contract, effective on the signing date of the new Agreement. The Company is proposing wage increases as follows: On the first pay period following the effective date of the Agreement, the top minimum scale in each classification in

Article III shall increase three percent (3%). On the first anniversary date of the Agreement, the top minimum scale in each classification in Article III shall increase two percent (2%). On the second anniversary date of the Agreement, the top minimum scale in each classification in Article III shall increase three percent (3%). The Company is not proposing retroactive pay.

We believe the Company's Final Offer is fair and in the best interest of both parties. We respectfully urge acceptance of this offer.

Please feel free to contact me with any questions the Union may have on the Final Offer.

Sincerely,

Richard C. Lowe

RCL/rps



Pittsburgh Post-Gazette
post-gazette.COM

# Final Offer

NLRB-0001713

**June 12, 2020**

# COMPANY FINAL OFFER

# AGREEMENT BETWEEN

# PITTSBURGH POST-GAZETTE

# AND

# THE NEWSPAPER GUILD OF PITTSBURGH

# TABLE OF CONTENTS

**Page**

I. Guild Shop ....3
II. Checkoff ....4
III. Classifications, Wages and Schedules of Minimums ....6
IV. Hours ....10
V. Overtime ....12
VI. Part-time, Temporary Employees and Two-Year Associates ....13
VII. Sick Leave ....14
VIII. Security ....15
IX. Expenses ....19
X. Internships, Two-Year Associates ....20
XI. Vacations ....21
XII. Holidays ....23
XIII. Advancement, Promotion and Transfer ....24
XIV. Severance Pay ....26
XV. Leaves of Absence ....27
XVI. Adjustment of Disputes ....29
XVII. Military Service ....31
XVIII. Preferential Re-Employment ....32
XIX. Miscellaneous ....33
XX. Insurance, Health and Welfare, Pensions ....37
XXI. Privilege Against Disclosure ....38
XXII. Management Rights ....39
XXIII. Term and Renewal ....40

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this ______________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph "A" above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Editorial Director, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

No person under Guild jurisdiction will be arbitrarily named as a Manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D. The parties recognize the following exceptions to the Guild's jurisdiction set forth in Paragraph C:

1. Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work.

2. Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

3. The Company may subcontract work.

4. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed 20 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

5. Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

   The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

   The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

   It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

## ARTICLE I
## Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

**ARTICLE II**
**Checkoff**

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature______________________________________________________

Date______________________________________

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall receive the following minimum wage rates for these classifications (5-day workweek):

**Content Providers -- (Provides original content for print and electronic publications and products):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st six months | 812.34 | 812.34 | 812.34 |
| 2nd six months | 833.08 | 833.08 | 833.08 |
| 2nd year | 953.89 | 953.89 | 953.89 |
| 3rd year | 996.27 | 996.27 | 996.27 |
| 4th year | 1,023.32 | 1,023.32 | 1,023.32 |
| 5th year | **1,088.71** | **1,110.48** | **1,143.80** |

**Content Editors/Producers -- (Edits and produces original content for print and electronic publications, products, and slot):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st six months | 823.16 | 823.16 | 823.16 |
| 2nd six months | 889.88 | 889.88 | 889.88 |
| 2nd year | 989.06 | 989.06 | 989.06 |
| 3rd year | 1,032.33 | 1,032.33 | 1,032.33 |
| 4th year | **1,102.27** | **1,124.31** | **1,158.04** |

**Assignment Editors -- (Assigns work to content providers and content editors/producers and edits and produces content as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 3rd year | 1,014.30 | 1,014.30 | 1,014.30 |
| 4th year | 1,032.33 | 1,032.33 | 1,032.33 |
| 5th year | **1,117.80** | **1,140.15** | **1,174.36** |

**Librarian -- (Provides newsroom, library and photo support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 804.23 | 804.23 | 804.23 |
| 2nd year | 816.85 | 816.85 | 816.85 |
| 3rd year | **856.21** | **873.34** | **899.54** |

**News Assistant -- (Provides newsroom, library and photo support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 673.50 | 673.50 | 673.50 |
| 2nd year | 691.53 | 691.53 | 691.53 |
| 3rd year | **730.85** | **745.46** | **767.83** |

**Editorial Clerks Administrative -- (Provides newsroom support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 604.07 | 604.07 | 604.07 |
| 2nd year | 620.30 | 620.30 | 620.30 |
| 3rd year | 633.82 | 633.82 | 633.82 |
| 4th year | **661.20** | **674.42** | **694.65** |

**Copy Messengers -- (Provides newsroom support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 505.80 | 505.80 | 505.80 |
| 2nd year | 510.31 | 510.31 | 510.31 |
| 3rd year | 514.81 | 514.81 | 514.81 |
| 4th year | **534.90** | **545.60** | **561.97** |

**Two-Year Associates -- (Performs various newsroom assignments as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 513.91 | 513.91 | 513.91 |
| 2nd year | **580.41** | **592.01** | **609.77** |

**Three-Month Interns -- (Performs various newsroom assignments as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st internship | 461.62 | 461.62 | 461.62 |
| 2nd internship | 475.14 | 475.14 | 475.14 |
| 3rd internship | **503.33** | **513.39** | **528.80** |

1. The above wage minimums need not apply to salaries of those who are on extended sick leave. The pay increases shall go into effect upon the employee's return to work.

2. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

3. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

4. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums.

5. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

6. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ......................................................minimum salary differential
Copy messenger to reporter/editor ........................................minimum salary differential
News assistant, clerk to reporter/editor………………………minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

When no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week.

7. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

8. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, until the top minimum is reached.

**ARTICLE IV**
**Hours**

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

i. The nature of the work is such that it can be compressed into 4 days.
ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
vii. A lunch or dinner break may be required as part of the work day.
viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

6. Subject to newsroom operation requirements, whenever possible, days off shall be consecutive days.

7. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

8. Time spent by employees traveling to and from assignments shall be considered as part of the working day. Exceptions: Trips outside the Tri-State area, sports events and self-initiated assignments.

9. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

10. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. They shall designate a period not to exceed twelve (12) months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week. In the event the Company reduces its print and/or digital publication schedule from its current schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours.

## ARTICLE V
## Overtime

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

## ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, and other leaves of absences, and to meet newsroom operational needs. Part-time employees shall not receive holiday pay or personal days.

3. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months¸ a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week’s vacation.

**ARTICLE VII**
**Sick Leave**

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent for three (3) consecutive days or more.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability -- Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company.

4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

6. Sick leave payments shall terminate upon termination of employment or death of the employee.

7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

8. An employee cannot use sick leave benefits for any purpose other than illness or injury.

9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

10. Company agrees to notify the Guild when an individual's STD is reduced or discontinued. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

**ARTICLE VIII**
**Security**

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and assist the employee for satisfactory service in the future. The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild twenty-one (21) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

The Company will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. Two year associates in the affected work group shall be laid off first. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:

a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports
e. Content providers (photographers/videographers) in Visuals
f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art
h. Assigning editors
i. Clerical/Librarians/News Assistants

C. i. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

ii. Employees in Work Group (i) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

iii. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company will provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date in the event of a layoff.

9. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twelve (12) months

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated. Said one year will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60)

consecutive calendar days, in which event the employee's one year time period shall commence anew.

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within 18 months from the start of their absence may have their benefits and seniority terminated. Said 18 months will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's 18 month time period shall commence anew.

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

10. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

11. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by the Company.

(b) In the event of discharge for misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

12. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

13. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

14. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

15. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company’s discretion.

16. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

17. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

**ARTICLE IX**
**Expenses**

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The Company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. Employees are required to authorize release of their DMV records.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**ARTICLE X**
**Internships, Two-Year Associates**

1. Unpaid academic internships will be limited to fourteen (14) a calendar year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of Articles VI, Sections 2-4; XIII; XIV; XV; XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates are excluded from the following classifications: librarian, news assistant, clerk, and messenger.

E. There will be no assignment restrictions

## ARTICLE XI
## Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service and four (4) weeks for eight (8) continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

**ARTICLE XII**
**Holidays**

1. The following holidays, or days observed as such, shall be granted to full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. A full-time employee shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, a full-time employee will receive 6-1/4 days' pay for the holiday week if he/she works the holiday and 4 other days during the holiday week.

3. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

**ARTICLE XIII**
**Advancement, Promotion and Transfer**

1. When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be not less than 30, nor more than 75 days as determined by the Company, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating

and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work.

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk **(**Copy/Pagination/Web Desk**)**, Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the Company and the Guild.

**ARTICLE XIV**
**Severance Pay**

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

# ARTICLE XV
## Leaves of Absence

1. The Company may grant employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild shall, upon request, be given a leave of absence without pay to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3. Any employee who has had five continuous years in the employ of the Company without a leave of absence may be given a leave of absence by the Company, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
   (b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
   (c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The Company may require employees to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

# ARTICLE XVI
## Adjustment of Disputes

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance, or when the Union reasonably should have known of the events giving rise to the grievance, in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and

binding. The expense of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case.

**ARTICLE XVII**
**Military Service**

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

**ARTICLE XVIII**
**Preferential Re-Employment**

1. In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the general type of work for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

**ARTICLE XIX**
**Miscellaneous**

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance independent contractor photographers may be retained for photo and video assignments.

5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

6. No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lock out its employees during the term of this Agreement.

7. The Guild shall be notified within 24 hours of all resignations tendered.

8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director.

20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.

      c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. The Company may use ADP or any other payroll services firm. Employees will be paid weekly, or bi-weekly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.

**ARTICLE XX**
**Insurance, Health and Welfare, Pensions**

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding. The Company agrees to provide a health, dental, vision and life insurance plan during the term of this Agreement.

Eligible bargaining unit employees participating in the Company's health, vision and dental insurance programs shall pay the following share of the total premium costs for the health, vision and dental insurance programs as determined by the Company:

| Coverage Choice | Employee Share |
|---|---|
| Employee | 30% |
| Employee +1 | 30% |
| Family | 30% |

| 2020 Premium Rates for Consumer Driven Healthcare Plan (CDHP) | | |
|---|---|---|
| **Tier** | **Monthly Premium** | **Employee Contribution** |
| Single | $667.31 | $200.00 |
| Employee +1 | $1,326.88 | $398.00 |
| Family | $2,015.90 | $605.00 |

2. Retiree healthcare

A. Any and all retiree medical benefits were terminated as of October 14, 2014.

3. 401(k) Plan

A. Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth in Exhibit 1, according to the parameters set out in the Plan Document. The Company has the right to make changes to the 401(k) Plan from time to time so long as the benefits provided in Exhibit 1 are not reduced.

4. Pension Plan.

A. The defined benefit pension plan has been merged and frozen.

## ARTICLE XXI
## Privilege Against Disclosure

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

**ARTICLE XXII**
**Management Rights**

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine work and quality standards; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease or restructure any department, operation or service of the Company in whole or in part; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce, change or discontinue research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

**ARTICLE XXIII**
**Term and Renewal**

1. This Agreement shall commence on __________________ and expire on __________________.

2. This Agreement shall be effective upon its execution and shall remain in full force and effect through _______________. Written notice of a desire to terminate this Agreement must be delivered by the one party to the other not more than one hundred fifty (150) days nor less than sixty (60) days prior to _______________.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: ______________________________________ Date: ______________________
Michael A Fuoco

By: ______________________________________ Date: ______________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ___________________________________ Date: ______________________

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books**,** recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block
Publisher and Editor-in-Chief

**Memorandum of Understanding**

The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid $50 for off-shift appearances.

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at not less than $25. Appearances scheduled during the staff member's non-working hours will be compensated at not less than $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to the appropriate Company representative, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker's Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

Exhibit 1
GUILD EMPLOYEES 401(K) PLAN

The PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:

(a) The PG will make a matching contribution ("PG Matching Contribution") to the PG Publishing Company 401(K) Plan (the "Plan") equal to 50% of the first $40 per week deferred by any Eligible Full Time Employee

(b) The maximum amount of PG Matching Contribution will be $20 per week or the pro-rated equivalent for less than Eligible Full Time Employees

(c) The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(d) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(e) The PG Matching Contribution will be subject to a vesting schedule as follows:

(i) Less than 3 years of service – 0% Vested

(ii) At least 3 years of service – 100% Vested

(iii) Vesting Service is counted from original hire date

(f) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(g) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

(h) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.

(i) All new employees will be automatically placed into the 401K plan with the ability to opt out.



Pittsburgh Post-Gazette
post-gazette.COM

# Final Offer

NLRB-0001762

**June 12, 2020**

# COMPANY FINAL OFFER

# AGREEMENT BETWEEN

# PITTSBURGH POST-GAZETTE

# AND

# THE NEWSPAPER GUILD OF PITTSBURGH

# TABLE OF CONTENTS

**Page**

I. Guild Shop ....3
II. Checkoff ....4
III. Classifications, Wages and Schedules of Minimums ....6
IV. Hours ....10
V. Overtime ....12
VI. Part-time, Temporary Employees and Two-Year Associates ....13
VII. Sick Leave ....14
VIII. Security ....15
IX. Expenses ....19
X. Internships, Two-Year Associates ....20
XI. Vacations ....21
XII. Holidays ....23
XIII. Advancement, Promotion and Transfer ....24
XIV. Severance Pay ....26
XV. Leaves of Absence ....27
XVI. Adjustment of Disputes ....29
XVII. Military Service ....31
XVIII. Preferential Re-Employment ....32
XIX. Miscellaneous ....33
XX. Insurance, Health and Welfare, Pensions ....37
XXI. Privilege Against Disclosure ....38
XXII. Management Rights ....39
XXIII. Term and Renewal ....40

# AGREEMENT

Agreement is made and entered into at Pittsburgh, PA this _____________, by and between the PG Publishing Company, a Corporation publishing the Pittsburgh Post-Gazette, hereinafter known as the Company, and The Newspaper Guild of Pittsburgh, a local chartered by The Newspaper Guild/Communications Workers of America, hereinafter known as the Guild.

Witnesseth: In consideration of the mutual covenants set forth the Company and the Guild agree as follows:

A. During the period of this Agreement the Company recognizes the Guild as the sole collective bargaining agency, for itself and on behalf of all employees of the Company in the:

EDITORIAL DEPARTMENT

and in all sub-divisions of the above mentioned departments, excluding those employees provided for in other existing Union Agreements.

B. Except such employees as are otherwise specifically provided for, all the conditions and benefits contained in this Agreement shall apply to all employees who now are or hereafter may be employed by the Company as set forth in Paragraph “A” above. Entirely excepted from the provisions of this Agreement are the following positions:

Publishers and Associate Publishers

Excepted from all provisions except Article XIX, Paragraph 10, of this Agreement, are the following Positions:

Publisher and Editor-in-Chief, Executive Editor, Editor of the Editorial Page, Editorial Director, Managing Editor, Deputy Managing Editor, Senior Assistant Managing Editor, Assistant Managing Editor, City Editor, Sports Editor, Sunday Editor, Technology Systems Editor, Business Editor, Night Operations Manager, Associate Editor of Opinion Pages, Editorial Cartoonist, and Confidential Secretaries.

No person under Guild jurisdiction will be arbitrarily named as a Manager (excluded from the Agreement).

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D. The parties recognize the following exceptions to the Guild’s jurisdiction set forth in Paragraph C:

1. Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work.

2. Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

3. The Company may subcontract work.

4. The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed 20 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

5. Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

   The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

   The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

   It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

## ARTICLE I
## Guild Shop

1. The Company shall require as a condition of employment of an employee that he be and remain a member of the Guild in good standing no later than the 30th day following either (1) the date of the first Guild Shop Agreement legally enforceable under the Labor Management Relations Act, or (2) the date of hiring, whichever is later.

2. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.

3. If any Guild member shall lose good standing by falling one (1) month in arrears in Guild dues including assessments, the Company shall, upon formal notice from the Guild, discharge said employee.

4. The Guild agrees that it will admit to membership and retain in membership any employee qualified according to the Constitution of the Newspaper Guild and the by-laws of the Local Guild.

5. The Company shall furnish the Guild president and treasurer in writing within one week of employment or transfer into Guild jurisdiction the following information:

(a) Name, address, minority group, sex, and date of birth.
(b) Date of hire.
(c) Classification.
(d) Experience rating and experience anniversary date.
(e) Salary.

When the person hired or transferred is a replacement for an employee entering the military service, the name of the person whom he is replacing is to be furnished.

6. Any employee who is discharged under the provisions of Section 1 and 3 shall receive no dismissal pay.

7. Discharges under this Article shall not be subject to review by the Board of Arbitration.

**ARTICLE II**
**Checkoff**

1. Upon an employee's voluntary written assignment, the Company shall deduct weekly from the earnings of such employee and pay to the Guild, not later than the 15th day of each month, all membership dues including assessments levied by the Guild for the current month. Such membership dues including assessments shall be deducted from the employee's earnings in accordance with a schedule furnished the Company by the Guild on the first day of each month. An employee's voluntary written assignment shall remain in effect in accordance with the terms of such assignment.

2. The Company shall notify the Guild of any changes in classification salary or step-up in years of experience within one week of the date change becomes effective.

3. The checkoff assignment shall be made upon the following form:

ASSIGNMENT AND AUTHORIZATION
TO CHECKOFF GUILD MEMBERSHIP DUES
INCLUDING ASSESSMENT

To: P G PUBLISHING COMPANY
and/or ASSIGNS, EMPLOYER

I hereby assign to the Newspaper Guild of Pittsburgh, and authorize the Company to deduct from any salary earned or to be earned by me as his employee, an amount equal to all my Guild membership dues including assessments, as certified by the Treasurer of the Newspaper Guild of Pittsburgh, for each calendar month following the date of this assignment.

I further authorize and request the Company to remit the amount deducted to the Newspaper Guild of Pittsburgh not later than the 15th day of that month.

This assignment and authorization shall remain in effect until revoked by me, but shall be irrevocable for a period of one year from the date appearing below or until termination of the collective bargaining Agreement between yourself and the Guild, whichever occurs sooner. I further agree and direct that this assignment and authorization shall be continued automatically and shall be irrevocable for successive periods of one year each or for the period of each succeeding applicable collective Agreement between the Company and the Guild, whichever period shall be shorter, unless written notice of its revocation is given by me to the Company and the Guild by registered mail not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of each period of one year, or of each applicable collective Agreement between the Company and the Guild, whichever occurs sooner. Such notice of revocation shall become effective for the calendar month following the calendar month in which the Company receives it.

This assignment and authorization supersedes all previous agreements and authorizations heretofore given by me in relation to my Guild membership dues including assessment.

Employee's Signature_______________________________________________

Date______________________________

~~Indemnification of Company. The Union shall defend, indemnify, and save the Company harmless against any and all claims, demands, suits, grievances, or other liability (including attorneys' fees incurred by the Company) that arise out of or by reason of actions taken by the Company pursuant to Article II.~~

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall receive the following minimum wage rates for these classifications (5-day workweek):

**Content Providers -- (Provides original content for print and electronic publications and products):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st six months | 812.34 | 812.34 | 812.34 |
| 2nd six months | 833.08 | 833.08 | 833.08 |
| 2nd year | 953.89 | 953.89 | 953.89 |
| 3rd year | 996.27 | 99~~7~~6.27 | 996.27 |
| 4th year | 1,023.32 | 1,023.32 | 1,023.32 |
| 5th year | **1,088.71** | **1,110.48** | **1,143.80** |

**Content Editors/Producers -- (Edits and produces original content for print and electronic publications, products, and slot):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st six months | 823.16 | 823.16 | 823.16 |
| 2nd six months | 889.88 | 889.88 | 889.88 |
| 2nd year | 989.06 | 989.06 | 989.06 |
| 3rd year | 1,032.33 | 1,032.33 | 1,032.33 |
| 4th year | **1,102.27** | **1,124.31** | **1,158.04** |

**Assignment Editors -- (Assigns work to content providers and content editors/producers and edits and produces content as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 3rd year | 1,014.30 | 1,014.30 | 1,014.30 |
| 4th year | 1,032.33 | 1,032.33 | 1,032.33 |
| 5th year | **1,117.80** | **1,140.15** | **1,174.36** |

**Librarian -- (Provides newsroom, library and photo support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 804.23 | 804.23 | 804.23 |
| 2nd year | 816.85 | 816.85 | 816.85 |
| 3rd year | **856.21** | **873.34** | **899.54** |

**News Assistant -- (Provides newsroom, library and photo support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 673.50 | 673.50 | 673.50 |
| 2nd year | 691.53 | 691.53 | 691.53 |
| 3rd year | **730.85** | **745.46** | **767.83** |

**Editorial Clerks Administrative -- (Provides newsroom support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 604.07 | 604.07 | 604.07 |
| 2nd year | 620.30 | 620.30 | 620.30 |
| 3rd year | 633.82 | 633.82 | 633.82 |
| 4th year | **661.20** | **674.42** | **694.65** |

**Copy Messengers -- (Provides newsroom support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 505.80 | 505.80 | 505.80 |
| 2nd year | 510.31 | 510.31 | 510.31 |
| 3rd year | 514.81 | 514.81 | 514.81 |
| 4th year | **534.90** | **545.60** | **561.97** |

**Two-Year Associates -- (Performs various newsroom assignments as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 513.91 | 513.91 | 513.91 |
| 2nd year | **580.41** | **592.01** | **609.77** |

**Three-Month Interns -- (Performs various newsroom assignments as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st internship | 461.62 | 461.62 | 461.62 |
| 2nd internship | 475.14 | 475.14 | 475.14 |
| 3rd internship | **503.33** | **513.39** | **528.80** |

1. The above wage minimums need not apply to salaries of those who are on extended sick leave. The pay increases shall go into effect upon the employee's return to work.

12. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

23. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

34. Nothing in this Agreement shall prevent employees from bargaining individually for pay increases. The minimum wage rates established herein are minimums only. Individual merit shall be acknowledged by increases above the minimums.

45. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

56. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ......................................................minimum salary differential
Copy messenger to reporter/editor .......................................minimum salary differential
News assistant, clerk to reporter/editor………………………minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

When no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week. ~~(Letter dated May 10, 2002, addresses conditions under which the differential will be paid.)~~

~~6~~7. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

~~7~~8. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, until the top minimum is reached~~, or until the merit increase is removed by the Company, in its discretion~~.

**ARTICLE IV**
**Hours**

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

i. The nature of the work is such that it can be compressed into 4 days.
ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
iv. No employee shall be assigned to work a four-day week without his/her consent.
v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
vii. A lunch or dinner break may be required as part of the work day.
viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

6. Subject to newsroom operation requirements, whenever possible, days off shall be consecutive days.

7. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

8. Time spent by employees traveling to and from assignments shall be considered as part of the working day. Exceptions: Trips outside the Tri-State area, sports events and self-initiated assignments.

9. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

10. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. They shall designate a period not to exceed twelve (12) months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week. In the event the Company reduces its print and/or digital publication schedule from its current schedule, the Company will give the Guild at least ten (10) days' notice prior to reducing an employee's workday or workweek. The parties shall meet during this ten (10) day notice period to discuss the effects of any planned reduction in hours. After the ten (10) day notice period has expired, the Company may implement the reduction in hours.

**ARTICLE V**
**Overtime**

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

**ARTICLE VI**
**Part-time, Temporary Employees and Two-Year Associates**

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, and other leaves of absences, and to meet newsroom operational needs. Part-time employees shall not receive holiday pay or personal days.

3. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months¸ a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week’s vacation.

**ARTICLE VII**
**Sick Leave**

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent for three (3) consecutive days or more.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability -- Bargaining unit employees will be covered by the Company's short term disability policy (STD). The Company reserves the right to modify or change the Company's STD policy on the same basis as nonrepresented employees of the Company.

4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

6. Sick leave payments shall terminate upon termination of employment~~, retirement~~ or death of the employee.

7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

8. An employee cannot use ~~sick leave or use~~ sick leave benefits for any purpose other than illness or injury.

9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

10. Company agrees to notify the Guild when an individual's STD is reduced or discontinued. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

**ARTICLE VIII**
**Security**

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and assist the employee for satisfactory service in the future. The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild twenty-one (21) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

~~(1) Voluntary incentives as designed by the Company may, in the Company's discretion, first be offered for a reduction in force after consultation with the Guild.~~

~~(2) If additional cost reductions are necessary, t~~The Company~~, after implementing any voluntary methods of reducing the force in consultation with the Guild,~~ will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. Two year associates in the affected work group shall be laid off first. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:

a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports
e. Content providers (photographers/videographers) in Visuals

f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art
h. Assigning editors
i. Clerical/Librarians/News Assistants

C. i. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

ii. Employees in Work Group (i) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and upon request) with a current breakdown of employees arranged by seniority and work group.

iii. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company will provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date in the event of a layoff.

9. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;
ii.) absence from work due to a layoff for more than twelve (12) months
iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated. Said one year will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's one year time period shall commence anew.

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within 18 months from the start of their absence may have their benefits and seniority terminated. Said 18 months will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's 18 month time period shall commence anew.

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

10. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

11. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by [__] the Company.

(b) In the event of discharge for [__] misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

12. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

13. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

14. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

15. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions in the Company’s discretion.

16. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

17. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

**ARTICLE IX**
**Expenses**

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The Company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. Employees are required to authorize release of their DMV records.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

**ARTICLE X**
**Internships, Two-Year Associates**

1. Unpaid academic internships will be limited to fourteen (14) a calendar year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of Articles VI, Sections 2-4; XIII; XIV; XV; XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates are excluded from the following classifications: librarian, news assistant, clerk, and messenger.

E. There will be no assignment restrictions

## ARTICLE XI
## Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service and four (4) weeks for eight (8) continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

**ARTICLE XII**
**Holidays**

1. The following holidays, or days observed as such, shall be granted to full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. A full-time employee shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, a full-time employee will receive 6-1/4 days' pay for the holiday week if he/she works the holiday and 4 other days during the holiday week.

3. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

**ARTICLE XIII**
**Advancement, Promotion and Transfer**

1. When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be not less than 30, nor more than 75 days as determined by the Company, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating

and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work.

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk **(**Copy/Pagination/Web Desk**)**, Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the Company and the Guild.

**ARTICLE XIV**
**Severance Pay**

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

**ARTICLE XV**
**Leaves of Absence**

1. The Company may grant employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild shall, upon request, be given a leave of absence without pay to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3. Any employee who has had five continuous years in the employ of the Company without a leave of absence may be given a leave of absence by the Company, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
(b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
(c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The Company may require employees to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

**ARTICLE XVI**
**Adjustment of Disputes**

1. It is the intent of the parties to this Agreement that every effort will be made to avoid disagreements, misunderstandings, employee management problems and disputes. Initially, any affected employee and that employee's immediate supervisor shall attempt to resolve any questions, problems or misunderstandings. A grievance is defined as a dispute over an alleged violation of this agreement and must be filed in writing with the Company within fifteen (15) days of the events giving rise to the grievance, or when the Union reasonably should have known of the events giving rise to the grievance, in order to be timely.

2. In the event any such dispute is not resolved, then a grievance shall be submitted to the employee's supervisor. Within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, the supervisor shall meet with the Union President/Business Representative, or designee in an attempt to resolve such dispute.

3. In the event the dispute is not settled to the satisfaction of the parties, the matter shall be referred to the VP Human Resources/Labor Relations, or designee, and the Guild President, or designee, for settlement.

4. The VP Human Resources/Labor Relations, or designee, and Guild President, or designee, shall, within ten (10) days after receipt of the grievance, excluding Saturdays, Sundays and holidays, meet and attempt to resolve the grievance. If they are unable to resolve the dispute within ten (10) days, excluding Saturdays, Sundays and holidays, from the date of their first meeting following referral of the dispute, either party may, within thirty (30) additional days, excluding Saturdays, Sundays and holidays, request the dispute be submitted to arbitration.

5. The parties shall then promptly attempt to mutually agree upon an impartial arbitrator within ten (10) working days after receipt of the request to submit the dispute to arbitration. If the parties are unable to agree upon an impartial arbitrator, then the Company and Union shall request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names of suggested impartial arbitrators. The parties may mutually agree to request an additional panel if the panel does not contain the names of impartial arbitrators satisfactory to them. In any event, the parties shall select an arbitrator no later than thirty (30) days from the receipt of the panel of arbitrators submitted by the Federal Mediation and Conciliation Service from which they intend to select. The parties shall select from the panel by alternately striking one (1) name from the list until only one (1) name remains, or by mutually agreeing upon one (1) of the arbitrators from the panels submitted. The party requesting arbitration shall strike first.

6. Once a grievance is timely filed and the answering party fails to respond within the prescribed time limits, the grievance shall be automatically moved to the next step.

7. The parties may mutually agree to extend the time limits set forth above. The arbitrator shall have no power to add to, subtract from, modify or amend any provisions of this Agreement. Each party agrees to accept and abide by the award of the arbitrator, which shall be final and

binding. The expense of the arbitration shall be shared equally by the parties. Each party shall bear the expense of the presentation of its own case.

**ARTICLE XVII**
**Military Service**

The Company shall comply with the provisions of the Uniform Service Employment and Re-Employment Rights Act of 1994, as well as any state legislation or regulations applicable to employees called to military leave. A full time employee who is unable to report for regularly scheduled work because the employee is required to report for active duty with the United States National Guard or a Reserve unit of the United States Military shall, for each of the first ten (10) work days lost because of such duty, be compensated in an amount equal to the difference between a day's pay at a straight time rate of pay and the amount earned for military service.

**ARTICLE XVIII**
**Preferential Re-Employment**

1. In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the general type of work for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

**ARTICLE XIX**
**Miscellaneous**

1. Seniority as used in this Agreement means the continuous length of service with the Company. If application of the preceding sentence results in two (2) or more employees having the same seniority, the employee whose name appears earlier on the Company's alphabetical listing of employees shall be deemed more senior.

2. An employee's by-line, initials, credit, tagline or other identifying information shall not be used over his protest provided the sole reason for withholding this information is related to preserving and furthering the professional integrity of the employee's work product.

3. Employees may be assigned to use multi-media equipment for print and electronic publications without restriction. The company shall provide equipment and adequate training for use of such equipment. Employees shall not be subject to discipline for a good faith effort to perform a skill outside their job classification.

4. Free-lance independent contractor photographers may be retained for photo and video assignments.

5. Bulletin boards suitably placed in all departments shall be maintained exclusively for the use of the Guild.

6. No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering or any other interference with or interruption of work shall be permitted during the term of this Agreement. Nor shall the Company lock out its employees during the term of this Agreement.

7. The Guild shall be notified within 24 hours of all resignations tendered.

8. For the purpose of application of this Agreement, it is understood that wherever the masculine pronoun is used as reference, the feminine pronoun also applies, in the language of this agreement.

9. Employees will be free to engage in any paid or volunteer activity outside of working hours under the following conditions:

(A) Employees must notify the Company in advance of any such activities, and must receive advance approval for such activities.
(B) Provided such activity does not consist of services performed for publications, radio, TV stations, or digital entities in direct competition with the Company, or other entities that may be a conflict of interest as determined by the Company.
(C) Provided such activities do not involve volunteer or paid work for any business, institution or organization that the employee regularly covers, or for any local or national political party or government service, either appointive or elective.
(D) The Company shall notify the Guild of its decision in these matters.
(E) No Company equipment will be used for outside activities.

There will be no exceptions to these provisions except as set forth by the Company and on file in the Post-Gazette's Personnel folder of the affected employee or employees.

(Code of ethics is reprinted in the back of the contract).

10. In the event that any valid Federal or State law or the final decision of any court of competent jurisdiction renders illegal any provisions of this Agreement, all other terms and provisions of the Agreement shall continue in full force and effect.

11. An employee may refuse to perform his or her duties when, in good faith and with good cause, he or she believes abnormally dangerous working conditions exist.

12. An employee called for jury duty or as a witness and required to serve, shall receive his regular salary less any amounts paid him for jury duty or as witness fees.

13. The Company shall supply the Guild on request, but not more than twice in one year, a list containing the following information for all employees on the payroll under Guild Jurisdiction.

(A) Name, address, minority group, sex, and date of birth
(B) Date of hiring.
(C) Classification.
(D) Experience rating and experience anniversary date.
(E) Salary.

The Company shall notify the Guild monthly in writing of:

(a) Merit increases granted by name of the employee, individual amount, resulting new salary, and effective date.
(b) Step-up increases paid by name of employee, individual amount, resulting new salary, and effective date.
(c) Changes in classification, salary changes by reason thereof, and effective date.
(d) Resignations, retirements, deaths and other revisions in the data listed in the first section of this paragraph and effective dates.

14. The Guild recognizes the company's right to conduct periodic written performance reviews for all employees.

15. The news assistant classification is based on the following:

A. Writing Duties: All writing could be described as non-creative. Examples: Engagements, weddings, routine obits, rewriting of church news, military announcements and routine news releases. If news assistant is asked to perform as a reporter, he/she will be paid as a reporter.

B. Research: Available to do research for reporters, but such assignments will be made by news assistant's immediate supervisor.

C. Department: Not assigned to a particular department but will not be delegated to more than one department during a single work day with this exception: he/she might be required to perform traditional clerical duties to meet the needs of the office.

D. Non-writing news assistants:

Art Department – routine graphics such as business charts, weather maps, simple bar graphs, calling down existing AP graphics and adapting them to PG style.

E. Existing clerks or future clerks might work as a news assistant one or two days a week for which they will be paid a daily differential. Furthermore, first consideration shall be given to the employees in Guild jurisdiction to whom advancement to the position of news assistant would constitute a promotion.

F. No news assistant will be reprimanded for an error in news judgment.

16. A. The Company will make reasonable efforts to provide a clean and safe working environment and to avoid conditions hazardous to the health of his employees. The employees will cooperate in maintaining these conditions.

B. The Company and the Guild agree that Repetitive Strain Injuries or Cumulative Traumas Disorders (collectively RSI) are a matter of concern. The Company and the Guild's Health and Safety Committee will meet regularly to discuss developments regarding RSI.

17. Employees may work at home with approval of the Company. The Guild will be notified of any such arrangement.

18. The Company is committed to ensuring that employees are free of the dangerous effects of drugs and alcohol. A copy of the Company's Drug and Alcohol Policy is available from the Human Resources Director.

19. The Company has a Transitional Duty Program. Under this program, employees injured due to an injury or illness and unable to perform all the functions of their pre-injury job may be returned to work in a modified duty capacity. A copy of the Company's Transitional Duty Program is available from the Human Resources Director.

20. The Company and the Newspaper Guild of Pittsburgh are committed to instituting same sex healthcare benefits in the Guild unit at the Pittsburgh Post-Gazette subject to the following conditions:

a. That such coverage is permissible within the State of Pennsylvania.
b. The parties agree on the cost of the program.

c. That the parties establish appropriate safeguards limiting the program to partners in a long-term committed relationship.

21. Notwithstanding anything to the contrary in this Agreement, the Company may take any and all actions necessary for the Company to reasonably accommodate any qualified disabled individual pursuant to the Americans with Disabilities Act.

22. Notwithstanding anything to the contrary in this Agreement, employees will be subject to the Company's ethics, professional integrity and social media policies as established and changed by the Company. The Company agrees to discuss the effects of any changes prior to implementation.

23. This Agreement covers only those matters specifically contained herein and supersedes all prior agreements between the Company and the Guild, including any letter of interpretation, verbal understanding and/or past practices.

24. The Company may use ADP or any other payroll services firm. Employees will be paid weekly, or bi-weekly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.

**ARTICLE XX**
**Insurance, Health and Welfare, Pensions**

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans. Such plans may be amended, changed, replaced or terminated, in whole or in part, including, but not limited to, insurance carriers, plan design, eligibility requirements, deductibles, premium costs, coverage options, co-pays and any other cost sharing arrangements, at the Company's sole discretion. The Company may offer benefits through commercial insurance carriers, on a self-insured funding basis or on any combination of commercial insurance or self-insured funding. The Company agrees to provide a health, dental, vision and life insurance plan during the term of this Agreement.

Eligible bargaining unit employees participating in the Company's health, vision and dental insurance programs shall pay the following share of the total premium costs for the health, vision and dental insurance programs as determined by the Company:

| Coverage Choice | Employee Share |
|---|---|
| Employee | 30% |
| Employee +1 | 30% |
| Family | 30% |

| ~~2019~~ 2020 Premium Rates for Consumer Driven Healthcare Plan (CDHP) | | |
|---|---|---|
| **Tier** | **Monthly Premium** | **Employee Contribution** |
| Single | ~~$648.94~~ $667.31 | ~~$195.00~~ $200.00 |
| Employee +1 | ~~$1,290.36~~ $1,326.88 | ~~$387.00~~ $398.00 |
| Family | ~~$1,959.82~~ $2,015.90 | ~~$588.00~~ $605.00 |

2. Retiree healthcare

A. Any and all retiree medical benefits were terminated as of October 14, 2014.

3. 401(k) Plan

A. Eligible bargaining unit employees will be allowed to participate in the Guild Employees' 401(k) Plan as set forth in Exhibit 1, according to the parameters set out in the Plan Document. The Company has the right to make changes to the 401(k) Plan from time to time so long as the benefits provided in Exhibit 1 are not reduced.

4. Pension Plan.

A. The defined benefit pension plan has been merged and frozen.

**ARTICLE XXI**
**Privilege Against Disclosure**

1. An employee may refuse to divulge the confidential source of any published material or material offered for publication, except to the Company or his representatives, including counsel. Subject to the foregoing requirements of disclosure, the Company agrees to support an employee who refuses to give up custody of, or to disclose, any unpublished confidential information, notes, records, documents, films, photographs or tape recordings which relate to news he gathered in connection with published material or to disclose the source of such unpublished material.

2. The Company shall notify the employee concerned and the Guild of any formal demand on the Company for such surrender of unpublished material or disclosure of the source of any published or unpublished material. Likewise, the employee shall notify the Company of any demand on the employee for such surrender of unpublished material or disclosure of the source of any published or unpublished material.

3. Should the employee be proceeded against under the law, the Company agrees to provide legal counsel, if requested by the employee, selected by the Company of the employee at the Company's expense, and, in such event, to indemnify the employee against any fines or damages, provided the employee has complied with the requirements of paragraph 1 and 2 above, and follows the advice given by counsel supplied by the Company.

4. Provided that the employee fully complies with the requirements of paragraphs 1, 2 and 3 above he shall suffer no loss under the collective bargaining Agreement as a result of his refusal to surrender unpublished material or disclose the source of any published or unpublished material to any federal, state, or municipal court, grand jury, agency, department, commission or legislative body.

5. Notwithstanding paragraph 1 above, in libel actions against the Company concerning published material, where, in the opinion of the Company's counsel the employee should disclose the source of such published material for the defense of the Company, the employee agrees to disclose the source of the published material.

**ARTICLE XXII**
**Management Rights**

Except as modified or restricted by this Agreement, all statutory and inherent managerial rights, prerogatives and functions are retained and invested exclusively in the Company, including, but not limited to, the right to reprimand, suspend, discharge or otherwise discipline employees for just cause; to determine the number of employees to be employed; to hire employees, determine their qualifications, and assign and direct their work; to promote, demote, transfer, lay off and recall to work in accordance with the provisions of this Agreement; to determine the products to be produced and/or the services to be rendered; to maintain the efficiency of operations; to set starting and quitting times; to determine the personnel, methods, means and facilities by which operations are conducted; to determine work and quality standards; to issue, amend and revise reasonable rules and policies in accordance with applicable law; to cease or restructure any department, operation or service of the Company in whole or in part; to control and regulate the use of machinery, facilities, equipment and other property of the Company; introduce, change or discontinue research, production, service, distribution and maintenance methods, materials, machinery and equipment; to determine the number, location and operation of departments, divisions and all other units of the Company; and to take action necessary to determine, manage and fulfill the mission of the Company. The Company's failure to exercise any right, prerogative or function hereby reserved to it, or the Company's exercise of any such right, prerogative or function in a particular way, shall not be considered a waiver of the Company's right to exercise such right, prerogative or function or preclude it from exercising the same in some other way not in conflict with the provisions of this Agreement.

**ARTICLE XXIII**
**Term and Renewal**

1. This Agreement shall commence on __________________ and expire on __________________.

2. This Agreement shall be effective upon its execution and shall remain in full force and effect through _______________. Written notice of a desire to terminate this Agreement must be delivered by the one party to the other not more than one hundred fifty (150) days nor less than sixty (60) days prior to _______________.

NEWSPAPER GUILD OF PITTSBURGH/COMMUNICATIONS WORKERS OF AMERICA

By: _______________________________________ Date: ______________________
Michael A Fuoco

By: _______________________________________ Date: ______________________
Jonathan D. Silver

PG PUBLISHING COMPANY

By: ____________________________________ Date: ______________________

Statement of Policy

The Post-Gazette always adhered to the principle that journalists must be free of obligation to any interest other than the public's right to know. We assume that members of the editorial staff are honest and honorable, and that none would show favoritism in exchange for favors or gifts.

The Post-Gazette, like many other news organizations, has become concerned in recent years about the practice that has flourished in many newsrooms of permitting employees to accept favors and gifts, many of which have been sent to home addresses. Today, with the public becoming increasingly critical of newspapers and their credibility, we must be concerned about even the appearance of impropriety. Anybody who thinks he is influencing news play by favors or gifts, even if he is not, is going to convince at least a dozen other persons that journalists can be bought.

After reviewing past practices, the Post-Gazette has decided to issue a statement of professional standards that will apply to all persons who gather, write or edit news. The sole purpose of this statement is to strengthen the Post-Gazette's reputation for integrity and high journalistic standards.

Reduced to its simplest form, the Post-Gazette's belief is that gifts, favors, free travel, special treatment or privileges can compromise the integrity of journalists and their employers. Nothing of value should be accepted by journalists or their employers.

The complete policy statement follows:

Free Tickets and Passes

Free tickets or passes to sports events, movies, theatrical productions, circuses, ice shows, amusement parks or other entertainments may not be accepted or solicited by staff members.

Working reporters, however, may accept passes to events where there are special facilities such as press boxes or tables -- for which tickets are not sold. Reviewers may accept tickets for the purpose of reviewing plays or movies, but they may not solicit such tickets for other staff members or friends. Season passes to movies may not be accepted.

Gifts and Gratuities

Gifts of insignificant value -- a pencil, pen, calendar, key chain or such -- may be accepted if it would be awkward to refuse or return them. All other gifts should be declined.

Staff members may not accept any gifts of liquor, wine or beer. In no instance may a staff member accept cash.

A gift that exceeds token value should be returned promptly with an explanation that it is against Post-Gazette policy. If it is impossible to return the gift, the company will donate it to a charity.

Travel

Junkets, free trips and reduced rate or subsidized travel may not be accepted. An exception may be made, however, when free or reduced rate transportation is the only means available to cover an event (such as a military flight or a trip arranged by a foundation or government). Staff members must consult with the managing editor before accepting such arrangements.

Staff members may travel on chartered planes (with a sports team or political candidate, for example) and take advantage of charter rates, hotel bookings or other services offered by a news source. All such trips must be approved by the managing editor.

In every instance, the news value of a trip will be the determining factor in approving or disapproving Post-Gazette participation.

Use of Merchandise or Products

Staff members should not accept the free use or reduced rate purchase of merchandise or products for personal pleasure when such an offer involves the staff member's newspaper position. This includes the loan or cut-rate purchase of such things as automobiles, furniture, boats, appliances, clothing and sporting goods.

A staff member may drive or use a product for a short time to test or evaluate it for news or feature articles or for photography. Extended or regular use of products for these purposes is prohibited.

Miscellaneous

Entertainment -- Where possible, Post-Gazette staff members should pay for meals and drinks when on company business. Dinner or cocktail parties are allowed if the event relates to news coverage or if it is valuable for background. "Freeload" affairs that have little or no news value should be avoided. This includes such things as special entertainment and parties for the press and families.

Memberships -- Free or reduced rate memberships in private clubs or organizations should not be accepted.

Books, Recordings, Games – Books**,** recordings and electronic games that are supplied to designated reviewers may be accepted for that purpose. Staff members should not solicit such items, however.

All staff members should be aware that good judgment is more effective than any rules or regulations. Copies of the Post-Gazette's policy statement may be obtained from the business office and may be sent to news sources when gifts or favors are declined.

John Robinson Block
Publisher and Editor-in-Chief

**Memorandum of Understanding**

The purpose of this MOU is to establish guidelines and recognize the news gathering agreement between KDKA and the Pittsburgh Post-Gazette. The Company and the Guild agree as follows:

1. Participation will be voluntary.
2. Credit lines and/or bylines will follow the current policy as well as the collective bargaining agreement.
3. There will be no compensation for employees who appear on the air while they are in the Post-Gazette newsroom or a news bureau.
4. Employees will be paid $25 for on-shift appearances when they must travel to the KDKA television studio.
5. Employees will be paid $50 for off-shift appearances.

MEMORANDUM OF UNDERSTANDING
PG SPEAKERS' BUREAU POLICY

Staffers making speaking appearances involving their professional role as staff members of the Pittsburgh Post-Gazette will be compensated when the appearance has been scheduled through the Post-Gazette Speakers' Bureau.

Appearances scheduled during the staff member's regular working hours will be compensated at not less than $25. Appearances scheduled during the staff member's non-working hours will be compensated at not less than $50. No mileage, parking or meal costs will pertain. In the case of out-of-town appearances, the Speaker's Bureau will attempt to make arrangements for the organization to provide reimbursement of travel expenses.

Staffers contacted for a speaking engagement must first refer the inquiring party to the appropriate Company representative, who will set up the details and review the eligibility. The Marketing Department will develop speaking engagements for staffers by publicizing the Bureau in the paper and through a mail-out brochure. The minimum recommended group size for eligibility is 25. Academic classes will be given separate consideration.

The Speaker’s Bureau will negotiate fees with groups and set up a share with the staffer over and above the minimums on a case-by-case basis. The idea is for these appearances to help underwrite appearances before groups in our community that cannot afford to pay such fees. After clearing its costs each year, the Bureau will donate any remaining newspaper share of bureau revenues to PG charities.

# MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding, between the Pittsburgh Post-Gazette and the Newspaper Guild of Pittsburgh, shall serve as an addendum to Article II of the collective bargaining agreement between the two parties.

The purpose of this agreement is to establish procedures through which employees who regularly perform duties above their classifications may receive regular increases in wage differentials.

The assignment of a full-time employee who has regularly worked in a higher classification at least one shift per week for a period of more than six consecutive months shall be considered a regular assignment for the purposes of salary differentials.

In such cases, employees shall receive credit for shifts worked at the higher classification, for the purpose of determining periodic increases in salary differentials according to the minimum wage schedules listed in Article III of the agreement. In accordance with Article III, Section 8, Paragraph (b) of the contract, employees must be assigned to higher classifications for greater than 50 percent of a shift to receive credit for one shift under this provision.

Employees who attain such status, therefore, shall receive regular steps up, per Article III, in salary differentials, based on the number of shifts worked at the higher classification.

For the purposes of this agreement, 130 shifts worked at a higher classification shall constitute six months of service, and 260 shifts worked at a higher classification shall constitute one year of service.

Exhibit 1
GUILD EMPLOYEES 401(K) PLAN

The PG Publishing ("PG") will make contributions to Eligible Employees (as defined below) in accordance with the following schedule:

(a) The PG will make a matching contribution ("PG Matching Contribution") to the PG Publishing Company 401(K) Plan (the "Plan") equal to 50% of the first $40 per week deferred by any Eligible Full Time Employee

(b) The maximum amount of PG Matching Contribution will be $20 per week or the pro-rated equivalent for less than Eligible Full Time Employees

(c) The PG will make the PG Matching Contribution as soon as practical after the close of each month and after receiving information regarding Employee deferrals;

(d) The PG Matching Contribution will be invested in the same manner as chosen by the Eligible Employee with respect to his/her employee deferrals;

(e) The PG Matching Contribution will be subject to a vesting schedule as follows:

(i) Less than 3 years of service – 0% Vested

(ii) At least 3 years of service – 100% Vested

(iii) Vesting Service is counted from original hire date

(f) The PG Matching Contribution will be afforded the same rights, options, benefits, and features as available under the terms of the Plan, in accordance with the terms of the Plan;

(g) "Eligible Employee" is defined as any employee who has completed the applicable probationary period as required to be considered an employee, under the terms of the labor agreement between PG Publishing and the Guild;

(h) The determination of the permissible types of compensation that may be deferred to the Plan is not altered by this proposal.

(i) All new employees will be automatically placed into the 401K plan with the ability to opt out.

# GC EXHIBIT 37

NLRB-0001811

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 37

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3



JPI
JUBELIRER, PASS & INTRIERI, P.C.
Attorneys-at-Law

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon

*also licensed in Ohio

*of counsel*
Neal R. Cramer
Joseph M. Burns**

**licensed in Illinois

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

June 22, 2020

**VIA EMAIL & FIRST CLASS MAIL**

Richard C. Lowe
King & Ballow
315 Union Street, Suite 1100
Nashville, Tennessee 37201
rlowe@kingballow.com

***Re: Contract Negotiations between Pittsburgh Post-Gazette and Newspaper Guild***

Dear Richard:

I received your letter of May 22, with attachments and most recently your "Final Offer" and letter of June 12, 2020. In response to both letters, it is important that the record be set straight. The union provided the PG with its counterproposal on September 6, 2019. Since then, the parties met on September 6, 2019 and February 24, 2020. We were scheduled to meet again March 25, 2020, when the pandemic struck and Governor Wolfe ordered the shutdown of non-essential business. At that time, we had yet not gone through one-third of the union's counterproposals. Nevertheless, we have now received a "Final Offer". Since we have not finished going through the union's counterproposal your "Final Offer" is at best mystifying. In addition, there remains a current charge before the NLRB alleging that the PG has bargained in bad faith. It is problematic that a "Final Offer" would have any legitimacy while charges of bad faith bargaining remain outstanding. What is most astounding is that after 24 meetings the company has not agreed to a single union proposal!

Before spending any time to respond to the "Final Offer", the employer must make it clear that by providing its "Final Offer", is it the PG's position that negotiations are terminated and will not meet in further contract negotiations? Please advise and once we are aware of the PG's position, we shall take appropriate action.

Very truly yours,

Joseph J. Pass

JJP:crc

16

# GC EXHIBIT 38

NLRB-0001814

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 38

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Fax: (888)-688-0482**
**E-mail: rlowe@kingballow.com**

July 14, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Contract Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

On June 12, 2020, the Company sent you its Final Offer. We asked the Union to contact the Company if it had any questions concerning the final offer. The Company received no questions concerning the substantive terms of the Company's final offer. The Union presented no counterproposals to the Company's final offer. The Union never offered to discuss the final offer.

After over three years of negotiations, the Company believes our negotiations are at impasse. If the Union disagrees, please tell us why you believe further bargaining will be fruitful. We will consider proposals from the Union that indicated substantive changes in the Union's position regarding any of the open issues that will move us closer to an agreement.

Sincerely,

Richard C. Lowe

RCL/rps

cc: Jack Yoedt

# GC EXHIBIT 39

NLRB-0001817

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 39

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22 **Witness:** SILVER **Reporter:** BW

**No. of Pages:** 3



JUBELIRER, PASS & INTRIERI, P.C.
*Attorneys-at-Law*

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon

*also licensed in Ohio

*of counsel*
Neal R. Cramer
Joseph M. Burns**

**licensed in Illinois

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

July 14, 2020

**VIA EMAIL & FIRST CLASS MAIL**

Richard C. Lowe
King & Ballow
315 Union Street, Suite 1100
Nashville, Tennessee 37201
rlowe@kingballow.com

***Re: Contract Negotiations between Pittsburgh Post-Gazette and Newspaper Guild***

Dear Richard:

Enclosed is your recent letter of July 14, 2020, as well as my June 22 response to your Final Offer. Contrary to your assertion that the union never responded to your "Final Offer" the enclosed clearly refutes that. As you can see in my letter of June 22, we clearly asked if the employer was willing to meet in further negotiations. Until your July 14 letter mischaracterizing the facts we have not heard a whisper from you. Clearly if it is the PG's position that negotiations are over it would be fruitless to meet and/or provide a response to the "Final Offer" other than it is unacceptable and we are not at impasse.

Since we have not heard any reasons as to why the remaining two-thirds of the Union's last proposal are or are not acceptable we are at a loss as to how you believe we are at an impasse! Upon receiving your answer to the question in my June 22 letter we are unable to move forward. The ball is in your court.

Very truly yours,

Joseph J. Pass

JJP:crc
Encls.




GENERAL COUNSEL 40
SKIPPED

NLRB-0001820

# GC EXHIBIT 41

NLRB-0001821

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 41

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 4

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**E-mail: rlowe@kingballow.com**

July 16, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

Thank you for your July 14 email. The Company believes our negotiations are at an impasse. Negotiations have gone on for over three years with no agreement being reached. The Union's strategy of avoiding and delaying negotiations and making regressive proposals without justification throughout bargaining has been inexcusable.

The Company presented its Best Offer on August 6, 2019. On September 6, 2019, the Union presented a counterproposal to the Company's Best Offer. The Company responded to approximately 75% of the Union's counterproposal in negotiations on September 6, 2019 and February 24, 2020. A meeting scheduled for March 25, 2020 was cancelled by the Union on March 22, 2020 because of the pandemic. The Union at that time declared the Union would no longer meet with the Company "until the current Coronavirus pandemic is completely arrested."

Because of the Union's announced refusal to meet, the Company sent the Union a comprehensive, written response to the Union's entire September 6, 2019 counterproposal on May 22, 2020. The Company informed the Union that the comprehensive, written response to the Union's counterproposal and the Company's August 6, 2019 Position Statement accompanying the Company's Best Offer provided the Union with the Company's position on substantially all of the remaining open issues. The Company respectfully urged acceptance of its offer. The Union never responded to the Company's May 22, 2020 letter.

The Company reached out again to the Union by letter on June 12, 2020. In the letter, the Company presented its Final Offer. The Company asked the Union to contact the Company with any questions concerning the Final Offer.

The Union responded by letter on June 22, 2020. In its letter, the Union raised no questions concerning the substantive terms of the Company's Final Offer. The Union did not offer any counterproposals to the Company's Final Offer. More significantly, the Union never offered to discuss the Final Offer.

Instead, the Union wanted to know "if it was the PG's position that negotiations are terminated and [the Company] will not meet in further contract negotiations." Union counsel is aware that a Final Offer does not, by itself, terminate contract negotiations. The Company has never asserted its Final Offer terminated contract negotiations. Indeed, it was the Union who announced on March 22, 2020, that it would no longer meet with the Company.

On July 14, 2020, the Company again notified the Union that the Company had not received any questions concerning the substantive terms of the Company's Final Offer. The Union had not presented any counterproposals to the Company's Final Offer. The Union had not offered to discuss the Final Offer. The Union had not requested to meet regarding the Final Offer. In short, the Union continues to refuse to engage in meaningful collective bargaining as it has done over these three years plus of negotiations.

The Company also stated in its July 14 letter that the Company believed the negotiations were at an impasse. If the Union disagreed, the Company asked the Union to tell the Company why it believed further bargaining will be fruitful. You stated in your July 14, 2020 email that the Union was not at impasse but refused to tell the Company why the Union believed further bargaining would be fruitful.

Despite the Company's belief the negotiations are at an impasse, the Company remains willing to consider substantive changes in the Union's bargaining positions regarding any of the remaining open issues that will move the parties closer to an agreement.

Sincerely,

Richard C. Lowe

RCL/rps

# GC EXHIBIT 42

NLRB-0001825

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 42

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 5

JUBELIRER, PASS & INTRIERI, P.C.
*Attorneys-at-Law*

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon

*also licensed in Ohio

*of counsel*
Neal R. Cramer
Joseph M. Burns**

**licensed in Illinois

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

July 20, 2020

***VIA EMAIL (rlowe@kingballow.com)***
***AND U.S. MAIL***

Richard C. Lowe, Esquire
King & Ballow
315 Union Street, Suite 1100
Nashville, TN 37201

Re: Negotiations Between Pittsburgh Post-Gazette and Newspaper Guild of Pittsburgh

Dear Richard:

I have received yours of July 16, 2020, and in response thereto provide the following.

I would agree with your observation that for over three years of "negotiations" no agreement has been reached. What is most striking is that over three years not a single Union proposal has been accepted by the Employer. When you speak of regressive proposals, it is the Company that has provided nothing but regressive proposals. The Company has consistently proposed to remove language from the current agreement placing the employees in a worse position, and then in a few instances reinstates language elsewhere in the agreement that takes away what is currently in the agreement, e.g., jurisdiction language.

Your assertion the Union is attempting to delay and/or avoid negotiations is simply false. On September 6 and February 24, the Company responded to about 25% of the Union's counterproposals. True, on March 25th we cancelled the meeting on March 26th because of the pandemic. The meeting of March 26th was for the purpose of continuing to review our proposal. Something that still needs to be done. We cancelled the meeting on the 26th not only for the safety and health of the participants on the Union's side, but for those on the Company's side. As a reminder, at that time Pennsylvania was in a complete shutdown.

Unfortunately, the Governor has recently issued a new proclamation reinstating some of the same stay at home orders as a result of the rising coronavirus cases and a threat remains that a complete shutdown may once again be ordered. I don't know about you but from our perspective we have no intention of subjecting anyone, including you, to the possibility of a

219 Fort Pitt Boulevard 1st Floor, Pittsburgh, PA 15222-1576 Ph: 412.281.3850 • 412.261.0147 F: 412.281.1985
facebook.com/jpilaw www.jpilaw.com




deadly virus simply to resume "negotiations" which have not yet borne much fruit.  Moreover, I should point out that on April 2, 2020, you advised one of our other Locals that "the Company is available to meet on any date at this point once we are all released from confinement".  Thus, your statement that "Because of the Union's announced refusal to meet, the Company sent the Union a comprehensive written proposal on May 22, 2020" is completely bogus.  Your email of April 2nd unequivocally states you refuse to meet until "all were released from confinement" and that is why there have been no meetings!  Because we are not from Tennessee, we are unaware if or when you were released from confinement and assumed once released we would hear from you.  June 12th was the first we heard from you when you sent your "Final Offer".  On June 22 the Union responded and asked that you make clear whether by providing your "Final Offer" was it your position that negotiations are terminated and you would no longer meet.  Until we understand why our last proposal was unacceptable there would be little sense in attempting to prepare any counterproposal to the "Final Offer".  Nonetheless, we never received any answers to our June 26 questions until July 14 when you stated the Company believed we were at impasse.  When receiving a "Final Offer" what is that supposed to mean?  Does that mean "Final" – maybe "Final" – sometimes "Final"?

You also want to know why the Union believed further bargaining would be fruitful.  I cannot tell you why further bargaining would be fruitful until we hear in an open discussion why two-thirds of the proposals the Union made, to which you never responded, are acceptable or unacceptable!  Negotiations require a dialogue to discuss the pros and cons of each proposal; not to send letters that try to make a case that there is an impasse.  I would agree that after three years you have not agreed to any Union proposals, however, since every Company proposal is regressive, we would like to know why each proposed takeaway is necessary.  We believe further negotiations would be fruitful if the Employer comes to the table with an open mind and a willingness to discuss proposals that can be mutually agreed to.  Proposals such as why the Employer needs to hire more stringers than currently allowed when the evidence clearly and unequivocally shows the Employer is not using the number of stringers currently permitted.  Since the Company is using only 10% of what they are currently permitted, why the change?  The Company's proposal makes no sense.  Unfortunately, that is but one of many, many examples needing to be discussed and understood.  We would love to know the reason why all other regressive proposals are needed.  Clearly if there is a good reason change is needed, we are more than willing to compromise.  Until we hear sufficient sound reasons for such changes, or why our proposals are unacceptable, it is difficult to reach an acceptable agreement.

More repulsive is your healthcare proposal which is beyond bad and clearly send a message that the Employer does not want an agreement.  Aside from it being a "bad plan", the Company maintains the sole and exclusive right to cancel the plan immediately after the parties sign the agreement.  They can also modify any of its terms at any time.  That gives the employees nothing!  The proposal is illusory.

Nonetheless, we are ever hopeful the Employer will come to its senses, approach the table in an effort to be reasonable and come to some amicable agreement.  We stand ready, willing and able to meet to go through our last proposal and your "Final Offer" and make suggested changes in an attempt to reach mutual agreement.

Keep in mind, any meeting going forward must be consistent with the requirements of safety for all concerned, including you. Please advise if you are willing and able to meet in order to negotiate terms of a mutually agreeable compromise from your "Final Offer". If you willing to meet, please advise as to your available dates so that we may reach a mutually agreed time, as well as the conditions under which such negotiations will be continued.

Very truly yours,

Joseph J. Pass

JJP:db

# GC EXHIBIT 43

NLRB-0001830

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 43

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 26

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**E-mail: rlowe@kingballow.com**

July 27, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Negotiations between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

After over three years of negotiations, the Company believes the parties are at impasse. Therefore, negotiations are terminated. The Company has implemented the following Articles and/or provisions of the Company's Final Offer.

1. **Agreement:** Paragraph C; Paragraph D, Sections 1 through 7

2. **Article III, Classifications, Wages and Schedules of Minimums:** The Company is implementing Article III except for Section 4.

3. **Article IV, Hours:** The Company is implementing Article IV but only the first sentence in Section 11.

4. **Article V, Overtime**

5. **Article VI, Part-time, Temporary Employees and Two-Year Associates**

6. **Article VII, Sick Leave:** The Company is implementing Article VII except for the second sentence of Article VII, Section 3.

7. **Article VIII, Security:** The Company is implementing Article VIII except for the phrase "in the Company's discretion" in Article VIII, Section 15.

8. **Article IX, Expenses**

9. **Article X, Internships, Two-Year Associates**

10. **Article XI, Vacations**

11. **Article XII, Holidays**

12. **Article XIII, Advancement Promotion and Transfer**

13. **Article XIV, Severance Pay**

14. **Article XV, Leaves of Absence**

15. **Article XVIII, Preferential Re-Employment**

16. **Article XIX, Miscellaneous:** Section 24 only

17. **Article XX, Insurance, Health and Welfare, Pensions:** The Company is implementing Article XX as set forth in the Addendum, except for Sections 2 and 3. Bargaining unit employees will be covered by the Company's health, dental, vision and life insurance plans beginning September 1, 2020.

The specific language of each Article and/or provision of the implemented terms and conditions referenced above is contained in the attached Addendum to this letter. The above implemented new terms and conditions supersedes and replaces the applicable Articles and/or provisions of the expired agreement.

Because of the impasse in these negotiations, the collective bargaining agreement is terminated. The evergreen provision in Article XXII provides that "[t]he terms and conditions of this Agreement shall remain in effect as long as negotiations continue." Negotiations are now terminated because of the impasse. The contractual terms and conditions of the collective bargaining agreement have expired, along with the evergreen provision. Article XXII is deleted and has no further force and effect.

The Company will continue to observe the established terms and conditions of the expired collective bargaining agreement as required by the National Labor Relations Act, except as otherwise modified by the implemented terms and conditions in this letter and except those terms and conditions recognized as strictly contractual. Additionally, the Company will no longer check off Union dues, including assessments.

With respect to arbitration, an arbitration clause does not continue in effect after a collective bargaining agreement expires. The Company expressly disavows and repudiates any contractual obligation to arbitrate post-expiration grievances as imposed by the collective bargaining agreement. The Company will unilaterally decide any obligation to arbitrate grievances on a case-by-case basis in accordance with the National Labor Relations Act. Moreover, the Company disavows and repudiates any implied-in-fact contract between the parties. *See Luden's, Inc. v. Local Union No. 6,* 28 F.3d 347 (3rd Cir. 1994).

Sincerely,

Richard C. Lowe

RCL/rps

July 27, 2020

# ADDENDUM

**Implemented Articles and/or Provisions from Company's Final Offer**

## AGREEMENT

C. The kind of work either normally, or presently, performed within the unit covered by this Agreement and other work assigned to be performed within said unit, or work which replaces or displaces such work, is recognized as the jurisdiction of the Guild, and performance of such work shall be assigned to employees within the Guild's jurisdiction.

D.    The parties recognize the following exceptions to the Guild's jurisdiction set forth in Paragraph C:

   1.    Supervisors and managerial employees may perform bargaining unit work. No bargaining unit employee will be laid off as a direct result of supervisors or managers performing bargaining unit work.

   2.    Non-bargaining unit employees may perform bargaining unit work on an occasional basis.

   3.    The Company may subcontract work.

   4.    The Guild recognizes that stringers will continue to be utilized by the Post-Gazette to fulfill its obligation to report the news. The amount of money paid to stringers is based on a percentage of the annual Guild payroll. The maximum amount to stringers will not exceed 20 percent of the annual Guild payroll. This percentage may be changed by mutual agreement to meet operational needs.

   5.    Recognizing the need to develop additional sources of revenue from the platforms with electronic and print products, and to expand our Post-Gazette audience, the Company agrees to work with the Guild in developing community journalism initiatives, including social networks with paid or unpaid content from contributors, including but not limited to, independent contractors, freelance journalists, bloggers, photographers and videographers, as well as institutions, government agencies and community organizations.

   The company agrees to prominently identify community-derived content as produced by independent providers who are not employed, edited or pre-moderated by the Post-Gazette.

   The company agrees to keep the Guild up-to-date on the company's Community Journalism standards.

It is understood that such work will be under the supervision of the Post-Gazette through bargaining unit and exempt editors.

6. The Company may continue to obtain content from commercial vendors, including, but not limited to, traffic and weather reports, maps, event calendars, dining guides, financial data and sports statistics.

7. The Guild shall have no jurisdiction over photo reprints. This involves work performed by image techs and photographers that is associated with the creation and distribution of photo reprints.

## ARTICLE III
## Classifications, Wages and Schedules of Minimums

Employees shall receive the following minimum wage rates for these classifications (5-day workweek):

**Content Providers -- (Provides original content for print and electronic publications and products):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st six months | 812.34 | 812.34 | 812.34 |
| 2nd six months | 833.08 | 833.08 | 833.08 |
| 2nd year | 953.89 | 953.89 | 953.89 |
| 3rd year | 996.27 | 996.27 | 996.27 |
| 4th year | 1,023.32 | 1,023.32 | 1,023.32 |
| 5th year | **1,088.71** | **1,110.48** | **1,143.80** |

**Content Editors/Producers -- (Edits and produces original content for print and electronic publications, products, and slot):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st six months | 823.16 | 823.16 | 823.16 |
| 2nd six months | 889.88 | 889.88 | 889.88 |
| 2nd year | 989.06 | 989.06 | 989.06 |
| 3rd year | 1,032.33 | 1,032.33 | 1,032.33 |
| 4th year | **1,102.27** | **1,124.31** | **1,158.04** |

**Assignment Editors -- (Assigns work to content providers and content editors/producers and edits and produces content as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 3rd year | 1,014.30 | 1,014.30 | 1,014.30 |
| 4th year | 1,032.33 | 1,032.33 | 1,032.33 |
| 5th year | **1,117.80** | **1,140.15** | **1,174.36** |

**Librarian -- (Provides newsroom, library and photo support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 804.23 | 804.23 | 804.23 |
| 2nd year | 816.85 | 816.85 | 816.85 |
| 3rd year | **856.21** | **873.34** | **899.54** |

**News Assistant -- (Provides newsroom, library and photo support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 673.50 | 673.50 | 673.50 |
| 2nd year | 691.53 | 691.53 | 691.53 |
| 3rd year | **730.85** | **745.46** | **767.83** |

**Editorial Clerks Administrative -- (Provides newsroom support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 604.07 | 604.07 | 604.07 |
| 2nd year | 620.30 | 620.30 | 620.30 |
| 3rd year | 633.82 | 633.82 | 633.82 |
| 4th year | **661.20** | **674.42** | **694.65** |

**Copy Messengers -- (Provides newsroom support as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 505.80 | 505.80 | 505.80 |
| 2nd year | 510.31 | 510.31 | 510.31 |
| 3rd year | 514.81 | 514.81 | 514.81 |
| 4th year | **534.90** | **545.60** | **561.97** |

**Two-Year Associates -- (Performs various newsroom assignments as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st year | 513.91 | 513.91 | 513.91 |
| 2nd year | **580.41** | **592.01** | **609.77** |

**Three-Month Interns -- (Performs various newsroom assignments as necessary):**

| | First Pay Period Following Effective Date of Agreement | First Anniversary Date of Agreement | Second Anniversary Date of Agreement |
|---|---|---|---|
| 1st internship | 461.62 | 461.62 | 461.62 |
| 2nd internship | 475.14 | 475.14 | 475.14 |
| 3rd internship | **503.33** | **513.39** | **528.80** |

1. The above wage minimums need not apply to salaries of those who are on extended sick leave. The pay increases shall go into effect upon the employee's return to work.

2. Experience credit for earlier employment by the Company or elsewhere may be given new employees in the Company's discretion.

3. Copy messengers or clerks may be assigned to the duties of a reporter, artist or photographer as a beginner for a period of six months as a preparation for his own training as an experienced newspaperman, but if still in college shall be paid the applicable intern rate for the duration of the trial period. However, if his work fails to meet the required standard or if the position is discontinued the employee shall have his choice of dismissal pay or return to his former duties. A copy messenger or clerk who has graduated from college and is assigned to the duties of a reporter, artist, photographer or copy reader shall receive the beginner salary for the assigned classification.

5. Any new classification established by the Company shall be subject to negotiations between the Company and the Guild.

6. (a) An employee temporarily transferred to a higher classification shall receive differential pay according to the following schedule:

Copy messenger to clerk ....................................................minimum salary differential
Copy messenger to reporter/editor .......................................minimum salary differential
News assistant, clerk to reporter/editor...........................minimum salary differential

(b) Daily differentials will be paid to employees who are assigned to higher classifications for greater than 50% of a shift. The differential to be paid shall be determined by dividing the monetary difference between the classifications by five (5) to establish a daily payment.

Employees in the copy messenger and clerk classifications may work up to 40 percent of their time in higher classifications before receiving the weekly minimum salaries for the higher classifications. They will receive daily differentials.

When no exempt newsroom manager is on duty and a Guild member is assigned to be the ranking supervisor on the premises for at least four hours (one-half) of his shift, he will receive an additional $30 per shift.

(c) The above is not intended to change present practices in cases where an employee substitutes in part for an employee in a department head or comparable capacity without assuming the full responsibility. In case of a long illness or absence of such an employee, the Company may assign another employee as "acting" and additional compensation shall be arranged between the employee, the Company and the Guild in direct relation to the amount of responsibility to be assumed by such substitute.

(d) The Harrisburg and Washington correspondent will receive a salary differential of $20 a week.

7. An employee hired above the minimum for his actual experience shall be given an experience rating in the minimum bracket comparable with his salary.

8. Employees may be upgraded to the next highest experience rating with anniversary date changed to the date of upgrading. Merit increases above minimums shall be maintained through the succeeding experience step-ups without change of anniversary date until the employee is either upgraded to a higher experience rating, until the top minimum is reached.

## ARTICLE IV
## Hours

1. A full-time employee's normal workday will be eight (8) hours within a nine (9) consecutive hour period. An employee's normal workweek shall be five days per week.

2. With the approval of the Company, full-time employees may work a four-day work week (for a regular week's pay) consisting of 4 ten hour days. By mutual agreement, full-time employees also may work a six-day week of not more than 40 hours. The Company will notify the Guild of such an arrangement. During holiday weeks, all full-time employees will be scheduled for a five-day week.

3. Additionally, with the approval of the Company, full-time employees with at least two years of service may, on a rotating basis, have the option of working a four-day week consisting of four 10-hour days at his request under the following conditions:

- i. The nature of the work is such that it can be compressed into 4 days.
- ii. At least one weekend shift may be required as part of the work week except by mutual agreement.
- iii. Employees shall be granted such assignments on a rotation according to seniority (similar to the Christmas week vacation rotation).
- iv. No employee shall be assigned to work a four-day week without his/her consent.
- v. The arrangement shall be limited to two months but may be extended by mutual agreement between the company and the employee based on availability.
- vi. The arrangement shall be limited to one per department at any one time. Exceptions must be approved by the department head and managing editor.
- vii. A lunch or dinner break may be required as part of the work day.
- viii. For holiday weeks, for the employee's vacation week(s), and weeks in which the employee takes single day vacations, the employee will be scheduled for a five day week.

4. Beat reporters who cover major sports are exempt from overtime provisions but shall receive additional vacation in a formula mutually agreed upon by the Company and the Guild.

5. A regular schedule of working hours shall be maintained for all employees. No less than three days' notice shall be given in advance of any change in an employee's working schedule and twenty-four (24) hours notice shall be given in the event of change in an employee's starting time, where possible. Schedules of holiday work in the editorial department shall be posted two weeks in advance of the holiday, where possible.

6. Subject to newsroom operation requirements, whenever possible, days off shall be consecutive days.

7. It is mutually agreed that the Company is entitled to service for the full unit of hours constituting a day's work or night's work or week's work as prescribed in this Agreement.

8. Time spent by employees traveling to and from assignments shall be considered as part of the working day. Exceptions: Trips outside the Tri-State area, sports events and self-initiated assignments.

9. Nothing in this Article shall be construed so as to interfere with the completion of assignments by employees nor the performance of emergency assignments.

10. With the approval of the Company, employees may elect to reduce their work week to fewer than 40 hours and shall be considered flex-time employees. They shall designate a period not to exceed twelve (12) months that they will remain in that status.

A. Upon expiration of the 12-month (or shorter) period, the employee may return to full-time status. If the employee elects to extend his/her flex time beyond 12 months, any return to full-time status will be determined by the availability of work. If no slots are available, (a hiring freeze implies that no slots are available) the flex time status will continue until a mutually agreeable job closest to his/her experience becomes available. For the first three months of the reduced work week, the employee's health insurance coverage will be unchanged. After three months, the Company will pay a portion of the health/dental/optical insurance premium based on the number of hours worked per week. For example, if the employee works three days a week, the Company will be responsible for 60 percent of the premium. For purposes of security under Article VIII, flex-timers shall be treated the same as full-time employees.

B. By seniority, flex-time employees will have the opportunity to return to full time status whenever a two-year associate is hired. The flex-time employee will have only one opportunity to return to full-time status. If he/she refuses to return to full-time status, he loses the right to return under the provisions of this paragraph.

11. The Company does not guarantee any specified hours of work per day or per week.

## ARTICLE V
## Overtime

1. Overtime shall be defined as work performed beyond 40 hours actually worked in the work week. Overtime shall be worked when required by the Company, except in case of illness, emergencies or exceptional situations. Overtime work must be approved in advance by the Company.

2. Overtime performed beyond 40 hours in any one week shall be paid for at time and one-half of the regular rate of pay, except where otherwise provided for in this Agreement. By mutual agreement, which will not be unreasonably withheld, an employee may take overtime in the form of compensatory time off in lieu of the traditional cash payment but at the same rate of time and one-half per overtime hour worked. The employee, by mutual agreement not to be unreasonably withheld, may take some of the overtime in cash and the remainder in compensatory time. Employees must take the compensatory time within the pay period in which the overtime is worked. The Company shall provide employees with forms for reporting overtime and for

designating whether they want payment in money and/or compensatory time off. These records shall be regularly provided to the Guild.

3. A full-time employee required to return to work after his regular working day shall be paid for the time worked, but not less than four hours. An employee authorized to contribute to the Post-Gazette electronically outside his regular working day shall be compensated for actual time worked, but not less than one hour at the employee's current rate.

4. An employee called to work on his day off shall be compensated at the rate of time and one-half for the time worked (provided the employee has actually worked forty (40) hours in that workweek), but not less than four hours,.

5. Overtime shall be reported in writing to the Company or its representative promptly after the overtime is worked. The Company shall cause a record of all overtime to be kept. Specified overtime records shall be made available to the Guild on request.

## ARTICLE VI
## Part-time, Temporary Employees and Two-Year Associates

1. The total number of two-year associates, paid interns and employees averaging less than 40 hours per week cannot exceed 35 percent of the Guild membership.

2. Part-time employees shall assume all of the obligations of this Agreement and shall receive its benefits on a proportionate basis unless stated otherwise elsewhere in this contract as their respective work week compares with a full work week of 40 hours. It is understood that part-time employees may work full time to cover absences due to vacation, sick leave, and other leaves of absences, and to meet newsroom operational needs. Part-time employees shall not receive holiday pay or personal days.

3. It shall be a policy of the Company to pay part-time employees not less than an hourly basis equivalent to the weekly wage minimum for the classification of work in which they are employed. Such part-time employees may work less than 20 hours per week in a four-day period without exceeding 10 hours in any one day. All benefits for these employees, unless stated otherwise elsewhere, will be proportionate to the number of hours regularly worked during the week.

4. Provisions of this Agreement shall not apply in the case of temporary employees hired for a special project. The Guild shall be notified in writing as to the nature of such project and its duration. Temporary employees may be hired to cover absences of other employees due to vacations, sick leaves, leaves of absence, etc. for up to eight months, a period which may be extended by mutual agreement between the Company and the Guild. These employees will be covered only by Articles I, II and VI of this Agreement. Furthermore, it is understood that temporary employees will not be replaced with other temporary employees after the eight-month period of employment, except by mutual agreement between the Company and the Guild. Temporary employees whose positions are extended beyond twelve (12) months shall receive one week's vacation.

**ARTICLE VII**
**Sick Leave**

1. Sick leave shall be calculated on an anniversary year basis. The company will provide eight (8) days sick pay annually which may be taken only when an employee is unable to work due to illness. The company may request that an employee furnish a doctor's certificate or other reasonable proof when absent for three (3) consecutive days or more.

2. There shall be no holiday premium pay during the sick leave period.

3. Short-term disability -- Bargaining unit employees will be covered by the Company's short term disability policy (STD).

4. If an employee becomes ill or injured while on vacation, sick leave will not start until the end of the scheduled vacation period. However, an employee who becomes ill or injured before his scheduled vacation begins shall have the right to reschedule his vacation.

5. No employee shall be entitled to sick pay for the period of any absence due to an injury incurred working for any other current employer.

6. Sick leave payments shall terminate upon termination of employment or death of the employee.

7. If there is a pattern of apparent abuse by an individual, the Company has the right to establish a three-day waiting period for sick leave for that individual.

8. An employee cannot use sick leave benefits for any purpose other than illness or injury.

9. In all cases of compensable accident, amounts paid under Worker's Compensation shall be deducted from any amount paid by the Company, as in the past.

10. Company agrees to notify the Guild when an individual's STD is reduced or discontinued. Employees claiming benefits under this Section shall, upon request, submit to an examination by a doctor or doctors designated and paid for by the Company.

**ARTICLE VIII**
**Security**

1. The Company's own best interest lies in ensuring fair treatment of all employees. The major purpose of any disciplinary action is to correct the problem, prevent recurrence, and assist the employee for satisfactory service in the future. The Company shall use progressive discipline, which includes coaching or verbal warning, written reprimands or warnings, suspension from work with or without pay, and discharge. The Company determines the appropriate disciplinary action

based on the facts and circumstances of each case, including the employee's employment record as a whole.

2. Discharges may be either (1) for good and sufficient cause or (2) to reduce the force. Discharges for causes are subject to review under Article XVI, Adjustment of Disputes.

3. The Company's right to determine the size of the force is recognized and the Company's decision to reduce the force (either permanently or temporarily) shall not be subject to review by the Board of Arbitration. The Guild may initiate arbitration of the question of whether reduction in force is in fact the reason for such discharge.

4. A. The Company shall notify the Guild twenty-one (21) days in advance of any proposed layoffs to reduce the force, specifying the job title, job classification and work groups defined below (the "work group"), and number of employees being laid off per work group, numerical order of layoffs within each work group and numerical order of overall layoffs, and the reason for the layoffs.

B. In the event of a layoff, the following procedures shall be observed:

The Company will proceed with layoffs in the affected work group. Substitute voluntary resignations in the affected group will be given consideration by the Company in lieu of employees otherwise slated for separation. Two year associates in the affected work group shall be laid off first. The Company reserves the right to offer regular employment to any two year associate, including one who would otherwise be subject to layoff as a two year associate under this provision. In all cases of selection of employees for layoffs or reductions in force, the Company will give consideration to seniority, qualifications, performance, and skills in the affected work group. The work group for purposes of layoff will be divided as follows:

a. Content providers (writers) in Local News
b. Content providers (writers) in Business
c. Content providers (writers) in Features & Editorial
d. Content providers (writers) in Sports
e. Content providers (photographers/videographers) in Visuals
f. Content editors (copy editors/paginators) on universal desk
g. Content editors in Digital design, Web and Art
h. Assigning editors
i. Clerical/Librarians/News Assistants

C. i. For the purposes of layoff, length of service for part-time employees shall be counted on a pro-rated basis. (For example, an employee who has worked three days per week for 20 years shall be credited with 12 years of service).

ii. Employees in Work Group (i) above who have performed work in a higher work group for at least 50 percent of their prior year's service shall be considered part of that work group for the purposes of a layoff. The company shall furnish the Guild (annually and

upon request) with a current breakdown of employees arranged by seniority and work group.

iii. Transferred employees must be in a new work group for at least six months to be considered part of that work group for layoff purposes. Otherwise, they shall be considered part of the last work group they occupied for at least six months prior to the transfer.

5. In the event of recall, the recall shall be according to seniority, provided that skill and qualifications are, in the opinion of the Company, equal. Such recall rights will last 12 months from the date of the employee's layoff.

6. The Company will forward notice of recall by certified mail to the Guild and to the last known address of the employee reflected on Company records. The employee must, within seven (7) calendar days of delivery or attempted delivery of the notice of recall, notify the Company of his/her intent to return to work on the date specified for recall and, therefore, return to work on such date.

7. In the event a laid off employee is not recalled within a year or is not employed elsewhere, severance pay based on his actual time of employment will be paid. If the employee is rehired within 12 months from the time the severance pay is received and the employee's seniority is restored under the provisions of the termination of seniority below, the employee will not be eligible for severance if any further layoffs occur.

8. The Company will provide three months of COBRA reimbursement for health insurance based on insurance coverage and cost sharing as of termination date in the event of a layoff.

9. Termination of Seniority – An employee's seniority shall be broken and rights under this Agreement forfeited for the following reasons:

i.) discharge, retirement, or resignation;

ii.) absence from work due to a layoff for more than twelve (12) months

iii.) failure to give notice of intent to work when recalled after a layoff within the time period specified in Article VIII 4(b)(6) except in case of emergency;

iv.) Employees who are off work as a result of illness or non work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within one year from the start of their absence may have their benefits and seniority terminated. Said one year will continue to run from the date of disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's one year time period shall commence anew.

v.) Employees who are injured on duty as a result of a work related injury and who are unable to either return to their regular position or obtain another regular position within their bargaining unit within 18 months from the start of their absence may have their benefits and seniority terminated. Said 18 months will continue to run from the date of

disability, unless the employee returns for a period in excess of sixty (60) consecutive calendar days, in which event the employee's 18 month time period shall commence anew.

vi) failure to return to work on the first work day following leave of absence except in cases of emergency.

10. For any employee hired without his having had one or more years, prior experience in the classification of work for which he is hired and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period, with a three-month extension at the Company's option. Company will give such employee periodic appraisal of his work and will notify the Guild of dismissal.

For an employee hired who has had at least one year of experience on a daily newspaper, and regardless of experience rating assigned for salary purposes, the first three months of his employment shall be a probationary period. By mutual agreement between the Guild, the employee and the Company, this probationary period may be extended for three additional months.

Probationary employees shall have all the benefits of this Agreement during their probationary period, except that they shall not have the right to appeal their dismissal under the grievance provision of this Agreement.

Tryouts will be for posted positions only, and tryouts may be given in any department. The tryout period will be for one week. By mutual consent between the Company and the Guild, the trial period may be extended.

An employee may ask for a tryout for any position or job that is posted because of an opening or resignation.

There may be no more than one tryout at any time in a single department and no more than three (3) on tryout at any time in all departments.

If a person is hired after a tryout period of one week or more, the entire tryout time will be considered as part of the probationary period.

11. (a) When an employee with six months' service or more is to be discharged, the Guild and the employee shall be notified in writing at least two weeks in advance of such discharge. Two weeks' pay in lieu of notice may be given by the Company.

(b) In the event of discharge for misconduct, or in the case of misconduct after notice has been given said employee may be discharged immediately with no notice pay.

(c) A dismissed employee and the Guild shall receive in writing from the Company the reason for dismissal of any employee covered by this Agreement.

12. There shall be no speed-up in work so as to place unreasonable duties upon any of the employees as a result of which their competency might be questioned. Any reduction in the force

shall not result in placing unreasonable duties upon any of the remaining employees as a result of which their competency might be questioned.

13. There shall be no discrimination against any employee or prospective employee because of sex, age, race, creed, color, national origin, sexual orientation, marital or parental status and those disabilities defined and covered under the Americans with Disabilities Act.

14. The Company will notify the Guild when changes are made in operations that will alter the duties of employees covered by this Agreement. Furthermore, the Company agrees that an adequate period of training will be provided at the Company's expense for such employees.

15. An employee who could be dismissed by the introduction of new or modified equipment, machines, apparatus or processes may be afforded the opportunity to transfer to other available positions.

16. Any employee assigned to operate Company-owned equipment shall be given an adequate period of training at the Company's expense.

17. Any employee assigned to operate a computer shall be offered an eye examination at the Company's expense prior to beginning work on such devices, and may be retested at least every two years.

## ARTICLE IX
## Expenses

1. If required, all reporters and photographers will use their personal cars in the service of the Company.

2. For the term of this agreement, the Company will reimburse for the business use of a vehicle by paying a vehicle allowance of 46 cents per mile. The reimbursement rates are based on gas price of $3.00 per gallon. The Company will review the Pittsburgh AAA gas rate on January 1, April 1, July 1, and October 1. The Company will adjust the reimbursement rate by 1.5 cent, upward or downward, for every 25 cent change from the $3.00 base rate on these dates.

3. The Company agrees to furnish the Guild with a list of all employees whose automobiles are regularly used. A day's notice must be given if an employee who does not regularly use his car is required to use his car in the service of the Company.

4. Necessary working equipment shall be provided for employees and paid for by the Company. If approved by the Company, an employee may use his personal equipment to cover breaking news and stories on deadline. Other use of personal equipment shall be by mutual agreement. It is understood that an employee can work on the Company's equipment out of the office to cover breaking news, deadline stories and columns. The Company shall provide a list of who is using his personal equipment and for what purpose. In no case shall an employee or applicant for employment be required to make personal equipment available as a condition of employment.

5. Company agrees to pay entire cost of parking in lots for photographers and videographers. For cars not regularly used, the Company shall pay all parking costs up to a maximum of $15.00 per day, after the employee pays the initial parking fee.

6. Requests for reimbursement of expenses shall be submitted within 30 days of completion of the assignment. Any extension must be approved by the Managing Editor.

7. Employees who are authorized to use employee owned automobiles for the benefit of the Company will keep their cars in such condition that they shall be approved by the inspection bureau of the state, and while operated for the benefit of the Company shall be operated only by an employee, who shall be a duly licensed operator of a motor vehicle, of which proof will be required on a yearly basis. Employees are required to authorize release of their DMV records.

8. Each employee, while continuing employment with the Company and continuing authorized use of personally owned cars in performance of work, shall purchase and maintain public liability insurance in the amount of $100,000 - $300,000; property damage in the amount of $50,000; and medical payment auto insurance, subject to No-Fault of Pennsylvania, of which proof will be required on a yearly basis.

## ARTICLE X
## Internships, Two-Year Associates

1. Unpaid academic internships will be limited to fourteen (14) a calendar year. The number may be increased by mutual consent between the Company and the Guild.

a. The Company will provide timely notice of all academic internships, which shall include starting and ending dates.

b. Academic internships will be limited to 32 hours per week and each intern's work hours will be posted. If an intern is required or requested to work beyond that limit, he/she will be hired as a temporary employee (Article VI, Paragraph 4) and paid at the appropriate prorated first-year intern scale.

c. No student will serve more than two academic internships.

2. The Company agrees to recognize paid intern service when computing pay scales for beginner staff members. Each paid internship will be limited to 13 weeks unless extended by mutual agreement between the Company and the Guild. Individual internships will not be consecutive.

3. The Company may hire two-year associates under the following conditions:

A. All of the provisions of the contract with the exception of Articles VI, Sections 2-4; XIII; XIV; XV; XVII and XVIII, will apply. However, associates will be eligible for the funeral and parental leaves outlined in Article XV. Those hired as two-year associates can have no more than 18 months experience working for a newspaper or a comparable media organization.

B. The period of employment cannot exceed 24 months and will not be renewed or extended.

C. The Company may offer regular employment to associates at any time during their period of employment.

D. Associates are excluded from the following classifications: librarian, news assistant, clerk, and messenger.

E. There will be no assignment restrictions

## ARTICLE XI
## Vacations

1. Employees hired prior to July 1 shall receive an annual vacation with full pay of one (1) week after six months of service: two (2) weeks for one (1) complete year of service; three (3) weeks for three (3) continuous years of service and four (4) weeks for eight (8) continuous years of service with the Pittsburgh Post-Gazette or other Block newspapers.

Employees hired at the top minimum prior to July 1 will receive two (2) weeks of vacation after six months of service. Employees hired at the top minimum between July 1 and August 31 will receive one week of vacation after three months of service (the length of service requirements may be waived by the department head to meet the needs of the office).

After one (1) complete year of service, all employees at the top reporter/editor minimum will receive three (3) weeks of vacation. An employee requesting vacation must give at least three (3) days' notice.

2. The employee's hiring date will determine his vacation eligibility. With the exception of Christmas week, seniority will be the basis for vacation preference if the request is submitted between January I and March 1. Employees who do not meet the March 1 deadline will be accommodated, if possible, but they will not be able to use their seniority after March 1 to bump someone who has scheduled his vacation prior to March 1. Christmas vacation will be granted on a rotating basis according to seniority but requests for Christmas week must be submitted and posted by September 1. No bumping of Christmas week will be permitted after the September 1 deadline. It is the declared intent of both the Company and the Guild that vacations be arranged in the best interest of the individual employee as well as the needs of the office and, when possible, vacations shall be granted in the more desirable vacation months.

3. Employees who do not submit vacation requests prior to September 1 will be assigned vacations by their department heads.

4. With the exception of the city staff/local news desk and the copy desk, vacations should be scheduled so that only one person from a department is off at any one time. The city staff/local news desk limit is five and the copy desk limit is two. Exceptions must be approved by the managing editor. For vacation purposes only, local columnists are not assigned to a department.

5. By arrangement with other employees and the approval of the department head, off days shall be changed in weeks preceding and following vacation periods, to provide a longer vacation where possible.

6. The vacation period shall be continuous, but employees shall have the privilege of splitting their vacations in such manner as may be agreed to between them and the Company. Split vacations and personal holidays are subject to the same limits described in Paragraph 4.

7. When a recognized holiday or day celebrated as such occurs during the vacation period of an employee, that employee shall receive an extra day to be added to his vacation period where possible, or be given an additional day off at another date.

8. The Guild recognizes the right of the Company to assign employees to work normally done by employees on vacation or on sick leave, provided provisions regarding wages and hours are not waived.

## ARTICLE XII
## Holidays

1. The following holidays, or days observed as such, shall be granted to full-time employees as provided in this Article: New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day and Christmas Day. A full-time employee shall receive four (4) personal holidays after working 12 complete months. Employees with 15 or more years of Post-Gazette service will receive a fifth personal holiday. To claim a personal holiday, an employee must give at least three (3) days' notice. Personal holidays are subject to the same limits described in Article XI, Paragraph 4.

2. A full-time employee required to work on the holiday shall receive an extra day's pay in addition to his regular weekly salary; and a full-time employee required to work on his day off during a holiday week shall be compensated at the rate of time and one-half but not less than a day's pay in addition to his regular weekly salary. Effective January 1, 1981, a full-time employee will receive 6-1/4 days' pay for the holiday week if he/she works the holiday and 4 other days during the holiday week.

3. When an employee's off-day falls on a holiday, or a day celebrated as such, he shall be given a day off at another date within a month, or may add the day to his vacation period if possible. To earn premium pay, the employee must work the holiday.

## ARTICLE XIII
## Advancement, Promotion and Transfer

1. When new positions, vacancies or openings are to be filled, consideration shall be given to the employees in Guild jurisdiction. The Company shall immediately post notice of such

vacancies, openings or jobs. An employee desiring to fill such vacancies, openings or jobs may either do so orally or may submit written applications within five (5) days of posting. Nothing in this Agreement shall restrict the Company's exclusive right to fill any vacancy or new position from outside the bargaining unit.

2. When an employee is advanced to a position in a higher classification, he shall be paid the salary minimum in the advanced classification next above his salary at the time of advancement, or be given an increase not less than one year's increase in experience rating in his former classification, whichever is greater. The effective date of such advancement shall become the employee's new anniversary date, provided further that at no time thereafter shall the employee be paid less than he would have received through the normal operation of the experience progression schedule had he retained his former classification.

3. The trial period for an employee so advanced shall be not less than 30, nor more than 75 days as determined by the Company, which time may be lessened or extended by mutual agreement between the Company and the Guild.

4. If during or at the end of such trial period the employee's service is found to be unsatisfactory, he shall be returned to his former position at the rate of pay received prior to his advancement plus any additional benefits that may have been granted in that classification during his temporary assignment or be given the option of accepting his severance pay.

5. For purposes of training, an employee may be transferred from one department to another for a period of up to 90 days. This period may be extended for 60 days by agreement of the Company, the employee and Guild, or terminated by the Company or the employee. During this training period the employee will continue to receive his salary including any step-ups in the category for which he otherwise would have been eligible. If the employee is being trained in a higher classification, he shall receive $4.00 a week during such training in addition to his salary including any step-ups for which he otherwise would have been eligible.

An employee may elect to return to his original department during the first 90 days of the training program by giving two weeks' notice to the Company. Any decision by the employee regarding the termination of the training program will be accepted by the Company without prejudice. If an employee requests a transfer to another department, it will be on the basis of a one-year trial with the understanding that he can be returned to his original department prior to the expiration of the trial period.

6. An employee promoted or transferred to take the place of one entering military service, may upon resumption of employment by such employee who was in military service, be returned to his previous position, salary for which shall not be less than the then current minimum applicable to that job classification taking into consideration his accumulated experience rating and increases in minimum wages and general increases granted to that job classification during the period of such assignment, or his prior salary plus any general increases, whichever is higher.

7. An employee promoted or transferred to fill in as a replacement for an employee on extended sick leave, maternity leave, or other leave of absence or transferred for purposes of training, shall be subject to the conditions outlined in paragraph 6, above.

8. No employee shall be transferred by the Company to another enterprise in the same city, or to work in another city, whether in the same enterprise or in other enterprises conducted by the Company, or by a subsidiary, related or parent company of the Company, without the employee's consent and payment of all transportation and other moving expenses of himself and family. There shall be no reduction in salary or impairment of other benefits as a result of such transfer. A transferred employee may be recalled at the Company's discretion with all transportation and moving expenses paid by the Company. An employee shall not be penalized for refusing to accept a transfer. In the event that a position cannot be filled with a Guild member under this provision, the company has the right to temporarily fill the position with a current exempt employee for a period not to exceed one year. If the position remains filled by an exempt employee at the end of a year, the company will post the job. In the event that no Guild member applies for the position or the company determines that none of the applicants is qualified, the exempt employee can remain in the position for another year without becoming a Guild member. It is understood the use of an exempt employee in this capacity is not intended to replace bargaining unit work.

9. Management shall have the right to transfer employees from one newsroom department to another for up to one year to meet the needs of the office. At the end of one year, transferred employees can remain in the current assignment or may apply for another available position. Transfers cannot be a result of punitive action. For purposes of definition, the following is each a department: Local News, Sports, Universal Desk (Copy/Pagination/Web Desk), Features, Editorial, Business, Photography/Multimedia, Library and Art. These department designations can be modified by mutual agreement between the Company and the Guild.

## ARTICLE XIV
## Severance Pay

1. Upon the discharge of any employee covered by this Agreement for causes other than deliberate self-provoked discharge and dismissal for cause, the Company shall pay the said employee as dismissal compensation a lump sum of money to be determined in accordance with the following schedule, for years of continuous and uninterrupted employment: One week's pay after 6 months' employment and one additional week's pay for each additional 6 months' employment, but not to exceed a total of 26 weeks' pay.

2. "Deliberate self-provoked discharge" shall mean (1) in cases when an employee conducts himself in a manner to compel discharge in order to collect dismissal indemnities rather than resign when it is the employee's intention to accept another position; (2) when an employee intends to retire from newspaper work and rather than resign, provokes discharge to collect dismissal indemnities; and (3) when an employee is guilty of proven theft.

3. The salary paid as dismissal compensation shall be the highest (except bonuses and pay for special work) received by the employee during the last 52 weeks of his employment.

4. The years of continuous and uninterrupted employment provided herein shall mean the total consecutive and uninterrupted years of service with the Company or with any enterprise associated or affiliated with the Company and military service completed during the Military Emergency and Selective Service Act Enactment Period of World War II provided dismissal pay has not been previously paid. Leaves of Absence shall not constitute breaks in service.

## ARTICLE XV
## Leaves of Absence

1. The Company may grant employees leaves of absence without prejudice to continuing employment or reduction of severance pay computation except that such time on leave shall not be considered service time. No leave of absence granted in one case shall constitute a precedent binding upon the Company in any other case.

2. Delegates elected to The NewsGuild and AFL-CIO, CLC Conventions, both national and local, and to delegates to special meetings, called by The NewsGuild shall, upon request, be given a leave of absence without pay to attend such conventions and/or meetings. The number of employees on leave under this Section shall be limited to five at any one time, except by mutual consent.

3. Any employee who has had five continuous years in the employ of the Company without a leave of absence may be given a leave of absence by the Company, not to exceed six months, without pay. Such leaves shall not constitute a break in employment, though the time spent on the leave shall not be counted in computing dismissal pay. Such leaves may be limited to one from each department at any one time.

4. The vacation period following a leave of absence must be delayed by half the actual time of the leave. If a leave of absence is granted to an employee who has not had five years of continuous service, said employee's vacation the following year shall be reduced proportionately.

5. An employee granted a leave, as outlined in paragraph 3, above, shall not use a leave for the purpose of trying out another position, unless agreed to by the Company.

6. Upon request funeral leaves according to the following schedule will be granted:

Two days: death of grandparent, grandchild, mother-in-law, father-in-law, close relative.

Three days: death of mother, father, brother sister, step-parent, step-brother, step-sister.

Five Days: death of spouse, spousal relationship, child or step-child.

An additional funeral leave of up to five days at ½ pay is available.

7. (a) Upon request, unpaid maternity, paternity or adoptive parent leave of not more than 8 months shall be granted.
   (b) Adoptive parent shall be granted a six-week leave at ½ pay at the time of adoption.
   (c) Parents not eligible for sick leave at the time of birth will be given the opportunity to take a six-week leave of absence at ½ pay.

8. Upon request, employees shall be granted two (2) days parental leave with pay at the time of delivery or adoption.

9. The parties agree to comply with the Family and Medical Leave Act of 1993. An employee who has been employed by the Company for twelve (12) months and who has completed the requisite one thousand two hundred fifty (1,250) hours of work during the twelve (12) month period immediately preceding the commencement of such leave, will be entitled to leave under that Act. The Company may require employees to use any of their vacation, sick leave and/or other paid leave to run concurrently with leaves of absences under the Family and Medical Leave Act.

10. The Guild shall be notified of all leaves and the conditions under which granted.

## ARTICLE XVIII
## Preferential Re-Employment

1. In the event of a layoff, laid off persons shall be placed upon a rehiring list. No person -- other than for positions excluded from the Agreement -- shall be hired by the Company except from this rehiring list (per Article VIII, Para. 4C(5)) unless same is exhausted with respect to the general type of work for which an additional employee is desired. A laid off employee must be qualified without additional training for the specific position to be filled in the event of recall.

2. The Company shall supply to the Guild the names of those persons who are placed upon the rehiring list with the date of their discharge, and the Company shall notify the Guild when persons are hired from such a list.

3. In the event a vacancy occurs in a post carrying less salary than an employee received at the time of his dismissal, he may accept the lesser salary if mutually agreeable to him, the Guild and the Company. Such an employee shall be given the first opportunity to fill in a higher classification. In the event of his reemployment before the period of his severance pay has expired, the employee shall remit the unexpired portion of his severance pay in a lump sum, or on a basis to be determined by mutual agreement between him, the Guild and the Company, provided that any sum remitted shall be added to severance pay as set forth in Article XIV in the event of a subsequent dismissal.

**ARTICLE XIX**
**Miscellaneous**

24. The Company may use ADP or any other payroll services firm. Employees will be paid weekly, or bi-weekly, at the discretion of the Company. The Company may require employees to participate in a direct deposit program for employee paychecks.

**ARTICLE XX**
**Insurance, Health and Welfare, Pensions**

1. Bargaining unit employees will be covered by the Company health, dental, vision, and life insurance plans.

Eligible bargaining unit employees participating in the Company's health, vision and dental insurance programs shall pay the following share of the total premium costs for the health, vision and dental insurance programs:

| Coverage Choice | Employee Share |
|---|---|
| Employee | 30% |
| Employee +1 | 30% |
| Family | 30% |

| 2020 Premium Rates for Consumer Driven Healthcare Plan (CDHP) | | |
|---|---|---|
| **Tier** | **Monthly Premium** | **Employee Contribution** |
| Single | $667.31 | $200.00 |
| Employee +1 | $1,326.88 | $398.00 |
| Family | $2,015.90 | $605.00 |

4. Pension Plan.

A. The defined benefit pension plan has been merged and frozen.

GENERAL COUNSEL 44
SKIPPED

NLRB-0001856

# GC EXHIBIT 45

NLRB-0001857

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 45

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22 **Witness:** SILVER **Reporter:** BW

**No. of Pages:** 3

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201

TELEPHONE: 615/259-3456

FACSIMILE: 615/254-7907

www.kingballow.com

**Direct Dial: (615) 726-5420**
**E-mail: rlowe@kingballow.com**

July 30, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA  15222

      Re:    Impasse between Pittsburgh Post-Gazette and
             The Newspaper Guild of Pittsburgh

Dear Joe:

On July 27, 2020, the Company implemented portions of its Final Offer after the Company bargained in good faith to impasse. As you know, an impasse in negotiations creates a hiatus in negotiations during which the employer is not obligated to meet with the union for the purposes of negotiations for a successor contract. In the event the current impasse is broken as provided under the National Labor Relations Act, the Company will honor any statutory duty to bargain.

Sincerely,

Richard C. Lowe

RCL/rps

# GC EXHIBIT 46

NLRB-0001860

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 46

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 4



Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon

*also licensed in Ohio

*of counsel*
Neal R. Cramer
Joseph M. Burns**

**licensed in Illinois

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

July 30, 2020

**VIA EMAIL** (rlowe@kingballow.com)
**AND US MAIL**

Richard C. Lowe
King & Ballow
315 Union Street, Suite 1100
Nashville, Tennessee 37201

***Re: Negotiations between The Newspaper Guild of Pittsburgh and Pittsburgh Post-Gazette***

Dear Richard:

We received your "unilaterally imposed" terms and conditions of employment dated July 27, 2020. Needless to say the union disagrees with your contention that the bargaining history demonstrates the parties are at impasse. Impasse is reached where there is no realistic possibility that continuing contract negotiations would be fruitful. Your frustration with the process is not the standard. When considering factors required for impasse, i.e. bargaining history, good faith in negotiations, length of negotiations, importance of the disputed issues and the contemporaneous understanding of the parties as to the status of negotiations, there can be no doubt that we are not at impasse and never have been. There can be no question that the company's unilateral implementation is unlawful and we have filed an unfair labor practice charge with the NLRB related thereto. Please note however, that should the company agree to revoke the unilateral implementation or portions of its "Final Offer" immediately, the union commits to withdraw the charge directly thereafter.

As you well know, we had a meeting scheduled for March 25, 2020, when the pandemic occurred. We canceled that meeting and your email of April 2, 2020, to our sister local clearly indicated you and the Post-Gazette were not willing to meet until "all are released from confinement". Thereafter we never heard a word from you as to whether or not you or the PG were "released" and whether or not you or the PG wanted to meet. Instead, you shipped off a "Final Offer" without ever providing a dialog as to why at least two-thirds of the union's last proposal was unacceptable. Negotiations requires give and take explanations and responses to questions raised during those negotiations so the parties can understand each other's position. By simply sending out a typed version of what you believe is an appropriate response is completely

inadequate. If that were the case, there would never be a necessity for meeting face to face. The law clearly requires meetings and negotiations, not simply position statements. In person negotiations is a requirement of the law.

Despite your unilateral announcement that bargaining has been ended, the union is ready, willing and able to resume bargaining and is requesting you meet and bargain for a new contract. Please advise the union of your available dates to continue negotiations with the eye toward reaching mutual agreement on a new CBA.

Very truly yours,

Joseph J. Pass

JJP:crc

# GC EXHIBIT 47

NLRB-0001864

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 47

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 4

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**E-mail: rlowe@kingballow.com**

July 31, 2020

**Via Email and U.S. Mail**
(jjp@jpilaw.com)

Mr. Joseph J. Pass
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Boulevard
Pittsburgh, PA 15222

Re: Impasse between Pittsburgh Post-Gazette and The Newspaper Guild of Pittsburgh

Dear Joe:

Thank you for your July 30, 2020 email. The Company respectfully disagrees with your claim the parties are not at impasse. After almost three and one-half years of negotiations, the parties are at a bona fide impasse.

You are correct when you state the Union cancelled the March 25 meeting. Specifically, you stated that "[t]he Guild meeting scheduled for the 25th will not be going forward, nor will there be any future meetings scheduled for any of the bargaining units at the Post-Gazette until the current Coronavirus pandemic is completely arrested."

Your reference to a communication dealing with another bargaining unit at the newspaper is nonsense. As you are well aware, there is no joint bargaining with the Guild and any other bargaining unit at the Post-Gazette. Additionally, I have always been available to meet on behalf of my client. There were no restrictions on my ability to travel because attorneys were deemed essential in Tennessee and therefore not subject to any stay at home restrictions. It was an International union representative from a different union negotiating for another bargaining unit at the Post-Gazette who was prohibited from traveling from Philadelphia during March because of the coronavirus. Again, it was the Guild who announced there would be no future meeting dates with the Guild until the pandemic was completely arrested.

Finally, in your letter, you state the Union is now ready, willing and able to resume bargaining. As you know, an impasse in negotiations creates a hiatus in negotiations during

which the employer is not obligated to meet with the Union for purposes of a successor contract. In the event the current impasse is broken as provided under the National Labor Relations Act, the Company will certainly honor any statutory duty to bargain. However, the Union has not proposed to make any substantive changes in the Union's bargaining position on the open issues. If the Company is mistaken, and the Union intends to make substantive changes in the Union's position regarding any of the open issues that will bring the parties closer to an agreement, please let us know. If the Union intends to make such substantive changes, we suggest the Union forward those substantive changes to the Company for review to facilitate the process.

Sincerely,

Richard C. Lowe

RCL/rps

# GC EXHIBIT 48

NLRB-0001868

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 48

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 3



JPI
Jubelirer, Pass & Intrieri, P.C.
Attorneys at Law

Joseph J. Pass
Edward H. Walter
James A. Welker
Joseph Santino Pass*
Steven E. Winslow
Patrick K. Lemon

*also licensed in Ohio

*of counsel*
Neal R. Cramer
Joseph M. Burns**

**licensed in Illinois

Ben Paul Jubelirer (1904–1983)
Frank P. G. Intrieri (1942–1976)

jjp@jpilaw.com

September 3, 2020

**VIA EMAIL** (rlowe@kingballow.com)
**AND US MAIL**

Richard C. Lowe
King & Ballow
315 Union Street, Suite 1100
Nashville, Tennessee 37201

***Re: Negotiations between The Newspaper Guild of Pittsburgh and Pittsburgh Post-Gazette***

Dear Richard:

In accordance with your correspondence of July 31, 2020, the Newspaper Guild of Pittsburgh has reconsidered its proposals and are prepared to make substantive changes to its bargaining position on the open issues. The union is therefore requesting a meeting in order to resume negotiations to present and explain to the PG its revised positions. I note in your email to me yesterday regarding dates you are available for the Teamsters negotiations that you are available September 8. Joe Molinero and Joe Barbano are unable to meet at all next week, but are available September 25.

As a result, I suggest we use September 8 as the date to meet with the Guild to resume those negotiations in an effort to bring the parties to an amicable resolution. Please advise if you will meet as suggested and if so, because of the coronavirus situation we would agree to meet at the company's facility in Clinton where we have been meeting with the Teamsters. We further suggest that the meeting begin at 10:00 am on September 8, 2020. Please advise if this is acceptable as well as confirming September 25 for the Teamsters.

Very truly yours,

Joseph J. Pass

JJP:crc
cc: Mike Fuoco
Jon Silver



# GC EXHIBIT 49

NLRB-0001871

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 49

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SILVER

**Reporter:** BW

**No. of Pages:** 4

Guild's Response to PG's Implemented Proposal
September 8, 2020

The Guild is willing to modify its position in the following manner:

**This is a package proposal for the items dealt with herein. All of the provisions set forth must be accepted as a package. If not accepted, the proposals shall be withdrawn and the original proposals shall be reinstated.**

1. The Guild will accept the proposition that supervisors and managerial employees may perform bargaining unit work on a daily basis so long as the number of supervisory and/or managerial employees performing such functions each day does not exceed 5% of the number of fulltime bargaining unit employees employed. In the event the number of fulltime bargaining unit employees drops below 100, the percentage of managerial employees to perform such work shall be reduced to 3%. In the event the number of fulltime bargaining unit employees drops below 50, the percentage of managerial/supervisory employees shall be reduced to 2%. In the event any bargaining unit employee is laid off in any of the classifications supervisors and managers shall not be permitted to perform any of the work in the classification in which the employee was laid off. Nor shall the use of managers and/or supervisors result in the reduction of the number of bargaining unit employees.

2. The Guild modifies its wage demand as follows:

   The base wage for all increases set forth herein shall begin with the "gross wage" as set forth in the last year of the most recently expired CBA. So there is no misunderstanding, strictly as an example, the Content Providers top wage after the 5th year of employment is $1,172.36 per week. For each category set forth in the current CBA, the wage increases below shall be based upon the gross wages for each classification prior to any deductions noted in the most recently expired CBA.

   6.5% increase in the first year of the contract.
   6.5% increase in the second year of the contract.
   6.5% increase in the third year of the contract.
   As for any employee making above the minimum the above increases shall be applied to the actual gross wages which that employee is currently being paid. In no event will any employee receive any less increase than that set forth above.

3. The agreement will be for three years commencing the date same is signed.

4. The union shall accept the company's health insurance program under the following conditions:

   (1) The first year of the agreement the employee shall pay 30% of the premium.

(2) Beginning on the second anniversary date of the agreement, the employee's contribution shall be reduced to 20% of the premium.

(3) Beginning on the third anniversary date of the agreement, the employee's contribution shall be reduced to 10%.

5. With regards to the classifications outlined in the PG's Implemented Proposal, the union shall accept those classifications, for the purposes of layoffs.

6. The Guild agrees that the maximum number of stringers shall not exceed 20% of the annual Guild payroll.

# GC EXHIBIT 50

NLRB-0001875

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 50

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SABATINI

**Reporter:** BW

**No. of Pages:** 3



SECURITY

NLRB-0001877

# GC EXHIBIT 51

NLRB-0001878

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 51

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** SABATINI

**Reporter:** BW

**No. of Pages:** 3



NLRB-0001880

# GC EXHIBIT 52

NLRB-0001881

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 52

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** TANNER

**Reporter:** BW

**No. of Pages:** 3



GREAT FOOD
SPECIALTY COCKTAILS
Horrible
Working
Conditions!
TEAMSTERS
LOCAL 341

NLRB-0001883

# GC EXHIBIT 53

NLRB-0001884

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 53

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** TANNER

**Reporter:** BW

**No. of Pages:** 3



NLRB-0001886

# GC EXHIBIT 54

NLRB-0001887

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 54

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** TANNER

**Reporter:** BW

**No. of Pages:** 3



COWBOY
PG illegally imposes Horrible Working Conditions!
SOLIDARITY!
STRONGER TOGETHER
HONK FOR UNIONS
HEY STAN WHAT'S YOUR PLAN?
www.PAAFLCIO.org
On The Road To Union Cities
UNION YES
PGH DPW

NLRB-0001889

# GC EXHIBIT 55

NLRB-0001890

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 55

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** TANNER

**Reporter:** BW

**No. of Pages:** 3



NLRB-0001892

# GC EXHIBIT 56

NLRB-0001893

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 56

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** TANNER

**Reporter:** BW

**No. of Pages:** 3



NLRB-0001895

# GC EXHIBIT 57

NLRB-0001896

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 57

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** TANNER

**Reporter:** BW

**No. of Pages:** 3



PITTS-
BURGH
IS UNION!

NLRB-0001898

# GC EXHIBIT 58

NLRB-0001899

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 58

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-19-22

**Witness:** TANNER

**Reporter:** BW

**No. of Pages:** 3



# GC EXHIBIT 59

NLRB-0001902

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 59

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-20-22

**Witness:**

**Reporter:** BW

**No. of Pages:** 14

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Facsimile: (888) 688-0482**
**E-mail: rlowe@kingballow.com**

June 7, 2021

**Via NLRB E-File**

Mr. David MacIntyre, Field Examiner
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222-4111

Re: Pittsburgh Post-Gazette
Case 06-CA-269346

Dear David:

Please accept this letter[1] as the Pittsburgh Post-Gazette's response to the matters you raised in your May 24, 2021 letter. The Company never engaged in unlawful surveillance of Newspaper Guild of Pittsburgh/CWA, Local 38061 ("the Union") activities for the reasons set forth below. The Post-Gazette's actions did not violate Section 8(a)(1) of the Act.

**Allegations:**

1. That on or about September 25, 2020, the Union held a demonstration outside of the Employer's offices currently located at 358 North Shore Drive in Pittsburgh, PA ("the Employer's facility").

3. That two Employer managers filmed and/or took pictures of the September 25, 2020 demonstration outside of the Employer's facility.

---

[1] This letter is submitted with the understanding that it is protected from disclosure to the full extent provided by the Board's Rules and Regulations. In addition, this letter has been prepared upon information presently available and does not purport to set forth every factual or legal position which could be made. Accordingly, this letter should in no way be construed to limit the Company in its defense of this case. The Company reserves the right to supplement and/or amend the statement, legal arguments, and information provided herewith to insure a full and accurate response.

CENTURY CITY OFFICE:
1999 AVENUE OF THE STARS, SUITE 1100 · CENTURY CITY, CALIFORNIA 90067 · TELEPHONE: 424/253-1255 · FACSIMILE: 888/688-0482

**Response:**

On September 25, 2020, elected officials and labor leaders held a rally in front of the Post-Gazette offices located at 358 North Shore Drive in support of the Union. The rally included close to a dozen elected officials, including Lt. Governor Fetterman and Mayor Peduto. The Union affirmatively sought and obtained media coverage of the event. Free diapers were also being distributed that day to people who wanted them on the street in front of the Company's offices and the site of the Union's rally. The Company, pursuant to its rights under the First Amendment's freedom of the press, routinely covers demonstrations of any kind, including labor demonstrations. Demonstrations are considered newsworthy by newsroom management.

The September 25, 2020 rally was considered a newsworthy event, especially because several city leaders and politicians attended and spoke at the rally. One of the Company's photographers, Arturo Fernandez, covered the event for the Post-Gazette as did other media outlets. (See Attachments 1 and 2 as examples). Mr. Fernandez took several photographs of the rally as part of his news assignment. There was no unlawful "surveillance" as the Union has claimed. Mr. Fernandez is an experienced news photographer who covered the event for the newspaper as a news story. Under the circumstances, covering a news event did not reasonably tend to coerce or intimidate employees in the exercise of their rights protected under the Act. Mr. Fernandez is well known by the newsroom employees. His taking pictures at a public event on the streets of Pittsburgh would not cause any of the newspaper's employees to believe they were under any threat of economic coercion or retaliation in violation of Section 8(a)(1). As every newspaper employee knows, the Post-Gazette historically covers union rallies without fanfare because they are newsworthy. It is what a newspaper does under the First Amendment.

Mr. Rob Weber, Director of Operations for the newspaper, was present in the newspaper's building on the day of the rally but took no photographs. An employer's mere observation of union activities that are conducted in public does not violate Section 8(a)(1) of the Act. *Porta Systems Corp.,* 238 NLRB 192 (1978). Management need not hide. *Tarrant Mfg. Co.,* 196 NLRB 794, 799 (1972).

**Allegations:**

2. That on or about October 24, 2020 and October 31, 2020, the Union held demonstrations on the public sidewalk opposite the private residence of Employer Owner John Block ("the Block residence").

4. That during each of the October 24, 2020 and October 31, 2020 demonstrations at the Block residence, there were security guards present who identified themselves to demonstrators as Employer employees.

5. That during each of the October 24, 2020 and October 31, 2020 demonstrations at the Block residence, at least one of the security guards present filmed and/or took pictures of the demonstration.

**Response:**

The Union demonstrated in front of the private residence of John Block, the Publisher of the Post-Gazette, on Saturday morning, October 31, 2020. (The Company is not aware of any demonstration at the Block residence on October 24, 2020).

Two officers from the Company's security contractor were present that morning and parked near Mr. Block's house. Because the Union's announced demonstration was to take place in a private neighborhood in front of the publisher's home, the Company had asked its security contractor to provide security. The security officers remained in their automobile. It is standard protocol of the security company not to engage protestors. There was no verbal interaction of any kind between the security officers and the protestors in front of Mr. Block's house.

At one point, the two security officers did leave their automobile and walked on Mr. Block's private property when some of the demonstrators engaged in a verbal confrontation with a person attempting to walk Mr. Block's dog. The protestors were blocking the dog walker's vehicle from leaving Mr. Block's private driveway. The dog walker apparently said something to the protestors which caused a confrontation. The two security officers approached the group of demonstrators and the person attempting to leave the driveway in an effort to defuse the situation. The officer's efforts were successful and the demonstrators allowed the person to leave Mr. Block's driveway.

As part of the security company's standard protocols, the Company has learned security officers did photograph the protestors in front of Mr. Block's residence. The Company did not authorize or view any of the photographs taken by the security officers. The officers did not identify themselves as "an employee of the PG" as the Union alleges.

The Post-Gazette's actions in this case did not constitute unlawful surveillance in violation of Section 8(a)(1) of the Act. Please let me know if you need any further information in this matter.

Sincerely,

Richard C. Lowe

RCL/rps

# Attachment 1

NLRB-0001907



PITTSBURGH CityPaper

News

September 25, 2020

# More than 100 rally for *Post-Gazette* workers, hoping to pressure owners to negotiate a new contract

By Ryan Deto

*CP photo: Ryan Deto*

Darrin Kelly speaking to the crowd outside of the Pittsburgh Post-Gazette offices

In July, the *Pittsburgh Post-Gazette* ran a byline-less story online with the headline, "Post-Gazette implements new contract." The story was about 100 words long and didn't include a comment from the Newspaper Guild of Pittsburgh, the union representing about 120 journalists at Pittsburgh's largest news paper.

To the guild, this announcement from management was an "unlawful declaration of an impasse," and so the union members set into motion the wheels of a strike. Since then, the guild has gathered support from leaders and institutions around the region, and got the endorsement of its parent union, The Newspaper Guild. Now the strike authorization awaits a decision from the Communication Workers of America.

But the theme of a rally held today outside of the *Post-Gazette* offices was about trying to avoid a strike. More than 100 rally-goers, including *P-G* guild members, other local union members, and Democratic politicians met in the street to decry the tactics used by *P-G* ownership. The message was the workers are ready to strike, but would rather restart talks to get a fair contract.

"This is more than a newspaper, this is a way of life, good journalism," said Darrin Kelly of the Allegheny-Fayette Central Labor Council. "This is a last ditch effort. You have left them absolutely no choice."

Guild members haven't seen a raise in more than 14 years, and their contract hasn't been renewed for more than three years. Over the last couple years, the work environment has been chaotic at the *P-G*, with owner John Block throwing a late night newsroom tirade in 2019, former executive editor Keith Burris writing and publishing racist editorials that the guild has openly protested, and management barring Black journalists Alexis Johnson and Michael Santiago from covering Black Lives Matter demonstrations.

Kelly said that many of the elected officials in attendance had already sent letters to the Blocks asking them to negotiate with the guild, and he encouraged others at the rally to do the same.

Through all of this, dozens of journalists have quit the paper, some accepting buyouts and others moving to different cities. *P-G* ownership have justified cuts and buyouts by saying the paper is losing money every year. The guild counters that by saying Block Communications, which owns many media companies, is profitable as a whole.

Jonathan Silver, unit chair for the guild, spoke at the rally about his former colleagues who have left the paper, saying he has "watched Pulitzer-prize winning colleagues leave because they cannot take the toxic environment."

"There is dignity in our work," said Silver. "But that work deserves to be fairly compensated."

Silver acknowledged the role that the Blocks played in keeping the paper afloat during the 2008 recession, but said moving forward they cannot place all the burden on the union members' backs.

Attendees also pointed out that ownership has retained lawyers for years from the firm King & Ballow and likely spending millions in order to draw out contract negotiations with the union.

The rally lasted about an hour, and high-profile politicians like Lt. Gov. John Fetterman (D-Braddock) and state House Minority Leader Frank Dermody (D-Oakmont) spoke in support of the guild. Pittsburgh Mayor Bill Peduto also addressed the crowd and said the journalists were not going through this alone.

"Labor movements were built on this ground," said Peduto, referencing the storied labor

history of Western Pennsylvania. "There has never been a time in American history that a free press is more important."

LOVE THIS STORY? HELP US WRITE MORE.
Click here to become a *Pittsburgh City Paper* member today.

## TRENDING

**Pittsburgh set to open some public pools, if they can find enough lifeguards**

**After increasing wage to $15 an hour, Klavon's says all positions are filled, morale is up, and prices haven't been raised**

**E-bikes coming to Healthy Ride bike share thanks to grant from Heinz Endowments**



# Attachment 2

NLRB-0001912

PITTSBURGH (KDKA) – Labor leaders and elected officials joined together Friday in what's being called a last-ditch effort to avoid a strike by the reporters, editors and photographers of the Pittsburgh Post-Gazette.

The rally brought together a unity council of labor unions from across the region urging the Post-Gazette management to negotiate a contract with its reporters, editors and photographers and avoid a crippling newspaper strike

ADVERTISING

WATCH NOW

**READ MORE:** State To Spray For Invasive Spotted Lanternflies Along Transportation Rights-Of-Way

"This allows our democracy to go forward without smears and lies, and we are here to support all of you," said Darrin Kelly, Allegheny County Labor Council president.

**Andy Sheehan** @AndySheehankdka

Labor unions and elected officials rally in support of Newspaper Guild, asking Post-Gazette management to negotiate and avoid strike. Report coming up. @KDKA

**bill peduto** @billpeduto

Proud to join fellow elected officials, union leaders & community leaders in supporting the workers of the Pittsburgh Post-Gazette. It's time to go back to the table & negotiate a fair contract.

Cranberry Beer Store Under Fire On Social Media For Dr. Rachel Levine Sign Some Call Transphobic

WATCH: Injured Russell Westbrook Has To Be Restrained After Sixers Fan Dumps Popcorn On Him

Southwest Airlines Attendant Loses 2 Teeth, Left Bloodied In Mid-Flight Attack By Passenger: 'She Just Knocked Her Out'

Missing DoorDash Delivery Leads To 2 Arrests In Bethel Park

Police: Woman Was Driving Drunk, Going 100 Mph When She Killed Passenger In Saw Mill Run Boulevard Crash

Robert Morris University Cutting Its NCAA Division I Men's And Women's Ice Hockey Teams

WATCH: Pirates' Cringeworthy-Error Leads To Cubs' Run Instead Of Easy Third Out

Penn Hills High School Remembers Students Who Died Too Young

Dennis Katona Due To Report To Same Jail As Victor Steban, Who Allegedly Tried To Kill Him

18 New Or Returning Nonstop Flights Take Off At Pittsburgh International Airport Through August

NOW PLAYING

3:43 PM · Sep 25, 2020

Share this Tweet

The Newspaper Guild membership has authorized a strike, which has been approved at the union's national level. If the parent, Communication Workers of America, give their ascent, a strike could be called at any time.

"We have an overwhelming mandate to strike. We're on a train to strike land. That's where we're going, Andy," said reporter and union officer Jonathan Silver, who says the guild is asking management one last time to avoid a walkout.

RELATED STORIES:

- Lt. Gov. Fetterman Speaks At Pittsburgh Post-Gazette Picket Event
- Journalist Strike Approved At Pittsburgh Post-Gazette
- Pittsburgh Post-Gazette Journalists Awaiting Authorization From Union To Begin Strike
- Union Representing Pittsburgh Post-Gazette Journalists Votes To Strike
- Union Representing Pittsburgh Post-Gazette Journalists To Take Strike Vote
- 'National Embarrassment': Pittsburgh Post-Gazette Under Fire After 2 Black Journalists Say They Were Barred From Protest Coverage
- 'Under Siege': Post Gazette Journalists Protest Newspaper Owners

"Right now the ball is in their court. We have done everything we can and this rally today represents a very powerful and loud last-ditch appeal," Silver said.

**READ MORE:** Furry Tails: Pirates Help Get The Word Out Player Chris Stratton's Dog Goes Missing

NOW PLAYING

Post Gazette management declined comment, but the rall out close to a dozen elected officials, including Lt. Governc Fetterman and Mayor Peduto, who noted that the staff is l less today than a decade ago.

**Andy Sheehan**
@AndySheehankdka

A coalition of labor unions call for Post-Gazette management to negotiate a contract with reporters, editors and

NLRB-0001914

5/28/2021 Case 2:24-cv-01166-CB Document 14-6 Filed 09/10/24 Page 1091 of 1118
Labor Leaders, Elected Officials Rally In 'Last-Ditch Appeal' To Avoid Strike At Pittsburgh Post-Gazette – CBS Pittsburgh

photographers to avoid a strike. Report coming up. @KDKA

3:26 PM · Sep 25, 2020

10 5 Share this Tweet

"How many years without a raise?" Fetterman asked.

"Fourteen," the crowd replied.

"End of story," said Fetterman. "That's crazy."

Peduto is asking management to negotiate.

**MORE NEWS:** CDC Eases Mask Guidance For Kids At Summer Camps

"Negotiate a fair contract. Come to the table and sit down. Negotiate, because that's how we do things in Pittsburgh," Peduto said.

We have a new app!

KDKA

CBSN
PITTSBURGH

DOWNLOAD
NOW!

NOW PLAYING

NLRB-0001915

https://pittsburgh.cbslocal.com/2020/09/25/pittsburgh-post-gazette-strike-rally/ 4/6

# GC EXHIBIT 60

NLRB-0001916

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 60

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:**
PITTSBURGH POST-GAZETTE

**Date:** 9-20-22

**Witness:**

**Reporter:** BW

**No. of Pages:** 13

KING & BALLOW
LAW OFFICES
315 UNION STREET
SUITE 1100
NASHVILLE, TENNESSEE 37201
TELEPHONE: 615/259-3456
FACSIMILE: 615/254-7907
www.kingballow.com

**Direct Dial: (615) 726-5420**
**Direct Facsimile: (888) 688-0482**
**E-mail: rlowe@kingballow.com**

July 22, 2021

**Via NLRB E-File**

Mr. David MacIntyre, Field Examiner
National Labor Relations Board, Region 6
1000 Liberty Avenue, Room 904
Pittsburgh, PA 15222-4111

Re: Pittsburgh Post-Gazette
Case 06-CA-269346

Dear David:

Please accept this letter[1] as the Pittsburgh Post-Gazette's supplemental response to the additional questions raised in your July 2, 2021 letter. The Post-Gazette ("the Company") previously responded to your initial inquiries in this matter on June 7, 2021. The facts and circumstances of this case clearly prove the Company did not engage in unlawful surveillance of Newspaper Guild of Pittsburgh/CWA, Local 38061 ("the Union") activities. The Company's actions did not violate Section 8(a)(1) of the Act.

## News Coverage of Union Demonstration

You asked for additional clarification of the Company's coverage of a news event in front of the Company's North Shore downtown facility. The responses to your additional questions are set forth below.

[1] This supplemental response is submitted with the understanding that it is protected from disclosure to the full extent provided by the Board's Rules and Regulations. In addition, this supplemental response has been prepared upon information presently available and does not purport to set forth every factual or legal position which could be made. Accordingly, this supplemental response should in no way be construed to limit the Company in its defense of this case. The Company reserves the right to supplement and/or amend the statement, legal arguments, and information provided herewith to insure a full and accurate response.

1. Whether Fernandez was using a cell phone and/or a camera to document this demonstration. If he was using a cell phone, was he also recording video in addition to taking photographs? Also, if he was using a cell phone, was it his personal device or one provided to him by the Employer?

   **Response:** Mr. Fernandez was using a newsroom camera.

2. Fernandez's exact job title and the Employer's position on whether he is a manager or supervisor as defined in the Act. Pittsburgh Post-Gazette/BCI - 2 - July 2, 2021 Case 06-CA-269346.

   **Response:** At the time of the demonstration, his job title was Chief Photo Editor. His current title is Assistant Managing Editor – Visuals and Interactives. He was a manager in both cases.

3. The general process by which the Employer assigns a story to be covered.

   **Response:** Newsroom management takes into account a number of factors, including but not limited to: potential news value to our readership; whether it's in the public interest; whether it's timely and relevant; how it compares to other news we are considering to cover in that particular cycle; whether we have ample staffing/resources to cover the most important stories of the day.

4. The specific process by which the Employer assigned Fernandez to cover the September 25, 2020 demonstration.

   **Response:** Newsroom management exercised its editorial judgment and decided to cover the event. Mr. Fernandez was present in the newsroom at North Shore and was assigned to the event.

5. The general process by which the Employer determines to either publish a story or not publish a story.

   **Response:** In general, newsroom management tries to determine what the actual news value of a story is after the reporting is completed. Some stories meet the bar, some don't.

6. The specific process by which the Employer determined not to publish a story on the September 25, 2020 demonstration at the Employer's facility, including its decision not to publish any of the photographs taken by Fernandez.

   **Response:** News management exercised its editorial judgment and decided not to publish a story on the event. The First Amendment protects the

newspaper itself and grants it a virtually unfettered right to choose what to print and what not to. *Miami Herald Publishing Company v. Tornillo,* 418 U.S. 241 (1974).

7. Whether Fernandez also photographed and/or videotaped the September 18, 2020 demonstration at the Employer's facility; and, if so, why?

**Response:** He did not. News management exercised its editorial judgment and decided not to cover that event.

Under the constitutional avoidance doctrine established in *DeBartolo Corp. v. Florida Gulf Coast Building & Construction Council,* 485 U.S. 568 (1988), the potential infringement of a newspaper's First Amendment rights precludes the Board from finding that coverage of the Union demonstration as a news event, including the taking of photographs by the newspaper, constituted unlawful surveillance under 8(a)(1) of the Act. In invoking the doctrine of constitutional avoidance, the Supreme Court in *DeBartolo* stated that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* at 575, 576. The Board just recently invoked the constitutional avoidance doctrine in *International Union of Operating Engineers, Local Union No. 150 a/w International Union of Operating Engineers, AFL-CIO and Lippert Components, Inc.,* 371 NLRB No. 8 (2021). Chairman McFerran, in her concurring opinion, stated "that because our statute need not be interpreted to reach the constitutionally protected conduct here, the Board should decline to interpret it that way." *Id.,* slip op. at 2. The Pittsburgh Post-Gazette has a First Amendment right to cover a news event it believes in its editorial judgment is newsworthy. The Supreme Court precedent requires the Board to respect First Amendment rights and avoid applying Section 8(a)(1) in a way that raises questions regarding the constitutionality of that statutory provision.

**Picketing at Publisher's Private Residence**

You asked for clarification concerning the Company's security contractor's presence during the Union's picketing at the Publisher's private residence. The responses to your additional questions are set forth below.

8. The names of the security guards who were present during the October 31, 2020 demonstration.

**Response:** Steve Cain and Charles Sansky

9. The nature of the relationship between the Employer and its security contractors, including whether they are regularly used by the Employer to provide security services at its facilities and/or the Block residence.

**Response:** The Company contracts with a security contractor to provide security for the Company. The security contractor provides regular security services at the Company's Clinton and North Shore facilities. Because the Publisher lives in a private residence in a residential neighborhood, the Company decided to provide a security presence during the Union's picketing of the Publisher's home.

10. Whether or not the Employer instructed its security contractor and/or its security contractor's employees to photograph and/or videotape the October 31, 2020 demonstration.

**Response:** As stated in the Company's June 7, 2021 response, the Company did not instruct or request the security contractor or its officers to photograph and/or videotape the October 31, 2020 picketing at the Publisher's home. Apparently, the photos were taken as part of the security company's standard protocols for an event. The Company has not viewed, nor does it possess, any photographs or videos of the October 31 picketing at the Publisher's home.

11. When and how the Employer came to understand that the security guards present for the October 31, 2020 demonstration photographed part of this demonstration as part of its security contractor's protocols.

**Response:** The Company first became aware that photographs were taken by the security officers on October 31, 2020 when the Region raised the issue in its May 24, 2021 letter. As stated in the Company's June 7, 2021 response, the Company never authorized, requested, or viewed any photographs and/or videotaping of any picketing at the Publisher's home.

12. The names of the security guards who were present during the demonstrations at the Block residence on October 3, 10 and 24, 2020.

**Response:** Steve Cain was present at the October 3, 2020 picketing of the Publisher's private residence. On October 31, 2020, Steve Cain and Charles Sansky were present. No Union picketing or demonstrating at the Publisher's private residence was witnessed by the security officers on October 10 and October 24, 2020.

13. Whether or not the employees of the Employer's security contractor photographed and/or videotaped the October 3, 10, and 24, 2020 demonstrations; and, if so, why?

**Response:** Photographs were taken on October 3 and October 31, 2020, as part of the security company's protocols for its officers at events they are providing security. These photos were not authorized, requested, or viewed

by the Company. No picketing or demonstrating was observed by the security officers on October 10 or October 24, 2020.

14. Whether or not the Employer instructed its security contractor and/or its security contractor's employees to photograph and/or videotape the October 3, 10, and 24, 2020 demonstrations.

**Response:** No. No picketing or demonstrating was observed by the security officers on October 10 or October 24, 2020.

In *NLRB v. Armcor Industries, Inc.*, 535 F.2d 239 (3d Cir. 1976), the Court held that to establish a violation of Section 8(a)(1), it need be shown that "**under the circumstances existing**, [the employer conduct] may reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act"; *See also The Boeing Co.,* 365 NLRB No. 154, slip op. at 16, fn. 80 (2017) (as with any number of other cases involving whether an employer . . . action (e.g., surveillance) violates Section 8(a)(1), the reasonable tendency inquiry focuses on an objective employee in the particular workplace); *United States Steel Corp. v. NLRB,* 682 F.2d 98 (3d Cir. 1982). (Emphasis added).

Under the circumstances of this case, there is no objective evidence of any Company conduct which had a reasonable tendency to interfere with, coerce or restrain employees in the exercise of their Section 7 rights. There was no unlawful surveillance for the following reasons:

- The Company never authorized, requested, or viewed any of the photographs taken at the Publisher's residence. The conduct by the security officers was isolated and there is no history of the Company photographing employees.

- The photos were taken on October 3 and October 31 as part of the security company's protocols when providing security at an event.

- It was the Union that posted photos of its picketing at the Publisher's residence on its own social media site. The photos show the Union trespassing on the Publisher's private property. The publication by the Union of its own activities at the Publisher's home clearly shows no objective evidence the Union or its supporters were subjected to any restraint or coercion.

- The picketing was not part of any organizing or election campaign.

- There is no evidence of anti-union animus.

- The picketing did not occur in the context of any strike.

- The picketing did occur in the context of the Union's refusal to bargain with the Company.

- The Company was justified in providing the Publisher security at his private residence. Demonstrating and picketing in a residential neighborhood on a Saturday morning in front of and on a private citizen's property is not a normal occurrence. The Company cannot be faulted for providing the Publisher of the Pittsburgh Post-Gazette benign security in the event any incident occurred.

Under these circumstances, there is no objective evidence the unauthorized actions by the security company reasonably tended to interfere with employees' Section 7 rights.

**Additional Charge Allegation**

The Union has alleged that a Company July 10, 2020 letter to the Union's President violated Section 8(a)(1) by threatening the Union with unspecified reprisals in retaliation for engaging in protected concerted activity. The Union's allegation is totally devoid of any merit because the concerted activity the Union engaged in was not protected and violated the No-Strike provision in the parties' collective bargaining agreement ("the Agreement"). More specifically, the Union's allegation is meritless for the following reasons:

1. This matter arose after the Company exercised its editorial discretion by not assigning a bargaining unit reporter to cover certain protests occurring at that time in Pittsburgh. Newsroom management believed an inappropriate tweet by the reporter expressing her personal views on issues she wanted to cover compromised her objectivity in reporting on the ongoing protests. As a news organization, the Post-Gazette has special privileges and responsibilities. To preserve its institutional and editorial integrity, the newspaper must have credibility with the community it serves. In today's political climate and with the explosion of social media, the newspaper is monitored closely by watchdog groups and its viewers for any evidence of bias. Preserving the newspaper's reputation in the community for institutional and editorial integrity is paramount.

The courts have long held the right to control the content of a privately published newspaper rests entirely with the newspaper's publisher. "The First Amendment affords a *publisher* – not a reporter – absolute authority to shape a newspaper's content." *Ampersand Publ'g, LLC v. NLRB,* 702 F.3d 51, 56 (D.C. Cir. 2012). The First Amendment protects the newspaper itself and grants it a virtually unfettered right to choose what to print and what not to. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974). The editorial policy of the newspaper is a nonmandatory subject of bargaining.[2]

---

[2] Labor laws apply to newspaper publishers, as they do to other businesses, but they cannot extend to the newspaper's editorial policies. In *Newspaper Guild of Greater Philadelphia, Local No. 10 v. NLRB,* 636 F.2d 550 (D.C. Cr. 1980), the Pottstown Mercury, a newspaper in suburban Philadelphia, had adopted a Code of Ethics (based on what is now the Society of Professional Journalists Code) in order "to spell out the Mercury's standards of integrity,

2. The Union objected to the Company's exercise of its editorial judgment in not assigning the reporter to protest stories. The Union's President, Mike Fuoco, then sent an email to Union members on June 5, 2020, urging bargaining unit reporters to retweet on their Social Media accounts the tweet which disqualified the previous reporter from being assigned protest coverage. (Attachment 1).

The Union's email explained that the purpose of its request was to place the newspaper in the untenable position of either foregoing all protest coverage or allowing such coverage by those who had engaged in improper social media commentary similar to that of the reporter who was not assigned to protest stories. The Union's conduct directly interfered with the newspaper's First Amendment right to exercise its editorial control and judgement in assigning reporters to stories, a permissive subject of bargaining.

3. The Union's conduct violated the No-Strike provision of the Agreement. The collective bargaining agreement expired March 31, 2017. The terms and conditions of the Agreement remained in effect by virtue of an "evergreen" clause. Article XIX, Miscellaneous, Section 7 of the Agreement prohibited bargaining unit employees from participating in the following concerted activities during the term of the Agreement:

> . . . No strike, slowdown, work stoppage or any other interference with or interruption of work shall be permitted during the term of this Agreement . . . .

4. The Union's actions in directing bargaining unit reporters to intentionally disqualify themselves from being assigned to cover the protests in Pittsburgh violated the No-Strike provision of the Agreement. The No-Strike provision prohibits any work stoppage or any other interference with, or interruption of, work during the term of the Agreement. The Union interfered with the Company's right to assign employees to certain work assignments. Many

---

objectivity, and fairness, and to protect and enhance its quality and credibility." *Id.* at 555. The court held that under the National Labor Relations Act, the newspaper was required to engage in collective bargaining over aspects of the Code that affected employment conditions (*e.g.,* any penalties to be imposed on employees), but the First Amendment barred any regulation that might intrude on the publisher's editorial judgment. *Id.* at 558. Such invasion would include any "interference by government with editorial content or other matters lying at the heart of a newspaper's independence." *Id.*

The court agreed with the publisher "that protection of the editorial integrity of a newspaper lies at the core of publishing control," that "credibility is central to their ultimate product and to the conduct of the enterprise" and, as a consequence, "editorial control and the ability to shield that control from outside influences are within the First Amendment's zone of protection and therefore entitled to special consideration." *Id.* at 560. Consequently, it held "a news publication must be free to establish without interference, reasonable rules designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the publication for which they work as a medium of integrity." *Id.* at 561.

This case presents the same issue. The Post-Gazette established and applied social media guidelines dictating that news reporters should not cover events about which they have engaged in public commentary. It neutrally applied these guidelines and basic journalistic standards by assigning protest coverage only to those reporters who were not active on social media with respect to the protests.

reporters followed the Union's directive. Such conduct violated the No-Strike provision of the Agreement. *NLRB v. Sands Manufacturing Co.,* 306 U.S. 332 (1939).

By directing reporters to disqualify themselves from being assigned protest stories, the Union was also engaging in a partial strike. A partial strike is a concerted attempt by employees, while remaining at work, to bring pressure to force an employer to accede to their demands. Employees who refuse to perform certain tasks while accepting others are engaging in a partial strike. Such conduct is denied the Act's protection. *Electronic Data Sys. Corp.,* 331 NLRB 343 (2000); *Yale University,* 330 NLRB 246 (1999).

5. Additionally, under the Board's recent contract coverage standard announced in *MV Transportation, Inc.,* 368 NLRB No. 66 (2019), the Board examines the plain language of the collective bargaining agreement to determine whether action taken by an employer was within the compass or scope of contractual language granting the employer the right to act unilaterally. In doing so, the Board gives effect to the plain meaning of the relevant contract language, applying ordinary principles of contract interpretation. The Board stated in *MV Transportation, Inc.,* that it "will not require that the agreement specifically mention, refer to or address the employer decision at issue." *Id.,* slip op. at 11.

The teachings of *MV Transportation* apply equally to a union's actions taken under a collective bargaining agreement. Applying the Board's contract coverage analysis, the Union's actions were clearly within the compass or scope of contractual language prohibiting such conduct under the Agreement's no-strike provision. In the Company's administration and enforcement of the Agreement, the Company had the absolute right to bring to the Union's attention the Company's belief the Union's actions violated the Agreement's no-strike provision. The Union was not engaging in protected concerted activities when it engaged in a partial strike and interfered with and interrupted work in the newsroom. Therefore, there can be no violation of Section 8(a)(1).

6. One can also make the case that the Union unlawfully modified the Agreement by failing to adhere to its terms. Section 8(d) provides, in relevant part, that "where there is in effect a collective-bargaining contract . . . **no party** to such contract shall terminate **or** modify such contract." *Bath Iron Works Corp.,* 345 NLRB 499 (2005) (emphasis added). Under the contract modification standard, an employer must have a "sound arguable basis" for its interpretation of a contract. The same holds true for a union. In this case, the Union cannot present any reasonable interpretation of the Agreement's language that its actions were permitted and not forbidden by the Agreement's no-strike provision. *ADT Security Services,* 369 NLRB No. 31 (2020). The Union modified the Agreement within the meaning of Section 8(d) of the Act, in violation of Section 8(b)(3) of the Act.

The Union, in this case, interfered with the Company's editorial discretion by engaging in unprotected concerted activity. The Company had the right to inform the Union that its conduct violated the No-Strike provision of the Agreement. The Union's conduct also violated Section 8(b)(3) of the Act within the meaning of Section 8(d).

7. Finally, the Union's new allegation of interference with protected concerted activity in its third amended charge is barred by the 10(b) limitation period. The timely filing of a charge tolls the time limitation of Section 10(b) as to matters subsequently alleged in an amended charge only if they are similar to, and arise out of, the same course of conduct as those alleged in the timely filed charge. In determining whether an amended charge relates back to an earlier charge for 10(b) purposes, the Board applies the three-prong "closely related" test set forth in *Redd-I, Inc.*, 290 NLRB 1115, 1118 (1988). Applying these factors, there is no factual similarity between the allegations of unlawful surveillance in the fall of 2020 and the dispute over the interpretation of the no-strike provision of the parties' collective bargaining agreement in July, 2020.

Additionally, the Company's defenses to the surveillance allegations and the Union's conduct in violation of the no-strike provision are different. The latter issue will involve a contract coverage analysis as set forth in *MV Transportation*, the Union's mid-term modification within the meaning of 8(d), and the defense the Union engaged in an unprotected partial strike.

The untimely new allegation by the Union is not closely related to the timely allegations of surveillance. The vastly different factual circumstances underlying the two allegations and the absence of common or similar defenses to the allegations, bars the Union's new allegation in the third amended charge under Section 10(b).

David, please let me know if you need any additional information.

Sincerely,

Richard C. Lowe

RCL/rps

Attachment

# Attachment 1

NLRB-0001927



# Please stand with Alexis

1 message

Michael Fuoco <mfuoco138@gmail.com> Fri, Jun 5, 2020 at 1:26 PM

Dear members:
You undoubtedly know about the horrible way in which Alexis Johnson has been treated by management and the strong showing of support she is receiving on social media platforms from our lieutenant governor, Bill Peduto, the Pittsburgh Black Media Federation, our sister Guild at the Toledo Blade and other journalists and the public.

To keep up the momentum and to show the company where we all stand, we kindly ask that you post the following on your social media accounts (the exact thing that Alexis tweeted but we need you to do this on your own account--an activity protected by federal law).Many of you have already retweeted or reposted her tweet, but we're asking you all to join in and post as your own with the hashtag #IStandWithAlexis. The text is ib bold.Simply cut and paste into a tweet.

> ***Horrifying scenes and aftermath from selfish LOOTERS who don't care about this city!!!!!.... oh wait sorry. No, these are pictures from a Kenny Chesney concert tailgate. Whoops. #IStandWithAlexis***
>
> Next, download the attachment--the photos same Alexis used.--and attach to your tweet with the text and send
>
> *Voila!* That's it.
>
> Now what is management going to do? Ban all of us from coverage? Or ignore our tweets--exactly what Alexis tweeted--thereby showing how they discriminate?
>
> They can resolve this--remove the ban they imposed on her coverage. But...well, you know.
>
> Please do this as soon as possible. We expect and will promote media coverage of our movement.
>
> Giving credit where credit is due, Tracie Mauriello floated this idea to Mike this morning, so thanks Tracie!!!
>
> In solidarity,
> The Guild Executive Committee

# GC EXHIBIT 61

NLRB-0001929

**Case No.** 06-CA-248017

**Official Exhibit No.** GC 61

**Dispostion:**

**Identified** X

**Rejected**_____

**Received** X

**In the Matter of:** PITTSBURGH POST-GAZETTE

**Date:** 9-20-22

**Witness:**

**Reporter:** BW

**No. of Pages:** 3



| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | 030 |
|---|---|---|---|---|---|
| 7L2 | 001053 | 001114 | | 0000300017 | 1 |

# Earnings Statement

*P G PUBLISHING CO*
*2201 SWEENEY DR*
*CLINTON, PA 15026*

Period Beginning: 07/12/2020
Period Ending: 07/18/2020
Pay Date: 07/23/2020

Taxable Marital Status:
Federal: Married

Exemptions/Allowances:
Federal: 1

JONATHAN D SILVER

| Earnings | rate | salary/hours | this period | year to date |
|---|---|---|---|---|
| Regular | 1179.61 | 40.00 | 1,179.61 | 35,388.30 |
| Hea/Wag Diver | | | -94.37 | -2,826.03 |
| Holidy Flat Amt | | | | 294.90 |
| Miscellanous | | | | 180.00 |
| Overtime 1.50 | | | | 641.42 |
| Salaried Unpaid | | | | -1,179.61 |
| **Gross Pay** | | | **$1,085.24** | 32,498.98 |

| Deductions | Statutory | this period | year to date |
|---|---|---|---|
| | Federal Income Tax | -68.97 | 2,054.58 |
| | Social Security Tax | -67.29 | 1,998.82 |
| | Medicare Tax | -15.74 | 467.47 |
| | PA State Income Tax | -33.32 | 997.77 |
| | Mt Lebanon T Income Tax | -14.11 | 422.54 |
| | Pittsburgh C Local Svc Tax | -1.00 | 30.00 |
| | PA SUI/SDI Tax | -0.65 | 19.50 |
| | **Other** | | |
| | Edit Guild Dues | -16.28 | 455.90 |
| | Guild 401K | -135.66* | 4,062.47 |
| | Parking | | 260.00 |
| | Parking Offset | | -260.00 |
| | **Net Pay** | **$732.22** | |
| | Checking Acct | -732.22 | |
| | **Net Check** | **$0.00** | |

*** Excluded from federal taxable wages**

Your federal taxable wages this period are $949.58

| Other Benefits and Information | this period | total to date |
|---|---|---|
| 401K Match | 20.00 | 593.56 |

**Important Notes**

COMPANY PH#: 412-263-1179

BASIS OF PAY: SALARY

**Additional Tax Withholding Information**

Taxable Marital Status:
PA: Single
Exemptions/Allowances:
PA: N/A

© 2000 ADP LLC

P G PUBLISHING CO
2201 SWEENEY DR
CLINTON, PA 15026

**Advice number:** **00000300017**
Pay date: 07/23/2020

| Deposited to the account of | account number | transit ABA | amount |
|---|---|---|---|
| JONATHAN D SILVER | | xxxx xxxx | $732.22 |

THIS IS NOT A CHECK

**NON-NEGOTIABLE**

# GC EXHIBIT 62

NLRB-0001932

EXHIBIT NO. GC-62 RECEIVED x REJECTED

CASE NO 06-CA-248017 CASE NAME Pittsburgh Post-Gazette

NO OF PAGES 3 DATE: 10-12-2022 REPORTER: Barrington Moxie



CO. FILE DEPT. CLOCK VCHR. NO. 021
7L2 001053 000201 0000420027 1

# Earnings Statement

*P G PUBLISHING CO*
*2201 SWEENEY DR*
*CLINTON, PA 15026*

Period Beginning: 10/04/2020
Period Ending: 10/10/2020
Pay Date: 10/15/2020

Taxable Marital Status:
Federal: Married

Exemptions/Allowances:
Federal: 1

**JONATHAN D SILVER**

| Earnings | rate | salary/hours | this period | year to date |
|---|---|---|---|---|
| Regular | 1117.80 | 40.00 | 1,117.80 | 39,983.12 |
| Hea/Wag Diver | | | | -2,960.55 |
| Holidy Flat Amt | | | | 294.90 |
| Miscellanous | | | | 210.00 |
| Overtime 1.50 | | | | 641.42 |
| Salaried Unpaid | | | | -1,887.38 |
| **Gross Pay** | | | **$1,117.80** | 36,281.51 |

| Deductions | Statutory | this period | year to date |
|---|---|---|---|
| | Federal Income Tax | -55.95 | 2,261.62 |
| | Social Security Tax | -60.81 | 2,224.84 |
| | Medicare Tax | -14.23 | 520.33 |
| | PA State Income Tax | -30.11 | 1,109.69 |
| | Mt Lebanon T Income Tax | -12.75 | 469.93 |
| | Pittsburgh C Local Svc Tax | -1.00 | 34.00 |
| | PA SUI/SDI Tax | -0.67 | 21.77 |
| | **Other** | | |
| | Guild 401K | -139.73* | 4,535.30 |
| | Med/Dent/Vision | -136.98* | 136.98 |
| | Edit Guild Dues | | 472.14 |
| | Parking | | 260.00 |
| | Parking Offset | | -260.00 |
| | **Net Pay** | **$665.57** | |
| | Checking Acct | -665.57 | |
| | **Net Check** | **$0.00** | |

*** Excluded from federal taxable wages**
Your federal taxable wages this period are $841.09

| Other Benefits and Information | this period | total to date |
|---|---|---|
| 401K Match | 20.00 | 673.56 |

**Important Notes**

COMPANY PH#: 412-263-1179

BASIS OF PAY: SALARY

**Additional Tax Withholding Information**

Taxable Marital Status:
PA: Single
Exemptions/Allowances:
PA: N/A

© 2000 ADP, LLC

P G PUBLISHING CO
2201 SWEENEY DR
CLINTON, PA 15026

**Advice number:** **00000420027**
Pay date: 10/15/2020

| Deposited to the account of | account number | transit ABA | amount |
|---|---|---|---|
| **JONATHAN D SILVER** | | xxxx xxxx | $665.57 |

**NON-NEGOTIABLE**

# GC EXHIBIT 63

NLRB-0001935

EXHIBIT NO. GC-63 RECEIVED x REJECTED

CASE NO 06-CA-248017 CASE NAME Pittsburgh Post-Gazette

NO OF PAGES 4 DATE: 10-12-2022 REPORTER: Barrington Moxie

**Joseph J Pass**

**From:** Joseph J Pass
**Sent:** Tuesday, July 10, 2018 4:09 PM
**To:** Richard Lowe
**Subject:** RE: Meeting Dates

Richard, The Guild will meet July 24. at 11:00 AM to first discuss the impact of the PG reducing its print editions as set forth in Linda Guest's letter of June 26. If time then permits we can thereafter discuss issues dealing with the future of the CBA.

*Joseph J. Pass*, Esquire
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Blvd
Pittsburgh, PA 15222
Direct Dial: 412-802-2651
Office: 412-281-3850
FAX: 412-281-1985
jjp@jpilaw.com

---

**From:** Richard Lowe [mailto:rlowe@kingballow.com]
**Sent:** Friday, July 06, 2018 12:45 PM
**To:** Joseph J Pass
**Cc:** 'Linda Ann Guest'
**Subject:** Meeting Dates

Joe,

At our last meeting with the Guild on May 3, 2018, the Company asked the Union for future meeting dates. You conditioned future meeting dates on the Company's response to a list of written questions, most of which asked for responses to issues we had already discussed at the bargaining table. The Company told the Union conditioning future bargaining in this manner was not acceptable. The Company again asked for future meeting dates.

It has been over two months and the Union still has not offered any meeting dates. The Company is again requesting meeting dates from the Union.

Thank you for your cooperation.

Best,
Richard

**Richard C. Lowe**
**KING & BALLOW**
**315 Union Street**
**Suite 1100**
**Nashville, TN 37201**

**E-mail: rlowe@kingballow.com**
**Direct Dial: 615-726-5420**

**CONFIDENTIAL**

This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or

copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone (615)726-5420 or by return email and delete the message, along with any attachments, from your computer. Thank you.

# GC EXHIBIT 64

NLRB-0001939

EXHIBIT NO. GC-64 RECEIVED x REJECTED

CASE NO 06-CA-248017 CASE NAME Pittsburgh Post-Gazette

NO OF PAGES 4 DATE: 10-12-2022 REPORTER: Barrington Moxie

**Joseph J Pass**

**From:** Joseph J Pass
**Sent:** Thursday, July 12, 2018 10:58 AM
**To:** Richard Lowe
**Subject:** RE: Meeting Dates

Richard, Please see my email of July 11,2018 @ 4: 09 PM. Thank you.

*Joseph J. Pass*, Esquire
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Blvd
Pittsburgh, PA 15222
Direct Dial: 412-802-2651
Office: 412-281-3850
FAX: 412-281-1985
jjp@jpilaw.com

**From:** Richard Lowe [mailto:rlowe@kingballow.com]
**Sent:** Thursday, July 12, 2018 9:40 AM
**To:** Joseph J Pass
**Cc:** 'Linda Ann Guest'
**Subject:** RE: Meeting Dates

Joe,
The parties have confirmed July 24 to discuss the effects of the Company's decision to become a digital news operation. We once again are requesting meeting dates for contract negotiations.
Best,
Richard

**Richard C. Lowe**
**KING & BALLOW**
**315 Union Street**
**Suite 1100**
**Nashville, TN 37201**

**E-mail: rlowe@kingballow.com**
**Direct Dial: 615-726-5420**

**CONFIDENTIAL**

This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone (615)726-5420 or by return email and delete the message, along with any attachments, from your computer. Thank you.

**From:** Joseph J Pass <jjp@jpilaw.com>
**Sent:** Wednesday, July 11, 2018 4:09 PM
**To:** Richard Lowe <rlowe@kingballow.com>
**Subject:** [EXTERNAL] RE: Meeting Dates

Richard, I believe my email was crystal clear that we are willing to engage in negotiations on the same day that we discuss the decision to eliminate 2 days of print. To the extent you misunderstood my email let me clarify. Because the

decision to eliminate print is in many ways inextricably tied to what a final agreement looks like, it is not only important but essential to understand the employers position on what the impact of two days less print has on the bargaining unit. Therefore after discussing that aspect of the company's plan, so long as time permits ,we will certainly continue on with discussing what a final CBA may look like. I think that's what I have for the past 50+ years believed to be what has been known as "negotiations". If for some reason after this explanation you still believe that we are not scheduling negotiations I would like to know where the ambiguity of our position lies.
Thank you and see you the 24th.

*Joseph J. Pass*, Esquire
Jubelirer, Pass & Intrieri P.C.
219 Fort Pitt Blvd
Pittsburgh, PA 15222
Direct Dial: 412-802-2651
Office: 412-281-3850
FAX: 412-281-1985
jjp@jpilaw.com

---

**From:** Richard Lowe [mailto:rlowe@kingballow.com]
**Sent:** Wednesday, July 11, 2018 4:05 PM
**To:** Joseph J Pass
**Cc:** 'Linda Ann Guest'
**Subject:** Meeting Dates

Joe,

The Company is available to meet on July 24 beginning at 11:00 a.m. to discuss the effects of the Company's decision to become a digital news organization.

With regard to contract negotiations, the Company is still waiting for suggested dates from the Union. The Union has refused to schedule meeting dates since our last meeting on May 3, 2018.

Thank you,
Richard

**Richard C. Lowe**
**KING & BALLOW**
**315 Union Street**
**Suite 1100**
**Nashville, TN 37201**

**E-mail: rlowe@kingballow.com**
**Direct Dial: 615-726-5420**

**CONFIDENTIAL**

This message, together with any attachments, is intended only for the use of the individual or entity to which it is addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone (615)726-5420 or by return email and delete the message, along with any attachments, from your computer. Thank you.