# EXHIBIT 1

JD–83–24
Pittsburgh, PA

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
DIVISION OF JUDGES

**PG PUBLISHING CO., INC. d/b/a
PITTSBURGH POST–GAZETTE**

**and**                                                    Case    **06–CA–259157
                                                                     06–CA–268248
                                                                     06–CA–302602**

**PITTSBURGH NEWSPAPER PRINTING
PRESSMEN'S/PAPERHANDLERS LOCAL
UNION NO. 9N, A/W THE GRAPHIC
COMMUNICATIONS CONFERENCE/
INTERNATIONAL BROTHERHOOD OF
TEAMSTERS LOCAL 24M/9N**

*Alexander Figuly, Esq.,*
        for the General Counsel.
*Michael Oesterle, Mary Kate Williams,* and *Jennifer Sherman, Esqs.,*
        for the Respondent.
*Joseph J. Pass, Joseph S. Pass,* and *Steve Winslow, Esqs.,*
        for the Charging Party.

DECISION

        G. REBEKAH RAMIREZ, Administrative Law Judge. The General Counsel alleges that
PG Publishing Co., Inc. d/b/a Pittsburgh Post–Gazette (Respondent or the Company) violated the
National Labor Relations Act (the Act) by: failing and refusing to bargain in good faith with the
Pittsburgh Newspaper Printing Pressmen's/Paper Handlers Local Union No. 9N, a/w the Graphic
Communications Conference/International Brotherhood of Teamsters Local 24M/9N (Union)
when it unilaterally changed the terms of a five–shift per week guarantee established by the parties'
expired collective-bargaining agreement without first bargaining with the Union to an overall
good-faith impasse for a successor collective-bargaining agreement, resulting in the layoff of three
employees; failing and refusing to bargain in good faith with the Union during negotiations for a
successor collective-bargaining agreement; and failing and refusing to bargain in good faith with
the Union during negotiations for an interim agreement concerning health insurance benefits. As
explained below, I recommend the dismissal of the five–shift per week guarantee allegation as
well as the dismissal of the allegation concerning bargaining for a health insurance benefits interim
agreement, but find Respondent violated the Act by bargaining in bad faith during negotiations for
a successor collective-bargaining agreement.

STATEMENT OF THE CASE

This case was tried in Pittsburgh, Pennsylvania, on August 21–25, 2023, November 1–3, 2023, and February 12, 2024. The Union filed the charge in Case 06–CA–259157 on April 14, 2020, and amended it on December 17, 2020; the charge in Case 06–CA–268248 on October 28, 2020, and amended it on April 16, 2021; and the charge in Case 06–CA–302602 on August 31, 2022, and amended it on October 6, 2022.

The General Counsel issued a consolidated complaint on May 16, 2023, and an order further consolidating cases and a second consolidated complaint on July 28, 2023.  In the second consolidated complaint (the complaint), as further amended during trial,[1] the General Counsel alleged that Respondent violated Section 8(a)(5) and (1) of the Act by failing and refusing to bargain collectively and in good faith with the Union as the exclusive collective-bargaining representative of employees in the following bargaining unit:

All journeymen pressmen, paperhandlers, paperhandling pressmen, and apprentice pressmen who work in the Employer's pressroom and paperhandling departments, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.[2]

Specifically, the General Counsel alleged Respondent:

(1) since about November 8, 2019, unilaterally changed the terms of a five–shift per week guarantee established by the parties' expired collective-bargaining agreement without prior notice to and without affording the Union an opportunity to bargain with respect to this conduct, and without first bargaining to an overall good–faith impasse for a successor collective-bargaining agreement, and as a result three named employees were laid off on November 9, 2019;

(2) since about April 29, 2020, bargained for a successor collective-bargaining agreement with no intention of reaching agreement, by insisting upon proposals that are predictably unacceptable, including to unilaterally control wage rates, hours and number of hours worked, discipline, performance of bargaining unit work by non–unit employees, provisions of health insurance, layoffs, and a broadly worded no–strike clause, and by failing to provide explanations regarding its proposals; and

(3) since about November 2021, bargained for an interim agreement concerning bargaining unit employees' health insurance benefits with no intention of reaching agreement by, inter alia, insisting on unilateral control over the health insurance benefits, insisting on the execution of its 2022 effects agreement and authorization forms, and by failing to provide explanations regarding its bargaining position.

Respondent timely filed an answer in which it denied committing any of the violations alleged in the consolidated complaint.

---

[1] At the hearing, the General Counsel amended complaint para. 10(d) to withdraw the allegations related to layoffs in 2020. (Tr. 24–25.)

[2] Hereinafter, the pressmen unit.

## PROCEDURAL ISSUES

### Respondent's Motion for Evidentiary Sanctions

5    Respondent served a subpoena duces tecum on the Union on August 2, 2023, the Union filed a petition to revoke the subpoena on August 9, 2023, and thereafter Respondent filed a response in opposition to the petition to revoke. During a pre–trial conference call, I instructed the Union to make a good faith effort to produce responsive documents at the beginning of the hearing pending my final ruling on its petition to revoke. On August 21, 2023, the first day of trial, I issued

10   an oral ruling at the beginning of the hearing denying in part and granting in part the Union's petition to revoke the subpoena. (Tr. 14–17, 23.) After a brief recess and prior to taking any testimony, the Union provided Respondent with a thumb drive containing responsive documents. (Tr. 28, 30–31.) After the General Counsel called its first witness, I amended my ruling granting the petition to revoke concerning certain subpoena items based on documents entered into evidence

15   by the General Counsel, which showed the relevance of additional documents subpoenaed by Respondent. (Tr. 75.) The Union explained that those additional responsive documents were already included in the thumb drive. (Tr. 75–76.)  The Union supplemented its production with hard copy documents towards the end of the day and the hearing was recessed so Respondent would have time to review the additional documents. (Tr. 101.) On August 23, 2023, the 3rd day

20   of trial, it came to my attention that the Union had additional responsive documents to produce and needed a recess to gather the documents. (Tr. 297.) Respondent requested, and I granted, additional time to review the supplemental production of documents. (Tr. 300.)  Respondent conducted its cross–examination of Union President Christopher Lang about the Union's production in response to Respondent's subpoena only after it had time to review the supplemental

25   production of documents. (Tr. 301–337.)  Lang testified that he received Respondent' subpoena the day that he went in for knee surgery and was recovering from surgery while attempting to respond to the subpoena. (Tr. 76.) Lang further testified that because he was having trouble focusing post–surgery and is not tech–savvy, he asked his sister to gather responsive documents to the subpoena. (Tr. 305–312.)  Lang admitted that he only searched for responsive documents

30   "until his knee hurt" and instructed his sister to conduct a search in the Union's email account with only the search term "Richard Lowe" (Respondent's lead negotiator during bargaining). (Tr. 306, 316.) Lang also admitted that he was not feeling well so he took all the records he had related to the Union and gave them to the Union's attorneys without reviewing them. (Tr. 323–324.)

35   On February 12, 2024, the 9th and final day of trial, Respondent filed a motion for evidentiary sanctions alleging that the Union failed to comply with Respondent's subpoena. Specifically, Respondent identified 145 documents that were responsive to the subpoena and were not produced by the Union. All 145 documents were moved into evidence as either General Counsel or Respondent exhibits. Respondent asserts that the Union failed to conduct a sufficient

40   electronically stored information (ESI) search, failed to produce documents in the electronic form that they are normally maintained, did not include email attachments in its production, produced illegible emails, failed to search for responsive information on Lang's social media accounts, and produced an insufficient privilege log. Consequently, Respondent requested evidentiary sanctions against the Union to include to limiting the General Counsel's and the Union's scope of cross–

45   examination, taking adverse inferences regarding responsive documents that were not produced, and an order that the Union pay Respondent's attorney's fees and costs, including witness fees, for the delay caused by the Union's noncompliance with the subpoena. The General Counsel opposes

Respondent's motion asserting that there is no basis to sanction the General Counsel since she does not represent the Union nor has any control over its conduct. The General Counsel also opposes sanctions against the Union asserting that Respondent waited almost six months to raise any subpoena compliance issues and because Respondent did not suffer any specific prejudice from the alleged deficient production. (GC Br. at 66–69.)

In *McAllister Towing & Transportation Co.*, 341 NLRB 394, 396 (2004), the Board noted that administrative law judges have discretion in imposing sanctions to deal with subpoena noncompliance "including permitting the party seeking production to use secondary evidence, precluding the noncomplying party from rebutting that evidence or cross–examining witnesses about it, and drawing adverse inferences against the noncomplying party." Having considered the Union's subpoena production and surrounding circumstances, I do not find that sanctions for subpoena noncompliance are warranted here. While the Union's subpoena production was initially delayed, needed to be supplemented a couple of times, and Lang's efforts in complying with the subpoena were less than ideal, I do not find that Respondent experienced any prejudice to its case as a result of any deficiencies in the Union's subpoena compliance. Respondent was able to submit a wealth of documents in support of its case and was allowed plenty of time to review the Union's production, prepare its cross–examination of Lang, and move into evidence documents produced by the Union despite Lang not being able to authenticate them (all parties agreed to the documents being admitted as business records). I also find that there is insufficient evidence to conclude that the Union intentionally withheld responsive documents. Rather, the credible evidence demonstrates that Lang, although seemingly disorganized and medically challenged at the time he prepared the production of documents, made a good-faith effort in turning over all responsive documents in his possession. Accordingly, I deny Respondent's motion for evidentiary sanctions.

On the entire record,[3] including my observation of the demeanor of the witnesses, and after considering the briefs filed by the General Counsel, Charging Party, and Respondent, I make the following:

## FINDINGS OF FACT[4]

## JURISDICTION

At all material times Respondent, a Pennsylvania corporation with offices and places of business in Clinton, Pennsylvania and Pittsburgh, Pennsylvania, has been engaged in the business

---

[3]  The transcripts and exhibits in this case are generally accurate.  During my review of the record, however, I identified transcript corrections that are warranted. In addition, Respondent proposed corrections to the transcripts. The transcript corrections that I have identified, along with the proposed corrections that I have verified and accepted are set forth in Appendix B to this decision. I have denied any requests for transcript corrections that do not appear in Appendix B.

[4]  Abbreviations used in this decision are as follows: "Tr." for transcript, "GC Exh." for General Counsel's exhibits, "R. Exh." for Respondent's exhibits, "GC Br." for General Counsel's post–hearing brief, "CP Br." for Charging Party's post–hearing brief, and "R. Br." for Respondent's post–hearing brief. Although I have included several citations in this decision to highlight particular testimony oR. Exhibits in the evidentiary record, I emphasize that my findings and conclusions are not based solely on those specific citations, but rather on my review and consideration of the entire record for this case and the demeanor of the witnesses.

of publishing the Pittsburgh Post–Gazette, a print and electronic newspaper. Respondent annually derived gross revenues in excess of $200,000 and held membership in and subscribed to various interstate news services, including Associated Press, published various nationally syndicated features, and advertised various nationally sold products. During the same time period, Respondent purchased and received products, goods and materials at its Pennsylvania facilities that were valued in excess of $5,000 and came directly from points outside of the Commonwealth of Pennsylvania. Respondent admits, and I find, that Respondent has at all material times been an employer engaged in commerce withing the meaning of Section 2(2), (6), and (7) of the Act. Respondent also admits, and I find, that the Union at all material times has been a labor organization within the meaning of Section 2(5) of the Act.

## ALLEGED UNFAIR LABOR PRACTICES

### A. Background

For many years, Respondent has recognized the Union as the exclusive collective-bargaining representative of employees in the pressmen unit. (GC Exh. 2 (Art. 2).) This recognition has been embodied in successive collective-bargaining agreements, the most recent of which was effective from November 16, 2014, until March 31, 2017 (the 2014–2017 contract or the expired contract). (GC Exh. 2.)

Respondent had other collective-bargaining agreements that also expired in 2017 with different unions representing other bargaining units, which included the Advertising unit, Operating Engineers, Electricians, Newspaper Guild, Machinists, Mailers, Teamsters, and the Finance unit. (Tr. 36, 118, 537.)  Historically, the unions representing these bargaining units, including the Union involved here, negotiated their economic terms collectively under the name the "Unity Council". (Tr. 46.)  Respondent bargained non– economic items separately with each labor union. (Tr. 46.)  However, the Unity Council was not used during bargaining for a successor agreement after the expiration of the 2014–2017 contract. (Tr. 46.)

During the duration of the expired contract, Respondent published a print newspaper edition seven days a week. Respondent and the Union began negotiating for a successor collective-bargaining agreement in March 2017, but after seven years bargaining, they have yet to reach agreement on a successor contract.  As will be discussed below, in this timeframe, Respondent transitioned from a print newspaper to a digital newspaper format, with print days reduced to two days a week.

### B. 2017 Bargaining Sessions

On October 11, 2016, Union President Christopher Lang sent a letter to Respondent's Senior Human Resources Manager Linda Guest providing notice of the Union's desire to open negotiations for a successor agreement. (GC Exh. 3.) By letter dated January 13, 2017, Respondent informed the Union that attorney Richard Lowe would be representing the company in negotiations. (GC Exh. 4; Tr. 539.)

On March 21, 2017, Respondent and the Union met for their first bargaining session.[5] Lowe served as Respondent's chief negotiator and was joined on the bargaining team by Pressroom Supervisor Brian Bennick, and Production Manager Mike Benednek. (GC Exh. 1(bb) and R. Exh. 188; Tr. 540.) Chris Lang served as the Union's chief negotiator and was joined by Pressmen Rich Bogaski and Tom Guckert. (Tr. 49, 540.)

Respondent provided the Union with its initial proposal which highlighted new language in yellow and struck through language that Respondent proposed to eliminate from the expired contract. (R. Exh. 189; Tr. 541.) Lowe explained that Respondent expected print days would be eliminated during the next contract's term and that "drastic changes would be needed." (Tr. 541.) Respondent had been losing millions of dollars every year due to its subscriber and advertising revenue decreasing as a result of the basic newspaper business model moving from a print newspaper to an online digital newspaper. (Tr. 545–548.)

Respondent's initial proposal included, in pertinent part, changes to the following contractual provisions:

-   Jurisdiction. Respondent struck this provision in its entirety and renamed it "Flexible Work Assignments." Respondent's proposal eliminated language stating that the Union had jurisdiction over the work of delivering and preparing rolls to run the presses and paper handler work; and proposed to add "nothing in this Agreement shall be construed as giving the Union exclusive jurisdiction over or an exclusive right to perform any work. The Company has the sole right to utilize individuals outside of the bargaining unit to perform duties and responsibilities performed by employees within the bargaining unit." In addition, Respondent proposed to add that "supervisors and managerial employees may perform any work performed by bargaining unit employees."

-   Decrease Presses–Notice. Article 10, Section 10.2 stated that employees listed by name at the time of the signing of the agreement would be guaranteed a five (5) shift payroll week for the balance of the Agreement, ending March 31, 2017. In case of layoffs due to economic reasons, the layoffs would take place by seniority and laid off employees would receive health and life insurance for a period of three months. Respondent's proposal eliminated this entire provision.

-   Hours–Lunch–Slide Hours. Respondent proposed to add a provision stating that the company will not guarantee any specified number of hours per day or week.

-   Wages. This provision established a wage diversion of 10% of earnings up to a maximum of $5,000 per calendar year during the first year of the contract and a wage diversion of 8% up to a maximum of $4,000 per year effective January 1, 2017. Respondent proposed a wage diversion of 10% of earnings, with wage rates and maximum diversion amounts per year to be negotiated.

---

[5]  The parties had previously met on May 17, 2017, for a benefits presentation. (R. Exhs. 187, 294, 195–196.) Kara Hart, director of corporate benefits for Respondent's parent company, presented a benefit proposal so that bargaining unit employees would consider joining corporate benefit plans. (R. Exhs. 465–467.)

-  Health and Welfare Benefits. This provision established that eligible employees would participate in the Western Pennsylvania Teamsters and Employers Welfare Fund (the Fund) and would contribute 8% of their wages to a maximum of $4,000 per calendar year for health insurance regardless of whether they participated in the insurance program. Respondent struck the entire provision and proposed that employees be covered by the Company's health, dental, vision, and life insurance plans, with the Company retaining sole discretion in amending, changing, replacing, or terminating the insurance plans.

-  No Strike or Lockouts. Respondent struck the entire provision which provided for no strikes, slowdowns, and work stoppages during the term of the agreement, and proposed that employees would not engage in any "slowdown, strikes of any kind, sympathy strike, bannering, boycotts… and picketing."

-  Disciplinary Procedure. Respondent struck the entire provision, which provided a detailed progressive disciplinary procedure, and renamed it "Corrective Action." Respondent proposed that the company would discipline employees in its discretion, with progressive discipline not required.

-  Management Rights. Respondent proposed, in pertinent part, to add that the company has the right "to restructure or outsource any department, operation or service of the company in whole or in part" and to "make, change, discontinue and enforce safety rules and rules governing the conduct of employees."

-  Miscellaneous. Respondent added a provision stating that the agreement supersedes prior agreements with the Union, including "letters of interpretation, verbal understanding and/or past practices."

(GC Exh. 6; R. Exh. 189.)

The parties met again on March 29, 2017, and continued to review the company's initial contract proposal. Director of Operations Robert Weber joined Respondent's bargaining team at this meeting. (R. Exh. 190; Tr. 557.) At the end of the meeting, Lowe asked if the Union wanted to extend the contract, and Lang said no. (R. Exh. 190; Tr. 557.)

The next bargaining session was on April 20, 2017. (Tr. 559.) Senior Human Resources Manager Linda Guest joined Respondent's bargaining team and started taking bargaining notes under the direction of Lowe, who continued to serve as Respondent's lead negotiator. (R. Exhs. 191–192; Tr. 559.)  At this meeting, the Union provided Respondent with their first contract proposal. The Union proposed a five–year contract, accepted some minor language changes proposed by Respondent, and proposed some new language to the union security provision, among other things. In pertinent part, the Union rejected Respondent's proposals regarding jurisdiction, hours–lunch–slide hours, wages, health and welfare benefits, no–strike provision, disciplinary procedure, and management rights. (R. Exhs. 191–192, GC Exhs. 7–8.)

After the parties exchanged their first proposals, they met four more times in 2017: on May 17, 2017, June 27, 2017, September 19, 2017, and November 14, 2017.  (GC Exhs.135–136, R.

Exhs. 194, 196–200, 202, 207–208, 215–216.)  During these sessions, Respondent kept detailed bargaining notes of the parties' discussions and the length of the meetings, while the record is devoid of any bargaining notes kept by the Union. The Union provided its proposals number 2, 3, and 4. (GC Exhs. 8–10.)  In summary, these bargaining sessions were short (1 to 2 hours long), and the parties dedicated much of the time to discuss Respondent's health insurance plan, and Respondent's proposals concerning jurisdiction, schedules, hours of work, layoffs, no–strike clause, and the sick days provision.

### C.  January–June 2018 Bargaining Sessions

International Union Representative Mike Huggins joined the Union's bargaining team as lead negotiator starting on January 23, 2018, the parties' first bargaining meeting in 2018. (R. Exh. 218; Tr. 626.) This session was again less than 2 hours long, with the Union spending about half of the time in caucus presumably getting Huggins caught up with open negotiation issues. (R. Exhs. 221–222.) The Union was not available for another bargaining session until April. (R. Exhs. 223–224.)

The parties met again on April 18, 2018. (GC Exhs. 133–134.) The Union proposed that for the jurisdiction provision the following sentence be added: "No supervisor or managerial employees may perform any work that is performed by bargaining unit employees if it is detrimental to any journeyman pressman."

The parties met again on May 2, 2018, and May 30, 2018.  (See GC Exhs. 137–138, R. Exhs. 225–226, 230–232, 236–237).[6] At the May 30, 2018, bargaining session, Respondent shared with the Union an updated proposal which reflected provisions highlighted in yellow with revised proposals. For example, the jurisdiction provision was revised to incorporate a Union proposal concerning pressmen's work. However, Respondent's proposal still maintained that: supervisors and managers "may" perform bargaining unit work; the elimination of the five–shift per week guarantee; that there would be no guarantee of any specified number of hours per day or week; a wage diversion of six percent of earnings to a maximum of $4,000 per year; that employees would be covered by the company's health, dental, vision and life insurance plans; that layoffs would be handled by giving consideration to seniority, performance, qualifications and ability; the same initial no–strike proposal that included a prohibition of sympathy strikes, bannering, and picketing; the same initial proposal changing the disciplinary procedure; and Respondent's right to restructure or outsource work as part of the management rights clause. One of the Union's biggest concerns was that Respondent would not guarantee 5 workdays a week. Lowe proposed that they guarantee 3 days per week. (R. Exh. 237; Tr. 668–679.)

---

[6]  Many of Respondent's exhibits concern the scheduling of bargaining sessions. These exhibits reflect that for the most part, Respondent took the lead in scheduling bargaining meetings, frequently having to follow up with the Union multiple times about scheduling additional meetings, and that the Union was, for the most part, responsible for the parties not meeting more often. On more than one occasion, the Union did not timely reply to emails about scheduling bargaining sessions and cancelled scheduled meetings.  (See R. Exhs. 229, 235, 239–241, 243–244, 246–247, 256, 263.)

### D. *Respondent's Decision To Eliminate Print Days in 2018*

By letter dated June 26, 2018, Respondent informed the Union that it had decided to become a digital news organization. The letter went on to explain that Respondent had already launched a new online application for tablets and phones and had expanded its social media presence. In pertinent part, the letter states:

"Delivering the news through digital platforms will fundamentally alter the scope and nature of our business. For starters, we will begin to reduce our print operations which have been the mainstay of our newspaper since it was founded.

Beginning August 25, 2018, we will eliminate two (2) days of our print operations… We are prepared to discuss the effects our decision will have on your bargaining unit."

(R. Exh. 242; Tr. 688.)

The parties met on July 25 and September 19, 2018, for effects bargaining over the decision to discontinue the 2 print days. (R. Exh. 247; Tr. 692–693.)  At these meetings, Respondent informed the Union that it was planning to lay off two bargaining unit employees effective October 6, 2018, as a result of the elimination of the print days. The parties exchanged proposals regarding this decision but did not reach an agreement. The Union took the position that Respondent could not lay off the employees because the expired contract provides a guaranteed five shifts of work per week, while Respondent took the position that the five shifts per week guarantee provision did not survive the expiration of the contract.[7] See *PG Publishing Co., Inc.*, 371 NLRB No. 141 (2022), enfd. denied 83 F.4th 200 (3rd Cir. 2023) (hereinafter *PG I*).[8] Respondent proceeded with laying off two employees effective October 6, 2018.

### E. *October–December 2018 Bargaining Sessions*

On September 26, 2018, Lowe sent an email to Huggins chronicling the difficulties Respondent was having in meeting more often with the Union to bargain for a successor agreement

---

[7]  The five–shift per week guarantee is found in Art. 10, Sec. 10.2 of the expired contract, which provides, in pertinent part: "… all employees listed by name at the time of the signing of this Agreement shall be guaranteed a five (5) shift mark–up each payroll week for the balance of the Agreement, ending March 31, 2017…"

[8]  *PG I* concerns the exact same expired collective–bargaining agreement, bargaining unit, and parties as the instant matter. The underlying complaint alleged that the two 2018 layoffs violated Section 8(a)(5) because Respondent eliminated the five–shift per week guarantee in the contract without first bargaining to an overall good–faith impasse. The administrative law judge (ALJ) that heard the case dismissed the complaint, but the Board reversed, finding that the layoffs violated the Act because they were made prior to the parties reaching an overall impasse in negotiations for a successor agreement, and the expired contract's language did not clearly and unmistakably waive the Union's right to maintenance of the five–shift per week guarantee. The Court of Appeals for the Third Circuit reversed the Board and remanded the case to the Board. The Third Circuit's decision will be discussed separately.

and asked for more bargaining dates. (R. Exh. 247.) The Union offered October 30, 2018, as the next date it would be available to meet.

At the October 30, 2018 meeting, Respondent provided the Union with a clean copy of its contract proposal with revisions and tentative agreements to date. (GC Exh. 139, R. Exhs. 248–249.) The parties discussed some of the open items, and the Union took a couple of caucuses lasting over 1 hour. (R. Exh. 249.) The Union ended the meeting after about 3 hours, including caucuses. Lowe asked the Union why they were meeting for three hours or less at each bargaining session to date, to which Huggins replied that all other unions involved in bargaining with Respondent were meeting for up to 3 hours only. Lowe complained that they needed to meet for a full day to make progress. The Union informed Respondent that its committee could not meet again until December. (R. Exh. 249; Tr. 715–716.) By email dated December 6, 2018, Lowe again requested to the Union that it meet for a full day of bargaining. (R. Exh. 251.)

The parties next met on December 11 and 12, 2018. (R. Exhs. 252–255; Tr. 717.) Both meetings were short. On December 11, the meeting started late because the Union was not ready, and the parties met for only about 1 hour. (R. Exh. 252; Tr. 721–722.) On December 12, 2018, the parties discussed the company's health insurance costs and the current wage diversion. (R. Exh. 255.) Huggins complained that it was difficult to bargain considering that the Union was hearing that Respondent would be reducing an additional 2 print days. Lowe replied that the Union should expect more print days to be reduced. (R. Exh. 253; Tr. 722.)

### F.   2019 Bargaining Sessions

On January 29, 2019, Senior Human Resources Manager Linda Guest sent an email to Lang outlining issues Respondent was having with the Union around scheduling more bargaining sessions. Guest stated that the Union had offered dates in February 2019, which were immediately accepted by Respondent, only to cancel at the last minute a bargaining session scheduled for February 1, 2019. Respondent offered seven additional dates to meet in February, and the Union only accepted to meet again on February 19, 2019. (R. Exh. 258.)

At the February 19, 2019 meeting, the Union took two 1–hour long caucuses and insisted on leaving the bargaining session after only four hours. (R. Exhs. 259–260.) Therefore, not much progress was made at this meeting. The Union provided Respondent with its proposal number five. (GC Exh. 11, R. Exhs. 259–260.) Lowe's uncontroverted testimony was that when he asked the Union what changed from the Union's previous proposal, Huggins told him to figure it out. (Tr. 730.) Respondent shared with the Union information about its 2019 benefits program. (R. Exh. 261.) Lowe suggested that the parties invite FMCS mediator Jack Yoedt to join the negotiations. (Tr. 737.)

The next day, Lowe sent an email to Huggins summarizing what was discussed at the table regarding next meeting dates. Lowe stated that Huggins had offered to meet on March 25, 28, and 29, and that although Respondent had accepted all dates, Lang had stated that "he may be playing golf in Florida during the offered March dates." Lowe offered to meet on weekends if that helped the Union meet more often. Huggins replied that Lang would be on vacation in March and asked Lowe to send him dates in April when the mediator would also be available. On March 4, 2019, Mediator Yoedt offered the parties eight dates in April, and the Union only accepted one, April

18, 2019. Yoedt also offered nine dates in May, and the Union only accepted one, May 14, 2019. Respondent accepted all of the dates offered by Yoedt. (R. Exh. 263.)

The parties met, as agreed, on April 18, 2019, with mediator Yoedt joining the meeting. (R. Exh. 264; Tr. 741.) According to an uncontroverted email from Lowe to Huggins summarizing the meeting, the Union arrived 20 minutes late, asked for a caucus after about 45 minutes, and left for the day during their caucus without alerting Respondent that they were not returning to the meeting (although Yoedt explained in an email that any miscommunication about the ending time for the meeting was his fault). (R. Exhs. 269–270.) Of significance, Lowe submitted to the Union and to Yoedt a position statement and updated proposal to assist the mediator in getting up to speed with the parties' bargaining proposals. (GC Exh. 12, R. Exh. 265.) In pertinent part, the position statement highlighted the following:

- Jurisdiction.  There is one remaining issue in Jurisdiction… Company has proposed to allow supervisors to perform bargaining unit work. Supervisors currently perform work to assist in solving … issues with the press runs… Company believes supervisors should be able to assist in operating the press when, in its judgment, such work would contribute to the efficient operation of the pressroom. Union opposes this proposal.

- Starting Times. Company proposes to stagger press crews' starting times to meet operational requirements. As the Company transitions to electronic delivery of news… the press will change… If the Company is able to obtain and maintain commercial print work in the future… press will vary from day to day.[9] Union will not agree.

- Staffing Practices.  Company proposes to retain "the exclusive right in every instance to determine the number of employees and the work assignments of all employees to operate the press." Respondent explained that this proposal relates to the phasing out of print days and future commercial opportunities that will impact manpower requirements. Union will not agree.

- Work Schedules.  Company proposes that "the Company is responsible for scheduling employees for work in the pressroom" and not the Union, as it has been the past practice, to adjust for fewer employees in the pressroom and to allow for more efficiency.

- Hours–Lunch–Slide Hours.  Company proposes that pressroom employees take staggered lunches and breaks, while the Union contends all employees take lunch and breaks at the same time. If print days are reduced, Respondent proposes that it will maintain five straight–time shifts per week for as many of the remaining full–time pressmen as is practicable to meet operational requirements. The Union wants to maintain a five–day per week guarantee.

- Sixth Shifts.  Respondent proposes to pay overtime "provided an employee has actually worked forty (40) hours." The Union wants Respondent to pay overtime for sixth shifts provided an employee has worked five shifts.

---

[9] Commercial work means work on any product or publication other than The Post–Gazette newspaper. (R. Exh. 265, p. 20.)

- Wages.  Respondent proposes a 2–percent wage increase by reducing the wage diversion from the current 8–percent to 6–percent. The Union wants to eliminate the 8–percent wage diversion. Respondent proposes a 4–hour work guarantee for reporting to work, while the Union wants to maintain the current 8–hour guarantee.

- Health and Welfare Benefits.  Respondent proposes that employees join its healthcare plan (with Respondent contributing 70% of the cost) and the Union has proposed alternative multi–employer health care plans.

- Seniority. Respondent proposes that in the event of a layoff or reduction in force, employees may be selected by taking into consideration seniority, performance, qualifications and ability. The Union proposes that layoffs be by strict seniority.

- No–Strikes or Lockouts.  Respondent proposes to add a prohibition of sympathy strikes, picketing, boycotts, and bannering to the no–strike clause. Respondent explained that it is agreeing to settle any alleged violation of the contract through the grievance and arbitration procedure, so it is fair to ask in return for a broad no–strike clause. The Union will not accept this proposal.

- Corrective Action.  Respondent proposes to "eliminate the rigid disciplinary procedure in the expired contract and replace it with" a provision that allows for disciple for just cause that may be progressive in nature.

- Management Rights.  Respondent proposes to add that it retains the right to outsource its operations in whole or in part explaining that this is in light of its transition to being a fully digital news organization, and the future of the press operations being uncertain.

- Miscellaneous.  Respondent proposed that it may use ADP or any other payroll services firm and may pay employees weekly or bi–weekly at its discretion.

(R. Exh. 265.)

The contract proposal attached to Respondent's position statement highlighted a number of clauses that were "agreed" upon. However, at the hearing, Lang testified that he did not think that all of the provisions in Respondent's position statement asserting that there was agreement were really agreed to, but he could not recall what the parties had agreed to either. (Tr. 84.) Lang asserted that the Company did not provide explanations for their proposals either. (Tr. 83, 89.) I do not credit Lang's testimony in this respect. His testimony was dismissive and vague, while Lowe's testimony was specific and corroborated by documentary evidence.

The parties met again on May 14, 2019. (R. Exh 271.) Mediator Yoedt was in attendance. The parties discussed the open items highlighted in Respondent's position statement but did not reach an agreement on any of them. (R. Exhs. 272–274.) The Union stated being unavailable to meet again in May, so the parties agreed that their next meeting would be on June 13, 2019. (R. Exh. 272, 276.) Lowe informed the Union that he would prepare a "best" offer to try to move negotiations along. (Tr. 750; R. Exhs. 271–272.)

On May 15, 2019, the Union informed Respondent by email that attorney Joseph (Joe) Pass would be representing them in negotiations moving forward. (Tr. 51, GC Exh. 5.) Pass represented other unions in negotiations with Respondent. (R. Exh. 279; Tr. 118.) Pass informed Lowe, by email, that he was not available on the previously agreed upon meeting date of June 13, 2019, and offered July 9 and 11, 2019, to meet. Respondent and Yoedt replied that they were available on both dates. (R. Exhs. 277–279.) However, Pass replied that he could only meet on July 9, 2019, because other dates in July conflicted with bargaining meetings he had concerning the other unions that represented Respondent's employees. (R. Exhs. 280–283.)

As agreed, the parties met on July 9, 2019, with Pass joining the Union's bargaining committee as lead negotiator. (Tr. 118, 757.) Respondent presented the Union with its "best offer." (GC Exh. 16.) The Union took a long caucus to review Respondent's best offer, and then asked for the meeting to end so they could have more time to review the proposals on the table and any agreements made to–date. (R. Exh. 284; Tr. 758, 767.) The Union informed Respondent that its committee was not available the rest of July and that Pass would provide available dates later. (R. Exh 285.) Respondent's best offer incorporated all the items described above in Respondent's position statement, and marked all provisions that the parties had tentatively agreed to date. (R. Exh. 286.) The very next day, Yoedt sent by email his availability for August, and a few days later, Lowe shared his availability in August. (Tr. 287–288.) In total, Lowe and Yoedt offered the Union 11 days to meet. (Id.)

### G.  Respondent Eliminates Two More Print Days in 2019

By letter dated July 17, 2019, Respondent informed the Union that it was eliminating two additional print dates effective September 30, 2019, as a result of its decision to become a digital news organization. Respondent invited the Union to engage in effects bargaining. (Tr. 93–94, 1077; GC Exh. 143.) Pass replied with an email to Lowe on July 19, 2019, seeking clarity on whether the parties would engage in effects bargaining or contract negotiations during dates previously offered by Lowe, and Lowe replied that Respondent was prepared to engage in effects bargaining on any of the dates that Respondent had previously made available to the Union. (GC Exh. 32.) The parties agreed to meet for effects bargaining on August 13, 2019. (GC Exh. 33.)

On August 13, 2019, the parties met for their first effects bargaining meeting concerning the elimination of the 2 additional print days. Lowe and Pass served as the lead spokespeople for Respondent and the Union, respectively (Tr. 1080.) Lowe and Operations Director Rob Weber kept detailed bargaining notes during all effects bargaining meetings. (R. Exhs. 326, 423.) Respondent informed the Union that as a result of eliminating two additional print days, it anticipated laying off four employees effective September 28, 2019. (R. Exh. 423; Tr. 1085.) Respondent provided the Union with a proposed new work schedule for the pressroom. (GC Exh. 147, R. Exh. 327.) The Union counter–proposed that the pressroom should operate on a four, ten hours per day schedule with no employee laid off. (R. Exh. 423; Tr. 1086.) In addition, Pass argued that Respondent could not lay off any employees because the expired contract provided a five–shift per week guarantee. (Tr. 1086–1087.) Weber explained that Respondent did not need as many employees as they had because the volume in newspaper distribution had decreased, so much so, that Respondent no longer used the two sides of the press and was using only one side of the press.

JD–83–24

(Tr. 1089–1090.) The meeting ended without an agreement.  On August 21, 2019, Weber sent the Union a detailed summary of the issues discussed at this meeting. (GC Exh. 148; Tr. 1104.)

5     The parties met again on August 27, 2019. (GC Exh. 34, R. Exh. 423.) Respondent informed the Union that it evaluated their four, 10–hour per day schedule proposal, and concluded that they would not have enough work to keep all employees busy on that schedule. (R. Exhs. 331, 423; Tr. 1107–1108.) At the conclusion of the meeting, the Union proposed that only two employees be laid off, first by asking for volunteers and then by seniority, with 20 weeks of severance pay and 6 months of paid healthcare benefits. Respondent counter–proposed that it
10     would lower the number of laid off employees from four to three, would accept volunteers prior to laying off by seniority, and would offer severance pay of 1 week per year of service up to 6 weeks of pay, and 3 months of paid healthcare benefits.[10] (R. Exh.149; Tr. 100–101, 149, 158, 168, 174, 1079–1090, 1108–1109.) Weber again sent the Union a detailed summary of the issues discussed at this meeting. (GC Exh. 149.) After the meeting, Respondent sent the Union
15     information regarding its commercial contracts. (R. Exh. 334.) Respondent offered five additional meeting dates in September, and the Union only accepted to meet on September 17, 2019. (GC Exh. 35; Tr. 1109.)

20     The parties next met on September 17, 2019, for effects bargaining. (GC Exh. 35, R. Exh. 337, 423.) Respondent provided the Union with an updated work schedule reflecting the layoff of three bargaining unit employees. (R. Exh. 338, GC Exh. 150.) The Union proposed a work schedule reflecting no layoffs and another one reflecting the layoff of two bargaining unit employees. (R. Exhs. 339 (a)–(c).) The difference between the number of layoffs each party proposed came down to one pressman from the maintenance crew. Respondent explained that the
25     elimination of two print days would result in less maintenance needed on the press. (R. Exh. 423.) The Union revised its severance pay proposal, proposing 12 weeks of pay for 8–15 years of service, 20 weeks of pay for 16–25 years of service, and 30 weeks of pay for 26 plus years of service. (GC Exh. 120.)  Respondent rejected this proposal. The Union then proposed to revise the severance package to 6, 12, and 18 weeks of pay depending on years of service.[11] (GC Exh. 124.) The parties
30     did not reach an agreement.  (Tr. 174.) Respondent offered to meet every day until October 1 to get this issue resolved, but the Union stated it would get back to Respondent with available dates. (GC Exh. 150; Tr. 1117.)

35     On October 17, 2019, Lowe sent a letter to Pass stating that Respondent never heard back from the Union after the September 17, 2019 meeting to schedule additional effects bargaining meetings. (GC Exh. 36; Tr. 1117.) Lowe stated that Respondent believed they were at an impasse, and that he was attaching Respondent's best and final offer. Lowe informed the Union that they would implement the final offer effective on October 25, 2019, and that effective November 2, 2019, they would lay off three pressmen based on seniority, unless there were volunteers. The
40     severance pay package would consist of 1 week per year of service up to 6 weeks of pay and 3 months of paid COBRA as per the expired contract. (GC Exh. 36.)

---

[10]  The expired contract already provided for 3 months of healthcare benefits in case of a layoff. (Tr. 100–101.)

[11]  I note that Lowe testified that Respondent did not receive this proposal from the Union. (Tr. 1124.)

14

Pass replied by letter dated October 18, 2019, stating that the Union believed Respondent could not lay off the employees listed on the expired contract because they are guaranteed five–shifts per week "during the life of the agreement" or until they are at a "bona fide impasse with regards to the negotiations of a new agreement." Pass stated that "unless the company is willing to actually negotiate it is a total waste of time to meet." (GC Exh. 37; Tr. 167.) Lowe replied by letter dated October 21, 2019, stating that Pass' letter misrepresented the law and the facts, and that Respondent stood by its October 17, 2019 letter. (GC Exh. 38.) Pass replied by letter dated October 31, 2019, stating that the Union disagreed with Respondent that they were at an impasse and requested that they meet with a Federal mediator before Respondent implemented its final offer. (GC Exh. 39.) Lowe replied that at their August 27, 2019 effects bargaining meeting, Federal Mediator Jack Yoedt had been present as an observer only because he had never witnessed an effects bargaining meeting; that federal mediators seldom, if ever, participate in effects bargaining; and that Lowe does not believe a mediator is necessary. (GC Exh. 40.) On November 6, 2019, Pass replied stating that a mediator in effects bargaining was no different than in regular bargaining and that Respondent's refusal to use one "will be appropriately dealt with." (GC Exh. 41.) The Union did not ask to meet again for effects bargaining.[12] (Tr 1120.)

By letter dated November 8, 2019, Respondent informed employees Richard J. Bogaski, Frank P. Balkovec, and John Peck, after all three volunteered to be laid off, that they would be laid off effective November 10, and would receive severance pay of one week's pay per year of service up to a maximum of 6 weeks, and 3 months of paid COBRA benefits.[13] (GC Exhs. 13–14, 144; R. Exhs. 505–507.)

### H.  February 11, 2020 Bargaining Session

As summarized above, the Union was only available to meet for collective bargaining on four occasions in 2019. Lowe and Federal Mediator Yoedt offered various bargaining dates after the July 9, 2019 meeting, but the Union did not agree to any meetings other than for effects bargaining. (Tr. 769.) Consequently, by letter dated January 17, 2020, Lowe accused the Union of deliberately avoiding negotiations. (R. Exh. 289.) Pass replied by letter dated January 23, 2020, stating that Respondent's July 9, 2019 "best offer" was "wholly and totally inadequate" and offered to meet on February 11, 2020. (R. Exh. 290.) Respondent agreed on the meeting date. (R. Exh. 291.)

Thus, after a 7–month hiatus resulting entirely from the Union's unavailability, the parties finally met on February 11, 2020. (R. Exhs. 292–293.) The Union asked when the Company believed it would be 100–percent digital, and whether negotiations should be geared toward that decision. Lowe replied that there was no decision on when the Company would transition to be all–digital.[14] (R. Exh. 293.) Lowe asked Pass if the Union had a proposal, and Pass provided him with a counterproposal to Respondent's July 9, 2019 "best offer." (GC Exhs. 17–18.) Respondent

---

[12] On April 14, 2020, the Union filed an unfair labor practice charge against the Respondent in Case 06–CA–259157, concerning the November 10, 2019 layoffs. (GC Exh. 1(e).)

[13] Sometime in 2020, the Union filed a grievance over these layoffs. Respondent denied the grievance asserting that the five–shift per week guarantee did not survive the expired contract. (R. Exh. 456.)

[14] As of the time of the hearing in this case, Respondent was down to 2 print days per week, but it is unclear when this happened. (Tr. 679.)

took a caucus to review the Union's proposal. When Respondent returned, Lowe asked why so many provisions had changed. Pass was unable to explain why some of the Union's proposals reverted to provisions from the expired agreement that the parties had already agreed to change. (Tr. 773–774.) For the most part, Pass stated that he did not know why some proposals had changed and/or replied to Lowe with "we'll get back to you." (GC Exh. 17, R. Exh. 293; Tr. 775–777.) Respondent requested to caucus again, and when Lowe emailed the Union to reconvene, Pass did not reply until about 1 hour later to say that the Union would not be back for another hour and a half, and only available to meet from 5 to 6 pm. Lowe explained that he had a flight to catch that afternoon and asked the Union for additional dates to meet. (R. Exhs. 295–297; Tr 778.) Not hearing back from Pass, Lowe asked for additional meeting dates by letter dated March 9, 2020. (R. Exh. 298.)

By letter dated March 20, 2020, Respondent presented the Union with a detailed response to the Union's counterproposal. (R. Exh. 298.) Respondent asserted that the Union made regressive proposals and reneged, in whole or in part, on tentative agreements the parties had previously reached. In pertinent part, Respondent pointed out the following:

- Jurisdiction. The parties had previously agreed to all the language in this provision except for the right of supervisors to perform bargaining unit work. The Union's proposal incorporated language that had been previously deleted and replaced with tentative agreements. With respect to the work of supervisors, the Union had previously proposed language allowing supervisors to perform bargaining unit work as long as it did not cause a loss of shifts or hours of work. In its new proposal, the Union instead proposed that supervisors could perform bargaining work so long as the number of employees did not go below a guaranteed level.

- Journeyman, Suspension of Publication, Sixth Shifts, Bereavement. The parties had tentatively agreed on language that was reneged by the Union in its proposal.

- Maintenance and makeready. The Union added language that had previously been deleted and added an additional crew member to the maintenance crew despite the reduction in print volume on the press.

- Starting Times, Decrease in Press Runs, Health and Welfare Benefits, Seniority, No Strike, Disciplinary Procedure, Management Rights. The Company rejected the Union's counterproposals and explained the reasons for its proposals for each provision.

(GC Exh. 19; R. Exh 299.)

### I.   Due to COVID–19 Pandemic All Bargaining Ceases

By letter dated March 22, 2020, Pass informed Lowe that he was cancelling a bargaining meeting with the Guild scheduled for March 25, and stated that there would be no "future meetings scheduled for any of the bargaining units at the Post–Gazette until the current Coronavirus pandemic is completely arrested." (GC Exh. 20, R. Exh. 471.) Therefore, the parties' scheduled March 23, 2020, bargaining meeting was cancelled. (GC Exh. 21.)

*J.   June–July 2020 Communications*

The parties did not meet or exchange any communications until June 16, 2020, when Lowe sent Pass a letter stating that given that the Union had not responded to Respondent's March 20, 2020 letter, Respondent was attaching its "final offer" stating, in pertinent part:

"We believe the Company's Final Offer is fair and in the best interest of both parties. We respectfully urge acceptance of this offer. Please feel free to contact me with any questions the Union may have on the Final Offer"

(GC Exh. 22(a), R. Exh. 302.) Respondent's final offer does not state that Respondent believes that the parties are at impasse.

On June 22, 2020, Pass replied to Lowe in a letter stating, in pertinent part, that Respondent's "final offer" was provided despite the fact that the parties "have not discussed or met subsequent to the March 20, 2020 response" and at a time "when there is currently an ULP trial ongoing between these two parties" and "another pending unfair labor practice." Pass asked whether the final offer meant that the company was ending negotiations. (GC Exh. 23, R. Exh. 303.)

On July 30, 2020, Lowe replied in an email and letter stating that the Company was not asserting that its final offer terminated contract negotiations and that it was the Union that had announced on March 22, 2020 that it would no longer meet. (GC Exh. 24, R. Exh. 302.)  Pass replied on the same date. In pertinent part, Pass stated that the Union was ready and willing to engage in good-faith negotiations and asked for Respondent's availability. (GC Exh. 25, R. Exh. 305.) By letter dated August 3, 2020, Lowe provide the Union with 21 dates in August when Respondent was available to meet the Union to continue bargaining. (GC Exh. 26, R. Exh. 306.) Pass replied by letter dated August 5, 2020, stating that the Union was willing to meet with Respondent on August 26, 2020. (GC Exh. 27, R. Exh. 307.) Lowe replied by letter accepting the date. (GC Exh. 28, R. Exh. 308.) However, on August 25, 2020, Pass had to cancel the meeting because Tom Guckert's wife was having emergency surgery the next day and Guckert was the only employee who was still in the Union's negotiating committee. (GC Exh. 29; Tr. 797.) On August 27, 2020, Pass offered September 14, 2020, to meet, and Lowe accepted the date. (GC Exh. 30, R. Exh. 310; Tr. 798.)

*K.  September 14, 2020 Bargaining Session*

The parties finally met again to continue bargaining for a successor collective-bargaining agreement on September 14, 2020.  (R. Exh. 311.) By this time, Linda Guest was no longer employed by Respondent, and Federal Mediator Yoedt had retired. (R. Exh. 311; Tr. 799, 805.) The Union provided Respondent with a counterproposal to Respondent's final offer. (GC Exh. 31.) The parties spent the meeting reviewing the Union's counterproposal. (R. Exh. 311.)

17

L.  *Respondent's Final Offer and Union's Counterproposal[15]*

| | Respondent's Final Offer June 16, 2020 | Union's Counterproposal September 14, 2020 |
|---|---|---|
| | 3 years, no retroactive pay | 5 years, retroactive pay |
| Art. 5 – Jurisdiction | Supervisors and managerial employees may perform any work performed by bargaining unit employees. | Supervisors shall be permitted to perform bargaining unit work so long as number of … employees … does not go below 15. Adds a whole paragraph from expired contract. |
| Art. 8 – Starting Time | Press crews … may be started at different hours… | Starting times may be changed with 72 hours' notice… |
| Art. 10– Decrease Presses | Eliminates Section 10.2 which included a five-shift guarantee. | Keeps Section 10.2 guaranteeing a five shift mark–up each week. |
| Art. 11– Staffing Practices | … Company retains the exclusive right … to determine the number of employees and the work assignments of all employees… | Staffing will be established in accordance with … Appendix A (which is a list of employees). |
| Art. 14– Hours– Lunch–Slide Hours | Section 14.3 Company reserves the sole right to determine whether to publish and distribute a printed product in whole or in part…Nothing in this Agreement shall be construed as a guarantee of any specified number of hours per day or per week… | … in the event the Company reduces print days in whole or in part, and a number of employees in the pressroom is reduced, the company agrees to maintain five straight time shifts per week for as many of the remaining fulltime pressman… |
| Art. 30– Insurance: Sick & Accident | Covered by the Company's short term disability policy (STD) on the same basis as non–represented employees. Company reserves the right to modify or change the STD policy. | Life insurance – same as provided in expired contract. STD– same as provided in expired contract (60% of base per policy established by parties.) |
| Art. 31– Health and Welfare Benefits | Covered by the Company's health, dental, vision and life insurance plans … plans may be amended, changed, replaced or terminated, in whole or in part… at the Company's discretion… Employee share is 30%. | Company shall pay the entire amount of base rate for 2019… in subsequent years, the company shall pay base rate plus all increases up to 25% per year… anything above 25% to be split with the Union. |
| Art. 39– Seniority | In layoffs… Company shall give due consideration to seniority, performance, … qualifications of employee… and ability. | Same language as expired contract |

---

[15] The following table is only an excerpt of some of the most relevant provisions where the parties could not agree on language.

| | Respondent's Final Offer June 16, 2020 | Union's Counterproposal September 14, 2020 |
|---|---|---|
| Art. 42– No strike or Lockouts | No strike, sympathy strike, slowdown, work stoppage, picketing, boycotts, bannering or any other interference with or interruption of work shall be permitted… | Same language as expired contract |
| Art. 43– Corrective Action | The Union agrees the Company may discipline employees for just cause… Company determines the appropriate disciplinary action based on the facts and circumstances of each case… | Same language as expired contract |
| Art. 47– Management Rights | Adding: to outsource any department, operation, or service of the Company in whole or in part… | Eliminating substantial language, including … "to determine the number of employees to be employed" … "to set starting and quitting times" … "to issue, amend, and revise reasonable rules" … "to introduce new or improved … methods…" and last three sentences of expired clause. |
| Art. 49– Miscellaneous | The Company may use ADP … Employees will be paid weekly or bi–weekly at the discretion of the Company. | Not included |
| Art. 50– Severance Pay | … Minimum severance …One week's pay for each year of service, with a maximum of six weeks' severance pay… | Severance pay has a maximum of 35 weeks of pay… |
| Art. 20– Wages | No wage diversion language. Starting wages decreased by 8– percent, then applied 3–percent increase for year one and 2– percent for year two. | No wage diversion. Wage increases of 7–percent in 2017, 6–percent in 2018, 5.5–percent in 2019, 6–percent in 2020, and 6– percent in 2021. |

(GC Exhs. 22(b) and (c) and 31.)

*M. Parties File Unfair Labor Practice Charges Against Each Other*

5

On September 16, 2020, Respondent filed an unfair labor practice charge against the Union, in Case 06–CB–266305, alleging that the Union was engaged in bad-faith bargaining by, inter alia, employing a strategy to stretch out negotiations and avoiding, delaying, and/or refusing to meet to negotiate a successor collective-bargaining agreement, and by making regressive proposals and reneging on tentative agreements without justification. (R. Exh. 313.)

10

19

Then, on October 28, 2020, the Union filed an unfair labor practice charge against Respondent, in Case 06–CA–268248, alleging that Respondent had, within the past 6 months, failed to engage in good-faith bargaining for a successor contract.

### N.  December 1, 2020 Zoom Bargaining Meeting

The parties next met to bargain over the successor collective-bargaining agreement via Zoom format on December 1, 2020. (R. Exh. 318; Tr. 814.) Lowe went through the Union's counterproposal and pointed out where the Union had made regressive proposals, had reneged on tentative agreements and/or had made bargaining proposals without an explanation. (R. Exh. 318; Tr. 815.) Lowe's bargaining notes do not indicate the Union's response, and the record does not have any additional information about this meeting.

### O.  No bargaining Meetings in 2021 and 2022

The parties did not meet at all in 2021 or 2022 to bargain for a successor collective-bargaining agreement. (Tr. 815–816.)

### P.  2020 Bargaining for an Interim Healthcare Insurance Agreement

#### 1.  Background

The expired contract provided that Respondent would contribute $1,299 per month for each eligible employee in the bargaining unit to pay for health insurance provided by the Western Pennsylvania Teamsters and Employers Welfare Fund (the "Fund"). (GC Exh. 2., Art. 37.1.) Further, for years 2016 and 2017, the expired contract provided that Respondent's contributions would not exceed a 5–percent annual increase above the $1,229 monthly rate. Increases in excess of 5–percent would be the responsibility of the bargaining unit members.

At the time the contract expired in 2017, Respondent was contributing $1,354.97 per month per employee due to annual 5–percent increases. *PG Publishing Co., Inc. dba Pittsburgh Post–Gazette*, 368 NLRB No. 41, slip op. at 1–2 (2019) (the 2019 Board decision). In the fall of 2017, the Fund increased employer contribution rates by 5–percent, and Respondent took the position that it was only required to continue paying the $1,354.97 rate. (Id.) The Union took the position that Respondent had to pay the increase, and the issue was litigated before the Board. In a decision issued on August 22, 2019, the Board ruled in favor of Respondent, finding that to maintain the status quo after the contract expired, Respondent was only required to continue to pay the monthly $1,354.97 rate per employee. (Supra, slip op. at 4.)

#### 2.  Effects Bargaining Regarding Healthcare Insurance

On October 26, 2020, the Fund sent Respondent a letter stating that it would not offer coverage to Respondent's employees after December 31, 2020. (R. Exh. 1.) A 60–day notification was sent to employees and the Union. (R. Exh. 2.) The Fund alleged that Respondent had not paid contribution increases in 2018, 2019, and 2020, and that "up to this point, the Trustees have been able to implement several benefit reductions below the level in place prior to 2018." (R. Exh. 1.)

The parties engaged in back and forth communications to schedule an effects bargaining meeting to discuss the healthcare benefit issue. (R. Exhs. 3–6, 463.) The parties eventually met by Zoom on December 2, 2020. (R. Exhs. 7–9.) Lowe acted as Respondent's spokesperson and Pass was the Union's spokesperson. Pass represented all four unions impacted by the Fund's decision

5  (Pressmen, Advertising, Mailers and Teamsters/Typographical (Typo) units). (R. Exh. 10; Tr. 841.) Pass demanded that Respondent pay any amount in excess of $1,354.97 per month so that employees could keep their benefits. He also requested that Respondent cease applying the 8–percent wage diversion. (Tr. 844–845.) Respondent declined to do so relying on the 2019 Board decision. Lowe explained that Respondent was losing commercial work and would eventually have

10  to cut more print days, but did not know when. (Tr. 844.) Respondent offered to replace the Fund's insurance plan with the Company's 2021 healthcare plan. (R. Exh. 17.) The parties did not reach agreement.

In a letter dated December 7, 2020, Pass informed Lowe that although Respondent "is

15  legally required" to pay the increases to the Fund, and there is currently "litigation pending in Federal Court seeking to compel the Post–Gazette to arbitrate that dispute," the unions decided that employees would pay the difference between what Respondent is paying and what is needed to maintain the insurance.[16] Pass also stated that employees would be forwarding a signed payroll authorization form so that Respondent could make payroll deductions for the additional cost of

20  $272.03 per month needed to keep the insurance. (R. Exh. 10.) Respondent replied by letter dated December 8, 2020, asking if the Fund had notified the Union that it would allow employees to keep their insurance under this proposed arrangement. (R. Exh 11.) Respondent also raised an issue regarding whether employee payroll deductions would qualify for pre–tax treatment. (Tr. 846.)

25

By letter dated December 9, 2020, the Fund notified Respondent that it would allow employees to stay in the Fund healthcare plan so long as it received an agreement in writing confirming that Respondent and the unions had agreed to resolve the dispute by having employees pay the $272.03 per month. The Fund also explained that it did not have the ability to set up direct

30  billing with its members so the payment of $1,354.97 and additional $272.03 per month would have to be paid by Respondent in full, even if Respondent would recoup the additional amount from its employees via payroll deductions. (R. Exh. 12.) Fund Director William Parry also explained in an email that the Fund would continue to insure employees as long as Respondent paid the January 2021 invoice, even if at the $1,354.97 monthly rate, and was able to start making

35  full payments by February 2021. (R. Exhs. 14–15; Tr. 847–849.)

In a letter dated December 15, 2020, Lowe summarized to Pass the chronology of discussions the parties had engaged in to–date to resolve the healthcare insurance issue, including an issue regarding certain unacceptable changes to the 2021 benefit plan. (R. Exhs. 16–17.) Pass

40  replied by email on December 17, 2020, stating that he had discussed the issue concerning changes to the 2021 benefit plan with the Fund, and the Fund had agreed to keep the benefit plan unchanged

---

[16]  The Union filed a grievance over the Company's refusal to pay contribution rate increases on November 21, 2019, and demanded that the parties proceed to arbitration. (R. Exh. 455.) Respondent informed the Union by letter dated March 13, 2020, that it did not have an obligation to arbitrate post–expiration grievances. (R. Exh. 455.)

from 2020 to 2021. (R. Exhs. 18–19.) The only remaining issue was whether employee contributions could be treated as pre–tax deductions. (R. Exhs.13, 20; Tr. 849–852.)

On December 17, 2020, Pass sent Lowe a proposed written agreement to sign. (R. Exh.
5    21.) The agreement would be between Respondent and all four impacted unions. On December 18, 2020, the Fund sent Respondent and the Union a separate proposed agreement setting forth the terms by which insurance coverage would continue, which included, inter alia, that Respondent would pay $1,627 per month per employee, which reflected the $272.03 increase that would be covered by employees through payroll deductions. (R. Exh. 22.) Also on December 18, 2020, the
10   Union sent Respondent payroll deduction authorization forms signed by bargaining unit employees stating in relevant part that the "authorization shall remain in effect until either my union reaches an agreement for a different payment schedule or you receive a written authorization from the undersigned that terminates and/or increases or decreases such deduction." (R. Exh. 23; Tr. 853–854.)
15

Lowe informed Pass that the payroll authorization forms that the Union sent were unacceptable because employees could terminate the authorizations unilaterally and leave the Company to pay 100–percent of the insurance cost. (R. Exh. 24; Tr. 855–856, 911–912.) Lowe also informed the Union and the Fund that Respondent had not agreed to sign a separate agreement
20   with the Fund, had never done so previously, and thus, it was declining to do so now. (R. Exhs. 24, 28; Tr. 857–861.) Pass invited Lowe to provide a revised agreement and payroll authorization form for his consideration. Lowe sent Pass a revised agreement and authorization form. (R. Exhs. 25–27). The Fund clarified that it would not insist on Respondent signing a term agreement as long as it signed an agreement with the unions. (R. Exhs. 29–30; Tr. 862.)
25

### 3.  The 2021 Healthcare Agreement

On December 22, 2020, the parties finally executed an agreement (hereinafter the 2021 healthcare agreement) reflecting that Respondent would continue paying $1,354.97 per month, per
30   employee, and employees would contribute $272.03 per month towards the insurance cost. (GC Exh. 42(a).) The parties also agreed on a revised payroll authorization form authorizing Respondent to deduct from employees' pay $62.78 on a weekly basis to cover the $272.03 monthly increase. The authorization form states, in pertinent part, that it will remain in effect "until either my union bargaining representative reaches an agreement with the PG Publishing Co., Inc, for a
35   different payment schedule or I am no longer an Eligible Employee participant." (GC Exh. 42(b), R. Exhs. 29, 31–34; Tr. 863–865.)

### Q.  2022 Increase in Healthcare Insurance Rates

40   1.  Healthcare insurance rate increase and parties' efforts to negotiate new healthcare agreement from October 2021–September 2022

On October 14, 2021, the Fund sent Respondent a notice stating that effective January 1, 2022, the new monthly contribution rate per employee would be $1,709.01, which represented a
45   5–percent increase. (R. Exhs. 35, 43.) On October 15, 2021, Respondent reached out to the Union to discuss the new rate. (R. Exh. 36.) On November 9, 2021, Pass informed Lowe, by letter, that the unions were taking the position that Respondent had an obligation to pay the increase, "as well

as all other increases which the employees have had to pay since the expiration of their most recently expired contracts." (R. Exh. 37.) Respondent disagreed with the Union's position and invited Pass to meet. (R. Exh. 38.) Pass proposed that the Company meet with all the unions in one meeting, but Respondent stated it would meet with each union separately. (R. Exh. 39; Tr. 865–868.)

The parties met for effects bargaining on November 17, 2021. (R. Exh. 40.) Lowe served as Respondent's lead negotiator and Pass as the Union's spokesperson. Representatives from each of the affected bargaining units (Pressmen, Teamsters, Mailers and Advertising units) served as members of the Union's negotiating committee. The Union continued to demand that Respondent pay for all of the increases since the contract expired. Respondent proposed that the parties amend the 2021 healthcare agreement and the payroll authorization forms to reflect the increased rate of $354.01 per month and the new payroll deduction authorization. (GC Exh. 43, R. Exh. 36.) The parties were not able to reach an agreement.[17] (R. Exh. 41; Tr. 868–871.)

By letter dated December 8, 2021, the Union informed Respondent that it maintained its position that the Company had the obligation to pay the 2022 increase so that it could "maintain the original level of benefits and as a show of good faith." (GC Exh. 44(a).) Notwithstanding its stated position and the fact that the parties had not reached an agreement, the Union sent new signed payroll authorization forms from bargaining unit employees authorizing Respondent to deduct the increased rate to remain in effect "until either my union reaches an agreement for a different payment schedule, *or you receive a written authorization from the undersigned that terminates and/or increases or decreases such deduction*." (GC Exh. 44(b).) (*emphasis added*). Thus, the authorization form included the same line that Respondent rejected the previous year. (Tr. 872.)

By letter dated December 9, 2021, Director of Operations Weber informed Lang that the new signed payroll authorization forms were not the ones the parties had previously agreed on and sent an amended healthcare agreement and payroll authorization forms that were identical to the previously agreed upon documents, except for the revised amounts, for signature. (GC Exh. 126; Tr. 872–873.)

On December 14, 2021, Pass replied to Weber, stating that if Respondent was willing to negotiate an "alternative health insurance program," then he would need certain information related to employees' use of the health insurance plan.[18] (R. Exh. 45.) Pass also stated that the unions were "vehemently" opposed to signing another agreement similar to the 2021 healthcare agreement but that, in any case, employees had signed new payroll authorization forms to cover the increase and maintain their health benefits. (R. Exh. 45.) By letter dated December 29, 2021, Weber replied to Pass stating, in relevant part, that the Company had not proposed an "alternative health care plan" in effects bargaining but that it remained willing to sign an amended healthcare

---

[17]  I do not credit Pass' testimony that he told Lowe that all we needed was to give the Company a new authorization and that Lowe said yes. (Tr. 184.) The credible documentary evidence clearly establishes that Respondent proposed to amend the 2021 healthcare agreement and payroll authorization forms to reflect the increased rates as a way to resolve the dispute.

[18]  Respondent's position regarding this "alternative health insurance" is that this was something the Union raised "out of the blue." (GC Exh. 48; Tr. 875.) Respondent did not have access to any of the information requested so it requested it from the Fund. (R. Exhs. 51, 446–447.)

agreement to resolve the healthcare issue. (R. Exh. 461.) Pass continued to adamantly insist that Respondent was required to accept employees' new payroll authorization forms. (R. Exh. 52.) By letters dated December 14 and 15, 2021, Weber again requested to Lang that the Union sign the amended 2021 healthcare agreement so that the insurance would not be terminated. (R. Exhs. 459–460.) By email dated January 5, 2022, Pass stated to Weber that if the Company refused to honor the payroll authorization forms, "legal and other action will be forthcoming, and we shall specifically request damages and legal fees against the Company." (R. Exh. 443.)

Concurrently, Weber sent a letter to Fund Director William Parry on December 15, 2021, explaining that Respondent planned to continue contributing to the Fund at the rate set forth in the 2021 healthcare agreement given that the Union refused to sign an amended healthcare agreement permitting Respondent to pay the increased rates. Weber also sent this letter to the Union. (R. Exhs. 440, 444; Tr. 877.) Pass replied to Weber's letter basically stating that the Company was required to honor the payroll authorizations forms employees had provided. (R. Exh. 442.) Parry replied in a letter to Weber dated February 4, 2022, stating that the Fund did not require any additional documentation to be executed because the Fund understood that sending invoices with the current increased rate met the bare requirements of the Taft–Harley Act. (R. Exh. 390.) Weber sent another letter to Parry explaining that no agreement had been reached with the Union and thus, the Company would continue to contribute to the Fund in accordance with the 2021 healthcare agreement. (R. Exhs. 391, 441; Tr. 881–882.)

After several communications back and forth, the parties agreed to meet in person for effects bargaining on February 22, 2022. (R. Exhs. 54, 58(a), 451–452, 454.) At the meeting, Pass informed Lowe that the Union would not sign an amended 2021 healthcare agreement but they would sign a letter stating that the Union does not object to deductions from pay in the new amounts. (R. Exh. 59.) Respondent's position was that in order to collect the increased rate, the parties had to amend the 2021 healthcare agreement. The parties did not reach an agreement.[19] (Tr. 888–889.)

On May 16, 2022, Fund Counsel Vincent Szeligo sent a demand letter to Respondent stating, in relevant part, that the current dispute between the Company and the unions did not excuse Respondent from paying the 2022 rate increase, that Respondent owed a delinquent amount of $25,587.12 in 2022 contributions, and that if the delinquency was not cured by July 1, 2022, coverage would terminate effective August 1, 2022. (GC Exh. 45.) In response, Respondent's attorney Michael Oesterle (and Lowe's colleague) sent a letter to the Fund dated June 3, 2022 stating that Respondent could not legally pay the increased rates because there was no written agreement authorizing such payments since the only written agreement in place was the 2021 healthcare agreement. (R. Exh. 61; Tr. 890–891.)

On June 3, 2022, Lowe sent a letter to Pass requesting again that the Union accept the Company's proposal to sign the amended healthcare agreement and revised authorization forms.

---

[19] By this time, the Union had filed unfair labor practice charges against Respondent over their refusal to pay the increased healthcare rates. Pass kept the Fund closely informed of the Union's legal strategy as reflected in an email exchange between Pass and Fund director Parry where Pass informed him that if Region 6 does not issue complaint on the healthcare soon, the Union is prepared to seek an injunction in federal court. Pass also requested that the Fund hold off on sending a notice of termination until April first to help the Unions proceed to Court. (R. Exh. 399.)

(GC Exh. 46, R. Exh. 62.) Pass replied by letter dated June 7, 2022, insisting that Respondent process the new payroll authorization forms that the Union had submitted, and asserting that the Union has no legal obligation to sign any agreement with Respondent. (GC Exh. 47, R. Exh. 63.)

On June 13, 2022, Lowe sent a long letter to Pass explaining the Company's position concerning why the parties needed to sign a revised healthcare agreement, and revised payroll authorization forms. (GC Exh. 48.) In his letter, Lowe explains that the 2021 healthcare agreement locked the contribution rates to the 2021 rates, and that was why the Company was asking the Union to sign a modified healthcare agreement that reflects the new contribution rates. Lowe also provided a summary of the events that led to the 2021 healthcare agreement, which included negotiations, exchange of proposals, and an agreement by all the parties involved. (Tr. 896–897.) In a letter dated June 16, 2022, Pass replied to Lowe stating that with regard to the 2021 healthcare agreement, "the union should have never signed" it because "the CBAs do not require any such agreement."[20]  In addition, Pass stated that the 2021 healthcare agreement dealt "with that particular year only." Finally, Pass referred to a number of new Board charges filed against Respondent regarding the healthcare issue. (GC Exh. 49.)

On June 30, 2022, the Fund sent a notice to Respondent and to participating employees notifying them that their healthcare benefits would end effective August 31, 2022. (GC Exhs. 50, 145.)

On July 12, 2022, Pass sent a letter to Lowe and Oesterle demanding that Respondent process the payroll authorization forms that the Company had repeatedly indicated were not acceptable. (R. Exh. 51.) Pass also stated that the unions were willing to provide the Company with a signed agreement stating that "the union has no objection to the employer making the deductions set forth in the employees' most recently submitted authorizations to the PG in order to maintain those health care benefits for the 2022 year without prejudice to its position that the employer is responsible for the amounts necessary to maintain the benefits in the health care plan." Pass also referred to unfair labor practice charges pending before the Board and asserted that Respondent would be committing "wage theft" if it kept applying the 8–percent wage diversion if employees lose their healthcare benefits. (R. Exh. 51.) According to Lowe, it was never clear that the 8–percent diversion was to be used to pay for employee healthcare benefits. The wage diversion was taken out from employees' wages even if an employee did not enroll in the Fund insurance plan. (Tr. 900–901.) Thus, the wage diversion was something that needed to be bargained over. (Tr. 906.)

On August 1, 2022, Pass sent another letter to Lowe and Oesterle basically repeating the same arguments the unions had previously made regarding why Respondent was required to process the new payroll authorization forms and maintain employees' healthcare insurance. (R. Exh. 52.) On August 3, 2022, Lowe sent a reply letter to Pass referring him back to Respondent's June 13, 2022 letter. (GC Exh. 53, R. Exh. 70.) Pass sent a reply letter on August 3, 2022, basically

---

[20]  The letter also mentions an arbitration involving the Guild, asserting that an arbitrator held that Respondent was required to pay whatever necessary to maintain the healthcare benefits, and that the arbitrator decision was upheld by the Court of Appeals of the Third Circuit. According to Lowe, the Company's appeal was dismissed on a technicality and not on the substance of the issue, and the Guild's CBA had an evergreen clause. (Tr. 841–842, 904.) In any case, I do not give weight to this information as it relates to a different union.

stating that he rejected Respondent's reasoning. (GC Exh. 54.) By letter dated August 15, 2022, Pass asked Lowe, in pertinent part, to explain what would happen with the 8–percent wage diversion after the insurance was cancelled on September 1, 2022. (GC Exh. 55.) By letter August 17, 2022, Lowe replied that all Respondent requested was for the parties to sign an amended 2021 healthcare agreement so that the benefits could continue and requested to engage in effects bargaining. (GC Exh. 56.) Pass' response was to state that the Union would sign the agreement as long as the agreement also stated that it "does not prejudice the union's position before the NLRB or other litigation that the employer is obligated to pay all increased costs".[21] (GC 57(a) and (b).) Respondent rejected this proposal. (GC Exh. 58.)

In late–August, Respondent sent another health insurance payment to the Fund that would cover the month of September 2022, albeit at the 2021 rate.[22] The Fund advised Respondent that it still owed an amount in arrears and needed to know immediately if the Company was going to pay the shortfall or arrange for alternative insurance coverage. (GC Exh. 59, R. Exh.76.) On August 29, 2022, the Fund notified Respondent that it could not continue to delay termination of coverage, and that even if Respondent reached an agreement to start paying the $1,709.01 rate for 2022, the Fund's actuary had already determined that the rate for 2023 would be increasing to $1,786.00 per member per month. (GC Exh. 60.) Therefore, the Fund would be terminating the plan absent a commitment by Respondent to pay the increased cost per member per month.[23]

On September 2, 2022, the Union received a letter from the Regional Director of Region 6 (Region 6) dismissing a charge the Union had filed against Respondent in Case 06–CA–294833, alleging that the Company's failure to increase its contributions to the Fund was a violation of Section 8(a)(5) of the Act. (R. Exh. 81.) The dismissal letter explained, in pertinent part, that the allegation concerning the January 2022 premium increase was barred by the doctrine of issue preclusion given the prior litigation which ended with the 2019 Board decision. (R. Exh. 81; Tr. 922.)

On September 8, 2022, the Fund advised employees that their group health coverage would end on October 1, 2022.[24] (GC Exh. 61, R. Exh. 82.)

---

[21] On August 22, 2022, all of the affected unions filed a complaint in District Court seeking a temporary injunction against Respondent for refusing to pay increases in the health insurance premiums for its employees. (R. Exh. 77.) However, shortly after, on August 30, 2022, the unions filed a voluntary dismissal and withdrew the complaint. (R. Exhs. 80, 83.)

[22] By letter August 24, 2022, Respondent had informed the Fund that it would continue to submit contributions according to the 2021 healthcare agreement unless the Fund informed it that it would no longer accept contributions. (GC Exh. 146.)

[23] On August 31, 2022, the Union filed charge 06–CA–302602 alleging, inter alia, that since August 1, 2022, Respondent has refused to bargain and bargained in bad faith in determining how it intends to maintain the health and welfare benefits set forth in the party's agreement, and that Respondent has refused to pay the amounts necessary to maintain those benefits and is refusing to honor employees' authorizations authorizing it to deduct from their pay amounts necessary to maintain the health benefits and as a result, employees are losing their health insurance. (GC Exh. 1 (i).)

[24] I note that on August 31, Fund counsel Vincent Szeligo sent an email to Pass asking if the dispute had been settled since the unions had withdrawn their injunction petition. He also asked if "we" all agree that coverage will terminate on September 30. (R. Exh. 400.)

On September 12, 2022, Pass again asked Lowe to answer the question regarding the 8–percent wage diversion Respondent was deducting from employee paychecks. [25] (GC Exh. 62.) Lowe's response was that Respondent remained willing to engage in effects bargaining. (GC Exh. 63.)

On September 16, 2022, Respondent transmitted payment to the Fund for the month of October at the 2021 rate, and the Fund informed Respondent that the payment would be returned. (GC Exh. 64, R. Exh. 86.)

Thereafter, on September 21, 2022, Respondent sent a letter to employees participating in in the Fund insurance. Respondent informed the employees that the Company had repeatedly asked the unions to meet to discuss modifications to the 2021 healthcare agreement, that the unions had not agreed to meet since February 22, 2022, and that the Fund had rejected the Company's last payment. (R. Exh. 180.)

Finally, on September 22, 2022, Pass offered Lowe and Oesterle to meet on September 27, 2022 to discuss the pending cancellation of the healthcare benefits. (GC Exh. 65.) Lowe and Oesterle agreed to meet. (GC Exh. 66.)

2.    September 2022 effects bargaining meetings

The parties met on September 27 and 29, 2022, for effects bargaining. (R. Exhs. 90(b), 90(c), 91–92.) Pass was the Union's lead spokesperson and was accompanied by representatives from all four affected unions, and Lowe was the Company's spokesperson, accompanied by Weber. (Tr. 927–928.) The Union first proposed that the Company pay the 2022 rate increase. (Tr. 220.) Respondent rejected this proposal. (Tr. 220.)  The Union then proposed that Respondent pay for the 2022 and 2023 increases, and employees would pay the 2024 increases. (Tr. 221.) Respondent did not accept this proposal either. The Union also proposed that Respondent give back the 8–percent wage diversion to employees' pay so employees could use that money to pay for the 2022 increases. (Tr. 223.) Respondent did not accept this proposal. Respondent proposed that the parties amend the 2021 healthcare agreement so that employees would pay for the increase. (Tr. 928–929.)

On September 29, Respondent offered an "alternative package proposal," which included an offer to add all union employees to the Company's healthcare benefit plan (including life insurance), with employees paying 30–percent of the insurance cost. Respondent proposed a 7–percent wage increase – calculated by applying 7–percent to the wage rates adjusted after the 8–percent wage diversion).[26] (GC Exh. 67.) Respondent provided the Union with information about the Company's plan. The Union rejected Respondent proposal and Pass stated that when you have a better proposal, we will meet again. (GC Exh. 67; Tr. 930–934.)

---

[25]    On the same date, Region 6 issued a complaint and notice of hearing against the Union in Case 06–CB–266305, alleging that since about March 22, 2017 through December 1, 2020, the Union had failed to bargain in good faith with the Company. (R. Exh. 314.) This complaint was dismissed on May 11, 2023. (R. Exh. 315.) Respondent's appeal of the dismissal was denied on June 23, 2023. (R. Exhs. 316, 317(a).)

[26]    As explained by Lowe, this 7–percent wage increase, would effectively leave employees with a 1–percent wage diversion. (Tr. 1133.)

On September 29, Respondent sent another letter to the employees participating in the Fund insurance plan to update them on negotiations with the unions. In a nutshell, Respondent informed its employees that the Union had demanded an 8–percent wage increase before they would agree to modify the 2021 healthcare agreement. (R. Exh. 181.)

5

### 3. October 2022 effects bargaining meetings and communications

The parties met again on October 3, 2022. (GC Exh. 70, R. Exh. 96 (a)–(c).) The Union proposed that employees' wages be increased by 3–percent effective January 1, 2022, followed by annual increases of 2.5–percent in 2023 and 2024, and employees would pay the 2022 insurance increase and any other annual increase thereafter. (GC Exh. 69; Tr. 936.) In other words, the Union was proposing to get the 8–percent wage diversion back to employees' paychecks. (Tr. 228.) Respondent rejected this proposal. The Union also proposed that Respondent set up an Individual Coverage Health Reimbursement Arrangement (ICHRA) plan, which is a mechanism by which the Company would continue to contribute the same monthly rate per employee into an account that would be available to employees to purchase insurance coverage in the market. (GC Exh. 70.) Respondent stated that they would look into this and get back to the Union. (Tr. 231.)

The Company proposed three options to the Union to keep healthcare insurance coverage. Option one was that the parties sign an amended healthcare agreement and payroll authorizations forms authorizing increased contributions from employees for $354.04 per month beginning October 1, 2022, to stay insured by the Fund until the parties could work out a mutually agreeable long term solution. (GC Exh. 72(a), R. Exh. 98.) Option two was that the parties sign an amended 2021 healthcare agreement and payroll authorization forms that would authorize $354.04 per month for 2022, and $431.03 per month for 2023, and a separate authorization to cover any amount in arrears owed to the Fund for 2022. (GC Exh. 73.) Pass informed Lowe that the Union would only accept option one if it was made clear that the agreement was only effective for the month of October. (GC Exh. 72, R. Exh. 103(a)–(c).) Thirdly, Respondent presented a second alternative package proposal, which was identical to the first one except that employees would receive a 9–percent wage increase instead of 7–percent as an incentive to participate in the Company's healthcare plan (in effect, providing employees with a 1–percent increase). (GC Exh. 71; Tr. 937, 1135.) The parties were unable to reach an agreement. (Tr. 938–939.)

After Respondent did some research on ICHRA plans, Weber sent an email to Pass informing him that Respondent was willing to establish a ICHRA plan if the Union agreed that the Company would be the plan administrator. (GC Exh. 72, R. Exh. 103(c).) The Union stated that could work. By email on October 4, 2022, Pass notified Respondent that the Fund would allow the insurance to continue through October, as long as Respondent paid the correct amount. Pass stated that there was no time to get signed authorizations, so he suggested that the Company pay the increased amount initially and recoup it later. (R. Exh. 103(d)–(f); Tr. 947.) Respondent proposed that the parties sign an amended healthcare agreement. (GC Exh. 72(a); Tr. 947.) Pass replied that the Union would only sign authorizations for October and "nothing more." (R. Exh. 103(g), 105.) Respondent offered to meet on October 6, 2022, and sent another update to employees on October 5. (R. Exh. 105(a), 445.)

45

### R.  The Unions Go Out On Strike

Ultimately, the parties did not reach an agreement on healthcare, and the Fund terminated coverage for employee in October. Sometime after October 5, 2022, bargaining unit employees went out on strike to protest the loss of their health insurance.[27] (Tr. 241, 968, 949.)

By letter dated October 17, 2022, Pass informed Lowe and Oesterle that the employees were "willing to return to work for a reasonable period of time if the employer agrees to return to the working conditions that existed prior… specifically that the healthcare benefits agreed to between the parties be reinstated and any increase in costs for those benefits be borne by the [Company]." (GC Exhs. 76, 77(a).) Lowe replied by letter dated October 17, 2022, stating that the Company "will continue to maintain the healthcare status quo until the parties reach an agreement in effects bargaining" and rejected the Union's proposal to "alter the status quo and revert back to 2017 conditions of employment which have been rejected by the courts and the Board." (GC Exh. 74.)  In a separate letter, Pass stated that employees would return to work "for a reasonable period of time, if the employer agrees to return the working conditions status quo ante," conditions which include that the healthcare benefits continue at the expense of the employer. (GC Exhs. 75, 77(e).)

### S.  Bargaining Resumes in 2023

1.  February 2023 effects bargaining and collective-bargaining meetings

On January 31, 2023, Federal Mediation and Conciliation Services (FMCS) commissioner Fulton Miklos reached out to the parties about scheduling negotiations and offered dates he was available. (R. Exhs. 110–111.) Miklos contacted the parties upon Lowe's request. (Tr. 816.)

The parties met on February 8, 2023 with Miklos in attendance. (R. Exh. 112.) The meeting was only about twenty minutes long. (Tr. 966.) The parties discussed that there was no reason to meet on the rest of the contract until the health issue settled. (R. Exh. 112.) The parties discussed the ICHRA plan and Lowe provided the Union with a document regarding an ICHRA basic plan. (R. Exh. 462.) The Union stated that they were working on a proposal and would provide it to Respondent. (R. Exh. 112; Tr. 970.) However, the ICHRA proposal was never raised again by the Union after this meeting. (Tr. 967.)

On February 13, 2023, Pass sent a letter to Lowe stating that employees would return to work as long as the Company reinstates the healthcare program and pays "whatever is necessary to maintain" it. (GC Exh. 78.)  Respondent did not consider this an unconditional offer to return to work. (Tr. 967–968.)

The parties met again on February 17, 2023, for effects bargaining and for collective–bargaining. Lowe kept separate bargaining notes for each section of the meeting, and Weber also kept bargaining notes. (R. Exhs. 114, 123(b), 319.) Prior to this meeting, Respondent had reached a healthcare agreement with the Teamsters union and the Union had asked Lowe to share it. (Tr. 970.) Lowe sent it to Ed Mooney, who was acting as spokesperson in effects bargaining for the

---

[27] The employees were still on strike as of, at least, August 22, 2023, the second day of trial. (Tr. 289.)

unions. (Tr. 969–970, 1126–1128.) At the meeting, Mooney had many questions about Respondent's health insurance plan. (Tr. 971; R. Exh. 123(b).) By the end of the meeting, Mooney stated that he would provide Respondent with a plan design. By letter dated February 21, 2023, Respondent sent the Union answers to the questions raised at the meeting about the Company's
5    healthcare program. (GC Exh. 79.)

With regard to collective bargaining, the Union provided Respondent with a new counterproposal to Respondent's July 2019 best offer. (R. Exhs. 319, 320, GC Exh. 141.) Lowe told the Union that he would review the Union's counterproposal and get back to them. The parties
10    did not engage in contract negotiations. (Tr. 971.)

2.    March 2023 communications regarding healthcare issue

On March 1, 2023, the Union sent a letter to Respondent stating it was examining the
15    Company's healthcare proposal and needed information concerning how the program arrived at the premium cost. (GC Exh. 80, R. Exh. 116.) Lowe sent Pass the requested information on March 14, 2023, stating that Respondent was ready and willing to meet for effects bargaining. (GC Exh. 81.)

20    On March 6, 2023, Lowe emailed mediator Fulton to advise him that Respondent had reviewed the Union's counterproposal, and that Respondent was ready to continue negotiations. (R. Exh. 320(a).)

On March 9, 2023, Pass forwarded to Lowe and Oesterle a February 27, 2022 letter from
25    the Fund stating that the Fund trustees were willing to allow Respondent to re–enter the Fund as long as Respondent pays the premium billed and agrees to annual increases that would not exceed the most recent lowest annual rate increase. (R. Exh. 117; Tr. 973–974.)

Lowe sent a letter to Pass on March 20, 2023 asking to meet for effects bargaining and for
30    contract negotiations and offered six dates in March and April 2023. (GC Exh. 82; Tr. 976.) Also on March 20, 2023, Lowe advised mediator Miklos that Respondent would not be meeting with the Union for bargaining on March 29, 2023, because Miklos had scheduled that meeting with the unions without the Company's agreement (a date that did not work for Respondent due to medical reasons) and had invited a second mediator without Respondent's agreement. (GC Exhs. 83–84.)
35    Additionally, Lowe stated that Respondent would no longer agree to bargaining meetings with FMCS mediators present. Lowe stated he lost confidence in Miklos. (Tr. 976–978.) The Union and Miklos tried to keep the March 29 meeting, but Respondent was not available and offered several alternate dates. (GC Exh. 84–89.) The Union accepted the alternate dates and asked for additional information regarding the Company's healthcare plan. (GC Exhs. 90–91.) Respondent
40    offered additional dates to meet. (R. Exh. 127.)

3.    April 12, 2023 effects bargaining and contract negotiations meeting

The parties next met on April 12, 2023, for effects bargaining about healthcare and for
45    contract negotiations. (GC Exhs. 92–93.) The meeting lasted approximately 1 hour. (R. Exhs. 129, 321.) The parties had already met for effects bargaining about healthcare with another union, and when it came time to discuss the pressmen unit, Lang said that whatever was discussed at the

previous meeting applied to the pressmen. (R. Exh. 129; Tr. 822–823, 985.) Regarding healthcare, Respondent provided the Union with additional information concerning its healthcare insurance plan. (R. Exh. 129(a), 131.) Respondent brought to the meeting a corporate benefits representative, Ryan McAlees, to answer questions. (Tr. 985.) The Union provided Respondent with a document
5  from the Employment Partners Benefits Fund. (GC Exh. 94.)  Lowe asked if this meant that the Union was proposing to go back to the Fund, and Mooney stated that the unions wanted Respondent to take a look at this plan design and consider it. (TR. 987–988.)

Regarding contract negotiations, the parties continued to discuss the Union's latest counter
10  proposal to Respondent's best offer. (GC Exh. 142; Tr. 986.)  Lowe pointed out that the Union was still including in its proposal problematic proposals, such as regressive language, and provisions that the parties had already agreed to change. (Tr. 823–827.) The Union refused to agree to anything as a "tentative agreement." (Tr. 827.) The Union's revised counterproposal had a few changes from the Union's September 14, 2020 counterproposal that are noteworthy:

15

- Jurisdiction. Decreased from 15 to 8 the number of active employees in the unit in order to allow supervisors to perform bargaining unit work.
- Wages. All wage diversions reinstated to employees, and in addition a $2,000 signing bonus, a general increase of 4.5-percent upon ratification, and an annual 4.5-percent
20  increase on years two and three.

This was the last bargaining meeting prior to the hearing in this matter. Respondent asked to meet again for contract negotiations, but the Union did not respond. (Tr. 827–828.)

25  In a letter dated April 21, 2021, Lowe sent additional information to Pass about the Company's insurance plan and asked for dates to continue effects bargaining over healthcare. (GC Exh. 95, R. Exh. 132.) Pass asked for additional information and Lowe provided it. (R. Exhs. 134, 137.) The parties exchanged communications regarding scheduling another effects bargaining meeting. (R. Exhs. 135, 138.)

30

4. May 1, 2023 effects bargaining session and other communications

The parties met again on May 1, 2023, for effects bargaining concerning the healthcare issue. (R. Exh. 140.) As it had happened in other occasions, the meeting with the Union was short
35  because everything the parties discussed with the other unions applied to the pressmen unit. (Tr. 994–994.) Respondent informed the Union that they would not be able to sponsor the plan design that the Union had provided because it fell outside the scope of the Company's self–insured healthcare plan structure. Respondent also stated that the Union's proposed plan design was different from what employees had with the Fund. Lowe asked Mooney if the Union had a cost
40  estimate for that plan, and Mooney said he did but would have to get back to them. (Tr. 995–998.) After a caucus, the Union came back with a benefits lawyer who discussed how Respondent could treat employee contributions pre–tax. (Tr. 998–1000.) Respondent stated that if it could be done, they would do it.

45  On May 15, 2023, the Union reached out to the Teamsters Local 261 and Employers Welfare Fund (Teamsters Fund) to ask for a cost estimate to have Respondent's employees join that insurance. (R. Exh. 600.) The Union requested that the Teamsters Fund prepare an estimate

assuming that Respondent would pay $1,354.97 per month per employee, and that the employees would contribute about $333.33 per month, which would come from Respondent eliminating the 8–percent wage diversion. (R. Exh. 600.) On May 18, 2023, Michael Miniotas, a consultant representing the Teamsters Fund, sent a proposal to the Union. (R. Exh. 601.) The proposal included a requirement that Respondent would have to sign a two–year participation agreement, and that the rates would be subject to renewal on January 1, 2025. Pass acknowledged receipt of the proposal and asked for some clarifications. (R. Exh. 602.) Pass sent the Teamsters Fund proposal to the Union, stating that this proposal would be presented to Region 6 in relation to a pending unfair labor practice charge and potential "injunction." (R. Exh. 475.)

By letter May 24, 2023, the Union sent an offer to return to work. The Union's offer was conditioned on Respondent signing a healthcare agreement with the Teamsters Fund. (GC Exh. 97.) The Union proposed that Respondent contribute $1,354.97 per month per employee to pay for the plan, and cease withholding the 8–percent wage diversion that existed under the expired agreement so that employees could pay for any additional premium costs necessary. Pass attached a summary of the proposed healthcare plan. On May 30, Respondent replied stating that it was ready to meet to discuss this proposal and asked that the Union send the "necessary agreements" the Union stated the Company would be required to sign to participate in the Teamsters Fund plan. (GC Exh. 98.) The parties exchanged communications regarding this proposal and exchanged dates to meet. (GC Exhs. 99–100, 102, 104–105, R. Exh. 146, 148.) In pertinent part, the Teamsters Fund would require Respondent to enter into a participation agreement and incorporated by reference a trust agreement. (GC Exh. 101–the participation agreement, 103(a)–(d)–the trust agreement.) Lowe noted that the participation agreement and the trust agreement had language providing the trustees with the right to modify, change, alter, or terminate the plan at any time. (Tr. 1008.)

5.  June 2023 effects bargaining meetings and related communications

The parties met on June 9, 13 and 17, 2023 for effects bargaining. As had been in the past, the Union was represented by Pass, accompanied by representatives of all impacted unions, and Respondent was represented by Lowe and Weber. (GC Exh. 105, R. Exh. 151.)

At the June 9, 2023 meeting, the parties discussed the Teamsters Fund plan. Lowe asked if Respondent had to agree to all of the conditions presented in the proposal, and Pass stated that it was an "all or nothing deal." (Tr. 1010.) Lowe stated that any agreement would have to be with Respondent and not with "BCI," which was referenced in the proposal. Lowe asked about a 60–day waiting period referred to in the proposal and asked what "contract" the Teamsters Fund meant to reference in the proposal because the parties do not have a labor contract. Pass replied that he would have to check. Lowe asked about language in the proposal stating that the Teamsters Fund had the right to modify the cost estimates if the projected demographics changed by more than 10–percent. Lowe stated that was concerning since 10–percent would translate to six employees, and with employees on strike and the potential of additional print days being eliminated, that could kick in. Lowe asked about the participation agreement referred in the proposal, and asked if they would need an agreement like they had with the 2021 healthcare agreement, and Pass said yes. Lowe stated that the Company had not had to sign a participation agreement in the past. (Tr. 1011–1016.) Pass explained that the plan's cost would not change for 2 years so the 10–percent language would not kick in. (Tr. 1016–1018.)

JD–83–24

    The parties met again on June 13, 2023. (R. Exh. 155.) Respondent proposed that the parties sign an effects bargaining healthcare agreement. (GC Exh. 106.) The proposed agreement was similar to the 2021 healthcare agreement, and copied key language from the Teamsters Fund

5    participation agreement, stating in pertinent part, that the parties agreed to participate in the Teamsters Fund plan, that Respondent would pay $1,354.97 per month per participant, employees would contribute $331.88 per month from their weekly wages, and that the Company would not be signatory to any participation agreement and trust agreement of the Fund. (GC Exh. 106; Tr. 1023–1024.) Lowe explained that Respondent had an issue with the participation agreement and

10    trust agreement because it would subject the Company to changes in costs and benefits at any time. (Tr. 1021–1022.) He told Pass that when the Company proposed its healthcare plan with similar language, the Union had objected, and now they were proposing the same thing back at them. Pass said that the Teamsters Fund would accept any agreement the parties come up with. (Tr. 1023.)

15    On June 14, 2023, Pass received confirmation from Miniotas that the Teamsters Fund would require Respondent sign the participation agreement before they would accept enrollment of employees into the plan. (R. Exh. 603.) Pass sent a letter to Lowe indicating that the Teamsters Fund required Respondent to execute the participation agreement because it protected the Fund from the Company refusing to pay in the middle of the 2–year agreement. Pass asked Lowe to

20    point out any provisions in the participation agreement that could be modified in order to satisfy any of Respondent's concerns. (GC Exh. 107.) Respondent argued that it had not been required to sign a participation agreement in the past and that the Fund would have the ability to recover any contributions not paid by the Company under the proposed effects bargaining agreement. (GC Exh. 108, R. Exh. 158; Tr. 1030.) Respondent also argued that Pass had represented to them at the

25    previous meeting that the Teamsters Fund would accept any agreement in writing. (GC Exh. 108; Tr. 1029.)

    On June 20, 2023, Miniotas sent a letter to Lowe and Pass, stating that (1) the premium contribution rates would be guaranteed through January 1, 2025, and (2) signing the participation

30    agreement was a requirement imposed by the Board of Trustees of the Teamsters Fund for all participating employers without exception.[28] (GC Exh. 109.) By letter dated June 23, 2023, Pass requested that Respondent agree to sign the participation agreement. (R. Exh. 160.)

    Lowe sent a letter to Pass, dated June 26, 2023, outlining the reasons why the parties should

35    sign Respondent's proposed effects bargaining healthcare agreement. (GC Exh. 111.) Lowe explained that Respondent's proposal was similar to the parties' 2021 healthcare agreement and would satisfy the legal requirements of Section 302 of the Labor–Management Relations Act and the Department of Labor. Further, he argued that a participation agreement was not needed when the parties were covered by the previous Fund insurance plan. Lowe further explained that the

40    participation agreement and trust agreement would permit the Teamsters Fund to change contributions rates, benefits and other conditions of the plan without the Company's input and

---

[28]  A series of emails between Pass and Miniotas, and Miniotas and the Board of Trustees of the Teamsters Fund, show that Pass tried to get the insurance rates locked for 2 years after he misread the Teamsters Fund proposal and thought the two–year agreement meant that the rates would be locked for two years. The Teamsters Fund refused to lock the rates longer than through January 1, 2025. (R. Exh. 604, 606–607.)

approval. (GC Exh. 111.) By letter dated July 5, 2023, Pass argued the Union's position. In a nutshell, the Union did not understand the Company's insistence that it will not sign a participation agreement, because Respondent's own proposals to join the Company's healthcare insurance included similar language allowing the Company to change, modify, or cancel the healthcare plan. (GC Exh. 112.) More letters were exchanged, basically re–asserting the same positions of the parties. (GC Exh. 113–116.) Lowe explained at the hearing that the issue for Respondent was that rates would change as of January 1, 2025, although the parties would still be in the middle of a two–year agreement with the Teamsters Fund. Therefore, the Company would have to deal with having no control over insurance costs in 2021, a potential application of the 10–percent rule, and the application of a new status quo (where the Fund can change the rate as they see fit). (Tr. 1056–1057.)

     6.  August–October 2023 Effects Bargaining and Related Communications

In a letter dated August 8, 2023, Pass proposed a revised participation agreement to address Respondent's concern that the Teamsters Fund could change benefits and rates unilaterally.[29] (GC Exh. 117.) Lowe agreed to review the proposed participation agreement and invited the Union to meet. (GC Exh. 118.) Pass replied by letter dated August 18, 2023, arguing, among other things, that Lowe kept referring to the parties' meetings as "effects bargaining" but that they were engaged in "negotiations." (GC Exh. 119.) Lowe replied that Respondent was ready to meet with the Union on effects bargaining over the healthcare issue and separately in contract negotiations. (GC Exh. 125.)

On August 21, 2023, Lowe sent a letter to Pass requesting additional dates to engage in effects bargaining over healthcare. On September 1, 2023, Pass replied explaining that he did not consider bargaining over healthcare was effects bargaining, and also reiterating that signing the participation agreement was a requirement of the Teamsters Fund. (R. Exh. 173.) Nevertheless, Pass offered to meet on September 12, 2023 and Lowe agreed to meet. (R. Exh. 174.) More communications ensued between the parties regarding whether signing the participation agreement was required to move forward. (R. Exh. 175–177.)

The parties met on September 12, 2023 to bargain about healthcare. Lowe and Weber kept bargaining notes. (R. Exh. 182.) Lowe expressed Respondent's concern that the Teamsters Fund retained the right to change the contribution rates as of January 1, 2025. Respondent continued to decline to sign the participation agreement. (Tr. 1065.) Respondent also refused the Union's proposal that it return the 8–percent wage diversion to employees' pay. (Tr. 1066.) Lowe asked Pass if the Union would agree to sign a revised payroll authorization form with the 2020 language on it. Pass stated they would. Christopher Lang was not in attendance at this meeting. (Tr. 1069.)

After the meeting, Pass sent Lowe a follow–up question regarding what Respondent proposed would be the term of the agreement. Lowe replied that the term would be the same term duration language as the 2021 healthcare agreement had, which was "effective upon execution and remaining in effect until a successor agreement is agreed to… or [the parties] agree to no longer participate" in the Teamsters Fund insurance. (R. Exh. 183–185.)

---

[29] Pass had Miniota review the proposed participation agreement prior to submitting it to Respondent. (R. Exh. 605.)

On October 31, 2023, Pass sent a letter to Lowe and Oesterle informing them that the Teamsters Fund reviewed Respondent's proposed agreement and found it inadequate because the term of the agreement did not provide for an annual increase. (R. Exh. 178.) Pass attached the Teamsters Fund's participation agreement and stated that the unions would sign Respondent's proposed healthcare agreement as long as the paragraph stating that the Company would not sign the participation agreement was eliminated, and the terms of the agreement were limited to December 31, 2024.[30] (R. Exh. 178.)

## DISCUSSION AND ANALYSIS

### A.  Credibility Findings

In making credibility determinations, all relevant factors have been considered, including the context of the witnesses' testimony, their interests and demeanor, whether their testimony is corroborated or consistent with the documentary evidence and/or the established or admitted facts, inherent probabilities and reasonable inferences that may be drawn from the record as a whole. Credibility findings need not be all–or–nothing –indeed, nothing is more common in all kinds of judicial decisions than to believe some, but not all, of a witness' testimony. See *Daikichi Sushi*, 335 NLRB 622, 623 (2001), enfd. 56 Fed. Appx. 516 (D.C. Cir. 2003). To the extent that credibility issues arose in this case, my credibility determinations are detailed in the findings of fact above.

### B.  Did Respondent violate the Act by unilaterally changing the terms of a five–shift per week guarantee in the expired contract without bargaining in good faith with the Union and without first bargaining to an overall good–faith impasse?

#### 1.  Complaint allegations

Paragraph 10 of the complaint alleges that Respondent violated Section 8(a)(5) and (1) of the Act by, on about November 8, 2019, unilaterally changing the terms of a five–shift per week guarantee established by the parties' expired collective-bargaining agreement without prior notice to and without affording the Union an opportunity to bargain with Respondent with respect to this conduct, and without first bargaining to an overall good–faith impasse, and as result, laying off three named employees.

#### 2.  Applicable legal standard

When a collective-bargaining agreement expires, the parties have a statutory obligation to maintain existing terms and conditions of employment, typically until they reach agreement on a successor contract or arrive at an overall impasse in negotiations. *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991), citing *NLRB v. Katz*, 369 U.S. 736 (1962). Pursuant to *Katz*, it

---

[30] Lowe testified that Respondent had not replied to this letter because it was received just days prior to the last day of the hearing in this case. His first impression was that this proposal did not resolve the outstanding issues between the parties. For example, the Union was still proposing that the Company cease applying the wage diversion and that the Teamsters Fund would still be able to increase insurance rates unilaterally. (Tr. 1075–1076.)

is generally held that, absent impasse or waiver, an employer's unilateral change during the course of a collective bargaining relationship of a matter that is a mandatory subject of bargaining is a *per se* violation of the Act" including in cases where "an existing agreement has expired and negotiations on a new one have yet to be completed." *Honeywell International Inc. v. NLRB*, 253 F.3d 125, 127 (D.C. Cir. 2001); *Litton* at 198. In *Litton,* the Supreme Court further explained that the terms of an expired CBA "retain significance because they define the status quo." Id. at 206. When interpreting an expired CBA, normal principles of contract interpretation apply. Id. at 203.

It is well settled that a union may waive its statutory right to compel the employer's maintenance of the status quo as to a particular term or condition. *Finley Hospital*, 362 NLRB 915, 916 (2015) enfd. den. 827 F.3d 720 (8th Cir. 2016). To find a waiver after the collective-bargaining agreement has expired, the Board will apply the "clear and unmistakable" waiver standard. *Nexstar Broadcasting, Inc. d/b/a KOIN–TV*, 369 NLRB No. 61, slip op. at 3–4 (2020) enfd. 4 F.4th 801 (9th Cir. 2021). The clear and unmistakable waiver standard "requires bargaining partners to unequivocally and specifically express their mutual intention to permit unilateral employer action with respect to a particular employment term". *Endurance Environmental Solutions, LLC*, 373 NLRB No. 141, slip. op at 1 (2024), citing *Provena St. Joseph Medical Center*, 350 NLRB 808, 811 (2007). Nevertheless, employers are privileged to make non–bargainable entrepreneurial decisions about the scope and direction of their business and, with respect to such a decision, the employer need not bargain with the union about whether to make the decision; it need only bargain about the "effects" of the decision once made. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 681–682 (1981).

### 3. Analysis

The General Counsel contends that Respondent could not lay off the three named employees in 2019 because these employees were protected by Section 10.2 of the expired CBA (the five–shift per week guarantee provision), and thus, Respondent had to keep the status quo until the parties agreed on a successor contract or reached good–faith impasse. Respondent argues that this exact issue was litigated and resolved in its favor by the United States Court of Appeals for the Third Circuit in *PG I*, and therefore should be dismissed under the doctrine of collateral estoppel, res judicata, and/or issue preclusion.[31] See *PG Publishing Co., Inc.*, 371 NLRB No. 141 (2022), enfd. denied 83 F.4th 200 (3rd Cir. 2023) (*PG I*). The General Counsel asserts that I should follow the Board's non–acquiescence policy to adverse appellate court decisions, and find a violation of the Act, as alleged. (GC Br. at 54, fn. 15.)  For the reasons set forth fully below, I recommend the dismissal of paragraph 10 of the complaint on collateral estoppel/ issue preclusion grounds.[32]

---

[31] Respondent filed its motion to dismiss paragraph 10 of the complaint at the hearing. In its post–hearing brief, Respondent incorrectly asserts that I granted its motion during the hearing. (R. Br. at 10.) I did not. At the hearing, I stated that I would be following the Third Circuit's finding that the five–shift guarantee did not survive the expiration of the contract. I invited the parties to submit any evidence deemed necessary to preserve any arguments they may need to raise in the future, including evidence about effects bargaining. (Tr. 963–964.)

[32] The principle of res judicata maintains that "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Sabine Towing & Transportation Co.*, 263 NLRB 114 (1982). Since this case concerns a different cause of action as *PG I*, I find res judicata inapplicable here.

The doctrine of collateral estoppel is properly applied in a proceeding involving a governmental entity such as the Board "where the government is litigating the same issue arising under virtually identical facts against the same party" in a subsequent proceeding. *Siren Retail Corporation*, 373 NLRB No. 140, slip op at 3 (2024) citing *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 173 (1984). The principle of collateral estoppel/ issue preclusion[33] maintains that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Sabine Towing & Transportation Co.*, 263 NLRB 114, 120 (1982). These principles apply even where the prior case is still pending before the Board. *Wynn Las Vegas, LLC*, 358 NLRB 690, 692 (2012). Collateral estoppel requires three elements to be met: (1) the issue in question is identical to the issue in the prior action; (2) the issue was "actually litigated" in the prior action; and (3) the determination made on the issue in the prior action was necessary and essential to the final judgment. *Sabine Towing & Transportation* at 120. I find that all three elements of collateral estoppel are met here.

First, *PG I* concerned the same issue presented here. In 2018, Respondent notified the Union of its decision to transition its newspaper to an all–digital, online publication, which resulted in the elimination of two print days. The parties bargained over the elimination of the print days and the anticipated layoff of employees, but did not reach an agreement prior to laying off two unit employees. At the time, the parties were engaged in bargaining for a successor contract and had not reached an overall impasse in negotiations.[34]  As discussed in the findings of fact above, Respondent eliminated two additional print days in 2019 as a result of its decision to move to an all–digital newspaper. Respondent again notified the Union, and the parties engaged in effects bargaining. Respondent laid off two additional bargaining unit employees in November 2019, as a result of eliminating the two additional print days, at a time when the parties were still engaged in bargaining for a successor contract and had not reached an overall impasse in negotiations.

In 2018 and again in 2019, the Union argued that Respondent could not layoff the employees because the five—shift guarantee provision survived the expiration of the contract, while Respondent argued that it did not. Thus, it is undisputed that *PG I* and the instant case concern the same Respondent, same Union, same bargaining unit, same expired contract, same five–shift guarantee provision, and same issue except for the fact that the layoffs happened in 2018 and 2019.[35] In both instances, the parties met for effects bargaining and could not reach agreement prior to implementing the layoffs at a time when they were still bargaining for a successor contract and had not reached an overall good–faith impasse.

Second, the same issue was "actually litigated" in *PG I*. The administrative law judge (ALJ) in *PG I* dismissed the complaint allegations concluding that Respondent was not subjected to the overall–impasse rule to bargaining over layoffs that were the result of a non–bargainable decision, i.e., the decision to become a digital news organization. The ALJ found that that there

---

[33] Issue preclusion is largely interchangeable with collateral estoppel and requires the same general elements as collateral estoppel. Thus, I will treat collateral estoppel and issue preclusion interchangeably.

[34] *PG I* proceeded before an ALJ on a stipulated record. (83 F.4th 200, slip. op. at 9, fn. 4.)

[35] I note that the General Counsel acknowledged in his post–hearing brief "that the instant case deals with the same contractual provisions as" *PG I*. (GC. Br. 62, fn. 16.)

was no evidence that the five–shift guarantee was eliminated in any way other than by the layoffs, which he found lawful. A divided Board reversed the ALJ. The Board majority framed the issue in the case as whether Respondent violated the Act by unilaterally laying off two employees who were guaranteed five shifts per week under the terms of an expired CBA, prior to reaching an impasse in negotiations for a new agreement. The Board, applying the clear and unmistakable waiver doctrine in *Finley Hospital*, held that the contractual language providing the five–shift guarantee did not terminate upon the CBA's expiration. Although the Board acknowledged that Respondent's decision to transition to an all–digital format and eliminate two print days was a core entrepreneurial decision, it held that Respondent had a statutory duty to maintain the status quo upon expiration of the CBA, which included the five–shift guarantee, absent bargaining to impasse or a new CBA. (*PG I*, slip op. at 6, fn. 18.)

The United States Court of Appeals for the Third Circuit reversed the Board. The Third Circuit framed the dispute over the five–shift guarantee as "whether ordinary contract principles or the heightened standard applicable to the waiver of a statutory right, i.e., the clear–and–unmistakable–waiver standard, should apply in determining whether a provision in an expired CBA becomes part of the post–expiration status quo for purposes of future labor negotiations." *PG Publishing Co*. at 212. The Third Circuit held that, by its terms, "Section 10.2 of the expired contract unambiguously provides that the five–shift guarantee ended on March 31, 2017" … "there is no question about what happens to the five–shift guarantee after March 31, 2017; "it ends, period." Id. at 217–218. Further, the Third Circuit determined that the Board erred in concluding that although Respondent's decision to transition to an all–digital format was a core entrepreneurial decision, it still had to bargain to an overall impasse before effectuating the layoffs. The Circuit Court concluded that under *First National*, Respondent's duty was to engage in effects bargaining, and remanded the case to the Board to determine whether Respondent engaged in adequate effects bargaining.[36] Based on the foregoing, it is clear that the issue of whether the five–shift guarantee survived the expiration of the CBA (and whether the layoffs resulting from eliminating print days were lawful) was "actually litigated" before the ALJ, the Board and the Third Circuit. Finally, the determination that the five–shift guarantee did not survive the expiration of the contract was necessary and essential to the final judgment in the prior action.

Notably, the General Counsel and Union here do not argue that this case is distinguishable in any material fact from *PG I*. The General Counsel argues, instead, that I should apply the Board's non–acquiescence policy. However, the Board has recognized the principles of collateral estoppel in cases similar to this one. *Sabine Towing & Transportation Co.*, 263 NLRB 114 (1982) is especially instructive. In *Sabine Towing & Transportation Co.*, 205 NLRB 423 (1973), enfd. den. 599 F.2d 663 (5th Cir. 1979) (*Sabine I*) the Board found that the employer violated the Act when it refused access to nonemployee union organizers to board its docked vessels. The Fifth Circuit Court of Appeals denied enforcement of the Board's order. A few years later, the employer again denied union organizers access to its docked vessels and the General Counsel issued a new complaint and moved for summary judgment based on *Sabine I*, arguing that the Board never acquiesced to the Fifth Circuit's opinion. Respondent argued that the General Counsel was

---

[36] Respondent's appeal was pending when the instant hearing began. On the first day of trial, Respondent filed a motion in limine to preclude evidence and testimony concerning the 2018 layoff which was the subject of *PG I*. I denied the motion. (Tr. 22.). The Third Circuit remanded *PG I* before the record in this case closed. That case is still pending before the Board. (R. Br. at 11.)

JD–83–24

estopped from relitigating the issue because the Fifth Circuit had refused to enforce the Board's order in *Sabine I*. The ALJ agreed with Respondent and found that collateral estoppel required the dismissal of the complaint. Applying *Montana v. United States*, 440 U.S. 147 (1979), the ALJ found that the General Counsel had not shown that the underlying facts had materially changed

5 from those in *Sabine I*, and concluded that the parties were estopped from seeking a reconsideration of the prior determination that Respondent did not violate the Act by refusing to permit organizers to board its vessels. *Sabine Towing*, supra at 122. The Board adopted the ALJ's decision in full.

Based on the foregoing, I find that the General Counsel and the Union are estopped from
10 relitigating the issue of whether the five–shift guarantee survived the expired contract. Neither the General Counsel nor the Union provided any evidence that the underlying facts materially changed to make collateral estoppel inapplicable. Accordingly, the five–shift guarantee did not survive the expiration of the contract, Respondent did not have a Section 8(a)(5) obligation to bargain with the Union to an overall good–faith impasse before being able to lay off employees in 2019, and
15 the 2019 layoffs were not unlawful. However, since the Fifth Circuit remanded *PG I* to the Board, there is still the question of whether Respondent had an obligation to engage in effects bargaining.

As Respondent accurately pointed out at the hearing and in its post–hearing brief, the complaint does not allege that Respondent had an obligation to bargain about the effects of its
20 decision to transition to an all–digital format. (R. Br. at 4, 10.) In fact, the complaint does not even mention Respondent's decision to change its operations.[37] Consequently, Respondent argues that paragraph 10 of the complaint should be dismissed without regard to an effects bargaining analysis because the General Counsel did not amend the complaint (even after the Third Circuit opinion issued) nor changed her legal theory to include an effects–bargaining obligation.
25

The Board evaluates whether it is appropriate to find a violation on a different legal theory that was not clearly articulated by the General Counsel by considering four factors: (1) whether the language of the complaint encompasses the legal theory upon which the violation was found; (2) whether the factual record is complete, or, in other words, whether the facts necessary to find
30 a violation under the theory in question were litigated; (3) whether the law is well established; and (4) the General Counsel's representations about the theory of violation, and the differences between the litigated theory and the theory [in question]. *DirectSat USA, LLC*, 366 NLRB No. 40, slip op. at 1 (2018) (finding that all four factors supported finding a violation on a different theory in that case), enfd. 925 F.3d 1272 (D.C. Cir. 2019). I find that all four factors are met here. The
35 complaint alleges a failure to bargain in good faith with regard to the 2019 layoffs. The factual record regarding effects bargaining is complete, and the substance of the parties' negotiations in this respect was fully litigated at the hearing. The law is well established with respect to an employer's obligations when engaged in effects bargaining. Finally, the General Counsel argued in his post–hearing brief that "Respondent was obligated to bargain with the Union over the effects
40 of its decision to reduce its print operations and explore other options in this bargaining apart from simply eliminating the five–shift per week guarantee and laying off unit employees covered by this guarantee." (GC Br. at 62.)

---

[37] As opposed to the complaint in *PG I*, which included a paragraph alleging that in June 2018, Respondent notified the Union of its decision to transition to a digital news services operation.

In light of the above, I find it is appropriate to evaluate whether Respondent violated the Act by failing to engage in effects bargaining, and I find that Respondent did not violate the Act in this regard. The record shows that Respondent provided the Union with both notice and an opportunity to bargain over the effects of its decision to eliminate an additional two print days in 2019 as a result of its entrepreneurial decision to move to an all–digital format. Respondent gave notice to the Union in July 2019, and the parties met three times between August and September to engage in effects bargaining. The parties exchanged proposals, and Respondent provided the Union with information requested. After the parties' last meeting on September 17, 2019, Respondent offered to meet every remaining day until October 1 to reach agreement.  The Union did not agree to meet again, and so Respondent provided the Union with its best and final offer on October 17, 2019. The Union failed to offer a counterproposal and did not ask to meet again.

Notably, Respondent had originally proposed to layoff four employees by October 1 according to seniority, but after considering the Union's proposals, it only laid off two employees, allowed employees to volunteer for the layoff, and postponed the layoffs to November 8, 2019. I also note that the Union barely made itself available to meet for any negotiations in 2019 and, to date, has adamantly refused to move from its position that the five–shift guarantee expired. The Union had plenty of time to engage in additional effects bargaining, and it failed to do so. Therefore, I do not find sufficient evidence of a violation of the Act and recommend dismissing paragraph 10 of the complaint.

### C. Did Respondent violate the Act by bargaining for a successor collective-bargaining agreement with no intention of reaching agreement?

#### 1.  Complaint allegations

Paragraph 11 of the complaint alleges that since about April 29, 2020, Respondent bargained for a successor collective-bargaining agreement with no intention of reaching agreement by (a) insisting on proposals that are predictably unacceptable to the Union, including unilateral control over wage rates, hours and numbers of hours worked, discipline, performance of bargaining unit work by non–unit employees, provisions of health insurance, layoffs, and a broadly worded no–strike clause; and by b) failing to provide explanations to the Union regarding Respondent's proposals.

#### 2.  Applicable legal standard

The Supreme Court has held that the statutory duty to "meet . . . and confer in good faith" is not fulfilled by "purely formal meetings between management and labor, while each maintains an attitude of 'take it or leave it.'"  Instead, "[c]ollective bargaining . . . presupposes a desire to reach an ultimate agreement, to enter into a collective-bargaining contract."  *NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 485 (1960); see also National Labor Relations Act, Sec. 8(d).

The touchstone of bad–faith bargaining is a purpose to frustrate the very possibility of reaching an agreement. *Phillips 66*, 369 NLRB No. 13, slip op. at 6 (2020).  In assessing whether a party has failed or refused to bargain in good faith, the Board considers the totality of the circumstances, including conduct both at and away from the bargaining table. From the context

of an employer's total conduct, it must be decided whether the employer is engaging in hard but lawful bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement.  Although the Board does not evaluate whether particular proposals are acceptable or unacceptable, it will examine proposals when appropriate and consider whether, on the basis of objective factors, bargaining demands constitute evidence of bad–faith bargaining.  An inference of bad–faith bargaining is appropriate when the employer's proposals, taken as a whole, would leave the union and the employees it represents with substantially fewer rights and less protection than provided by law without a contract.  *District Hospital Partners, L.P., d/b/a George Washington University Hospital*, 373 NLRB No. 55, slip op. at 1–2 (2024) (relying on *Public Service Co. of Oklahoma (PSO)*, 334 NLRB 487, 487–488 (2001), enfd. 318 F.3d 1173 (10th Cir. 2003)); *Phillips 66*, 369 NLRB No. 13, slip op. at 6 (2020); *Altura Communication Solutions, LLC*, 369 NLRB No. 85, slip op. at 3 (2020), enfd. 848 Fed.Appx. 344 (9th Cir. 2021); *Audio Visual Services Group, Inc. d/b/a PSAV Presentation Services*, 367 NLRB No. 103, slip op. at 5 (2019), affd. 957 F.3d 1006 (9th Cir. 2020).

### 3.  Analysis

Before proceeding with an analysis of Respondent's proposals, I will consider Respondent's motion to dismiss Paragraph 11 on Section 10(b) grounds. Paragraph 11 alleges that Respondent's unlawful conduct started since April 29, 2020, which is 6 months prior to October 29, 2020, the date when the charge in Case 06–CA–268248 was served. Respondent alleges that the proposals alleged as "predictably unacceptable" to the Union were first proposed in March 2017, and again in its "best offer" on July 9, 2019, and therefore the complaint allegation is time barred. (R. Br. 65.) The General Counsel argues that Respondent's proposals are not alleged to be unlawful per se, but that Respondent's adherence to its proposals over the course of bargaining indicates bad faith. (GC Br. at 41–42.) The Board has indicated that a union should not assume that an employer's initial proposals are fixed positions and should test the employer's willingness to bargain before filing a bad–faith bargaining charge. See *PG Publishing Co., Inc., d/b/a Pittsburgh Post–Gazette*, 373 NLRB No. 93, slip op. at 1, fn. 1 (2024). The record here establishes that Respondent provided the Union with its "final offer" on June 16, 2020, well within the Section 10(b) period, and the parties subsequently met to bargain for a successor CBA at various times in 2020 and 2023. Thus, I find that the Union filed its bad–faith bargaining charge after it tested Respondent's willingness to bargain, and I note that Respondent's final offer continued to be on the table through at least the closing of the record in this case. I will consider Respondent's proposals and bargaining conduct prior to April 29, 2020, as background "in elucidating the nature of Respondent's conduct at the table" during the 10(b) period. See *Tennessee Construction Co.*, 308 NLRB 763, 763 fn. 2 (1992) and *Regency Service Carts, Inc.*, 345 NLRB 671, fn. 5 (2005). For the foregoing reasons, I find that Section 10(b) does not bar the bad–faith bargaining allegation, and deny Respondent's motion to dismiss paragraph 11.

As an initial matter, I do not find the Respondent "failed to provide explanations" to the Union regarding its proposals. The record is replete with evidence that Respondent explained its proposals throughout the seven years that the parties have been bargaining. Early in negotiations, Respondent explained that the traditional print newspaper business model was radically changing and moving towards an online digital format, and therefore Respondent would need flexibilities in the successor CBA to deal with these changes. Lowe testified in detail about explaining Respondent's proposals to the Union, and Respondent's bargaining notes corroborate his

testimony. In contrast, the Union did not keep bargaining notes and its witnesses did not provide specific testimony regarding how Respondent allegedly failed to explain its proposals. Therefore, I recommend dismissing this aspect of the complaint allegation.

5          Turning now to the rest of the bad–faith bargaining allegation, I note that Respondent's July 2018 decision to transition to an all–digital newspaper format and resulting decision to eliminate 2 print days in 2018, and an additional 2 print days in 2019, were entrepreneurial decisions over which it did not have a bargaining obligation, but predictably had a huge impact on negotiations. During the 2014–2017 contract, Respondent ran a seven–day print operation.
10  Notably, by the end of 2019, its print operation was down to 3 days, and by the end of 2023, it was down to 2 days. I also note that during the seven–year period during which negotiations have transpired, the parties had a seven–month hiatus in negotiations prior to a meeting on February 11, 2020, due primarily to the Union's unavailability, followed immediately by another six–month hiatus due to the Union cancelling all bargaining due to the COVID–19 pandemic in March 2020.
15  After Respondent tendered its final offer on June 16, 2020, the parties only met twice, on September 14, 2020, and December 1, 2020. Although the parties met for effects bargaining concerning the employees' healthcare benefits during 2021 and 2022, they did not meet once for contract negotiations. The Union tendered its last counterproposal for a successor CBA on February 17, 2023, which was followed by a short bargaining meeting on April 12, 2023. It is with
20  this background in mind that I view Respondent's proposals. I find that, despite Respondent explaining its proposals, and the Union's reluctance to meet more often, Respondent's conduct, viewed as a whole, evidence a failure to bargain in good faith with the Union.

          Respondent's July 16, 2020 final offer included the following proposals, in pertinent part:
25

- Allowing supervisors and managers to perform bargaining unit work.

- Allowing the Company to determine the number of employees and the work assignments of all employees, including having no guarantee of any specified number
30    of work hours per day or week (although in the event that the Company reduces print days, and the number of employees is reduced, the Company agrees to maintain five straight–time shifts per week for the remaining employees as long as is practicable).

- Covering employees under the Company's short term disability policy, reserving the
35    right to modify or change the policy.

- Covering employees under the Company's healthcare and life insurance plans, with the Company reserving the right to amend, change, replace or terminate such plans.[38]

40  - Adding that for layoffs, the Company will consider employees' seniority, performance, qualifications and ability.

- Adding to the no strike clause, sympathy strikes, picketing, boycotts, bannering and any other interference with or interruption of work.

_____

[38] As will be discussed more fully in the next section, Respondent's healthcare proposal changed after July 16, 2020.

- Replacing the disciplinary action policy with a policy that allows the Company to discipline for just cause.

5
- Adding to the management rights clause that the Company reserve its right to outsource any department, operation or service, in whole or in part.

- Eliminating the 8–percent wage diversion and $4,000 per year cap, and adding that employees would be paid minimum wage rates, using as a starting point the expired
10 contract's wages decreased by 8–percent, and adding a 3–percent increase for year one and a 2–percent increase for year two. In other words, the 8–percent wage diversion was incorporated into the minimum wage rates, with rates reflecting an effective 3–percent diversion in year two.

15        Prior to Respondent's final offer, Respondent had proposed all of the above provisions, in one way or another, the Union had provided counterproposals, and the parties had discussed the reasons for each other's proposals. Despite these discussions, Respondent continued to insist on the above proposals. On the several occasions that the parties met after Respondent tendered its final offer, Respondent did not show any intention to move from the above proposals, which
20 remained on the table through April 12, 2023 (the last contract bargaining session that is part of the record in this matter), with the exception of its healthcare proposal.

        I recognize that neither the Board nor the courts may compel concessions or otherwise sit in judgment upon the substantive terms of collective-bargaining agreements. In examining an
25 employer's proposals, the Board examines, not their merits, but "whether in combination and by the manner propose they evidence an intent not to reach agreement." *Altura Communications Solutions*, 369 NLRB No. 85, slip. op. 2 (2020). The Board has found that combined proposals that "grant the employer broad discretion to unilaterally act, without bargaining, on a wide range of employees' critical terms and conditions of employment, while simultaneously foreclosing
30 virtually any avenue for the employees and their union to counteract the broad power the employer sought to arrogate to itself" demonstrate bad faith bargaining. *District Hospital Partners, L.P.*, 373 NLRB No. 55 (2024). Applying these principles, I find that Respondent's adherence to the above particular set of proposals over the course of bargaining indicates bad faith. Thus, I do not find that each proposal above is predictably unacceptable to the Union on its own, but taken as a whole,
35 a union facing such proposals "could do just as well with no contract at all."[39] *Altura Communications Solutions*, 369 NLRB No. 85, slip op at 4.

        Respondent's proposals allowed the Company to assign bargaining unit work to non–unit employees, including supervisors, and to outsource the work altogether. Thus, Respondent would
40 be able to effectively eliminate the bargaining unit. Respondent also would have complete discretion to choose who is laid off in case of a reduction in force. Furthermore, Respondent's proposals would have given it total discretion over employees' hours of work, and discipline.

---

[39] Respondent argues that its proposals were not predictably unacceptable, citing *10 Roads Express*, 372 NLRB No. 105 (2023), for the proposition that proposals are not predictably unacceptable when they are justified. I find *10 Roads Express* inapposite since that case did not deal with predictably unacceptable proposals at all.

Respondent's proposal regarding "minimum" wage rates, presupposes that the Company would also have discretion to pay higher wages. Under this combination of proposals, the Union would have no recourse if the Company unilaterally eliminated all bargaining unit work, reduced the bargaining unit, reduced employees' work hours, laid off employees, or paid employees a higher wage.

It is noteworthy that Respondent made few economic and other concessions throughout the parties' negotiations in exchange for the broad discretion that it sought. For instance, the wage increase proposed was not in fact an increase since it decreased the expired contract's wages by 8–percent before applying a 3–percent increase – in effect leaving a 5–percent wage reduction in place for year one and a 3–percent wage reduction in place for year two. Additionally, Respondent's final offer eliminated the annual $4,000 maximum for the wage diversion, which was historically used to offset healthcare costs, and added that employees would contribute 30–percent of their healthcare costs, subject to change at any time. Respondent proposed a broad no–strike proposal that entirely prohibited picketing, which would include informational picketing, bannering, and "any other" interference with work. I find unconvincing Respondent's argument that its proposed broad no–strike clause was justified because it was in exchange for agreeing to a broad grievance and arbitration provision, just cause termination, and memorialized wages, and other working conditions. (R. Br. at 38.) The grievance procedure in Respondent's final offer is not materially different from the one in the expired contract, and the expired contract had more expansive protections for employees prior to termination given it included a progressive disciplinary procedure.

Considered in their totality, Respondent's proposals demonstrate a failure to bargain in good faith. I find instructive that the Board in *PG Publishing Co., Inc. d/b/a Pittsburgh Post–Gazette*, 373 NLRB No. 93 (2024), found that Respondent failed to bargain in good faith with another union, representing its editorial department employees, by its overall conduct in negotiations for a successor CBA. In that case, Respondent was also represented by Lowe and the union by Pass, and the parties similarly struggled with long periods where they did not meet and had been bargaining for a successor contract since 2017. Respondent's final offer there contained similar proposals as the ones in the instant case, including that supervisors could perform bargaining unit work, employees had no guarantees of hours of work per day or week, bargaining unit could be subcontracted, layoffs would not be done by seniority exclusively, and the same broad no–strike clause proposed in this case. The ALJ there found that the combined proposals showed that Respondent failed to bargain in good faith, and the Board adopted this finding in full. Here, the combination of Respondent's proposals is virtually identical. An inference of bad faith is appropriate when the employer's proposals, taken as a whole, would leave the union and the employees it represents with substantially less rights than provided by law without a contract. That is the case here. See also *District Hospital Partners, L.P.*, 373 NLRB No. 55 (2024) (finding that the employer engaged in bad-faith bargaining by pressing a combination of proposals that simultaneously insisted on a broad management rights clause, a broad no–strike provision and no effective grievance and arbitration procedure); *Public Service Co. of Oklahoma* (PSO), 334 NLRB 487, 488–489 (2001) (finding employer unlawfully insisted on proposals granting it unilateral control over virtually all significant terms and conditions of employment, including the right to discipline or discharge for just cause, a broad management rights clause affording the employer discretion to transfer, subcontract or have non–bargaining unit employees perform bargaining unit work., and a broad no–strike clause); *Altura Communication Solutions, LLC*, 369 NLRB No. 85,

slip op. at 4–5 (finding that under the combination of employer proposals, the union "would be left with no avenue to challenge any of the respondent's decisions," where the proposals included a broad management–rights clause that would have allowed the elimination of the bargaining unit entirely, no guarantee of hours of work, the right to unilaterally change or eliminate health benefits, the discretion to pay above the minimum wage amounts proposed, and a broad no–strike clause.)

Respondent argues that evidence of its intent to reach an agreement can be found in the fact that it provided extensive explanations for its proposals, that the parties reached many tentative agreements, that it did not declare impasse or implement any of its contract proposals, and that there is no evidence that it engaged in unlawful conduct away from the bargaining table.[40] (R. Br. at 24–25, 60–61.) Respondent did not cite to any Board case where an employer's otherwise bad faith bargaining was excused because it provided justifications for its proposals, reached tentative agreements and/or did not declare impasse. Nevertheless, Respondent's arguments miss the mark because the evidence demonstrates that Respondent's proposals, taken as a whole, would leave the union and employees with substantially fewer rights and less protection than provided by law without a contract.

Finally, Respondent argues that I should not find it acted in bad faith because the Union engaged in bad faith bargaining by, among other things, refusing to meet, restricting the length of meetings, cancelling meetings, making regressive proposals and reneging on tentative agreements. (R. Br. 62–65.) It is noteworthy that the record shows that the Union indeed engaged in the above conduct.[41] However, the evidence does not reflect that Respondent's proposals were made in response to the Union's conduct. Respondent failed to show or explain how the Union's conduct connected to its own conduct. Also, the General Counsel has not alleged that Respondent engaged in similar conduct as the Union's alleged misconduct. Therefore, Respondent has not shown a nexus between the Union's conduct and the Company's failure to bargain in good faith. See *Greyhound Lines, Inc.*, 319 NLRB 554, 555–557 (1995) (affirmative defense based on alleged union misconduct stricken because no nexus was shown between the alleged misconduct and respondent's refusal to bargain, which was the subject of the complaint.) Although the Union's conduct in this case raises serious concerns, the fact remains that, under the totality of the circumstances, Respondent's adherence to its proposals evinces bad faith bargaining. Therefore, I find that Respondent violated Section 8(a)(5) and (1) of the Act

---

[40] Respondent also argues that its proposals are not predictably unacceptable because nearly identical proposals as the ones involved in this matter were accepted by other unions that bargained with the Company during the same time period, i.e., the Electricians, Operating Engineers and the Machinists. (R. Br. at 51–58.) I give this evidence little weight because it is the totality of Respondent's proposals, and adherence to those proposals, that show bad faith bargaining. Although Respondent may have achieved agreement with other unions on similar proposals, every bargaining unit has its own priorities and interests which guide their tolerance to accept certain proposals. Therefore, I find this evidence too remote and of little value.

[41] I also note that after Respondent filed a charge against the Union for this conduct, a complaint against the Union issued and was later withdrawn. The Board considers a party's affirmative defenses despite the fact that the General Counsel has considered the same evidence and refused to issue complaint. *Reese M. Garab d/b/a South Alabama Plumbing*, 333 NLRB 16 (2001), and *Chicago Tribune Co.*, 304 NLRB 259 (1991).

### D. Did Respondent violate the Act by failing to bargain in good faith over an interim agreement concerning health insurance benefits?

1. Complaint allegations

Paragraph 12 of the complaint alleges that since about November 2021, Respondent bargained over an interim agreement concerning health insurance benefits with no intention of reaching agreement by insisting on the execution of its 2022 effects agreement and authorization forms and by failing to provide explanations to the Union regarding its position.

2. Applicable legal standard

The applicable legal standard is the same that is set forth above for paragraph 11 of the complaint.

3. Analysis

As discussed fully in the findings of fact above, the Board ruled in August 2019 that to maintain the status quo for health insurance benefits after the contract expired, Respondent was only required to continue to pay the monthly $1,354.97 rate per employee. After effects bargaining, the parties executed the 2021 healthcare agreement under which Respondent would continue to pay the $1,354.97 rate per employee, and the Union agreed that employees would pay the difference between Respondent's contribution and the Fund's actual premium rates for 2021. Also, each employee signed a payroll authorization form to reflect this agreement. Notably, Respondent rejected a proposal by the Union to have the payroll authorization forms state that employees could withdraw their authorization at any time. After the Fund announced another premium increase that would take effect in 2022, the parties again engaged in effects bargaining. Respondent took the position that the parties should revise the 2021 healthcare agreement to reflect the premium increase. Notwithstanding the Board's 2019 decision, the Union took the position that Respondent had to pay all increases to the insurance premium that had taken place since the contract expired. That is where things stood as of November 2021.

In December 2021, without reaching any agreement, the Union tendered signed payroll authorization forms from employees authorizing Respondent to deduct the premium increase from employees' pay with the caveat that the forms included the language that Respondent had previously opposed allowing employees to withdraw their authorizations at will. The parties kept meeting for effects bargaining but could not reach an agreement. Respondent sent a multitude of communications explaining its position that the 2021 healthcare agreement was still in effect, and that the Company could not process the payroll authorization forms the Union sent due to, among other things, the unacceptable terminable at–will language. Respondent continued to abide by the 2021 healthcare agreement, sending monthly payments to the Fund until the Fund cancelled the insurance plan in October 2022. Respondent continued to meet with the Union for effects bargaining, making proposals, and considering the Union's proposals, including setting up an ICHRA plan. After employees went on strike, the Union offered that employees would return to work if Respondent agreed to pay for all premium increases. The Union continued to hold this position through at least February 2023. Eventually, the parties started discussing joining the Teamsters Fund insurance plan. Again, the record is replete with communications where

Respondent explained the reasons why it proposed to execute an agreement similar to the 2021 healthcare agreement applicable to the Teamsters Fund.

5

Based on the totality of the circumstances, I do not find that Respondent engaged in bad faith bargaining during effects bargaining for an interim healthcare agreement. The evidence demonstrates that Respondent engaged in good–faith bargaining in 2020 that resulted in the 2021 healthcare agreement, and I do not find that Respondent's proposal that the parties revise the agreement to reflect the 2022 increase is evidence of bad faith. Given the parties' history and the Board's 2019 decision, Respondent's proposal was reasonable. I note that the Union never

10 explained during bargaining or at the hearing why it would not sign an amended 2021 healthcare agreement or why it changed the language in the payroll authorization forms. Further, the Union adamantly refused to adhere to the Board's 2019 decision, and unreasonably tendered payroll authorization forms to the Company that it knew would be unacceptable. When the Union tendered the predictably unacceptable payroll authorization forms to the Company, it did so as a fait

15 accompli, arguing again and again that the Company was required to process them or face legal action.

Furthermore, contrary to the General Counsel's assertions, Respondent did not refuse to meet with the Union and did not refuse to bargain over alternative healthcare options. The record

20 establishes that Respondent's attempts to discuss the payroll authorization forms were met with the Union's inexplicable stance that it would not sign a revised agreement and would not revise the offered payroll authorization forms. Respondent then proposed that the employees join the Company's healthcare plan and provided the Union with substantial information the Union requested in order to consider this proposal. The General Counsel asserts that Respondent acted in

25 bad faith because its proposal included that the Company had discretion to change and/or terminate health insurance benefits. Respondent correctly asserts that the Union's proposal with regard to the Teamsters Fund plan also included this type of language. I do not find that Respondent's proposal is evidence of bad faith, since the record establishes that once the Union rejected Respondent's healthcare proposal, Respondent moved on and made proposals regarding an

30 ICHRA plan and the Teamsters Fund plan. I also find that there is no evidence to support the General Counsel's allegation that Respondent did not provide explanations for its proposals. The record is replete with communications where Respondent explained its proposals regarding the healthcare benefit.

35 Based on the foregoing, I find that the General Counsel failed to establish that Respondent bargained in bad faith with respect to negotiating an interim health insurance agreement. Accordingly, I recommend the dismissal of this allegation.

CONCLUSIONS OF LAW

40

1.    Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act.

2.    The Union is a labor organization within the meaning of Section 2(5) of the Act.

45

3.    Respondent failed and refused to bargain in good faith for a successor collective-bargaining agreement in violation of Section 8(a)(5) and (1) of the Act by, since about April 29,

2020, insisting on contract proposals, that viewed as a whole, would leave the Union and bargaining unit employees with substantially fewer rights and less protection that provided by law without a contract.

5          4.  Respondent's unfair labor practices affect commerce within the meaning of Section 2(6) and (7) of the Act.

REMEDY

10        Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act.

          The General Counsel and the Union request an order requiring Respondent to: (1) bargain
15   on request within 15 days of a Board Order, meet with the Union at reasonable times and bargain in good faith, and if an understanding is reached, embody the understanding in a signed agreement; and upon the Union's request, hold bargaining sessions for a minimum of 15 hours per week (or in the alternative on another schedule to which the Union agrees); and submit written bargaining progress reports every 15 days to the compliance officer for Region 6, with copies served on the
20   Union; (2) make whole the Union for costs and expenses incurred during bargaining; (3) make whole all employee negotiators for any losses, including consequential damages, that were incurred while attending bargaining sessions; (4) hold a meeting or meetings, scheduled to ensure the widest possible attendance, where a Respondent representative will read the Notice to employees on worktime in the presence of a Board agent and, at the Union's request, a Union
25   representative; (5) Respondent to provide each Unit employee that attends the meeting with a copy of the Notice to be read, and also mail the notice to employees, and: (6) that all eligible Unit members be made whole for the lost opportunity to bargain in good faith for successor collective bargaining agreements by compensating affected employees for all direct or foreseeable pecuniary harms suffered as a result of Respondent's bad faith bargaining, including any healthcare costs
30   incurred.

          The Board has held that in the vast majority of cases involving bad–faith bargaining violations, a bargaining order accompanied by the usual cease–and–desist order and the posting of a notice will suffice to induce a respondent to fulfill its statutory obligations.  However, "[i]n cases
35   of unusually aggravated misconduct [] where it may fairly be said that a respondent's substantial unfair labor practices have infected the core of a bargaining process to such an extent that their 'effects cannot be eliminated by the application of traditional remedies,' an order requiring the respondent to reimburse the charging party for negotiation expenses is warranted both to make the charging party whole for the resources that were wasted because of the unlawful conduct, and to
40   restore the economic strength that is necessary to ensure a return to the status quo ante at the bargaining table." *Frontier Hotel & Casino*, 318 NLRB 857, 859 (1995); see also *Nexstar Broadcasting, Inc. d/b/a KOIN–TV*, 371 NLRB No. 118, slip op. at 2 & fn. 5 (2022); *Regency Service Carts*, 345 NLRB 671, 676 (2005).

45        I do not find that Respondent engaged in unusually aggravated misconduct in this case that would support ordering Respondent to reimburse the Union for negotiating costs and expenses or to order it to make whole employee negotiators.  I find this case distinguishable from *PG Publishing*

*Co.*, 373 NLRB No. 93 (2024), where the Board ordered a make–whole remedy for the Union and employee negotiators, since in that case Respondent was not only found to bargain in bad faith by its overall conduct in negotiations for a successor collective-bargaining agreement, but it was also found to have unilaterally implemented changes to employees' terms and conditions of employment without first bargaining to a good faith impasse, and further violated Section 8(a)(1) by creating an impression of surveillance. Here, Respondent has not implemented any terms of employment from its final offer, nor have I found it violated the Act in any other form.

I do not find that a notice reading and distribution is warranted in this case either, and note that the Board also refused to order a notice reading and distribution in *PG Publishing Co.*, supra, slip op. at 2, fn. 3. I agree with Judge Carter's reasoning in *PG Publishing Co.*, supra, finding that this is not a case where Respondent's unfair labor practices involved a high–level management official openly participating in a widely disseminated course of unlawful conduct as has been present in cases where the Board has ordered a notice reading. See *Starbucks Corp.*, 372 NLRB No. 122, slip op. at 1 fn. 3 (2023).

I also deny the General Counsel's request that I order Respondent to compensate any affected employees for harms suffered as a result of the Respondent's bad–faith bargaining. The Board declined to order such a make whole remedy in *Ex–Cell–O–Corp.*, 185 NLRB 107, 110 (1970), and this remains the existing Board precedent. See *Jones Lang LaSalle Americas, Inc.,* 373 NLRB No. 37, slip op. 3 (2024). Thus, I decline to order this special remedy.

However, I find it appropriate, given the specific circumstances of this case, to order an affirmative bargaining order. I am guided by the affirmative bargaining order in *PG Publishing Co.*, supra, and the analysis therein justifying one. See *PG Publishing Co.*, slip op. at 23-24 citing *Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 738-739 (D.C. Cir. 2000). Following the three-factor balancing test in *Vincent*, I find that an affirmative bargaining order in this case will vindicate the Section 7 rights of the unit employees who were denied the benefits of collective bargaining through their designated representative by Respondent's failure and refusal to bargain in good faith with the Union since at least April 29, 2020. Requiring Respondent to bargain with the Union for a reasonable period of time will serve the policies of the Act by fostering meaningful collective bargaining without the added pressures of the potential of a decertification petition or withdrawal of recognition. The alternative remedy of a cease-and-desist order would be inadequate because it would allow a challenge to the Union's majority status and would allow Respondent to benefit from its unlawful conduct. Therefore, I shall order Respondent to bargain with the Union, within 15 days from the Union's request, meet with the Union at reasonable times and bargain in good faith, if an understanding is reached, embody the understanding in a signed agreement, and submit written bargaining progress reports every 30 days to the compliance officer of Region 6, with copies served on the Union.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[42]

---

[42] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions and recommended Order shall, as provided in Sec. 102.46 of the Rules be adopted by the Board and all objections to them shall be deemed waived for all purposes.

ORDER

Respondent, PG Publishing Co., Inc. d/b/a Pittsburgh Post–Gazette, Pittsburgh, Pennsylvania, its officers, agents, successors, and assigns, shall

1. Cease and desist from

a. Failing and refusing to bargain with the Pittsburgh Newspaper Printing Pressmen's/ Paperhandlers Local Union No. 9N, affiliated with The Graphic Communications Conference/ International Brotherhood of Teamsters Local 24M/9N in good faith as the exclusive collective-bargaining representative of the employees in the bargaining unit.

b. In any like or related manner, interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed in Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act:

(a) Within 15 days of the Union's request, meet with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and condition of employment and, if an understanding is reached, embody the understanding in a signed agreement:

All journeymen pressmen, paperhandlers, paperhandling pressmen, and apprentice pressmen who work in the Employer's pressroom and paperhandling departments, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

(b) Submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

(c) Within 14 days after service by the Region, post at its facility in Pittsburgh, Pennsylvania, copies of the attached notice marked "Appendix A."[43] Copies of the notice, on forms provided by the Regional Director for Region 6, after being signed by the Respondent's authorized

---

[43] If the facility involved in these proceedings is open and staffed by a substantial complement of employees, the notices must be posted within 14 days after service by the Region. If the facility involved in these proceedings is closed or not staffed by a substantial complement of employees due to the Coronavirus Disease 2019 (COVID–19) pandemic, the notices must be posted within 14 days after the facility reopens and a substantial complement of employees have returned to work. If, while closed or not staffed by a substantial complement due to the pandemic, the Respondent is communicating with its employees by electronic means, the notice must also be posted by such electronic means within 14 days after service by the Region. If the notice to be physically posted was posted electronically more than 60 days before physical posting of the notice, the notice shall state at the bottom that "This notice is the same notice previously [sent or posted] electronically on [date]." If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

JD–83–24

representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to the physical posting of paper notices, the notices shall be distributed electronically, such as by email, posting on an intranet or internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. In the event that, during the pendency of these proceedings, the Respondent has gone out of business or closed the facility involved in these proceedings, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current and former employees employed by Respondent at any time since April 29, 2020.

(d)   Within 21 days after service by the Region, file with the Regional Director for Region 6 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

IT IS FURTHER ORDERED that the complaint is dismissed insofar as it alleges violations of the Act not specifically found.

Dated, Washington, D.C., December 27, 2024

_____

G. Rebekah Ramirez
Administrative Law Judge

51

## APPENDIX A

## NOTICE TO EMPLOYEES

Posted by Order of the
National Labor Relations Board
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

**WE WILL NOT** fail and refuse to bargain with the Pittsburgh Newspaper Printing Pressmen's/ Paperhandlers Local Union No. 9N, affiliated with The Graphic Communications Conference/ International Brotherhood of Teamsters Local 24M/9N (Union) in good faith as the exclusive collective-bargaining representative of the employees in the bargaining unit.

**WE WILL NOT** in any like or related manner interfere with, restrain, or coerce you in the exercise of your rights guaranteed you under Section 7 of the National Labor Relations Act.

**WE WILL,** within 15 days of the Union's request, meet with the Union as the exclusive collective-bargaining representative of the employees in the following appropriate unit concerning terms and condition of employment and, if an understanding is reached, embody the understanding in a signed agreement:

All journeymen pressmen, paperhandlers, paperhandling pressmen, and apprentice pressmen who work in the Employer's pressroom and paperhandling departments, excluding all other employees, confidential employees, guards, managers, professional employees, and supervisors as defined by the Act.

**WE WILL** submit written bargaining progress reports every 30 days to the compliance officer for Region 6 of the National Labor Relations Board, and serve copies of the reports on the Union.

PG Publishing Co., Inc.
d/b/a Pittsburgh Post–Gazette
_____
(Employer)

Dated _____ By _____
(Representative)        (Title)

JD–83–24

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act. It conducts secret–ballot elections to determine whether employees want union representation, and it investigates and remedies unfair labor practices by employers and unions. To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below.  You may also obtain information from the Board's website:  www.nlrb.gov

NLRB Region 6, William S. Moorehead Federal Building, Rm 904, Pittsburgh, PA 15222–4111
(412) 395–4400, Hours: 8:30 a.m. to 5:00 p.m.

The Administrative Law Judge's decision can be found at https://www.nlrb.gov/case/ 06-CA-259157 or by using the QR code below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273-1940.



**THIS IS AN OFFICIAL NOTICE AND MUST NOT BE DEFACED BY ANYONE**
THIS NOTICE MUST REMAIN POSTED FOR 60 CONSECUTIVE DAYS FROM THE DATE OF POSTING AND MUST NOT BE ALTERED, DEFACED, OR COVERED BY ANY OTHER MATERIAL. ANY QUESTIONS CONCERNING THIS NOTICE OR COMPLIANCE WITH ITS PROVISIONS MAY BE DIRECTED TO THE ABOVE REGIONAL OFFICE'S COMPLIANCE OFFICER, (412) 690–7117.

JD–83–24

## APPENDIX B
Corrections to Transcript
PG Publishing Co., Inc. d/b/a Pittsburgh Post–Gazette, 06–CA–259157, et al.

P. 50, 24–26: "Jack Gibb" should be "Jack Yoedt"
P. 69, 21, 24: "Hearing Officer Ramirez" should be "Judge Ramirez"
P. 70, 1, 7: "Hearing Officer Ramirez" should be "Judge Ramirez"
P. 71, 11, 13, 15: "Hearing Officer Ramirez" should be "Judge Ramirez"
P. 73, 10: "Hearing Officer Ramirez" should be "Judge Ramirez"
P. 97, 22: "exploration" should be "expiration"
P. 210, 15: "Mr. Low" should be "Mr. Lowe"
P. 217, 24: "investment" should be "pressmen"
P. 228, 22, 25: "imposing" should be "proposing"
P. 235, 22: "plaining" should be "explaining"
P. 240, 24: "81/71" should be "81.70"
P. 241, 6–7: "99.4" should be "99.47"
P. 241, 18: "Titled (audio interference)" should be "unfair labor practice"
P. 243, 25: "aI(e)" should be "and 77(e)"
P. 244, 2, 7: "aI(e)" should be "and 77(e)"
P. 244, 24: "negation" should be "negotiation"
P. 250, 15: "GC–32" should be "GC–82"
P. 251, 1: "it 3 38 40" should be deleted
P. 260, 20: "Moody" should be "Mooney"
P. 262, 1: "Pask" should be "Pass"
P. 263, 6: "county" should be "company"
P. 274, 5: "affects bargaining" should be "effects bargaining"
P. 281, 23: "attacked" should be "attached"
P. 289, 3: "shift" should be "strike"
P. 344, 21: "Ms. Williams" should be "Mr. Figuly"
P. 353, 13: "Ms. Williams" should be "Mr. Figuly"
P. 378, 11: "veil" should be "brief"
P. 462, 20: "Judge Ramirez" should be "Mr. Figuly"
P. 505, 3: "Ms. Sherman" should be "Mr. Winslow"
P. 550, 20: "help" should be "health"
P. 552, 8: "done by (audio interference)" should be "done by strict seniority"
P. 557, 1: "pressroom" should be "pressmen"
P. 590, 25: "027" should be "207"
P. 598, 19: "roles" should be "rolls"
P. 635, 6: "brining" should be "bringing"
P. 638, 20: "bank" should be "make"
P. 650, 8: "manager rights" should be "management rights"
P. 653, 5: "May 22nd" should be "May 2nd"
P. 665, 24: "effectively" should be "predictably"
P. 666, 6–7: "in part of" should be "barred by Section 10(b)"
P. 668, 25: "Bennett" should be "Bennick"
P. 669, 1: "Benedict" should be "Benedick"
P. 669, 5: "Wasaski" should be "Bugaski"

P. 678, 7: "Gwynedd" should be "Gannett"

P. 708, 3: "Insureder" should be "Disability"

P. 723, 14: "Wagaski" should be "Bugaski"

P. 723, 24: "Becky (phonetic)" should be "Becky Smith"

P. 730, 21: "Clint" should be "Clinton"

P. 737, 7: "greeting" should be "meeting"

P. 741, 20: "indiscernible" should be "tentative"

P. 742, 10: "unsupervised student" should be "supervisors doing"

P. 748, 6–7: "2.73 and 2.74" should be "273 and 274"

P. 750, 22–23: "Jackson (phonetic throughout)" should be "Jack Yoedt"

P. 765, 23–24: "Manager Rights" should be "Management Rights"

P. 767, 2: "Cleaning" should be "Printing"

P. 771, 6: "2003" should be "2020"

P.772, 23: "A couple 11/2020" should be "February 11, 2020"

P. 773, 15: "progressive" should be "regressive"

P. 775, 16: "9/1917" should be "9/19/2017"

P. 784, 19: "Judge Ramirez" should be "Ms. Williams"

P. 794, 14: "Mr. Pass (sic)" should be "Mr. Pass"

P. 800, 1: "Brian Bennett (phonetic throughout)" should be "Brian Bennick"

P. 800, 1–2: "Mike Benedict (phonetic throughout)" should be "Mike Benedick"

P. 800, 2–3: "Rob Webber (phonetic throughout)" should be "Rob Weber"

P. 801, 4: "Paper, hammers" should be "paperhandlers"

P. 804, 17: manager rights should be "management rights"

P. 805, 5: "Gill" should be "Yoedt"

P. 810, 12: "aggressive" should be "regressive"

P. 811, 25: "gets" should be "objects"

P. 812, 2: "CBE (phonetic throughout)" should be "CB"

P. 813, 2: "(indiscernible)" should be "insisting"

 P. 814, 10: "will get it the way that I see it proper" should be "will give it the weight that I see proper"

P. 814, 18: "April 1st" should be "December 1st"

P. 815, 9: "aggressive" should be "regressive"

P. 827, 15: (indiscernible) agreements" should be "tentative agreements"

P. 860, 1: "for" should be "in"

P. 860, 9: "dealers" should be "mailers"

P. 886, 17: "Judge Ramirez" should be "Ms. Williams"

P. 891, 15: "aggrieved" should be "agreed to"

P. 899, 9: "us" should be "on"

P. 901, 1: "version" should be "diversion"

P. 940, 24–25: "Ryan MacLeish (phonetic)" should be "Ryan McAlees"

P. 949, 18: "staff" should be "status quo"

P. 962, 14: "duplication" should be "authentication"

P. 962, 23: "(indiscernible) basic" should be "Section 10(b)"

P. 963, 5: "(indiscernible)" should be "bad faith"

P. 963, 18–19: "implement its decision. And we'll put in all–digital form" should be "implement its decision to move to an all–digital form"

P. 964, 24: "10(d)" should be 10(b)"

P. 972, 9–10: "MacLeish (phonetic throughout)" should be "McAlees"

P. 973, 13: "notes" should be "notice"

P. 984, 13: "Typists" should be "Typos"

P. 985, 2, 14: "MacLeish" should be "McAlees"

P. 987, 6, 24: "MacLeish" should be "McAlees"

P. 989, 6, 23, 25: "MacLeish" should be "McAlees"

P. 992, 15: "MacLeish" should be "McAlees"

P. 995, 17: "made it into evidence" should be "admitted into evidence"

P. 995, 21, 25: "MacLeish" should be "McAlees"

P. 1002, 14: "unconditional" should be "conditional"

P. 1003, 11: "the 251 fund" should be "the 261 fund"

P. 1003, 12: "970" should be "97"

P. 1003, 20: "153,000" should be "1500/3000"

P. 1004, 10: "assigned" should be "to sign"

P. 1007, 7: "similar" should be "summary"

P. 1007, 12: "phone" should be "plan"

P. 1007, 13: "dopes the" should be "cover of"

P. 1009, 1–2: "was in different sw firsts" should be "suggested Typos first"

P. 1009, 8: "Client's" should be "Respondent's"

P. 1013, 20: "low" should be "old"

P. 1017, 18: "SMA" should be "S&A"

P. 1018, 4: "2022" should be 2025"

P. 1023, 20: "second" should be "separate"

P. 1024, 10: "bother" should be "borrow"

P. 1025, 4: "20–2016" should be "261"

P. 1027, 24: "Local 216 plan" should be "Local 261 plan"

P. 1030, 9: "302" should be "ERISA"

P. 1053, 24: "set up" should be "settled"

P. 1058, 8: "stilling" should be "still"

P. 1063, 25: "we don't" should be "we have"

P. 1071, 20: Respondent's Exhibit Number 185 "Withdrawn" should be "Admitted"

P: 1085, 25: "Wagaski" should be "Bugaski"

Volume 2, throughout: "Low" should be "Lowe"

Volume 2, throughout: "Osterle" should be "Oesterle"

Volume 8, throughout: "Ramierz" should be "Ramirez"