**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NANCY WILSON, *Regional Director,* *for and o/b/o the NLRB*, | ) ) ) | |
| Petitioner, | ) ) | 2:24-cv-01166-CB |
| v. | ) ) | Judge Cathy Bissoon |
| PG PUBLISHING CO., INC., | ) ) | |
| Respondent. | ) | |

**ORDER**

Petitioner's Third Amended Petition (Doc. 82) for injunctive relief under Section 10(j) will be denied. The Motion (**Doc. 97**) for leave to file an amicus brief will be denied, as an improper attempt to rehabilitate the evidence. Finally, Respondent's Motion (Doc. 89) to dismiss will be denied as moot.

The undersigned is aware of the gravity of these matters, and has great sympathy for the affected employees. Many of them have dedicated years, decades or their adult lives in service of their vocation, and the PG. The consequences bear upon the financial stability of them and their families. There are few things more serious.

As much as we might wish otherwise, market forces care not a whit. Few newspapers have been able to sustain the print model that, for over a century, served the needs of ownership, employees and readers. History is littered with the remnants of once sustainable industries laid to waste by "advances," shifts in market forces or both. Some towns and cities have been hollowed out. With advances in AI, questions loom as to who will remain standing when the dust has settled. For most, a belief that their job functions will remain unaffected, and their

performance is irreplaceable, requires good doses of naïveté and denial.  Should any person work long enough, he or she must expect that job functions, in whole or in part, will radically change or dissipate.  Like stable workers before the horseless carriage, switchboard operators before the smart phone and factory and warehouse workers before automation, father time remains undefeated.

Those affected are well aware of the realities.  It is one thing to understand it, and quite another to experience it.  Questions will linger regarding who – among ownership, management and rank and file employees – should bear the brunt.  The effects, depending on one's financial condition, are disparate.  Obviously, the Court is in no position to dictate the answers.  To favor or disfavor a side, based on such considerations, would be judicial activism at its most obvious.  The Court must focus on the legal issues and standards.  The question is whether Petitioner has satisfied the standards in *McKinney*.  She has not.  In reaching the first critical element – likelihood of success on the merits – it is game over.

Before explaining why, some context is warranted.  The Court is uncertain whether certain legal aspects are discernable to those affected, and the general public.  This litigation has not proceeded in a usual fashion.  From inception to present, Petitioner often has deviated from standard convention.

The original Petition sought relief on behalf of four overarching groups of bargaining units, including multiple sub-units.  Petitioner would explain that this was done because the unions negotiated in unity, as if they were one.  Regardless of the justification, this much is true.  The Court has reviewed dozens, maybe hundreds, of court decisions in this area.  If other cases exist involving petitions of similar breadth, the Court has not seen them.

The complications were exacerbated by Petitioner's litigation practices.  Counsel indiscriminately dumped thousands of pages of administrative records into the docket.  Their approach was so extreme that Petitioner's office could not process the filings through the Court's electronic filing system.  When their choices caused filing difficulties, they ignored instructions and attempted to make it the Clerk of Court's problem.  This resulted in repeated rebukes, which continued to present.[1]  Even had Petitioner been flawless in execution, what counsel submitted was entirely unmanageable.  It would have taken weeks, months, maybe years for the Court to digest the materials to the extent it could make use of them.

At the Hearing, which was expected to be completed in one day, Petitioner's evidentiary productions related almost exclusively to the hardships suffered by union members as a result of losing health insurance coverage.  Their testimony was credible, compelling and it showed the human consequences resulting from this difficult situation.  Sadly, it did not speak at all to critical showings required of Petitioner, most obviously, a likelihood of success on the merits.  Rather, counsel hoped the Court would rely on the voluminous administrative records dumped into the docket.  While that may have sufficed before *McKinney* (although not in the way submitted), afterward it clearly did not.

---

[1] *See* text-Order at Doc. 6 (Petitioner's staff were advised, repeatedly, that the combined file size of their exhibits was too large to docket as a single entry; that they should break up the exhibits and file them separately; they ignored these instructions, instead mailing a flash drive to the Clerk's Office; the Court directed the Clerk to return the flash drive; and Petitioner was advised that the exhibits would not be filed until compliance was achieved); text-Order at Doc. 7 (identifying multiple further instances of non-compliance with ECF protocols, which had the force of law by Standing Orders of Court); text-Order at Doc. 50 (requiring Petitioner to "file/refile ALL affidavits of . . . testifying witnesses," because the Court "already ha[d] spent too much time hunting for needles in haystacks"); text-Order at Doc. 57 (allowing amendment under strict instructions, in anticipation of further difficulties); *and* text-Order at Doc. 80 (again ordering Petitioner's office to review the Court's ECF procedures after continued noncompliance).

Petitioner having rested, this normally would have been the end of the matter. Petitioner had not come close to meeting her burdens, and the request for an injunction would have been denied at that point. Nevertheless, over Respondent's strenuous objection, the Court agreed to continue the Hearing given the importance of the matters involved. Petitioner received one more bite at the proverbial apple.

Meanwhile – both before and after what turned out to be "Day 1" of the Hearing – unfavorable decisions regarding Petitioner's healthcare recovery rolled in. Frankly, Petitioner's focus on this aspect seemed (and seems) odd, given the way things have trended. More than once, Petitioner attempted to "amend" around the unfavorable decisions. Again, this is fairly unusual. To a legal observer, it appeared a classic case of the tail wagging the dog.

Now, after two continuances and multiple opportunities for evidentiary production, Petitioner is no closer. Her prime witness, union counsel Joseph Pass, was not credible, and the Respondent witnesses' accounts were significantly more believable. They testified that, for the vast majority of the relevant negotiations, Mr. Pass was not even present. *See, e.g.*, Doc. 85 at 110 (Mr. Pass was not involved in Advertisers negotiations until they went on strike in October, 2022); *id.* at 126 (for the Pressmen, he was uninvolved for two years, joined the negotiations and promptly terminated them); *and id.* at 151 (no involvement in Mailers negotiations).[2] His inability to recall specifics was consistent, and the difficulties ran deeper than common fading of memory. His contemporaneous communications reflected a similar lack of familiarity. *See, e.g.*, Doc. 85 at 93-95 (Mr. Pass denied having reneged on prior agreements, but admitted his lack of familiarity, both during the relevant time frame and presently).

---

[2] The Hearing transcripts are filed at Docs. 53, 85 and 96. Of the three entries, only the first one (Doc. 53) has cleared request-for-redaction protocols. The other two are expected to be released on April 14, 2025 (Doc. 85) and April 28, 2025 (Doc. 96).

While Mr. Pass may believe he was helping, his involvement seems akin to lobbing a bomb into the negotiations and sauntering away. Indeed, on one occasion, Mr. Pass seemed to do just that — dropping in to completely undermine already resolved issues with what could only be viewed as regressive bargaining. Doc. 85 at 95-96, *id.* at 142-43; *see also id.* (when asked about regressiveness, during negotiations and at the Hearing, Mr. Pass responded, "I don't know," and "I can't recall."). Credible evidence suggests that headway was being made, until Mr. Pass inserted himself and all gains were surrendered.

The Court understands that lawyer services do not come cheap. Mr. Pass testified that the unions made a financial decision not to employ him "all the time," but instead had him act as a consultant. Doc. 85 at 12-13. Half measures sometimes prove less effective than no measures, and – on the present record – it is hard to conclude that value was added.

In light of these determinations, Mr. Pass's impressions regarding the bargaining process are immaterial. The Court finds, by a preponderance of the evidence, that he was not sufficiently involved. The Court also finds credible the testimony of PG negotiator Michael Oesterle that he was told Mr. Pass lacked authority to bargain. Doc. 96 at 62-63 (Mr. Pass's authority was restricted to the NLRB litigation). While Mr. Pass tried his darnedest, his testimony simply was not helpful. The witness cannot be faulted for not knowing what he does not know. The bigger problem was Petitioner's decision to offer him as a sole witness regarding the bargaining process at issue in this case.

Mr. Pass's post-Hearing attempts at rehabilitation, through amicus filings, are rejected. Obviously, such filings are not intended for the submission of additional information, let alone to rehabilitate competent, unfavorable evidence. The Court is discomforted by this attempt – and his assertions are not supported by sworn statements. The Court does not wish the forest to

be lost for the trees, however.  Given the Court's evaluation of the *competent* evidence, Mr. Pass's post-Hearing assertions lack credibility.  This final play, ironically, is consistent with his pattern of involvement described above — namely, insinuation to no good effect.

As for health care benefits/coverage, no amount of goalpost-moving can salvage the theory.  The Court finds, by a preponderance of the evidence, that Respondent has not been shown to have bargained in bad faith.  The Court finds unconvincing Mr. Pass's suggestion that the 2020 healthcare agreement was signed under something akin to legal duress.  *Cf.* Doc. 85 at 91.  And the Court finds credible Mr. Osterle's testimony that the unions had agreed to pay the 5% increase in contributions; and Mr. Pass's later denial was problematic.  Doc. 96 at 70-71.

Moreover, the Court finds that Respondent consistently made overtures to bargain regarding the terms and conditions of employment in its new — and inevitable — digital environment (including effects bargaining).  *See. e.g.*, Doc. 44-1 at pgs. 6-13 (various letters, dated Jun. 26, 2018 through June 11, 2024, inviting discussions).[3]  In contrast, the Court finds that the bargaining units thwarted bargaining efforts again and again.  Doc. 53 at 67-68; Doc. 85 at 118-19, 140-46; Doc. 96 at 50, 75-76; *cf. id.* at 75 ("This was one of the strangest negotiations, and I've been doing this 36 1/2 years[, t]his was a union who . . . absolutely refused to respond to the proposals.").  Indeed, at one point, Mr. Pass — presumably speaking on behalf of all the relevant unions — indicated that all bargaining would cease until COVID was over.

---

[3]  Petitioner takes the position that Respondent's bargaining efforts here were illusory.  The Court does not agree.  The terms offered by Respondent, as recounted in detail through the testimony of its representatives, were made in light of the realities of the PG's move to a digital platform.  The terms balanced those realities with a desire to continue the employment of as many workers as possible, for as long as possible.  While some of the proposals may, superficially, have seemed less advantageous to the unions, the Court finds credible the rationales offered by PG's negotiators as to why such provisions were necessary under these circumstances.  Doc. 85 at 113-23.  If the unions believed that PG's concerns could be addressed through alternative means, that is why there are negotiations.

Doc. 85 at 144; *see also id.* (attempting, on direct examination by Petitioner's counsel, to massage his written statement, to unconvincing effect). While it is unclear whether Mr. Pass realized that COVID would likely never be over, the rest of the universe worked with existing and new technologies to get important work done. Mr. Pass somehow decided that the unions here would throw in the towel. It is difficult to reconcile Petitioner's assertions of bad faith with Mr. Pass's wholesale bargaining roadblock.

In sum, Petitioner has failed to show, by a preponderance of the evidence, a likelihood of success on the merits. The Court is aware that multiple ALJs have found Respondent to have engaged in bad faith bargaining in significant respects; and that the Board has affirmed the ruling as to the Guild. Under *McKinney*, however, this Court is charged with an independent duty to assess the requirements before injunctive relief will issue. The law will continue to develop, as courts and counsel grapple with the quantum and type of evidence required under *McKinney*. Of one thing the Court is certain, however: it cannot be a "rubber stamp." Mr. Pass's involvement aside, Petitioner cannot meet her burdens by attaching thousands of pages of administrative records and assuring the Court, it is in there somewhere.

As to parties' longstanding labor disputes, the undersigned has seen only the tip of the iceberg. It is unrealistic to believe that the Court's understanding will ever be commensurate with those of the parties and their representatives. The undersigned notes, however, that there are reasons for the truism, where there is smoke, there often is fire. The multiple findings of bad faith bargaining against the PG certainly leave no shortage of smoke. Based on what has been offered in *this* case, however, the PG does not hold a monopoly on causes for breakdown. Nothing can be achieved when one side takes their ball and goes home.

While the affected employees likely will be disappointed with this result, a couple things should be kept in mind. First, any relief here, by definition, would be temporary. A Section 10(j) injunction expires upon the issuance of a Board decision and order. Second, they may question whether protracted litigation is the best course. Leadership have faced the unenviable position of sharing hard truths, and it may have seemed better to put on a strong face.

But good outcomes are not served by a burying of heads in the sand. As recounted in Respondent's proposed Fs & Cs, which are incorporated by reference, the reduction in print days would leave swaths of employees short of a five-day work week. Doc. 101 at ¶¶ 89-95 (Advertisers); *id.* at ¶¶ 204-209 (Mailers); *and id.* at ¶ 247-255 (Pressmen). If the unions' position is that the PG must pay employees for five days when they only have two days of work, that does not seem a reasonable expectation.

As for the reduction in print days, the genie cannot be put back in the bottle. And, with the growing trend of jurisprudence limiting the scope of monetary recovery,[4] it is hard to see why continued embroilment in litigation is superior to meaningful effects bargaining. The latter is tailor made. *See generally* 10 Emp. Coord. Labor Relats. § 36:52 (Feb. 2025) (effects bargaining is intended "to soften the blow of the change and to ensure that employees do not have to absorb all its harsh effects") (citation omitted).

Ample pre-implementation notice has been provided, and Respondent consistently has expressed a willingness to negotiate. Mr. Pass, on the other hand, withdrew, citing years of intractability. *See* Doc. 85 at 99-100 (the unions would not negotiate because prior efforts were "fruitless," "worthless," and "absolutely [had] been futile for eight years"). No one likes to fall

---

[4] NLRB v. Starbucks Corp., 125 F.4th 78, 96-97 (3d Cir. 2024) (rejecting the recovery contemplated in Thryv, Inc., 372 NLRB No. 22 (Dec. 13, 2022)).

8

victim to "rope-a-dope." Trepidation is healthy, and blind faith naïve. Should the unions refuse to engage, however, the Court wonders what is the end game, and how will it serve the best interests of the workers?

While the bitter taste of bad experience does not readily evaporate, there appear signs that this time may be different. PG's counsel offered to open its books to union leadership, so they could see the scope of the problem. Doc. 85 at 109- 110; Doc. 96 at 61-62. No action was taken. Counsel surely are familiar with scenarios wherein unions have sought to compel such production. *See generally* NLRB v. New Assocs., 35 F.3d 828, 832 (3d Cir. 1994) (citations omitted). The PG's offer of transparency should not be dismissed out of hand. That union representatives declined suggests that the financial realities were well understood.[5]

While intractability may result from any number of things, an inability to move beyond past sins is ubiquitous. As the hardships of industrial advances are not always felt equally, neither are the consequences of paralysis. If the employees feel like Charlie Brown and the football, the evidence in this case calls into question whether the PG is "Lucy," or the only Lucy.

The undersigned cannot grant injunctive relief on this record. Petitioner has not demonstrated a likelihood of success on the merits. The Court does not reach the remaining *McKinney* factors. The Third Amended Petition (**Doc. 82**) for injunctive relief is **DENIED**;[6]

---

[5] Because the Court considers the point a significant one, it will indulge Mr. Pass's post-Hearing submission to this limited extent. Mr. Pass does not dispute that the PG offered to show union representatives its books, he merely notes that those individuals no longer are with the union. Doc. 98 at 10-11. Why this development should be construed against Respondent is unclear. That Respondent declined to extend the invitation to Mr. Pass himself is, within the context described above, understandable.

[6] Petitioner has not requested further leave to amend, and she has more than enough bites at the apple. The dismissal is with prejudice.

Respondent's Motion (**Doc. 89**) to dismiss is **DENIED AS MOOT**; and the Motion (**Doc. 97**) for leave to file an amicus brief is **DENIED**. Final judgment under Rule 58 will issue.

    IT IS SO ORDERED.


February 13, 2025                                                s/Cathy Bissoon
                                                              Cathy Bissoon
                                                              United States District Judge

cc (via ECF email notification):

All Counsel of Record